# EXHIBIT 1

# EXHIBIT 1

CODE $1425
MARK H. GUNDERSON, LTD.
Mark H. Gunderson, Esq.
Nevada Bar Number 2134
Mark A. Hughs, Esq.
Nevada Bar No. 5375
6121 Lakeside Drive, Ste. 230
Reno, Nevada 89511
(775) 829-1222

Attorneys for John Carstarphen

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

John Carstarphen,                                        Case No.    CV03  01402

                              Plaintiff,   Department No. 6

    vs.

Richard Milsner, as a shareholder and Treasurer of
American Medflight, Inc., John A. Dawson, as a
shareholder and President of American Medflight,
Inc., American Medflight, Inc., a Nevada
corporation, Reno Flying Service, Inc., a Nevada
Corporation, DOES 1 through 10 and
CORPORATIONS 1 through 10,

                              Defendants.

_____/

**VERIFIED COMPLAINT**

Plaintiff John Carstarphen, by and through his undersigned counsel, states and alleges:

**GENERAL ALLEGATIONS**

1.      John Carstarphen ("Carstarphen") is, and was at all times relevant to this action, a

resident of Washoe County, Nevada.

2.      Defendant Richard Milsner ("Milsner") was at all times relevant to this action, a

resident of Contra Costa County, California.

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

1

EXHIBIT 1

1    3.    Defendant John A. Dawson ("Dawson") was at all times relevant to this action, a
2  resident of Washoe County, Nevada.

3    4.    American Medflight, Inc. ("American Medflight") is, and was at all times relevant
4  to this action, a Nevada corporation, in the business of operating an air ambulance out of Reno
5  and Elko, Nevada.

6    5.    Reno Flying Service, Inc. ("Reno Flying Service") is, and was at all times relevant
7  to this action, a Nevada corporation.

8    6.    The true names and capacities, whether individual, corporate, associate or
9 otherwise of Defendants Does and Corporations 1 through 10, inclusive, are unknown to
10 Carstarphen, who therefore sues those Defendants by such fictitious names. Carstarphen is
11 informed and believes, and alleges, that each of the Defendants designated by such a fictitious
12 name is in some manner responsible for the events and happenings referred to and proximately
13 caused foreseeable damage to Carstarphen. Carstarphen shall ask leave of the Court to amend
14 this Complaint to show their true names and capacities when the true identities of the fictitious
15 Defendants have been ascertained.

16    7.    At all times relevant to this action, the Defendants, and each of them, were the
17 principals, employers, associates, co-venturers, agents and/or employees of one another and were
18 acting within the purpose and scope of their agency and employment with the authorization
19 and/or permission of their principal and/or employer. Each Defendant has ratified and approved
20 the acts of his agent and, at all material times, each of the Defendants was responsible in some
21 manner for the acts and conduct alleged in this Complaint.

22    8.    Carstarphen owns thirty-three and 1/3 percent (33 1/3 %) of American Medflight's
23 issued stock. Milsner owns approximately thirty three and 1/3 percent (33 1/3%) of American
24 Medflight's issued stock and Reno Flying Service (of which Milsner is the majority shareholder)
25 owns thirty point eighty three percent (30.83%) of American Medflight stock and Dawson owns
26 the remaining stock, equal to approximately two and one half percent (2 ½ %).

27
28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511

2

1    9.    Milsner and Dawson are the only shareholders of Reno Flying Service; Milsner

2    owns ninety six and one quarter percent (96 1/4 %) of Reno Flying Service's issued stock and

3    Dawson owning the remaining three and three quarter percent (3 3/4 %).

4    10.    On or about September 24, 1997, Carstarphen signed a Loan Guaranty ("1997

5    Guaranty") with the Pioneer Citizens Bank of Nevada for the benefit of American Medflight. By

6    signing the 1997 Guaranty, Carstarphen personally exposed himself to liability on the principal

7    amount of $1.75 million dollars.

8    11.    On or before September 2000, Reno Flying Service lost its line of credit with

9    Nevada State Bank.

10    12.    On or before September 2000, Dawson utilized the 1997 Guaranty to obtain a

11    loan for Reno Flying Service from the Pioneer Citizens Bank of Nevada in various amounts from

12    September 2000 to February 2003; the maximum of which was $281,800. However, Dawson's

13    actions were not ratified by American Medflight nor were there any corporate resolutions to

14    obtain same. More importantly, as Carstarphen is personally liable on the 1997 Guaranty,

15    Dawson did not obtain Carstarphen's consent. Moreover, no mention of the need for the loan to

16    Reno Flying Service, or discussion of any related expenses, was brought up at any of American

17    Medflight's Annual Shareholders' meetings or Board of Directors' meetings held between

18    February 2000 and the present.

19    13.    On or about September 14, 2002, the Board of Directors of American Medflight

20    held a meeting where the topic of refinancing two planes was discussed. As there was no

21    apparent need for the refinancing, Carstarphen voted no to the resolution. The resolution,

22    however, passed with Milsner and Dawson voting yes.

23    14.    On or about October 7, 2002, Carstarphen requested certain information

24    pertaining to American Medflight pursuant to Nevada law. Milsner denied Carstarphen's request

25    informing Carstarphen that he did not comply with applicable Nevada law.

26    15.    Consequently, Carstarphen engaged the assistance of legal counsel to prepare his

27    request for information. Carstarphen then resubmitted his request, fully complying with the

28    requirements set forth in Nevada Revised Statute ("NRS") 78.257 by attaching an Affidavit

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

3

1  attesting to the basis for the request.  On January 17, 2003, Milsner again denied Carstarphen's

2  request, reiterating that Carstarphen did not comply with the applicable statute.

3      16.   It is not practicable nor is it worthy for Carstarphen to submit his complaint

4  regarding disclosure of corporate records before American Medflight's Board of Directors as

5  both Dawson and Milsner are interested parties.  Thus, any such submittal by Carstarphen would

6  be futile and to no avail.

7      17.   Additionally, on or about November 18, 2002, Carstarphen began receiving

8  "monthly billing" statements for a "bank loan guarantee" from American Medflight.  Carstarphen

9  had not been given any explanation for the billing statements, nor did Carstarphen have any idea

10  as to why he was being billed.

11      18.   American Medflight's tax returns for the years 2000 and 2001 show a deduction

12  for "consulting fees" in the amount of $60,000 each year.  To date, Carstarphen is informed and

13  believes that an approximate amount of $275,000 have been paid out in "consulting fees" to

14  Reno Flying Service.  As an American Medflight Shareholder and a member of its Board of

15  Directors, Carstarphen is not aware of any consulting fee nor was the topic ever broached at any

16  of the Board of Directors' meetings.  Moreover, Carstarphen is not aware of the nature of the

17  consultation given or the necessity for same.

18      19.   American Medflight's Income Statement for twelve months ending December 21,

19  2002, show additional questionable costs and expenses.  As an American Medflight Shareholder

20  and a member of its Board of Directors, Carstarphen questions the large amounts paid out for

21  certain expenses, including but not limited to, amounts paid for equipment aircraft rental, aircraft

22  maintenance and labor, accounting (Reno and Elko), legal fees (Reno and Elko), and promotion-

23  meals (Reno).  Additionally, there is a great disparity between the amounts written off for

24  American Medflight Reno and that written off for American Medflight Elko.

25      20.   On or about February 13, 2003, Carstarphen received a faxed notice from Dawson

26  as to a meeting of American Medflight's Shareholders and Board of Directors to be held the

27  following Monday, February 17, 2003.  As the notice was not in compliance with American

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
5121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

4

1  Medflight's corporate by-laws, Carstarphen declined to attend and requested compliance with the
2  by-laws as to meeting notices.

3      21.    As a result of the actions of Dawson and Milsner, it is not practicable for
4  American Medflight to carry on its business, and Carstarphen has suffered damages.

5                               **FIRST CLAIM FOR RELIEF**

6            **(Injunctive Relief Compelling Disclosure Pursuant to NRS 78, *et seq.*)**

7      22.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
8  Complaint and incorporates the same by reference as if fully set forth at this point.

9      23.    As an American Medflight shareholder and Board of Director member,
10  Carstarphen is entitled to inspect and have access to all corporate records upon written demand
11  pursuant to applicable Nevada law. Carstarphen has made a written demand to inspect and
12  access American Medflight's corporate records, which demand was in full compliance with the
13  applicable statutes. However, Milsner denied Carstarphen's request on January 17, 2003.

14      24.    Milsner's denial of Carstarphen's request was willful and in contravention of
15  applicable Nevada law.

16      25.    As a direct and proximate result of Milsner's actions, Carstarphen has been
17  damaged in an amount in excess of $10,000.00, together with interest, costs and attorneys' fees.

