KING & RUSSO, LTD
PATRICK O. KING, ESQ., BAR NO. 5034
J. SCOTT RUSSO, ESQ., BAR NO. 6477
1677 Lucerne Street, Suite B
Minden, NV 89423

Telephone No. (775) 783-7500
Facsimile No. (775) 783-7600

Attorneys for Plaintiff John Carstarphen

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA - RENO

| | |
|---|---|
| John Carstarphen, an individual | Case No.: 3:07-cv-00542-ECR-RAM |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RULE 26(a)(2)(B) DISCLOSURE OF EXPERT REPORT** |
| Richard Milsner, an individual and DOES 1 through 10, inclusive. | |
| Defendants. | |

Plaintiff John Carstarphen, by and through his undersigned counsel, submits the Expert Witness Report of James S. Proctor, CPA, CFE attached hereto as Exhibit "A" in compliance with FRCP26(a)(2)(B) and Section (3) of the Scheduling Order

DATED: January 5, 2009        KING & RUSSO, LTD.

By:_____
J. Scott Russo
Attorneys for Plaintiff

-1-



December 31, 2008

Mr. J. Scott Russo
King & Russo, Ltd.
1677 Lucerne Street, Suite B
Minden, Nevada 89423

    Re: **John Carstarphen v. Richard Milsner**
       Case No. 3:07-cv-00542-ECR-RAM

Dear Mr. Russo,

This preliminary report is in response to our engagement concerning the matter of John Carstarphen v. Richard Milsner. Meridian Business Advisors (MBA) was engaged to provide forensic accounting services on behalf of Mr. John Carstarphen (Client) regarding possible damages to the Client in the above-referenced matter.

Comments and observations are based on our professional experience as CPAs and forensic accountants. They are not intended to represent legal conclusions or legal opinions.

## Description of Assignment and Scope of Work

In mid 2004, Mr. James Proctor and his predecessor firm were engaged to assist in the Nevada State District Court companion case to the above-referenced matter. At that time and after review of the pleadings and case to-date, and conferences with his attorney, and John Carstarphen, a work program with procedures to perform was developed to assist in the case and ascertain the damages to John Carstarphen. There has been much dispute and disagreement in providing complete documents and information from which to prepare certain analyses and reports. In some areas there is an overabundance of information, and some of the information has been duplicated, while in other areas there is a complete lack of information, with no explanation as to why documents and information would be missing.

Reno Flying Service, Inc. (hereafter RFS) was organized in 1991 and American MedFlight, Inc. (hereafter AMF) was organized in 1993, at which time they began conducting business between each respective company.

Since 1993, Carstarphen has been the owner of thirty-three and 1/3 percent (33 1/3%) of AMF's issued stock, which is eight hundred (800) shares. Richard Milsner (Milsner) and John Dawson (Dawson), who formed AMF with Carstarphen in 1993, each also, owned 1/3 percent (33 1/3%) of AMF's issued stock. Both Milsner and Dawson are believed to be shareholders in RFS, of which Milsner is believed to be the controlling and majority shareholder.

In 1998, RFS/Milsner purchased Dawson's AMF stock, placing Milsner in control of 2/3 percent (66 2/3%) of AMF's issued stock. In December 2005, Milsner sold the 66 2/3% of AMF's stock he controlled to the AMF Employee Stock Option Plan (ESOP.) The ESOP paid RFS/Milsner a cash down payment and provided a

EXHIBIT "A"

promissory note for the balance of the purchase price. According to the terms of the stock sale agreement to the ESOP, Milsner had AMF guarantee payment of sufficient sums into the ESOP for the ESOP to service its debt to RFS/Milsner, thereby creating a large liability on the financial statements of AMF.

During the initial years, John Carstarphen performed a number of tasks in managing AMF, including the billing. The performance of these tasks continued until 1999 when he was terminated. Since Mr. Carstarphen's absence from AMF, it is possible that there has been conduct by some of the insiders and related parties to the financial detriment of AMF and therefore the financial detriment of Mr. Carstarphen.

