# EXHIBIT 1

# EXHIBIT 1

Deposition of John Carstarphen, Friday, April 23, 2010

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA-RENO

-oOo-

JOHN CARSTARPHEN,

      Plaintiff,

vs.          Case No.: 3:07-cv-00542-ECR-RAM

RICHARD NILSNER, an
individual, DOES 1
through 10,

      Defendants.

_____/

DEPOSITION OF JOHN CARSTARPHEN

taken on behalf of the defendant at the offices of
Richard G. Hill, 652 Forest Street, Reno, Nevada, Friday,
April 23, 2010, at 10:02 a.m., before Debra J. Bartois,
Court Reporter and Notary Public, pursuant to notice.

Reported by:          DEBRA J. BARTGIS, CCR #56

---

iii

INDEX

| | PAGE: |
|---|---|
| 10:02 a.m., Deposition Commenced | 1 |
| EXAMINATION | |
|   By Mr. Hill | 1 |
| 11:16 a.m., Recess Taken | 64 |
| 11:30 a.m., Deposition Resumed | 65 |
| EXAMINATION | |
|   Resumed by Mr. Hill | 65 |
| 12:31 p.m., Lunch Recess | 112 |
| 1:28 p.m., Deposition Resumed | 113 |
| EXAMINATION | |
|   Resumed by Mr. Hill | 113 |
| 2:18 p.m., Recess Taken | 165 |
| 2:22 p.m., Deposition Resumed | 166 |
| EXAMINATION | |
|   Resumed by Mr. Hill | 166 |
| 4:23 p.m., Deposition Adjourned | 264 |

EXHIBITS MARKED FOR IDENTIFICATION:
**EXHIBITS NOT COPIED.  ON ORIGINAL ONLY**

| 56 | A yellow sheet from a note pad containing handwriting | 3 |
|---|---|---|
| 57 | A handwritten note dated 4/23/10 | 3 |
| 58 | A two-page document dated January 5, 2000 entitled Time Line | 3 |

---

ii

APPEARANCES:

For the Plaintiff:    KING & RUSSO, LTD.
                    Attorneys at Law
                    by SCOTT RUSSO, ESQ.
                    1021 Country Lane
                    Gardnerville, Nevada 89460

For the Defendant:    RICHARD G. HILL, ESQ.
                    Attorney at Law
                    652 Forest Street
                    Reno, Nevada 89509

For American Medflight,  PAUL F. HAMILTON, ESQ.
Inc.:              Attorney at Law
                    577 California Avenue
                    Reno, Nevada 89501

Also Present:        JIM BROWN

---

iv

EXHIBITS MARKED FOR IDENTIFICATION:  (Cont'd)    PAGE:

| 59 | A copy of an e-mail dated Friday, September 01, 2006 | 5 |
|---|---|---|
| 60 | A copy of a multi-page document, entitled First Amended Complaint For Breach Of Fiduciary Duties And Self Dealing | 65 |
| 61 | A copy of a two-page letter dated February 12, 2007 from Jack Dawson to John Carstarphen | 120 |
| 62 | A copy of a multi-page document entitled Aircraft Lease, AMF-50303 through AMF-50308 | 142 |
| 63 | A copy of a multi-page document entitled Aircraft Lease, AMF-50309 through AMF-50314 | 142 |
| 64 | A copy of a multi-page document entitled American Medflight, Inc. Employee Stock Ownership Plan | 210 |
| 65 | A copy of a multi-page document entitled Defendant's Declaration And Identification Of Documents and Items | 220 |

1

```
 1                    RENO, NEVADA
 2                FRIDAY, APRIL 23, 2010
 3                    10:02 A.M.
 4                      -oOo-
 5                  JOHN CARSTARPHEN
 6             having been first duly sworn,
 7               testified as follows:
 8          MR. HILL: The record should reflect that
 9     this is the date, time, and place set for the taking
10     of the deposition of the plaintiff John Carstarphen
11     in this matter.
12          Mr. Carstarphen is present, accompanied by
13     his counsel Mr. Russo.  I represent the defendant
14     Mr. Milsner.
15          We're at my office at 652 Forest Street.
16     Joining us today is Mr. Brown, who is a
17     director of American Med Flight.
18                   EXAMINATION
19     BY MR. HILL:
20     Q    Mr. Carstarphen, you have been placed under
21     oath this morning?
22     A    Yes.
23     Q    Do you have any questions about what that
24     oath means?
25     A    No.
```

3

```
 1     A    A note pad.
 2     Q    I can see it's a note pad, sir.  What's on
 3     it?
 4     A    I have just stuff that I made notes on.
 5     Q    All right.  May I see it, please?
 6          Thank you.
 7               (A yellow sheet from a notepad was
 8               marked Exhibit 56 for
 9               identification.)
10               (Handwritten notes dated 4/23/10 were
11               marked Exhibit 57 for
12               identification.)
13               (A two-page document dated January 5,
14               2000 entitled Time Line was marked
15               Exhibit 58 for identification.)
16     BY MR. HILL:
17     Q    Mr. Carstarphen, I have marked Exhibits 56,
18     57, and 58.  And I'll give you back your pad.
19          The first page, Exhibit 56, is the top
20     sheet from your pad; is that correct?
21     A    That's correct.
22     Q    Is that all your handwriting?
23     A    That's my handwriting.
24     Q    Okay.  We'll come back to that one later.
25          Well, when did you prepare 56?
```

2

```
 1     Q    Do understand that that is the same oath
 2     that would be administered if we were in a court of
 3     law?
 4     A    Yes.
 5     Q    Do you need me to go over the admonitions
 6     concerning procedures, or do you feel comfortable
 7     with them, sir?
 8     A    I'm fine.
 9     Q    Okay.  Did you do anything to prepare for
10     the deposition today?
11     A    No.
12     Q    Nothing whatsoever?
13     A    Nothing.
14     Q    Did not look at any documents?
15     A    No.
16     Q    Did not speak with any person at all?
17     A    Only with my attorney.
18     Q    Okay.  With whom did you speak?
19     A    Mr. Russo.
20     Q    And when?
21     A    This morning.
22     Q    And how long did that discussion last?
23     A    15, 20 minutes.
24     Q    Okay.  You have some documents in front of
25     you.  What do you have, sir?
```

4

```
 1     A    This morning.
 2     Q    Did you refer to anything?
 3     A    No.
 4     Q    Just from memory?
 5     A    Yes.
 6     Q    Okay.  Exhibit 57, what is this, sir?
 7     A    Some more notes that I made.
 8     Q    When did you make them?
 9     A    Last night.
10     Q    Did you refer to any documents or anything
11     in making this?
12     A    No.
13     Q    Okay.  So you did --
14     A    Strictly from memory.
15     Q    So you did prepare this in anticipation of
16     your deposition; is that right?
17     A    Yes.
18     Q    Okay.  For you to refer to --
19     A    Uh-huh.
20     Q    One of the things you need to do is to say
21     yes or no for the court reporter.
22     A    Yes.
23     Q    Thank you, sir.
24          And Exhibit 58 consists of, it's a couple
25     things.  Let me show you Exhibit 58, sir.  It's two
```

Deposition of John Carstarphen, Friday, April 23, 2010

5

1    pages?
2        A    Yes.
3        Q    What is that?
4        A    That's a timeline that I prepared back in
5    the year 2000.
6                  (A copy of an e-mail dated Friday,
7                  September 01, 2006, was marked Exhibit
8                  59 for identification.)
9    BY MR. HILL:
10       Q    Okay. And what is Exhibit 59?
11       A    This is an e-mail to Mark Gunderson with
12   some additional dates that I remembered. And I don't
13   know, look on the date of that.
14       Q    "Look on the date." Oh, you're talking
15   about 59?
16       A    Yes. This was prepared back in 2006.
17       Q    Okay. We'll get copies of all of these
18   made. And if as we go you feel you need to refer to
19   any of these this morning in answering any questions,
20   you're free to do so. I would just ask that you
21   identify, "I'm now looking at Exhibit 56 to refresh
22   my recollection," that's fine, just as long as it's
23   clear on the record. Okay?
24       A    Yes.
25       Q    All right. Are you familiar with this

7

1        Q    Has Mr. Brown ever told you anything that
2    you subsequently found out to be false?
3        A    I don't believe so.
4        Q    Okay. Has Mr. Brown done anything that
5    caused you any of the harm in this case that you
6    complain about?
7        A    No.
8        Q    Do you know a lady named Linda Reed?
9        A    Yes.
10       Q    How is it that you know Ms. Reed, sir?
11       A    She's the bookkeeper for American
12   Medflight.
13       Q    Is Ms. Reed -- I forgot about Mr. Brown.
14            Is Mr. Brown competent at what he does?
15       A    Yes.
16       Q    And what is it that he does at American
17   Medflight, sir?
18       A    He's director of maintenance.
19       Q    And he's also a director?
20       A    Uh-huh.
21       Q    Yes?
22       A    Yes.
23       Q    Thank you. My job is to catch those
24   things.
25       A    Okay.

6

1    gentleman to my left?
2        A    Yes.
3        Q    Who is he?
4        A    Jim Brown.
5        Q    And how is it that you know Mr. Brown, sir?
6        A    He's the director of maintenance and a
7    director of American Medflight.
8        Q    All right. How long have you known
9    Mr. Brown?
10       A    Oh, God.
11       Q    More than ten years?
12       A    Yes.
13       Q    Okay.
14       A    Probably about 1993.
15       Q    Did you meet him before American Medflight
16   was formed?
17       A    I'm sure I did.
18       Q    Has he been an employee of American
19   Medflight since its inception?
20       A    Yes.
21       Q    Have you known Mr. Brown to be an honest
22   man, sir?
23       A    Yes.
24       Q    Has Mr. Brown ever lied to you, sir?
25       A    No.

8

1        Q    Do you have any complaints about any things
2    that Mr. Brown has done or not done in his capacity
3    as a director of maintenance at American Medflight?
4        A    No.
5        Q    Okay. Do you have any complaints or issues
6    with anything that Mr. Brown has done in his capacity
7    as a director at American Medflight?
8        A    No.
9        Q    Now Ms. Reed is the bookkeeper?
10       A    Uh-huh.
11       Q    Yes?
12       A    Yes.
13       Q    Okay. We'll get you trained by the end of
14   the day.
15       A    Okay.
16       Q    Is Ms. Reed competent?
17       A    Yes.
18       Q    Have you ever known Ms. Reed to lie to you,
19   sir?
20       A    No.
21       Q    Is she an honest person, sir?
22       A    Yes.
23       Q    Has she ever told you anything that proved
24   to be false?
25       A    I don't believe so.

Deposition of John Carstarphen, Friday, April 23, 2010

9

1    Q    Ms. Reed worked for you for a period of
2   time, did she not, sir?
3    A    Yes, she did.
4    Q    What was her position, and who did she work
5   for?
6    A    Her position was bookkeeper.
7         MR. HILL:  Off the record.
8              (Off the record.)
9   BY MR. HILL:
10   Q    Are you familiar with a Mr. Geyer?
11   A    Yes.
12   Q    How is it that you are familiar with a
13  Mr. Geyer, sir?
14   A    Mr. Geyer was a chief pilot.
15   Q    At American Medflight?
16   A    Yes.
17   Q    Was Mr. Geyer an honest person, sir?
18   A    Yes.
19   Q    Did Mr. Geyer ever lie to you?
20   A    No.
21   Q    Was Mr. Geyer competent in his functions?
22   A    Yes.
23   Q    Did Mr. Geyer ever tell you anything that
24  proved to be untruthful?
25   A    I don't believe so.

11

1    A    I don't know.
2    Q    Did you know him before he was the chief
3   pilot?
4    A    No.
5    Q    Who hired him, do you know?
6    A    No.
7    Q    Have you spoken to Mr. Burrell?
8    A    In a conversation?
9    Q    Yes.
10   A    No.
11   Q    So you've never talked to the man?
12   A    Yes.
13   Q    My statement is correct; or no, you have
14  talked to him?
15   A    I have talked to him in a board of
16  directors meeting only.
17   Q    Okay.  Has Mr. Burrell ever lied to you,
18  sir?
19   A    I don't know him well enough to answer that
20  question.
21   Q    So as you sit here you have no reason to
22  believe that anything that Mr. Burrell has ever told
23  you was false; is that correct?
24   A    I don't believe Mr. Burrell has told me
25  anything.

10

1    Q    Okay.  There is a new gentleman who is on
2   the board of directors at American Medflight.  Do you
3   know his name?
4    A    Not offhand.
5    Q    Okay.
6    A    His first name is John.
7    Q    And his last name starts with a B?
8    A    I'm not sure.
9         MR. BROWN:  Burrell.
10        THE WITNESS:  Burrell.
11  BY MR. HILL:
12   Q    How long have you known Mr. Burrell,
13  Mr. Carstarphen?
14        Is that the gentlemen you're referring to?
15   A    Yes.
16   Q    How long have you known Mr. Burrell,
17  Mr. Carstarphen?
18   A    A couple of months maybe, or something like
19  that.
20   Q    What does he do at American Medflight, if
21  you know?
22   A    He's the chief pilot --
23   Q    And --
24   A    -- and director.
25   Q    And how long has he been the chief pilot?

12

1    Q    Okay.  Do you have any complaints or issues
2   with any actions that Mr. Burrell has taken as chief
3   pilot at American Medflight?
4    A    I don't know him well enough to have any
5   issues.
6    Q    Fair enough, sir.
7         And do you have any complaints or issues
8   with anything that Mr. Burrell has done in his
9   capacity as director at American Medflight?
10   A    I don't believe so.
11   Q    Are you familiar --
12        MR. HILL:  The record should reflect that
13  Mr. Hamilton, who is counsel for American Medflight,
14  has joined us.
15  BY MR. HILL:
16   Q    Mr. Carstarphen, are you familiar with
17  Mr. Dawson?
18   A    Yes.
19   Q    How long have you known Mr. Dawson?
20   A    Probably since 1990.
21   Q    Okay.  And you and Mr. Dawson got together
22  and formed American Medflight with Mr. Milsner; is
23  that correct?
24   A    That's correct.
25   Q    And since that time that Mr. Dawson has

13

1  been a -- he started as a shareholder of American
2  Medflight; did he not?
3      A   Yes.
4      Q   But he is no longer a shareholder of
5  American Medflight, is he?
6      A   Correct.
7      Q   And do you know when he ceased to be a
8  shareholder in American Medflight, sir?
9      A   I think 1998.
10     Q   Okay. And Mr. Dawson has been an officer
11 and a director of American Medflight at various
12 times; is that correct?
13     A   At various times.
14     Q   Okay. Has Mr. Dawson ever lied to you,
15 Mr. Carstarphen?
16     A   No.
17     Q   Has Mr. Dawson ever told you anything that
18 subsequently proved to be false?
19     A   I do not believe so.
20     Q   Has Mr. Dawson competently discharged his
21 duties as an employee of American Medflight, to your
22 knowledge?
23     A   Yes.
24     Q   Do you have any complaints or issues with
25 any actions that Mr. Dawson has taken in his capacity

14

1  as a director of American Medflight?
2      A   Can you rephrase that?
3      Q   Yes, sir.
4          Mr. Dawson has been a director of American
5  Medflight for virtually its entire existence. Will
6  you agree with me?
7      A   Yes.
8      Q   Okay. And during that time do you believe
9  that Mr. Dawson has done anything as a director that
10 was inappropriate?
11     A   You're going to have define
12 "inappropriate." I've had disagreements, but I don't
13 know that I would call it inappropriate.
14     Q   I'm sorry. I didn't hear the last part.
15     A   I said that I have had disagreements --
16     Q   Okay.
17     A   -- but I would not characterize it as
18 inappropriate.
19     Q   Okay. Has Mr. Dawson done anything that
20 you would characterize as - in his capacity as a
21 director; I would like to focus on that for a few
22 minutes - has Mr. Dawson done anything that you
23 regard as intentionally wrong?
24     A   Yes.
25     Q   Okay. What has he done that you regard as

15

1  intentionally wrong, sir?
2      A   Well, I mean, he -- I'm not quite sure how
3  to answer that.
4      Q   Okay.
5      A   I'm not quite sure.
6      Q   Let's see if we can put a little finer
7  point on it. I'm sorry.
8      A   I mean, I have had disagreements as to
9  policy, and to characterize it as something wrong is
10 not -- it's a disagreement in policy and direction.
11     Q   Okay. Can we say then that your
12 disagreements with Mr. Dawson would be in the nature
13 of a disagreement about how business should be
14 conducted?
15     A   Yes.
16     Q   Do you think that Mr. Dawson has ever done
17 anything that was calculated to harm you, sir?
18     A   No.
19     Q   Has Mr. Dawson done anything that has
20 caused you any of the harm that you complain about in
21 this lawsuit?
22     A   I'm not sure.
23     Q   Okay. What do you think that Mr. Dawson
24 may have done that caused or contributed to any of
25 the harm that you claim you suffered in this lawsuit,

16

1  sir?
2          MR. RUSSO: I object to it's not reasonably
3  calculated to lead to the discovery of admissible
4  evidence. There is no allegation against Mr. Dawson
5  in this case.
6  BY MR. HILL:
7      Q   Okay. Mr. Carstarphen, I think you
8  understand the rules that the Judge decides the
9  objections, and your counsel is welcomed to put his
10 objections on the record, but once he states his
11 objections then you are required to go forward and
12 answer the question until and unless Mr. Russo
13 instructs you not to answer the question. Do you
14 understand that?
15     A   Uh-huh.
16     Q   Thank you.
17         MR. RUSSO: Can you read back that
18 question?
19         (The Question was Repeated.)
20 BY MR. HILL:
21     Q   Do you have the question in mind, sir?
22     A   Yes, I think so.
23     Q   Okay. What has Mr. Dawson done that caused
24 you harm, sir? Give me the list, and we'll talk
25 about all of them; I promise.

17

1   A   I'm not quite sure how to answer that.
2       MR. RUSSO: I think it might speed it up if
3   I talk to him for a moment. We'll take a 30-second
4   break.
5       MR. HILL: I have a question pending,
6   counsel, and it's inappropriate --
7       MR. RUSSO: He said he's not sure, and I'm
8   going to see if I can speed this up.
9       MR. HILL: Counsel, I strongly object to
10  you taking the witness out of the room to coach him
11  while I've got a question pending. That's
12  inappropriate behavior, sir.
13          (Off the record.)
14      MR. HILL: We're back on the record,
15  please.
16  BY MR. HILL:
17  Q   Mr. Carstarphen what did you and Mr. Russo
18  discuss?
19      MR. RUSSO: Objection, attorney/client
20  privilege, and I instruct the witness not to answer.
21      MR. HAMILTON: And there are cases coming
22  all over the place that say he has to answer that,
23  and you can't take him out and coach him and --
24      MR. HILL: Mr. Hamilton.
25      MR. HAMILTON: -- it's a sanctionable event

18

1   for you to do that.
2       MR. HILL: Mr. Hamilton, please.
3   BY MR. HILL:
4   Q   Mr. Carstarphen, I just want to be clear.
5   You and Mr. Russo did leave the room, and you and
6   Mr. Russo did you have a conversation; is that
7   correct?
8   A   Yes.
9   Q   And Mr. Russo has instructed you not to
10  answer my question to tell me what you and he
11  discussed outside. Is that your understanding?
12  A   No.
13      MR. RUSSO: That was my instruction.
14  BY MR. HILL:
15  Q   Well, are you going to follow Mr. Russo's
16  instruction, Mr. Carstarphen?
17  A   He didn't give me any instruction.
18  Q   Sitting here in the room when I asked you
19  to tell me what Mr. Russo told you outside, didn't
20  you hear Mr. Russo say to you that he objected, and
21  instructed you not to answer my question about what
22  you talked about outside?
23  A   Yes.
24  Q   And do you intend to abide by that
25  instruction, sir?

19

1   A   Yes.
2   Q   Okay. What do you believe Mr. Dawson has
3   done that caused you harm, sir?
4   A   I don't believe that Mr. Dawson did
5   anything directly to harm me. Okay?
6   Q   Okay.
7   A   However, he was complicit with Mr. Milsner
8   in things that did harm me.
9   Q   What do you --
10  A   In other words, he went along with things
11  that did do a lot of harm.
12  Q   Is this different from the description you
13  gave me earlier about differences over policy, or are
14  we talking about -- do we continue to be talking
15  about differences over policy?
16  A   Yes.
17  Q   Policy?
18  A   Yes.
19  Q   Okay. My question was compound, so it was
20  a poor one, and I apologize.
21      Do you believe that -- well, what is the
22  harm that you claim in this case do you believe
23  Mr. Dawson was complicit in, sir?
24  A   All of it.
25  Q   All of it. Okay. When did you form the

20

1   opinion that Mr. Dawson was complicit in the harm
2   that you claim in this case, sir?
3   A   Because he voted along with Mr. Milsner.
4   Q   Okay. And do you believe that Mr. Dawson
5   voted the way he did to hurt you?
6   A   No, I don't think so.
7   Q   Do you think that Mr. Dawson had an honest
8   disagreement with you about the issues in question?
9   A   It could be. I don't know.
10  Q   Do you believe Mr. Dawson had a dishonest
11  motive in voting in manners that you believe caused
12  you harm?
13  A   No.
14  Q   Do you think it's just an honest
15  disagreement about how the business should be run?
16  A   I don't know what it is.
17  Q   Okay. Voting in complicity with
18  Mr. Milsner is one item that you have identified for
19  me that you say whereby Mr. Dawson caused you or
20  contributed to the harm that you claim.
21      Is there anything else that he did or did
22  not do, sir?
23  A   No.
24  Q   Do you believe that Mr. Milsner manipulates
25  or controls Jim Brown?

21

1     A     I have no idea.
2     Q     Do you have any reason to believe that he
3   does?
4     A     I don't have any idea.
5     Q     So have you -- okay. You don't know? You
6   don't know?
7     A     I don't know.
8     Q     Okay. What about Linda Reed, does he
9   manipulate or control Linda Reed?
10    A     I don't know.
11    Q     Has he ever manipulated or controlled
12  Linda Reed, to your knowledge?
13    A     I don't know.
14    Q     Has he every manipulated or controlled
15  Jim Brown, to your knowledge?
16    A     I don't know.
17    Q     What about Mr. Gever, does Mr. Milsner
18  manipulate or control Mr. Gever?
19    A     I don't know.
20    Q     What about Mr. Burrell?
21    A     I don't know.
22    Q     What about Mr. Dawson?
23    A     I don't know.
24    Q     So you don't know whether Milsner
25  manipulates or controls Dawson in the matters that we

22

1   were talking about earlier where he voted complicitly
2   with Milsner?
3     A     I don't know.
4     Q     Okay. Has anybody ever told you that?
5     A     Told me what?
6     Q     That Milsner manipulated or controlled
7   Dawson?
8     A     No.
9     Q     Okay. Do you believe it as you sit here?
10    A     I don't know.
11    Q     You don't know one way or the other.
12    A     I don't know one way or the other.
13    Q     The harm that you contend that Mr. Dawson
14  caused you --
15          MR. RUSSO: He doesn't contend. There is
16  no allegation in the complaint of that.
17          MR. HILL: Well, I understand that, but
18  he's testified here today to the contrary. I
19  understand that Mr. Dawson is not in the case, and
20  that's fine, but his testimony is what it is.
21  BY MR. HILL:
22    Q     You believe that Mr. Dawson voting the way
23  he did caused or contributed to the harm that you are
24  complaining about in this case; is that right?
25    A     Yes.

23

1     Q     Okay. Did you, at any point when any of
2   those votes were being cast, did you say to
3   Mr. Dawson words to the effect of: Mr. Dawson, that
4   vote is causing me harm?
5     A     No.
6     Q     Have you said words to the effect to
7   Mr. Dawson: Mr. Dawson, that vote you took on any
8   particular date caused me harm?
9     A     No.
10    Q     You're familiar with my client Mr. Milsner?
11    A     Yes.
12    Q     When did you first meet Mr. Milsner?
13    A     I think about 1994.
14    Q     And was that in the process of
15  American Medflight being formed?
16    A     Yes.
17    Q     Is Mr. Milsner an honest person, sir?
18    A     No.
19    Q     You regard Mr. Milsner as a dishonest
20  person; is that correct?
21    A     Yes.
22    Q     Has Mr. Milsner ever told you anything that
23  was false?
24    A     Yes.
25    Q     What has Mr. Milsner told you that was

24

1   false, sir? Give me the list, and we'll go through
2   all of them.
3     A     Well, the list is too numerous I think to
4   even try and come up with.
5     Q     Well, why don't you give me the top five.
6   Let's start with the top five. Can we do that?
7     A     Okay. The first one was before a board of
8   directors meeting he told me that if I dropped the
9   lawsuit I could participate in ESOP.
10    Q     Okay. What else?
11    A     He told me that he would buy my stock back
12  in 1999.
13    Q     Okay. What else?
14          MR. RUSSO: Do you need to take notes of
15  the list?
16  BY MR. HILL:
17    Q     Do you need to refer to your Exhibits 56,
18  57, 58, 59, Mr. Carstarphen? Feel free. I mean,
19  your attorney is trying to help you.
20          MR. RUSSO: No, I'm just saying if you want
21  to take notes as you go because it helps you, then
22  please do so.
23  BY MR. HILL:
24    Q     So you are now looking at which document?
25    A     56.

25

1    Q    Okay.
2    A    He told me when I questioned him about the
3    consulting fee that he deserved it because of the
4    risk he was taking.
5    Q    What else, sir?
6         These are statements that Mr. Milsner made
7    to you that were false; is that right?
8    A    That's correct.
9    Q    Okay. What else?
10   A    This is not a false statement, but he
11   admitted the fact that my stock was going to go down
12   $1.3 million by the sale of the ESOP to Mr. Milsner
13   by Mr. Milsner.
14   Q    What else, sir?
15   A    He --
16   Q    While we're at it let's do this -- well,
17   keep going with false.
18   A    You said you wanted the top five.
19   Q    We're going to go beyond five, but we'll
20   start with five and see where we go.
21   A    Okay.  He used my personal guarantee on a
22   line of credit for his personal use in an amount of
23   about $140,000 without my knowledge.
24   Q    Okay. What else?
25   A    He wrote himself a personal check for

26

1    $100,000, without Jack or my knowledge.
2    Q    What else, sir?
3    A    He took about another, and I'm not sure of
4    the amount but it's around $100,000, as a fee for
5    guaranteeing the notes on the aircraft.
6    Q    Okay. What else?
7    A    Is that enough?
8    Q    No, I want to hear everything, sir. This
9    is the time for you to tell me about all of the
10   things that Mr. Milsner has done to you, sir.  And I
11   am going to insist that I get answers to my
12   questions, sir.
13        Now you seem to be welling up.  Are you
14   okay?
15   A    No.  I'm fine.
16   Q    Do you need a break?
17   A    No, I don't need one.  I'm fine.
18   Q    Okay.
19   A    We specifically had in the bylaws
20   protection when we formed the corporation that there
21   would be no self-dealing.  And I had a construction
22   company at that time, and we all agreed that if
23   American Medflight was to use my construction company
24   for anything that one or the other partners would
25   sign the checks and watch the disbursements.  And

27

1    likewise, if any money was to be going to Reno Flying
2    Service, that I was supposed to sign the checks and
3    approve them.  Which was never done.
4         And subsequently in 2008 that provision of
5    the bylaws was repealed, against my vote.
6    Q    Okay. What else, sir?
7    A    That's enough.
8    Q    Mr. Carstarphen, have you told me all of
9    the things that Mr. Milsner has done to you -- or let
10   me back up.
11        We started off on this, when I asked you to
12   tell me everything that Mr. Milsner told you that was
13   false.  Have you now told me everything that
14   Mr. Milsner told you, has ever told you, that was
15   false?
16   A    No, I'm sure there are many more things
17   that I can't remember.
18   Q    Okay. How about anything that he told you
19   or did that caused you any of the harm that you
20   complain about in this case?
21   A    All of these things.
22   Q    Okay.  These are - if I understand, with
23   maybe one exception - these are things that Milsner
24   did that caused you harm.
25   A    Yes.

28

1    Q    What I would like you to tell me, though,
2    is, is -- well, you told me that Mr. Milsner said in
3    1999 that you would buy your stock.  Do you remember
4    telling me that, sir?
5    A    Yes.
6    Q    Tell me, what did Mr. Milsner say to you?
7    A    I don't know.  We negotiated this over a
8    period of a year, so there was many conversations.
9    Q    Okay. What did he precisely tell you
10   that -- well, let me back up.
11        You contend that Mr. Milsner told you he
12   would buy your stock, and that Mr. Milsner failed to
13   do so.
14   A    Correct.
15   Q    And that conversation took place in 1999.
16   A    I believe so.
17   Q    Okay.  Do you believe that you are entitled
18   to any compensation for anything pertaining to that
19   conversation?
20   A    No.
21   Q    Okay.  Then we don't need to worry about
22   that.
23        What else -- well, but you believe that
24   Milsner told you he would buy the stock, and had no
25   intention of buying it?

29

1    A    Yes.
2    Q    Why do you believe that, sir?
3    A    It's just what I believe.
4    Q    What facts is that belief based on?
5    A    A year's worth of negotiations, and many
6    documents produced and legal documents produced.
7    Q    Okay. Did you expend money on attorney's
8    fees?
9    A    Yes.
10   Q    With whom?
11   A    I'm not sure.
12   Q    Do you still have --
13   A    I think --
14   Q    I'm sorry. Go ahead.
15   A    Go ahead. I'm not sure.
16   Q    Okay. Do you still have the documentation
17   concerning those negotiations?
18   A    Oh, yes.
19   Q    Where is it?
20   A    It's in my home.
21   Q    All right. The rest of the items are
22   things that Mr. Milsner did - at least as I
23   understand, but we'll go through them - that caused
24   you harm. What I would really like to narrowly focus
25   on is whether Milsner has ever lied to you.

30

1            MR. RUSSO:  Actually, that's what the
2    question was -- -
3            MR. HILL:  Right.
4            MR. RUSSO:  -- not harm, he said, but where
5    did he lie.
6            MR. HILL:  I know. And he gave me a
7    nonresponsive answer, and I'm trying to bring the
8    witness back on beam here.
9    BY MR. HILL:
10   Q    Do you understand, sir?  I mean, we'll go
11   through all of these, I promise you we will, but I
12   want you to tell me, before we move on, any time that
13   Milsner lied to you.
14           And if you contend he lied to you in these
15   things we'll go back through them, but are there any
16   things where he just flat out lied to you?
17   A    Many times.
18   Q    Okay. Any that you recall as you sit here
19   today?
20   A    Not offhand.
21   Q    Has Mr. Milsner lied to you in the year
22   2010, sir?
23   A    I don't believe so.
24   Q    Did Mr. Milsner lie to you in the year
25   2009?

31

1    A    I don't know.
2    Q    What about 2008, sir, did he lie to you
3    during that year?
4    A    I don't know.
5    Q    Did Mr. Milsner lie to you during 2007,
6    Mr. Carstarphen?
7    A    I don't know.
8    Q    Mr. Carstarphen, are you on any medication
9    today?
10   A    No.
11        Any medication?
12   Q    Yes, sir.
13   A    Yes, I take medication.
14   Q    Okay. Do you take anything that would
15   affect your memory?
16   A    No.
17   Q    Do you take anything that would affect your
18   ability to understand my questions?
19   A    No.
20   Q    Are you diabetic?
21   A    No.
22   Q    Do you have any conditions that would
23   affect your ability to recall or understand my
24   questions, recall answers or --
25   A    No. No.

32

1    Q    Okay. Did Mr. Milsner lie to you in the
2    year 2006, Mr. Carstarphen?
3    A    I don't know.
4    Q    Did he lie to you in the year 2005?
5    A    I don't know.
6    Q    Did he lie to you in the year 2004?
7    A    I don't know.
8    Q    Has anybody ever told you that Mr. Milsner
9    lied to you in any of those years?
10   A    I don't know.
11   Q    You do not know --
12   A    I do not know.
13   Q    -- if anybody ever told you that Milsner
14   lied to you?
15   A    I don't know.
16   Q    So that means somebody may have; may not
17   have?
18   A    May have; may not have.
19   Q    Okay. All right. I guess --
20        MR. HILL:  Off the record.
21           (Off the record.)
22   BY MR. HILL:
23   Q    Have you ever spoken to a Mr. Daoro?
24   A    No.
25   Q    Do you know who Mr. Daoro is?

Deposition of John Carstarphen, Friday, April 23, 2010

33

1    A    Yes.
2    Q    Who is he?
3    A    He's a CPA for, I believe, Richard Milsner.
4    Q    Does he do any CPA work for American
5    Medflight?
6    A    I believe so.
7    Q    Have you ever spoken to him?
8    A    I already answered that.
9    Q    And what was the answer, sir?  I'm sorry.
10   A    No.
11   Q    Have you ever tried to contact Mr. Daoro?
12   A    I don't believe so.
13   Q    Have you been provided with Mr. Daoro's
14   telephone number?
15   A    I do not believe I have his telephone
16   number.
17   Q    Have you ever asked him for it?
18   A    No.
19   Q    Has anybody ever said that you could not
20   talk to Mr. Daoro?
21   A    No.
22   Q    Mr. Daoro served as a director of the
23   company for a time, did he not, sir?
24   A    Yes.
25   Q    Do you have any complaints about anything

34

1    that Mr. Daoro did or did not do while he served as a
2    director of American Medflight?
3            MR. RUSSO:  Objection, no foundation.  You
4    weren't on the board.  He doesn't know what he did.
5    Why don't you ask him that first.
6    BY MR. HILL:
7    Q    You are a director of American Medflight,
8    are you not, sir?
9    A    Yes.
10   Q    What do you understand your job to be as a
11   director?
12   A    I don't understand the question.
13   Q    What does it mean to you to be a director
14   of American Medflight, sir?  What are your duties?
15   A    It's to take care of the business aspect of
16   the company.
17   Q    All right.  And what things do you do to
18   take care of the business aspect of the company?
19   A    Involved in meetings of various things that
20   we're planning on doing, or expenditures that are
21   planning to be made.
22   Q    Okay.  So you are involved in meetings from
23   time-to-time?
24   A    Yes.
25   Q    Okay.  What else do you do to be a good

35

1    director, Mr. Carstarphen -- well, let me back up.
2            Are you a good director?
3    A    I believe so.
4    Q    Okay.  What do you do to be sure that
5    you're a good director?
6    A    Meet with the corporate officers from
7    time-to-time.
8    Q    Okay.  What else?
9    A    Review the financial statements.
10   Q    Okay.  What else?
11   A    Review income tax returns.
12   Q    Okay.  Anything else?
13   A    That's pretty much it.
14   Q    Okay.  You've never been to law school;
15   have you, sir?
16   A    No.
17   Q    You're not a lawyer?
18   A    God, no.
19   Q    So I would like your understanding
20   as a layman, what kind of duties, if any, what kind
21   of responsibilities do you have to serve the
22   shareholders in the company as a director?  Just your
23   opinion.  It may be right, it may be wrong, but it's
24   your opinion, sir.
25   A    I have a fiduciary responsibility to look

36

1    after the shareholders of the company.
2    Q    Okay.  What is -- you used a word, two
3    words, "fiduciary responsibility."  What does that
4    mean?
5            MR. RUSSO:  To you.
6    BY MR. HILL:
7    Q    To you.
8    A    It's a responsibility to look after the
9    best interests of the shareholders.
10   Q    Okay.  And how do you meet that obligation,
11   sir?  What things do you do to meet that obligation
12   to the other shareholders?
13   A    All the things that I just enumerated.
14   Q    Okay.  Do you believe that as a director
15   you're supposed to be careful how money is spent by
16   the company?
17   A    That's more of a day-to-day operation than
18   a director.
19   Q    Okay.  Okay.  Do you believe that the
20   directors are responsible to see to it that the
21   company honors its agreements?
22   A    Yes.
23   Q    Do you believe that the directors -- are
24   you as a director, are you supposed to comply with
25   the rules that control the company?