18      26.    Under the circumstances, Carstarphen is entitled to injunctive relief compelling
19  Milsner to disclose American Medflight's corporate records to Carstarphen, pursuant to his
20  request.

21                              **SECOND CLAIM FOR RELIEF**

22                    **(Breach of Fiduciary Duty and Self-Dealing)**

23      27.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
24  Complaint and incorporates the same by reference as if fully set forth at this point.

25      28.    Dawson and Milsner are obligated to act in good faith and with due regard to the
26  interests of the other shareholders of American Medflight.

27      29.    By their actions, including those which benefit Reno Flying Service, to the
28  detriment of American Medflight, Dawson and Milsner have violated American Medflight's by-

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

5.

1 | laws and harmed American Medflight and Carstarphen, in breach of their fiduciary duties as
2 | members of American Medflight.

3 |     30.    By their actions, including those which benefit Reno Flying Service, Dawson and
4 | Milsner have engaged in self-dealing and other conduct in breach of their fiduciary duties to
5 | American Medflight and its member Carstarphen.

6 |     31.    As a direct and proximate result of Dawson and Milsner's breach of fiduciary
7 | duties, Carstarphen has suffered damages in an amount in excess of Ten Thousand dollars
8 | (10,000.00).

9 |     32.    Dawson and Milsner's breach of fiduciary duties are intentional and fraudulent,
10 | for which actions Carstarphen is entitled to recover exemplary damages.

11 | ### THIRD CLAIM FOR RELIEF

12 | ### (Breach of Contract)

13 |     33.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
14 | Complaint and incorporates the same by reference as if fully set forth at this point.

15 |     34.    By their actions, Dawson and Milsner have breached American Medflight's
16 | Articles of Incorporation and Corporate By-Laws, thus harming American Medflight as well as
17 | Carstarphen.

18 |     35.    As a direct and proximate result of Dawson and Milsner's breach of fiduciary
19 | duties, Carstarphen has suffered damages in an amount in excess of Ten Thousand Dollars
20 | ($10,000.00).

21 | ### FOURTH CLAIM FOR RELIEF

22 | ### (Declaratory Relief)

23 |     36.    An actual controversy has arisen and now exists between Carstarphen and
24 | Dawson and Milsner concerning their respective rights and obligations.

25 |     37.    Carstarphen desires a judicial determination of the parties' rights and duties.

26 |     38.    A judicial declaration is necessary and proper at this time under the circumstances
27 | in order that the parties may determine their rights and duties.

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6171 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

6

1

## FIFTH CLAIM FOR RELIEF

2

### (Dissolution)

3      39.      Carstarphen realleges the allegations contained in the preceding paragraphs of this

4  Complaint and incorporates the same by reference as if fully set forth at this point.

5      40.      It is not reasonably practicable to carry on the business of the corporation in

6  conformance with its organizational and operational documents.

7      41.      Under the circumstances, dissolution of American Medflight should be ordered in

8  conformance with NRS Chapter 78.

9

## SIXTH CLAIM FOR RELIEF

10

### (Appointment of a Receiver)

11      42.      The circumstances above described require the appointment of a receiver to

12  oversee the American Medflight's business pending resolution of the case by the court.

13      43.      The appointment of a receiver is necessary and proper at this time under the

14  circumstances, in order that the corporation's property, real and personal, are protected during the

15  pending litigation.

16

## SEVENTH CLAIM FOR RELIEF

17

### (Accounting)

18      44.      Carstarphen realleges the allegations contained in the preceding paragraphs of this

19  Complaint and incorporates the same by reference as if fully set forth at this point.

20      45.      Under the circumstances, it is just and reasonable for an accounting by American

21  Medflight of its financial status, including but not limited to an accounting of its assets,

22  liabilities, capital accounts and finances to be ordered.

23      WHEREFORE, Carstarphen prays for:

24      1.      An Order for Injunctive relief compelling Milsner and/or Dawson to disclose

25  American Medflight's corporate records pursuant to NRS Chapter 78;

26      2.      Judgment for Carstarphen and against Defendants on all claims of this Complaint;

27      3.      A judicial declaration of the parties' rights and obligations;

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
3121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

7

1      4.      Dissolution of American Medflight, Inc. and distribution of corporate assets

2    according to proof;

3      5.      Judgment for Carstarphen and against Defendants on the dissolution claim;

4      6.      An accounting;

5      7.      The appointment of a receiver to oversee American Medflight's business pending

6    resolution of this litigation;

7      8.      An award of exemplary and punitive damages for Carstarphen and against

8    Defendants, according to proof, on all claims of the parties;

9      9.      An award of damages for Carstarphen and against Defendants, according to proof.

10     10.     An award of interests, costs and attorney's fees to Carstarphen and against

11   Defendants;

12     11.     For such other and further relief as the Court deems just and proper.

13     DATED this _____ day of March, 2003.

14                                          MARK H. GUNDERSON, LTD.

15

16                          By:     _____
                                    Mark H. Gunderson, Esq.
17                                  Nevada State Bar No. 2134
                                    Mark A. Hughs, Esq.
18                                  Nevada State Bar No. 5375
                                    Attorneys for John Carstarphen
19

20

21

22

23

24

25

26

27

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
5121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

8

## VERIFICATION

1

2  STATE OF NEVADA      )
                        ) ss:
3  COUNTY OF WASHOE     )

4

5      JOHN CARSTARPHEN, being first duly sworn, deposes and says:

6      That he is a Plaintiff in the above-entitled action; that he has read the foregoing

7  **VERIFIED COMPLAINT** and knows the contents; that the same is true of his own knowledge,

8  except for those matters stated upon the information and belief, and as to those matters, he

9  believes them to be true.

10

11     Executed in ___R ε ℵ o___, Nevada this 3RD day of March, 2003.

12

13                              _John Caustarph_____

14                              JOHN CARSTARPHEN

15  SUBSCRIBED and SWORN to before
16  me this 3rd day of March, 2003.

17  _Danielle L. Howman_____
    NOTARY PUBLIC

18  My commission expires on: ___5|2|06___.

19

20          DANIELLE L. HOWMAN
            Notary Public - State of Nevada
21          Appointment Recorded in Washoe County
            No: 91-2623-2 - Expires May 2, 2006
22

23

24

25

26

27

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

9

# EXHIBIT 2

# EXHIBIT 2

CODE 3370

# FILED

APR 2 8 2008

HOWARD W. CONYERS, CLERK
By: _____
DEPUTY CLERK

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

JOHN CARSTARPHEN,

          Plaintiff,

vs.

                             Case No. CV03-01402

                             Dept. No. B6

RICHARD MILSNER, et al.,

          Defendant.
_____/

AND ALL RELATED MATTERS.
_____/

## ORDER

    Richard L. Milsner filed a motion to dismiss, pursuant to NRCP 41(e). John Carstarphen filed an opposition.

    The Court finds this matter was not brought to trial within the five-year time period of NRCP 41(e). The Court finds the stipulation to set trial beyond the five-year deadline was silent on the issue of the NRCP 41(e) and, therefore, was insufficient to extend or toll the deadline. *See Prostack v. Lowden*, 96 Nev. 230, 606 P.2d 1099 (1980). The Court further finds the stay, contained in the parties' stipulation of August 13, 2007, stayed only motion practice and discovery, but did not prevent the parties from bringing this action to trial. The Court further notes, that while no order or stipulation lifted the stay, the parties proceeded with discovery and motion practice. Finally, the Court finds its order of December 14, 2007, was ineffective, as it was based upon an error of law and the Court lacked jurisdiction to extend or toll the deadline of NRCP 41(e).