## Business Records, Documents, and Information

We have requested documents and information, which in our judgment, would be absolutely necessary to prepare a comprehensive analysis of the financial aspects of the case. What has been provided, from the defendant(s) makes any type of analysis incomplete because of the missing information. Our preliminary report has been prepared based upon an investigation and analysis of the information provided to date. The information and documents provided and relied upon are listed on **Appendix A.**

The following AMF and RFS documents have not yet been provided for our analysis:

- 1998 through 2008 financial statements for RFS.
- 1998 through 2003 and 2006 through 2008 tax returns for RFS.
- 1998 through 2008 general ledger detail for RFS.
- 1996, 1997, 2003, 2004, and 2006 through 2008 financial statements for AMF.
- 2006 through 2008 tax returns for AMF.
- 1999 and 2002 through 2008 general ledger detail for AMF.
- Any AMF ESOP valuations performed subsequent to 2006.
- Form 5500 for ESOP for 2004-2008
- All Forms W-2, W-3 for the 5 year period 2000-2005
- All Forms W-2, W-3 for 2006 – 2008
- Payroll Registers for 2006-2008
- Accountant workpapers for tax returns and any financial statements, including but not limited to intercompany reconciliations and workpapers
- Account detail listing either through the general ledger or any type of internal workpapers or CPA workpapers for:
    - Repair & Maintenance
    - Legal & Professional
    - Management
    - Consulting
    - Outside Services
    - Lease/Rent Expense/Equipment Rental
    - Insurance
- All intercompany billings, statements and/or invoices between AMF & RFS for 2000 - 2008
- ESOP financial statements, benefit statements
- ESOP valuation appraiser workpapers. The known valuation firms are:
    - Sansome Street Appraisers, San Francisco

- M.O. Weinress (later Weinress & Associates), Sausalito
- Year end adjusting journal entries

We were provided access to over 200 boxes of files and records located at the hanger of AMF and RFS in 2004. A number of those files and records were irrelevant for the tasks in which we were engaged. Upon inspection of the records it became obvious that while some months were complete (including having duplicate copies and runs of general ledgers and other supporting documentation) there were other months in which the records were incomplete and full details weren't available. What is interesting and suspicious about the records is that some were complete and meticulous and even duplicative, and others, for certain time periods, contained gaps and a dearth of information. We have worked around those gaps of missing or incomplete information to the best of our ability to arrive at our conclusions. There were no tax returns on site at the offices of AMF at the time of inspection.

While we have been provided AMF tax returns subsequent to 2004, the underlying supporting information and workpapers have not been provided. We also have not been provided any intercompany information between AMF and RFS, including any reconciliations and accountant workpapers.

**Business Valuation**

One critical financial analysis of AMF would be its value, and hence Mr. Carstarphen's stock value. In order to report on such it would be necessary for AMF to prepare a business valuation.

When preparing a business valuation, the appraiser obtains the historical and financial information of the company from several sources, which can include financial statements, tax returns, and the books and records of the company. These documents set forth financial information from which to prepare certain calculations. Typically, at least five (5) years of statements and information is used. A large and critical component of a business valuation includes, normalizing earnings, this typically starts with the historical financial information from the company and adjusts for items that are not ordinary and necessary business expenses, and deemed "discretionary" expenses. Items of income and expenses are adjusted to arrive at adjusted earnings from which to perform the critical calculations necessary to arrive at the value of any closely held company.

If a company is publicly traded, the financial markets can also be used in determining certain critical and key components of the business valuation. In closely held companies the normalized earnings are often compared to industry averages, which can adjust and effect the final valuation of the company. **In companies where there are related entities, insiders, or inter-company accounts, a full and complete understanding and accounting of such needs to be considered. This is why at the initial outset of our request for documents, we requested and stated that RFS information would be critical to any valuation used for damages. The needed information would include, but not be limited to, the inter-company transactions, which would materially affect any type of earnings; as well as, balance sheet analysis and calculations, in calculating a business valuation used for damages.** Even the defendant's ESOP business appraiser recognized the importance and need for such, as he considered and made some adjustments for missing and incomplete information.