Deposition of John Carstarphen, Friday, April 23, 2010

37

1    A    Yes.

2    Q    Okay. Was Mr. Daoro complicit in anything

3    that Mr. Milsner did that caused you harm?

4    A    I don't know.

5    Q    Do you believe that Milsner controls or

6    manipulates Daoro?

7    A    No.

8    Q    Okay.

9    A    Can I make a clarifying statement?

10   Q    Certainly, sir.

11   A    At the time when Mr. Daoro was a board of

12   director I was not a board of director, so I have no

13   knowledge of what went on.

14   Q    Okay. Fair enough.

15   A    Okay?

16   Q    Fair enough. But I still need to ask those

17   questions because somebody may have told you that,

18   and I need to know that information if you have it.

19   Okay?

20   A    Okay.

21   Q    Now do you believe that Milsner manipulates

22   or controls Mr. Dawson?

23   A    I already answered that question.

24   Q    I'm sorry, sir, I don't recall the answer.

25   A    I don't know.

38

1    Q    Oh, you don't know. Okay. Fair enough.

2         Have you ever alleged that he did? Have

3    you ever told anybody that Mr. Milsner manipulated or

4    controlled Jack Dawson?

5    A    No.

6    Q    Okay. Do you have a personal opinion of

7    Mr. Milsner? Do you like him or dislike him?

8    A    I don't think I can say one way or the

9    other.

10   Q    So your testimony here today under oath is,

11   is that you do not have an intense dislike for

12   Richard Milsner?

13   A    I still deal with the man.

14   Q    I understand that, sir. Can you answer my

15   question?

16   A    Do I dislike him? No.

17   Q    Okay. So do you like him?

18   A    No.

19   Q    Not a good guy?

20   A    Not a good guy.

21   Q    And you've already told me he's not an

22   honest person?

23   A    I said that.

24   Q    Okay. When did you first form the opinion

25   that Mr. Milsner was not an honest person,

39

1    Mr. Carstarphen?

2    A    1998.

3    Q    Tell me about that. What was it that

4    caused you at that point in time to believe that

5    Mr. Milsner was not honest?

6    A    That's when he terminated me.

7    Q    Okay. Mr. Milsner terminated you?

8    A    Jack Dawson terminated me.

9    Q    And you think that Milsner put him up to

10   it?

11   A    I don't know what that means.

12   Q    Well --

13   A    I'm sure they were in agreement.

14   Q    Okay. Mr. Dawson is the one who

15   communicated to you face-to-face that you were being

16   terminated?

17   A    Yes.

18   Q    Do you believe -- were there good grounds

19   to terminate you, sir?

20   A    No.

21   Q    What were you told were the grounds that

22   you were terminated?

23   A    I was not told.

24   Q    Just no reason at all; you're done, that's

25   it, get out?

40

1    A    Uh-huh.

2    Q    Yes?

3    A    Yes.

4    Q    Thank you.

5         Do you believe that Milsner told -- well,

6    there was a stock transaction between Dawson and

7    Milsner in 1998.

8    A    Yes.

9    Q    Was the agreement to terminate you reached

10   before or after, do you know?

11   A    I don't know.

12   Q    What about that termination caused you to

13   believe that Milsner was not an honest person?

14   A    At that time when Jack was selling his

15   stock it was going to be for a payment of $5,000 a

16   month. And I told -- and I was the president of the

17   company at that time, and I knew very well that the

18   company could pay Jack Dawson $5,000 a month for his

19   stock and retire the stock, and then Mr. Milsner and

20   I would be 50-50 ownership.

21        He told me that the company could not

22   afford $5,000 a month, and that he was going to buy

23   the stock directly, and making him a two-third owner

24   and then moving me to a minority stock owner of

25   one-third.

41

1    Within one month of that time, the company
2  started paying Reno Flying Service 5,000 a month in a
3  consulting fee that easily could have gone to buying
4  Jack's stock. And that continued on until, I
5  believe, 2008, for a period of ten years --
6    Q    Okay.
7    A    -- of over half a million dollars.
8    Q    And you believe that was a dishonest act by
9  Mr. Milsner?
10   A    I do believe that.
11   Q    And when did you form the opinion that that
12 was a dishonest act by Mr. Milsner?
13   A    About three months into the payment of that
14 $5,000 a month I confronted Mr. Milsner, and I
15 believe right shortly after that is when I was
16 terminated.
17   Q    Okay. So the stock deal with Milsner and
18 Dawson was in February of '98? Is that on one of
19 your timelines?
20   A    Probably.
21   Q    Let's take a look. Your counsel has handed
22 you what document?
23        MR. RUSSO:  58.
24        THE WITNESS:  58.
25

43

1    A    Because I signed two of the checks.
2    Q    Okay.
3    A    And that's when I questioned why we were
4  doing this. And then in December of '98 they fired
5  me.
6    Q    Okay. Did Mr. Milsner do anything after
7  1998 to redeem himself to show you that he was an
8  honest guy, or did he continue to be a dishonest
9  person thereafter, sir?
10   A    He continued to be a dishonest person
11 thereafter.
12   Q    Okay. And in all of your dealings with him
13 has he been dishonest with you?
14   A    Yes.
15   Q    Do you believe that Mr. Milsner has done
16 things to try to hurt you?
17   A    Yes.
18   Q    Are there things that Mr. Milsner did that
19 he was trying to hurt you, other than what you've
20 already told me about here this morning?
21   A    I'm sure there is.
22   Q    But you don't recall anything else as you
23 sit here?
24   A    No.
25   Q    Okay. All right. Mr. Carstarphen, as long

42

1  BY MR. HILL:
2    Q    Thank you, sir.
3         What does it say on there, or does it?
4    A    Repeat the question?
5    Q    Is the timing of the stock transaction
6  between Milsner and Dawson on Exhibit 58, sir?
7    A    Yes.
8    Q    What does it say?
9    A    It occurred in September of '98.
10   Q    Okay. And you prepared this document in
11 2000?
12   A    Yes.
13   Q    So your recollection of things in 1998
14 would have been better in 2000 than it is today; is
15 that fair?
16   A    Probably.
17   Q    And when did the $5,000 a month payment
18 start, sir? Shortly thereafter?
19   A    I have down here either August or October
20 of '98.
21   Q    Okay. So somewhere between August and
22 October of '98 is when the 5,000 a month started.
23   A    Yes.
24   Q    When and how did you find out about that
25 $5,000 a month?

44

1  as there is not a question pending I'm happy to break
2  at any time.
3         You did sign some checks for this
4  consulting fee, didn't you?
5    A    Yes.
6    Q    And you thought it was wrong when you did
7  it?
8    A    I didn't know exactly what it was for, and
9  I asked questions and I couldn't get answers.
10   Q    Did you ever hear of Nancy Reagan?
11   A    Who?
12   Q    Nancy Reagan. Did you ever hear of her
13 program: Just say no? Did you ever hear of that?
14   A    Uh-huh.
15   Q    Did you ever think about just saying: No,
16 I'm not going to sign them?
17   A    I did do that on the third check that came
18 around.
19   Q    Okay. And who did you say no to, sir?
20   A    Mr. Milsner.
21   Q    Okay. You and Mr. Milsner met
22 face-to-face?
23   A    No.
24   Q    How did the conversation occur, sir?
25   A    I'm sure it was on the phone.

Deposition of John Carstarphen, Friday, April 23, 2010

45

```
 1     Q    Okay.  What did he say?
 2     A    I don't remember.
 3     Q    What did you say?
 4     A    I says:  What is this $5,000 a month thing
 5  for?
 6     Q    And what did he say?
 7     A    He says it was for his -- the risk that he
 8  was taking.
 9     Q    Okay.  Has anybody ever told you that in
10  that period of time Reno Flying Service had been
11  paying bills for American Medflight?  Anybody ever
12  say anything like that to you?
13     A    Reno Flying Service has never paid any
14  bills for American Medflight.
15     Q    Did American Medflight owe Reno Flying
16  Service any money in that time frame, in the time
17  frame when those $5,000 checks started?
18     A    During that?
19     Q    Yes.
20     A    What do you mean?  In what period?
21     Q    Well, I wasn't there.  You told me this
22  morning that the checks started in sometime between
23  August and October of 1998.  At that point in time
24  was American Medflight paying rent to Reno Flying
25  Service?
```

46

```
 1     A    Rent?  I'm sure.
 2     Q    Okay.  Was it paying its share of overhead
 3  expenses at that point in time?
 4     A    Yes.
 5     Q    Was it current on its accounts with Reno
 6  Flying Service?
 7     A    Yes.
 8     Q    Okay.  I'm going to hand you binder 1, and
 9  I'm going to ask you to turn to Exhibit 15, please.
10       Mr. Carstarphen, do you recognize
11  Exhibit 15 as the bylaws of American Medflight?
12     A    They're the bylaws of Arrow Medicare.
13     Q    And did not Arrow Medicare, Inc., become
14  American Medflight, Inc.?
15     A    Yes.
16     Q    Do you recognize Exhibit 15 as the bylaws
17  of American Medflight?
18     A    I think the bylaws were changed to say
19  American Medflight, not Arrow Medicare.
20     Q    When did that change take place?
21     A    I don't know.
22     Q    Were you a director at that time?
23     A    Yes.
24     Q    So there should be a directors resolution
25  to that effect?
```

47

```
 1     A    I don't know if there was or there wasn't.
 2     Q    Where did the bylaws of Arrow Medicare,
 3  Inc. that we see here as Exhibit 15, do you know
 4  where this document came from?
 5     A    Yes.
 6     Q    Where?
 7     A    I produced it.
 8     Q    Okay.  Where did you get it?
 9     A    I don't know.
10     Q    What did you do -- how did you prepare
11  them?
12     A    It was basically a cut and paste of some
13  other documents I had.
14     Q    Are you telling me that the bylaws
15  themselves were changed, or just the name on the
16  document was changed?
17     A    I believe just the name on the document.
18     Q    Okay.  So the bylaws themselves are
19  substantially as they were when they were agreed upon
20  way back when?
21     A    I believe so.
22     Q    Okay.  And let's look at the last page.
23       Do you know if that's Milsner's signature?
24  Do you believe it is?
25     A    I don't know, but I believe it is.
```

48

```
 1     Q    Okay.  And he's signing as the corporate
 2  secretary, and he says:  The undersigned duly elected
 3  secretary of the corporation does certify that the
 4  foregoing bylaws were adopted by the board of
 5  directors on the 25th day of January, 1993.
 6       Is that a true statement?
 7     A    I believe that to be correct.
 8     Q    Were you in agreement that these bylaws as
 9  we see here in Exhibit 15 should be adopted?
10     A    Yes.
11     Q    Why have bylaws?
12     A    What do you mean, why have bylaws?
13     Q    Why did you think -- did you think they
14  were necessary?
15     A    Yes.
16     Q    Why did you think they were necessary?
17     A    It shows how you're going to operate your
18  corporation.
19     Q    Would it be fair to say that the bylaws are
20  the ground rules for how we're going to run the
21  company?
22     A    Yes.
23     Q    And do you think that the corporation
24  should abide by the ground rules?
25     A    Definitely.
```

Deposition of John Carstarphen, Friday, April 23, 2010

49

1    Q    And do you think that the directors are
2    controlled by the bylaws?
3    A    I don't know how to answer that question.
4    Q    Okay. Fair enough. That may have gotten a
5    bit technical.
6         Do you, as a director, believe that you're
7    bound by these bylaws?
8    A    Yes.
9    Q    And the other directors are bound as well?
10   A    Yes.
11   Q    Okay. Let's look for just a moment at --
12   you know what Bates stamps are, don't you?
13   A    Uh-huh.
14   Q    Let's go to page ANI 0020. It's page 4 of
15   the document. Let me know when you're there.
16        Are you with me?
17   A    Uh-huh.
18   Q    Section 1.08, Voting. I'm just going to
19   move things along here, I'm going to be rude and
20   point. Do you see where it says in here that every
21   share gets one vote?
22   A    Uh-huh.
23   Q    Do you see that?
24   A    Yes.
25   Q    Okay. And have you ever gotten more than

51

1    A    I believe so.
2    Q    Do you understand that to mean majority
3    rules at American Medflight?
4    A    Yes.
5    Q    Okay. And has that always been acceptable
6    to you?
7    A    Yes.
8    Q    Now when this corporation was formed you
9    owned -- what percentage of the corporation do you
10   own today, sir?
11   A    One-third.
12   Q    And you understood from the very beginning,
13   did you not, that that meant you could be out-voted?
14   A    Yes.
15   Q    And when you agreed to these bylaws you
16   understood that was a possibility, didn't you?
17   A    Yes.
18   Q    And have you ever been out-voted?
19   A    Yes.
20   Q    Have you been out-voted a lot?
21   A    Yes.
22   Q    Do you believe that the votes were in any
23   way fraudulent?
24   A    No.
25   Q    Do you believe that there was any kind of

50

1    one vote per share?
2    A    No.
3    Q    Has anybody ever claimed to be entitled to
4    more than one vote per share?
5    A    No.
6    Q    Okay. Let's go to page 21, the next one,
7    sir. ANI 0021.
8         Let me direct your attention to the
9    paragraph that's G: If a quorum is present --
10   A    Wait, wait. Wait. Okay.
11   Q    Are you with me?
12   A    Yes.
13   Q    Let me read it to you: If a quorum is
14   present, unless the articles of Incorporation provide
15   for a different proportion, the affirmative vote of
16   holders of at least a majority of the voting power
17   represented at the meeting and entitled to vote on
18   any matter shall be the act of the stockholders,
19   unless voting by class is required for any action of
20   the stockholders by the laws of the State of Nevada,
21   the Articles of Incorporation or these bylaws, in
22   which case the affirmative vote of holders of at
23   least a majority of the voting power of each such
24   class shall be required.
25        Did I read that correctly, sir?

52

1    miscount that occurred when you lost on a vote?
2    A    No.
3    Q    Are there any of the issues that you
4    brought up here that you say Wilsner caused you harm
5    that were not the subject of a vote?
6    A    Yes.
7    Q    Okay. Well, which one?
8    A    I don't have the list.
9    Q    I'll try to remember to ask you that
10   question as we go through. I think that's a fairer
11   way to do it than try to get you to recall that.
12        Let's go to ANI 22, please.
13        Section 1.3, Action Without Meetings. Let
14   me represent to you, sir, I think this paragraph
15   means that the directors and shareholders can act
16   without having to call a formal meeting.
17        Do you understand that to be what that
18   paragraph says?
19   A    I don't know.
20   Q    Take a minute.
21   A    Okay.
22   Q    Do you recall my question, sir?
23   A    Say it again?
24   Q    Do you understand that this paragraph that
25   you just read to yourself, 1.13 Action Without

Deposition of John Carstarphen, Friday, April 23, 2010

53

1    meetings, that the shareholders don't have to have a
2    meeting; that if they can come to agreement, they can
3    do what they want?
4        A    Yes.
5        Q    Okay. And that any decision made can be
6    made by the majority; is that right?
7        A    I'm not sure of that question.
8        Q    Okay. Do you see anything in 1.13 that
9    requires anything other than a majority?
10       A    No.
11       Q    Let's go to page 25, please, sir, AMI 0025.
12           Let me direct your attention to Section
13   2.12, Board of Directors Decisions. Do you see that,
14   sir?
15       A    Uh-huh.
16       Q    The affirmative vote of a majority of the
17   directors present at a meeting at which a quorum is
18   present is the act of the board of directors.
19           Did I read it correctly?
20       A    Yes.
21       Q    You understood that the majority rule was
22   the rule for shareholders? Right?
23       A    Yes.
24       Q    The majority rule is the rule for the
25   directors; right?

54

1        A    Yes.
2        Q    Are you okay?
3        A    Uh-huh.
4        Q    Okay. Let's go to the next page,
5    page 0026.
6            Let me direct your attention to Section
7    2.15, Mr. Carstarphen. Let me read the first two --
8    well, let me read it to you: Except as otherwise
9    restricted in the laws of the State of Nevada or the
10   Articles of Incorporation, the board of directors has
11   full control over the affairs of the corporation.
12           Did I read that sentence correctly?
13       A    Yes.
14       Q    So as a shareholder do you understand that
15   you're turning control of the company over to the
16   directors?
17       A    Yes.
18       Q    Now you have not been a director the whole
19   time that the company has been in existence; is that
20   right?
21       A    No.
22       Q    When did you begin being a director?
23       A    On the formation.
24       Q    When did you stop being a director for the
25   first time?

55

1        A    When they fired me.
2        Q    So at that point in time you were removed
3    as a director?
4        A    I believe so.
5        Q    Did they tell you you were removed as a
6    director?
7        A    I don't know the exact circumstances.
8        Q    Okay. And your testimony is that that
9    occurred in December of 1998?
10       A    I believe it's on about that time.
11       Q    Okay. Do you need to look at one of the
12   sheets that you have out in front of you?
13       A    No.
14       Q    Okay. So you ceased to be a director in
15   1998?
16       A    I don't know the exact date.
17       Q    When you were fired you ceased to be a
18   director?
19       A    I don't know that it was at the same time.
20       Q    Okay. Do you recall a time when you were
21   not a director?
22       A    After I was fired.
23       Q    But you can't tell me --
24       A    No.
25       Q    Let me see if I understand. It occurred

56

1    simultaneously?
2        A    I don't know.
3        Q    So sometime after you were fired, you
4    ceased to be a director?
5        A    Yes.
6        Q    But you don't know when?
7        A    I don't know when.
8        Q    Okay. When did you become a director
9    again?
10       A    I don't know. After I was fired I
11   subsequently went back to work for the company
12   because it had problems with the accounts receivable.
13       Q    Okay.
14       A    And then I would have to look at Exhibit
15   Number 58 to give you the next date.
16           Then again in November of '99 I was fired
17   again.
18       Q    So you were fired for the first time in
19   December of '98, and then fired again in November of
20   '99?
21       A    Correct.
22       Q    Okay. And what document are you reading
23   from?
24       A    58.
25       Q    Thank you.

57

1 Were you a director from the time that you
2 were fired the first time until you were fired the
3 second time?
4 A I don't remember.
5 Q Were you given any cause for either
6 termination?
7 A No.
8 Q Both of them were just a complete mystery
9 to you?
10 A Yes.
11 Q What was the trouble that American
12 Medflight was having with its accounts receivable
13 that they required your return to the company?
14 A They were getting very large.
15 Q Okay. And what did you do -- or did you do
16 anything to remedy that circumstance?
17 A Yes.
18 Q What did you do?
19 A We brought the billing back in-house. We
20 had it previously subcontracted out.
21 Q Was that something that was done while you
22 were there before you were fired the first time?
23 A We had it contracted out in '98.
24 Q Before you were terminated?
25 A Yes.

58

1 Q And who was it contracted with, if you
2 recall?
3 A Oh, God.
4 MR. HAMILTON: Yes?
5 THE WITNESS: Upper management, I believe.
6 BY MR. HILL:
7 Q The name of the company was Upper
8 Management?
9 A No. I don't know.
10 Q If it comes to you, stop me and tell me.
11 Did you disagree with the decision to have
12 the billing go outside?
13 A At the time, no.
14 Q Was it a decision that everybody agreed on?
15 A I believe so.
16 Q Okay. Was there a --
17 A Let me clarify that.
18 Q Sure.
19 A We didn't have the knowledge in-house to do
20 the billing, the medical billing, and so we
21 subcontracted that out.
22 Q Okay. And you then came back on board and
23 brought the billing back in-house?
24 A Yes.
25 Q And that was something I gathered that you

59

1 stewarded?
2 A Yes.
3 Q Okay. All right. Do you recall whether or
4 not you were a director in the year 2000?
5 A I don't recall.
6 Q You recall when you filed the first
7 lawsuit. 2003, March, I believe?
8 A Uh-huh.
9 Q Were you a director at that time?
10 A I don't believe so.
11 Q Okay. When do you recall becoming a
12 director again?
13 A It's only just been recently within the
14 last year or so.
15 Q Okay. We'll probably look at some of those
16 documents in a little while.
17 Look at page AMI 0031, please.
18 Mr. Carstarphen, have you read these bylaws
19 in the last year?
20 A No.
21 Q When was the last time you recall having
22 read these?
23 A I don't think I've read them from cover to
24 cover in years. But I have read parts of it.
25 Q Do you recall having read this part we see

60

1 here at the bottom of page AMI 0031, Indemnification,
2 Article VII? Do you recall having read this before?
3 A No.
4 Q Do you think as a director you should know
5 what that says?
6 A I know what it says.
7 Q What does it say?
8 A It's an indemnification of the directors.
9 Q What does it mean?
10 A It means that --
11 Q To you.
12 A -- in any litigation they're to be
13 indemnified.
14 Q Okay. And you understand the corporation
15 is indemnifying Milsner in this case.
16 A Yes.
17 Q Let's go to page 033.
18 Let me read the first sentence of paragraph
19 7.02, Amendment, to you, sir: The provisions of this
20 article relating to indemnification shall constitute
21 a contract between the corporation and each of its
22 directors and officers which may be modified as to
23 any director or officer only with that person's
24 consent or as specifically provided in this section.
25 Did I read that first sentence correctly?

61

```
 1      A    Yes.
 2      Q    Had you ever read that before?
 3      A    I'm sure I have.
 4      Q    We talked earlier, but I just want to
 5   confirm, you believe people should honor their
 6   contracts?
 7      A    Yes.
 8      Q    And that applies to corporations?
 9      A    Yes.
10      Q    And then the second sentence says:
11   Notwithstanding any other provision of these bylaws
12   relating to their amendment generally, any repeal or
13   amendment of this article which is adverse to any
14   director or officer shall apply to such director or
15   officer only on a prospective basis and shall not
16   limit the rights of an indemnitee to indemnification
17   with respect to any act or failure to act occurring
18   prior to the time of such repeal or amendment.
19           Did I read that sentence correctly,
20   Mr. Carstarphen?
21      A    I believe so.
22      Q    Thank you. There are some big words in
23   there. Let's talk about some of those for just a
24   moment.
25           "Prospective." What does that word mean to
```

63

```
 1           Do you have any reason why the corporation
 2   should not continue to indemnify Mr. Milsner in this
 3   case, sir?
 4      A    Yes.
 5      Q    Why?
 6      A    I believe that the corporation is
 7   indemnifying Mr. Milsner but not me.
 8      Q    Okay. Any other reasons?
 9           Any other reason you can think of, sir?
10      A    Not offhand.
11      Q    Okay. Have you asked the company to
12   provide you with indemnification?
13      A    Yes.
14      Q    And when did you do that?
15      A    I'm not sure of when, but it's probably at
16   least a couple years ago.
17      Q    What did you do or not do that you think
18   the company should indemnify you for?
19           Do you understand the question?
20      A    No.
21      Q    Okay. You think you should be indemnified;
22   right?
23      A    Yes.
24      Q    Why?
25      A    Because I'm a director.
```

62

```
 1   you, sir?
 2      A    I'm not quite sure.
 3      Q    Okay. Do you think it means that only for
 4   things that occur after -- do you think this sentence
 5   says that the corporation can only amend the
 6   indemnification provisions to apply to things that
 7   occur after the date of the amendment?
 8      A    I believe so.
 9      Q    Okay. Has this part of these bylaws been
10   amended, do you know?
11      A    I don't know.
12      Q    Have you asked that it be amended?
13      A    No.
14      Q    Have you brought the matter up at a board
15   of directors meeting, the amendment?
16      A    I don't believe so.
17      Q    Okay. Let's go to the last page. Section
18   9.0 - excuse me - 9.01. That deals with amendment of
19   the articles.
20           Have the bylaws at all been amended? I
21   think you told me before the name has been changed on
22   the document.
23      A    Yes.
24      Q    Okay. Well, we'll go through some
25   amendments later.
```

64

```
 1      Q    Okay. And what act did you do as a
 2   director that you think entitled you to
 3   indemnification?
 4      A    I'm not with you.
 5      Q    Why should the company indemnify you, sir?
 6      A    Because I was a director.
 7      Q    What did you do that triggered your right
 8   to be indemnified? Do you know?
 9      A    The litigation that was filed against me.
10      Q    Okay. And what do you understand are the
11   complaints against you?
12      A    I don't know.
13      Q    Have you read the counterclaim against you?
14      A    Yes.
15      Q    Did you understand it? Do you think you
16   understand it?
17      A    Not really.
18      Q    Okay.
19           MR. HILL: Why don't we take a break, and
20   then go until noon.
21           (At 11:16 a.m. a recess was taken.)
22                    -oOo-
23
24
25
```

Deposition of John Carstarphen, Friday, April 23, 2010

65

```
 1                    RENO, NEVADA
 2               FRIDAY, APRIL 23, 2010
 3                    11:30 A.M.
 4                      -oOo-
 5                   EXAMINATION
 6                    (Resumed)
 7   BY MR. HILL:
 8      Q    Mr. Carstarphen, would it be fair to say
 9   that since 19 -- you told me that you formed the
10   opinion that Milsner was a dishonest person in 1998.
11   Do you recall telling me that?
12      A    Yes.
13      Q    Okay. Would it be fair to say that ever
14   since that time you've not trusted him?
15      A    Yes.
16            (A copy of a document entitled First
17            Amended Complaint for Breach of
18            Fiduciary Duties and Self Dealing was
19            marked Exhibit 60 for identification.)
20   BY MR. HILL:
21      Q    Mr. Carstarphen, I've handed you what we
22   have marked for your deposition as Exhibit 60. I
23   will represent to you, sir, that this is a document
24   that your attorneys filed on your behalf in this case
25   on January 29, 2008.
```

66

```
 1            Have you seen this document before today?
 2      A    Probably.
 3      Q    Okay. Do you recall the first time you saw
 4   it?
 5      A    No.
 6      Q    Do you recall the last time you saw it?
 7      A    No.
 8      Q    But you do recall having seen it at some
 9   point in time, some place, some where?
10      A    I believe I have seen it.
11      Q    Okay. Mr. Carstarphen, the lawsuit that
12   you have brought, you seek to have money paid to you;
13   is that right?
14      A    I don't know what this says.
15      Q    Well, what do you want the Judge to do?
16   You want him to give you money, don't you?
17      A    Yes.
18      Q    And you want him to give --
19      A    Reverse what Milsner did to devalue my
20   stock.
21      Q    You want the Judge to order Milsner to pay
22   you money; right?
23      A    Yes.
24      Q    Okay. And that's money that would go to
25   you, John Carstarphen.
```

67

```
 1      A    Yes.
 2      Q    Not to the company. Right?
 3      A    I believe so.
 4      Q    Okay. Were you a director when this
 5   lawsuit was filed?
 6      A    What was the day?
 7      Q    Yours got cut off at the top. Let me show
 8   you. This is the way the Feds do it. Well, the
 9   lawsuit was filed in November of 2007.
10            You weren't a director then, were you?
11      A    I don't know.
12      Q    You don't recall?
13      A    I don't recall.
14      Q    Okay. Let's talk about -- well, you told
15   me earlier that the bylaws - and I think that's the
16   term you used - had been amended to address, I think
17   you said self-dealing. Do you recall telling me
18   that?
19      A    No.
20      Q    You don't recall telling me earlier today
21   that the bylaws had been amended so that there would
22   be no self-dealing, and you told me about your
23   company and about RFS?
24      A    Yes.
25      Q    Okay. Do you recall that testimony now?
```

68

```
 1      A    Yes.
 2      Q    Okay. Good.
 3            Let's look at Exhibit 1 in that binder,
 4   Mr. Carstarphen.
 5            These are the minutes of the third meeting
 6   of the board of directors of American MedFlight, Inc.
 7   Is that correct, Mr. Carstarphen?
 8      A    Uh-huh.
 9      Q    Yes?
10      A    Yes.
11      Q    Thank you, sir.
12            And the meeting was held on February 9,
13   1995; is that correct?
14      A    Yes.
15      Q    Is this the document to which you referred
16   earlier, sir, that amended the bylaws to address what
17   you called the self-dealing issue?
18            Take a minute and look at it.
19      A    I don't believe so.
20      Q    Well, you're on page AMC 0043; is that
21   right?
22      A    Yes.
23      Q    Let's look at AMC 0044.
24            Take a moment and read that first indented
25   paragraph to yourself, Mr. Carstarphen.
```

Deposition of John Carstarphen, Friday, April 23, 2010

69

1    A   Yes.
2    Q   Okay. Is this the document that you relied
3  on when you told me earlier about steps being taken
4  to stop the self-dealing or prevent self-dealing?
5    A   There's two parts to that.
6    Q   Okay.
7    A   There is this part, and then I believe in
8  2008 it was repealed.
9    Q   Okay. My question to you, Mr. Carstarphen,
10 let me put it this way, do you believe that you
11 personally have the right to veto whether or not
12 American Medflight does business with Reno Flying
13 Service?
14    A   I don't understand the question.
15    Q   Do you, John Carstarphen, have the right to
16 say that American Medflight will not do business with
17 Reno Flying Service without your prior approval?
18    A   That's what this says.
19    Q   You believe that what I just said is the
20 right that you have, is that correct, that you have
21 the -- let me start over.
22        Do you believe --
23    A   A clarification is as a stockholder, or a
24 board of director, or as an officer?
25    Q   You, do you, John Carstarphen, without -

71

1    A   That doesn't mean they're not there.
2    Q   Do you know of any payments by American
3  Medflight to R.L. Milsner, Inc. that were signed by
4  Mr. Milsner?
5    A   I don't know of any.
6    Q   Have you made any inquiry to find out if
7  there were?
8    A   No.
9    Q   If there are no checks drawn on American
10 Medflight payable to Reno Flying Service signed by
11 Richard Milsner, has that paragraph been complied
12 with?
13    A   Jack Dawson has written checks to Reno
14 Flying Service and he was an owner.
15    Q   Can you answer my question, sir?
16        MR. RUSSO:  He just did.
17        THE WITNESS:  I think I just did.
18 BY MR. HILL:
19    Q   The answer is no, because Dawson was an
20 owner of Reno Flying Service?
21    A   Correct.
22    Q   And you told me that that came to an end in
23 the fall of 1998?
24    A   Yes, he sold his stock in '98.
25    Q   All right. So do I understand you to be

70

1  we'll go through all of those - do you,
2  John Carstarphen, believe that you, in any capacity
3  whatsoever, have the right to prevent Reno Flying
4  Service and American Medflight from doing business
5  together?
6    A   No.
7    Q   What do you understand that paragraph to
8  say, sir?
9    A   I understand this paragraph to say that any
10 contractual agreements, payments, shall be signed by
11 a disinterested party --
12    Q   Okay. And do you --
13    A   -- to the other company.
14    Q   Do you contend that that provision has been
15 breached?
16    A   Yes, I do.
17    Q   When was it breached?
18    A   Almost immediately.
19    Q   Are you aware, sir, of any checks payable
20 from American Medflight to Reno Flying Service that
21 were signed by Richard Milsner?
22    A   I don't know.
23    Q   You know of none, do you?
24    A   I don't know of any.
25    Q   Thank you.

72

1  saying, sir, that you, John Carstarphen, have to sign
2  all those checks?
3    A   That's what this says.
4    Q   You understand it to say that?
5    A   That's what I understand it to say.
6    Q   Okay. Without regard for whether you're an
7  officer of the company?
8    A   It doesn't necessarily mean that I have to
9  sign it; it has to be signed by a disinterested
10 party.
11    Q   Did Dawson become disinterested in Reno
12 Flying Service when he sold his stock, sir?
13    A   He didn't sell all of his stock. He still
14 had some.
15    Q   Do you believe that Mr. Dawson is still an
16 owner of Reno Flying Service as you sit here today?
17    A   No, he's not.
18    Q   Has Mr. Dawson been an owner of Reno Flying
19 Service since 2004, sir? Do you know?
20    A   I don't know.
21        MR. RUSSO:  You're going to have to define
22 "disinterested." If he's president of the company is
23 he disinterested?
24        MR. HILL:  I don't know.
25        MR. RUSSO:  I mean president of the --

Deposition of John Carstarphen, Friday, April 23, 2010

73

1    BY MR. HILL:
2        Q    Do you believe that it's inappropriate for
3    Mr. Dawson to sign checks paying Reno Flying Service,
4    sir?
5        A    I don't know that.
6        Q    Do you believe it is inappropriate --
7        A    I don't know what his position is with Reno
8    Flying Service.
9        Q    Do you contend in this lawsuit, sir, that
10   Mr. Dawson signing checks payable from American
11   medflight to Reno Flying Service violates the
12   provision that we see here on page AMC 0044?
13       A    When he is an owner of Reno Flying Service,
14   I do believe that this violates this provision.
15       Q    And if Dawson is not an owner, from that
16   point forward is it okay for him to sign those
17   checks?
18       A    If he's an officer, he's still an
19   interested party.
20       Q    So the answer is if he continues as an
21   officer at Reno Flying Service then it's not okay for
22   him to sign those checks.
23       A    According to this provision.
24       Q    Okay.  So you personally, John Carstarphen,
25   would have to come in and sign all those checks?

74

1        A    Not me personally, a disinterested party,
2    which could be like Will Gever.
3        Q    Okay.  But you've indicated to me that you
4    believe this has been ignored?
5        A    It's been ignored since the inception of
6    this in 1995.
7        Q    When did you first find out that that
8    provision was being ignored, sir?
9        A    Almost immediately.
10       Q    Okay.  So this was adopted in February of
11   1995.  Is it your testimony, sir, that by June of
12   1995 you knew that it was being dishonored?
13       A    Yes.
14       Q    Disobeyed?
15       A    Yes.
16       Q    And did you know from that day forward that
17   it had been disobeyed?
18       A    Yes.
19       Q    Do you know, has the board of directors --
20   well, let me back up.
21           Do you contend that that provision that we
22   talked about -- and let's put it on the record here
23   just so we're all clear.  It says:  Now, therefore,
24   be it resolved that any business, contractual or
25   financial dealings with Olympian General

75

1    Constructors, Inc., Professional Air Charter, Reno
2    Flying Service, Inc., and Richard L. Milsner, Inc.,
3    including future interests of the directors, shall be
4    approved by the board of directors, and any
5    contracts, agreements or financial payments in any
6    amount shall be signed by the president and a
7    disinterested party to the contractural agreement or
8    financial payment.
9            Did I read that correctly, sir?
10       A    I believe so.
11       Q    Okay.  Are you aware, has the board of
12   directors -- let me back up.
13           You've been provided with financial
14   information in the first case and this case, have you
15   not, sir?
16       A    Yes.
17       Q    And do you believe, do you contend,
18   Mr. Carstarphen, that there are any transactions
19   between American medflight and Reno Flying Service
20   that are not accurately reflected on the books and
21   records of the company?
22       A    I don't believe so.
23       Q    Let me put it in the vernacular.  Do you
24   think the books at AMF are cooked?
25       A    No.

76

1        Q    Okay.  They're accurate?
2            Have you ever found any inaccuracies?
3        A    All the time.
4        Q    And have they been corrected?
5        A    Yes.
6        Q    Did the inaccuracies include payments of
7    money to Reno Flying Service?
8        A    I'm sure it did.
9        Q    Tell me one that you found, sir.
10       A    I don't know.
11       Q    You can't identify one as you sit here
12   today?
13       A    No.  Once you find something that's wrong,
14   you correct it, fix it.
15       Q    The prohibition now that we talked about on
16   AMC 0044, it applies to Olympian General
17   Constructors, Inc.
18       A    Yes.
19       Q    When did that -- is that still in business?
20       A    No.
21       Q    When did it cease to be in business?
22       A    I don't know.
23       Q    Was it in business at the time this was
24   prepared?
25       A    No.