-1-

EXHIBIT 2

1    Accordingly, Milsner's motion to dismiss is granted.

2    DATED: This _28_ day of _April_____, 2008.

3

4    _____
                    DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | <div align="center">CERTIFICATE OF SERVICE BY MAILING</div> |

1  CERTIFICATE OF SERVICE BY MAILING

2  Pursuant to NRCP 5(b), I hereby certify that I am an employee of the Second Judicial

3  District Court, in and for the County of Washoe; and that on this _____ day of April,

4  2008, I faxed a true and correct copy of the attached document addressed as follows:

5  Patrick King, Esq
   J. Scott Russo, Esq.
6  1677 Lucerne St., #B
   Minden, NV 89423
7
   Richard G. Hill, Esq.
8  652 Forest Street
   P.O. Box 2551
9  Reno, Nevada 89505

10

11

12  Heidi Boe
    Administrative Assistant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

# EXHIBIT 3

# Carstarphen vs Milsner

Condensed Transcript of
the Deposition of:

# John Carstarphen

**Date:** April 13, 2004

Peggy Hoogs & Associates
Certified Court Reporters & Videoconferencing
435 Marsh Avenue
Reno, NV  89509
(775) 327-4460
Fax: (775) 327-4450
depos@powernet.net

EXHIBIT 3

Page 77

1    Q  Of--
2    A  Of Aero Medcare.
3    Q  What else?
4    A  The dates when the consulting and-- consulting
5    started.
6    Q  You're referring to the consulting fee?
7    A  Yes.
8    Q  Okay. What else did you look into in
9    preparation for this deposition?
10   A  That's all.
11   Q  That's it?
12   A  Yeah.
13   Q  When did the consulting fee begin?
14   A  1998.
15   Q  Were you still employed at the time at American
16   Medflight?
17   A  I believe I was.
18   Q  Okay. You say that the salary-- I asked you
19   what monies were taken out of American Medflight that
20   should be repaid, and you said salary and compensation
21   since 1998. Anything else?
22   A  That's all I can think of right now.
23   Q  Okay. Whose salary?
24   A  That's a good question. This is monies paid to
25   Reno Flying-- It's not salary, it's called consulting

Page 78

1    and support.
2    Q  Okay. So just so we're clear, when you said
3    salary, you did not mean to state that any monies paid
4    to any person in the form of wages--
5    A  No.
6    Q  --should come back?
7    A  No.
8    Q  My statement is correct?
9    A  Yes.
10   Q  Okay. When you said compensation, what you
11   were referring to was this consulting fee business?
12   A  Yes.
13   Q  Okay. And just so we're clear, let's look at
14   Exhibit 2. This--
15   MR. CASHILL: Do you want to stretch?
16   THE WITNESS: No, I'm fine.
17   BY MR. HILL:
18   Q  I'm having trouble reading upside down. It
19   says consulting and support.
20   MR. GUNDERSON: We're looking at Exhibit 2?
21   MR. HILL: We are, sir.
22   BY MR. HILL:
23   Q  Is that what you're referring to?
24   A  Yes, I am.
25   Q  And you say that began in 1998?

Page 79

1    A  Yes.
2    Q  When did you first discover that this-- Was it
3    called consulting and support in 1998?
4    A  I believe it was.
5    Q  And how did you discover that it was being
6    paid?
7    A  When I saw one of the financial statements.
8    Q  Do you recall when in 1998?
9    A  It was the later part of '98 or middle of '98.
10   Q  Do you recall when the payments started to be
11   made? Do you know when they started to get made?
12   A  The middle of '98.
13   Q  And what did you do when you found this item on
14   this financial statement that you saw?
15   A  I asked Rich Milsner what this was.
16   Q  And what did Mr. Milsner tell you?
17   A  He told me that it was a fee to go to him for
18   the extra risk that he was taking in the company.
19   Q  Did you ask him what risks he was referring to?
20   A  Well, we had a discussion. And I said, "About
21   the risk," I said, "I'm taking a risk, too."
22   Q  Okay. Did you voice your objection to
23   Mr. Milsner at that time?
24   A  Yes, I did.
25   Q  Did you send Mr. Milsner a letter voicing your

Page 80

1    objection?
2    A  No.
3    Q  Did you memorialize your objection at that time
4    in any fashion?
5    A  No, other than talking with Jack and Rich.
6    Q  And it was your understanding that this
7    consulting and support was paid to Milsner?
8    A  It was paid to Reno Flying Service.
9    Q  Okay. By that time was Reno Flying Service
10   billing American Medflight at its normal rate that it
11   would charge its other customers, do you know?
12   A  No.
13   MR. GUNDERSON: For--
14   MR. HILL: Anything.
15   BY MR. HILL:
16   Q  Do you know?
17   A  No.
18   Q  Had American Medflight paid its balance owed to
19   Reno Flying in full at that time, do you know?
20   A  At what time? In 1998?
21   Q  Yes, sir.
22   A  I don't see anywhere on here the liability of
23   Reno Flying Service.
24   Q  What are you looking at, sir?
25   A  Exhibit 3.

Page 85

1   A  No.
2   Q  Okay.  Is there anything else on that document
3   that isn't true?
4   A  It says on here that I terminated my
5   employment; and that's not true.
6   Q  Okay.  Anything else?
7   A  I believe everything else is correct.
8   Q  Do you believe that you are entitled to any
9   compensation whatsoever for having been terminated as
10  an employee of American Medflight?
11  A  Like what?
12  Q  Did American-- did you have an employment
13  agreement with American Medflight?
14  A  No.
15  Q  Was American Medflight justified in terminating
16  you?
17  A  In my opinion?
18  Q  Yes, sir.
19  A  No.
20  Q  Okay.  What were you told was the reasons you
21  were being terminated?
22  A  I wasn't given any reasons.
23  Q  None whatsoever?
24  A  I don't believe so.
25  Q  Okay.  Who told you you were terminated?

Page 86

1   A  Jack Dawson.
2   Q  What did he tell you?
3   A  That you're terminated.
4   Q  What did you say?
5   A  I don't know what I said.
6   Q  You did-- did you ask for an explanation?
7   A  Probably did.
8   Q  Did he give you one?
9   A  No, not to my knowledge.
10  Q  Okay.  Was there anything about that event that
11  is relevant to any of the compensation you seek in this
12  lawsuit?
13  A  None.
14  Q  Okay.  Did you-- You heard Mr. Dawson's
15  testimony that the employees at American Medflight had
16  an opinion concerning alcohol, your use of alcohol in
17  particular?
18  A  Yes.
19  Q  Did you hear that?
20  A  Yes.
21  Q  Did anybody ever voice that to you while you
22  were at American Medflight?
23  A  Yes.
24  Q  And who was that?
25  A  Jack Dawson.

Page 87

1   Q  Anyone else?
2   A  No one else.
3   Q  Did there ever come a time when any employee of
4   American Medflight asked not to fly with you or refused
5   to fly with you?
6   A  No.
7   Q  Were the suspicions about your using alcohol
8   well-founded?
9   A  No.
10  Q  You deny them?
11  A  Yes.
12  Q  Are you still a director?
13  A  You already asked that.  Yes.  The answer was
14  yes.
15  Q  Okay.  When was the last directors' meeting?
16  A  I believe it was in December.
17  Q  Who prepared-- Were there minutes prepared?
18  A  Yes.
19  Q  Who prepared them?
20  A  I did.
21  Q  Did they accurately reflect what was discussed?
22  A  I believe so.
23  Q  Is it your opinion--
24  A  Both Rich and Jack signed them.
25  Q  Is it your opinion that American Medflight is

Page 88

1   being mismanaged?
2   A  Yes.
3   Q  Can you tell me in what respects?
4   A  I think that it's being mismanaged because of
5   self-dealing with Reno Flying Service.
6   Q  Okay.  Anything else?
7   A  No.
8   Q  Is the self-dealing with Reno Flying Service to
9   which you refer the consulting fee?
10  A  That's part of it.
11  Q  What else?
12  A  Aircraft rental, maintenance.  American
13  Medflight spends three quarters of a million dollars
14  with Reno Flying Service every year that I don't think
15  is necessary.
16  Q  Do you mean to-- Did I understand you to say
17  that Reno Flying Service is taking three quarters of a
18  million dollars per year from American Medflight
19  without cause?
20  A  I didn't say without cause.
21  Q  Okay.  Are you-- is it your testimony that Reno
22  Flying Service is overcharging American Medflight?
23  A  I think it's self-dealing.
24  Q  Okay.  What do you mean by "self-dealing"?
25  A  It's own interests, I think there is no

Page 93

1    THE WITNESS: 2002, I believe.
2        MR. CASHILL: I've done the same and I can't find
3    it. There are-- there are some page omissions.
4    Perhaps--
5        MR. GUNDERSON: There's no page omissions, counsel.
6    I believe that those records are, in fact, in the
7    records that have been produced.
8        MR. CASHILL: There are pages missing from--
9        MR. GUNDERSON: If you'll give me a list of those,
10    I'll check my records and make sure that you get them
11    if we have them.
12        MR. CASHILL: What we're both saying is that
13    there's no copy of the demand by Mr. Carstarphen. If
14    you have that and can fax it to us today for this
15    deposition, it would help us tremendously.
16        MR. GUNDERSON: Do you have a page number?
17        MR. CASHILL: I don't.
18    BY MR. HILL:
19    Q   Who did you send it to?
20    A   I believe I sent it to-- I don't know who I
21    sent it to.
22    Q   Had you consulted with Mr. Gunderson prior to
23    sending that letter?
24    A   No.
25    Q   Had you consulted with any lawyer prior to