One of the primary issues in accounting for inter-company transactions would again be to normalize the earnings, for amounts of income and expenses, and debts and receivables that

might not be indicative of normal operations and not within industry averages. While the allocation of such between companies would not necessarily be fraudulent, or could be for tax and business purposes, those items would not be considered normal and would be considered discretionary and need to be accounted for in a business valuation.

In order to expediently and correctly report on the valuation of AMF, and Mr. Carstarphen's stock interest we requested copies of the business valuations performed by the AMF ESOP business appraiser. The purpose of such was not to use the ESOP business valuations for the stock value but to use such as a starting point in calculating Mr. Carstarphen's stock interest. ESOP's are valued differently than business valuations of companies. However, ESOP valuations are governed by the same professional standards and theories as traditional business valuations. If the ESOP valuations were performed in accordance with professional standards, and the underlying Department of Labor and Treasury regulations, then there would be supporting workpapers that would account for the intercompany transactions and other aforementioned normalizing and discretionary adjustments. This would assist us in computing a value of Mr. Carstarphen's stock interest and would further assist the trier of fact in determining the damages to Mr. Carstarphen. We have not received any of the ESOP appraiser's working papers or support for the amounts included in their ESOP valuation reports.

An analysis of the four (4) ESOP valuations provided by the defendants resulted in a number of discrepancies and inconsistencies between the methods and assumptions used by the ESOP appraisers. Without the appraisers' workpapers it is impossible to determine why there are inconsistencies between the four reports. Further, the methodologies and assumptions used to prepare some reports has resulted in lower, unexplained values of the AMF ESOP, whereby if earlier reporting methods and assumptions had been used, the resulting ESOP value would have been higher.

**Limiting Conditions and Disclosures**

MBA, its officers, directors or employees preparing this report have no present or contemplated financial interest in or with John Carstarphen, Richard Milsner, American Medflight, or Reno Flying Service. Our fees for work on this case are based upon our normal hourly billing rates plus direct costs, and in no way are contingent upon our results or our findings.

Portions of our report and analysis are based on historical financial information provided to us through Mr. Carstarphen and third parties as noted. The information has not been subjected to any audit or review procedures, as promulgated by the American Institute of Certified Public Accountants, by us during this engagement. Accordingly, this report should not be construed, or referred to, as an audit, examination, or review of financial information by MBA or the CPAs associated with MBA. Accordingly, we take no responsibility for the underlying data present in documents, schedules, and worksheets presented or relied upon in this report, which are solely the representations of others. MBA and the persons working on this report are not attorneys and, as such, do not express any legal representations or opinions herein.

MBA, and the experts signing this report reserve the right to amend this report in the event additional documents, pertinent information, and/or other material are discovered subsequent to the submission of this report.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may the report be used for other than its intended purpose. Use of this report is restricted to you

and Mr. John Carstarphen and those persons you and he deem necessary. Therefore, this report should not be used for any other purpose or by anyone not informed on such matters.

**Preliminary Conclusions**

Based upon our review and analysis of the incomplete information provided to-date, we have determined that the amount of unauthorized transactions paid by AMF to RFS for 2005 and 2006 is approximately **$1,850,135 (Exhibit 1)**. We have not been provided any information for 2007 or 2008.

Further, had AMF purchased one additional aircraft instead of renting such from RFS it would have had an additional projected cash flow of approximately **$1,350,727 (Exhibit 2)**. This assumes the same Engine Reserve being accrued by AMF and similar lease amounts paid to RFS as in 2006, because we have not been provided 2007 and 2008 information.

Mr. Carstarphen's stock ownership was diluted in 1998. Had AMF redeemed Mr. Dawson's stock instead of Mr. Milsner, Mr. Carstarphen's ownership in AMF would've been 50% instead of $33^{1/3}$%. Thus, he would have received a $195,000 dividend check in 2006 instead of $130,000, a difference of **$65,000 (Exhibit 3)**.

Our analysis of the records did not include a review of the time and billing records, patient records/charts, or trip sheets. Additionally, as Mr. Carstarphen's remuneration was limited, we did not prepare any damages for lost wages.

Our preliminary report does not include accrued interest on any amounts determined to be owed to Mr. Carstarphen.