77

1    Q    Professional Air Charter?
2    A    Yes.
3    Q    Was that in business then?
4    A    I believe so.
5    Q    And that was your business?
6    A    Yes.
7    Q    Okay. Who prepared this document that we
8    see here, AMC 0043, 44, 45, and 46? You did, didn't
9    you?
10   A    I did.
11   Q    Okay. And it was signed as presented by
12   you; is that right? Were there any changes made?
13   A    I don't believe there was any changes, but
14   it's too far ago that I don't remember. I don't
15   believe there was any changes.
16   Q    Fair enough, sir. Thank you.
17        The provision that I read to you, did I
18   read the whole thing?
19   A    No.
20   Q    Do you want to go back onto the other page?
21   A    You need to read the first part.
22   Q    Starting at: Whereas, John R. Carstarphen
23   owns the majority of the stock --
24   A    Yes.
25   Q    -- of Olympian General Constructors, Inc.

---

78

1    and Professional Air Charter, and Richard L. Milsner
2    and John A. Dawson owns the majority of the stock of
3    Reno Flying Service, Inc., and Richard L. Milsner
4    owns the majority of the stock of Richard L. Milsner,
5    Inc., including future interests of the director.
6    Upon a motion duly made, seconded, and unanimously
7    carried now, therefore, the part that I read earlier?
8    A    Correct.
9    Q    Is it your testimony, sir, that you believe
10   this changed the bylaws?
11   A    Changed the bylaws?
12   Q    Yes.
13   A    I don't know that.
14   Q    Do you believe that provision altered
15   the bylaws that we talked about earlier?
16   A    I don't know.
17   Q    Was there any word in there that -- did you
18   hear the word "bylaw" in anything that I have read?
19   A    I don't believe so.
20   Q    Does the word "bylaw" even appear in this
21   document, sir, do you know?
22   A    I don't know.
23   Q    How can the board of directors change a
24   director's resolution under the bylaws, sir? Do you
25   know?

---

79

1    A    A director's resolution?
2    Q    Yes.
3    A    What is that?
4    Q    Look at the first page of Exhibit 1, sir.
5    A    Okay.
6    Q    Minutes of third meeting, the board of
7    directors of American Medflight, Inc. And then it
8    goes on and it says: Now, therefore, be it resolved.
9    A    Okay.
10   Q    Do you understand that to be a resolution?
11   A    Yes.
12   Q    Can the board of directors change those, or
13   is the board of directors forever locked in?
14   A    No. They can change it.
15   Q    Okay. Are you aware -- well, let me back
16   up.
17        You've told me that throughout the entire
18   period of time you've known that this provision has
19   not been honored. Yes?
20   A    1995, to I believe 2008.
21   Q    And will you agree with me, sir, that the
22   directors knew that?
23   A    Did the directors know that?
24   Q    Yes.
25   A    I would say yes.

---

80

1    Q    Does the prohibition that we're talking
2    about -- well, okay.
3         In your complaint, let's turn to
4    Exhibit 60, paragraph 8 on page 3, please,
5    Mr. Carstarphen.
6         Let me know when you're there, sir.
7    A    Okay.
8    Q    Let me read it to you: Plaintiff is
9    informed and believes, and based thereon alleges,
10   that defendants have engaged and continued to engage
11   in an intentional, systematic, self-dealing plan to
12   divert funds and business opportunities of American
13   Medflight to Reno Flying Services, which was owned
14   and operated solely by defendants period.
15        Did I read that sentence correctly, sir?
16   A    Yes.
17   Q    Who are the defendants? Who did that, sir?
18   A    Mr. Milsner.
19   Q    Just Mr. Milsner, or --
20   A    And Jack Dawson when he was owner of Reno
21   Flying Service.
22   Q    Okay. Anybody else?
23   A    I don't believe so.
24   Q    Do I understand you to take the position -
25   and I'll ask Mr. Russo if he disagrees - that once

81

1  Dawson sold out of Reno Flying Service, he ceased to
2  be somebody that you're talking about here and that
3  your lawyers are talking about here?
4          MR. RUSSO:  If you're asking me to answer
5  that, it's absolutely not; he's still president of
6  Reno Flying Service.
7  BY MR. HILL:
8      Q   Okay.  So do you adopt Mr. Russo's answer?
9      A   I believe so.
10     Q   Okay.  Now what business opportunities did
11 Dawson divert from American Medflight to Reno Flying
12 Service?
13     A   Maintenance, aircraft rental --
14     Q   Do you want to use any of your sheets?
15     A   -- funds from the line of credit.
16     Q   Okay.
17     A   140,000.
18     Q   Go ahead.
19         You've got Exhibit 56 now?
20     A   Yes.
21     Q   Okay.  I just wanted the record to be
22 clear.
23     A   Consulting fees of 5,000 a month from 1998
24 to 2008.
25     Q   Okay.  Let me help.  Do you have a problem

82

1  with the leasing of the airplanes by --
2      A   Yes.
3      Q   -- by AMF from Reno Flying Service?
4      A   Yes.
5      Q   Anything else that are business
6  opportunities that American Medflight diverted to
7  Reno Flying Service?
8      A   That's the main ones.
9      Q   Are there any others?
10     A   I don't know.
11     Q   Okay.  Who would know that, sir?
12     A   Probably Richard Mlisner.
13     Q   Okay.  Reno Flying Service was in business
14 when American Medflight was formed; was it not?
15     A   Yes.
16     Q   What business was Reno Flying Service in
17 when American Medflight was formed?
18     A   It had aircraft charter, aircraft
19 maintenance, and flight instruction.
20     Q   Now the line of credit, let's talk about
21 that one.  When I took your deposition at one point
22 you told me that you had not suffered so much as a
23 nickel's worth of harm.  Do you recall that
24 testimony, Mr. Carstarphen?
25     A   Yes.

83

1      Q   Is that still your testimony?
2      A   Yes.
3      Q   Now the maintenance, do I understand
4  correctly that you do not believe that American
5  Medflight should have maintenance on its aircraft
6  performed at Reno Flying Service?
7      A   Can we back up to the line of credit one?
8      Q   We can back up, sir.
9      A   When you say "harm," they took $140,000
10 that I was personally guaranteeing.  I think there is
11 harm there.
12     Q   Do you stand by the answers you previously
13 gave in deposition testimony, sir?
14     A   Yes.
15     Q   In that testimony my recollection - and we
16 can get the deposition out if you want - you said
17 that you had not had to pay anybody any money
18 anywhere in the world as a result of that guarantee.
19 Is that still the case?
20     A   That's still the case.
21     Q   You told me that nobody had increased any
22 cost of credit to you anywhere in the world as a
23 result of that guarantee.  Is that still the case?
24     A   That's the case.
25     Q   And you've told me in the past that you've

84

1  seen documentation that Reno Flying Service paid all
2  of the money that it owed on that line of credit.
3      A   I don't know that, and I don't know that
4  they paid the interest.
5      Q   Okay.  Do you have any basis to believe
6  that they did not?
7      A   I have no idea how to do it because I was
8  not shown any records.  I was denied access to the
9  records.
10     Q   Do I understand your testimony to be, sir,
11 that from the time you were terminated in 1999 you
12 were denied -- well, were you denied access to
13 financial information from 1998 forward?
14     A   Yes.
15     Q   And there came a point in time when you
16 were no longer provided financial information; is
17 that right?
18     A   1998.
19     Q   I just asked and you said 19 -- okay.  Let
20 me back up.
21         There came a time when AMF stopped
22 providing you with financial information.
23     A   Yes.
24     Q   Was that when you were fired the first time
25 or the second time?

85

1      A    The first time and the second time.
2      Q    So you had no information, no financial
3  information from the time you were fired the first
4  time until you were rehired; is that right?
5      A    Yes.
6      Q    Did you have access to financial
7  information from that point until you were fired
8  again?
9      A    I had limited access.
10     Q    Okay. And your testimony is that you were
11  cut off and provided no financial information from
12  American Medflight from December of -- November or
13  December of 1999 when you were fired forward; is that
14  right?
15     A    No.
16     Q    Okay. Tell me.
17     A    I was provided K-1 information for tax
18  purposes, and I'm not sure if I saw complete tax
19  returns, but at least I know I for sure had to have
20  the K-1 to file my taxes.
21     Q    Okay.
22     A    Okay?
23     Q    Was that all you were given?
24     A    For many years.
25     Q    Okay. And --

87

1      Q    Have you asked her to send them to you?
2      A    Any time I call her and ask for something,
3  I have been given the information currently.
4      Q    So you would concede that it's probably an
5  oversight as opposed to somebody trying to not --
6  somebody trying to deny you information?
7      A    I would say so.
8      Q    Okay. So your testimony then is you got no
9  Monday reports from the time you were fired in 1999
10  up until two years ago --
11     A    Yes.
12     Q    -- did I understand correctly? Okay.
13  Good.
14          All right. Now the maintenance, the last
15  time we talked in one of these depositions you told
16  me that you believed that the charges that American
17  Medflight paid at Reno Flying Service were comparable
18  to those that American Medflight would pay if it took
19  its business elsewhere.
20          Is that still your testimony?
21     A    I would believe so, but I'm not sure.
22     Q    Have you taken, have you taken any steps to
23  ascertain if the charges by Reno Flying Service to
24  American Medflight are reasonable?
25     A    Only in a limited way.

86

1      A    And then later on Jack was providing me
2  with certain limited amounts, and as now I am
3  provided a lot more information.
4      Q    What limited amounts were you getting, sir?
5      A    I don't know.
6      Q    Okay.
7      A    I don't really know.
8      Q    What are you getting now that you didn't
9  get before?
10     A    I'm getting now anything I ask for.
11     Q    Have you been given Monday reports
12  throughout the entire period of time, sir?
13     A    No.
14     Q    Did the Monday reports stop in 1999?
15     A    Yes.
16     Q    And have they resumed?
17     A    They resumed about two years ago --
18     Q    Okay.
19     A    -- and then stopped again.
20     Q    All right. Is that a function of
21  information being withheld, or a function of the
22  Monday reports not being done? Do you know?
23     A    I don't know if it's being withheld.
24  I think Linda just forgot to start sending them to
25  me.

88

1      Q    Tell me what you've done, sir.
2      A    I've looked at some of the invoices that
3  were given to Jim Proctor to prepare his report.
4      Q    Okay. What else?
5      A    I would say that's about it.
6      Q    And have you found any charges by
7  Reno Flying Service that were billed to American
8  Medflight that were not reasonable?
9      A    No.
10     Q    And do you concede that those charges were
11  comparable to what American Medflight would pay
12  elsewhere?
13     A    I don't know that, but I would assume that.
14     Q    Okay. You have made no investigation of
15  that fact, have you?
16     A    No.
17     Q    Do you know anybody who has?
18     A    I believe Jim Proctor, the consultant that
19  we hired, has done that.
20     Q    Okay. So your understanding then is that
21  Mr. Proctor has made an inquiry --
22     A    Yes.
23     Q    -- as to the reasonableness of those
24  charges?
25     A    Uh-huh. Yes.

Deposition of John Carstarphen, Friday, April 23, 2010

89

1   Q   And has he made an inquiry --
2   A   Yes.
3   Q   -- to determine if they are comparable to
4   other providers of similar goods and services?
5   A   I don't know.
6   Q   What has Mr. Proctor told you that he did?
7   A   All I've done is read his report.
8   Q   So Mr. Proctor has not told you anything
9   about an inquiry pertaining to the reasonableness or
10  the comparability of the charges, other than what's
11  in his written report. Is that your testimony, sir?
12  A   He may have told me something about
13  Magginetti --
14  Q   Okay.
15  A   -- is that right?
16  Q   I'll get you a spelling. That's a tough
17  one.
18      What did he tell you?
19  A   Just in passing.
20  Q   What did he tell you?
21  A   I think he said that he talked to them on
22  the telephone.
23  Q   Okay.
24  A   I don't know. I don't remember what he
25  said.

90

1   Q   When did that conversation take place?
2   A   Six months or more.
3   Q   Mr. Magginetti issued a report in December.
4   He's one of our experts. Have you read his report?
5   A   No.
6   Q   You haven't?
7   A   No.
8   Q   Do you know it's out there?
9   A   Yes.
10  Q   Okay. You contend -- well, let me back up.
11      Do you contend that American Medflight
12  should take its business elsewhere from Reno Flying
13  Service?
14  A   No.
15  Q   Okay. So you are content with American
16  Medflight doing business at Reno Flying Service?
17  A   No.
18  Q   Okay. What's the beef?
19  A   I think it should be done in-house.
20  Q   Okay. And there was a business model
21  prepared for American Medflight, Arrow Medicare, Inc.
22  at the time. Do you recall telling me that in the
23  prior deposition?
24  A   Yes.
25  Q   Have you ever found that business plan?

91

1   A   No.
2   Q   Did that business plan include that AMF,
3   what we know today as AMF, was going to do its own
4   maintenance?
5   A   I don't recall.
6   Q   Fair enough, sir.
7       Have you ever made a pitch to the board of
8   directors to do the maintenance --
9   A   Yes.
10  Q   -- in-house?
11  A   Back in 1995.
12  Q   Since that time have you?
13  A   Yes.
14  Q   When?
15  A   I don't know that I formally brought it up
16  at a board of directors meeting. It was mostly a
17  discussion between Jack, me, and Rich.
18  Q   In the prior testimony, sir, you told me
19  that you never made such a proposal after 1999. Do
20  you recall today having made such a proposal at any
21  time after 1999?
22  A   That American Medflight does it in-house?
23  Q   Yes, sir.
24  A   I don't know.
25  Q   Have you prepared a business model for the

92

1   creation of an in-house maintenance department at
2   American Medflight?
3   A   I don't believe so.
4   Q   Have you ever done any cost analyses?
5   A   No.
6   Q   Well, tell me what steps -- what
7   information have you presented to the board of
8   directors to suggest that that would be an
9   appropriate thing to do?
10  A   I did not make any formal thing to the
11  board of directors; it was informal between Jack,
12  Rich, and me.
13  Q   And this started in 1995, I think you said?
14  A   Yes.
15  Q   And it was rejected at that time?
16  A   Yes.
17  Q   And was it rejected in 1996?
18  A   I don't know.
19  Q   But it's been rejected every time you've
20  brought it up?
21  A   Yes.
22  Q   Okay. Do you know how much it would cost?
23  Do you know how much it would cost to open a
24  maintenance facility at American Medflight?
25  A   Back in 1995?

Deposition of John Carstarphen, Friday, April 23, 2010

93

```
 1       Q    At any point in time, sir.
 2       A    I have no detailed cost numbers.
 3       Q    Ever?
 4       A    What?
 5       Q    Ever?  At any point in time?  Let me start
 6   my question over again.
 7            Can you tell us at any point in time have
 8   you ever had a cost estimate to what it would cost to
 9   open a maintenance facility at American Medflight?
10       A    Why would I have that when it's rejected
11   every time I brought it up?
12       Q    So you don't have those numbers?
13       A    No.
14       Q    You never had those numbers?
15       A    I don't think so.
16       Q    Know anybody that does?
17       A    I'm sure Jack Dawson does.
18       Q    Okay.  Anyone else?
19       A    Probably Rich Milsner could have since he
20   is an owner of Reno Flying Service.
21       Q    Okay.  Anyone else?
22       A    I don't know.
23       Q    Now this maintenance facility, did you have
24   any kind of business plan for it; or was it just:
25   Gee, we ought to go start this?
```

94

```
 1       A    Why would you do a business plan if it's
 2   rejected before you even get started?
 3       Q    So you did not come to Milsner or Dawson
 4   and say, here's what I think we ought to do; and
 5   these are what I think the numbers might be?  Did you
 6   ever have that kind of conversation?
 7       A    No.
 8       Q    So it never got off beyond:  I think we
 9   ought to open a maintenance facility for ourselves?
10       A    That's where it stopped.
11       Q    Okay.  Now do I understand you to believe
12   that the Judge should order Mr. Milsner to pay you,
13   John Carstarphen, all the money that American
14   Medflight paid to Reno Flying Service for
15   maintenance?
16       A    No.
17       Q    What do you think you're entitled to for
18   compensation for not having the maintenance facility
19   in-house at American Medflight?
20       A    The profit it made.
21       Q    Okay.  Do you know how much that is?
22       A    No, I don't.
23       Q    And why do you believe that Reno Flying
24   Service or Mr. Milsner -- let me back up.
25            Why do you believe Mr. Milsner should pay
```

95

```
 1   that to you?
 2       A    He should pay it to me and the other
 3   stockholders of American Medflight.
 4       Q    Okay.  Why?
 5       A    Because it's lost business opportunity that
 6   American Medflight could have done itself.
 7       Q    Did American Medflight have the money to
 8   open a maintenance facility at any time, sir?
 9       A    Yes.
10       Q    When?
11       A    In 1995.
12       Q    Okay.  Do you have any records that show
13   that it had the wherewithal to open its own
14   maintenance facility in 1995?
15       A    It had the director of maintenance, it had
16   the director of operations all in-house, already
17   there.
18       Q    Do you have any documentation to show me or
19   to show the Judge that American Medflight had the
20   money to do that?
21       A    I have no documentation.
22       Q    Okay.  Do you know anybody that does?
23       A    There's a possibility that they have
24   records back to 1995.  I don't know.
25       Q    Okay.  But you don't know anybody that
```

96

```
 1   would know that answer to that question, do you?
 2       A    No.
 3       Q    Okay.
 4       A    Other than Jack, Rich, and I know that it
 5   could.
 6       Q    Okay.  And if Milsner disagrees with you,
 7   it's because he's lying?
 8       A    People can disagree and not be lying.
 9       Q    That is a possibility in your world?
10       A    Yes.
11       Q    Okay.  Do you think that -- well, were you
12   prepared to invest any money in the maintenance
13   facility?
14       A    Yes.
15       Q    How much did you have to invest, sir?
16       A    I don't know at that time.
17       Q    When you made these -- you had these
18   discussions, because they aren't really a proposal,
19   were they?
20       A    It was just discussions.
21       Q    Did you ever say:  I will contribute a
22   particular amount?
23       A    Like I said, it never got that far.
24       Q    Okay.  So the answer to the question is, is
25   no, a specific dollar figure contribution was never
```

97

1    discussed.
2         A    It never got that far.
3         Q    Okay.  The aircraft rental,
4    Mr. Carstarphen, do you make the -- now do you in
5    your mind distinguish between rental and leasing, or
6    is that all under one umbrella for complaint
7    purposes?
8         A    You could put it under one umbrella, but
9    it's the leasing.
10        Q    Well, really a bottom line, don't you
11   contend that American Medflight should just simply
12   not be doing business with Reno Flying Service?
13   Isn't that what you really contend?
14        A    No.
15        Q    So it's okay for them to do business?  In
16   your mind?
17        A    Yes.
18        Q    Now what's the problem with the aircraft
19   rental?  We'll talk about leasing in a minute, but
20   let's talk about the rental, sir.
21        A    Okay.  You're making a distinction; you're
22   going to have to tell me what the distinction is.
23        Q    Well, is there in your mind, sir, a
24   distinction between the rental of aircraft between
25   American Medflight and Reno Flying Service on one

98

1    hand, do you distinguish that from a lease of
2    aircraft?
3         A    To me a lease means there is a contractual
4    obligation, where renting you're just doing it by the
5    hour.
6         Q    Okay.  If you lease it you're agreeing to
7    consume a certain amount; if you're renting, it's
8    when you need it.
9         A    Yes.
10        Q    Okay.  Now let's talk about the leasing.
11   American Medflight leases, is it two airplanes from
12   Reno Flying Service, do you know?
13        A    As far as I know there are no leases.
14        Q    Were there --
15        A    There may be some now, but when I was
16   there, there were no leases.
17        Q    Do you recall a transaction in 2007
18   pursuant to which American Medflight leased one or
19   more airplanes from Reno Flying Service?
20        A    I wasn't there in 2007, and had no access
21   to any books or records.
22        Q    So my mentioning it to you now is the first
23   time you've heard of it?
24        A    I've heard of it before, but I don't have
25   any knowledge of it.

99

1         Q    Did you know about the transaction before
2    it occurred?
3         A    What transaction is that?
4         Q    The leasing of airplanes?
5         A    I knew of no leasing --
6         Q    Okay.
7         A    -- prior to it occurring.
8         Q    Well, when was the first time you heard
9    that American Medflight might have rented - or excuse
10   me - might have leased an airplane from Reno Flying
11   Service?
12        A    I'm not sure I can answer that question
13   because we kind of used "lease" and "rent"
14   interchangeably.
15        Q    You do?
16        A    I do, and Jack does.
17        Q    Okay.  You believe leave that to be the
18   case.
19        A    I don't know.  In my mind they're being --
20   all I know is how it was done from 1995 until I was
21   terminated in 1998 and '99.
22        Q    Okay.
23        A    And in that period of time it was done as
24   rental on an as-needed basis.
25        Q    Okay.

100

1         A    There was no contractual agreement, or
2    price or anything.
3         Q    Could you take Exhibit 60 out again,
4    Mr. Carstarphen, please.  Turn to page 3, please,
5    sir.
6              May I direct your attention to paragraph 9,
7    Mr. Carstarphen.  Let me read it to you:  Plaintiff
8    is further informed and believes, and based thereon
9    alleges, that defendants have routinely rejected
10   plaintiff's demand to purchase new aircraft for
11   American Medflight, even though such purchases would
12   clearly be in the best economic interest of American
13   Medflight, choosing instead to require American
14   Medflight to lease aircraft from Reno Flying Service,
15   thereby increasing Reno Flying Service's revenues to
16   the detriment of American Medflight.
17             Did I read that correctly?
18        A    I believe so.
19        Q    Did you see this document before it was
20   filed?
21        A    Say again?
22        Q    Did you read this before it was filed?
23        A    I believe so.
24        Q    Did you read that paragraph?
25        A    I believe so.

101

1    Q    Do you know what that paragraph is talking
2    about?
3         MR. RUSSO:  As the author of that paragraph
4    I can tell you I was using "lease" and "rent"
5    interchangeably.
6    BY MR. HILL:
7    Q    Okay.  Is that your understanding,
8    Mr. Carstarphen?
9    A    Yes.
10   Q    Okay.  The planes that AMF rents from RFS
11   are Piper Cheyenne II?
12   A    Correct.
13   Q    And the lease goes both ways -- or the rent
14   goes both ways, doesn't it?  American Medflight rents
15   a plane from Reno Flying Service, and sometimes Reno
16   Flying Service rents from American Medflight.  Do you
17   know that to be the case?
18   A    Yes.
19   Q    Do they charge each other the same rate?
20   A    I don't know that, but I believe so.
21   Q    If they do charge each other the same rate,
22   is there anything unfair in that arrangement?
23   A    Yes.
24   Q    What's unfair to the company, sir?
25   A    It's lopsided.

102

1    Q    Why?
2    A    Because American Medflight rents aircraft
3    from Reno Flying Service more than it does the other
4    way around, to the amount of about three-quarters of.
5    a million dollars a year.
6    Q    On what do you base this statement that AMF
7    rents planes from RFS more than the other way around?
8    A    From the financial statements.
9    Q    Okay.  Can you tell me which ones?
10   A    All of them.
11   Q    Okay.  Do you know how the rental rates are
12   calculated?
13   A    No.
14   Q    As a director of the company do you think
15   that would be an important thing for you to know in
16   deciding policy of the company?
17   A    No, I relied on Jack Dawson to do that, and
18   he does a very good job at it.
19   Q    Do you think that Mr. Dawson is helping
20   Mr. Milsner loot American Medflight?
21   A    No.
22   Q    You understand that Mr. Dawson has set
23   those rates for the rental?
24   A    Yes.
25   Q    Do you believe that he has done so

103

1    appropriately?
2    A    To the best of my knowledge.
3    Q    Okay.  Do you think that American Medflight
4    should just go -- should have gone and bought new
5    planes; is that right?
6    A    No, they should have bought one new plane.
7    Q    Fair enough.  Fair enough.
8         When should they have done so?  Can you
9    give me a year?
10   A    I cannot give you a date.
11   Q    Do you recall in 2000 -- the topic coming
12   up in 2007?
13   A    I would say that that was in the right time
14   frame.
15   Q    If I tell you that the directors -- because
16   you weren't a director then, and you weren't an
17   officer; were you?
18   A    I don't believe so.
19   Q    Okay.  If I tell you that the directors
20   determined that there was a need for American
21   Medflight to have another plane at its disposal in
22   the first quarter 2007, would that strike you as a
23   reasonable thing for them to have concluded?
24   A    I have no knowledge of that.
25   Q    No knowledge one way or the other?

104

1    A    I have no knowledge of it.
2    Q    It might have been reasonable; it might not
3    have been reasonable?
4    A    I don't know that they proposed it or
5    not --
6    Q    Okay.
7    A    -- I was not privy to any of that
8    information.
9    Q    Do you know what a hypothetical question
10   is, Mr. Carstarphen?
11   A    What?
12   Q    Do you know what a hypothetical question
13   is?
14   A    Yes.
15   Q    Hypothetically speaking, that's sort of
16   like for sake of discussion, for sake of argument,
17   for sake of argument, sir, assume that in the first
18   quarter of 2007 the board of directors of American
19   Medflight determined that there was a need for
20   American Medflight to have an additional aircraft.
21   Do you have any basis upon which to assert that that
22   decision was wrong?
23   A    It was my opinion that before 2007 we
24   should have had another airplane.
25   Q    Okay.  So if no airplane had been acquired,

Deposition of John Castardnell, Friday, April 23, 2010

**105**

```
1    then by 2007 there was clearly a need?
2         A    There was a need --
3         Q    Okay.
4         A    -- I believe before 2007.
5         Q    Okay. Now we talked about this line of
6    credit a little while ago. Did American Medflight
7    benefit from your having guaranteed that line of
8    credit?
9         A    They wouldn't have got it without my
10   guarantee.
11        Q    That's a different question, sir. Did they
12   get a benefit from you -- well, let me state it like
13   this.
14             Do I understand you to say they got a
15   benefit because they got it, and without your
16   guarantee they wouldn't have gotten it.
17        A    That's correct.
18        Q    So there was a benefit from your guarantee?
19        A    Yes.
20        Q    Okay. Now that guarantee was terminated;
21   was it not?
22        A    Repeat the question?
23        Q    The guarantee that you complained about in
24   the first lawsuit, that guarantee was terminated,
25   wasn't it?
```

**106**

```
1         A    My guarantee was terminated.
2         Q    Right. And do you recall when?
3         A    I don't know when, but it was after I
4    discovered that they took $140,000 to give to
5    Rich Milsner from my line of credit.
6         Q    Had the line of credit been terminated
7    before the lawsuit was filed, the first one?
8         A    I don't know what the date was.
9         Q    Since the termination of that guarantee,
10   have you ever guaranteed any obligation of American
11   Medflight to anybody or any company anywhere on this
12   planet?
13        A    Since that termination?
14        Q    Yes, sir.
15        A    No.
16        Q    Have you been asked to guarantee any
17   obligation of American Medflight?
18        A    Yes.
19        Q    Who made such a request of you, sir?
20        A    Mr. Milsner requested I guarantee the
21   refinance of the two airplanes to get money for Reno
22   Flying Service. The two airplanes, one of them had
23   two more months' of payments to make, and the other
24   one had, I think, a year and one month payment. And
25   I thought it was very foolish to refinance airplanes
```

**107**

```
1    for six or seven years that are almost paid off to
2    use money for Reno Flying Service.
3         Q    When did this conversation take place, sir,
4    before the first lawsuit was filed, or after the
5    first lawsuit was filed?
6         A    Before.
7         Q    Okay. And your response to Mr. Milsner's
8    inquiry that you co-sign on a -- he asked you to
9    co-sign.
10        A    Yes.
11        Q    You knew he was going to guarantee, didn't
12   you?
13        A    Yes.
14        Q    And what was your response to Mr. Milsner
15   when he asked you to guarantee an obligation of
16   American Medflight? Your answer was no, wasn't it?
17        A    The answer was no because American
18   Medflight did not need funds, and it was stupid to
19   take airplanes that are almost paid off and refinance
20   them for six or seven more years. And the reason for
21   refinancing was, I believe, to divert the money to
22   Reno Flying Service.
23        Q    Okay. But your answer was no.
24        A    My answer was no.
25        Q    Thank you.
```

**108**

```
1              Has anyone else ever asked you to guarantee
2    any obligation of American Medflight, sir?
3         A    I don't believe so.
4         Q    Has Mr. Dawson ever made that request of
5    you?
6         A    I believe Jack asked me at the time to do
7    it along with Rich, but I'm not sure.
8         Q    When you say "at the time," you're talking
9    about the one you've already told me about?
10        A    The refinance.
11        Q    Okay. So at this point I get the
12   impression your recollection is a little fuzzy, but
13   now you kind of think it may have been both Milsner
14   and Dawson that asked you to co-sign the guarantee
15   with Milsner?
16        A    It could be but, it was mainly Milsner.
17        Q    Okay. Okay. Dawson may have been
18   involved?
19        A    May have; may not.
20        Q    Okay. Fair enough. What I want to make
21   sure of, though, is, is that was before the first
22   lawsuit was filed?
23        A    Yes.
24        Q    So the one, the only time that Jack Dawson
25   has asked you to guarantee any obligation of American
```

109

```
 1   Medflight occurred before the first lawsuit was filed
 2   in 2003.
 3        A    Like I said, I can't guarantee that he did,
 4   but he could have.
 5        Q    Now you say he may have?
 6        A    He may have.
 7        Q    Okay.  Do you have a recollection of when
 8   he may have, sir?
 9        A    When they were doing the refinancing.
10        Q    The refinancing you've told me about?
11        A    Yes.
12        Q    And you told me that when Misner asked you
13   it was before the 2003 lawsuit.
14        A    Yes.
15        Q    So the same event.
16        A    Same event.
17        Q    So the one, the only time that Mr. Dawson
18   asked you to guarantee any obligation of American
19   Medflight was before the first lawsuit was filed.
20        A    I can't guarantee that he asked me.
21        Q    Okay.  How much money have you invested in
22   American Medflight, sir?
23        A    25,000.
24        Q    Okay.  And you understand the distinction
25   between debt and equity?
```

110

```
 1        A    Yes.
 2        Q    What's the difference?  To you.  What do
 3   you understand the difference to be?
 4        A    Between debt and equity?
 5        Q    Yes.  Do you understand the question?
 6        A    Uh-huh.
 7        Q    Okay.  What's the difference?
 8        A    Equity is investment into the company, and
 9   debt is money owed to the company.
10        Q    Owed by the company --
11        A    Owed by the company.
12        Q    And your testimony is you had $25,000 of
13   equity?
14        A    No.
15        Q    How much equity did you have, sir?
16        A    12,500.
17        Q    And the other twelve-five was debt.
18        A    Correct.
19        Q    And it's been paid back.
20        A    Correct.
21        Q    Okay.  Other than that, and the guarantee,
22   what other moneys or credit have you made available
23   to American Medflight?
24        A    I've invested the fact that I was director
25   of operations of a professional air charter,
```

111

```
 1   experience, I invested three years working on setting
 2   up this company almost full-time with no pay.
 3        Q    You were looking at 56, is that right?  Do
 4   you want to look at one of the other ones, sir?
 5        A    Yes.  57.
 6        Q    Okay.  What does it say on 57?
 7        A    This is just notes that --
 8        Q    Understood.  You told me that earlier.
 9        A    I signed on a million dollars' worth of
10   notes and a line of credit.
11             I invested my management experience over
12   the years.
13             I put in another $35,000 worth of income
14   tax that was not reimbursed by the company on profit;
15   it had to come out of my own pocket.
16        Q    When was that, sir?
17        A    Oh, God.  That was like about five years
18   ago.
19        Q    So 2005?
20        A    I don't know on that.
21        Q    Okay.
22        A    I would have to go back to my income tax
23   returns to find out.
24        Q    You did draw a salary while you were at
25   American Medflight; did you not?
```

112

```
 1        A    Yes.
 2        Q    When did you start drawing a salary?
 3        A    I believe in '95 or '96.
 4        Q    Right after the company opened?
 5        A    The company opened in '93.
 6        Q    Okay.  So was the company conducting
 7   operations in 1993?
 8        A    No.
 9        Q    When did it start conducting operations?
10        A    In '95.
11        Q    I thought you told me earlier that you had
12   a charter business that was active during this period
13   of time.  Did I misunderstand?
14        A    I don't know how active it was between '93
15   and '95.
16        Q    And Olympian Constructors, had that been
17   put down by this time?
18        A    Long before.
19             MR. HILL:  Off the record.
20             At 12:31 p.m. the lunch recess was taken.)
21                       -oOo-
22
23
24
25
```

113

```
1                    RENO, NEVADA
2              FRIDAY, APRIL 23, 2010
3                    1:20 P.M.
4                    -oOo-
5                  EXAMINATION
6                  (Resumed)
7   BY MR. HILL:
8        Q    Are you ready to go back on the record,
9   sir?
10       A    Yes.
11       Q    Were there any answers that you gave me
12  during our morning session that you would like to
13  change, explain, or modify?
14       A    No.
15       Q    Can you tell me, please, sir, what exhibit
16  are you looking at?
17       A    AMI 0042.
18            MR. RUSSO:  That's Exhibit Number 18.
19            MR. HILL:  Thank you, sir.
20  BY MR. HILL:
21       Q    Go ahead, Mr. Carstarphen.  What did you
22  want to change or modify?
23       A    I just wanted to add to the fact that on
24  the last paragraph on AMI 0042 it requires any checks
25  to be signed by me that go to Reno Flying Service.
```

114

```
1        Q    Okay.  And does it provide -- well, what do
2   you understand to be the appropriate remedy for
3   violation of that or the other provision that we
4   talked about?  If your signature isn't on there, does
5   AMF get the goods or services?
6        A    I don't know what the remedy is.
7        Q    Well, just a second.
8             AMF, hypothetically - let's do a
9   hypothetical, okay - American Medflight has Reno
10  Flying Service do $10,000 worth of avionics work on
11  one of its planes, and you aren't there to sign, you
12  don't sign, it's more than $2500.
13            Does American Medflight get that for free,
14  or does it still have to pay?  What's your opinion?
15       A    I believe this was installed to provide
16  checks and balances.
17       Q    Okay.
18       A    I don't know what you're talking about a
19  remedy.
20       Q    Did you have any understanding of what
21  would happen if that wasn't complied with?
22       A    No.
23       Q    Okay.
24       A    I assumed when it was written that it would
25  be complied with, but it was not complied with.
```

115

```
1        Q    Do you feel comfortable as you sit here
2   today that the board of directors has known that
3   throughout this period of time?
4        A    Oh, yes.
5        Q    Okay.  And you as a member of the board of
6   directors today are aware that American Medflight is
7   doing business with Reno Flying Service?
8        A    Yes, there is nothing wrong with doing
9   business with Reno Flying Service.
10       Q    Okay.  Have you signed any checks payable
11  to Reno Flying Service since you were terminated in
12  1999?
13       A    No.
14       Q    And we discussed before lunch that if
15  Mr. Dawson is an officer of Reno Flying Service, that
16  makes him an interested party, as you understand
17  things.  Isn't that right?
18       A    Yes.
19       Q    So are you aware of whether or not
20  Mr. Dawson has signed any checks payable from
21  American Medflight to Reno Flying Service?
22       A    I'm not personally aware because I don't
23  have any access to the financial records.
24       Q    Let's assume that he is doing so.  Does
25  that violate the terms and conditions of what you've
```

116

```
1   been talking about here?
2        A    Not since 2008 when they were amended.
3        Q    Okay.  But up until the day before that it
4   would be a violation?
5        A    Yes.
6        Q    Okay.  But the board of directors has known
7   about it the whole time.
8        A    Meaning --
9        Q    Whoever was on the board of directors knew
10  that.
11       A    I don't know that -- for sure Rich Wilsner
12  knows; Jack Dawson knows; I know.  Whether or not
13  Bob Daoro, who was a board of director at one point
14  knew, I do not know.
15       Q    Has American Medflight ever offered to
16  return any goods or services that were provided to it
17  by Reno Flying Service at any time, do you know?
18       A    Say that again now?  Who is returning what?
19       Q    AMF, has it ever returned or offered to
20  return any goods or services that it received from
21  Reno Flying Service?
22       A    How is it going to return a service?
23       Q    I don't know.  Just a dumb question.  Can
24  you give me an answer?
25       A    I can't give you an answer to a question I
```

117

1  can't --
2      Q   I'm sorry, sir. Can you give me your
3  answer again?
4      A   Repeat the question.
5      Q   Okay. Has AMF offered or returned any
6  goods that it has ever acquired from Reno Flying
7  Service?
8      A   What kind of goods?
9      Q   Anything, sir. Do you know?
10     A   I don't know.
11     Q   Okay. Why was Reno Flying Service renting
12 airplanes from American Medflight?
13     A   When an airplane has to go in for scheduled
14 maintenance, it could have been that they didn't have
15 a serviceable aircraft to operate.
16     Q   Will you concede, sir, that all of the
17 instances in which an aircraft was rented by American
18 Medflight from Reno Flying Service, that it was
19 actually used for an American Medflight business
20 purpose; or do you think they were joyriding?
21     A   No, it was for a business purpose.
22     Q   Okay. Okay. And is there any contention
23 on your behalf that there was anything wrong with any
24 of those planes that were rented from Reno Flying
25 service to American Medflight?