Page 94

1    sending that letter?
2    A   Prior to sending that letter?
3    Q   Yes, sir.
4    A   I believe I did.
5    Q   Who?
6    A   Marvin Murphy.
7    Q   Okay. Did you receive a response to your
8    request?
9    A   Yes, I did.
10    Q   From whom?
11    A   I believe it was Rich Milsner.
12    Q   And what was that response-- what was the
13    substance of that response?
14    A   Substantially it said that I had to have an
15    affidavit in accordance with Nevada Revised Statutes to
16    release that information to me.
17    Q   And did you provide such an affidavit?
18    A   Yes, I went to Mr. Murphy and he--
19        MR. GUNDERSON: Hold on. I want to caution you, no
20    conversations that you had with-- Whatever you told
21    Mr. Murphy, whatever Mr. Murphy told you is covered by
22    the attorney/client privilege.
23        THE WITNESS: Okay.
24        MR. GUNDERSON: So I don't want you to invade that
25    privilege and tell anybody what you said to Mr. Murphy

Page 95

1    or what Mr. Murphy said to you.
2        THE WITNESS: Okay. Mr. Murphy prepared the
3    affidavit for me.
4    BY MR. HILL:
5    Q   And what did you do with it?
6    A   I gave it to, I believe, Mr. Milsner or Dawson.
7    Q   I don't recall having seen that document.
8    A   Okay.
9    Q   Did you get a response from either Mr. Milsner
10    or Mr. Dawson to that document?
11    A   Yes.
12    Q   What was the response?
13    A   The response was that it didn't comply with
14    Nevada state law.
15    Q   And what, if anything, did you do as a result
16    of that information?
17    A   What could do I?
18    Q   So the answer to my question then is you did
19    nothing in response to the reply from either Dawson or
20    Milsner, is that correct?
21    A   That's correct.
22    Q   Okay. Tell me everything that Mr. Milsner has
23    done for which you believe you are entitled to
24    compensation.
25    A   I believe that the consulting and support

Page 96

1    should be paid back to the company.
2    Q   Okay. Is there anything else in your opinion
3    that Mr. Milsner has done that was inappropriate in
4    relation to American Medflight?
5    A   I think the self-dealing with Reno Flying
6    Service--
7    Q   Okay.
8    A   --is inappropriate.
9    Q   Anything else?
10    A   That's it.
11    Q   Okay.
12    A   Right now.
13    Q   By the self-dealing what do you mean, the
14    consulting and the rental? Anything else?
15    A   And the maintenance.
16    Q   Okay. Maintenance, rental and the consulting.
17    What about the maintenance is inappropriate?
18    A   I believe that there's nothing that Reno Flying
19    Service is doing for American Medflight that American
20    Medflight can't do for itself.
21    Q   Does--
22    A   I mean, American Airlines does not contract out
23    their maintenance, they do it themselves.
24    Q   Okay. Does American Medflight have mechanics
25    on staff?

# EXHIBIT 4

# EXHIBIT 4



PROCTOR DAVIS
and Company
Certified Public Accountants

February 14, 2006



EXHIBIT
**3O**

Mark Gunderson
Mark H. Gunderson, Ltd.
5345 Kietzke Lane #200
Reno, NV 89511

> Re: John Carstarphen v American MedFlight and Reno Flying Svc., et. al.
> Case #CV 03-01402

Dear Mr. Gunderson:

In mid 2004 we were enga_ _d to assist you in the above-referenced matter. At that time, after review of the pleadings and case to-date, and conferences with you, your office, and John Carstarphen, we developed a work program with procedures to perform to assist you in the case and ascertain the possible damages to John Carstarphen. As you are aware, there has been a serious lack of cooperation in regard to providing complete documents and information from which to prepare certain analysis and reports. There is an overabundance of information, and some of the information has been duplicated, while in other areas there is a complete lack of information available, with no explanation as to why documents and information would be missing.

What follows is a preliminary discussion of what was performed, with initial results and conclusions. We reserve the right to amend this report as more additional information becomes available, which would more fully report the financial transactions and position, and may change the conclusions and information in this report.

We have previously provided you the initial list of documents and information, which in our judgement, would be necessary to prepare a comprehensive analysis of the financial aspects of the case. What was provided, from the other side, makes any type of initial analysis incomplete, because of the missing information. The information which has been requested that is still missing or has not been provided, is listed on **Exhibit B** and includes tax returns, general ledgers, and general ledger account detail.

Because of the over 200 boxes of files and records located at the hangar's of American Medflight and Reno Flying Service, during the inspection and tagging of information to be provided we limited the amount of records requested to those accounts which were relevant to the transactions of the issues involved in this case. That is, we did not request the complete general ledger records of each account, for each month. A number of those accounts were irrelevant for the tasks in which we were engaged. Upon inspection of the records it became obvious that while some months were very complete and detailed, including having multiple copies and runs of general ledgers and other supporting documentation, there were other months in which the records were incomplete, and there was not the full detail available. What is interesting and suspicious about the records, is that some can be so complete, and meticulous and duplicative, and for others, and for certain time periods there are gaps and a dearth of information. We have worked around those gaps of missing or incomplete information to the best of our ability to arrive at our preliminary conclusions.

RFS 02220

Bank of America Plaza • 50 West Liberty Street, Suite 805 • Reno, Nevada 89501-1948 • 775-323-2577 • fax: 775-323-5942 • e-mail: cpa@proctordavis.com

EXHIBIT 4

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 2

Reno Flying Service, Inc. was organized in 1991 and American Medflight, Inc. was organized in 1993, at which time they began conducting business between each respective company. During the initial years John Carstarphen performed a number of tasks in managing American MedFlight, including the billing, until 1999 when he was terminated.

There was or is an agreement between the companies that American Medflight will pay Reno Flying Services $5,000 per month for a management agreement. We find no evidence that such an agreement was in writing. During the period 1998-2004 $390,000 was paid by American Medflight to Reno Flying Service per the management agreement as consulting. Each year they paid the total of $60,000 ($5,000 per month), with the exception of 2003 in which $55,000 was paid, 2002 in which $65,000 was paid, and 2004 in which $65,000 was paid. It is possible that the cause of those differences are only timing differences, though we cannot conclude such.

Since 1999, when Mr. Carstarphen left, we noted that American Medflight had two large expenditures in engine overhauls, in 2002 for $139,500 and 2004 for $576,263. Other observations during the period subsequent to Mr. Carstarphen leaving, insurance totals $827,969 for the period 1999-2004 ($137,984 average). Repairs and maintenance totals $1,854,469 for the period, (average of $309,078). We noted in 2004, in addition to the $576,263 in engine overhaul, $680,418 was expended toward repairs and maintenance.

We prepared a comparison of the tax returns available for Reno Flying Service and American Medflight, (**Exhibits D & E**). Further, we also compared the tax returns to the financial statements (**Exhibit F**). We had to prepare this analysis in total because each year's complete, detailed, general ledger was not available. Without such it isn't possible to compare specific amounts between general ledger, financial statements and tax returns.

An analysis of the Cost of Goods, as reported on the tax return is at **Exhibit Q**.

Based upon our review of the tax returns for American Medflight, please note the following observations:

1. In 2000 & 2001 there were $333,000 & $286,000, respectively, of bad debts. We are unsure as to what these items are, but the General Ledger denotes a description of "Write Off Reno/Elko".

2. In 2004 there was an increase in salaries and wages by over $90,000.

3. The rent doubled in 2000, from 1999, which now averages approximately $30,000 per year.

4. Though not specifically identified, but identified as pension and profit sharing, it appears that the possible ESOP contributions for 2003 were $177,197 and in 2004 were $185,461. This is in addition to $34,665 of accrued pension in 2004.

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 3

   5.   While minimal to none in prior years, in 2002 - 2004 legal and accounting fees
        increased significantly. **Exhibit R** details expenses for those years that were
        provided. The detail for 2002-2004 hasn't been provided.

        | a. | 1998 | $ | 549 |
        |----|------|---|------|
        | b. | 2000 | | 17,633 |
        | c. | 2001 | | 5,423 |
        | d. | 2002 | | 13,786 |
        | e. | 2003 | | 76,356 |
        | f. | 2004 | | 89,636 |

   6.   In 2004 $9,870 was paid in Director's fees. Based upon the records available
        it cannot be determined to who these fees were paid.

   7.   In 2004 the office expense doubled to $38,391.

   8.   In 2004 the utilities and telephone doubled to $69,828, thus representing 5.7%
        of total expenses of the Company, a significant increase.

   9.   There are large miscellaneous, unidentified expenses in 2003 & 2004 of $8,638
        and $24,944, respectively.

   10.  The only years that Officer's Compensation was specifically identified and
        separated on the tax return were 1999 for $3,000 and 2000 for $18,000.