We reserve the right to amend this report if additional and more complete information becomes available, which would more fully report the financial transactions and position, and could change the conclusions and information in this report. We therefore reserve the right to change our report and testimony.

**Respectively Submitted,**

MERIDIAN BUSINESS ADVISORS

*[signature]*

**James S. Proctor, CPA, CFE**

**Director**

**Appendix A**
**CARSTARPHEN LITIGATION**
**DOCUMENTS CONSIDERED**

<u>American MedFlight</u>
    Company Articles of Incorporation and
    Bylaws.
    Board of Director's minutes.
    Financial Statements - 1995, 1998 through 2002, and 2005.
    Tax Returns - 1995 through 2005.
    General Ledger Detail - 1995 through 1998, 2000 and 2001.
    ESOP valuations:
        (1) - Prepared by Sansome Street Appraisers, Inc., dated 6/30/04.
        (2) - Prepared by M.O. Weinress Corporate Valuations, dated 12/15/2005.
        (3) - Prepared by M.O. Weinress Corporate Valuations, dated 12/31/2005.
        (4) - Prepared by M.O. Weinress Corporation Valuations, dated 12/31/2006.
    Company value as noted in the 1999 business broker letter, prepared by Corporate Investment International of Nevada.
    Company value as noted in an email from T.W. Associates.
    Company bank statements.

<u>Reno Flying Service</u>
    Financial Statements - 1995 through 1997.
    Tax Returns - 1995 through 1997, 2004 and 2005.
    General Ledger Detail - 1995 through 1997

<u>Other</u>
    Defendants Experts Report, dated 07/16/2007.
    Carstarphen deposition dated 07/10/2007.
    Carstarphen deposition dated 04/13/2004.
    Dawson deposition dated 3/28/2006.
    Milsner deposition dated 3/16/2006.
    Federal Complaint dated 01/28/2006.
    James S. Proctor, Expert Witness Report dated 2/14/2006
    James S. Proctor, Expert Witness Report dated 07/19/2007.
    James S. Proctor, Expert Witness Report dated 04/18/2008.
    BV Library Search, www.bvlibrary.com
    Internal Revenue Service, Revenue Ruling 59-60.
    Update on Valuing ESOP Shares, from ESOP World, 11/16/2003
    Unique Factors Related to the Valuation of ESOP Stock, from ESOP Financial Advisor Insights dated Winter 2005. Willamette Management Associates.
    Uniform Standards of Professional Appraisal Practice.
    PPC's Guide to Business Valuations.

## AMERICAN MEDFLIGHT
## PAYMENTS TO RENO FLYING SERVICE
### Consulting Fees, Aircraft Rental and Maintenance

|  | Acct. # | 2005 | 2006 | Total |
|---|---|---|---|---|
| Aircraft Maintenance Labor Reno | 4010.3 |  |  | - |
| Aircraft Maintenance Labor Elko | 4010.4 |  |  | - |
| Aircraft Maintenance Parts Reno | 4014.3 |  |  | - |
| Aircraft Maintenance Parts Elko | 4014.4 |  |  | - |
|  |  | 302,210 | 363,900 | 666,110 |
| Equipment A/C Rental Reno | 4120.3 |  |  | - |
| Equipment A/C Rental Elko | 4120.4 |  |  | - |
|  |  | 539,664 | 529,361 | 1,069,025 |
| Consulting & Support Reno | 7118.3 | 55,000 | 60,000 | 115,000 |
| Consulting & Support Elko | 7118.4 |  |  | - |
|  |  | 55,000 | 60,000 | 115,000 |
| Total |  | 896,874 | 953,261 | **1,850,135** |

Source: 2005 financial statements, as the 2005 RFS tax return has not been provided, and 2006 tax returns.

Note: The information provided by defendants does not provide adequate detail of separate accounts, only in total.