118

1      A   No.
2      Q   Okay. Was that the only answer you wanted
3  to change or correct?
4      A   Yes.
5      Q   Okay. The consulting fees, has anybody
6  ever explained to you why those were paid?
7      A   Rich told me when --
8      Q   I'm sorry. I've asked you the question,
9  and you said it was to compensate him for risk he was
10 taking.
11     A   Yes.
12     Q   Okay. Okay. Nobody has ever said that
13 that was because AMF owed RFS any money? Nobody has
14 ever said that to you?
15     A   RFS never owed any money to American -- or
16 the other way around.
17     Q   American Medflight never owed any money to
18 Reno Flying Service?
19     A   No, that's not exactly true. There were
20 times when we may have carried -- American Medflight
21 may have carried an accounts payable balance to Reno
22 Flying Service for maintenance from time-to-time,
23 but --
24     Q   Paid in the ordinary course of business.
25     A   -- we were very careful to allocate funds

119

1  between the two companies as best as possible, down
2  to the toilet paper.
3      Q   Who did that? Did you ever do that?
4      A   Yes, I did.
5      Q   Tell me about what you did.
6      A   We would go to Costco and buy supplies; we
7  would split the supplies the best we could come up
8  with.
9          In other words, if American Medflight had
10 twice as many employees as Reno Flying Service, we
11 would split the costs two-thirds/one-third.
12     Q   So if somebody were to get up and testify
13 at trial that their review of the books and records
14 of American Medflight show that in the time frame
15 when you were there American Medflight wasn't paying
16 its fair share of the overhead, that testimony would
17 be mistaken?
18     A   Yes, it would. Jack and I took great
19 effort to try and make it as equitable as possible --
20     Q   Okay.
21     A   -- because of different stockholders
22 involved.
23     Q   Okay. Let me show you -- well, let me back
24 up.
25         Did you ever attend a meeting of the

120

1  shareholders where Mr. Brown was present, this fellow
2  that was here this morning?
3      A   He's not a shareholder.
4      Q   Did Mr. Brown ever attend a shareholders
5  meeting, sir?
6          I know he's not a shareholder, but did he
7  ever attend such a meeting?
8      A   Not until very recently.
9      Q   You attended shareholders meetings during
10 the period of time that you were not a director?
11     A   I'm not sure.
12            (A copy of a two-page letter dated
13            February 12, 2007 from Jack Dawson to
14            John Carstarphen, was marked Exhibit
15            61 for identification.)
16 BY MR. HILL:
17     Q   Let me show you what I've marked as
18 Exhibit 61, Mr. Carstarphen. Take a moment and look
19 at it. I'm going to first ask you if you've ever
20 seen it before.
21     A   Okay.
22     Q   Have you ever seen this before?
23     A   Yes.
24     Q   Did you receive it on or about February 12,
25 2007?

121

```
1      A    This one says 11/5/09.
2      Q    Mr. Carstarphen, that is how the Federal
3   Court --
4      A    Okay.
5      Q    -- file stamps documents that come in.  Let
6   me direct you --
7      A    Oh, okay.
8      Q    Do you see where it's dated there February
9   12th, 2007?
10      A    Yes.
11      Q    Did you get it at or about that time, do
12   you think?
13      A    Probably.
14      Q    Do you recall seeing it before today?
15      A    Yes.
16      Q    What was the first time you saw it, do you
17   remember?
18      A    No.
19      Q    All right.  Did you meet with Linda Reed,
20   Will Geyer, Dave Gurney, Jim Brown, and Jack Dawson
21   on February 8, 2007?
22      A    It says that there.
23      Q    Do you recall getting this letter and
24   saying:  Boy, that's a lie.  Anything to that effect?
25      A    No.
```

122

```
1      Q    Do you have any recollection at all of that
2   meeting?
3      A    Not very much, but I'm sure it occurred.
4      Q    Okay.  Do you have any -- you read
5   Exhibit 61 to yourself before we started talking
6   about it, didn't you?
7      A    Yes.
8      Q    Do you disagree with Mr. Dawson's recital
9   in the first paragraph that the meetings were held to
10   discuss the need for aircraft at AMF?
11      A    Uh-huh.
12      Q    That's true?
13      A    Yes.
14      Q    Okay.  And you met the next day with him in
15   private?
16      A    I don't know.
17      Q    You don't recall meeting with Mr. Dawson
18   the next day?
19      A    No.
20      Q    Do you recall ever meeting Mr. Dawson in
21   private to discuss whether or not American Medflight
22   needed airplanes?
23      A    Yes.
24      Q    Okay.  Was that this meeting, or a
25   different one?
```

123

```
1      A    I don't know.
2      Q    Tell me about the meeting you recall.
3      A    Jack and I had numerous meetings about
4   aircrafts --
5      Q    Okay.
6      A    -- and the need for retiring the Cheyennes.
7      Q    Do you have any recollection of anything
8   else that was discussed at those meetings, other than
9   what you just told me?
10      A    I'm sure we discussed litigation issues,
11   probably.
12      Q    What litigation?  Your litigation against
13   the company?
14      A    Yes.
15      Q    Okay.  Did Mr. Dawson tell you ever that
16   American Medflight had tried to get financing to buy
17   planes?
18      A    He probably did.
19      Q    You don't remember one way or the other?
20      A    He probably did.
21      Q    Okay.  What did he tell you?
22      A    He told me that, just what it says in here,
23   that they couldn't get financing because there was a
24   pending litigation.
25      Q    Well, that's not what it says, is it?
```

124

```
1   Well, it says due to the current lawsuit.
2      A    Yes.
3      Q    Okay.  And it also says:  And because you
4   and Rich Milsner will not guarantee the loans.
5      A    Yes.
6      Q    Was that true?
7      A    Yes.
8      Q    You refused to guarantee?
9      A    Milsner did, too.
10      Q    Okay.  Did Milsner say that he would
11   guarantee if you would guarantee?
12      A    At that point I don't think we were
13   talking.
14      Q    Did Dawson tell you that if you were
15   willing to guarantee, Milsner was willing to
16   guarantee?
17      A    I don't know.
18      Q    You don't know.  It might have happened; it
19   might not have happened; you don't remember?
20      A    I don't know.
21      Q    Okay.  Fair enough, sir.  Now --
22      A    You have to realize that before all of this
23   I was willing to get the third airplane long before
24   these problems started.  Once he started taking money
25   from the company on a line of credit and stuff, I
```

125

1   refused to guarantee the loans. But I was willing,
2   back when we needed a third airplane, to guarantee
3   the loan.
4       Q   Did you come up with any proposals under
5   which -- in the time frame of this letter,
6   Exhibit 61, did you have any proposals to anybody as
7   to how you thought American Medflight should get the
8   planes that it needed?
9       A   Yes.
10      Q   What?
11      A   It was prior to this period of time --
12      Q   Okay.
13      A   -- I can explain one thing. Okay?
14      Q   Please. Please.
15      A   American Medflight had two airplanes to
16  operate with. Okay? And it has a base here in Reno
17  and one in Elko. Okay? That leaves, it needs a
18  third airplane to do maintenance on because we
19  operate 24/7.
20      Q   Right. So if one of the planes is down for
21  a tire change, you got to have some other plane to
22  put into service.
23      A   Otherwise we're out of service and we're
24  losing flights.
25      Q   Bingo. Does that make good business sense

126

1   to you?
2       A   Yes.
3       Q   Okay. Thank you. Go ahead.
4       A   Then Reno Flying Service had two airplanes.
5   Okay? They used one to haul the doctors around, the
6   cardiologists five days a week, which they could do
7   the maintenance on weekends with no problems. Okay?
8       Then they also had another airplane that
9   they flew to Las Vegas with bank checks every night.
10  They lost the contract to fly down to Las Vegas so
11  they didn't need that airplane any more.
12      I proposed at that time that we buy that
13  second airplane from Reno Flying Service for American
14  Medflight, and at that time I was willing to
15  guarantee the loan to buy that airplane. I was
16  turned down.
17      Q   Okay. Are you done?
18      A   Yes.
19      Q   Okay. When did that occur?
20      A   I believe that occurred prior to this date.
21      Q   Can you give me --
22      A   A year or two, or something like that.
23      Q   So it was in at least 2005, maybe earlier?
24      A   I'm not sure of the date at all.
25      Q   Did you put this proposal in writing?

127

1       A   No.
2       Q   Is it memorialized anywhere?
3       A   No.
4       Q   Who did you make it to?
5       A   Rich Milsner and Jack Dawson.
6       Q   So you guys were talking at that point?
7       A   Yes.
8       Q   Okay. What did they say?
9       A   They said no.
10      Q   Did they say why?
11      A   They wanted to keep the airplane in Reno
12  Flying Service, and I presumed that's when it started
13  that they wanted to be able to siphon money out of
14  American Medflight into Reno Flying Service.
15      Q   So Dawson was then actively involved in the
16  siphoning of money from the company; is that your
17  testimony?
18      A   I would say he was complicit.
19      Q   What does that mean? Let's not mince
20  words.
21      A   He went along with the deal --
22      Q   Did he profit from it?
23      A   -- Rich Milsner -- yes, he was -- I believe
24  at that time he was still a stockholder of Reno
25  Flying Service.

128

1       Q   Okay. And this is in 2005?
2       A   I don't know the date.
3       Q   Whenever the date -- let's give it a time
4   frame. Whenever it was that Reno Flying Service lost
5   its contracts to hold the bank checks, whenever that
6   was --
7       A   That's what it was. I don't know what that
8   date was, but that's when it was.
9       Q   That's the event around which that you've
10  just told me pivots.
11      A   Yes.
12      Q   And what did you believe Mr. Dawson
13  profited from that, sir?
14      A   He was a stockholder of Reno Flying
15  Service.
16      Q   Okay. What do you believe Mr. Dawson
17  profited?
18      A   I have no idea.
19      Q   Did American Medflight have the need --
20  well, you've already told me American Medflight,
21  every time it rented an airplane from Reno Flying
22  Service it had a need for it.
23      A   Correct.
24      Q   Okay. And are we in agreement that the
25  rates charged by Reno Flying Service to American

129

```
 1    Medflight were fair and reasonable?
 2       A    I can't answer that because I don't know
 3    what they are.  I did at one point.
 4       Q    Okay.
 5       A    They were at $650 an hour, and now they're
 6    up to like $1200 an hour, so I have no idea whether
 7    that's reasonable, and when the rates changed, or
 8    what they were.
 9       Q    Have you taken any steps to investigate
10    what the rental market was that AMF could have tapped
11    into at any time as an alternate to Reno Flying
12    Service?
13       A    No, because there is nothing here locally
14    that they could rent.
15       Q    So AMF had no choice but to rent from Reno
16    Flying Service, is that what you're telling me, or do
17    without?
18       A    No, the choice was to buy an airplane for
19    itself.
20       Q    Okay.  And your testimony is that you
21    offered to guarantee?
22       A    Yes.
23       Q    And is that in this same time frame with
24    the loss of the bank check business?
25       A    Yes.
```

130

```
 1       Q    The check route business.
 2       A    Yes.
 3       Q    Okay.  Now let's come back to 2007.  In
 4    response to this letter that you have in front of
 5    you, Exhibit 61, did you make a proposal of any kind
 6    to anybody as to how to get the planes that American
 7    Medflight needed?
 8       A    Did I make any proposal?
 9       Q    Dawson comes to you and he says:  Look,
10    because of your lawsuit neither Milsner nor you are
11    willing to guarantee.  American Medflight is
12    suffering because it needs a plane, and it can't get
13    it on its own.
14            Is that a fair summation of what he said?
15       A    Yes.
16       Q    Did you have any constructive responses to
17    that?
18       A    I don't think anybody did.
19       Q    So the answer is no?
20       A    No.
21       Q    You didn't suggest any alternatives?
22       A    I don't know of any alternatives.
23       Q    Fair enough, sir.
24            Now you were aware that they were proposing
25    that Reno Flying Service would lease two airplanes to
```

131

```
 1    American Medflight; were you not?
 2       A    No.
 3       Q    Doesn't that say that in here?
 4       A    Well, in my terminology "lease" and "rent"
 5    are synonymous, and you're trying to make a
 6    distinction, and I don't know of -- I know of no
 7    leases ever occurring.
 8       Q    Well, let's read Exhibit 61 together.
 9    Okay.  Please follow along.
10            The last sentence on the first page:  We
11    discussed having Reno Flying Service, Inc., with
12    Rich Milsner guaranteeing the loan, lease the
13    necessary aircraft to AMF.
14            Did I read that sentence correctly, sir?
15       A    Yes.
16       Q    Is Mr. Dawson misstating the facts in this
17    letter?
18       A    No.
19       Q    So you did discuss that with him?
20       A    Yes, but I'm telling you in my terminology
21    "lease" and "rent" were the same.  I knew of no such
22    thing as a written contract lease.
23       Q    Are you aware that -- let's focus on my
24    question; okay?  You had that discussion with
25    Jack Dawson?
```

132

```
 1       A    I had many discussions with Jack Dawson.
 2       Q    Thank you, sir.
 3            Let me read the next sentence to you:  I
 4    pointed out that this would obviously cost AMF more
 5    than purchasing the aircraft as RFS, as well as any
 6    leasing company, would be making a profit.
 7            Have you ever leased anything, sir?
 8       A    Yes.
 9       Q    Did the company that you leased from make a
10    profit in the transaction?
11       A    Yes.
12       Q    Was that fair?
13       A    Yes.
14       Q    Was it reasonable?
15       A    Yes.
16       Q    Is it customary?
17       A    Yes.
18       Q    Did you think that Milsner had any duty to
19    rent a plane to AMF?
20       A    No.
21       Q    Did he have any duty to rent it, rent a
22    plane to AMF at a loss?
23       A    No.
24       Q    Anybody that AMF would have done business
25    with would have made a profit, wouldn't they?
```

133

1    A    Yes, but I don't know where you're going.
2    Q    Do you know how much profit RFS made by
3    leasing airplanes to American Medflight?
4    A    No.
5    Q    Do you know whether that number is
6    reasonable or unreasonable?
7    A    I do not know the number.
8    Q    But do you know -- fine. Well, I think the
9    answer is: I don't know.
10        AMF did lease two airplanes from Reno
11   Flying Service. Do you know that, or not?
12   A    I do not know that.
13   Q    Okay. Then Mr. Dawson continues in his
14   letter: We all agreed, including you -
15   John Carstarphen - and I, that this was the only
16   course AMF had available to it and that we should
17   proceed with the plan for RFS to purchase the
18   aircraft to lease to AMF.
19        Did I read that correctly, sir?
20   A    I believe so.
21   Q    Did you have that discussion with
22   Jack Dawson?
23   A    What discussion?
24   Q    The one I just read to you, sir. Let me
25   read it to you again. I apologize for being rude;

134

1    let me point to --
2    A    I was listening to you; I wasn't reading.
3    Q    I knew you were, and that's why. So let's
4    go through it together.
5         We all agreed, including you and I, that
6    this was the only course AMF had available to it and
7    that we should proceed with the plan for RFS to
8    purchase the aircraft to lease to AMF.
9         Did I read that correctly?
10   A    Yes.
11   Q    Did you have that discussion with
12   Jack Dawson on or about February 29th, 2007?
13   A    Yes.
14   Q    In the next sentence he says: If you do
15   not agree with the content of this letter please let
16   me know within ten days, otherwise I will have the
17   necessary board meetings to go forward.
18        Do you see that there?
19   A    Yes.
20   Q    Was that on there when you got this?
21   A    I'm sure it was.
22   Q    Did you get back to him and say: No, don't
23   do that?
24   A    I don't know that I said -- I got back, I'm
25   sure I talked to him in that period of time.

135

1    Q    When did you talk to him, sir?
2    A    In this period of time. We had been
3    discussing this whole situation of getting additional
4    aircraft.
5    Q    Do you have a recollection of what you said
6    to Mr. Dawson, sir?
7    A    That we should probably proceed to get this
8    King Air because we are having trouble getting parts
9    for the Cheyennes.
10   Q    Okay. The part he wanted to hear from you
11   about was the leasing from Reno Flying Service. Did
12   you understand that?
13   A    Yes.
14   Q    Did you address that issue when you got
15   back to him?
16   A    I'm sure I addressed it probably before he
17   wrote this letter.
18   Q    What did you say to him?
19   A    I said that's the only way it's going to
20   proceed with this lawsuit continuing.
21   Q    So you knew before the lease was done, and
22   you knew that was what they were going to do, and did
23   not say to them: No, don't do it. Is my statement
24   correct?
25   A    Yes.

136

1         MR. HILL: Give me just one moment. I want
2    to get the leases. Okay?
3         (Off the record.)
4    BY MR. HILL:
5    Q    Mr. Carstarphen, how many planes does
6    American Medflight have at its disposal at this time?
7    A    I believe two.
8    Q    What are they?
9    A    Two Piper Cheyenne II's.
10   Q    What happened to the planes that -- were
11   there King Airs acquired?
12   A    Yes, there were.
13   Q    What happened to them?
14   A    There was only one acquired.
15   Q    Okay. What happened to it?
16   A    They never could get it on the Part 135
17   certificate, and Jack turned around and sold it.
18   Q    Okay. So at this point they only have two
19   airplanes?
20   A    Two airplanes.
21   Q    What do they do when one of the planes is
22   in for service, sir?
23   A    They rent it from Reno Flying Service, an
24   airplane, for about a quarter of a million dollars a
25   year -- three-quarters of a million, excuse me.

137

1    Q    And you think that that three-quarters of a
2   million dollars should be paid back?
3    A    No, I think American Medflight should own a
4   third airplane --
5    Q    Okay.
6    A    -- and not rent from Reno Flying Service.
7    Q    Okay. Could you take Exhibit 60 out,
8   please, Mr. Carstarphen. Paragraph 8, line 5 on
9   page 3 -- let's start on line 4.
10        Defendants have engaged and continue to
11  engage in an intentional, systematic, self-dealing
12  plan to divert funds and business opportunities of
13  American Medflight to Reno Flying Services.
14        Have you and I now discussed every business
15  opportunity that has been diverted, that you contend
16  has been diverted from American Medflight to Reno
17  Flying Service?
18   A    Have we discussed it? Yes.
19   Q    Okay. Have we discussed every device,
20  every scheme, everything that you know about, about
21  how moneys were diverted to Reno Flying Service from
22  American Medflight?
23   A    No.
24   Q    What else is there?
25   A    I don't know. I haven't had access to

139

1   American Medflight?
2    A    Today? Nothing.
3    Q    Okay.
4    A    Everything I have asked for they have given
5   me.
6    Q    Okay. Have you conducted any investigation
7   to determine if there are any other ways in which
8   Mr. Dawson or Mr. Milsner, or anybody else for that
9   matter, is diverting any money from American
10  Medflight to any place in the --
11   A    I have no way of knowing that.
12   Q    Okay. Do you contend that it was
13  inappropriate for any reason that American Medflight
14  gets its insurance through Mr. Milsner's company?
15   A    Do I think it's inappropriate?
16   Q    Yes, sir.
17   A    Yes.
18   Q    Okay. Why?
19   A    Why? Because since 1995 we have never
20  gotten a competitive bid on any of the insurance, and
21  I believe that any prudent businessman would
22  occasionally, maybe not every year, but occasionally
23  put it out to another insurance company to see
24  whether or not we're paying the appropriate rates or
25  not.

138

1   records and books to find out.
2    Q    But today you and I have talked about all
3   the ones you know about, haven't we?
4    A    I have talked --
5    Q    There could be others.
6    A    They could be others.
7    Q    There could be others. But have we now
8   talked about all the ones you know about, the ones
9   that you've uncovered?
10   A    I've talked about the major ones.
11   Q    What else is there? Tell me the minor
12  ones. I want to know all of them today, sir.
13   A    I don't know offhand. I would have to do
14  some research.
15   Q    What would you look at, sir?
16   A    These are the major ones.
17   Q    Are there any others, I don't care if it's
18  a dollar 25 --
19   A    I have no idea because I have no access to
20  books and records.
21   Q    Okay.
22   A    I have no access to Reno Flying Service
23  records. I have limited access to American Medflight
24  records.
25   Q    Okay. What have you been denied from

140

1    Q    Have you discussed that issue with
2   Mr. Dawson?
3    A    Yes.
4    Q    What has Mr. Dawson told you,
5   Mr. Carstarphen?
6    A    He has told me that Mr. Milsner is giving
7   us a very good break on the insurance.
8    Q    Is that all he's told you?
9    A    Yes.
10   Q    And do you have any reason to believe that
11  Mr. Dawson is being untruthful with what he has told
12  you in that regard?
13   A    Like I said again, any prudent business
14  person would get competitive quotes, and we have
15  never done that since 1995.
16   Q    Mr. Carstarphen, my question to you is a
17  yes or a no answer. Do you believe that Mr. Dawson
18  is being truthful --
19   A    I have no --
20   Q    Mr. Carstarphen, please allow me to pose
21  the question, and then I will allow you to answer.
22   A    Okay.
23   Q    Those are the ground rules.
24        I see three possibilities: Dawson is
25  telling you the truth, Dawson is lying to you, or

Deposition of John Carstarphen, Friday, April 23, 2010

141

1  Dawson doesn't have a basis in fact to make the
2  statement.
3          Do you see any other options in terms of
4  what Mr. Dawson told you about whether or not
5  Mr. Milsner is giving American Medflight a break on
6  the insurance?
7      A   That spells it out pretty much.
8      Q   Which one of the options would you pick,
9  sir?
10     A   All three.
11     Q   All three. Okay. So on what basis do you
12 contend that Mr. Dawson is lying to you, sir? Did
13 you have any facts?
14     A   I didn't say he's lying to me. He doesn't
15 have the information either since there has been no
16 competitive bidding.
17     Q   Has Mr. Dawson ever told you that he's
18 tried to get a competitive bid?
19     A   No.
20     Q   Have you ever asked him?
21     A   Have I ever asked him? I asked for
22 competitive bids and I never got them.
23     Q   Has Mr. Dawson told you he tried to get
24 one, ever?
25     A   No.

143

1  independent estimate for the insurance for American
2  Medflight?
3      A   No.
4      Q   Why not?
5      A   They wouldn't let me do it when I was
6  there.
7      Q   Well, you're a director, sir. Why didn't
8  you just say: I'm going to go make some inquiries
9  and find out so I know how much you guys are
10 stealing. Why didn't you do that?
11     A   I didn't say they were stealing.
12     Q   Well, how much do you think the Judge
13 should give you for that?
14     A   I have no idea, because I cannot tell you
15 whether the insurance rate that we're paying is
16 correct or it isn't correct.
17     Q   Has anybody ever told you that the rate
18 that American Medflight is paying for insurance is
19 too high?
20     A   No.
21     Q   Have they ever told you that it's higher
22 than it should be; anybody?
23     A   No.
24     Q   Do you have any fact that leads you to
25 believe that the price is above what's reasonable?

142

1               (A copy of a document entitled
2               Aircraft Lease, AMF-58303 through
3               AMF-58308, was marked Exhibit 62 for
4               identification.)
5               (A copy of a document entitled
6               Aircraft Lease, AMF-58309 through
7               AMF-58314, was marked Exhibit 63 for
8               identification.)
9  BY MR. HILL:
10     Q   Mr. Carstarphen, let me show you Exhibits
11 62 and 63.
12         Mr. Carstarphen, the question I'm going to
13 put to you is whether you've ever seen either
14 Exhibit 62 or 63 before today?
15     A   No. Let me look at number 62. Are they
16 the same?
17         No, I've never seen either one.
18     Q   Okay. We don't need to waste any of your
19 time talking about them.
20         Now do you have an opinion as to how much
21 Mr. Dawson or Mr. Milsner have diverted from American
22 Medflight through the use of Mr. Milsner's company to
23 place insurance?
24     A   No.
25     Q   Have you ever gone out and gotten an

144

1      A   No.
2      Q   Have they been real insurance policies that
3  have been provided by Milsner's office, do you know,
4  as opposed to you see on TV these ads warning you
5  about insurance scams? Do you think they're real
6  policies or real companies?
7      A   I don't know.
8      Q   Have you ever even looked at the policies,
9  sir?
10     A   Yes.
11     Q   When?
12     A   When I was president of the company.
13     Q   Up until 1999?
14     A   '98.
15     Q   Okay. Since that time you have not looked?
16     A   I haven't been allowed to look at them.
17     Q   Have you asked?
18     A   I asked many times, and they always --
19     Q   Who?
20     A   What?
21     Q   Who did you ask, and what did you ask for
22 in terms of insurance, sir?
23     A   I asked in 1998 -- let me look at my paper,
24 sir.
25     Q   You are looking at Exhibit 58, is that

145

1    right?
2        A    I'm looking at number 58.
3            In May of '98 I made requests for
4    documentation through Marvin Murphy, attorney, and I
5    was refused all information.
6        Q    Do you have a copy of that request?
7        A    Yes, I do.
8        Q    Where?
9        A    I made the request in writing --
10       Q    I need a copy of it, sir. Where do you
11   have it?
12       A    I would have to go try and find it.
13       Q    But your Exhibit 58 --
14       A    And we made -- I made a request in writing.
15   I don't believe Marvin Murphy did that, I believe I
16   did it on my own. I drafted the letter and requested
17   the information in writing. I was subsequently
18   denied access to the information, and they said that
19   I needed to provide an affidavit of some kind.
20           At that time I went to Marvin Murphy --
21       Q    Mr. Carstarphen, I'm going to be rude and
22   I'm going to interrupt you and try to get you back on
23   beam. Okay?
24           That was the focus of the first lawsuit.
25   You remember the first lawsuit, don't you?

147

1    Since January 1, 2004. Please tell me.
2        A    I've just been asking for financial
3    information, and I've been denied that.
4        Q    Tell me specifically when you asked, who
5    you asked, and what you asked for in that time frame
6    that I have identified for you, sir.
7        A    It was probably all to Jack Dawson.
8        Q    Okay. And was it in writing?
9        A    No.
10       Q    Were any of them in writing?
11       A    No.
12       Q    So all the requests that you made were
13   verbal?
14       A    No. In 2000 -- in 1998 they were in
15   writing.
16       Q    Mr. Carstarphen --
17           MR. RUSSO: He's limiting your time to --
18   BY MR. HILL:
19       Q    Mr. Carstarphen, do you understand what the
20   statutes of limitations is?
21       A    Yes.
22       Q    Do you know that the statutes of
23   limitations for breach of fiduciary duty is three
24   years?
25       A    Uh-huh.

146

1        A    Yes.
2        Q    And you remember what happened to that
3    lawsuit, don't you?
4        A    Yes.
5        Q    That's not at issue in this case, is it?
6        A    Well, you're asking me when I --
7        Q    Let me rephrase my question and try to work
8    out --
9        A    Okay.
10       Q    -- and we can try to move this along
11   because Mr. Russo has to go back to Los Angeles, and
12   with you not focusing - maybe with me asking
13   unfocused questions - we're going to be here for a
14   long time. He's going to have to come back. We
15   don't want to do that; okay?
16           Since 2004 have you requested access to
17   insurance information and been denied same?
18       A    I have not asked for insurance information
19   specifically.
20       Q    Okay. Have you asked for information since
21   2004, and has that request ever been denied?
22       A    Yes.
23       Q    When?
24       A    All of them.
25       Q    What requests are you talking about, sir?

148

1        Q    Yes?
2        A    Yes.
3        Q    Has anybody ever told you that?
4        A    Yes.
5        Q    Has anybody ever told you that the claims
6    in the first case have gone away?
7        A    Yes.
8        Q    Okay. So let's focus, please, from
9    January 1, 2004 until the present, have you made a
10   written request for any information pertaining to
11   American MedFlight to Mr. Dawson?
12       A    I don't believe so.
13       Q    Thank you.
14       A    They all were verbal.
15       Q    Okay. Tell me about the verbal ones. What
16   did you ask for, sir?
17       A    Financial information.
18       Q    What did you say to Mr. Dawson, sir?
19       A    Can I get interim financial statements,
20   year-end financial statements, tax returns?
21       Q    And your testimony today is that Mr. Dawson
22   refused to provide any information?
23       A    Yes.
24       Q    Okay.
25       A    No, I can't say that. In 2004 it's yes.

149

1   Now I am getting information. And I started getting
2   a little at a time. But not complete.
3        Q   Mr. Carstarphen, are you capable of telling
4   me when you asked Mr. Dawson for information that he
5   refused to give you since January 1, 2004? Can you
6   do that?
7        A   I can't -- I don't understand what you're
8   trying to get to.
9        Q   Okay. You, John Carstarphen, have asked
10  Mr. Dawson for financial information about American
11  Medflight.
12       A   Yes.
13       Q   Those conversations took place between
14  January 1, 2004 and today. Is that right?
15       A   Yes.
16       Q   And you contend that Mr. Dawson denied
17  those requests. Yes, or no?
18       A   He denied them in 2004, and now he's
19  providing information.
20       Q   When in 2004, sir?
21       A   What do you mean when in 2004?
22       Q   Can you give me a quarter of the year?
23       A   No.
24       Q   Can you give me a season?
25       A   No.

150

1        Q   Can you tell me whether it was first half
2   or second half?
3        A   No.
4        Q   Can you tell me what you asked for?
5        A   Financial information.
6        Q   So you said to Mr. Dawson: Mr. Dawson, may
7   I have financial information?
8        A   Yes.
9        Q   Were you any more specific than that?
10       A   No.
11       Q   And your testimony is Mr. Dawson gave you
12  nothing?
13       A   Nothing.
14       Q   Okay. And if I understand your
15  testimony -- well, when was the next time you made a
16  request of Mr. Dawson for financial information?
17       A   I don't know.
18       Q   Was there a second one in 2004, or was
19  there only one?
20       A   I have no idea.
21       Q   Who would know that, sir?
22       A   I don't know anybody that would know that.
23       Q   Okay. Did you make a request in 2005?
24       A   I don't know.
25       Q   Did you make a request in 2006?

151

1        A   I don't know.
2        Q   2007?
3        A   I don't know.
4        Q   2008?
5        A   I don't know, but I have in those periods
6   of time made different requests.
7        Q   Well, Mr. Carstarphen, do you think that
8   that's credible testimony?
9        A   Yes.
10       Q   You do? You think the Judge is going to
11  sit back and say: Boy, that Mr. Carstarphen guy, he
12  sure told me when he wanted that information and what
13  he didn't get.
14           MR. RUSSO:  Objection.  Argumentative.
15  That's not a question.
16           MR. HILL:  You're right. You're right. I
17  apologize.
18  BY MR. HILL:
19       Q   Did anybody ever tell you that American
20  Medflight was required to do business with Reno
21  Flying Service?
22       A   No.
23       Q   Did you provide Mr. Proctor with any
24  information for his report?
25       A   I did provide some information.

152

1        Q   What information did you provide to him?
2        A   I told him I think -- what I thought the
3   salaries were for mechanics and --
4        Q   Okay.
5        A   -- I told him how many aircraft we're
6   renting between the two companies back when I was
7   president.
8        Q   Anything else?
9        A   I gave him different financial statements
10  and documents that I had acquired from Jack.
11       Q   What other information did you give him?
12       A   Background information as to how this
13  cross-rental thing worked when I was president of the
14  company.
15       Q   How tell me how the cross-rental thing
16  works?
17       A   Say again?
18       Q   Tell me what you told him about how it
19  works.
20       A   What we did was a monthly cross-billing for
21  the hours. We would bill Reno Flying Service for
22  hours they used of our aircraft, and vice versa, and
23  we --
24       Q   Did you tell him --
25       A   -- would cross-bill. There would be two

153

1   bills.
2       Q   Did you tell him that the rates -- do you
3   know, are the rates the same that they charge each
4   other?
5       A   When I was president they were the same.
6       Q   Do you know if that's the situation today?
7       A   I do not know.
8       Q   Okay. Go ahead. Anything else?
9       A   No.
10      Q   Okay. Do Milsner and Dawson have to do
11  what you want to do in terms of the operation of
12  American Medflight?
13      A   Say that again?
14      Q   Does Milsner have to do what you want, or
15  did he have to do what you want to do in terms of the
16  operation of American Medflight?
17      A   I don't understand the question.
18      Q   Were you in charge at American Medflight?
19      A   Up until the time I was fired. I was the
20  president.
21      Q   And after that, you were a one-third owner
22  of the company.
23      A   Correct.
24      Q   And it was the other two-thirds who asked
25  you to leave?

154

1       A   Yes.
2       Q   Okay. Did they have to follow your
3   instructions?
4       A   No.
5       Q   Where there ever any things that you and
6   Milsner did agree on in terms of operating AMF?
7       A   We agreed on almost everything 100 percent
8   until 1997 or '8 when Jack sold his stock.
9       Q   Okay. And that's when you determined that
10  Milsner was dishonest?
11      A   Yes.
12      Q   Did you ever believe anything Milsner told
13  you after that?
14      A   No.
15      Q   Page 3 of Exhibit 60, Mr. Carstarphen.
16  Paragraph 10, line 23. I'm going to read it to you.
17  Please follow along: Plaintiff is informed and
18  believes, and based thereon alleges -- are you with
19  me?
20      A   Uh-huh.
21      Q   Line 24. -- that employees of Reno Flying
22  Service whom have performed maintenance on American
23  Medflight planes are also employees of American
24  Medflight with salaries paid jointly by American
25  Medflight; thus, defendants have required American

155

1   Medflight to pay for maintenance performed by its own
2   employees.
3           Did I read that correctly?
4       A   I believe so.
5       Q   Do you have any facts to support that
6   assertion?
7       A   Yes.
8       Q   What employees?
9       A   Jim Brown.
10      Q   Is he it?
11      A   Yes.
12      Q   Okay. And tell me what you're referring to
13  here or your lawyer is --
14      A   And also Jack Dawson.
15      Q   Okay. Tell me about it.
16      A   Jim Brown is paid by American Medflight and
17  Reno Flying Service to be director of maintenance.
18      Q   Okay.
19      A   For both companies.
20      Q   Okay.
21      A   Jack Dawson is paid to be the director of
22  operations for American Medflight and Reno Flying
23  Service.
24      Q   Okay.
25      A   Okay?