   11.  From 2002 to 2003 there was an $88,527 increase in insurance expense,
        representing a 63% increase.

   12.  In years prior to 2002, there were no pre-paid expenses. Beginning in 2002
        there were pre-paid expenses, including 2004 whereby $549,964 was identified
        as pre-paid expenses, long term. There is no detail available that indicates
        what those amounts might be.

   13.  In 2004, the cash in bank and certificates of deposit was $426,654.

   14.  As discussed, there were fluctuations in the cost of goods sold, it is possible
        the Company was building up expenses to reduce income.

   15.  Taxes (again without any detailed explanation) represents a very high
        percentage of payroll, more than just payroll taxes. We cannot determine if
        any of these are sales taxes or excise taxes.

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 4

16. There have been no S Corporation distributions (dividends). It is ordinary business practice for S Corporations to periodically distribute to shareholders accumulated retained earnings. At the very least to distribute retained earnings to the shareholders for the payment of the income taxes associated with those earnings.

17. As you are aware, there have been changes to the stock percentages, these changes are reported on **Exhibit H**. These stock percentages do not include any changes or dilution due to implementation of the ESOP. Further, discussion of the ESOP is below.

The reason the aforementioned is important is that since Mr. Carstarphen's absence from the company it's possible that there has been conduct by some of the insiders and related parties to the detriment of Mr. Carstarphen. This could include insurance not competively bid, possible additional expenses, unnecessary equipment and expenses, certain self-dealing transactions, and possibly the inflation of expenses. Those would reduce the net income of the company thereby reducing the potential value of the company, reduce the cash flow of the company and possibly divert monies to other companies.

Based on the above observations and what might be considered unusual or non-recurring expenses, and income, and asset and liability amounts we've attempted to normalize the earnings of the company as illustrated on **Exhibit I**. Barring reasonable, additional explanations for the above aberrations or documentation and information, the normalized earnings may more accurately report the financial operations of the company.

**Exhibit G** recaps the rental payments to Reno Flying Service by American Medflight.

**Exhibits O & P** report the transactions to related parties (insiders and other parties of interest). Amounts paid to Reno Flying Service were larger than the rent payments, as reflected on **Exhibit G**, due to payments to Reno Flying Service for re-imbursements of labor, of which we do not have sufficient detailed analysis. These amounts were not considered for any "normalization of earnings". They are reported for your information to determine what, if anything, be considered as a result of these amounts. We are continuing to analyze the transactions between American Medflight and Reno Flying Service.

We received from Mr. Carstarphen one page of the ESOP valuation prepared in 2004 by Sansome Street Appraisers, Inc., without the underlying support and analysis for the four income approaches used. It is impossible to determine if they are reasonable. The bulk of the judgment by the appraisal company involved in each of the income methods revolves around the development of the capitalization and discount rates. In addition to weighing those areas, the weight assigned each year in the capitalization of weighted earnings and what to capitalize is a matter of judgment. There has not been provided any analysis concerning the weights given each year so it cannot be determined the reasonableness of the weighting.

RFS 02223

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 5

The ESOP by definition is a minority shareholder. Prevailing valuation theory applies minority discount before the marketability discount. The ESOP valuation as presented applies the marketability discount before the minority discount. However as multiplication is commutative the net results would be the same, the presentation is just backward from what is normally considered prudent. IRS Revenue Ruling 59-60 discourages the use of the combination or weighting of methods except in some special cases such as in ESOPS. Further research needs to be performed in this area to determine *if this* ESOP falls into the special case category that Revenue Ruling 59-60 only allows in special cases. Revenue Ruling 59-60 is the established tax law in tax valuation cases and states as follows:

> "Because valuations are not made on the basis of a prescribed formula, it is difficult for the various, applicable factors in a particular case to be assigned mathematical weights in deriving fair market value. For this reason, no useful purpose is served by taking an average of several factors (for example, book value, capitalized earnings and capitalized dividends) and basing the valuation on the result. **Such a process excluded active consideration of other pertinent factors, and the end result may not be supported by a realistic application of the significant facts in the case except by mere chance**. (Emphasis added)

> "This statement if valid and as such, the use of the combination or averaging of methods except for some special cases such as in ESOPS, is discouraged."

Thus the value adjusted for marketability as reported in the summary page of the valuation at $6,297,000.00 has not been adequately proved for purposes of this litigation. Further, as discussed above ESOP valuations are based on different formulas, criteria, and assumptions than a traditional business valuation. Often, because of the strict ERISA and IRS requirements, and the conservative nature the valuation of stock for an ESOP can result in a lower stock value than other business valuations.

The value of American Medflight as performed for purposes of the ESOP may be calculated correctly based upon the information provided to the Appraisal company. However, given the aforementioned questionable items the amounts used for the calculations may need to be adjusted. If company earnings have been misstated or don't accurately reflect "normal" earnings then the valuation could be incorrect even though the calculations, assumptions and methodology could be correct.

As a general observation, the 2004 (which might be for 2003) ESOP valuation does seem to be a more accurate reflection of the company's "value" than the 1999 value as prepared by the business broker, Corporate Investment International of Nevada.

RFS 02224

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 6

By definition an ESOP has a minority interest in the stock of a company. Thus, our calculation of potential damages includes the ESOP valuation of the company with the minority interest calculation. Had John Dawson's stock reverted to the corporation as treasury stock instead of to Richard Milsner, John Carstarphen's stock ownership percentage would've increased beyond the 33% to 50%. Even owning 50% of the company would not result in using the percentage of the full value of the company, there would still need to be some discount for lack of control.

Because the valuation of the company would've been performed for ESOP purposes, albeit they may need to be adjusted, full complete copies of the valuation for 2003, 2004 and 2005 should be requested.

Without all of the information on the ESOP including the valuations, it is impossible to determine if all the requirements and fiduciary duties are being met and adhered to. There has not been provided a detailed accounting of what the ESOP includes or what Mr. Carstarphen's portion is. Nor, can it be determined if Mr. Milsner has any interest in the ESOP.

From the initial documentation received and based on the condition of the records when we first prepared analyses and recaps, there were a number of abnormalities with relationships to the different amounts reported, and even some strange relationships between ratio's. Upon further examination of the multitude of information and as a result of reconstruction of some of the transactions we were able to satisfy ourselves that most of the unusual relationships could be explained or were items of inconsistent reporting.

Our analysis and review of the records did not include a review of the time and billing records, patient records/charts, or trip sheets.

Based upon the information submitted to date, and considering the missing documentation the potential damages to Mr. Carstarphen are as follows:

|  | Normalized Earnings | As Actually Reported |
|---|---|---|
| Ownership interest based on ESOP value | $2,676,000 | $1,766,160 |
| Undisbursed Equity, American Medflight (S-Corp) | 665,049 | 297,405 |
| S-Corp distributions, for the payment of corporate taxes on the individual income tax return | 358,103 | 104,092 |
| Projected 2005 individual income tax liability, due to the payment of C-Corporation dividends | 19,500 | 19,500 |
|  | $3,718,652 | $2,187,157 |

The above amounts are further recapped on **Exhibit A.**

RFS 02225

Mark Gunderson
Mark H. Gunderson, Ltd.
February 14, 2006
Page 7

As Mr. Carstarphen's remuneration was limited, we did not prepare any damages for lost wages.

As recently as late January 2006, Mr. Carstarphen reported to us that he received a $130,000 dividend check and $60,000 worth of payroll from American Medflight. We don't know the reason as to why he received these monies, but have computed them into the affect on the damages, primarily the income tax that he will be responsible for paying on the C Corporation dividends of $130,000 that was paid to him.

In addition to receiving much more complete information, including explanations and answers to the points raised, thus far, I would recommend that the 2005 corporate income tax return, financial statements, detailed general ledger, and accountant workpapers and ESOP valuation be provided well in advance of trial.

As more information becomes available, these amounts may significantly differ, we reserve the right to change our report. By using the above it may further assist you in inquiries of the defendant's appropriate personnel.

Respectfully submitted,

James S. Proctor, CPA, CFE
PROCTOR, DAVIS & Co.

/bka

RFS 02226

# EXHIBIT 5

# EXHIBIT 5



**PROCTOR DAVIS**
*and Company*
Certified Public Accountants

April 18, 2008

Mr. J. Scott Russo
King & Russo, Ltd.
1677 Lucerne Street, Suite B
Minden, NV  89423

      Re:   Carstarphen v. Milsner
             Case No. CV 03-01402

Dear Mr. Russo:

We have been provided additional documentation and information subsequent to our draft report of February 2006.  Based upon our review and analysis of such, we have determined that the amount of unauthorized transactions paid by American MedFlight (AMF) to Reno Flying Service (RFS) is approximately **$6,509,829**, based upon the information available.  Refer to Exhibit A.