**EXHIBIT 1**

## CARSTARPHEN LITIGATION
## Comparison of Aircraft Lease vs Purchase - BEFORE TAX

### ASSUMPTIONS

1. Aircraft Purchase Price - $586,584, no downpayment
2. Assumed aircraft purchase in 1998.
3. Fuel, Maintenance and Crew not a consideration (being paid for already).
4. Engine reserve contribution would be $80/hr/aircraft. Aircraft usage would be 200 hours per month.
5. Seven year amortization/payoff.
6. Interest rates: 8.75% for 4.5 years and 5.75% for 2.5 years

### CASH FLOW

| | Purchase economics | | | | Cash Flow |
| --- | --- | --- | --- | --- | --- |
| | Loan Pmt | Engine Reserve | Net Cash Flow | Lease Actual | Improvement With Purchase |
| 1998 | 102,996 | 192,000 | (294,996) | (372,858) | $ 77,862 |
| 1999 | 112,360 | 192,000 | (304,360) | (377,619) | 73,259 |
| 2000 | 112,360 | 192,000 | (304,360) | (376,848) | 72,488 |
| 2001 | 112,360 | 192,000 | (304,360) | (212,037) | (92,323) |
| 2002 | 110,642 | 192,000 | (302,642) | (284,808) | (17,834) |
| 2003 | 108,236 | 192,000 | (300,236) | (235,745) | (64,491) |
| 2004 | 108,236 | 192,000 | (300,236) | (217,770) | (82,466) |

Cash Flow affect for the period January 1998 through December 2004.  $ (33,505)

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 2005 | 9,020 | 192,000 | (201,020) | (539,664) | $ 338,644 |
| 2006 | 0 | 192,000 | (192,000) | (529,361) | 337,361 |
| 2007 | 0 | 192,000 | (192,000) | (529,361) | 337,361 |
| 2008 | 0 | 192,000 | (192,000) | (529,361) | 337,361 |

Cash Flow affect for the period January 2005 through December 2008.  **$ 1,350,727**

EXHIBIT 2

Carstarphen v. Milsner
2006 DIVIDEND

|  | $33^{1/3}\%$ Stock Ownership | 50% Stock Ownership |
|---|---|---|
| Total Dividend | $ 390,000 | $ 390,000 |
| Dividend to Carstarphen | 130,000 | 195,000 |
| Dividend to Milsner | $ 260,000 | $ 195,000 |
| **Difference** | **$ 65,000** | |

**EXHIBIT 3**

## James S. Proctor, CPA, CFE
DIRECTOR - FORENSIC ACCOUNTING,
MERIDIAN BUSINESS ADVISORS

**EDUCATION & CERTIFICATIONS**

**BS**, University of Nevada, Reno
**CPA**, Certified Public Accountant, Nevada
**CFE**, Certified Fraud Examiner

**EXPERIENCE**

Mr. Proctor has over 25 years of business consulting and litigation related experience. He is the former managing partner of a long-time Reno, Nevada Certified Public Accounting firm where, in addition to business consulting, tax and financial statement related services, he performed many litigation support services. These services included forensic accounting investigations, divorce analysis, expert witness testimony, court appointed examiner, court appointed receiver, and business valuation assignments. Mr. Proctor also served as a United States Bankruptcy Trustee where he administered bankruptcy cases under Chapter 11 and Chapter 7. He has operated businesses in financial distress as a trustee, searched for hidden assets, investigated fraudulent transfers, preferential transfers, and testified accordingly when called upon. He also has directed and conducted debtor examinations. Jim has worked in the gaming industry and has in depth knowledge of gaming operations. Early in his career he worked with the international accounting firm of Grant Thornton. Jim has also been active in the Nevada Society of CPAs, has served as the Chairman of the Professional Ethics Committee, and has received the Outstanding Community Service Award.

In addition to his **CPA** certification, Jim is a Certified Fraud Examiner **(CFE)**.