156

1       Q   Is there a problem with that, with those
2   two gentlemen being employed by both companies, is
3   there a problem with that?
4       A   There is no problem.
5       Q   Okay. So what's the problem that this is
6   referring to, as you understand it?
7       A   What this is referring to is the fact that
8   if they're under the employ of American Medflight we
9   don't need to have to go out and hire anybody else,
10  we already have them in-house to do our own
11  maintenance.
12      Q   Is American Medflight paying all of
13  Mr. Brown's salary?
14      A   I don't believe so.
15      Q   Is it paying all of Mr. Dawson's salary?
16      A   No, I don't believe so.
17      Q   Have you done anything during the pendency
18  of this lawsuit to go out and price what any employee
19  would cost if you replace them?
20          Do you understand my question?
21      A   Yes.
22      Q   Have you done any --
23      A   No.
24      Q   Made any phone calls?
25      A   No. I left that up to Jim Proctor to do.

157

1    Q   Okay.  So if anybody has gone out to
2  ascertain what's the appropriate wage to be paying a
3  director of maintenance or a director of operation,
4  or any other employee for that matter, somebody other
5  than you has done that.
6    A   Yes.
7    Q   Okay.  Do you plan to do that before trial?
8    A   No.  I'm relying on my consultant.
9    Q   How much have you paid Mr. Proctor?
10   A   How much have I paid him?
11   Q   Yes.
12   A   I don't know in total.
13   Q   Now this isn't the --
14   A   And for just this report or --
15   Q   Well, let's back up.
16   A   I mean, he's been on this case for years.
17   Q   We all have, Mr. Carstarphen; we're all
18  growing old together.
19       Mr. Proctor was your expert in the first
20  case; right?
21   A   Yes.
22   Q   Mr. Proctor is your expert in this case.
23   A   Yes.
24   Q   Mr. Proctor has been an expert for you in
25  another case, hasn't he?

158

1    A   Yes.
2    Q   Tell me about that case.
3        MR. RUSSO:  I'll give you a short leash for
4  this one for time.  In a broad sense tell him about
5  it --
6        MR. HILL:  Do you want to tell me about it?
7  We might get through faster.
8        MR. RUSSO:  No, I'm saying I don't believe
9  it's relevant to this --
10       MR. HILL:  That's fine.
11       MR. RUSSO:  -- so why don't you tell him
12  just briefly about the other case.
13       MR. HILL:  That's fine.
14  BY MR. HILL:
15   Q   Who are the parties to the other case, sir?
16   A   First Health Service Corporation.
17   Q   And who?
18   A   And American MedFlight -- I mean, American
19  Home Companion.
20   Q   Now was that a lawsuit?
21   A   That was a lawsuit, yes.
22   Q   Okay.  Where was the lawsuit?
23       MR. RUSSO:  An administrative proceeding.
24       MR. HILL:  Thank you.
25  BY MR. HILL:

159

1    Q   Where was this pending?  In Carson City?
2  With the State of Nevada?  In Federal Court?  Do you
3  know?
4    A   I don't know.
5    Q   Did it proceed to a trial or a hearing?
6    A   It went to an administrative hearing.
7    Q   Okay.  And did Mr. Proctor testify at that
8  hearing?
9    A   Yes, he did.
10   Q   Did he have a report in that case?
11   A   Did he have a report?
12   Q   Yes.  You've seen the report he did in this
13  case.  He's done a couple of reports in this case,
14  hasn't he?
15   A   I don't know whether it was a report or it
16  was exhibits.  I would have to go back and look.
17   Q   Do you have copies?
18   A   I'm sure I do.
19   Q   And were these copies offered as evidence
20  to the administrative Judge?
21   A   I'm sure they were.
22   Q   Were you there for the hearing?
23   A   Yes, I was.
24   Q   Who represented American Home Companion?
25   A   Patrick King.

160

1    Q   And what's the status of that case at this
2  time?
3    A   It's been finalized.
4    Q   Okay.  What does that mean?
5    A   The administrative Judge made a decision.
6    Q   Okay.  What was his decision?
7    A   It was against American Home Companion.
8    Q   All right.  And was there an appeal taken?
9    A   No.
10   Q   Was there a lawsuit filed in the court to
11  ask the Judge to look at the decision?
12   A   No.
13   Q   So did American Home Companion have to pay
14  something to somebody?
15   A   No.
16   Q   Was American Home Companion trying to get
17  money?
18   A   Yes.
19   Q   And did it get any money?
20   A   No.
21   Q   Okay.  All right.  Were there any other
22  experts besides Proctor?
23   A   In regard to what?
24   Q   That matter, sir.
25   A   That matter?

161

1    Q    The one we were just talking about.
2    A    Expert witnesses?
3    Q    Yes, sir.
4    A    No.
5    Q    Those three times, are those the total
6  times that you or any company that you're affiliated
7  with have employed Mr. Proctor for any reason?
8    A    I believe that's correct.
9    Q    Okay. So can you tell me, sir, how many
10  times has Reno Flying Service billed American
11  Medflight for work that American Medflight employees
12  did on American Medflight planes? Can you tell me
13  that?
14    A    No, but it was done monthly.
15    Q    Tell me what was done. Explain this scam
16  to me.
17    A    What scam?
18    Q    Isn't it a scam that they're using this to
19  take money away from your interest in the company,
20  sir?
21    A    They're diverting money, yes.
22    Q    Tell me about this diversion, sir. Tell me
23  how it works. Do you know?
24    A    It was billed monthly.
25    Q    Okay. What was billed?

162

1    A    It was billed, for maintenance and aircraft
2  rental it was billed monthly.
3    Q    All right. And do you contend that Reno
4  Flying Service was billing American Medflight for
5  planes that Reno Flying Service was making available
6  to AMF?
7    A    Yes.
8    Q    Are you saying there are phantom rental
9  invoices?
10    A    No.
11    Q    Okay. What's the problem with the monthly
12  invoices for the rental?
13    A    The problem is, is American Medflight
14  should own its own airplane and not pay retail rate
15  when it can do it at wholesale rate.
16    Q    Is it paying retail rates, sir?
17    A    I have no idea what it's paying.
18    Q    So you don't know whether it's paying at
19  wholesale, retail, or beyond retail, do you?
20    A    I have no access to the books and records.
21    Q    So you don't know?
22    A    I do not know.
23    Q    Okay. And you've made no inquiry in the
24  marketplace?
25    A    What inquiry would I make?

163

1    Q    Have you ever called anybody up to ask them
2  what they would charge to rent an airplane?
3    A    What would that gain me when I don't even
4  know what rate they're paying?
5    Q    Okay. Tell me, are you telling me that
6  each and every month Reno Flying Service bills
7  American Medflight for charges that Reno Flying
8  Service is billing for work that AMF employees are
9  doing on AMF planes?
10    A    You lost me completely on that one.
11    Q    Mr. Carstarphen --
12        MR. RUSSO:  I think he already identified
13  Jim Brown as the person he's referring to.
14  BY MR. HILL:
15    Q    Well, are you telling me that you believe
16  that Reno Flying Service has billed American
17  Medflight for work that Mr. Brown did on an American
18  Medflight airplane?
19    A    Mr. Brown is the director of maintenance
20  and does very little work on the airplanes.
21    Q    Can you listen to my question,
22  Mr. Carstarphen?
23    A    I am listening.
24    Q    Do you believe that Reno Flying Service has
25  billed American Medflight for work that Jim Brown did

164

1  on American Medflight airplanes?
2    A    Yes.
3    Q    What facts do you have to support that,
4  sir?
5    A    The fact that he's there every day.
6    Q    Anything else, sir?
7    A    No.
8    Q    Can you identify one invoice, one
9  transaction that supports what you're saying?
10    A    Jim Brown does not go out and twist
11  wrenches so it won't show up on an invoice.
12    Q    So what you're telling me then is, is that
13  Reno Flying Service does not bill American Medflight
14  for Jim Brown turning wrenches on an American
15  Medflight plane?
16    A    Basically that's what I'm saying --
17    Q    Okay.
18    A    -- I don't know that he doesn't
19  occasionally go out and twist a wrench.
20    Q    But again, the point being --
21    A    I'm not going to go looking through all
22  those invoices to try and find it.
23    Q    Okay. So it's not at issue in this case?
24    A    I don't believe it is.
25    Q    Oh. See how easy that was?

Deposition of John Carstarphen, Friday, April 23, 2010

165

1      Are there any other American Medflight
2  employees that you think Reno Flying Service has
3  billed American Medflight for?
4      A   I don't know.
5      Q   Okay. Has anybody told you that?
6      A   No.
7      Q   All right. Now do I understand --
8          MR. HILL: Let's take a break.
9          (At 2:18 p.m. a recess was taken.)
10                   -oOo-
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

166

1               RENO, NEVADA
2           FRIDAY, APRIL 23, 2010
3                 2:22 P.M.
4                   -oOo-
5                EXAMINATION
6                (Resumed)
7  BY MR. HILL:
8      Q   Mr. Carstarphen, the harm that you claim
9  you suffered in this case, you suffered because of
10  things that people did to American Medflight, right,
11  not because of anything anybody did to you?
12      A   Yes.
13      Q   And the only reason you were harmed is
14  because you're a shareholder in American Medflight;
15  is that right?
16      A   Yes.
17      Q   Now this morning when we started I asked
18  you to list out the things that Milsner told you that
19  were false, and you gave me the list of things that
20  he did that hurt you.
21      A   Yes.
22      Q   And the first one you told me about was the
23  ESOP business.
24      A   Yes.
25      Q   Now do you believe that the transaction

167

1  between Milsner where he sold his stock to the ESOP,
2  do you believe that that damaged American Medflight?
3      A   I don't know the answer to that.
4      Q   Well, your lawyers have alleged that it
5  did. You understand that Tony Weinress appraised the
6  company, and he appraised it $5.5 million. Do you
7  remember hearing that?
8      A   Uh-huh.
9      Q   Yes?
10      A   Yes.
11      Q   Thank you.
12          And then he came back and he appraised it
13  at a substantially lower price. Do you remember
14  that?
15      A   Two weeks later, yes.
16      Q   And you believe that that differential --
17  is that differential the damage you believe you
18  suffered?
19      A   No, I believe that that differential
20  divided by three is what was my damage.
21      Q   Okay. Thank you. So whatever that
22  differential between those two, Weinress's appraisals
23  are, one-third of that is the damage that you
24  suffered?
25      A   That was approximately 1.3 million.

168

1      Q   And is that the basis for your calculation
2  is Weinress's two appraisals?
3      A   Yes.
4      Q   Do you have any other information that you
5  can rely on to assert that the damage was suffered;
6  anything else?
7      A   I don't believe so.
8      Q   Okay. Have you ever hired a business
9  appraiser to appraise American Medflight?
10      A   No.
11      Q   Do you know anybody who has?
12      A   Jack Dawson has.
13      Q   When did he do that?
14      A   It was 2005 when they did these appraisals
15  on December the 15th and December 31.
16      Q   Okay. Do understand the distinction
17  between enterprise value and equity value? Have you
18  ever heard those terms?
19      A   Not enterprise value.
20      Q   Okay. You don't really believe, do you,
21  that because Milsner sold his stock to the ESOP that
22  a third-party buyer would pay less for the company?
23  You don't really believe that, do you?
24      A   Yes.
25      Q   You believe that because Richard Milsner

169

1  sold two-thirds of the shares in the company to the
2  ESOP, that if a buyer came along he would pay three
3  point something million dollars less for the company?
4      A   Yes. The appraiser thinks so.
5      Q   That's what you understand that to say?
6      A   Yes.
7      Q   Haven't you in fact had conversations with
8  Mr. Dawson where you've told him that you understand
9  that the Weinress appraisals are specific-purpose
10 ESOP appraisals, and that the company really wasn't
11 damaged? You've had conversations to that effect
12 with Jack Dawson, haven't you?
13     A   No.
14     Q   You deny saying to Jack Dawson that you
15 understand that a buyer who came along would still
16 pay the same price for American Medflight? Do you
17 deny that, sir?
18     A   I don't remember any conversations to that
19 effect.
20     Q   Okay. So tell me --
21     A   I didn't even understand why the appraisal
22 came in that low until months later. I didn't
23 understand it.
24     Q   And how did that epiphany come to you, sir?
25     A   It was after numerous conversations with

170

1  Jack. He couldn't figure out why the stock should go
2  down by $3.6 million. He didn't understand it. He
3  called Daoro, talked with him; he called the
4  appraiser, and talked with the appraiser; and he
5  never could get a really good answer.
6          And it dawned on me, some three months
7  later, that the reason it went down is because
8  American Medflight took on a guarantee of this
9  $3.6 million and got basically nothing in return for
10 it.
11     Q   So what I'm having trouble grasping,
12 Mr. Carstarphen, let's say that the transaction
13 between Milsner and the ESOP takes place on Tuesday.
14 Let's hypothetically say that on Monday the company,
15 all the company's assets are worth $5.5 million.
16 Maybe they were worth more; maybe they were worth
17 less; but let's use that as a hypothetical number.
18     A   That's fine.
19     Q   On Monday the company is worth $5.5 million
20 to a buyer --
21     A   Yes.
22     Q   -- to Debbie over here, the court reporter.
23 She's got a lot of money, and she wants to buy an air
24 ambulance company. And she's negotiating, and she's
25 willing to pay $5.5 million on Monday.

171

1          She goes home, Carstarphen sells his stock
2  on Tuesday, and she comes back on Wednesday with a
3  check. Is she going to pay 5.5, or do you think
4  she's going to pay that 3.9 lower number?
5      A   The 3.9.
6      Q   The lower number?
7      A   The lower number.
8      Q   Okay. Does the company still, under the
9  Monday, Tuesday, Wednesday that I just gave you, the
10 hypothetical, does the company still own all the
11 planes that it had on Monday?
12     A   Yes.
13     Q   Does the company still have every thing
14 that it had on Monday?
15     A   It has everything, but it has another
16 $3.6 million worth of debt.
17     Q   Owed to whom?
18     A   Owed to Rich Milsner.
19     Q   Now on Monday Mr. Milsner owned two-thirds
20 of the company, didn't he?
21     A   Yes.
22     Q   How much was that worth?
23     A   I don't know. Two-thirds of the 5.5.
24     Q   Isn't that 3.6?
25     A   Yes.

172

1      Q   Isn't that the number there, sir? Do you
2  see the connection?
3      A   Yes.
4      Q   3.6? 3.6?
5      A   Yes.
6      Q   Okay. So let's say that transaction with
7  Debbie closes on Monday, and she pays $5.5 million to
8  John Carstarphen get? He gets one-third after all
9  the debts are paid; right?
10     A   But no one would pay that when there is an
11 additional 3.6 million in debt.
12     Q   So you believe that anybody who would pay
13 to buy the company would have to pay that 5.5 and pay
14 the 3.6?
15     A   3.6.
16     Q   That's what you believe, sir?
17     A   Yes. That's what I've been told.
18     Q   Who has told you that, sir?
19     A   Jack Dawson.
20     Q   Who else?
21     A   That's it.
22     Q   Okay. And we have discussed that
23 Mr. Dawson is a truthful individual?
24     A   Yes.

173

1    Q    So you would expect Mr. Dawson to say that,
2    that if Debbie comes back on Wednesday to buy
3    American Medflight she's not only going got to pay
4    the 5.5 that she was offering to pay, she's now got
5    to pay the 3.6 on top of that?
6    A    Yes.
7    Q    Okay. Now did you think that the 5.5 was a
8    fair price?
9    A    I really have no way of knowing that.
10   Q    Your opinion of value, sir, in that time
11   frame, was it higher than 5.5 or lower than 5.5?
12   A    To be truthful, I would say it would be
13   lower.
14   Q    What did you think the company was really
15   worth at that time, sir?
16   A    I really have no idea. I was not part of
17   the -- I had no financial information to make a
18   decision on that.
19   Q    But you just told me that you thought the
20   value was lower than 5.5. Did I hear that correctly?
21   A    Yes.
22   Q    What did you think it was?
23   A    I don't know, but I think it was lower.
24   Q    Oh, come on. You told me that you had an
25   opinion --

174

1    A    You asked me if it was higher or lower, and
2    I think it's lower.
3    Q    How much lower? A million?
4    A    I don't know.
5    Q    2?
6    A    I have no idea.
7    Q    Okay. Now you contend -- well, let's go
8    there for a minute.
9         Let's take a look at Exhibit 52,
10   Mr. Carstarphen. Are you at Exhibit 52,
11   Mr. Carstarphen?
12   A    Yes.
13   Q    About five pages down --
14        MR. RUSSO: Where did this memo come from?
15   Has this always been out there?
16        MR. HILL: Of course.
17        MR. RUSSO: This one here?
18        MR. HILL: Yes.
19        MR. RUSSO: The January 1, 2004?
20        MR. HILL: Yes. It's from the last case.
21        MR. RUSSO: Okay.
22        MR. HILL: Mr. Proctor came over with his
23   file and had these in his file.
24        MR. RUSSO: Okay. Good enough.
25

175

1    BY MR. HILL:
2    Q    You and I have talked about these before.
3    Do you recall that, sir?
4    A    Uh-huh.
5    Q    Yes?
6    A    Yes.
7    Q    Okay. Let me direct your attention here to
8    this page. It's called Minor Revisions to Income Tax
9    Analysis from John Carstarphen. And then there is an
10   e-mail address of cessna185@sbcglobal.net.
11        That was and still is your e-mail, isn't
12   it, sir?
13   A    It's no longer.
14   Q    Oh, it's not any more?
15   A    No.
16   Q    When did it cease to be your e-mail?
17   A    I don't know. A year or two ago.
18   Q    But on March 4th, 2006 that's what your
19   e-mail was?
20   A    Yes.
21   Q    Okay. And did you in fact send this e-mail
22   to Mark Gunderson and Jim Proctor on or about
23   March 4th, 2006?
24   A    Yes, I believe so.
25   Q    Okay. Hi, Mark and Jim. Attached is my

176

1    revision to the income tax analysis.
2         Well, Mr. Carstarphen, did you have data to
3    make an income tax analysis, or not?
4    A    Yes.
5    Q    Okay. So you did have financial
6    information?
7    A    I told you that.
8    Q    No, you have been telling me all day that
9    you were denied financial information, sir.
10   A    I was denied access to information in that
11   2004 range, and I started getting some information,
12   not a lot, but some; until today I have whatever I
13   have asked for.
14   Q    Okay.
15   A    I don't know why you don't understand that.
16   Q    I'm sorry, sir. I can't explain that.
17        You did have sufficient information to do
18   an income tax analysis to calculate the worth of the
19   company; right? That's what you're telling these
20   guys.
21   A    Yes.
22   Q    Okay. Tell me the process you went through
23   to get to this. Because in the next sentence you
24   say: This shows an approximate net worth of AMF of
25   $12 million, or my one-third share of $4 million.

177

1    A    Uh-huh.
2    Q    Was that the number that -- were those the
3    numbers that you came up with in March of 2006?
4    A    Yes, I did.
5    Q    Okay.
6    A    And it was very close to what Jim came up
7    with, too, with the same information.
8    Q    So tell me the methodology that you used,
9    Mr. Carstarphen.
10   A    I really don't even remember.
11   Q    Did you honestly think in March of 2006
12   that American Medflight was worth -- had a net worth,
13   a net worth of $12 million?
14   A    That's what our analysis came up with.
15   Whether I believed it or not, I don't know.  I don't
16   know if I had good information or I had bad
17   information.
18   Q    Well, you had been to the meeting on
19   December 5th, 2005 where the sale was discussed.
20   Yes?
21   A    Yes, I was.
22   Q    And the value that was discussed at that
23   meeting that Mr. Weinress came up with was
24   $5.5 million; wasn't it?
25   A    I don't believe I had that information

178

1    until later.  I don't know that at that meeting of
2    December the 15th, or whatever it was, I don't
3    believe there was a number available.
4    Q    Mr. Carstarphen, do you remember that a
5    court reporter was there?
6    A    Yes, there was a court reporter there.
7    Q    And do you remember telling Mr. Milsner
8    that you had received page 40 of an appraisal?
9    A    Oh, yes, I did.
10   Q    Okay.  Does that refresh your recollection?
11   A    Yes.
12   Q    So you had Weinress $5.5 million number,
13   didn't you?
14   A    I presume so.
15   Q    Well, did you, or didn't you?
16   A    I believe that's what it was.
17   Q    Okay.  Was this a major shock to you that
18   the company was really worth $12 million when the
19   appraiser three months before is telling you that
20   it's worth 5.5?  Or did you know that all along?
21   A    No, I did not know that all along.
22   Q    You did think that the 5.5 was too cheap,
23   didn't you?
24   A    I did believe it at that time.
25   Q    Okay.  And you're now today thinking

179

1    5.5 was too high?  Or too low?
2    A    Yes.  I think it's too high.
3    Q    So the value of the company was actually
4    much lower, or lower than 5.5?
5    A    Yes.  And the reason being is in the
6    appraisal they dismissed any problems with the
7    lawsuit and didn't take any valuation of that into
8    account.  They said it was of no problem, and it
9    would be settled shortly.  Or something to that
10   effect.
11   Q    Well, the lawsuit did go away, didn't it?
12   A    Yes.
13   Q    So, Mr. Carstarphen, what happened between
14   December 5th, 2005 and March 4th, 2006?  That's about
15   three months, isn't it, January, February, March,
16   three months --
17   A    Yes.
18   Q    -- what happened to convince you that that
19   company was now worth $12 million?  What happened?
20   A    It was just running the income tax numbers
21   that we had.  And I didn't even believe that, because
22   something just wasn't adding up at all.
23   Q    Mr. Carstarphen, do you believe that the
24   company was worth $12 million in March of 2006?
25   A    No.

180

1    Q    So you were bullshitting Mr. Gunderson and
2    Mr. Proctor?
3    A    No, I was showing a point.
4    Q    What was the point?
5    A    That the analysis that Mr. Proctor was
6    coming up with was the same thing I was coming up
7    with, or close to it --
8    Q    And you've just told me now that you don't
9    believe that number; is that right?
10   A    No, I don't believe that number.
11   Q    So you don't believe Mr. Proctor's number
12   either, do you?
13   A    I thought that there was something wrong
14   with our analysis.
15   Q    And did you find out that there was
16   something wrong with your analysis?
17   A    I don't know.
18   Q    Who would know, sir?
19   A    I don't know.
20   Q    Have you satisfied yourself that the
21   analysis that your expert used throughout this whole
22   matter is correct?  Or he's wrong?
23   A    Do you think that Mr. Proctor's number is
24   wrong?
25   Q    What I think doesn't matter.  I want to

181

1  know, is Mr. Proctor right or is Mr. Proctor wrong?
2      A    I believe Mr. Proctor is right in his
3  current analysis in the report that he presented.
4      Q    Was he wrong in 2006?
5      A    I don't know that he was wrong.
6      Q    Okay.  But we're in agreement that the
7  12 million is wrong.
8      A    Yes.
9      Q    Okay.  If you continue down, the last
10  paragraph:  Rob yesterday said we should make another
11  settlement offer.  Rich will not settle now.
12         Did anybody tell you that?
13     A    No.
14     Q    So you just thought that up yourself?
15     A    Yes.
16     Q    However - can you tell me what's whited out
17  there - However?
18     A    In these additional numbers presented my
19  offer --
20     Q    -- my offer would be $6 million.
21         So how did you arrive -- now is that
22  $6 million damages, or is that to buy your stock?
23     A    To buy the stock.
24     Q    So in an analysis that you now disavow you
25  thought your stock was worth 4 million, but you

182

1  wanted an additional 2 million from Mr. Milsner; is
2  that right?
3      A    I don't know.
4      Q    Well, who authored this memo,
5  Mr. Carstarphen?
6      A    I did.  I did.
7      Q    What did you mean?
8      A    We were talking about a settlement offer.
9      Q    How did you get to that number?
10     A    I don't know how I got to that number.
11     Q    Was there any support for it?
12     A    I don't know.  This was back in 2006.  And
13  it's just a memo.  This is no formal written offer,
14  or anything.
15     Q    No, this is what you're telling your
16  attorney you think your case is worth.  Isn't that
17  what this is?
18     A    Basically.
19     Q    Okay.  And how did you come to the
20  $6 million value?
21     A    I don't know.
22     Q    Did you want to settle the case?
23     A    Yes.
24     Q    Did you think $6 million was realistic?
25     A    No.

183

1      Q    Well, then why did you tell your lawyer
2  that you wanted $6 million?
3      A    I didn't.
4      Q    Presented my -- However, in these
5  additional numbers presented my offer would be
6  $6 million.
7         Isn't that what it says?
8      A    Yes.
9      Q    Let's go back to the next to the last page
10  in Exhibit 52, Mr. Carstarphen.
11         Did you send this memo to Mark Gunderson on
12  or about March 18, 2004, Mr. Carstarphen?
13         MR. RUSSO:  Let me just get one
14  qualification, Richard.
15         MR. HILL:  Certainly.
16         MR. RUSSO:  You got these from Jim Proctor
17  in a production?
18         MR. HILL:  I was sitting across this very
19  table from Mr. Proctor, and I said:  Is that your
20  file?  And he said:  Yes.  And I said:  Can I see it?
21  And he said:  Yes, here you go.
22         MR. RUSSO:  So these were documents in the
23  file that were produced to you as part of the expert
24  documents.  Okay.
25         MR. HILL:  Not this production.

184

1         MR. RUSSO:  I understand.
2         MR. HILL:  The last case.
3         MR. RUSSO:  Okay.  I just wanted to make
4  sure there was a waiver there.
5         MR. HILL:  Oh, I don't know.  I think so.
6         MR. RUSSO:  Well, if it was provided to the
7  consultant --
8         MR. HILL:  I think so.
9  BY MR. HILL:
10     Q    Mr. Carstarphen, do you recognize this
11  memo?
12     A    Not really, but I'm sure it's mine.
13     Q    Okay.  Item Number 5:  The four invoices
14  you reference, October through November 1998, these
15  same invoices exist for each and every month to the
16  present because I've seen most of them.
17         Now these are the invoices for what?
18  Aren't these the consulting fee?
19     A    Yes, I believe so.
20     Q    And you're telling your lawyer that you've
21  seen most of them from October 1998 through March of
22  2004.  Now were you lying to him, or were you lying
23  to me earlier?
24         MR. RUSSO:  Objection.  Argumentative.
25         THE WITNESS:  The invoices in 1998, I was

Deposition of John Carstarphen, Friday, April 23, 2010

185

```
 1   still the president of the company, and I would see
 2   those. What's the problem?
 3   BY MR. HILL:
 4        Q    These same invoices exist for each and
 5   every month to the present --
 6        A    That's correct.
 7        Q    -- because I have seen most of them.
 8             Was that statement you made to your lawyer
 9   true?
10        A    I haven't seen them; I've seen them in the
11   financial records --
12        Q    That's not what it says.
13        A    Well, maybe I didn't word it correctly.
14        Q    Are there any other things you're mistaken
15   about, Mr. Carstarphen?
16             MR. RUSSO:  There is no question.
17             THE WITNESS:  I'm trying to explain myself,
18   and I don't think you're being very fair.
19             I told you that I saw the records in 1998
20   because I was president of the company and I had
21   access to the financials. When I say I've seen them,
22   it could be that I misspoke there, but I know that
23   they're there because I see them in the financial
24   statements.
25
```

187

```
 1        A    Number 6?
 2        Q    The next sentence after the one I just read
 3   to you, sir. Come on.
 4        A    In number 5?
 5        Q    Did you write to your lawyer, and did you
 6   say:  There are also records showing RFS paid to AMF
 7   the interest to NSB owed by RFS on money borrowed
 8   from AMF so AMF could pay the interest to NSB?
 9             Did you write that to your lawyer?
10        A    More than likely. You're talking about in
11   paragraph 6?
12        Q    Hence - then you go on and say - Hence,
13   interest charges came from RFS to AMF and then to
14   NSB.
15             Mr. Carstarphen, do you hate
16   Richard Milsner so much that you're prepared to
17   commit perjury and make up facts, make up lies, to
18   try to get at him in this case?
19             MR. RUSSO:  Objection. Argumentative.
20   Instruct the witness not to answer
21             MR. HILL:  Your lawyer has instructed you
22   not to answer, sir.
23             Would you care to identify privilege, for
24   the record?
25             MR. RUSSO:  The question is
```

186

```
 1   BY MR. HILL:
 2        Q    Did you misspoke in this letter, or did you
 3   misspoke here earlier today?
 4        A    I misspoke in this letter.
 5        Q    Okay. Thank you.
 6             Item number 6, the loans were made to RFS
 7   using AMF $300,000 line of credit, of which this
 8   300,000 line of credit was part of the total
 9   $1.7 million personal guarantee of mine.
10             That's the line of credit you and I talked
11   about earlier this morning.
12        A    Yes.
13        Q    And you told me that you didn't believe
14   that Reno Flying Service had paid everything off. Do
15   you remember that?
16        A    I didn't say that. I said I do not know
17   that it's ever been repaid or that the interest has
18   ever been repaid.
19        Q    Would you read the next sentence in your
20   memo to Mr. Gunderson to me, please, sir?  Please
21   read it out loud.
22             Sir?
23        A    Say again?
24        Q    I asked you to read the next sentence in
25   your memo to Mr. Gunderson. Read it out loud.
```

188

```
 1   argumentative --
 2             MR. HILL:  Okay.
 3             MR. RUSSO:  -- it's cumulative --
 4             MR. HILL:  Yes or no on privilege?
 5             MR. RUSSO:  It's argumentative, it's
 6   cumulative --
 7             MR. HILL:  Okay.
 8             MR. RUSSO:  -- and with the three caveats
 9   in there, are you willing to do this, this, this, and
10   this, and this; if you want to ask them individually,
11   I'm sure that he will answer them.
12   BY MR. HILL:
13        Q    Sir, you do hate Mr. Milsner, don't you?
14        A    No.
15        Q    Your testimony that you gave to me this
16   morning is contrary to what's in your memo to
17   Mr. Gunderson. Yes?
18        A    I don't believe so.
19        Q    You think your testimony here today is
20   consistent with this memo of March 18th, 2004?
21        A    I don't know. I would have to read this
22   thing.
23        Q    Okay. And if you get the copy of this
24   deposition and your testimony is different -- oh,
25   never mind.
```

189

1    All right. Now at the meeting -- have you
2  read the transcript of the December 5th meeting?
3    A    I don't believe so.
4    Q    Do you pay Mr. Russo and Mr. King by the
5  hour, or do they have this case on a contingency?
6    A    I pay by the hour.
7         And there is no real reason for me to read
8  the transcript when I was there.
9    Q    Did you at that point -- well, first of all
10 did you agree that AMF should have an ESOP?
11   A    Yes.
12   Q    You, on that record, told everybody at that
13 meeting that you had a ESOP for your business. Was
14 that true?
15   A    Yes.
16   Q    You told everybody that you understood
17 ESOPs. Was that true?
18   A    I understand the concepts of an ESOP, but
19 I'm not an ESOP attorney.
20   Q    Did you ask Mr. Milsner or Mr. Dawson any
21 questions prior to the meeting of December 5th, 2005
22 about the AMF ESOP, or ESOPs in general?
23   A    Yes, I'm sure I did.
24   Q    What questions did you -- well, did you ask
25 either of those gentlemen any questions about the

190

1  ESOP, AMF ESOP or ESOPs in general, that they refused
2  to answer?
3    A    No. We had that ESOP for four years
4  probably prior to that, and we had many discussions
5  about ESOPs.
6    Q    Did either gentleman give you any
7  misinformation about either the AMF ESOP or ESOPs in
8  general prior to or at the December 5th meeting?
9    A    I would say no.
10   Q    Okay. You contend that Milsner didn't give
11 you information that you needed to make a decision;
12 is that right?
13   A    Yes.
14   Q    What information was that, sir?
15   A    Neither Mr. Milsner, the Weinress appraisal
16 company --
17   Q    Weinress?
18   A    Weinress, nor Menke, who was the
19 administrator, told me that my stock was going to go
20 down $1.3 million.
21   Q    What did you think the result of that
22 transaction was going to be on the balance sheet of
23 the books, sir?
24   A    I thought that there was going to be a
25 transfer of the equity ownership from Milsner to the

191

1  ESOP, and that was the only consequences on the
2  books.
3    Q    You understood before that meeting that the
4  ESOP did not have $3.6 million; right?
5    A    Yes.
6    Q    You understood that Milsner was going to
7  get paid over time; did you not?
8    A    I had no idea as to how much stock he was
9  going to sell. He could have only sold a portion of
10 it that the ESOP did have funds to buy. I had no
11 information as to what was going on. I had no
12 information that there was going to be a loan on the
13 company; nothing. There was no documents of any kind
14 presented there.
15   Q    You thought your shares were worth
16 1 point -- you were being offered $1.8 million for
17 your shares; isn't that the number?
18   A    I was never offered anything.
19   Q    Isn't that the number that was discussed,
20 sir?
21   A    I believe that's correct.
22   Q    Okay.
23   A    But that was just taking one-third of the
24 5.5.
25   Q    You understood that you could sell all of

192

1  your stock for $1.8 million to the ESOP, didn't you?
2    A    I don't know what that number was. What's
3  one-third of 5.5?
4    Q    I thought you had a clear recollection of
5  the meeting, sir.
6    A    I did have a clear recollection of the
7  meeting.
8    Q    Do you have a clear recollection of the
9  meeting as you sit here today?
10   A    Pretty much so.
11   Q    I mean, that's a meeting where you contend
12 you lost $1.3 million. I would think that's pretty
13 crystal clear.
14   A    It was not crystal clear at that point. It
15 wasn't until months later that I found out --
16        MR. HILL: Counsel - I'm sorry for
17 interrupting, sir - will you give him back that
18 binder, please.
19 BY MR. HILL:
20   Q    Please open the binder to Exhibit 53,
21 Mr. Carstarphen, the last page.
22        Did you send this e-mail to Mark Gunderson
23 from your e-mail account of cessna185sbc@lobal.net on
24 Monday, December 5th, 2005 at 3:43 p.m.?
25   A    More than likely.