Further, had AMF purchased one additional aircraft instead of renting such from RFS it would've had an additional projected cash flow of approximately **$1,427,765** as outlined on Exhibit B.

Mr. Carstarphen's stock ownership was diluted in 1998 as outlined on Exhibit C.  Had AMF redeemed that Mr. Dawson's stock instead of Mr. Milsner, Mr. Carstarphen's ownership in AMF would've been 50% instead of $33^{1/3}$%.  Thus, he would've received an $195,000 dividend check in 2006 instead of $130,000, a difference of **$65,000**.  As outlined on Exhibit D.

Respectfully, submitted this 18th day of April, 2008.

James S. Proctor, CPA, CFE
PROCTOR, DAVIS & Co.,
Certified Public Accountants

/bka

5420 Kietzke Lane, Suite 108 • Reno, Nevada 89511 • 775-323-2577 • fax: 775-323-5942 • e-mail: cpa@proctordavis.com

EXHIBIT 5

# EXHIBIT 6

# EXHIBIT 6

1           IN THE SECOND JUDICIAL DISTRICT COURT **ORIGINAL**

2                   OF THE STATE OF NEVADA

3                IN AND FOR THE COUNTY OF WASHOE

4                           -oOo-

5    JOHN CARSTARPHEN,

6               Plaintiff,
                                        Case No.:  CV03-01402
7         vs.
                                        Dept. No.  6
8    RICHARD MILSNER, as a shareholder
     and Treasurer of American
9    Medflight, Inc.; JOHN A. DAWSON,
     as a shareholder and President
10   of American Medflight, Inc.;
     AMERICAN MEDFLIGHT, INC., a
11   Nevada Corporation; RENO
     FLYING SERVICE, INC., a
12   Nevada Corporation, DOES 1
     through 10 and CORPORATIONS
13   1 through 10,

14              Defendants.
     _____/
15

16

17              DEPOSITION OF JAMES S. PROCTOR

18   taken on behalf of Defendant Richard Milsner, at the

19   offices of Richard G. Hill, 652 Forest Street, Reno,

20   Nevada, at 9:25 a.m., Tuesday, April 22, 2008, before

21   Jerry J. Silven, a Notary Public, pursuant to notice.

22

23

24

25   Reported by:                    JERRY J. SILVEN, CCR #55

1      A      Yeah, being the end of the day I don't

2  think I could explain it very well.

3      Q      A put being the right to compel someone to

4  purchase?

5      A      Right.

6      Q      Are you aware of the existence of such a

7  right to Mr. Carstarphen as to anybody or any entity?

8      A      No.  The bylaws, as I said, talked a right

9  of first refusal.

10     Q      And did you find any documents that you

11  think unambiguously showed that the conduct -- that the

12  insiders, that the unauthorized transactions were truly

13  to the detriment to Mr. Carstarphen?

14     A      Yes.

15     Q      We talked about all of those instances

16  today.  Have we talked today about all of the opinions

17  that you have pertaining to Mr. Carstarphen's damages?

18     A      No.

19     Q      What other opinions do you have?

20     A      Like I said, if we were provided more

21  information, like if you decided you wanted to volunteer

22  some of the information that I have requested and would

23  like, I could have some more opinions.

24     Q      Well, I understand that, and what I'd like

25  to know is, the opinions that you hold as you sit here

1   today, have we talked about all the opinions that you

2   have pertaining to Mr. Carstarphen's damages?

3       A      Let's go through them and see.   There's the

4   consulting fee.   There's the line of credit.   There's the

5   dividend.   There's the repairs and maintenance.   There's

6   the purchase versus lease.   There's some type of

7   compensation or interest on the line of credit.

8       Q      We have the Dawson stock being retired?

9       A      The Dawson stock, possible debt that

10  Milsner may have incurred with AMF, maybe not.  Maybe not

11  a payback.  We don't know about that $130,000 that we

12  discussed earlier.

13              MR. HILL:  Feel free to chime in, Mr. King.

14              MR. KING:  We've got the issue of the

15  bylaws requiring two signatures.

16              MR. HILL:  Understood.  That's a river of

17  gristle running through this whole thing.  But I

18  appreciate the comment, yes.

19              THE WITNESS:  I think that's pretty much

20  it.

21  BY MR. HILL:

22       Q      As you sit here, you're not aware of any

23  other opinions relative to Mr. Carstarphen or his

24  damages.

25       A      No.

228

1                    CERTIFICATE OF REPORTER

2

    STATE OF NEVADA      )
3                        )         ss:
    COUNTY OF WASHOE      )

4

5           I, JERRY J. SILVEN, a duly commissioned Notary
    Public, Washoe County, State of Nevada, do hereby
6   certify:

7           That I reported the deposition of the witness,
    JAMES S. PROCTOR, commencing on Tuesday, April 22, 2008,
8   at the hour of 9:25 a.m.;

9           That prior to being examined, the witness was by
    me first duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth; that I thereafter
    transcribed my said shorthand notes into typewriting and
11  that the typewritten transcript of said deposition is a
    complete, true and accurate record of testimony provided
12  by the witness at said time.

13          I further certify (1) that I am not a relative or
    employee of an attorney or counsel of any of the parties,
14  nor a relative or employee of any attorney or counsel
    involved in said action, nor a person financially
15  interested in the action, and (2) that pursuant to NRCP
    30 (e), transcript review by the witness was not
16  requested.

17          IN WITNESS WHEREOF, I have hereunto set my hand
    in my office in the County of Washoe, State of Nevada,
18  this 17th day of June        , 2008.

19

20

21
                        Jerry J. Silven, CCR #55

22

23

24

25

# EXHIBIT 7

# EXHIBIT 7

ORIGINAL

**CODE 3880**
1 | MARK H. GUNDERSON, LTD.
Mark H. Gunderson, Esq.
2 | Nevada State Bar No. 2134
3 | 6121 Lakeside Dr., Ste. 230
Reno, NV 89511
4 | (775) 829-1222
Attorney for John Carstarphen
5
6
7
IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
8
IN AND FOR THE COUNTY OF WASHOE
9
JOHN CARSTARPHEN,                                          Case No. CV03-01402
10
Plaintiff,                                    Dept. No. 6
11
12 |                v.
13 | RICHARD MILSNER, as a shareholder and
Treasurer of American Medflight, Inc., JOHN
14 | A. DAWSON, as a shareholder and President
of American Medflight, Inc., AMERICAN
15 | MEDFLIGHT, INC., a Nevada corporation,
RENO FLYING SERVICE, INC., a Nevada
16 | Corporation, DOES 1 through 10 and
17 | CORPORATIONS 1 through 10
18 |                Defendants.
_____/
19
RICHARD MILSNER, JOHN A. DAWSON,
20 | and AMERICAN MEDFLIGHT, INC., a
Nevada corporation,
21
22 |                Counterclaimants,
23 |                v.
24 | JOHN CARSTARPHEN,
25 |                Counterdefendant.
26
_____/
27 | ///
28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

1

EXHIBIT 7

**PLAINTIFF/COUNTERDEFENDANT JOHN CARSTARPHEN'S RESPONSES TO DEFENDANT RENO FLYING SERVICE, INC.'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

When and how did you discover that your personal guarantee had been used to facilitate any grant of credit to Reno Flying? Please identify all documents showing same and/or your first communication of such discovery to any other party to this litigation.

**RESPONSE TO INTERROGATORY NO. 1:**

Carstarphen received weekly financial summaries from December 31, 1999 to February 6, 2003, at which time Richard Milsner (Milsner) and Jack Dawson (Dawson) refused to provide further financial information regarding American Medflight (AMF). These financial summaries contained the following information: Money Market Account Balance, Accounts Receivable, Accounts Payable to Reno Flying Service (RFS), Line of Credit Balance, Collections for the month, Reno Crew Flights for the month, Elko Crew Flights for the month, N111KV Loan Balance (Aircraft Loan) and N789CH Loan Balance (Aircraft Loan). Carstarphen's records from December 31, 1999 until May 22, 2000 reflect a zero balance for the Line of Credit, which have been previously identified as CAR0525 - CAR0542. On or about September 18, 2000, the Line of Credit Balance reflected $70,000, and the Money Market Balance of $120,185.73 previously identified as CAR0524. At this time, Carstarphen questioned Dawson as to why they were borrowing $70,000 when they had $120,185.73 in the Money Market Account. Dawson responded that RFS had lost their Line of Credit with Nevada State Bank (NSB) and therefore needed operating money. Carstarphen further questioned Milsner and Dawson as to why his Line of Credit was being used for RFS when he had no financial interest in RFS. Carstaphen was summarily dismissed and the practice continued for 2 ½ years until September 9, 2002.