**PROFESSIONAL/COMMUNITY AFFILIATIONS**

American Institute of Certified Public Accountants
Nevada Society of Certified Public Accountants
Association of Certified Fraud Examiners, lifetime member
Association of Insolvency Accountants
Vets with a Mission
Chamber of Commerce, Leadership Reno
Washoe Legal Services

CLOSE WINDOW  |  PRINT THIS PAGE

# JAMES S. PROCTOR, CPA, CFE
## CUMULATIVE CASE LISTING

| Date | | Case Number |
|---|---|---|

### U.S. Bankruptcy Court District of Nevada

| Date | Case | Case Number |
|---|---|---|
| 2001 | *Anderson & Sons Trucking | 00-32778 |
| 1997 | Henson, Joel & Sandy[1] | 96-30190 |
| 1995 | *Avatar International Merchant Bancorp[1] | 94-31058 |
| 1993-94 | Ruby Dome | 93-31066 |
| 1993 | *E.T. Hermann[1] | 92-32138 |
| 1993 | Minedew Chapter 13 bond claim[2] | Various |
| 1992 | *Sierra Woods Group[1] | 87-00226 |
| 1992 | *Loftin Associates Inc.[1] | 90-01248 |
| 1991 | Indio Properties v Fred Cox | 87-00027/28 |

### Federal District of Nevada

| Date | Case | Case Number |
|---|---|---|
| 2000 | Outdoor Media Dimensions v. City of Reno | CV-N-99-0668-ECR |
| 1999 | Fletcher v Woodburn & Wedge & Gerald Oskam[2] | CV-N-99-9-RAM |
| 1994-95 | Gerland v. Tahoe Douglas Fire Protection District[1] | CV-N-93-588-ECR |

### Second Judicial District of Nevada

| Date | Case | Case Number |
|---|---|---|
| 2003 | Altman vs USA Media[3] | CV02-01855 |
| 2002 | Frank v. Frank | DV02-00560 |
| 2001 | Byrnes v LAS-CA[3] | CV-99-06529 |
| 2000 | Lewis v. Proflame Inc., et al. | CV-99-00997 |
| 1999 | Hart v Dory[2] | CV-97-00250 |
| 1998 | Taormina v. Bussey[1] | CV-98-06177 |
| 1998 | Hewitt v. City of Reno | CV-97-02421 |
| 1997 | Selective Industrial v Levy[3] | CV-96-00904 |
| 1996 | Paschall v Fidelity National Title[1] | CV-94-00205 |
| 1994 | Trelease v Hardesty[3] | CV-89-3562 |
| 1994 | Haggerty v Haggerty | |
| 1992 | Skender v Skender[2] | CV-96-01670 |
| 1992 | Trimmer Ltd. v Dooley[3] | CV-89-3545 |
| 1991 | Pike v Pike[3] | DV-91-530 |

### Ninth Judicial District of Nevada

| Date | Case | Case Number |
|---|---|---|
| 2003 | Allred v Bullis[3] | CV-02-0157 |
| 1999 | Richards v Herz[3] | CV-98-0176 |

### California Superior Court - County of Sacramento

| Date | Case | Case Number |
|---|---|---|
| 1995 | Quinton, Ekins & Motherlode Communities v Bass & Hart Law Corp.[2] | 539447 |

### United States Bankruptcy Court - Eastern District of California

| Date | Case | Case Number |
|---|---|---|
| 1999 | Sierra Rehabilitation Services, Inc. v. James Majerus[1] | 99-23527-B-7 |

\* Appointed Examiner
1) Testimony
2) Deposed
3) Testimony and deposition

Meridian Business Advisors (MBA) billing rates for professionals range from $175 to $295 per hour. Court testimony and/or deposition testimony will be invoiced at the above rates plus an additional $100 per hour. In addition, out-of-pocket costs that may be required by this assignment, such as the use of on-line research services, copying, research sources, publications, and outside travel will be invoiced as well.

Currently the hourly rates are as follows:

| | |
|---|---|
| Directors | $250 - $295 |
| Analysts | $175 - $195 |
| Support | $ 50 - $ 70 |

# **CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b), I certify that I am an employee of King & Russo, Ltd., and not a party to, nor interested in, the within action; that on December 5, 2008, I deposited in the United States Mail at Irvine, California, with adequate postage thereon, a true and correct copy of PLAINTIFF'S RULE 26(a)(2)(B) DISCLOSURE OF EXPERT REPORT enclosed in a sealed envelope and addressed to the last known address as set forth below:

Richard G. Hill, Esq.
652 Forest Street
Reno, NV  89509

_____
Employee of King & Russo, Ltd.