193

1    Q   Well, let's not mince words.  Is that a yes
2  or a no?
3    A   I don't remember the document, but it's
4  signed by me, and it looks like it came from my
5  e-mail address.
6    Q   Hi, Mark.  Went pretty much as I had
7  expected.
8        What did you expect was going to happen?
9    A   That Rich was going to sell stock to the
10  ESOP.
11    Q   Okay.  No surprises, and no revelations.
12        Now your testimony has been that before the
13  meeting Milsner told you that you could only engage
14  in a transaction with the ESOP on the condition he
15  dismissed your lawsuit.  Isn't that your testimony,
16  sir?
17    A   Yes, it is.
18    Q   Now there was some discussion about money
19  being borrowed from banks.  Do you remember that?
20    A   Money being borrowed -- yes, there was some
21  discussion of it.  That was called a leverage
22  buy-out.
23    Q   What's a leverage buy-out, Mr. Carstarphen?
24    A   It's where Milsner sells his stock to the
25  ESOP, and the bank loans the money to American

194

1  Medflight to buy the stock.
2    Q   Okay.  Now that's not what we have here.
3  What we have here is Milsner provided seller
4  financing; isn't that right?
5    A   Yes.
6    Q   So that's not a leveraged ESOP, is it?  By
7  your definition.
8    A   We did not do the leverage buy-out.
9    Q   What did you do?  What did Milsner do --
10    A   Milsner agreed --
11    Q   -- what label would you put on it?  It's a
12  non-leveraged buy-out?
13    A   Yes.
14    Q   Have you read Proctor's reports that he's
15  issued in this case?
16    A   Yes.
17    Q   Did you understand them?
18    A   Pretty much so, I think.
19    Q   Okay.  Well, we're not going to get to his
20  report today, but I'm going to ask you next time we
21  get together to explain it to me, because I don't
22  understand it.
23        Now --
24    A   I think he should explain it; not me.
25    Q   Well, I'm going to give you a chance to

195

1  explain it.
2        MR. RUSSO:  And then I'll of course object
3  that it's --
4        MR. HILL:  Of course.  I would expect
5  nothing less.
6  BY MR. HILL:
7    Q   You say in this first line:  No surprises
8  and no revelations.
9        You didn't know before you went to that
10  meeting that Milsner was going to make a condition of
11  your participation that you had to dismiss the
12  lawsuit.  You didn't know that before you got there,
13  did you?
14    A   No.
15    Q   No surprises; no revelations.  It doesn't
16  say:  Whoa, this guy told me I couldn't participate
17  unless I dismissed my lawsuit.  That you thought was
18  worth $2 million; right?  On top of the 4 million for
19  your stock.
20    A   I don't think that's a revelation.
21    Q   Okay.  It wasn't?
22        MR. RUSSO:  Doesn't it say it right there?
23        MR. HILL:  No.  Well, we'll get there.
24  BY MR. HILL:
25    Q   You do talk later down there about the

196

1  condition, don't you?
2    A   Yes.
3    Q   Do you recall whether Milsner said that the
4  condition applied -- well, let me back up.
5        There were two ways this transaction was
6  proposed to you.  Way number one, you could take the
7  promissory note on the same terms that Milsner was
8  getting --
9    A   I knew nothing of a promissory note at that
10  time.
11    Q   Okay.  So you don't recall any discussion
12  where Mr. Milsner said to you that you could take a
13  promissory note on the same terms that he was
14  getting?  You don't recall that?
15    A   He never said anything like that.  He said
16  to me that I could participate in the ESOP if I
17  dropped the lawsuit.
18    Q   Period.  Period.
19    A   Period.
20    Q   And it didn't matter whether it was what
21  you called the leverage where the money comes from
22  the bank --
23    A   Yes.
24    Q   -- or whether it was whatever he was going
25  to do, or he was going to be taking the note --

Deposition of John Carstarphen, Friday, April 23, 2010

197

1    A    Yes.
2    Q    -- either way you had to dismiss your
3  lawsuit first.
4    A    If I wanted to participate in the ESOP.
5    Q    Either way, either with the bank money or
6  with the note.
7    A    Nothing was discussed of that. It was
8  just: If you want to participate in the ESOP, you
9  have to drop the lawsuit.
10   Q    Okay. By that point in time your
11 deposition had been taken in the first case; right?
12   A    I believe so.
13   Q    And Dawson's deposition had been taken;
14 right?
15   A    I don't know, but I presume so.
16   Q    You understood how court reporters work.
17   A    Yes.
18   Q    They take this stuff down, and a Judge is
19 going to believe that that's what's said. You
20 understood that?
21   A    Yes.
22   Q    And you contend that this discussion that
23 you had with Milsner was before the meeting; right?
24   A    It was a ten-second conversation before the
25 meeting.

199

1    A    I don't know when.
2    Q    Did he tell you that before the meeting or
3  after the meeting?
4    A    Before the meeting.
5    Q    Okay. Was it at his office or was it on
6  the phone?
7    A    I have no idea.
8    Q    What were the circumstances where that came
9  up?
10   A    I'm sure at some point we were discussing
11 the ESOP.
12   Q    Were you getting advice from anybody about
13 what the ESOP transaction would mean to you?
14   A    No.
15   Q    Why not?
16   A    I wasn't selling to the ESOP.
17   Q    Then why did you go to the meeting?
18   A    Because I was requested to go to the
19 meeting.
20   Q    When you went to the meeting did you want
21 to sell your shares to the ESOP, or not?
22   A    No.
23   Q    Okay. So it didn't matter then whether
24 Milsner put a condition on it or not, did it --
25   A    No.

198

1    Q    Okay. And who were the participants to
2  that conversation?
3    A    Rich Milsner and myself.
4    Q    Where was Dawson?
5    A    What?
6    Q    Where was Jack Dawson?
7    A    I have no idea.
8    Q    My associate Casey Baker was at that
9  meeting. Was he anywhere nearby?
10   A    No one was nearby.
11   Q    So if Milsner denies it, then we just have
12 your word and his word.
13   A    Yes.
14   Q    Okay. Did you send -- did you instruct
15 Mark Gunderson to send a letter to Cashill or me or
16 Milsner or anybody to confirm that conversation that
17 you had?
18   A    No. Why?
19   Q    Why not?
20   A    Why would I want to do that?
21   Q    You wanted to make the deal with the ESOP,
22 didn't you?
23   A    I was told by Mark Gunderson that if I sold
24 my stock to the ESOP the lawsuit would go away.
25   Q    Okay. When did he tell you that?

200

1    Q    -- because you didn't want to sell.
2    A    I was told that if I sold my stock to the
3  ESOP I would be out of the, I would not have - I
4  don't know what you call it - an interest in the
5  company, and couldn't continue the lawsuit.
6    Q    Okay. And based on that -- and you thought
7  that lawsuit was worth 2 million bucks. Based on
8  that you didn't want to sell the ESOP because you
9  wanted to keep your lawsuit going; right?
10   A    I didn't want to give up the lawsuit.
11   Q    And you knew, your attorney had told you
12 that if you gave up the lawsuit, if you gave up
13 the -- if you sold to the ESOP you gave up the
14 lawsuit.
15   A    That's what he told me.
16   Q    Hand-in-hand, if you sell you lose the
17 right to the lawsuit.
18   A    That's correct.
19   Q    And that was unacceptable to you because it
20 was worth 2 million bucks; right?
21   A    2 million bucks? My stock was worth
22 2 million.
23   Q    Your stock was worth 4 million; don't you
24 remember your memo?
25   A    My stock was worth 2 million.

201

1    Q    Okay. It was worth 2 million. And your
2   lawsuit was worth another 2; wasn't it?
3    A    I don't know.
4    Q    What did you think the lawsuit was worth,
5   Mr. Carstarphen? Before you walked in the door to go
6   to that meeting, you thought you had -- you had
7   $2 million worth of stock; is that right? That's
8   what you just told me. Do you want to take that
9   back?
10   A    Two-thirds of the 5.5. I don't know what
11  that number is.
12   Q    1.8.
13   A    Okay. Then that's what it is, if you tell
14  me.
15   Q    Okay. And you also owned a lawsuit against
16  Milsner, didn't you? What did you think that was
17  worth?
18   A    It hasn't been worth anything.
19   Q    Do you understand that AMF, because of your
20  lawsuits, has shelled out three-quarters of a million
21  dollars in attorney's fees? Do you understand that?
22   A    I don't doubt that at all.
23   Q    What do you think the reaction is going to
24  be of Joe ESOP, who works for American MedFlight,
25  when he finds out that one of the directors of the

202

1   company brought two frivolous lawsuits against the
2   company that cost it three-quarters of a million
3   dollars? What do you think their response is going
4   to be? Do you think they're going to sue
5   Jack Dawson?
6    A    This is not a frivolous lawsuit --
7    Q    Okay. So tell me --
8    A    -- and I've spent an equal amount of that.
9   And of that three-quarters of a million dollars
10  you're saying has been paid in attorney's fees, I
11  have paid one-third of that.
12   Q    You have, sir. And thank you.
13       Now what did you think that lawsuit was
14  worth when you walked in the door for that meeting?
15   A    I have no idea.
16   Q    You and your counsel had discussed it;
17  hadn't you?
18   A    I don't believe so.
19   Q    Okay. Now are you paying Mr. King and
20  Mr. Russo by the hour?
21   A    Yes.
22   Q    How much have you paid them so far in this
23  case?
24       MR. RUSSO: Objection. Attorney/client
25  privilege. Instruct the witness not to answer.

203

1        MR. HILL: Okay.
2   BY MR. HILL:
3    Q    What are the terms and conditions that you
4   have with them?
5        MR. RUSSO: Objection. Attorney/client
6   privilege. Instruct the witness not to answer.
7        MR. HILL: Counsel, attorney's fees --
8   BY MR. HILL:
9    Q    Do you think the Judge should award you
10  attorney's fees? Do you know?
11   A    I don't know.
12   Q    Okay. Well, we'll be together for another
13  session.
14       All right. So when you go to this meeting
15  you've been informed by your attorney that if you
16  sell to the ESOP your lawsuit goes away; right?
17   A    I didn't think -- he didn't inform me
18  before that. I think I believed that.
19   Q    What was your source of information for
20  that belief, sir?
21   A    I believe I got that information from
22  either Mark Gunderson or, what's his name, SanJay?
23  SanJay? What is his name?
24   Q    Somebody that worked for Gunderson?
25   A    Yes.

204

1    Q    Oh, okay.
2    A    The attorney.
3    Q    Somebody from that office --
4    A    Yes.
5    Q    -- told you that?
6        Okay. And how much did you have invested
7   in your lawsuit at that point in time?
8    A    I don't know.
9    Q    A couple hundred thousand dollars?
10   A    I don't know. That number is not
11  unreasonable, in that range.
12   Q    Okay. In attendance was myself, Rich, and
13  Jack, a representative from Hill's office, another
14  attorney who said he was representing Rich, and a
15  court reporter.
16       Wasn't it John Fowler who represented AMF?
17   A    I don't know.
18   Q    Do you know if Fowler was there?
19   A    I didn't know him at that time.
20   Q    Do you know him now?
21   A    I don't know. I think I got him confused
22  with somebody else.
23   Q    Do you know Todd Ratfield? Do you know who
24  he is?
25   A    I've heard the name.

205

```
 1      Q    Was he there at that meeting?
 2      A    I don't know.
 3      Q    I'll go through the items as Jack laid out
 4  in the notice.
 5           First of all they want to sell the existing
 6  aircraft and get King Air C-90's because of the
 7  trouble getting parts, and they want me to sign on
 8  the notes.
 9           So you did at least have that discussion at
10  that meeting that they wanted you to sign on the
11  notes.
12      A    Yes.
13      Q    Did you tell them you would or wouldn't?
14      A    I don't remember what I told them.
15      Q    Okay.  You don't remember one way or the
16  other?
17      A    I don't remember one way or the other.
18      Q    Okay.  So if Dawson testifies that you
19  refused --
20      A    I probably would have refused --
21      Q    Okay.
22      A    -- but I don't know that I said it at the
23  meeting.
24      Q    Okay.  2003, 2004, and 2005 contribution to
25  the ESOP is approximately $540,000, and Rich wants to
```

206

```
 1  sell some of his stock to the ESOP before the end of
 2  the year.
 3      A    Yes, that's what I understood.
 4      Q    Okay.  What difference did it make to you
 5  whether he sold some or all.  Did it?
 6      A    Really at that time it didn't, but I didn't
 7  realize the implication of him selling it all.
 8      Q    Did you understand -- well, I'm
 9  Joe Six-Pack, I work at American Medflight, and I'm
10  part of the ESOP.  How do I get my money out?
11           There's three ways I leave the company:
12  If I die, if I retire, or I get fired.  Okay?  Do you
13  agree with me?  Those are the three options; right?
14      A    Yes.
15      Q    Okay.  How do I get my money, when I do one
16  of those three things, if I'm Joe Six-Pack?  Do you
17  know?
18      A    The money has to -- there has to be a slush
19  fund in the ESOP to pay out those fees.
20      Q    Does the AMF ESOP have a slush fund, sir?
21           And I presume, you don't mean to make it
22  like a bad slush fund, you just mean cash laying
23  around; or do you mean a slush fund used for improper
24  purposes?
25      A    No, I mean allocated money.
```

207

```
 1      Q    And the ESOP doesn't have money allocated
 2  right now; does it?
 3      A    I have no idea.  I don't see the books and
 4  records.
 5      Q    You know that the AMF ESOP is having
 6  trouble paying Milsner.  You know that; don't you?
 7      A    It was delinquent on its payments for two
 8  years, but it's now current.
 9      Q    You know that it's had trouble making
10  payments; don't you?
11      A    In the past.  But not now.
12      Q    And what changed?
13      A    The note that Milsner had with the company
14  was renegotiated to something that it could pay.
15      Q    And if the three-quarters of a million
16  dollars in cash that AMF has had to pay came back
17  into the company, do you have an opinion as to
18  whether or not AMF, the AMF ESOP could make those
19  payments?
20      A    As far as I know, AMF is currently making
21  the payments to Rich Milsner.
22      Q    And those payments are substantially
23  reduced; aren't they?
24      A    I don't have information as to them.  I
25  haven't seen any of the documentation.
```

208

```
 1      Q    You're aware of a check written by Milsner
 2  to himself on an American Medflight account in the
 3  amount of $100,000; aren't you?
 4      A    Yes.  I was told by Jack Dawson.
 5      Q    And when Mr. Dawson told you about that,
 6  was that Mr. Milsner did it last week, Mr. Milsner
 7  did it last month, Mr. Milsner did it last quarter,
 8  or Mr. Milsner did it today or yesterday?  Give me
 9  the time frame on what he told you.
10      A    I don't think he told me when he did it,
11  but I assumed it was probably within a month of when
12  he told me.
13      Q    He told you immediately when he found out,
14  didn't he?
15      A    I don't know.
16      Q    Okay.  Did you and he discuss that this was
17  now an opportunity to renegotiate Milsner's note to a
18  lower payment?
19      A    Because of the hundred thousand dollars?
20      Q    You had that discussion with him, didn't
21  you?
22      A    No, I don't think so.  But we had been
23  talking for a number of times before this 100,000,
24  and I'm sure afterwards, of renegotiating the terms
25  and conditions of that note.
```

Deposition of John Carstarphen, Friday, April 23, 2010

209

1    Q    Your testimony is that you and Dawson did
2  not discuss that that was an opportunity to get
3  Milsner in a corner and take a lower payment amount.
4  Did you and he have that discussion at that time or
5  not?
6    A    No.
7    Q    Okay.  That's fine.
8         Now did you read this --
9    A    Let me clarify something.
10   Q    Please.  Please.
11   A    I believe that Jack had talked with Rich
12 shortly after the 2005 meeting when the documents
13 showed up that he didn't think the company could make
14 those payments and wanted to renegotiate a loan at
15 that time, and it was refused.
16   Q    Where was the company -- the company was
17 short on cash, wasn't it?
18   A    Yes.
19   Q    Okay.  Now did you read the ESOP stuff that
20 was sent to you?
21   A    What ESOP stuff?
22   Q.   Well, let me back up.
23        Was any material pertaining to the ESOP
24 provided to you by anybody on the planet before that
25 December 5th meeting?

210

1    A    Like I said, I think the ESOP was in effect
2  for 3 or 4 years before that, and I'm sure I had got
3  information on ESOP.
4    Q    Okay.  Did you read it all when you got it?
5    A    I'm sure I did.
6         (A copy of a multi-page document
7          entitled American Medflight Employee
8          Stock Ownership Plan, was marked
9          Exhibit 64 for identification.)
10 BY MR. HILL:
11   Q    Let me hand you what we've marked as
12 Exhibit 64, Mr. Carstarphen.  Have you ever seen this
13 document before?
14        Do you recognize this as the first couple
15 of pages of the American Medflight Employee Stock
16 Ownership Plan?
17   A    Uh-huh.
18   Q    Yes?
19   A    Yes.
20   Q    Okay.  Do you know what a put is?
21   A    A put?
22   Q    A put.
23   A    Yes.
24   Q    What is a put?
25   A    That's selling a thing short.

211

1    Q    Okay.  Do you know, does American Medflight
2  -- did you read this when you got it?  Exhibit 64?  I
3  mean I've only included a couple of pages here; it's
4  a big, thick sucker.  Did you read it when you got
5  it?
6    A    I don't know that I did.
7    Q    Did have you questions when you read it?
8  If you read it?
9    A    Anybody that's dealt with an ESOP has lots
10 of questions.
11   Q    What did you do to get your questions
12 answered, sir?
13   A    I would talk to Mr. Menke from
14 time-to-time, or what was his name -- Coltman.
15   Q    Coltman?  Bachman?
16   A    Not Bachman, Lyle Coltman.
17   Q    Kyle Coltman?
18   A    Kyle.
19   Q    With a K?
20   A    Kyle.  Kyle.  That's it.
21   Q    What did you and Mr. Coltman talk about, do
22 you remember?
23   A    We had many conversations over the years.
24   Q    How many ESOPs did you have?  This is dated
25 December of 2003.  How many ESOPs had you been

212

1  involved with at that time?
2    A    I think this was the only one.
3    Q    When did the ones come along for your
4  company?
5    A    I don't know the date.
6    Q    Before or after this?
7    A    I'm sure it was afterwards.
8    Q    Did you ever talk with Milsner about any of
9  the terms of the employee stock ownership plan?
10   A    We had it for 3 or 4 years, I'm sure we
11 did.
12   Q    Tell me every conversation you had with
13 Milsner about the AMF ESOP.
14   A    I have no idea.
15   Q    Can you recall, as you sit here today, can
16 you recall the content of one conversation --
17   A    No.
18   Q    -- that you had with Mr. Milsner before the
19 December 5th meeting pertaining to the American
20 Medflight ESOP?
21   A    Recently before the '05 meeting?
22   Q    Let's get our -- let's focus; okay?
23        We've got the December 5th, 2005 meeting
24 that we've been talking about.
25   A    Yes.

213

```
 1        Q     Before that time I would like you to tell
 2   me one conversation you had with Milsner about the
 3   AMF ESOP.  Can you do that?
 4        A     No.
 5        Q     Was there one?
 6        A     I'm telling you that we had conversations
 7   about ESOPs over a three or four-year period.
 8        Q     Okay.
 9        A     There was no conversation with Mr. Milsner
10   about this, other than he was talking about doing a
11   leveraged buy-out, and he was going to get offers
12   from banks to do so.
13        Q     Okay.  The whole purpose of the ESOP was to
14   get somebody to buy your stock, wasn't it?
15        A     Yes.
16        Q     I mean, that's why you filed the first
17   lawsuit, wasn't it, because you wanted somebody to
18   buy your stock.
19        A     No.
20        Q     That wasn't your goal?
21        A     No.
22        Q     Okay.  Let's look at page AMF 02582 in
23   Exhibit 64, sir.
24        A     What page, the number again?
25        Q     587.
```

214

```
 1              Are you with me?
 2        A     Yes.
 3        Q     Section 16, Rights and Options on
 4   Distributed Shares of Company Stock.  Do understand
 5   that to be referring to stock that's vested in
 6   employees of the ESOP?
 7        A     I don't understand that.
 8        Q     That's not what you understand that to be
 9   referring to?
10        A     I don't know what it means.
11        Q     Let me read the -- it says (a):  Put
12   Option:  If the distribution of the plan benefit is
13   made in the form of shares of company stock, and if
14   such company stock is not immediately repurchased by
15   the company or the trust, then the qualified holder
16   of such stock shall be granted at the time that such
17   shares are distributed to the qualified holder an
18   option to put the shares to the company; provided,
19   however, that all such shares are so put.
20              Did you read that before I just read it to
21   you?  Did you ever see that?
22        A     Not really.
23        Q     Did you have an understanding -- has
24   anybody ever told you that AMF has to recognize the
25   ESOP obligation to Milsner on its books and records
```

215

```
 1   as a matter of accounting practice, or do you believe
 2   that it's the guarantee?
 3        A     I don't know either of those.
 4        Q     Well, you believe that the debt to Milsner
 5   has somehow come through and bit you; right?
 6        A     Yes.
 7        Q     And that's because the $3.3 million in debt
 8   is on the balance sheet of the company; right?
 9        A     Yes.
10        Q     Why is it there?  Do you know?
11        A     Because the company took on this debt.
12        Q     Did it take on the debt by reason of the
13   fact that it established the ESOP, or did it take on
14   the debt because AMF guaranteed it; do you know?
15        A     No.
16        Q     You signed the resolution to adopt the
17   ESOP, didn't you?
18        A     Yes.
19        Q     As a director of the company you thought
20   that was a good thing to do.
21        A     Yes, I did.
22        Q     Why?
23        A     Because I thought it would give the
24   employees something rather than selling it out to a
25   third-party.
```

216

```
 1        Q     Did you think in the long-run it would be
 2   good for the company?
 3        A     Yes.
 4        Q     Do you still think that today?
 5        A     Yes.
 6        Q     And did you make any inquiry of anybody
 7   about what the financial impact would be on the
 8   company before you agreed to the formation of the
 9   ESOP?
10        A     No.
11        Q     You did understand that the proposal was
12   that American Medflight was going to guarantee the
13   obligation.  You did understand that --
14        A     No.
15        Q     -- before you went to the meeting, didn't
16   you?
17        A     No.
18        Q     When was the first time you heard about
19   that?
20        A     I heard about that sometime in January or
21   February when the documents came through.
22        Q     When you say, "the documents came through,"
23   what do you mean?  Do you mean the second Weinress
24   appraisal?
25        A     The second Weinress appraisal.
```

217

1    Q    Okay. That was your first notice?
2    A    And I don't know when Jack got the ESOP
3    documents, the sale documents, you know, the transfer
4    and all that.
5    Q    As a director of the company, you were a
6    director back then and you're a director today, do
7    you think you have an obligation to read the things
8    that you are voting on?
9    A    I don't believe I was a director then.
10   Q    You're a director today.
11   A    Yes.
12   Q    Do you believe that you have an obligation
13   to read the data that's provided to you that's
14   pertinent to decisions that you're going to make
15   relating to the company?
16   A    Yes.
17   Q    And if you don't understand it, do you have
18   an obligation to ask questions?
19   A    ESOP is not one that you're going to figure
20   out in a couple of hours. This is a long -- I've
21   been at this ESOP thing, I don't know, for 4 or
22   5 years, and I still don't know everything.
23   Q    Do you as a director have an obligation to
24   the shareholders, in your opinion, to read the data
25   provided to you and to ask questions of people if you

218

1    don't understand it before you vote on it?
2    A    This is why we have people like Menke to
3    advise us. I'm not an ESOP attorney.
4    Q    Okay. Nor am I, thank God.
5         Do you think it was reasonable for you to
6    rely on guidance - as a director - for you to rely on
7    guidance from Menke?
8    A    Yes.
9    Q    Was it reasonable for Milsner to rely on
10   guidance from Menke?
11   A    I don't know.
12   Q    Well, if it was reasonable for you, why
13   wouldn't it be reasonable from him?
14   A    I can't answer for him.
15   Q    Tell me why he's held to a different
16   standard than you, in your opinion?
17   A    I didn't say he was held to a different
18   standard. I mean, where he gets his advice is his
19   business, not mine.
20   Q    As a director of the company do you think
21   it's reasonable for you to hire a professional and
22   follow his advice?
23   A    It's reasonable for me to hire a
24   professional. I don't necessarily have to follow his
25   advice.

219

1    Q    If his advice makes sense to you and you
2    don't see any red flags is it reasonable to go
3    forward?
4    A    Yes.
5    Q    Okay. Did you have any -- did you see any
6    red flags before you went to that meeting in December
7    of 2005?
8    A    No, I did not see any red flags.
9    Q    Do you have any reason to think that -- do
10   you think that Milsner knew something about the
11   ESOP -- let me back up.
12        Do you contend that Milsner knew that the
13   sale of his stock would cause a problem, and didn't
14   tell you about it?
15   A    I certainly do.
16   Q    On what facts do you base that, sir?
17   A    I have none. Other than the character of
18   Mr. Milsner.
19   Q    Okay. So you don't have any memo to that
20   effect?
21   A    No.
22   Q    You don't have any letters, e-mails,
23   telegrams?
24   A    No.
25   Q    Has anybody ever told you that?

220

1    A    Told me what?
2    Q    That Milsner knew and hid it from you? Has
3    anybody ever told you that?
4    A    No.
5    Q    You just think because he's a rotten SOB
6    that he must have known and he must have withheld it
7    from you; is that right?
8    A    If it follows the pattern of the previous
9    years, I would say so.
10   Q    And that's all you have to support that
11   assertion, isn't it?
12   A    That's correct.
13   Q    Now your testimony is that you have no data
14   available to you that there was going to be a
15   guarantee; is that correct, sir?
16   A    That's correct.
17        (A copy of a document entitled
18        Defendant's Declaration and
19        Identification of Documents and Items
20        was marked for identification.)
21   BY MR. HILL:
22   Q    Let me show you Exhibit 65,
23   Mr. Carstarphen.
24        Mr. Carstarphen, we've talked earlier today
25   about Bates stamping, and that kind of stuff. You

221

```
 1   know what that is; right?
 2       A    Yes.
 3       Q    I'll tell you that right here on Exhibit 65
 4   this is a document that my office prepared confirming
 5   documents that were sent out on May 3rd, 2006 to your
 6   lawyer's office.
 7            And continue to the back.  Do you see where
 8   it says RFS 00705?
 9       A    Yes.
10       Q    Did you see this letter on or about
11   December 5, 2003, the one that's Bates stamped 00706?
12       A    I don't know.
13       Q    Mr. Carstarphen, in the binder that
14   Mr. Russo has, let's jump to that for just a minute.
15            MR. HILL:  Can you hand that to him?
16            MR. RUSSO:  Sure.  Which one?
17            MR. HILL:  Exhibit 33, it's the minutes of
18   the 17th meeting of the board of directors of
19   American Medflight.
20            MR. RUSSO:  And start with what page?
21            MR. HILL:  It's the last two pages.
22            MR. RUSSO:  Okay.
23   BY MR. HILL:
24       Q    Okay.  December 9, 2003.  Do you see down
25   in the body it says:  Now, therefore, be it resolved
```

222

```
 1   the minutes of the 16th meeting of the board of
 2   directors shall be adopted and placed in the
 3   corporate minute book.  Do you see that?
 4       A    Uh-huh.
 5       Q    Okay.  Then the next thing it says:  It was
 6   discussed to sell the corporation to the employees
 7   through an ESOP plan to be administered by Menke &
 8   Associates to be concluded on or before December 31,
 9   2003, at a cost of administration not to exceed
10   $9,000, and document costs not to exceed $4,000.  It
11   was also discussed to change the corporation tax
12   status to a C Corporation, as required by the ESOP.
13            Were you a party to that conversation on
14   December 9th, 2003?
15       A    Yes.
16       Q    Did you have this letter here that we were
17   just talking about from Menke dated December 5, 2003
18   in front of you at that meeting?
19       A    I don't know.
20       Q    Well, what were you voting on?
21       A    To form an ESOP.
22       Q    Well, it talks about Menke, doesn't it?
23       A    Yes.
24       Q    Okay.
25       A    I don't recall that letter, but it could
```

223

```
 1   very well be there.  I don't have it.  That's a long
 2   time ago.
 3       Q    You were at the meeting, it was discussed,
 4   it was agreed, and you signed those minutes, didn't
 5   you?
 6       A    Yes.
 7       Q    And it's got you listed as a director and a
 8   vice president.
 9       A    Yes.
10       Q    And do you have the documentation that was
11   handed out before that meeting?
12       A    I don't know.
13       Q    Okay.  Let me direct your attention -- do
14   you have Exhibit 65, Mr. Carstarphen?
15            There you go.  It's that guy right there.
16            Turn to page 00707.  The bottom of the
17   page -- are you on page 07?
18       A    Uh-huh.
19       Q    Okay.  Item Number 5:  The loan would be
20   guaranteed by the company.
21            Do you see that?
22       A    Uh-huh.
23       Q    Okay.  That's a yes?
24       A    Yes.
25       Q    Thank you.
```

224

```
 1            You understood the loan to be a loan that
 2   the company is going to make so the employees can buy
 3   the company?
 4       A    Yes.
 5       Q    Somebody, either the company is going to
 6   loan the money or you, the shareholders, are going to
 7   loan the money; right?  But in any event, that loan
 8   is going to be guaranteed by the company; right?
 9       A    Yes.
10       Q    If you had this letter, if you read it, you
11   knew that; right?
12       A    Right.  But I didn't know how much stock.
13   I assumed what he said when he was going to sell some
14   of his stock, he was going to sell as much as we had
15   money in the ESOP to buy.
16       Q    The meeting we're talking about now, sir,
17   is the December 5th -- is December 9, 2003 when the
18   ESOP was approved.
19            Now you didn't want to sell just some of
20   your stock, you wanted to sell all of your stock,
21   didn't you?
22       A    I didn't want to sell any of the stock.
23       Q    Then --
24       A    What meeting, at what time are you talking
25   about?
```

Deposition of John Carstarphen, Friday, April 23, 2010

225

1      Q    Right here, sir, the 17th meeting of the
2   directors of American Medflight. This one right
3   here. You wanted --
4      A    This is when we formed the ESOP.
5      Q    And it was formed because you wanted to
6   sell your stock.
7      A    It wasn't just me. Rich and me wanted to
8   sell the stock to the ESOP.
9      Q    You wanted out. You were locked in with
10  the most dishonest person you've ever met, weren't
11  you, Rich Milsner; you were locked in with him and
12  you wanted out.
13            MR. RUSSO: Objection. Argumentative.
14  BY MR. HILL:
15     Q    Isn't he the most dishonest person you've
16  ever met?
17     A    I don't know.
18     Q    Who have you met that's more dishonest than
19  Richard Milsner?
20     A    I don't know.
21     Q    Okay. You wanted out, didn't you?
22     A    I wanted to sell my stock to the ESOP.
23     Q    And you wanted to sell all of it, didn't
24  you?
25     A    I don't know at that point.

226

1      Q    Why in the world -- okay. Okay. So you
2   were willing then to --
3      A    This is when we were forming the ESOP. I
4   had no idea even what an ESOP was hardly at this
5   point.
6      Q    No, but you knew that Milsner and Dawson
7   were raping the company, didn't you?
8      A    Yes.
9      Q    You knew that in December of '03; you knew
10  that.
11     A    Yes.
12     Q    So your testimony is that you were willing
13  to sell some of your stock, but you were willing to
14  hang out with these guys that, well, they're going to
15  rape the company and hurt you. Is that your
16  testimony?
17     A    No, it's not my testimony --
18     Q    Okay. So how much of your stock --
19     A    -- you're putting words in my mouth.
20     Q    How much of your stock did you want to
21  sell?
22     A    At that point I had no idea how the whole
23  thing even worked.
24     Q    Then why did you vote for it?
25     A    Because I thought it was a good thing to

227

1   do.
2      Q    And what did you base that on, sir?
3      A    Information that Menke had provided in
4   little brochures and different little, tiny pamphlets
5   that gave an idea of what an ESOP is and how it
6   works. At that time I had no clue what an ESOP
7   really was and how difficult it really is.
8      Q    But you nonetheless went ahead and voted
9   for it for the company, didn't you?
10     A    Yes, I did.
11     Q    Do you bear any responsibility if that was
12  a bad decision?
13     A    I don't believe it was a bad decision.
14     Q    It cost you a million three.
15     A    It did. But I don't believe it was a bad
16  decision.
17     Q    Okay. All right. Let's go back to
18  Exhibit 53, Mr. Carstarphen. We went off on a
19  tangent there. Let's go back to where we were.
20     A    What exhibit?
21     Q    53, sir.
22            Are you with me, Mr. Carstarphen? Oh, the
23  last page of Exhibit 53. My mistake. This is the
24  one that's Bates stamped AMF 59782. Is that right?
25     A    Yes.

228

1      Q    Okay. You say: 2003, 2004, and 2005
2   contribution to the ESOP is approximately $540,000
3   total, and Rich wants to sell some of his stock to
4   the ESOP before the end of the year. Hence, the need
5   to get item 4 revised.
6            What was item 4? Do you remember?
7      A    No.
8      Q    Let's go to the preceding page. That's
9   Bates stamp number AMF 59781. Do you see item --
10  this is the notice of stockholder meeting, isn't it?
11     A    Yes.
12     Q    You got this and went to the meeting.
13     A    Uh-huh.
14     Q    Yes?
15     A    Yes.
16     Q    Thank you.
17            Item number 4: Amendment to the bylaws of
18  the company to exempt sales to ESOPs from the
19  requirements in Section 1.14 and 8.1 to offer the
20  shares to the corporation and the other stockholders
21  first.
22            That was item number 4; wasn't it?
23     A    Yes.
24     Q    And that needed to be fixed so -- that
25  needed to be changed because up until that point you

229

1    had had a right of first refusal --
2        A    Right.
3        Q    -- as had the company.
4        A    Right.
5        Q    Okay. And that was changed. And you go on
6    and you say: We voted on item 4. You say: Rich
7    voted yes. Is that what it says? It just says:
8    Rich, yes. And it says: I "abtained." Do you mean
9    "abstained"?
10       A    Yes.
11       Q    When you abstain, Mr. Carstarphen, does
12   that mean you're against it, or does that mean you're
13   just taking no position at all?
14       A    It means I'm not taking any position at
15   all.
16       Q    Okay. And so you're not going to vote one
17   way or the other.
18       A    I was not going to vote yes or no.
19       Q    Okay. What did you think was going to
20   happen -- I mean at that meeting you knew Milsner
21   owned two-thirds of the shares.
22       A    Yes.
23       Q    So did you say to him: But wait a minute,
24   Mr. Milsner, I would like to keep my right of first
25   refusal; or were you willing to give it up?

230

1        A    I did not vote yes, and I didn't vote no.
2        Q    Did you say that you were opposed to doing
3    away with the right of first refusal, rights of first
4    refusal attached to the stock in the company?
5        A    If I opposed, I would have voted no.
6        Q    Okay. And if you were in favor of it, you
7    would have voted yes?
8        A    Yes.
9        Q    So what does abstaining mean here? You
10   didn't care?
11       A    It means that I was not going to vote on it
12   because I didn't understand all the ramifications to
13   this.
14       Q    Did you, at any point prior to the
15   conclusion of that meeting on December 5th, 2005, say
16   to Mr. Milsner: I don't understand. Did those words
17   come out of your mouth?
18       A    I don't believe so.
19       Q    But as you sat there you knew you didn't
20   understand?
21       A    No.
22       Q    Well, then why did you abstain? I thought
23   you just told me it was because you didn't know; you
24   didn't understand.
25       A    I didn't know what the ramifications would

231

1    be.
2        Q    Did you say that to Mr. Milsner?
3        A    No.
4        Q    Did you ask them to postpone the meeting so
5    you could have time to talk to an advisor?
6        A    No.
7        Q    Now Mr. Carstarphen --
8        A    You have to realize, he had two-thirds of
9    the vote, so whichever way it was going to go he had
10   the control of it.
11       Q    You told me this morning that Milsner - and
12   I'll put words in your mouth here - Milsner has never
13   told you the truth once. Maybe that's a little
14   strong, but you didn't trust him. You knew he was
15   not trustworthy. And you sit down at a meeting, and
16   you're willing to just go with the flow with a guy
17   that you don't understand -- or you don't trust?
18   That's what you're telling us here today?
19       A    I'm telling you that it wouldn't make any
20   difference whatever I did.
21       Q    So why did you even bother to go to the
22   meeting?
23       A    Because I was asked to go to the meeting.
24       Q    Now you had Mr. Gunderson working for you
25   at that time?

232

1        A    Yes.
2        Q    You had Mr. Proctor working for you at that
3    time?
4        A    I don't know.
5        Q    You had other people in Gunderson's office
6    working for you at that time?
7        A    Yes.
8        Q    And your testimony is you did not -- or did
9    you consult with them about anything pertaining to
10   the ESOP before you went to this meeting?
11       A    I don't believe so.
12       Q    Did they tell you: We don't represent you
13   in relation to the ESOP?
14       A    Say again?
15       Q    Did they say they wouldn't represent you in
16   relation to the ESOP?
17       A    No. I think Mark told me, he says: Go to
18   the meeting and see what they have to say.
19       Q    But you have the feeling -- did Mark say to
20   you that he was qualified to represent you in
21   relation to the ESOP matter?
22       A    No.
23       Q    Did he say he wasn't qualified?
24       A    I don't think the subject came up.
25       Q    So he didn't say to you: You know,

233

1  Mr. Carstarphen, I think we ought to get some help
2  here?
3      A    No.
4      Q    Did you ask Mr. Gunderson what the effects
5  and ramifications were going to be of item number 4?
6      A    No.
7      Q    Why not? He's your lawyer, you've paid him
8  a couple hundred thousand dollars up to that point in
9  time, what's a couple more bucks to get something
10 that you're going to -- so that you can understand
11 it?
12     A    I don't know.
13     Q    Okay. Hence, it passed. I will fax you a
14 copy of the resolution. This does not hurt me in any
15 way.
16         Well, you understood, did you not, that
17 your right of first refusal was gone. Right?
18     A    Yes.
19     Q    Okay. And you had enough information to
20 determine that that didn't hurt you.
21     A    I didn't feel at that time it would hurt
22 me.
23     Q    Okay. Were you right?
24     A    No.
25     Q    You were wrong?