On or about November 30, 2000, the Line of Credit Balance was $90,000 and noted next to the number is "RFS", was previously identified as CAR0517. On or about December 4, 2000 Line of Credit Balance was $90,000 and noted next to the number is "RFS", previously identified as CAR0516. On or about July 30, 2001, the Line of Credit Balance was $24,000 and noted next to the number is "RFS", previously identified as CAR0481. On or about August 31, 2001, the Line of Credit Balance was $56,500 and noted next to the number is "belongs to RFS", previously

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

2

identified as CAR0477. On or about September 4, 2001, the Line of Credit Balance was $56,500 and noted next to the number is "belongs to RFS", previously identified as CAR0476. From September 18, 2000 until February 6, 2003, a weekly balance on the Line of Credit varied in amounts, reflecting a maximum amount of $281,800 on September 30, 2001, previously identified as CAR0403 - CAR0524.

Carstarphen has reviewed no accounting or been provided access to any accounting from AMF, RFS, Dawson or Milsner as to who paid the interest on this Line of Credit for 2 ½ years. Since it was AMF Line of Credit, he would assume AMF paid the interest unless shown otherwise. If anything happened to RFS during this period, Carstarphen would have been personally liable for the entire balance $281,800 to NSB. Furthermore, Milsner and Dawson could have increased this liability to a maximum of $1,750,000 in which Carstarphen signed as a personal guarantee with NSB without his consent. There was no Board of Director approval for the execution of the personal guarantee. Those with knowledge of the foregoing are as follows: John Carstarphen, Dawson, Milsner, Linda Reed, Will Geyer and Jim Brown.

**INTERROGATORY NO. 2:**

If you contend that you suffered any loss, cost, damages or harm of any kind (all collectively referred to as "harm") or make any payment as a proximate result of the matters referenced in your complaint, please:

    a) State each incident to which you refer and contend any harm was suffered or payment made;

    b) State all actions and omissions to act which comprise each incident and/or how same caused any alleged harm;

    c) Show, in full, all calculations setting forth all harm suffered or payments made as a proximate result of any act or omission to act identified;

    d) Identify each document or thing showing or tending to show any harm suffered or payment made as a proximate result of any matters referenced in your complaint;

    e) Identify each and every communication by which you expressed objection to the alleged use or misuse of the guarantee referenced in your complaint.

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

3

## RESPONSE TO INTERROGATORY NO. 2:

Objection.  The complete financial books and records of AMF have not been made available for inspection.  Accordingly, this response cannot be complete until full access to the complete books and records of AMF have been made available for inspection.  Without waiving that objection, it is clear that there is no distinction between AMF, RFS and Milsner.  AMF has been and is profitable, yet the profits have been siphoned off for the benefit of Mr. Milsner and not paid to Carstarphen.  Among the acts of self-dealing and siphoning of profits, include:

1)      RFS in using a Line of Credit of AMF.  Since Carstarphen was personally liable to a maximum of $281,800, this figure was his potential loss exposure.  The amount of interest paid by AMF during the 2 ½-year period on the Line of Credit used by RFS.  The amount is unknown to Carstarphen but should be paid back to AMF.  There was no Board of Director approval for the foregoing.  People with knowledge of the foregoing are Dawson, Milsner, Linda Reed, Will Geyer and Jim Brown.

2)      In 10 years of business, approximately $1 million dollars has been paid to R. L. Milsner Insurance (which is owned by Milsner) for all AMF's insurance without a competitive bid of any kind in the 10 years.  When Carstarphen requested competitive bids, he was summarily dismissed.  The 2000 Income Tax Return shows an insurance expense of $88,842 and the 2001 Income Tax Return show an insurance expense of $108,775.  Competitive bids for all 10 years and the difference if any should be paid back to AMF.  There was no Board of Director approval for the foregoing.  People with knowledge of the foregoing are John Carstarphen, Dawson, Milsner, Will Geyer and Linda Reed.

3)      AMF pays RFS a Consulting fee each and every month of $5,000.  In 1998 $25,000, 1999 $60,000, 2000 $60,000 (verified by Income Tax Return), 2001 $60,000 (verified by Income Tax Return), 2002 $60,000, 2003 $60,000 and 2004 $20,000.  Totaling $345,000.  There never has been any "consulting" provided by RFS.  Carstarphen further tried to resolve this matter but was summarily dismissed by Milsner and Dawson.  This money needs to be repaid to AMF and an amended Income Tax Returns needs to be filed with the IRS because this is not a legitimate expense.  There was no Board of Director approval for the foregoing.  People

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

4

1   with knowledge of the foregoing are John Carstarphen, Dawson, Milsner, Will Geyer, Jim

2   Brown and Linda Reed.

3       4)    Dawson is the Director of Operations for AMF and RFS. Jim Brown is Director

4   of Maintenance for AMF and RFS. Will Geyer is Chief Pilot for AMF and RFS. These three

5   key management personnel are fully qualified to manage all functions of AMF and RFS. In the

6   last 10 years AMF pay RFS approximately $2.5 million dollars for maintenance service it could

7   do for itself. When questioning the need to pay full mechanic shop rates and mark-up on parts,

8   Carstarphen was summarily dismissed by Milsner and Dawson. RFS does approximately $1.5

9   million dollars per year in revenue of which 50% comes from AMF. This does not make prudent

10  business sense. Hence, RFS should repay to AMF an estimated profit of 20% of the $2.5 million

11  dollars or $500,000 to AMF. There was no Board of Director approval for the foregoing. People

12  with knowledge of the foregoing are John Carstarphen, Dawson, Milsner, Will Geyer, Jim

13  Brown and Linda Reed.

14      5)    Dawson is the Director of Operations for AMF and RFS. Jim Brown is Director

15  of Maintenance for AMF and RFS. Will Geyer is Chief Pilot for AMF and RFS. These three

16  key management personnel are fully qualified to manage all functions of AMF and RFS. AMF

17  pays rental of approximately $3 million dollars for aircraft rented to RFS, which is imprudent.

18  The cost of the aircraft is only $750,000 approximately or about $10,000 per month in payments.

19  AMF could have bought four (4) airplanes for cash with this money paid to RFS. The 2000

20  Income Tax Return shows rental expense of $376,848 and the 2001 Income Tax Return show

21  rental expense of $212,037. This is not prudent business practice. Hence, RFS should repay to

22  AMF and estimated profit of 20% of the $3 million dollars or $600,000 to AMF. There was no

23  Board of Director approval for the foregoing. People with knowledge of the foregoing are John

24  Carstarphen, Dawson, Milsner, Will Geyer, Jim Brown and Linda Reed.

25      6)    Dawson draws a full salary from AMF and RFS, but is only there about 10-15%

26  of the time and one half or more of that is spent with RFS. This salary that is 85-90% of AMF

27  salary should be repaid to AMF. Dawson sold the majority of his shares to Milsner in 1998 and

28  now he gets a "Golden Parachute" of $10,000 a month plus a full salary and does not have to

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

work much.  There was no Board of Director approval for the foregoing.  People with knowledge of the foregoing are John Carstarphen, Milsner, Dawson, Will Geyer, Jim Brown and Linda Reed.

7)    Legal fees paid by AMF on behalf of Milsner and Dawson personally should be repaid to AMF.  There was no Board of Director approval for the foregoing.  People with knowledge of the foregoing are Dawson, Milsner, Linda Reed and Will Geyer.

8)    Personal use of credit cards paid by AMF on behalf of Milsner and Dawson should be repaid to AMF.  There was no Board of Director approval for the foregoing.  People with knowledge of the foregoing are Dawson, Milsner, Linda Reed and Will Geyer.

9)    Carstarphen has a $5,000 credit balance with RFS as a customer of RFS, since December of 2002.  Carstarphen has requested the return of the $5,000, in writing, as a customer of RFS, and his request has been ignored by Milsner and Dawson.  People with knowledge of the foregoing are John Carstarphen, Dawson, Milsner, Will Geyer, Jim Brown and Linda Reed.

10)    In 2002 Carstarphen paid $1,523 to the IRS for taxes owed for AMF alone.  This money came out of his own pocket.  In 10 years of ownership of AMF, he has not received one penny in profits from AMF or Milsner and he had nothing to pay his taxes due the U.S. Government.  AMF is very profitable and averages $2.5 to $3 million dollars in revenue per year.

11)    In the deposition of Dawson on April 12, 2004, Carstarphen learned that Dawson sold his remaining 2-½% of AMF to Milsner in violation of AMF's By-Laws.  The By-Laws require that the stock be offered to Carstarphen and he have an option to buy the shares in proportion to the amount he owns.