235

1      Q    And you would have also gotten a third of
2  the $540,000 that the ESOP had in the bank, wouldn't
3  you?
4      A    Yes.
5          MR. HILL: Okay. So help me with the math,
6  Scott.
7          MR. RUSSO: About 500.
8          MR. HILL: That's fair.
9  BY MR. HILL:
10     Q    Let's call it roughly $500,000 was coming
11 your way if you wanted to sell your stock to the
12 ESOP; right?
13     A    Yes.
14     Q    And Milsner told you: He said there was
15 one stipulation, is I drop the lawsuit by the end of
16 December. So that was for you to get the cash.
17     A    Yes.
18     Q    Okay. Which I am not going to do.
19     A    Yes.
20     Q    Okay. You don't, in this memo any place
21 say: But he told me before the meeting I couldn't
22 participate anyway before the meeting. You don't say
23 that in here; do you?
24     A    I don't know.
25     Q    Well, read it and tell me if it's in there.

234

1      A    Yes.
2      Q    And is it Milsner's fault that you were
3  wrong?
4      A    No.
5      Q    Okay. Item Number 3: LOC -- is that line
6  of credit, Mr. Carstarphen?
7      A    Yes.
8      Q    Okay. Item 3: Line of credit for
9  $350,000, and Rich wants me to sign on the line of
10 credit, which I will not do with the lawsuit.
11         So you've said no.
12     A    Yes.
13     Q    Okay. Then the next paragraph you say:
14 Rich has obtained two offers to loan money to the
15 ESOP, Merrill Lynch 1 million, and Diablo Valley Bank
16 for 2 million. Rich has agreed to a loan of
17 $1 million with his personal guarantee, of which I
18 would get $330,000.
19         That's what it says. So you understood
20 that Mr. Milsner was going to get a loan that he had
21 to guarantee, and he was going to give you at least
22 $330,000 from that loan. That's what you understood.
23     A    If I sold to the ESOP.
24     Q    Right.
25     A    Yes.

236

1      A    I don't see it in there.
2      Q    Is that because you made it up?
3      A    No.
4      Q    Is there any memorialization anywhere of
5  that fact?
6      A    I've already answered that.
7      Q    Help me out.
8      A    There is no memorialization.
9      Q    Okay.
10     A    There is no witnesses, there is no person
11 that overheard the conversation.
12     Q    We do have a letter to your -- an e-mail
13 that you wrote that afternoon to your lawyer, though.
14     A    Uh-huh.
15     Q    Yes?
16     A    Yes.
17     Q    And it isn't in there, is it?
18     A    No.
19     Q    Okay. Did you talk with Mark on the phone
20 at or about this time?
21     A    I don't believe so, but it could have been.
22     Q    Did you tell Mark that Milsner told you
23 before the meeting that you could only participate if
24 you dropped the lawsuit?
25     A    More than likely at some point I did tell

237

1 him that.
2    Q    But you don't know as you sit here?
3    A    No.
4    Q    Okay. We'll have to ask Mark.
5         Then you go on and say: They also talked
6 about large tax consequences, however they changed
7 the Corp. from S to C the start of 2005.
8         Well, we saw back here, that was done in
9 2003, in December of 2003; do you remember?
10   A    Yes, but it wasn't changed, I don't think,
11 until '05.
12   Q    Was that with your approval?
13   A    That's what Menke told us we had to do.
14   Q    Okay. And following Menke's advice was a
15 smart move here; right? I mean, they're the experts.
16   A    Not in hindsight.
17   Q    Oh, okay, not in hindsight. But at that
18 point in time when you were at that meeting -- well,
19 from December of 2003 when the ESOP was adopted, up
20 until the meeting December 5th, 2005 you were
21 following the advice that Menke was giving you;
22 weren't you?
23   A    Yes.
24   Q    Did Milsner follow the advice that Menke
25 gave him?

238

1    A    I have no idea.
2    Q    Do you have any reason to believe that
3 Milsner did not follow the advice that Menke gave
4 him?
5    A    I think he had other advisors.
6    Q    Okay. What else?
7    A    I don't know.
8    Q    Okay. Who else do you believe Mr. Milsner
9 had that was advising him about the AMF ESOP?
10   A    I have no direct knowledge, but I believe
11 that it was Daoro.
12   Q    Okay. You have no facts to support that
13 statement, do you?
14   A    No.
15   Q    It's just because you think that Milsner is
16 a rotten guy, you suspect he must have had somebody
17 else out there. Right?
18   A    No, I think that Milsner is a shrewd
19 businessman, and I think he would obtain other advice
20 other than Menke.
21   Q    Okay. Do you think that Milsner and Dawson
22 got you to form the ESOP specifically so they could
23 hurt you?
24   A    No.
25   Q    Do you think that the harm that you believe

239

1 you've suffered just was an accident, if it happened
2 at all?
3    A    I don't believe it was an accident, but
4 that's only my belief.
5    Q    Do you have any facts that you can point to
6 that you think show that Milsner or Dawson wanted to
7 hurt you by doing the ESOP?
8    A    I believe that Milsner knew that it would
9 devalue my stock before that meeting of the 5th, and
10 that's why he had a court reporter there.
11   Q    Okay.
12   A    Because we have never had a court reporter
13 there for any other board of director meeting.
14   Q    But you've had them there for every one
15 since, haven't you?
16   A    Yes.
17   Q    Okay.
18   A    Not at my request, though.
19   Q    I know that. I'll take credit for that.
20        MR. HILL: Will you read back his last
21 answer, please, Debbie.
22        (The Answer was Repeated.)
23 BY MR. HILL:
24   Q    Do you have any facts, or is this just
25 suspicion that Milsner knew?

240

1    A    Suspicion.
2    Q    Okay. No facts?
3    A    None.
4    Q    Okay. And has anybody ever told you that
5 Milsner knew in advance?
6    A    No.
7    Q    Now you understand today the concept of a
8 minority discount, don't you?
9    A    Yes.
10   Q    You were a one-third owner from the get-go
11 in this company, weren't you?
12   A    Yes.
13   Q    And that meant that you're not in control;
14 right?
15   A    That's correct.
16   Q    So if the people who are in control,
17 Milsner and Dawson, if they decide that the company
18 is going to buy Fords instead of Chevys, and you like
19 Chevys, or vice versa, that's what the company is
20 going to buy; right?
21   A    Yes.
22   Q    And unless you can show that they're
23 getting kickbacks, or there is something inherently
24 wrong with what they want to do, they get to run the
25 company; don't they?

241

```
 1      A   Yes.
 2      Q   And you knew that when you got into this,
 3   didn't you?
 4      A   Yes.
 5      Q   When did the concept first -- we're not
 6   done with 53, yet.  Don't be closing that up.
 7          MR. HILL:  Let's take a minute.
 8          (Off the record.)
 9   BY MR. HILL:
10      Q   Mr. Carstarphen, you knew that the price
11   you were being offered on your stock, the 1.8, that
12   did not include a minority discount, did it?
13      A   I was never offered anything for my stock.
14      Q   There was discussion at the meeting that
15   you -- Exhibit 53, the last page, the last paragraph:
16   They asked me to get back to them in ten days.
17          Why in the world did they want you to get
18   back to them?
19      A   I don't know what that was in reference to.
20   I don't know that that was the ESOP.  I don't think
21   it was.  I think it was other things.
22      Q   What were you going to get back -- what
23   were you supposed to get back to them about in ten
24   days?
25      A   I don't know, but it could be the King
```

242

```
 1   Airs.
 2      Q   And then you go on and you say:  My plan is
 3   to just ignore them and give no response unless you
 4   advise differently.
 5          If it wasn't the ESOP then it was some
 6   other item of important corporate business that your
 7   plan was to just ignore them; is that right?  Is that
 8   what you just told me?
 9      A   Yes.
10      Q   Is that a responsible thing for the
11   director of a company to do, Mr. Carstarphen?
12      A   At this point in time, yes.
13      Q   Is that the way you conduct your affairs at
14   your business, Mr. Carstarphen?
15      A   I don't know what that question means.
16      Q   Do you ignore issues --
17          MR. RUSSO:  It's a stockholders meeting,
18   not a directors meeting.
19          MR. HILL:  Whatever.  The same question.
20   BY MR. HILL:
21      Q   You elected to ignore their request to get
22   back to you within ten days; right?  You can get back
23   to them within ten days?
24      A   I don't even know what this is in reference
25   to.
```

243

```
 1      Q   Okay.  Did you talk about this with
 2   Mr. Gunderson?
 3      A   I don't know.
 4      Q   Did he advise you to make any kind of a
 5   counteroffer to these people?
 6      A   There was no offer involved.
 7      Q   You just told me on here:  Rich has agreed
 8   to a loan of $1 million with his personal guarantee,
 9   of which I would get $330,000.
10      A   That's if I sold my stock.  But I was not
11   going to sell my stock.
12      Q   Mr. Carstarphen, is it your experience that
13   when someone makes you an offer, you make them a
14   counteroffer --
15      A   Nobody made me any offer.
16      Q   I thought you just told me they said if you
17   dismiss your lawsuit you can have $330,000?
18      A   That's what Rich Milsner told me before the
19   meeting.
20      Q   That's an offer, isn't it?
21      A   He told me I could participate in the ESOP
22   if I dropped the lawsuit.
23      Q   Isn't that an offer?
24      A   I don't think so.  And in this particular
25   part here I was trying to explain to him that if we
```

244

```
 1   did the leverage buy-out, I would get $330,000.
 2      Q   And he had to guarantee the money that went
 3   to you.  And he wasn't going to do that if you were
 4   suing him.  Does that make sense to you?
 5      A   That was never discussed.
 6      Q   Okay.  You understood -- you testimony is
 7   that you didn't know how much stock Milsner was going
 8   to sell?
 9      A   That's what I said up here.
10      Q   Okay.
11      A   It said he was going to sell a portion of
12   his stock, or something like that.
13      Q   Was that material -- if he had told you
14   that he was going to sell all of his stock, would
15   your decision have been any different?
16      A   I don't know.  I didn't know about this
17   evaluation of the company.
18      Q   And I've just got to go back to that for a
19   minute.
20          You understand the difference between a
21   stock transaction and a stock sale and an asset sale
22   when you're selling a business.
23          Do you understand the distinction?  From
24   the look on your face I don't think so.
25      A   I don't think so.
```

245

1    Q    Let me explain it to you. Let's say we go
2  buy a donkey to do donkey rides, and we put the
3  donkey in the corporation. Okay? And you own half
4  the stock of the donkey, and I own half the stock of
5  the donkey corporation. Are you with me?
6    A    Yes.
7    Q    We can take and sell our shares in the
8  donkey corporation to Debbie, the court reporter,
9  okay, or the corporation can sell the donkey to
10 Debbie and the money goes into the corporation.
11        Do you understand the distinctions there?
12   A    Okay.
13   Q    Now let's apply that to American Medflight.
14 Go back to my Monday, Tuesday, Wednesday scenario.
15 Do you remember?
16   A    Yes.
17   Q    On Monday Debbie comes in and wants to pay
18 $5.5 million for American Medflight, and she wants to
19 buy all of the stock. So she pays Milsner two-thirds
20 of the money and she pays one-third of the money to
21 you; right?
22   A    Yes.
23   Q    On that same Monday Debbie comes in and
24 wants to buy the corporation, buy the assets of the
25 company for $5.5 million. Are you with me?

246

1    A    Yes.
2    Q    She pays the $5.5 million. The money goes
3  where? Into the corporation? Milsner gets
4  two-thirds, you get one-third; right?
5    A    I thought the assets would stay in the
6  corporation.
7    Q    Well, but you and Milsner don't get along
8  so we're going to sell the donkey and we're going to
9  split the money right here on the sidewalk, and you
10 go your way and I go my way.
11   A    Okay.
12   Q    We can do that, can't we?
13   A    Yes.
14   Q    Now let's go to Wednesday. Debbie comes
15 in, and what's happened to that donkey that makes
16 that donkey worth less than he is worth on Monday in
17 an asset sale? Why is that donkey worth any less?
18   A    Because someone put a lien on the company.
19   Q    Okay. So Debbie comes in and buys the
20 stock and she puts $5.5 million on the table. The
21 money goes first to pay the $336,000 debt to the
22 creditor, Milsner; right?
23   A    Yes.
24   Q    What's left; the 3.6 million?
25   A    Yes.

247

1    Q    The two-thirds, that 3.6 goes to Milsner.
2  What's left? One-third of the money. Who gets it?
3          MR. RUSSO: One-third of one-third --
4          MR. HILL: One-third of one-third.
5          MR. RUSSO: -- to him. The other
6  two-thirds goes to the other shareholders.
7  BY MR. HILL:
8    Q    What shares does the ESOP own at that time?
9  What's their equity, sir?
10   A    Two-thirds.
11   Q    Have they paid for it?
12   A    No. They paid some.
13   Q    Isn't the correct flow she buys the stock,
14 two-thirds of the money goes to the ESOP, one-third
15 of the money goes to you; the people in the ESOP pay
16 off Milsner, and they get what's left?
17   A    Yes.
18   Q    Now we sell the donkey to Debbie for
19 $5.5 million. The corporation gets the money.
20 Right?
21   A    Uh-huh.
22   Q    You get a third, they get two-thirds, and
23 they pay Milsner. Right?
24   A    Yes.
25   Q    Okay. So where is the damage to the donkey

248

1  in this transaction, Mr. Carstarphen?
2    A    Because of the liability that the company
3  has.
4    Q    But the liability gets paid out of the
5  ESOP's share.
6          Do you think -- let me see if I understand
7  what you're saying. You think in this scenario the
8  money comes in, and Milsner gets $3.6 million because
9  he's a creditor, and then whatever is left over gets
10 split one-third to you, two-thirds to the ESOP? Is
11 that what you think happens?
12   A    There is no money coming into the company.
13 Okay? Your hypothetical is not right.
14        Right now, if I want to go sell my stock to
15 anybody else or even if I want to sell it to the
16 ESOP, it's only -- it's now been devalued by
17 $1.3 million.
18   Q    Okay. You have a house that's worth a
19 million dollars. If it's free and clear, what is
20 your equity?
21   A    1 million.
22   Q    And if you put a loan against it for
23 $500,000, what is your equity in the house?
24   A    How much is the loan?
25   Q    500,000.

249

```
 1        A     Then it's worth 500,000.
 2        Q     The house isn't worth 500,000; the house is
 3   still worth a million, isn't it?
 4        A     But my interest in it is only worth
 5   500,000.
 6        Q     Right.  Your equity in the house is worth
 7   500,000?
 8        A     Right.
 9        Q     The house is still worth one million?
10        A     Yes.
11        Q     The million dollars --
12        MR. RUSSO:  Paying 500, a million plus 500,
13   assuming $500,000 debt -- -
14        THE WITNESS:  Your hypothetical here is
15   assuming I got something for that 500,000.  Like as
16   if I went out and I refinanced it for 500,000, I
17   would have 500,000, I sell it for a million, I would
18   get another 500,000 and pay off the 500,000 worth of
19   debt.
20        In this case American Medflight did not get
21   anything for taking on this $3.6 million debt.
22   BY MR. HILL:
23        Q     But that was --
24        A     That was nothing.
25        Q     That was the package that you voted for --
```

250

```
 1        A     I did not vote for that.
 2        Q     Didn't we just cover in the 17th meeting
 3   you agreed to the formation of the ESOP?
 4        A     The formation of the ESOP is not agreeing
 5   to that.
 6        Q     Okay.  If you say so.
 7        Now did you understand, do you understand
 8   as you sit here that Weinress's first appraisal is
 9   based on projected numbers?
10        A     I have no idea how they came up with
11   their --
12        Q     Have you even read his appraisal?
13        A     I have glanced at that summary page.  The
14   rest of it I have no idea what they're saying.
15        Q     Before the sale by Milsner you owned a
16   third of the company?
17        A     Yes.
18        Q     You still own a third of the company?
19        A     Yes.
20        Q     Okay.  Have you tried to sell your stock?
21        A     No.
22        Q     You've not had anybody appraise the
23   company; is that right?
24        A     I have not had anybody appraise the
25   company?
```

251

```
 1        Q     Have you had anybody appraise your interest
 2   in the company?
 3        A     For what purpose?
 4        Q     For any reason, Mr. Carstarphen.
 5        A     No.
 6        Q     Your business proposal for AMF to start
 7   doing its open maintenance, is AMF going to take in
 8   other people's planes to work on in that scenario?
 9        A     No.
10        Q     So have you done any studies to determine
11   whether -- now you think there should be two
12   mechanics or one mechanic or three?
13        A     I do not know.
14        Q     Okay.  If you've got extra time, if the
15   mechanics' don't have enough AMF planes to work on,
16   what are they supposed to do?
17        A     I don't think that's a problem.
18        Q     Do you have any facts to base that on?  Do
19   you have any studies?
20        A     The fact is that there is usually one
21   airplane in the hanger being maintained.  If you had
22   three airplanes, which I wanted to have, there would
23   be one airplane in the hanger almost all the time
24   being worked on.
25        Q     Okay.  So is that the basis on which you
```

252

```
 1   assert that two mechanics would have full-time
 2   employment with AMF?
 3        A     I have no idea how many mechanics.
 4        Q     Okay.  Is there any chance that you were
 5   confused at this meeting in December of 2005 about
 6   what the proposals were that were being made to you?
 7        A     There was no proposals being made to me.
 8        Q     Is there any possibility that you're
 9   confused about that?
10        A     What proposals were being made?
11        Q     Well, I thought we already covered the
12   million dollar loan that you were going to get
13   $330,000 from.
14        A     I was just explaining to them there was --
15   that was dropped almost immediately.
16        Q     Okay.  Do you believe that the damages that
17   AMF suffered by reason of the Reno Flying Service
18   relationship continue to this day?
19        A     Yes.
20        Q     Do you plan to amend your complaint to
21   include damages after the date of the filing of the
22   complaint?
23        MR. HILL:  Or maybe I should address that
24   to you.
25        MR. RUSSO:  We will amend it according to
```

253

1  proof.
2      MR. HILL: Well, and do you think that will
3  get you around a relevancy objection?
4      MR. RUSSO: I don't think it's going to be
5  a problem.
6  BY MR. HILL:
7      Q    If I understand --
8      MR. RUSSO: I can amend every day until
9  trial for new damages, including up and through the
10 trial date.
11 BY MR. HILL:
12     Q    You said you talked to Mr. Menke?
13     A    Yes, I have.
14     Q    How many times?
15     A    Once, I believe.
16     Q    What did you and he talk about?
17     A    I told him that I was no longer going to
18 use his services.
19     Q    Okay. When was that?
20     A    That was probably in '06.
21     Q    Do you think that Menke was in cahoots with
22 Milsner trying to hurt you?
23     A    I have no idea, but I think he should have
24 told me that my stock was going to go down
25 $1.3 million since I was paying him for his services.

255

1  that this December 5th, 2005 meeting occurs, you're
2  in litigation with Milsner and Dawson?
3      A    Yes.
4      Q    And AMF and Reno Flying Service; right?
5      A    I don't know when I dropped American
6  Medflight and Jack Dawson from the lawsuit. I don't
7  know.
8      Q    It was much later.
9      A    Okay.
10     Q    Assume that it was.
11     I mean, do you sue people that you trust,
12 or do you sue people you don't trust?
13     A    You sue people that you don't trust.
14     Q    So you didn't trust Milsner, and you didn't
15 trust Dawson, you didn't trust AMF, and you didn't
16 trust Reno Flying Service, right, when you went to
17 this meeting?
18     A    I didn't trust Milsner.
19     Q    Did you trust Dawson?
20     A    I believe that he was just going along with
21 Milsner.
22     Q    Why? Why is he just going along with
23 Milsner?
24     A    Because Milsner is paying his salary, and
25 he's paying him for his stock.

254

1      Q    Okay. So you don't think that Menke gave
2  you what you paid for?
3      A    No. And I don't know that it was him
4  personally --
5      Q    Them.
6      A    -- them as a company.
7      Q    Right. They dropped the ball because they
8  didn't tell you -- you think Milsner should have
9  known, but you regard Menke as experts; right?
10     A    Yes.
11     Q    And you think that Menke should have
12 stepped up and told you that?
13     A    Yes.
14     Q    Okay.
15     A    And subsequently I found another
16 administrator.
17     Q    Okay. Has the ESOP for your company been
18 funded?
19     A    Yes.
20     Q    Do the employees own any of the stock?
21     A    No.
22     Q    So you're just putting money aside into the
23 plan?
24     A    Yes.
25     Q    Now I just want to be clear, as of the time

256

1      Q    Any other reason? He's got a picture of
2  him in a dress, or something?
3      A    No.
4      Q    So the only reason that Dawson is complicit
5  with Milsner is because Milsner is paying his salary,
6  what, at AMF and at RFS?
7      A    Yes.
8      Q    And he paid him, or he's paying him for his
9  stock?
10     A    Yes.
11     Q    Okay. And those are the only reasons?
12     A    I have no idea what other reasons there
13 would be.
14     Q    Have you asked him?
15     A    No.
16     Q    Why haven't you said: Jack, why are you
17 doing this to me? You've never asked him that?
18     A    No.
19     Q    Why not?
20     A    I don't believe so.
21     Q    Why not?
22     A    Why? It's Milsner who is pulling the
23 strings.
24     Q    But haven't you ever said to Jack Dawson:
25 Jack, you know this guy is a bad guy, Milsner is a

Deposition of John Carstarphen, Friday, April 23, 2010

257

1  bad guy, why are you doing this to me with him? Why
2  haven't you said that to him?
3      A   I don't know.
4      Q   Do you really believe it?
5      A   I have no idea why.
6      Q   Okay. They told you at the meeting that if
7  they didn't hear back from you in ten days they were
8  just going to go ahead; right? Milsner told you
9  that: If we don't hear back from you in ten days
10 we're going to assume you don't want to be involved
11 and we're going to just proceed. Isn't that what
12 they told you?
13     A   I don't believe so.
14     Q   Okay.
15     A   The ten days, I don't know what that was
16 referring to, but I knew at the meeting they were
17 going to proceed.
18     Q   Is it your contention that Milsner profited
19 by the sale of his stock?
20     A   What do you mean, "profited"?
21     Q   You contend that Milsner made a profit when
22 he sold his stock; right?
23     A   I didn't say that.
24     Q   Okay. Do you believe he did make a profit
25 when he sold his stock?

258

1      A   I don't know -- you're going to have to
2  define the word "profit."
3      Q   Did Mr. Milsner make a profit when he sold
4  his stock?
5      A   I don't know what that means. Usually a
6  profit means you do something, and then you make a
7  profit on the end result.
8      Q   Is that what Milsner did here with the sale
9  of his stock?
10     A   If the, what is it, Weinress appraisal is
11 correct, he sold it for the appraised value, and
12 there was no profit in it.
13     Q   Okay.
14     MR. RUSSO:  How about define "profit" as
15 money received over investment, and he invested
16 $12,500.
17     THE WITNESS:  Yes.
18 BY MR. HILL:
19     Q   Okay. Was the price on the Weinress
20 appraisal more than his stock was really worth, in
21 your opinion?
22     A   I have no idea.
23     Q   Okay.
24     A   I already answered that I thought it was
25 overvalued, which is not to my benefit, but I don't

259

1  know.
2      Q   You contend that you as a shareholder in
3  the company were damaged by that transaction; right?
4      A   I was.
5      Q   And you own a third of the company; right?
6      A   Yes.
7      Q   So the ESOP suffered twice as much damage
8  as you did?
9      A   I don't know.
10     Q   Well, if you suffered 1 point --
11     A   3.
12     Q   -- 3, did they suffer 2.6?
13     A   I don't know. I don't know how that works.
14     Q   Is there anything about this ESOP that
15 differs from a garden variety ESOP, as far as you
16 know?
17     A   I don't know what a garden variety ESOP is,
18 but this seems to be what an ESOP is.
19     Q   Are you aware of any features about the AHF
20 ESOP that differ dramatically from the features of
21 any other ESOP?
22     A   No. The ESOP I have for American Home
23 Companion was also drafted by Menke.
24     Q   Okay. And are there things that were wrong
25 with it?

260

1      A   I have no idea.
2      Q   Well, why did you stop using Menke?
3      A   Because he didn't tell me my stock was
4  going to devalue by $1.3 million.
5      Q   Did you tell him that when you told him you
6  weren't going to use his services any more?
7      A   Yes, I did.
8      Q   What did he say?
9      A   I don't remember.
10     Q   You called this guy up, and you read him
11 the riot act and --
12     A   No, I did not read him the riot act.
13     Q   You don't remember what he said?
14     A   I don't remember.
15     Q   Did he say: Mr. Carstarphen I'm sorry?
16 Did he say: Mr. Carstarphen, you're mistaken?
17     A   He didn't say I was mistaken.
18     Q   Did he say you were right?
19     A   He didn't -- I don't know what he said. He
20 apologized, and he wanted to continue to have my
21 business, and I told him it was out of the question.
22     Q   Okay.
23     A   It was a very cordial, it was not a riot
24 act or anything.
25     Q   Do you contend that Milsner controls the

261

1  AMF ESOP?
2      A    I contend that Milsner controls everything.
3      Q    Everything?
4      A    Everything.
5      Q    Including Scott Russo?
6      A    He controls everything with American
7  Medflight and Reno Flying Service as of the time that
8  Jack sold his stock.
9      Q    Can you point out for me anything that the
10 ESOP has done since it's been a shareholder that you
11 can point to and say: That's evidence right there
12 that Milsner controls it?
13     A    He pulls the strings on everything.
14     Q    Other than that nice generality, can you
15 give me a specific, sir? Give me one instance where
16 you can point to and say: That shows that Milsner
17 controls the ESOP. Can you do that?
18     A    Probably the December 5th meeting.
19     Q    The December 5th, 2005.
20     A    Yes.
21     Q    Okay. Tell me.
22     A    He controlled the whole thing.
23     Q    He controlled the whole thing.
24     A    Yes.
25     Q    Milsner --

262

1      A    He controlled the leveraged buy-out. He
2  controlled how much stock he was going to sell. When
3  he said he was going to sell some stock, he sold all
4  of his stock. He controls the whole thing.
5      Q    That's his side of the transaction. Tell
6  me, do you know who the trustee is of the ESOP, or
7  the trustees --
8      A    Jack Dawson.
9      Q    Okay. Do you believe that Jack Dawson in
10 his capacity as the trustee of the AMF ESOP is doing
11 Milsner's bidding?
12     A    Back then, yes.
13     Q    What about as you sit here right now?
14     A    I don't believe so.
15     Q    So as of right now Dawson's in control of
16 the ESOP; is that right?
17     A    Yes.
18     Q    And is he his own man in relation -- is he
19 doing what he needs to do for the ESOP members as the
20 trustee of the ESOP, in your opinion?
21     A    Ever since Milsner took that $100,000, I
22 think Jack Dawson does not believe in Rich Milsner
23 any more, and is doing his own bidding now.
24     Q    Okay. Is that the tear point in your
25 opinion where Milsner lost control of the AMF ESOP?

263

1      A    I don't know, but I believe that was the
2  catalyst.
3      Q    So is it your opinion then that up until
4  that moment Milsner was in control of the AMF ESOP?
5      A    Yes.
6      Q    Can you point to any facts -- you've told
7  me that you believe that the sale transaction that
8  was discussed at the December 5th, 2005 meeting is
9  evidence that Milsner controls the ESOP, or did at
10 that time. From that point until the $100,000 check
11 incident, can you identify any act --
12     A    No.
13     Q    -- to support that?
14         MR. RUSSO:  Do you have much more?
15         MR. HILL:  Yes.
16         MR. RUSSO:  Well, let's call it.
17         MR. HILL:  All right.
18 BY MR. HILL:
19     Q    Mr. Carstarphen, have there been any
20 answers you've given me today that you would like to
21 change at this time?
22     A    No.
23     Q    Any questions that you didn't understand,
24 other than the ones that you called to my attention?
25     A    I think I understood them.

264

1          MR. HILL:  All right. Do you want the
2  transcript sent to you?
3          MR. RUSSO:  To King & Russo.
4          MR. HILL:  Is that the address you gave
5  her?
6          MR. RUSSO:  Yes.
7          MR. HILL:  Okay.
8     (At 4:23 p.m. the deposition was adjourned.)
9                   -oOo-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I, JOHN CARSTARPHEN, deponent herein, do hereby certify and declare under penalty of perjury, the within and foregoing transcription to be my deposition in said action, subject to any corrections I have heretofore submitted, and that I have read, corrected, and do hereby affix my signature to said deposition.

_____
John Carstarphen

STATE OF NEVADA    )
                   )   ss:
COUNTY OF WASHOE   )

Subscribed and sworn to before me this_____day of
_____, 2010_.

_____
Notary Public

CERTIFICATE OF REPORTER

STATE OF NEVADA    )
                   )   ss:
COUNTY OF WASHOE   )

I, DEBRA J. BARTGIS, a duly commissioned Notary Public, Washoe County, State of Nevada, do hereby certify:

That I reported the deposition of the witness, JOHN CARSTARPHEN, commencing on Friday, April 23, 2010, at the hour of 10:02 a.m.;

That prior to being examined, the witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate record of testimony provided by the witness at said time.

I further certify (1) that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action, and (2) that pursuant to NRCP 30 (e), transcript review by the witness was requested.

IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Washoe, State of Nevada, this_____day of _____, 2010.

_____
Debra J. Bartgis, CCR #56

# EXHIBIT 2

# EXHIBIT 2

# TURNER, LOY & CO., LLC
## CERTIFIED PUBLIC ACCOUNTANTS

**6502 South McCarran Boulevard, Suite D, Reno, Nevada 89509**

David W. Turner
Pamela K. Loy

(775) 823-3777
Fax: (775) 823-3773

April 22, 2008

Mr. Richard G. Hill
Richard G. Hill, Chartered Attorneys at Law
652 Forest Street
Reno, NV 89509

**Re: John Carstarphen v. Milsner, et. al.**

Dear Mr. Hill:

Based upon further examination of documentation associated with the above referenced case, we have concluded that during the period from 1995 through 1999 Reno Flying Service paid approximately $302,779 of expenses related to shared administrative payroll expenses and shared office expenses that should have been charged to American MedFlight during American MedFlight's start-up years. This overpayment amount was calculated before adjusting for the $5,000 monthly consulting fee paid by American MedFlight to Reno Flying Service commencing August 1998. The attached Exhibit 1 provides a summary of our conclusion. The attached Exhibits 2 through 4 provide the cost and payment details supporting the summary amounts appearing on Exhibit 1.

In arriving at our conclusion, we have assumed that shared expenses should have been split 50% - 50% between American MedFlight and Reno Flying Service. We believe that this is a conservative assumption because American MedFlight was both a start-up business and has a more complex business model than Reno Flying Service (air ambulance versus charter/maintenance). As such, it is very likely that American MedFlight should have been allocated more than 50% of shared administrative payroll expenses because the shared employees devoted more time to that company. Approximately 76% of the total shared expenses during the period from 1995 through 1999 relate to shared administrative payroll expenses.

Respectfully submitted the 22nd day of April, 2008.