This is not a corporation for the benefit of all the stockholders and especially Carstarphen as a minority stockholder.  AMF is Milsner's personal bank account.  All the above are examples of self-dealing by Milsner and Dawson, as well as the illustrations of Carstarphen's damages.  Discovery is continuing and this response is intended to and shall be supplemented.

///

**INTERROGATORY NO. 3:**

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

1    If not identified elsewhere in response to an interrogatory, please state all damages you

2    seek pursuant to the matters alleged in your complaint and all factual bases therefore.

3    **RESPONSE TO INTERROGATORY NO. 3:**

4    See Carstarphen's responses to Interrogatory No. 2.   Discovery is continuing and this

5    response may be supplemented.

6    **INTERROGATORY NO. 4:**

7    Please identify each person you expect to call as an expert witness or consultant at the

8    trial of this matter and, as to each such person, please state the date each such person was first

9    contacted by you or on your behalf, the subject matter upon which such expert or consultant is

10    expected to testify, a summary of the grounds of each opinion, whether a written document or

11    report was prepared by each such expert or consultant and if a written document or report was

12    prepared by such expert or consultant, please identify the same with such specificity as you

13    concede will satisfy a motion to compel production of same.

14    **RESPONSE TO INTERROGATORY NO. 4:**

15    No decision has been made or an expert witness and once a decision is made to retain an

16    expert, this interrogatory will be supplemented.

17    **INTERROGATORY NO. 5:**

18    Describe, as understood by you, the terms and conditions of the relationship between

19    American Medflight, Inc., and Reno Flying Service, Inc. (i.e. what, if anything, did either do for

20    or furnish to the other).   Please identify all documents, which support or memorialize your

21    understanding.

22    **RESPONSE TO INTERROGATORY NO. 5:**

23    See Carstarphen's responses to Interrogatory No. 2.   Dawson is the Director of

24    Operations for American Medflight, Inc. and Reno Flying Service, Inc. and Jim Brown is the

25    Director of Maintenance for American Medflight, Inc. and Reno Flying Service, Inc.  Will Geyer

26    is the Chief Pilot for American Medflight, Inc. and Reno Flying Service, Inc. and together, these

27    three key management personnel are fully qualified to manage all functions of American

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

7

Medflight, Inc. and Reno Flying Service, Inc.   Reno Flying Service, Inc. does nothing for American Medflight, Inc., that American Medflight, Inc. could not do by itself.

**INTERROGATORY NO. 6:**

Please identify each and every item of expense or other entry on any financial statement and/or tax return or other document to which you refer in paragraph 19 of your complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

The items of expense or other entry on any financial statement and/or tax return or other document referred to in paragraph 19 of the complaint include, but are not limited to:

1. Income Statement provided to Carstarphen by Dawson for December 31, 2002 demonstrates discrepancies, previously identified as CAR 0286-0289;

2. the write-off amount for Reno was noted as $92,323.74, while the write-off amounts for Elko was $253,121.55;

3. the Promotional Meal amount for Reno was noted as $1,737.52, while the Promotional Meal amount for Elko was $103.37;

4. the Accounting Expense noted as $9,113.00;

5. the Education Expense noted as $25,854.63;

6. the Legal Expense noted as $4,672.94; and

7. the Salaries Management Expense noted as $102,900.32.

Plaintiff reserves the right to supplement this answer with additional information for Interrogatory No. 6 as it becomes available and/or discovered.

**INTERROGATORY NO. 7:**

State the value which you place on your stock in American Medflight, Inc. If you contend that any of the matters in your complaint have affected that value in any fashion, please state all facts to which you refer and identify documents showing such facts and/or any impact to which you refer.

**RESPONSE TO INTERROGATORY NO. 7:**

See Carstarphen's responses to Interrogatory No. 2.  Once the financial information of

///

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

8

AMF is produced, Carstarphen will be in a position to respond to this interrogatory.  Discovery is continuing.

**INTERROGATORY NO. 8:**

If you are directly or indirectly involved in any business enterprises anywhere in the world, and if any such enterprise employs any former employee of American Medflight, Inc., or Reno Flying Service, Inc., please identify each employee and all documents in that employee's employment file.

**RESPONSE TO INTERROGATORY NO. 8:**

The only former employee of American Medflight, Inc. hired by Carstarphen is identified as Linda Reed, who was initially used as a consultant on a part-time basis, more specifically four (4) hours per day, for an eight (8) month period and with Milsner and Dawson's approval. Carstarphen and Dawson entered into a contract, additionally initialed by Linda Reed, Sandra, Carstarphen and Will Geyer, agreeing to pay American Medflight, Inc. and Reno Flying Service, Inc. a set hourly fee for Linda Reed's services.  After eight (8) months of Reed's employment, Dawson relayed he did not want Reed to work for AHC any longer.  Reed gave notice to American Medflight, Inc. and Reno Flying Service, Inc. and began to work for AHC full-time.

**INTERROGATORY NO. 9:**

State, in full, all relief which you seek against:

a)   Richard Milsner;

b)   John Dawson;

c)   American Medflight, Inc.;

d)   Reno Flying Service, Inc.

**RESPONSE TO INTERROGATORY NO. 9:**

Carstaphen believes Milsner, Dawson and Reno Flying Service, Inc. should return all monies to American Medflight, Inc. diverted to Milsner and Dawson thru Reno Flying Service, Inc. over the last ten (10) years without Board of Director approval. Carstarphen further believes that a receiver should be appointed to run the "day to day" operations of American Medflight,

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

9

1  Inc., the assets of American Medflight, Inc. should be sold off and the stockholders should divide

2  up the proceeds in accordance to their respective stock ownership.

3  **INTERROGATORY NO. 10:**

4      Please state when and how you obtained documents identified as CAR-0014 – CAR-

5  0020.

6  **RESPONSE TO INTERROGATORY NO. 10:**

7      The fax number located at the top of the documents is from DIGRAZIA to American

8  Medflight, Inc./Reno Flying Services, Inc,, more specifically to fax number 1-775-856-5801.

9  For this reason, Carstarphen believes Will Geyer or Dawson gave documents identified as CAR-

10  0014 – CAR-0020 to him on or about October 22, 2002.

11      DATED this _22_ day of April, 2004.

12                                          MARK H. GUNDERSON, LTD.

13

14      By:  _Mark H. Gunderson_

15                                          Mark H. Gunderson, Esq.
                                            Nevada State Bar No. 2134
                                            Attorney for John Carstarphen

16

17

18

19

20

21

22

23

24

25

26

27

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

10

1 <div align="center">**VERIFICATION**</div>

2 STATE OF NEVADA       )
                                          ) ss:
3 County of Washoe      )

4       John Carstarphen, being first duly sworn, deposes and says:

5       That he is the Plaintiff in the above-entitled action; that he has read the foregoing

6 **PLAINTIFF JOHN CARSTARPHEN'S RESPONSES TO DEFENDANT RENO FLYING**

7 **SERVICE, INC.'S FIRST SET OF INTERROGATORIES** and knows the contests thereof;

8 that the same is true of his own knowledge, except for those matters stated upon information and

9 belief, and as to those matters, he believes them to be true.

10       Executed in Reno, Nevada this 22nd day of April, 2004.

11

12                                                           John Carstarphen
                                                                    John Carstarphen

13

14 SUBSCRIBED and SWORN to before
me this 22nd day of April, 2004.

15

16 Sarah E. Steubing
NOTARY PUBLIC for Nevada

17 Commission Expires: Nov. 7, 2007

SARAH E. STEUBING
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No. 03-85164-2 - Expires November 7, 2007

18

19

20

21

22

23

24

25

26

27

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

## CERTIFICATE OF MAILING

I certify that I am an employee of the law office of MARK H. GUNDERSON, LTD., and that on the _22nd_ day of April, 2004, I deposited for mailing in Reno, Nevada, a true copy of **PLAINTIFF/COUNTERDEFENDANT JOHN CARSTARPHEN'S RESPONSES TO DEFENDANT RENO FLYING SERVICE, INC.'S FIRST SET OF INTERROGATORIES,** addressed to:

Wm. Patterson Cashill, Esq.
410 California Avenue
Reno, Nevada 89509

Richard G. Hill, Esq.
652 Forest Street
Reno, Nevada 89509

Tod M. Ratfield, Esq.
Del Beccaro, Ratfield, Hornsby & Blake
800 S. Broadway, Suite 301
Walnut Creek, CA 94596

Sarah E. Steubing

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 200
5345 KIETZKE LANE
RENO, NEVADA 89511
(775) 829-1222

11