David B. Thomas, MBA

Member American Institute of Certified Public Accountants

AMF 04000

## Exhibit 1
### Shared Administrative Payroll and Office Expense Summary
### 1995 Through 1999

| | |
|---|---|
| Expenses Paid By Reno Flying Service | 901,126.23 |
| Expenses Paid By American Medflight | 295,567.51 |
| Total Expenses Paid | 1,196,693.74 |
| | |
| 50% Of Total Expenses Paid | 598,346.87 |
| | |
| Excess Expenses Paid By Reno Flying Service | 302,779.36 |

## Exhibit 2
## Shared Administrative Payroll and Office Expense Detail
## American MedFlight

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 5-Year Total |
|---|---|---|---|---|---|---|
| Brown, James - Maintenance Director | - | - | - | 1,000.00 | 1,250.00 | 2,250.00 |
| Coyne, Kathy - Office Staff | - | - | - | - | 3,702.45 | 3,702.45 |
| Dawson, John | - | - | - | - | 3,000.00 | 3,000.00 |
| Geyer, William - Chief Pilot | - | - | 11,050.00 | 9,950.00 | 46,007.99 | 67,007.99 |
| Griffin, Patty - Office Staff | 92.60 | 93.00 | - | - | - | 185.60 |
| Reed, Linda - Office Manager | - | 11,133.00 | 17,508.04 | 17,930.08 | 18,524.56 | 65,095.68 |
| Scott, Bethney - Office Staff | - | - | - | 9,793.01 | 6,267.69 | 16,060.70 |
| Tombow, Leslie - Chief Pilot | - | 3,300.00 | - | - | - | 3,300.00 |
| Thompson, Sheri - Office Dispatcher | 12,899.88 | 3,487.50 | - | - | - | 16,387.38 |
| Payroll Taxes @ 7.65% | 993.92 | 1,378.03 | 2,184.69 | 2,958.49 | 6,024.58 | 13,539.71 |
| Total Shared Payroll Expense | 13,986.40 | 19,391.53 | 30,742.73 | 41,631.58 | 84,777.27 | 190,529.51 |
|  |  |  |  |  |  |  |
| Rent | 5,308 | 10,879 | 11,155 | 19,088 | 16,407 | 62,837.00 |
| Office Expense | 3,127 | 9,151 | 10,413 | 6,849 | 8,198 | 37,738.00 |
| Postage & Freight | 143 | 417 | 850 | 1,206 | 1,847 | 4,463.00 |
| Total Shared Office Expense | 8,578.00 | 20,447.00 | 22,418.00 | 27,143.00 | 26,452.00 | 105,038.00 |
|  |  |  |  |  |  |  |
| Total Shared Expense | 22,564.40 | 39,838.53 | 53,160.73 | 68,774.58 | 111,229.27 | 295,567.51 |

Memo: Consulting Expense Paid
To Reno Flying Service

|  | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
|  | - | - | - | 25,000.00 | 60,000.00 |

Page 1 of 2

**Exhibit 2**
**Shared Administrative Payroll and Office Expense Detail**
**Reno Flying Service**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 5-Year Total |
|---|---|---|---|---|---|---|
| Brown, James - Maintenance Director | 36,000.00 | 39,333.20 | 39,999.84 | 40,999.84 | 36,507.83 | 192,840.71 |
| Carstarphen, John | - | - | 200.00 | 100.00 | - | 300.00 |
| Coyne, Kathy - Office Staff | - | - | - | - | 3,946.75 | 3,946.75 |
| Dawson, John | 49,840.23 | 49,093.63 | 47,299.92 | 47,299.92 | 47,299.92 | 240,833.62 |
| Geyer, William - Chief Pilot | - | - | 35,041.20 | 38,654.10 | 750.00 | 74,445.30 |
| Griffin, Patty - Office Staff | 19,740.40 | 16,054.00 | - | - | - | 35,794.40 |
| Hanson, Pamela - Office Staff | 1,260.00 | - | - | - | - | 1,260.00 |
| Reed, Linda - Office Manager | 9,594.70 | 16,117.00 | 17,508.04 | 17,930.08 | 16,167.28 | 77,317.10 |
| Ragsdale, Philip - Chief Pilot | 26,176.92 | - | - | - | - | 26,176.92 |
| Tombow, Leslie - Chief Pilot | - | 15,897.30 | - | - | - | 15,897.30 |
| Payroll Taxes @ 7.65% | 10,909.84 | 10,441.88 | 10,713.75 | 11,091.27 | 8,007.39 | 51,164.13 |
| Total Shared Payroll Expense | 153,522.09 | 146,937.01 | 150,762.75 | 156,075.21 | 112,679.17 | 719,976.23 |
| | | | | | | |
| Rent | 19,770 | 18,944 | 26,278 | 10,396 | 12,293 | 87,681.00 |
| Rent Allocated to Cost of Goods Sold | - | - | - | 11,638 | 12,476 | 24,114.00 |
| Office Expense | 8,458 | 18,848 | 13,514 | 11,304 | 13,294 | 65,418.00 |
| Postage | 836 | 784 | 811 | 766 | 740 | 3,937.00 |
| Total Shared Office Expense | 29,064.00 | 38,576.00 | 40,603.00 | 34,104.00 | 38,803.00 | 181,150.00 |
| | | | | | | |
| Total Shared Expense | 182,586.09 | 185,513.01 | 191,365.75 | 190,179.21 | 151,482.17 | 901,126.23 |

Page 2 of 2

TURNER, LOY & CO., LLC
CERTIFIED PUBLIC ACCOUNTANTS

AMF 04003

## Exhibit 3
## Payroll Detail
## American Medflight - Information From Forms W-2 and W-3

| Employee | Form W-2 Amounts | | | | | 5-Year Total |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| Ainsworth, John | - | - | - | - | 6,195.00 | 6,195.00 |
| Alcorn, Stephen | 5,228.35 | 822.50 | - | - | - | 6,050.85 |
| Angius, Robert | - | - | 666.27 | - | - | 666.27 |
| Balmos, Jill | - | - | - | - | 9,807.70 | 9,807.70 |
| Bishop, Daniel | - | - | - | - | 4,708.34 | 4,708.34 |
| Brown, James | - | - | - | 1,000.00 | 1,250.00 | 2,250.00 |
| Bueler, Wendi | - | 16,880.07 | - | - | - | 16,880.07 |
| Buevin, Eric | - | 5,056.15 | - | - | - | 5,056.15 |
| Burkhard, David | - | - | 80.00 | 62.50 | 81.60 | 224.10 |
| Carstarphen, John | 2,000.00 | 12,000.00 | 30,000.00 | 48,000.00 | 34,000.00 | 126,000.00 |
| Chittenden, Amy | 9,293.65 | 12,136.98 | - | - | - | 21,430.63 |
| Cornelison, Gale | 21,997.69 | - | - | - | - | 21,997.69 |
| Coyne, Kathy | - | - | - | - | 3,702.45 | 3,702.45 |
| Davies, Amy | - | - | 4,117.83 | 47,496.05 | 30,638.06 | 82,251.94 |
| Dawson, John | - | - | - | - | 3,000.00 | 3,000.00 |
| Demyer, William | 1,206.00 | 9,256.30 | - | | | 10,462.30 |
| Dietmeier, Melvin | - | - | 6,416.32 | 15,238.08 | - | 21,654.40 |
| Dion, Deeann | 22,341.68 | 6,611.37 | - | | | 28,953.05 |
| Dockter, Duane | - | - | - | 15,634.45 | 36,400.40 | 52,034.85 |
| Dubrowski, Alan | - | 6,210.00 | 33,962.33 | - | - | 40,172.33 |
| Unphy, Danielle | 277.80 | 279.00 | - | | | 556.80 |
| Fenske, Cheryl | - | - | 4,759.42 | 29,796.10 | 25,188.23 | 59,743.75 |
| Foster, Dallas | - | - | 6,852.88 | 42,173.76 | 18,924.97 | 67,951.61 |
| Frantz, Carol | - | - | - | - | 12,885.35 | 12,885.35 |
| Fregoso, Robert | - | - | - | - | 880.65 | 880.65 |
| Geyer, William | 23,100.00 | 19,930.00 | 11,050.00 | 9,950.00 | 46,007.99 | 110,037.99 |
| Graves, Darren | - | - | - | - | 6,727.60 | 6,727.60 |
| Greaves, Bradley | - | - | 509.58 | 33,798.23 | 31,781.06 | 66,088.87 |
| Grey, James | 5,000.00 | 28,820.00 | - | - | - | 33,820.00 |
| Griffin, Patty | 92.60 | 93.00 | - | - | - | 185.60 |
| Griffith, Brenda | - | - | - | - | 10,765.89 | 10,765.89 |
| Haase, Mark | - | - | - | 26,479.58 | 38,302.66 | 64,782.24 |
| Haase, Stephan | - | - | - | - | 834.00 | 834.00 |
| Hellman, Todd | - | - | - | 953.40 | 29,378.92 | 30,332.32 |
| Hewitt, Philip | - | - | - | 8,103.60 | 36,003.09 | 44,106.69 |
| Holguin, Doris | - | 5,155.86 | 12,342.50 | 10,003.50 | 1,515.00 | 29,016.86 |
| Ingram, Christopher | - | - | - | - | 1,819.50 | 1,819.50 |
| Inskeep, Christopher | 1,567.50 | - | - | - | - | 1,567.50 |
| Jordan, James | - | - | 40.00 | 33.00 | - | 73.00 |
| Kozy, Mark | - | - | 9,590.00 | - | - | 9,590.00 |
| Laughridge, Fergus | 196.66 | 34,522.80 | 35,531.05 | 34,941.68 | 10,980.64 | 116,172.83 |
| Lavery, Kenneth | - | - | - | 12,489.96 | 6,196.12 | 18,686.08 |
| Lawrence, Rodney | - | 17,399.95 | 33,798.26 | 43,669.04 | 40,323.23 | 135,190.48 |
| Lutz, Stephen | - | 19,650.00 | 16,472.93 | - | - | 36,122.93 |
| Manley, Charlene | - | - | - | 16,461.10 | - | 16,461.10 |
| Marble, Jere | - | - | - | - | 3,000.00 | 3,000.00 |
| Pepham, Colin | - | - | 13,547.48 | 15,954.92 | - | 29,502.40 |

Page 1 of 2

TURNER, LOY & CO., LLC
CERTIFIED PUBLIC ACCOUNTANTS

AMF 04004

## Exhibit 3
## Payroll Detail
## American Medflight - Information From Forms W-2 and W-3

| Employee | Form W-2 Amounts | | | | | 5-Year Total |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| Merren, Michael | - | - | - | 33,830.12 | 43,993.58 | 77,823.70 |
| Mohler, John | - | - | 380.00 | 400.00 | 939.49 | 1,719.49 |
| Morales, Miguel | - | - | - | - | 185.60 | 185.60 |
| Ohsawa, Kazumasa | - | - | - | - | 139.20 | 139.20 |
| Orey, James | - | - | 35,472.88 | 3,589.74 | - | 39,062.62 |
| Ozer, Craig | - | - | 3,241.03 | 47,892.88 | 8,409.84 | 59,543.75 |
| Pazos, Christopher | - | 1,165.83 | - | - | - | 1,165.83 |
| Peck, Janet | - | - | - | - | 5,894.20 | 5,894.20 |
| Peck, Jeffrey | - | - | - | 74.63 | 75.00 | 149.63 |
| Pedone, Frank | - | - | - | - | 12,453.20 | 12,453.20 |
| Pisio, Garrison | - | - | - | 22,005.31 | 13,417.54 | 35,422.85 |
| Pollino, Gail | - | - | - | - | 8,980.00 | 8,980.00 |
| Ragsdale, Philip | 3,615.38 | - | - | - | - | 3,615.38 |
| Raw, Thomas | 3,861.71 | - | - | - | - | 3,861.71 |
| Reed, Linda | - | 11,133.00 | 17,508.04 | 17,930.08 | 18,524.56 | 65,095.68 |
| Roney, Steven | - | - | - | - | 15,524.17 | 15,524.17 |
| Ruth, David | - | - | - | - | 3,250.72 | 3,250.72 |
| Schmitt, Lyle | 2,500.00 | 31,800.00 | 32,020.48 | 36,243.44 | 25,198.99 | 127,762.91 |
| Scott, Bethney | - | - | - | 9,793.01 | 6,267.69 | 16,060.70 |
| Silvaroli, Patrick | - | - | - | 14,465.85 | 4,012.14 | 18,477.99 |
| Slaughter, Richard | - | - | 680.00 | 2,351.10 | 2,974.00 | 6,005.10 |
| Sparks, Robin | - | - | - | - | 3,574.33 | 3,574.33 |
| Stanton, James | - | - | - | - | 7,800.36 | 7,800.36 |
| Teserio, Tim | - | - | 6,416.32 | 7,985.07 | 3,128.68 | 17,530.07 |
| Thompson, Kenneth | 46,750.00 | 66,593.94 | 65,271.44 | 19,537.55 | - | 198,152.93 |
| Thompson, Sheri | 12,899.88 | 3,487.50 | - | - | - | 16,387.38 |
| Tombow, Leslie | 14,950.00 | 3,300.00 | - | - | - | 18,250.00 |
| U'Ren, Jonathan | - | 2,000.00 | - | - | - | 2,000.00 |
| Vaona, Paul | - | - | 4,161.57 | 7,901.01 | - | 12,062.58 |
| Witham, Larry | - | 2,086.17 | - | - | - | 2,086.17 |
| Form W-3 Total | 176,878.90 | 316,390.42 | 384,888.61 | 636,238.74 | 636,041.74 | 2,150,438.41 |

TURNER, LOY & CO., LLC
CERTIFIED PUBLIC ACCOUNTANTS

AMF 04005

**Exhibit 4**
**Payroll Detail**
**Reno Flying Service - Information From Forms W-2 and W-3**

| Employee | Form W-2 Amounts | | | | | 5-Year Total |
|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | |
| Mergan, Theodore | - | - | 1,351.36 | - | - | 1,351.36 |
| Morales, Miguel | - | - | - | 9,556.65 | 9,318.00 | 18,874.65 |
| Morrison, Leroy | 808.60 | 1,780.40 | 1,538.00 | 3,251.40 | 2,545.00 | 9,923.40 |
| Murphree, Steven | - | - | 3,362.15 | - | - | 3,362.15 |
| Nonini, Ty | - | - | 5,574.40 | - | - | 5,574.40 |
| Ohsawa, Kazumasa | - | - | - | - | 3,798.60 | 3,798.60 |
| Orey, James | - | 621.00 | 2,370.45 | - | - | 2,991.45 |
| Parker, Raymond | - | - | - | 393.13 | - | 393.13 |
| Peck, Jeffrey | - | - | 4,689.06 | 14,458.63 | 17,158.05 | 36,305.74 |
| Pedone, Frank | - | - | - | - | 749.99 | 749.99 |
| Pisio, Garrison | - | - | - | 122.09 | 1,407.53 | 1,529.62 |
| Profit, Andrew | 100.00 | - | - | - | - | 100.00 |
| Ragsdale, Philip | 26,176.92 | - | - | - | - | 26,176.92 |
| Reed, Linda | 9,594.70 | 16,117.00 | 17,508.04 | 17,930.08 | 16,167.28 | 77,317.10 |
| Riebeling, Eric | 4,300.00 | - | - | - | - | 4,300.00 |
| Ruth, David | 13,826.00 | 12,672.30 | 16,663.40 | 12,024.80 | 4,879.00 | 60,065.50 |
| Ruth, Patricia | 281.03 | 279.99 | 330.75 | 224.25 | 108.75 | 1,224.77 |
| Salo, Terry | - | - | 1,360.80 | - | - | 1,360.80 |
| Schmidt, Lyle | - | 1,597.00 | 875.00 | 122.09 | 3,527.42 | 6,121.51 |
| Scott, Bethney | - | - | 15,111.25 | 9,794.11 | 8,562.73 | 33,468.09 |
| Scott, Casey | 7,307.70 | 9,619.40 | 11,724.00 | - | - | 28,651.10 |
| Shanley, Chris | - | - | - | 3,025.00 | 10,800.00 | 13,825.00 |
| Sharen, Bruce | 15,552.40 | 21,573.65 | 11,171.55 | - | - | 48,297.60 |
| Smith, Victor | 2,541.00 | - | - | - | - | 2,541.00 |
| Stein, Virginia | - | - | 9,216.00 | - | - | 9,216.00 |
| Stewart, Steven | - | - | - | 367.50 | - | 367.50 |
| Teserio, Tim | - | - | - | 7,467.24 | 1,776.22 | 9,243.46 |
| Tombow, Leslie | 5,757.30 | 15,897.30 | - | - | - | 21,654.60 |
| U'Ren, Jonathan | 17,801.30 | 2,258.10 | - | - | - | 20,059.40 |
| Vandyke, Kirt | 3,456.90 | 19,702.20 | - | - | - | 23,159.10 |
| Waddell, James | 19,432.69 | 29,009.71 | 30,765.32 | 36,375.26 | 6,752.12 | 122,335.10 |
| Warjabedian, Adriano | - | - | - | - | 5,037.48 | 5,037.48 |
| Water, John | - | - | - | - | 5,041.51 | 5,041.51 |
| White, Elliott | - | - | - | - | 417.60 | 417.60 |
| Woodburn, Alan | 1,008.00 | 620.80 | 1,250.04 | 1,812.40 | 3,943.60 | 8,634.84 |
| Zaragoza, Amador | 853.78 | - | - | - | - | 853.78 |
| | | | | | | |
| Form W-3 Total | 259,854.52 | 300,793.24 | 319,094.86 | 336,534.43 | 302,169.37 | 1,518,446.42 |

TURNER, LOY & CO., LLC
CERTIFIED PUBLIC ACCOUNTANTS

AMF 04006

**Exhibit 4**
**Payroll Detail**
**Reno Flying Service - Information From Forms W-2 and W-3**

| Employee | 1995 | 1996 | 1997 | 1998 | 1999 | 5-Year Total |
|---|---|---|---|---|---|---|
| | | | Form W-2 Amounts | | | |
| Anguis, Robert | 8,256.00 | 20,996.00 | 25,100.00 | 5,375.00 | | 59,727.00 |
| Barnes-Truitt, Karma | - | - | - | - | 1,050.40 | 1,050.40 |
| Beauregard, Marion | - | 3,822.87 | 3,129.53 | - | - | 6,952.40 |
| Blasier, Theron | - | - | 93.00 | - | - | 93.00 |
| Bonar, Erick | - | - | 3,987.50 | 24,287.17 | 6,199.26 | 34,473.93 |
| Bonilla, Carlos | 1,763.40 | 241.20 | - | - | - | 2,004.60 |
| Booth, Mark | - | - | - | 3,628.80 | - | 3,628.80 |
| Boyce, Jerry | - | - | - | 12,383.51 | 29,321.63 | 41,705.14 |
| Brent, Stephen | - | - | 4,733.00 | 5,126.90 | - | 9,859.90 |
| Briggs, Tom | 271.00 | - | - | - | - | 271.00 |
| Brown, James | 36,000.00 | 39,333.20 | 39,999.84 | 40,999.84 | 36,507.83 | 192,840.71 |
| Burke, Todd | - | - | - | - | 11,561.50 | 11,561.50 |
| Burkhard, David | - | - | 663.00 | 8,905.20 | 10,623.10 | 20,191.30 |
| Bush, Terry | - | 2,178.00 | 1,262.80 | - | - | 3,440.80 |
| Cahill, Aidan | - | 305.40 | - | - | - | 305.40 |
| Carmichael, Ryan | - | 534.00 | 72.00 | - | - | 606.00 |
| Carstarphen, John | - | - | 200.00 | 100.00 | - | 300.00 |
| Cloutier, Samuel | - | - | - | 2,024.50 | 1,824.76 | 3,849.26 |
| Coppick, Andrea | 3,117.10 | 4,847.30 | - | - | - | 7,964.40 |
| Coyne, Kathy | - | - | - | - | 3,946.75 | 3,946.75 |
| Cramer, Lyle | 96.60 | - | - | - | - | 96.60 |
| Dawson, John | 49,840.23 | 49,093.63 | 47,299.92 | 47,299.92 | 47,299.92 | 240,833.62 |
| Dee Pagni, Pamela | 79.20 | - | - | - | - | 79.20 |
| Deitmeier, Melvin | - | - | - | 1,151.21 | - | 1,151.21 |
| Dunphy, Daniele | 4,675.29 | 8,583.79 | - | - | - | 13,259.08 |
| Edwards, Dante | - | - | - | - | 6,391.00 | 6,391.00 |
| Englebrecht, Raymond | - | - | 7,651.05 | 10,174.69 | - | 17,825.74 |
| Evans, Tony | - | 643.20 | 1,892.60 | - | - | 2,535.80 |
| Fenske, Cheryl | - | - | 4,937.30 | 210.09 | 3,502.79 | 8,650.18 |
| Foster, Dallas | - | - | - | 488.36 | 80.00 | 568.36 |
| Geyer, William | 1,335.08 | 18,224.00 | 35,041.20 | 38,654.10 | 750.00 | 94,004.38 |
| Granger, Angela | 408.10 | - | - | - | - | 408.10 |
| Graves, Darren | - | - | - | - | 356.50 | 356.50 |
| Griffin, Patty | 19,740.40 | 16,054.00 | - | - | - | 35,794.40 |
| Gustavson, Craig | - | - | 2,849.45 | 2,505.75 | - | 5,355.20 |
| Hanson, Pamela | 1,260.00 | - | - | - | - | 1,260.00 |
| Hickerson, George | 91.20 | - | - | - | - | 91.20 |
| Hoerth, Matthew | - | - | - | - | 6,423.35 | 6,423.35 |
| Howe, Dawn | - | - | - | - | 1,400.00 | 1,400.00 |
| Jordan, James | 4,122.60 | 922.10 | 1,572.40 | 2,819.40 | - | 9,436.50 |
| Kozloski, Chad | - | - | - | 1,454.80 | 525.60 | 1,980.40 |
| Kozy, Mark | - | - | 505.70 | - | - | 505.70 |
| Langstrom, Neil | - | - | - | - | 24,336.72 | 24,336.72 |
| Lavery, Kenneth | - | - | - | 4,104.86 | 8,077.38 | 12,182.24 |
| Lawrence, Brian | - | - | - | 7,915.70 | - | 7,915.70 |
| tz, Stepher | - | 3,265.70 | - | - | - | 3,265.70 |
| uta, Stephen | - | - | 3,243.00 | - | - | 3,243.00 |

Page 1 of 2

# EXHIBIT 2A

# EXHIBIT 2A

gr

1   RICHARD G. HILL, ESQ.
2   State Bar No. 596
    CASEY D. BAKER, ESQ.
3   State Bar No. 9504
    RICHARD G. HILL, CHARTERED
4   652 Forest Street
    Reno, Nevada 89509
5   (775) 348-0888
    Attorneys for Defendant
6

7

8

9                   UNITED STATES DISTRICT COURT

10               FOR THE DISTRICT OF NEVADA - RENO

11

12  John Carstarphen.                    )
                                         )   Case No.: 3:07-cv-00542-ECR-RAM
13              Plaintiffs,              )
                                         )
14  v.                                   )
                                         )
15  Richard Milsner, an individual,     )
    DOES 1 through 10,                   )
16                                       )
                Defendants.              )
17  _____ )

18            **DECLARATION OF DAVID B. THOMAS, MBA**

19          DAVID B. THOMAS, MBA, having been duly sworn, avers under penalty of

20  perjury, as follows:

21          1. I am a resident of the State of Nevada and over 18 years of age.  This

22  declaration is based on my personal knowledge, except for those matters stated on

23  information and belief, and as to those items, I believe them to be true. This declaration is

24  made in support of the Motion for Summary Judgment by defendant Richard Milsner, and

25  represents my testimony if called upon to present same in Court.

26          2. I have been retained as an expert by Richard G. Hill, Esq., counsel for

27  defendant Richard Milsner in this case.  Exhibit 2 (Bates numbered AMF-4000-4007),

28  ///

LAW OFFICE
RICHARD  G.  HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

1  attached to the subject <u>Motion for Summary Judgment</u>, is a true and correct copy of my
2  report, and represents my professional opinions regarding my review of the shared
3  administrative and office expenses between Reno Flying Service, Inc., and American
4  Medflight, Inc.

5      3. I declare under penalty of perjury that the foregoing is true and correct to
6  the best of my knowledge.

7              DATED:: July 6, 2010

8

9              David B. Thomas
               DAVID B. THOMAS, MBA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

LAW OFFICE
RICHARD   G.   HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858
28

2

# EXHIBIT 3

# EXHIBIT 3

### UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS
### OF
### AMERICAN MEDFLIGHT, INC., a Nevada corporation

The undersigned, being the directors of American Medflight, Inc., a Nevada corporation (the "Corporation") hereby consent pursuant to NRS 78.315 to the following as the due and proper actions by the Board of Directors of the Corporation.

#### Award of Bonus to President of the Corporation.

The Corporation is aware of the dilligent and skillful efforts of Jack A. Dawson, President of the Corporation, and are aware that the Corporation has had a profitable 2005.

In appreciation of Mr. Dawson's efforts for the year, the Board of Directors hereby directs the officers and employees of the Corporation to pay a year-end bonus to Mr. Dawson in the sum of $30,000.

Jack A. Dawson, by signing the signature line below, hereby declines to participate in this Board of Directors decision.

Dated: December 20, 2005.

Richard L. Milsner

William Geyer

Dated: December 20, 2005

I hereby decline to participate in the decision concerning the subject matter set forth in this resolution and abstain from voting on the matter.

Jack A. Dawson

# EXHIBIT 4

# EXHIBIT 4

1 | KING & RUSSO, LTD
PATRICK O. KING, ESQ., BAR NO. 5034
2 | J. SCOTT RUSSO, ESQ., BAR NO. 6477
1677 Lucerne Street, Suite B
3 | Minden, NV 89423

4 | Telephone No. (775) 783-7500
Facsimile No. (775) 783-7600
5

6 | Attorneys for Plaintiff John Carstarphen

7

8 | **UNITED STATES DISTRICT COURT**

9 | **FOR THE DISTRICT OF NEVADA - RENO**

10

11 | John Carstarphen, an individual          Case No.: 3:07-cv-00542-ECR-RAM

12 |            Plaintiff,

13 |     vs.                                  **PLAINTIFF JOHN
                                            CARSTARPHEN'S RESPONSE TO**
14 |                                          **INTERROGATORIES** (SET NO. 3)
     Richard Milsner, an individual and DOES 1
15 | through 10, inclusive.

16 |            Defendants.

17

18

19 | PROPOUNDING PARTY:        RICHARD MILSNER

20 | RESPONDING PARTY:         JOHN CARSTARPHEN

21 |        Plaintiff John Carstarphen ("Responding Party" and/or "Carstarphen") hereby

22 | responds to Interrogatories (Set No. 3) propounded by Defendant Richard Milsner

23 | ("Propounding Party" and/or "Milsner") as follows:

24 | **GENERAL OBJECTIONS AND QUALIFICATIONS**

25 |        Responding Party interposes the following General Objections and Qualifications

26 | to each of the Interrogatories. These objections are made to each and every individual

27 | Interrogatory and are incorporated by reference into each of the specific responses which

28 | are set forth below.

-1-

1        The responses by Responding Party to the Interrogatories should not be construed
2  as an admission that such information and/or documentation is relevant to the subject
3  matter of this litigation or is admissible evidence.

4        Responding Party's lack of objection to the Interrogatories, or any individual
5  Interrogatory contained therein, is not to be deemed an admission that the Interrogatory is
6  not otherwise seeking privileged information and/or documentation or objectionable on
7  some other grounds.

8        All of the responses contained herein are based only upon the information and
9  documents which are presently available to and specifically known to Responding Party,
10  and discloses only those contentions which are presently asserted by Responding Party
11  upon the facts known.

12        It is anticipated that further discovery, independent investigation, legal research
13  and analysis will supply additional facts, add meaning to the known facts, as well as
14  establish entirely new factual conclusions and legal contentions, all of which may lead to
15  substantial additions to, changes in and variations from the contentions herein set forth.

16        The following responses are given without prejudice to Responding Party's right to
17  produce evidence of any subsequently discovered facts which Responding Party may
18  later recall. Responding Party accordingly reserves the right to change any and all
19  responses herein as additional facts are ascertained, analyses are made, legal research is
20  completed and contentions are made. The responses contained herein are made in a good
21  faith effort to supply as much factual information and as much specification of legal
22  contentions as is presently known, which should in no way be to the prejudice of
23  Responding Party in relation to further discovery, research or analysis.

24        Responding Party has a made a diligent search and reasonable inquiry in an effort
25  to respond to each of the Interrogatories as Responding Party understands and interprets
26  each Interrogatory. If Propounding Party subsequently asserts an interpretation of the
27  Interrogatories which differs from that of Responding Party, Responding Party reserves
28  the right to supplement his objections or responses, or both.

1

## RESPONSE TO INTERROGATORIES

2 INTERROGATORY NO.8:

3       State what you mean by the phrases "...Milsner's sale to the AMF ESOP would

4 have [an] adverse effect on the fair market value of AMF" and "...the AMF ESOP

5 liability to Milsner would devalue AMF..." State all factual and legal bases on which you

6 contend that AMF was, in fact, devalued or harmed by any transaction referenced in your

7 pleadings. State all amounts of all devaluations or harm that you contend proximately

8 resulted to AMF or your interests in AMF from any act or ommission to act by Milsner,

9 showing all calculations and all assumptions. Identify each and every appraisal or

10 valuation of any kind for AMF or your interests therein upon which you rely.

11 RESPONSE TO INTERROGATORY NO. 8

12      The stock sale by Milsner to the AMF ESOP, because the ESOP did not have the

13 money to pay for the stock, required AMF to guarantee payment to the ESOP for the

14 same amount of the note from the ESOP to Milsner for the stock. Prior to the stock sale,

15 and at the time Carstarphen chose not to sell himself because Milsner said that a

16 condition to doing so for Carstarphen was that he must dismiss his state court lawsuit, the

17 value of AMF at the beginning of December 2005 was purportedly as set forth in the

18 Menke &Associates valuation. After the close of 2005, Menke & Associates provided a

19 new year end valuation which showed the value of AMF to be less by the same sum as

20 the amount of the note from the ESOP to Milsner. Carstarphen called Menke &

21 Associates to ask why the value of the company had dropped seemingly "overnight", and

22 was told that AMF's guarantee of the note was a liability to AMF and therefore decreased

23 the value of AMF by the sum of the note.

24      The appraisals upon which Carstarphen relies for the impact of the Milsner stock

25 sale are the appraisals prepared at the beginning of December 2005, before the stock sale,

26 and the 2005 year end appraisal. Both were prepared by Menke.& Associates.

27      The current amount of the devaluation of AMF as a result of Milsner's sale is not

28 known by Carstarphen because he does not know the unpaid balance of the note at this

1    time. However, Milsner and Jack Dawson, the ESOP trustees, should know the precise

2    figure. Carstarphen's damages are $1/3^{rd}$ of the devaluation.

3          In addition, Milsner's self dealing by requiring AMF to charter aircraft from RFS,

4    pay RFS for aircraft maintenance and repairs, and pay "consulting fees" to AMF, when

5    AMF was capable of adding aircraft and maintaining/repairing the aircraft with its own

6    employees, devalued AMF. The devaluation is because Milsner increased AMF's

7    expenses and decreased AMF's revenue and profits so that he would profit from RFS.

8    The difference between what Milsner forced AMF to pay RFS and what AMF would

9    have paid its own employees and would have paid to purchase and operate the necessary

10    airplanes (in lieu of chartering) is the damage. Carstarphen is a $1/3^{rd}$ owner of AMF and

11    therefore his damage is $1/3^{rd}$ of the additional profit that AMF would have realized but

12    for Milsner's self dealing.. Once the underlying basis for each check from AMF to RFS

13    is determined, Carstarphen can more precisely estimate the impact and the damages to

14    Carstarphen.

15    INTERROGATORY NO.9:

16          If you contend that Milsner failed to disclose any data to you that he received from

17    Menke & Associates that was in any way associated with any transaction referred to in

18    your pleadings, identify each transaction to which you refer, identify all data to which

19    you refer, state when you contend that Milsner received it, and identify all documents that

20    memorialize the data to which you refer and Milsner's receipt thereof.

21    RESPONSE TO INTERROGATORY NO. 9:

22          Carstarphen is not aware of any data that Milsner received from Menke &

23    Associates and did not disclose.

24    INTERROGATORY NO.10:

25          If you contend that Milsner failed to disclose any data to you in connection with

26    any transaction referenced in your pleadings, identify each transaction, state precisely

27    what you contend Milsner failed to disclose, state the relevancy of whatever it may be

28

1   that you contend Milsner did not disclose, and identify all documents showing the data

2   and transactions referred to.

3   RESPONSE TO INTERROGATORY NO. 10:

4       Carstarphen is not aware of any "data" that Milsner had and did not disclose.

5   Milsner did not disclose to Carstarphen that if Carstarphen did not sell his stock in

6   December 2005, the stock would be worth much less due to the note from the ESOP to

7   Milsner, but Carstarphen does not know that Milsner had "data" on this issue. Milsner did

8   not disclose the fact that Castarphen did not have to dismiss his lawsuit as a condition of

9   selling his stock to the ESOP.  Milsner did not disclose "data" on his self dealing by

10   having AMF pay RFS millions of dollars for services and "consulting fees", and has

11   never disclosed to Carstarphen that he has been writing hundreds of thousands in checks

12   to pay himself from the AMF checking account.  However, as Castarphen understands

13   this interrogatory, it is seeking data with respect to the stock sale, and in that context

14   Carstarphen is not aware of "data" that Milsner had and did not provide.

15   INTERROGATORY NO.11:

16       State on what basis you contend Milsner knew or should have known of the data

17   referred to in the preceding interrogatory.  State how you contend Milsner came into

18   possession of that data, and all bases on which you contend that Milsner had but failed to

19   provide you with that data.

20   RESPONSE TO INTERROGATORY NO. 11:

21       Carstarphen understands the "data" in this interrogatory to be in the context of the

22   stock sale in December 2005.  Carstarphen is not aware of data Milsner had and failed to

23   provide.

24   INTERROGATORY NO. 12:

25       In response to Interrogatory No.2, you state that you "...**had no knowledge the**

26   **AMF ESOP executing a note to (sic) would cause liability by AMF.  Carstarphen**

27   **did not know that Milsner's sale to t he AMF ESOP would have any adverse effect**

28   **on the fair market value of AMF."**  If you contend that Milsner was, in any way, or to

-5-

1  any extent, responsible for any lack of understanding on your part, state each act or

2  omission to act by Milsner that you contend contributed to your lack of understanding. If

3  you contend that Milsner knew, or should have known, of your lack of understanding,

4  state how that knowledge did or should have come to Milsner. State all legal and factual

5  bases on which you contend Milsner had any duty to you as to each act or omission to act

6  identified.

7  RESPONSE TO INTERROGATORY NO. 12:

8      Carstarphen does not contend that Milsner is responsible for Carstarphen's lack of

9  understanding. Carstarphen does contend that Milsner should have known that he could

10  not condition Carstarphen's sale to the ESOP on the dismissal of the State Court lawsuit.

11  INTERROGATORY NO.13:

12      As to any transaction referenced in your First Amended Complaint, do you

13  contend that Milsner owed you a duty to explain any fact or law pertaining to such

14  transaction to you and that Milsner failed to do so adequately? If so, state each

15  transaction to which you refer, state what Milsner failed to adequately explain, and state

16  the source of each duty to which you refer. Identify all documents memorializing each

17  fact stated in response to this interrogatory.

18  RESPONSE TO INTERROGATORY NO. 13:

19      There are over 2,000 transactions involving Milsner's self dealing since January

20  2005. Carstarphen contends that every transaction whereby AMF paid RFS violated the

21  Bylaws of AMF, which required that prior consent from Carstarphen first be obtained, as

22  well as his signature on all checks from AMF to Milsner's entities, including RFS. These

23  were checks and balances put in place to prevent the very self dealing that Milsner

24  engaged in. However, Carstarphen does not contend that Milsner owed a duty to explain

25  any fact or law. Rather, he had a duty to not engage in self dealing. Since one of the

26  transactions at issue is the stock sale by Milsner to the AMF ESOP, Carstarphen does not

27  contend that Milsner had a duty to explain facts or law to Carstarphen, but he did have a

28

1   duty to not exclude Carstarphen from the stock sale by placing a condition on his
2   participation that violated the law.

3   INTERROGATORY NO. 14:

4       If you contend that Richard Milsner breached any fiduciary duties to you,
5   including but not limited to any claimed duty of loyalty, due care or good faith, state each
6   duty to which you refer and the source or bases for each duty.  State each act or omission
7   to act that you contend violated any duty identified.  Identify all actors, the substance of
8   each act, the date and place of each act, and all harm that resulted from each breach of
9   each duty identified.  Identify each document or other thing that memorializes any fact
10  stated in response to this interrogatory.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 | RESPONSE TO INTERROGATORY NO. 14:

2         There are over 2,000 transactions involving Milsner's self dealing since January

3 | 2005. Every act of self dealing was a breach of fiduciary duty owed to Carstarphen as a

4 | $1/3^{rd}$ shareholder.Carstarphen contends that every transaction whereby AMF paid RFS

5 | violated the Bylaws of AMF, which required that prior consent from Carstarphen first be

6 | obtained, as well as his signature on all checks from AMF to Milsner's entities, including

7 | RFS. These were checks and balances put in place to prevent the very self dealing that

8 | Milsner engaged in.  Carstarphen is still reviewing the back up to the transactions, and

9 | can be more specific when those transactions are all reviewed. The harm to Carstarphen

10 | has been the loss of profit distribution and the devaluing of his stock .

11 | DATED:  October 20, 2009           KING & RUSSO, LTD.

12 |

13 |                     By: *Patrick O King*

14 |                        Patrick O. King
                       Attorneys for Plaintiff

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-8-

**VERIFICATION**

STATE OF NEVADA     )
                         : ss.
CARSON CITY       )

    I, JOHN CARSTARPHEN, do hereby swear under penalty of perjury the assertions of this Verification are true.

    I am the Plaintiff named in the above and foregoing action.  I have read the Interrogatories and responses to same and know the contents thereof; and that the same is true of my own knowledge, except as to those matters therein stated upon information and belief, and as to those matters he believes them to be true.

    DATED this 30th day of September 2009

                                   _John Carstarphen_
                                   JOHN CARSTARPHEN

SIGNED AND SWORN TO before me on
_Oct 2_ , 2009,
by _John Carstarphen_
NOTARY PUBLIC
_Raymond E. Karels_ –

RAYMOND E. KARELS
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 06-108066-2 - Expires July 24, 2010

1

## CERTIFICATE OF SERVICE

2    Pursuant to NRCP 5(b), I hereby certify that I am an employee of KING & RUSSO,

3    LTD., and that on this date of October 21, 2009, I served or caused to be served, a true and correct

4    copy of the RESPONSES TO INTERROGATORIES (SET NO. 3), as follows:

5

[   X   ]                    By **U.S. POSTAL SERVICE:** I deposited for mailing in the United States
6                            Mail, with postage prepaid, an envelope containing the above-identified
                            document, at Minden, Nevada, in the ordinary course of business, addressed
7                            as follows:

8                            Richard G. Hill, Esq.
                            Casey D. Baker, Esq.
9                            Richard G. Hill, Chartered
                            652 Forest Street
10                           Reno, NV  89509
11                           (775) 348-0888

12

[      ]                      By **HAND DELIVERY**, via:
13

14                    [      ]         Reno-Carson Messenger Service
                     [      ]         Interoffice-type messenger
15                    [      ]         other type of delivery service:_____

16                   by placing a true and correct copy of the above-identified document in an envelope
                     addressed as follows:
17

18            DATED this 21st day of October 2009

19

20                                              _Mary Jamks_
21                                              Employee of KING & RUSSO, LTD.

22

23

24

25

26

27

28

-9-