# EXHIBIT 5

# EXHIBIT 5



1  CODE $1425
   MARK H. GUNDERSON, LTD.
2  Mark H. Gunderson, Esq.
   Nevada Bar Number 2134
3  Mark A. Hughs, Esq.
   Nevada Bar No. 5375
4  6121 Lakeside Drive, Ste. 230
   Reno, Nevada 89511
5  (775) 829-1222

6
   Attorneys for John Carstarphen
7

8
       IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
9
                 IN AND FOR THE COUNTY OF WASHOE
10

11
   John Carstarphen,                        Case No.   CV03 01402
12
                          Plaintiff,  Department No. 6
13

14       vs.

15  Richard Milsner, as a shareholder and Treasurer of
    American Medflight, Inc., John A. Dawson, as a
16  shareholder and President of American Medflight,
    Inc., American Medflight, Inc., a Nevada
17  corporation, Reno Flying Service, Inc., a Nevada
    Corporation, DOES 1 through 10 and
18  CORPORATIONS 1 through 10,

19

20                              Defendants.

21  _____

22                   **VERIFIED COMPLAINT**

23       Plaintiff John Carstarphen, by and through his undersigned counsel, states and alleges:

24                   **GENERAL ALLEGATIONS**

25       1.    John Carstarphen ("Carstarphen") is, and was at all times relevant to this action, a

26  resident of Washoe County, Nevada.

27       2.    Defendant Richard Milsner ("Milsner") was at all times relevant to this action, a

28  resident of Contra Costa County, California.

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

1

3.     Defendant John A. Dawson ("Dawson") was at all times relevant to this action, a resident of Washoe County, Nevada.

4.     American Medflight, Inc. ("American Medflight") is, and was at all times relevant to this action, a Nevada corporation, in the business of operating an air ambulance out of Reno and Elko, Nevada.

5.     Reno Flying Service, Inc. ("Reno Flying Service") is, and was at all times relevant to this action, a Nevada corporation.

6.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants Does and Corporations 1 through 10, inclusive, are unknown to Carstarphen, who therefore sues those Defendants by such fictitious names. Carstarphen is informed and believes, and alleges, that each of the Defendants designated by such a fictitious name is in some manner responsible for the events and happenings referred to and proximately caused foreseeable damage to Carstarphen. Carstarphen shall ask leave of the Court to amend this Complaint to show their true names and capacities when the true identities of the fictitious Defendants have been ascertained.

7.     At all times relevant to this action, the Defendants, and each of them, were the principals, employers, associates, co-venturers, agents and/or employees of one another and were acting within the purpose and scope of their agency and employment with the authorization and/or permission of their principal and/or employer. Each Defendant has ratified and approved the acts of his agent and, at all material times, each of the Defendants was responsible in some manner for the acts and conduct alleged in this Complaint.

8.     Carstarphen owns thirty-three and 1/3 percent (33 1/3 %) of American Medflight's issued stock. Milsner owns approximately thirty three and 1/3 percent (33 1/3%) of American Medflight's issued stock and Reno Flying Service (of which Milsner is the majority shareholder) owns thirty point eighty three percent (30.83%) of American Medflight stock and Dawson owns the remaining stock, equal to approximately two and one half percent (2 ½ %).

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511

2

9.     Milsner and Dawson are the only shareholders of Reno Flying Service; Milsner owns ninety six and one quarter percent (96 1/4 %) of Reno Flying Service's issued stock and Dawson owning the remaining three and three quarter percent (3 3/4 %).

10.    On or about September 24, 1997, Carstarphen signed a Loan Guaranty ("1997 Guaranty") with the Pioneer Citizens Bank of Nevada for the benefit of American Medflight. By signing the 1997 Guaranty, Carstarphen personally exposed himself to liability on the principal amount of $1.75 million dollars.

11.    On or before September 2000, Reno Flying Service lost its line of credit with Nevada State Bank.

12.    On or before September 2000, Dawson utilized the 1997 Guaranty to obtain a loan for Reno Flying Service from the Pioneer Citizens Bank of Nevada in various amounts from September 2000 to February 2003; the maximum of which was $281,800.   However, Dawson's actions were not ratified by American Medflight nor were there any corporate resolutions to obtain same.   More importantly, as Carstarphen is personally liable on the 1997 Guaranty, Dawson did not obtain Carstarphen's consent.   Moreover, no mention of the need for the loan to Reno Flying Service,  or discussion of any related expenses, was brought up at any of American Medflight's Annual Shareholders' meetings or Board of Directors' meetings held between February 2000 and the present.

13.    On or about September 14, 2002, the Board of Directors of American Medflight held a meeting where the topic of refinancing two planes was discussed.   As there was no apparent need for the refinancing, Carstarphen voted no to the resolution.   The resolution, however, passed with Milsner and Dawson voting yes.

14.    On or about October 7, 2002, Carstarphen requested certain information pertaining to American Medflight pursuant to Nevada law.   Milsner denied Carstarphen's request informing Carstarphen that he did not comply with applicable Nevada law.

15.    Consequently, Carstarphen engaged the assistance of legal counsel to prepare his request for information.   Carstarphen then resubmitted his request, fully complying with the requirements set forth in Nevada Revised Statute ("NRS") 78.257 by attaching an Affidavit

IARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

3

1    attesting to the basis for the request. On January 17, 2003, Milsner again denied Carstarphen's

2    request, reiterating that Carstarphen did not comply with the applicable statute.

3        16.     It is not practicable nor is it worthy for Carstarphen to submit his complaint

4    regarding disclosure of corporate records before American Medflight's Board of Directors as

5    both Dawson and Milsner are interested parties. Thus, any such submittal by Carstarphen would

6    be futile and to no avail.

7        17.     Additionally, on or about November 18, 2002, Carstarphen began receiving

8    "monthly billing" statements for a "bank loan guarantee" from American Medflight. Carstarphen

9    had not been given any explanation for the billing statements, nor did Carstarphen have any idea

10    as to why he was being billed.

11        18.     American Medflight's tax returns for the years 2000 and 2001 show a deduction

12    for "consulting fees" in the amount of $60,000 each year. To date, Carstarphen is informed and

13    believes that an approximate amount of $275,000 have been paid out in "consulting fees" to

14    Reno Flying Service. As an American Medflight Shareholder and a member of its Board of

15    Directors, Carstarphen is not aware of any consulting fee nor was the topic ever broached at any

16    of the Board of Directors' meetings. Moreover, Carstarphen is not aware of the nature of the

17    consultation given or the necessity for same.

18        19.     American Medflight's Income Statement for twelve months ending December 21,

19    2002, show additional questionable costs and expenses. As an American Medflight Shareholder

20    and a member of its Board of Directors, Carstarphen questions the large amounts paid out for

21    certain expenses, including but not limited to, amounts paid for equipment aircraft rental, aircraft

22    maintenance and labor, accounting (Reno and Elko), legal fees (Reno and Elko), and promotion-

23    meals (Reno). Additionally, there is a great disparity between the amounts written off for

24    American Medflight Reno and that written off for American Medflight Elko.

25        20.     On or about February 13, 2003, Carstarphen received a faxed notice from Dawson

26    as to a meeting of American Medflight's Shareholders and Board of Directors to be held the

27    following Monday, February 17, 2003. As the notice was not in compliance with American

28

IARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
8121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

4

1 | Medflight's corporate by-laws, Carstarphen declined to attend and requested compliance with the
2 | by-laws as to meeting notices.

3 |     21.    As a result of the actions of Dawson and Milsner, it is not practicable for
4 | American Medflight to carry on its business, and Carstarphen has suffered damages.

5 | **FIRST CLAIM FOR RELIEF**

6 | **(Injunctive Relief Compelling Disclosure Pursuant to NRS 78, *et seq.*)**

7 |     22.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
8 | Complaint and incorporates the same by reference as if fully set forth at this point.

9 |     23.    As an American Medflight shareholder and Board of Director member,
10 | Carstarphen is entitled to inspect and have access to all corporate records upon written demand
11 | pursuant to applicable Nevada law.  Carstarphen has made a written demand to inspect and
12 | access American Medflight's corporate records, which demand was in full compliance with the
13 | applicable statutes.  However, Milsner denied Carstarphen's request on January 17, 2003.

14 |     24.    Milsner's denial of Carstarphen's request was willful and in contravention of
15 | applicable Nevada law.

16 |     25.    As a direct and proximate result of Milsner's actions, Carstarphen has been
17 | damaged in an amount in excess of $10,000.00, together with interest, costs and attorneys' fees.

18 |     26.    Under the circumstances, Carstarphen is entitled to injunctive relief compelling
19 | Milsner to disclose American Medflight's corporate records to Carstarphen, pursuant to his
20 | request.

21 | **SECOND CLAIM FOR RELIEF**

22 | **(Breach of Fiduciary Duty and Self-Dealing)**

23 |     27.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
24 | Complaint and incorporates the same by reference as if fully set forth at this point.

25 |     28.    Dawson and Milsner are obligated to act in good faith and with due regard to the
26 | interests of the other shareholders of American Medflight.

27 |     29.    By their actions, including those which benefit Reno Flying Service, to the
28 | detriment of American Medflight, Dawson and Milsner have violated American Medflight's by-

IARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

5

1  laws and harmed American Medflight and Carstarphen, in breach of their fiduciary duties as
2  members of American Medflight.

3     30.    By their actions, including those which benefit Reno Flying Service, Dawson and
4  Milsner have engaged in self-dealing and other conduct in breach of their fiduciary duties to
5  American Medflight and its member Carstarphen.

6     31.    As a direct and proximate result of Dawson and Milsner's breach of fiduciary
7  duties, Carstarphen has suffered damages in an amount in excess of Ten Thousand dollars
8  (10,000.00).

9     32.    Dawson and Milsner's breach of fiduciary duties are intentional and fraudulent,
10  for which actions Carstarphen is entitled to recover exemplary damages.

11              **THIRD CLAIM FOR RELIEF**

12                 **(Breach of Contract)**

13     33.    Carstarphen realleges the allegations contained in the preceding paragraphs of this
14  Complaint and incorporates the same by reference as if fully set forth at this point.

15     34.    By their actions, Dawson and Milsner have breached American Medflight's
16  Articles of Incorporation and Corporate By-Laws, thus harming American Medflight as well as
17  Carstarphen.

18     35.    As a direct and proximate result of Dawson and Milsner's breach of fiduciary
19  duties, Carstarphen has suffered damages in an amount in excess of Ten Thousand Dollars
20  ($10,000.00).

21              **FOURTH CLAIM FOR RELIEF**

22                 **(Declaratory Relief)**

23     36.    An actual controversy has arisen and now exists between Carstarphen and
24  Dawson and Milsner concerning their respective rights and obligations.

25     37.    Carstarphen desires a judicial determination of the parties' rights and duties.

26     38.    A judicial declaration is necessary and proper at this time under the circumstances
27  in order that the parties may determine their rights and duties.

28

IARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6171 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

6

1

## FIFTH CLAIM FOR RELIEF

2

### (Dissolution)

3      39.    Carstarphen realleges the allegations contained in the preceding paragraphs of this

4    Complaint and incorporates the same by reference as if fully set forth at this point.

5      40.    It is not reasonably practicable to carry on the business of the corporation in

6    conformance with its organizational and operational documents.

7      41.    Under the circumstances, dissolution of American Medflight should be ordered in

8    conformance with NRS Chapter 78.

9

## SIXTH CLAIM FOR RELIEF

10

### (Appointment of a Receiver)

11      42.    The circumstances above described require the appointment of a receiver to

12    oversee the American Medflight's business pending resolution of the case by the court.

13      43.    The appointment of a receiver is necessary and proper at this time under the

14    circumstances, in order that the corporation's property, real and personal, are protected during the

15    pending litigation.

16

## SEVENTH CLAIM FOR RELIEF

17

### (Accounting)

18      44.    Carstarphen realleges the allegations contained in the preceding paragraphs of this

19    Complaint and incorporates the same by reference as if fully set forth at this point.

20      45.    Under the circumstances, it is just and reasonable for an accounting by American

21    Medflight of its financial status, including but not limited to an accounting of its assets,

22    liabilities, capital accounts and finances to be ordered.

23      WHEREFORE, Carstarphen prays for:

24      1.    An Order for Injunctive relief compelling Milsner and/or Dawson to disclose

25    American Medflight's corporate records pursuant to NRS Chapter 78;

26      2.    Judgment for Carstarphen and against Defendants on all claims of this Complaint;

27      3.    A judicial declaration of the parties' rights and obligations;

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 830
5121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

7

1   4.    Dissolution of American Medflight, Inc. and distribution of corporate assets

2   according to proof;

3   5.    Judgment for Carstarphen and against Defendants on the dissolution claim;

4   6.    An accounting;

5   7.    The appointment of a receiver to oversee American Medflight's business pending

6   resolution of this litigation;

7   8.    An award of exemplary and punitive damages for Carstarphen and against

8   Defendants, according to proof, on all claims of the parties;

9   9.    An award of damages for Carstarphen and against Defendants, according to proof.

10   10.    An award of interests, costs and attorney's fees to Carstarphen and against

11   Defendants;

12   11.    For such other and further relief as the Court deems just and proper.

13   DATED this _____ day of March, 2003.

14                                   MARK H. GUNDERSON, LTD.

15

16                    By:    _____

17                           Mark H. Gunderson, Esq.
                             Nevada State Bar No. 2134
18                           Mark A. Hughs, Esq.
                             Nevada State Bar No. 5375
19                           Attorneys for John Carstarphen

20

21

22

23

24

25

26

27

28

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 220
5121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

8

# VERIFICATION

STATE OF NEVADA          )
                         ) ss:
COUNTY OF WASHOE         )

JOHN CARSTARPHEN, being first duly sworn, deposes and says:

That he is a Plaintiff in the above-entitled action; that he has read the foregoing **VERIFIED COMPLAINT** and knows the contents; that the same is true of his own knowledge, except for those matters stated upon the information and belief, and as to those matters, he believes them to be true.

Executed in _____R E n o_____, Nevada this 3ᴿᴰ day of March, 2003.

_____
JOHN CARSTARPHEN

SUBSCRIBED and SWORN to before me this 3ʳᵈ day of March, 2003.

_____
NOTARY PUBLIC

My commission expires on: _____5|2|06_____.

DANIELLE L. HOWMAN
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 91-2623-2 - Expires May 2, 2006

MARK H. GUNDERSON, LTD.
A PROFESSIONAL
LAW CORPORATION
SUITE 230
6121 LAKESIDE DRIVE
RENO, NEVADA 89511
(775) 829-1222

9

# EXHIBIT 6

# EXHIBIT 6

1              IN THE SECOND JUDICIAL DISTRICT COURT

2                   OF THE STATE OF NEVADA

3                 IN AND FOR THE COUNTY OF WASHOE

4                          -oOo-

5    JOHN CARSTARPHEN,

6                   Plaintiff,
                                        Case No.:  CV03-01402
7              vs.
                                        Dept. No. 6
8    RICHARD MILSNER, as a shareholder
     and Treasurer of American
9    MedFlight, Inc.; JOHN A. DAWSON,
     as a shareholder and President
10   of American MedFlight, Inc.;
     AMERICAN MEDFLIGHT, INC., a
11   Nevada Corporation; RENO
     FLYING SERVICE, INC., a
12   Nevada Corporation, DOES 1
     through 10, and CORPORATIONS
13   1 through 10,

14                   Defendants.
     _____/
15

16

17            DEPOSITION OF JOHN CARSTARPHEN

18   taken on behalf of Defendant Richard Milsner, at the

19   offices of Richard G. Hill, 652 Forest Street, Reno,

20   Nevada, at 10:13 a.m., Wednesday, April 23, 2008, before

21   Jerry J. Silven, a Notary Public, pursuant to notice.

22

23

24

25   Reported by:                  JERRY J. SILVEN, CCR #55

ii

```
 1

 2

 3

 4    APPEARANCES:

 5    For the Plaintiff:          KING & RUSSO, LTD.
                                  Attorneys at Law
 6                                by PATRICK O. KING
                                  1677 Lucerne Street, #B
 7                                Minden, Nevada 89423

 8

 9    For the Defendant           RICHARD G. HILL
      Richard Milsner:            Attorney at Law
10                                652 Forest Street
                                  Reno, Nevada 89509
11

12    Also Present:              SANDRA CARSTARPHEN

13                               JOHN A. DAWSON

14

15

16

17

18

19

20

21

22

23

24

25
```

iii

INDEX

PAGE:

10:13 a.m., Deposition Commenced.................. 1

EXAMINATION
          By Mr. Hill.............................. 1

11:03 a.m., Recess Taken.......................... 41
11:12 a.m., Deposition Resumed.................... 42

EXAMINATION
          Resumed by Mr. Hill..................... 42

11:55 a.m., Lunch Recess.......................... 71
1:13 p.m., Deposition Resumed..................... 72

EXAMINATION
          Resumed by Mr. Hill..................... 72

1:48 p.m., Deposition Adjourned................... 92

EXHIBITS MARKED FOR IDENTIFICATION:

52      A copy of a multi-page document
        dated January 1, 2004,
        MEMO TO:  Mark Gunderson.................. 73

1

```
 1        RENO, NEVADA, WEDNESDAY, APRIL 23, 2008, 10:13 A.M.

 2                            -oOo-

 3

 4                       JOHN CARSTARPHEN

 5          being first duly sworn, testified as follows:

 6

 7               MR. HILL:  The record should reflect that

 8   this is the date, time and place set for the resumption

 9   of the deposition of Mr. Carstarphen.

10               The record should reflect that Mr.

11   Carstarphen is here this morning with his counsel Mr.

12   King; Mrs. Carstarphen is with us as is Mr. Dawson.

13                         EXAMINATION

14   BY MR. HILL:

15          Q     Sir, will you please state your name and

16   spell your last name for the court reporter.

17          A     John Carstarphen.  C-a-r-s-t-a-r-p-h-e-n.

18          Q     Mr. Carstarphen, you've been placed under

19   oath this morning?

20          A     Yes.

21          Q     If as we go if I ask you a question that

22   you do not hear or do not understand will you stop me and

23   tell me?

24          A     Yes.

25          Q     So if you answer a question it will be
```

2

1    because you both heard it and understood it?

2          A     Yes.

3          Q     Do you have any reason why we should not go

4    forward at this time?

5          A     No.

6          Q     You've been deposed twice in this matter?

7          A     Yes.

8          Q     Have you reviewed the transcripts of those

9    depositions?

10         A     Briefly.

11         Q     Have you made any changes to any of those

12   depositions?

13         A     I don't know.  I don't remember.

14         Q     You may have, may not have?

15         A     I may or may not have.  It's too long ago.

16   I don't remember what I did.

17         Q     Well, we have not been provided with any

18   correction sheets to either session of your deposition.

19   Do you recall if you signed any correction sheets?

20               MR.  KING:  There were no changes.

21               MR. HILL:  Thank you, sir.

22               THE WITNESS:  I think there were some

23   changes in the first one.

24               MR.  KING:  I retract that.

25               MR. HILL:  We've not been provided with any

1  correction sheets. If they're out there, I'd kind of

2  like to see them.

3              MR. KING: Me too.

4              MR. HILL: Okay. So you haven't seen them

5  either.

6              MR. KING: No.

7  BY MR. HILL:

8      Q    Did you do anything to prepare for today?

9      A    Nothing.

10     Q    What I'd like to do, I've got a binder here

11 that's got some of the exhibits that we've used before.

12 Can you turn, please to --

13             MR. KING: And just for clarification,

14 this is a continuation of the deposition to allow

15 completion of some questions that weren't asked

16 previously. It's my understanding that you don't intend

17 to go back over the territory that's already been covered

18 in the two previous depositions.

19             MR. HILL: I don't believe I will. I do

20 think there may be a little bit of overlap, but more by

21 way of entree to the questions that were not asked

22 before. If you think we're getting repetitious, I'll

23 trust you to say so.

24             MR. KING: And to the extent that you ask

25 a question that was asked and answered in either of the

4

1   two previous depositions, I'll have a standing objection,

2   if that meets with your approval.

3            MR. HILL:  However you want to handle it.

4   I'm happy to accommodate.

5   BY MR. HILL:

6        Q    Can you turn to Exhibit 7, please, Mr.

7   Carstarphen.  Are you with me, sir?

8        A    I think so.

9        Q    This is your request for information

10   directed to American MedFlight dated October 7, 2002.

11       A    That is correct.

12       Q    Is this the one, the only request that you

13   ever made in writing for information from AMF?

14       A    I believe so.

15       Q    Have you ever been to the AMF office, and

16   have you ever requested at the AMF office to be allowed

17   access to records of any kind?

18       A    At what time?

19       Q    Ever.

20       A    Oh yes.

21       Q    And how many such requests have you made?

22       A    When?  You mean in total?

23       Q    Yes, sir.

24       A    I don't know.

25       Q    More than 10?

5

1     A     Probably.

2     Q     More than 20?

3     A     I don't know.

4           MR.  KING:  Just for clarification.  The

5     question that you asked, counselor, was:  Have you ever

6     been to the offices and asked for information?

7           Did you mean pursuant to that letter, or

8     are we just talking in general?  Because I'm sure

9     everyday he goes to work he asks for information.

10          MR. HILL:  Well, my question was -- let me

11    try it again.

12    BY MR. HILL:

13    Q     Have you ever been to the offices of AMF

14    and requested access to financial information?

15    A     Yes.

16    Q     When was the last time you did that?

17    A     I don't know.  I don't know if I can answer

18    that.

19    Q     Is there a reason why you can't recall?

20    A     There's no reason why I can't recall.

21    Q     But you.do recall that you have been to the

22    AMF office and requested access to financial information?

23    A     Yes.

24    Q     Were those requests honored?

25    A     Sometimes yes.  Sometimes no.

6

1    Q    I'd like to know about the yes times and

2  I'd like to know about the no times.

3         MR. KING:  I'm going to object to the

4  yes-time-question as being overly broad, unreasonable and

5  burdensome.

6  BY MR. HILL:

7    Q    Do you understand the question, sir?

8    A    Uh-huh.

9    Q    Can you answer it?

10    A    From the period when I was fired the second

11  time I was denied access all the way up until probably

12  about 2004, in that neighborhood.

13         And then after Jack and I started talking

14  about doing a settlement on this case, then I started

15  getting some more information.

16    Q    What did you request that you were denied?

17    A    All this stuff that's on this information

18  sheet here.

19    Q    I'd like to know about the requests that

20  you made in person at that office.  Can you tell me what

21  you requested and what you were denied access to?

22    A    I was denied complete access from about '99

23  till about 2004.

24    Q    I want to be careful here and be sure that

25  you and I are, as we say splitting the same hair.

7

1          This document, Exhibit 7, requests that you

2   be sent information, doesn't it?

3          A     Yes.

4          Q     I want to differentiate between a request

5   that you be sent information and a request that you, John

6   Carstarphen, personally made at the office of AMF.  Okay?

7   Got the distinction clear?

8          A     I think so.

9          Q     And I would like to know -- let's start

10  with, what did you specifically request that you were

11  specifically denied when you went to the AMF?

12               MR.  KING:  Objection.  Asked and answered.

13               THE WITNESS:  I don't think I was allowed

14  in the office from '99 to 2000.

15  BY MR. HILL:

16          Q     Who told you you could not go into the

17  office?

18          A     I don't think anybody told me I couldn't.

19          Q     So why did you think you were not allowed?

20          A     Because I was fired and kicked out of

21  there.

22          Q     And if you fire somebody you don't want

23  them back on your premises?

24          A     That's usually the way it works.

25          Q     So if I understand, then, in that time

1   period you did not present yourself at the AMF office and

2   request access to financial information; is that correct?

3           A       I believe that to be the case.

4           Q       Maybe we can go about it this way.  You

5   were terminated in December 1998; is that correct?

6           A       Yes.

7           Q       Did you, from December 1998 until you were

8   rehired, and if I recall correctly, that was in, I think,

9   April of '99?

10          A       I believe that to be correct.

11          Q       During that period of time did you go to

12  the AMF office and request information of any kind?

13          A       I don't believe so.  But I think during

14  that period from '99 to April '04 I was getting like

15  Monday Reports.

16          Q       I'd like to focus on my question, because I

17  want to go through this narrowly.  We're going to come

18  back and we're going to talk about what you did get.  But

19  I want to go through and I want to cover the time periods

20  here.

21                  Now, when you returned in April of '99, did

22  you have full access to all the books and records at AMF?

23          A       I don't know.

24          Q       Did anyone during that period of time --

25          A       I think I would have had access to

1    anything.  I believe I would have.  But I don't know.

2              Q      During that period of time did you attempt

3    to look at any books and records and did anyone say, no,

4    you can't look at that, words to that effect?

5              A      I don't believe so.

6              Q      So we're now up to December 1999; is that

7    correct?

8              A      December of '99?

9                     MR.  KING:  In what context, counsel?

10                    THE WITNESS:  In reference to what?

11   BY MR. HILL:

12             Q      Mr. Carstarphen I want to go through each

13   and every time you contend that you were at the AMF

14   office and somebody said you couldn't look at something.

15   We're going to go through that on a time sequence.  All

16   right?

17             A      Okay.

18             Q      If I understand so far, up until December

19   1998, you were the president, and during that period of

20   time you had full access to all books and records at AMF;

21   is that right?

22                    MR.  KING:  Objection mischaracterizes his

23   prior testimony.

24   BY MR. HILL:

25             Q      Do you understand my question?

10

1        A        Uh-huh.

2        Q        You were the president?

3        A        Yes.

4        Q        Did you, up until December of 1998, have

5   full access to all books and records at AMF?

6        A        Yes.

7        Q        From the time period from December of '98

8   until, I think, April I think you've told me you didn't

9   go in at all?

10        A        I don't believe I did.

11        Q        From April '99 up until December of 1999,

12   you were the president of the company again?  Yes?

13        A        I don't know.

14        Q        Did anybody during --

15        A        It wasn't -- I was fired the second time, I

16   believe in November, not December.

17        Q        Fair enough.  My mistake.

18        A        I don't know if it's a mistake.  That's

19   what I think it is.

20        Q        You're the witness, your testimony's the

21   important part.

22                  Up until the time you were terminated,

23   which we've now identified as November of 1998.

24        A        '99.

25        Q        Thank you again.

11

1          Up until that second termination, what was

2     your position with the company?

3          A    I don't remember.

4          Q    Did you, during that period of time, have

5     full access to all books and records at American

6     MedFlight?

7          A    I believe so.

8          Q    From that time, let's say from December 1,

9     1998 up until the date of your Exhibit 7, did you ever go

10    to the AMF office and request access to any books and

11    records?

12         A    Give me that date period again.

13         Q    From the date you were fired the second

14    time --

15         A    November '99.

16         Q    -- up until the date of Exhibit 7, did you

17    ever go to the AMF office and ask for access to any books

18    and records?

19         A    I don't believe so.

20         Q    From the date of Exhibit 7 forward, did you

21    ever go to the AMF office and ask for access to books and

22    records?

23         A    I don't believe so.

24         Q    Now, it's going to be tedious and I

25    apologize, but I want to go back to the start of our

12

1    timeline in December of 1998, same questions I've been

2    asking you.

3             Well, let me put it this way, maybe we can

4    cover it with one question.

5             Did you ever have an attorney, an

6    accountant or any other agent on your behalf go to

7    American MedFlight and ask for access to books and

8    records?

9        A     In what time period?

10       Q     Ever.

11       A     Yes.

12       Q     When?

13       A     Shortly after I sent this letter.

14       Q     That would be Exhibit 7?

15       A     Yes.

16       Q     Who was it that you sent?

17       A     I didn't send anybody.  I consulted with an

18   attorney.

19       Q     Please listen to my question.  Did anybody

20   on your behalf -- well, before you filed the lawsuit, did

21   anybody send a demand letter to American MedFlight asking

22   for access to books and records?

23       A     I hired someone to write a letter is what

24   you're asking me?

25       Q     Yes.

```
 1          A     No.

 2          Q     So let me see if I understand the flow.

 3                You send this letter in October '02?

 4          A     Yes.

 5          Q     Milsner responds and says that people in

 6    Elko have said you didn't comply with the statute?

 7          A     Correct.

 8          Q     And they're not going to send you the

 9    information that you're requesting?

10          A     Correct.

11          Q     You then provide an affidavit?

12          A     Correct.

13          Q     Did you, after you provided the affidavit,

14    send anybody over to AMF to demand access to books and

15    records?

16          A     No.

17                MR.  KING:  You mean other than the

18    attorney and Jim Proctor?

19                MR. HILL:  Well --

20                MR.  KING:  I mean, I just want to be real

21    clear.

22                MR. HILL:  I do, too.

23                MR. KING:  You're being very general --

24                MR. HILL:  I am.

25                MR. KING:  -- and I'm aware of facts
```

14

1  that --

2              MR. HILL:  Okay, we'll go there.

3  BY MR. HILL:

4      Q     After the litigation was commenced, you,

5  Mr. Proctor, and some people from Gunderson's office went

6  to AMF.  Are you aware of that?

7      A     Yes, I was there.

8      Q     You were there that day.

9              Did anybody at AMF that day deny access to

10  any books and records that you're aware of?

11     A     I don't think they could find the income

12  tax returns.

13     Q     Anything else?

14     A     I think there was some other things, but I

15  don't know.

16     Q     You were here for Mr. Proctor's deposition

17  yesterday?

18     A     For the first part of it.

19     Q     Were you here when we discussed with him

20  whether or not everything that he requested that day was

21  provided?

22              MR. KING:  Objection.  Mischaracterizes

23  Mr. Proctor's testimony.

24              MR. HILL:  No, I asked whether he was here

25  when I asked the question.  I've not told him what I

15

1  thought the answer was.

2              MR.  KING:  Objection.  Relevance.

3  BY MR. HILL:

4      Q      Were you here yesterday when I asked that

5  question of Mr. Proctor, sir?

6      A      Repeat the question.

7      Q      I asked Mr. Proctor yesterday whether or

8  not everything that he requested that day from American

9  MedFlight had been provided.  Were you here when I asked

10  that question of him?

11     A      I don't remember that.

12     Q      If you don't remember then you don't

13  remember.

14             Do you understand that the tax returns

15  were, in fact, found and provided --

16             MR.  KING:  Objection.

17  BY MR. HILL:

18     Q      -- to the people that requested them that

19  day?

20     A      I don't know.

21     Q      So as you sit here today, you don't know

22  whether the tax returns were provided or not?

23     A      I think -- I don't know.

24     Q      Other than questions that you have about

25  that day, has there been any other time when you or

16

1    anybody on your behalf ever went to American MedFlight

2    and requested information to look at the books and

3    records?

4                    MR.  KING:  You mean personally?

5                    MR. HILL:  Yes.

6                    THE WITNESS:  I don't know if they did it

7    in person or not.  But they did it in writing I'm sure.

8    BY MR. HILL:

9        Q    Who?

10       A    Mark Gunderson.  Jim Proctor.

11       Q    Anybody else?

12       A    Could have been Marvin Murphy back when I

13   was requesting this in '02.

14       Q    Have you provided us with any letters from

15   Mr. Murphy to AMF requesting documents, do you know?

16       A    No.  He was the one that prepared the

17   affidavit.

18       Q    I understand that.

19            Did you hire Mr. Murphy to make a demand

20   for access to records?

21       A    No.

22       Q    And we've covered that before the lawsuit

23   was filed Gunderson didn't make a demand for access to

24   books and records, he just filed; is that right?

25       A    I don't know.

17

1      Q      And Proctor didn't come along until 2004;

2    is that right?

3      A      I don't know the date, but it was about a

4    year after the litigation started.

5      Q      I'd like you to turn to Exhibit 10, please.

6    Are you with me?

7      A      Uh-huh.

8      Q      Did you receive this document on or about

9    February 26, 2003, that being the first page of Exhibit

10   10?

11     A      I have no idea.

12     Q      Were they providing you with information --

13   let me back up.

14            After you were terminated in December of

15   1999, were you ever provided with any financial

16   information by American MedFlight?

17     A      I don't know.

18     Q      If you were, did you look at it?

19     A      Oh I'm sure I would have.

20     Q      In Exhibit 10, let's go to page 390,

21   please.  Do you know if you received this document from

22   American MedFlight, sir?

23     A      No.

24     Q      Do you know how it came into the possession

25   of your attorneys?

18

1      A      If I had copies of it, then I would have

2   given it to Mr. Gunderson.

3      Q      And where would you have gotten these?

4      A      Out of my file.

5      Q      Did you have a file where you kept this

6   kind of material?

7      A      Yes.

8      Q      And you turned all of that over to

9   Gunderson?

10      A      No, I made copies of it.

11      Q      And then turned the copies over to

12   Gunderson.  So you still have that original file?

13      A      Yes.

14      Q      Where is it?

15      A      It's in my home.

16      Q      And you could get that to Mr. King?

17      A      Yes.

18      Q      None of it's been destroyed or lost?

19      A      I don't believe so.

20      Q      What would you call the file that this was

21   in?

22      A      Financial statements.

23      Q      Financial.  So if I asked Mr. King to

24   provide us with the financial statements file, this is

25   what we'll get?

19

1          A      I don't know.

2                 MR.  KING:  Well, the discovery question is

3     closed.  If you want to reopen it so we can get some of

4     that information, Jim Proctor said we could discuss that

5     with him.

6     BY MR. HILL:

7          Q      On this page down here I see an item, loan

8     payable Carstarphen.  Do you see that;

9          A      Uh-huh.

10         Q      Had you loaned $13,823.61 to American

11    MedFlight as of the December 31, 1998?

12         A      I don't know.

13         Q      How much money did you invest -- give me

14    the total of money that you've ever invested in American

15    MedFlight?

16         A      Total amount of money?

17         Q      Total amount of money.

18                MR.  KING:  For clarification, I think he's

19    talking about cash as opposed to credit.

20                THE WITNESS:  What's that?

21                MR.  KING:  I don't mean to speak for you,

22    counsel, but to be clear, he's talking about cash.

23                Am I correct, counsel?

24                MR. HILL:  Yes.  I mean --

25

1    BY MR. HILL:

2         Q    I don't talk about bringing a briefcase

3    full of cash in.  Check, money order, wire.  Money that

4    you invested in American MedFlight, sir, hard money, cash

5    money.

6              I don't want to hear about credit right

7    now, extensions of credit.  I want to know how much money

8    did John Carstarphen invest in American MedFlight.  Do

9    you know?

10        A    Approximately around 25,000.

11        Q    And you understand the distinction between

12   debt and equity?

13        A    Yes.

14        Q    Was it all equity, or was it half-and-half,

15   or what was the split, if you know?

16        A    It was half-and-half.

17        Q    So the amount of money then that you had as

18   equity in American MedFlight, grand total is $12,500?

19             MR.  KING:  Objection.  Mischaracterization

20   of his testimony.  It calls for a legal conclusion.

21   BY MR. HILL:

22        Q    Do you understand the question, sir?

23        A    Yes.

24        Q    And the answer is?

25        A    Well, it might be this 13,823.61.  I don't

21

1   know.

2         Q     Well, I thought you told me that you

3   invested 25,000 and that it was half-and-half.

4         A     That's correct.

5         Q     So, do you understand what we see here on

6   page 390, that that 13,000 figure is a loan?

7         A     Yes.

8         Q     Loans are paid back?

9         A     Yes.

10        Q     Was that paid back?

11        A     Yes.

12        Q     Was it paid back with interest?

13        A     No.

14        Q     Was there an agreement that there would be

15  interest on it?

16        A     No.

17        Q     Do you have any issue in this case about

18  interest on that money?

19        A     No.

20        Q     Did Milsner and Dawson both make the same

21  amount of loans?

22        A     Say that again.

23        Q     Did Milsner loan the same amount of money

24  to the company?

25        A     Yes.

```
 1          Q      Did Dawson loan the same amount of money to

 2   the company?

 3          A      Yes.

 4          Q      Do you know if those have been repaid?

 5          A      I believe they have.

 6          Q      During the period of time when you were

 7   receiving financial information from American MedFlight,

 8   have you ever found anything on the financial statements

 9   that you've gotten that was untruthful?

10          A      I'm sure I found mistakes in the financial

11   statements from time to time.

12          Q      Can you give me an example?

13          A      No.

14          Q      So as you sit here today, you are unable to

15   identify for me any errors in the financial statements

16   from American MedFlight that have been provided to you;

17   is that correct?

18          A      When there's this much money involved in

19   different accounts, I'm sure there's mistakes in there,

20   and as we find them we correct them.

21          Q      All right.  And as you sit here today, you

22   are unable to identify any; is that correct?

23                 MR.  KING:  Objection.  Mischaracterizes

24   his testimony and it's way too broad.  Can you narrow it

25   down to a time frame?
```

1    BY MR. HILL:

2         Q    Are you able to identify so much as one

3    error in any of the financial statements provided to you

4    by American MedFlight for the whole period of time?  Can

5    you identify one?  If you can, we'll talk about it.  If

6    you can't, we'll move on.

7         A    I can't.

8         Q    Fair enough.  I mean, they may be in there,

9    you just don't know where they are?

10        A    That's correct.

11        Q    Okay.  That's fine.

12             Can you go back to 402.  This purports to

13   be the income statement for the period of time ending

14   December 31, 1998.  Do you see that up there?

15        A    Uh-huh.

16        Q    On here it says insurance, aircraft, Elko.

17   Do you see that first entry there?

18        A    Yes.

19        Q    Then it says, insurance, general liability;

20   insurance, ground unit, Elko; malpractice, Elko; SIIS,

21   Elko; medical equipment; and other Elko insurance.  Do

22   you see those?

23        A    Uh-huh.

24        Q    Who's that insurance placed through, what

25   agency, do you know?

SILVER STATE COURT REPORTERS (775) 329-6323

24

1      A      Well, the aircraft would be -- the general

2  liability was R.L. Milsner.  The SIIS I think was through

3  another company.  And the health insurance might be

4  through another company.

5      Q      But you knew that AMF, as of December 31,

6  1998, was purchasing insurance from R.L. Milsner, Inc.?

7      A      Yes.

8      Q      Did you, in December of 1998, complain to

9  anybody about that state of affairs?

10      A      I don't know in December '98.  I did

11  previous to that.

12      Q      You did?

13      A      Yes.

14      Q      To whom did you complain, sir?

15      A      I complained to both Rich and Jack that I

16  thought we should have competitive bidding on our

17  insurance.

18      Q      And did you send any memos to that effect?

19      A      No.

20      Q      But you knew that the insurance was placed

21  through Milsner's office?

22      A      Oh yes.

23      Q      And that included both Reno and Elko?

24      A      Yes.

25      Q      Can you turn to page 396.  Let's say 397.

1    Do you see at the top it says, repairs, maintenance,

2    Reno; do you see that top entry?

3             A     Yes.

4             Q     As of December 31, 1998, you knew that

5    American MedFlight was paying Reno Flying Service for

6    repairs and maintenance, didn't you?

7             A     Yes.

8             Q     Did you object to that?

9             A     Yes.

10            Q     To whom?

11            A     To Mr. Milsner.

12            Q     All right.  And did you send any memos or

13   anything to that effect?

14            A     No.

15            Q     What was your complaint?

16            A     My complaint was, and this is what I told

17   them, I believe in '95, that we should be hiring our own

18   mechanics to do the maintenance.

19            Q     And how much did a mechanic make in 1995,

20   sir, do you know?

21            A     Probably in the $15 an hour range.

22            Q     And how many mechanics would AMF have

23   needed at that point in time?

24            A     One to two.

25            Q     And did they have to have equipment?

26

1          A       All mechanics own their own equipment.

2          Q       So they don't need any specialized tools

3     that the employer would provide?

4          A       There would be some specialized tools, yes.

5          Q       Can you tell me what?

6          A       Like aircraft jacks.

7          Q       Hoists?

8          A       No, we don't use hoists -- well, yeah,

9     maybe a hoist to get an engine out of the airplane.

10         Q       And you prepared the business plan for AMF;

11    is that right?

12         A       Yes.

13         Q       Did your original business plan contemplate

14    hiring your own mechanic?

15         A       I don't know if that was in the business

16    plan or not.

17         Q       But as of this date you understood that --

18    well, I've asked that.

19                 Now, were airplanes being rented from Reno

20    Flying Service at this point in time, to your knowledge?

21         A       In what time period?

22         Q       We're talking about December 31, sir.

23         A       Yes.

24         Q       And you knew that that was going on?

25         A       Yes.

27

```
 1          Q    And did you object?

 2          A    Yes.

 3          Q    To whom?

 4          A    To Jack and Rich.

 5          Q    And what did you propose be done?

 6          A    I proposed that we buy another airplane.

 7          Q    And how much would that have cost?

 8          A    In '98 it probably was around 600,000.

 9          Q    Were you prepared in 1998 to guarantee the
10  purchase of an airplane?

11          A    Sure, most definitely.

12          Q    Did there come a point in time when you
13  stated you were not prepared to guarantee the purchase of
14  an airplane?

15          A    No.

16          Q    So your testimony is that from December 31,
17  1998 through the present you have at all times been
18  prepared to guarantee the purchase of an airplane by
19  American MedFlight?

20          A    No.

21               MR.  KING:  Objection.  Mischaracterizes
22  his prior testimony.

23               THE WITNESS:  You asked me in 1998 if I was
24  prepared, and I was.

25
```

1  BY MR. HILL:

2      Q      And I believe the next question I asked you

3  was, did there come a time when you were not prepared to

4  guarantee, and I believe your answer was no, but we'll

5  look at the court reporter's testimony when he

6  transcribes it.

7      A      Well, that's not correct.

8      Q      Tell me what's not correct about it.

9      A      After I was fired I refused to sign on any

10 more notes.

11     Q      So how is American MedFlight going to buy a

12 plane without personal guarantees?

13            MR. KING:  Objection.  Argumentative.

14 BY MR. HILL:

15     Q      Do you understand my question, sir?

16            MR. KING:  No, counselor, he can't.  You

17 have to clarify it.  You started the question with, in

18 the beginning did you personally guarantee?

19            Now you're saying how were they going to

20 buy a plane?

21 BY MR. HILL:

22     Q      Mr. Carstarphen, did you, after December

23 31, 1998, make a proposal that American MedFlight

24 purchase an airplane?

25     A      No.

29

1          Q     So any proposal to that effect that you

2     made was before December 31, 1998?

3          A     Yes.

4          Q     When did you make that proposal?

5          A     I don't know.

6          Q     Was it in writing?

7          A     No.

8          Q     Had you located a plane?

9          A     No.

10         Q     Had you arranged any financing?

11         A     No.

12         Q     So it was just an idea?

13         A     No.

14         Q     Did it go beyond being --

15         A     It was a business decision.

16         Q     All right.  But it was not reduced to

17    writing; is that correct?

18         A     For what purpose?

19         Q     For any purpose.

20         A     No.

21         Q     Tell me then about the conversations that

22    you had to pursue that concept?

23         A     I don't understand the question.

24         Q     Who did you talk to about it?

25         A     Jack Dawson and Rich Milsner.

30

```
 1          Q     Together or sequentially?
 2          A     I don't know.
 3          Q     All right.  What did you say?
 4          A     What did I say?
 5          Q     Yes.
 6          A     Well, I said that when we -- we have a base
 7   in Elko that operates 24/7, and we have a base that
 8   operates in Reno 24/7, you can't do maintenance on the
 9   airplanes, there's no time.  So you need a third
10   airplane.
11          Q     And when was this conversation?
12          A     I don't know.
13          Q     Can you give me a year?
14          A     It was probably when we started the Elko
15   operation.
16          Q     When was that?
17          A     I don't know.  I don't remember.
18          Q     And with whom did you this have
19   conversation?
20          A     I am sure I had it with Jack and Rich.
21          Q     Together?
22          A     I don't know.
23          Q     What did Mr. Dawson say?
24          A     I don't remember.
25          Q     What did Mr. Milsner say?
```

|      |   |                                                            |
|------|---|------------------------------------------------------------|
| 1    | A | I don't remember.                                          |
| 2    | Q | Did it ever come up again?                                 |
| 3    | A | Yes, it came up several times.                             |
| 4    | Q | You can't give me the year when any of                     |
| 5    |   | those conversations came up?                               |
| 6    | A | It was in the time frame when we started                   |
| 7    |   | Elko.                                                       |
| 8    | Q | Well, by 1998 we've got the Elko office                    |
| 9    |   | going?                                                      |
| 10   | A | Yes.                                                       |
| 11   | Q | We see that here in these pages in Exhibit                 |
| 12   |   | 10 what we're talking about.                               |
| 13   | A | So it was prior to that.                                   |
| 14   | Q | Did it ever come up after December 31,                     |
| 15   |   | 1998?                                                      |
| 16   | A | At that point I was fired and out of the                   |
| 17   |   | company.                                                   |
| 18   | Q | So the answer to the question would be no?                 |
| 19   | A | Probably no.                                               |
| 20   | Q | All right.  Let's go to Exhibit 10, please.                |
| 21   |   | Let's go to page 379.  We're going to be going forward in  |
| 22   |   | the binder.                                                |
| 23   |   | Have you ever seen this document before,                   |
| 24   |   | sir?                                                       |
| 25   | A | Probably.                                                  |

32

```
 1          Q     There's writing on these pages.  Do you
 2   recognize it?
 3          A     Uh-huh.
 4          Q     Whose is it?
 5          A     Mine.
 6          Q     When did you put it on there?
 7          A     I have no idea.
 8          Q     Did you receive this document on or about
 9   June 30, 1999?
10          A     Don't know.
11          Q     Do you know how you got it?
12          A     No.
13          Q     These numbers on here, can you tell me what
14   you're trying to do?
15          A     Well, the first one there is the total of
16   the accounts receivable.
17          Q     And just doing the quick math, that number
18   seems to be -- the typed-in number seems to be bigger
19   than the number you've written in.  Are we in agreement
20   on that?
21          A     Yes.
22          Q     What's the difference, can you tell me?
23          A     Offhand, no.
24          Q     Can you tell me why there's a difference.
25          A     No.
```

33

1       Q       Is that your writing that says, do we need?

2       A       No.

3       Q       So it's somebody else's writing?

4       A       Yes.

5       Q       And then there's a line through the

6   1,500,000 number and there's 759,147 written off to the

7   side.  Do you know what that means?

8       A       No.

9       Q       Then continuing down, there's a notation of

10  1,520,000 next to aircraft.  What's that for, do you

11  know?

12      A       No.

13      Q       Let's jump down to under liabilities.  Do

14  you see that?  It says 92,000 RFS.  Do you see that?

15      A       Uh-huh.

16      Q       Is that your writing?

17      A       No.

18      Q       Do you know what that means?

19      A       No.

20      Q       Do you know if on that date AMF owed RFS

21  $92,000 in accounts payable?

22      A       No.

23      Q       Did AMF pay interest for the moneys that

24  were owed to RFS?

25      A       Ask that question again.

34

1    Q    Sure.  During this period of time AMF was

2  indebted to Reno Flying Service, wasn't it?

3    A    Why would it be indebted?

4    Q    In this period of time, June 30, 1999, was

5  AMF paying bills current with Reno Flying Service?

6    A    Well, I don't know, I wasn't there.

7    Q    Well, you were there in June of 1999,

8  weren't you, sir?

9    A    I thought we've covered that.  That's when

10  I was rehired.

11    Q    Right.

12    A    Okay.  Ask your question.

13    Q    Sure.  In this time frame, June of 1999,

14  was AMF paying its bills on an ongoing basis with Reno

15  Flying Service, do you know?

16    A    I believe so.

17    Q    During the period of time that you had been

18  there had there ever been a time when AMF was not able to

19  pay its bills with Reno Flying Service on a current

20  basis?

21    A    There might have been a brief time back in

22  '95.

23    Q    And did AMF pay interest on the money that

24  was owed to RFS?

25    A    I can't recall.

35

```
 1          Q     Can we go to the next page?  Is this your
 2   writing that we see here?
 3          A     Yes.
 4          Q     What are you trying to do, if you recall?
 5          A     I don't recall.
 6          Q     All right.  But that is your writing?
 7          A     Yes.
 8          Q     All right.  Let's go forward now to 369.
 9   Are you with me?
10          A     Uh-huh.
11          Q     There's some writing there.  Is that yours?
12          A     No.
13          Q     Do you know whose it is?
14          A     No.
15          Q     Do you know if you received this document
16   from AMF?
17          A     No.
18          Q     Can you turn to page 375?  It got cut off
19   in the copying process, let me show you mine.
20                I hand you my copy and call your attention
21   on the top of page 375 that there appears to be some sort
22   of a fax header that's partially cut off.
23          A     Uh-huh.
24          Q     Did this document come to you by facsimile,
25   sir?
```

36

1          A     I don't know.   What's the fax number there?

2          Q     Well, 856-5801.   Do you recognize that?

3     That's the outbound fax number.   That's AMF, isn't it?

4          A     Yes.

5          Q     I think we'll come in a minute to some

6     inbound.

7                Is this the kind of financial data that you

8     were requesting in Exhibit 7?

9          A     Yes.

10         Q     Let's go back to 369 for just a moment.

11               We see here that the company's still

12    carrying the loans to the three of you.   Do you see that

13    at the bottom?

14         A     Yes.

15         Q     Let's now go to 364, please.   January 30,

16    2000.   Does yours have a -- this one's a better one.

17               365.   Do you see the fax header cross the

18    top there?   It looks like it was sent to somebody on

19    March 31, 2000.

20         A     Yes.

21         Q     Do you know whether you received this

22    document on or about that date?

23         A     No.

24         Q     Let's go to 359, please.   Are you with me?

25         A     Uh-huh.

37

1      Q     This balance sheet, the financial

2    information of the company, it purports to be dated

3    February 29, 2000; is that right?

4          A     Yes.

5          Q     That's after you were terminated; is that

6    right?

7          A     That's correct.

8          Q     You, in fact, continued to receive this

9    data after you were terminated; isn't that right?

10          A     I believe so.

11          Q     Let's go to 339, please, Mr. Carstarphen.

12   Are you with me?

13          A     Uh-huh.

14          Q     Do you see down here, it looks like that

15   loan to you was repaid before the end of the year 2000?

16          A     It appears so.

17          Q     Do you recall being repaid?

18          A     Yes.  I don't remember the date.

19          Q     Fair enough.  But clearly by the end of

20   2000 you had been repaid?

21          A     Yes.

22          Q     And neither Milsner nor Dawson had; do you

23   see they're still being carried on here?

24          A     Yes.

25          Q     Do you have any reason to doubt that that's

38

```
 1   true?

 2          A     I have no doubt.

 3          Q     Let's go to 329.  This purports to be a

 4   balance sheet and related financial data dated July 31,

 5   2001; do you see that?

 6          A     Yes.

 7          Q     Down here there's some writing.  Is that

 8   yours?

 9          A     Yes.

10          Q     Why did you put that on there?

11          A     I have no idea.

12          Q     In your first session of your deposition

13   you testified that you suffered no harm of any kind

14   whatsoever as a result of the RFS use of the AMF line of

15   credit.  Do you recall that testimony?

16                MR.  KING:  Objection.  Mischaracterizes

17   his prior testimony.

18                MR. HILL:  Thank you.

19   BY MR. HILL:

20          Q     Let me just ask it this way, then.  As you

21   sit here today, do you contend that you suffered any harm

22   whatsoever as a result of the use of the credit line of

23   AMF by Reno Flying?

24          A     Yes.

25          Q     What did you suffer sir?
```

1      A      After this point after five years of

2  discovery I still do not know whether or not Reno Flying

3  Service paid back the money that they stole.  I don't

4  know that they paid the interest.  I have had no

5  accounting.  I've seen no checks.

6          Q      Have you requested them?

7          A      Yes.

8          Q      When?

9          A      I requested it through Mr. Gunderson, I

10  believe.

11          Q      And you understand that that request went

12  unheeded?

13          A      Yes.  I don't know if it's unheeded.  I

14  haven't seen nothing.

15          Q      If Mr. Dawson testifies at trial that RFS

16  repaid all of the money with all of the interest, do you

17  have any basis to refute that?

18          A      No.

19                  MR.  KING:  Objection.  Lack of foundation.

20                  MR. HILL:  Thank you.

21                  MR.  KING:  Calls for a legal conclusion.

22                  MR. HILL:  Thank you.

23  BY MR. HILL:

24          Q      Assuming Mr. Dawson testifies to that

25  effect, and further assuming that to be the truth, have

1    you suffered any harm as the result of the use of the AMF

2    line of credit by Reno Flying Service?

3              A      Yes.

4              Q      Can you articulate it for me?

5              A      Since American MedFlight didn't have that

6    money, and it may have needed it severely at some point,

7    it couldn't tap into that line of credit, and it could

8    have made the company in serious peril.

9              Q      Is it your understanding that AMF ever

10   attempted to utilize that line of credit, but was denied

11   use of that line of credit because it had already been

12   used by Reno Flying Service?

13             A      I don't know that.

14             Q      Any other harm that you can articulate for

15   me today that befell you as a result of that action by

16   Reno Flying Service?

17             A      I felt extremely betrayed.

18             Q      Anything else?

19             A      I think when a partner does something like

20   that without my knowledge I think it's -- I lose a lot of

21   trust.

22             Q      Is it your testimony that you did not know

23   that Reno Flying Service was going to use the line of

24   credit before it in fact did do so?

25             A      I had no knowledge of it, and would never

41

1    have approved it.

2          Q     Fair enough.

3                MR. KING:   Could we take a short break for

4    just a second?

5                MR. HILL:   Okay.   That's fine.

6

7            (A recess was taken at 11:03 a.m.)

8                        -o0o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

1          RENO, NEVADA, WEDNESDAY, APRIL 23, 2008, 11:12 A.M.

2                              -o0o-

3                    MR. HILL:  Let's go back on the record.

4                         EXAMINATION

5                          (Resumed)

6     BY MR. HILL:

7          Q    Let's go to 323.  Once again the copier --

8     let me show you my copy of 323, and direct your attention

9     to the fax header across the top.

10         A    Okay.

11         Q    This is a financial statement dated October

12    31, 2001; is that right?

13         A    Yes.

14         Q    And the fax header across the top seems to

15    indicate that on 11/28/01, which was a Wednesday, at 1623

16    it was faxed to you.  Can you make that out on there?

17         A    Uh-huh.

18         Q    Does that refresh your recollection --

19         A    No.

20         Q    -- whether you did or didn't get that?

21         A    No.

22         Q    So, as you sit here, you're unable to say

23    whether you did or did not get this?

24         A    Well, since it was in my possession, I

25    would assume I did.

43

1        Q     Will you concede that you got it by fax on

2   that date?

3        A     No.

4        Q     Let's go to 312, please.

5              MR.  KING:  Is that the one we just looked

6   at?  What number was that?

7              THE WITNESS:  323.

8   BY MR. HILL:

9        Q     Are you with me on 312, Mr. Carstarphen?

10       A     Yes.

11       Q     There's some writing across the top.  Do

12  you recognize it?

13       A     Yes.

14       Q     Is it yours?

15       A     Yes.

16       Q     Preliminarily, what does that mean, other

17  than --

18       A     It means just what it means.

19       Q     So, this was not final?

20       A     Yes.

21       Q     And how would you have known whether it was

22  final or not?

23       A     I don't know.

24       Q     Would you have had to call someone at

25  American MedFlight to ascertain that?

1        A     Maybe someone called me.   I don't know.

2        Q     You don't recall one way or the other; is

3  that right?

4        A     Ask the question again.

5        Q     Whether you called somebody at AMF or they

6  called so you could ascertain that this was in fact

7  preliminary?

8        A     I have no idea.

9        Q     Let's go to 296, please.   Are you with me?

10        A     Uh-huh.

11        Q     This is a financial statement dated

12  September 30, 2002; is that right?

13        A     Yes.

14        Q     And let me show you -- again I apologize,

15  sir, but on your copy it got cut off.   Let me show you my

16  copy, which has a fax header.   Do you see that?

17        A     Yes.

18        Q     That indicates that on October 24, 2002,

19  that was faxed to you; is that right?

20             MR.   KING:   Lack of foundation.

21             MR. HILL:   That's what it says, doesn't it?

22             THE WITNESS:   Yes.

23  BY MR. HILL:

24        Q     Do you have any reason to dispute that?

25        A     No.

45

1       Q      Does this refresh your recollection about

2    whether or not as of October 24, 2002, you had this

3    document in your possession?

4       A      No.

5       Q      Did there ever come a time when these

6    documents were given to you in bulk by American

7    MedFlight?

8              Do you understand the question?

9       A      Ask that again.

10      Q      Okay.  What we've been going over here, as

11   best I can tell from the fax headers, these have been

12   sent at various times.  And you don't recall getting them

13   at the various times.

14             And what I'd like to know is, and I'm

15   trying to refresh your recollection here, did there come

16   a time when somebody gave you a big bundle of financial

17   data from American MedFlight?

18      A      I don't believe so.

19      Q      Let's go to page 290.  Again, let me show

20   you my copy because I can tell already yours is cut off.

21   This has that same fax header on it, doesn't it?

22      A      Uh-huh.

23      Q      Different date.  This says 11/11/02.  Can

24   you turn to page 292, please?

25             MR.  KING:  Could I take a look at yours

46

1   for a second here?

2              MR. HILL:  Certainly.  You know what

3   happens is, is the copier reduces it by 5%, so you get

4   parts of it cut off.

5              THE WITNESS:  I don't have 292.  The page

6   is upside down here.

7              MR. HILL:  Well, at least it's got a fax

8   header on it.  At least that copy has a fax header, and

9   it appears to be the 3 of some sequence, doesn't it?

10             THE WITNESS:  Yeah.

11  BY MR. HILL:

12        Q    On here we see aircraft maintenance labor,

13  aircraft maintenance parts for Reno and Elko, don't we?

14        A    Yes.

15        Q    And you understood that to be AMF getting

16  labor and materials from Reno Flying Service?

17        A    Yes.

18        Q    Did you ever go out and price any of the

19  competitors for Reno Flying Service?

20        A    No.

21        Q    Well, let me break the question down.

22             You never went out and priced for labor,

23  competitive with Reno Flying Service.  My statement's

24  correct?

25        A    For maintenance?

1          Q     Bad question.  Let me start over.

2                Did you ever go out and price any of the

3    competitors of Reno Flying Service in relation to

4    maintenance charges?

5          A     I don't know if I went out and got them,

6    but I know what they are.

7          Q     Is it your understanding that Reno Flying

8    Service charged AMF a rate different than Reno Flying

9    Service charged other customers?

10         A     No.

11         Q     Same rate it charged other customers?

12         A     I believe so.

13         Q     And is that rate competitive in the

14   community, do you know?

15         A     I'd say it was comparable.

16         Q     Does that mean there are some higher, some

17   lower?

18         A     Yes.

19         Q     And as to parts, same thing, comparable?

20         A     Yes.

21         Q     What about the aircraft rental?  Did you

22   ever go out and price renting from other companies?

23         A     I don't believe so.

24         Q     Do you know whether the rental prices

25   charged by Reno Flying Service to AMF were competitive

48

1    with what you could have gotten elsewhere?

2         A    I don't think competitive is the word;

3    comparable.

4         Q    Fair enough.  That's fine.

5              So about the same as somebody else would

6    have charged?

7         A    Yes.

8         Q    Now, were you here yesterday when there was

9    discussion about wet leases of airplanes that we had with

10   Mr. Proctor?

11        A    I don't remember, but I know the

12   terminology.

13        Q    What is a wet lease?

14        A    It means you're renting the aircraft, the

15   pilot and the fuel is all included.

16        Q    And does that include maintenance?

17        A    It includes maintenance.

18        Q    Like Hertz, out the door, bumper-to-bumper,

19   and all you do is fill it up?  Or do you even fill it up

20   when you bring it back?

21        A    No, I mean wet means that the fuel is

22   included.  You don't have to put fuel in.

23        Q    If AMF had purchased planes, it would have

24   had to pay maintenance on the planes?

25        A    Correct.

1          Q        And it would have had to put fuel in the

2     planes?

3          A        Correct.

4          Q        And it would have had to have personnel fly

5     the planes?

6          A        Correct.

7          Q        Whereas if it's leasing from Reno Flying

8     Service, those costs are included?

9          A        That's correct.

10         Q        Let me take you back to the top of 210.

11    I'll ask your counsel to please bear with me --

12                  Well, I take that back.  Let's go to 292.

13                  I think that this page is 292.  It's got a

14    fax of 11/11/02 on it.  Do you see that?

15         A        Uh-huh.

16         Q        And it appears to have been again sent to

17    you.

18         A        Correct.

19         Q        Now let's go to 284 and finish up with

20    Exhibit 10.

21                  Is there anything on this December 31, 2002

22    financial statement that you've come to learn is

23    erroneous?

24         A        No.

25         Q        Let's go to Exhibit 11.  I'll ask you to go

50

1    to page 406. And once again your fax header has been cut

2    off. That one has a fax header on it, doesn't it?

3         A    Yeah.

4         Q    Can you read what the fax header says?

5         A    1/08/03.

6         Q    And what's the date of the document itself,

7    the handwritten date?

8         A    1/8/03.

9         Q    Same day?

10        A    Yes.

11        Q    Is this what was typically referred to as a

12   Monday Report?

13        A    Yes.

14        Q    Do you know whose handwriting this is?

15        A    No, I don't.

16        Q    Do you know, did you receive these by fax

17   on or about the date that they were created?

18        A    I have no idea.

19        Q    Do you know how this document came to be in

20   your possession?

21        A    No.

22        Q    But do you concede that it was in your

23   possession and that you provided it to Gunderson?

24        A    Yes.

25             MR. KING: I'm perplexed as to how they

SILVER STATE COURT REPORTERS (775) 329-6323

```
 1   managed to get something lining up perfectly and yet the
 2   fax isn't on top.
 3               MR. HILL:  I can have my copying girl come
 4   in and try to explain it to you.
 5   BY MR. HILL:
 6          Q    Let's to go the last document in Exhibit
 7   11, please.
 8               Are you with me?  There is CAR 0542, Mr.
 9   Carstarphen?
10          A    Yes.
11          Q    Is this the Monday Report for December 31,
12   1999?
13          A    It appears to be so.
14          Q    Do you see this AP RFS down there?
15          A    Uh-huh.
16          Q    What does that mean to you?
17          A    Accounts payable.
18          Q    You had just been terminated at American
19   MedFlight as of the date of this document; is that right?
20               MR.  KING:  Objection as to the
21   characterization of "terminated."
22               THE WITNESS:  I don't know.
23   BY MR. HILL:
24          Q    Do you understand this entry here AP to RFS
25   to mean that as of this date American MedFlight owes Reno
```

52

1    Flying Service 80,024.20?

2         A    Yes.

3         Q    Do you know if that debt had been accrued

4    during the time when you were running the company?

5         A    No.

6         Q    It had not been?

7         A    I think this is just a monthly expense.

8         Q    The 80,000 is a monthly expense?

9         A    Yes.

10        Q    Can you turn to the next page, please?

11        A    What page is that?

12        Q    That would be 541.

13        A    Uh-huh.

14        Q    Dated January 24, 2000.  It says AP to RFS,

15   63,000.  Is that again just a monthly expense?

16        A    Yes, that's what I would assume.

17        Q    Let's go to the next page, 540.  Same

18   number on the AP to RFS.  Do you see that?

19        A    Uh-huh.

20        Q    Yes?

21        A    Yes.

22        Q    Thank you.  And let's go to page 539.  This

23   is the February 7, 2000 --

24        A    Uh-huh.

25        Q    -- Monday Report?

53

1        And we're now into the next month.  Do you

2    know if AMF paid that in full?

3        A    No.

4        Q    Is this a different 63,000 or the same, do

5    you think?

6        A    It's probably the same.

7        Q    Let's go to 538.  That shows 35,140 as of

8    February 28.  Do you know, was AMF paying and then

9    incurring these, or has it incurred these obligations and

10   paying them down?

11       Do you understand the distinction?

12       A    No.

13       Q    We see the first page, it's at 80,000.

14   Then it goes down to 63,000.  Then it drops down to

15   35,000.  Then it drops down to 24,000.  Then it drops to

16   14.

17       Had these been paid in full and these are

18   new charges we're seeing, or are we seeing a sum being

19   paid down?

20       A    I can't answer that.  But I think it would

21   be new ones.  I think it would be paid down to zero and

22   then it would be incurred new.

23       Q    You understood --

24       MR.  KING:  Let me ask a question.  Did you

25   generate these?

SILVER STATE COURT REPORTERS (775) 329-6323

54

1              THE WITNESS:  No.

2   BY MR. HILL:

3        Q    Do you know who did?

4        A    Was probably Linda Reed, but I can't say

5   for sure.

6        Q    Let's go back to Exhibit 7 for just a

7   minute.  If you have it in mind, that's your request for

8   the copies to be sent to you?

9        A    Yes.

10       Q    What did you want the documents for?

11       A    What did I want them for?

12       Q    Yes.

13       A    I wanted to see what the financial

14  condition of the company was.

15       Q    Well, hadn't you been getting the financial

16  data that we've talked about in Exhibit 10 all along?

17       A    I had been getting some of it, but the

18  stuff I requested I was not getting.

19       Q    So why did you want it?  Just to find --

20            MR.  KING:  Objection.  Asked and answered.

21  BY MR. HILL:

22       Q    Just on account of because?

23       A    Yeah.

24       Q    Fair enough.  Had you already planned to

25  sue Milsner by the time that you sent that request?

55

```
 1          A    No.

 2          Q    When did you decide you were going to sue

 3   Milsner?

 4          A    When I couldn't get the information.

 5          Q    Bear with me, I don't know if I asked the

 6   question.

 7               Did you ever go out and try to get bids

 8   from other insurance brokers for AMF?

 9          A    No.

10          Q    Why not?

11          A    I don't know how to answer that.

12          Q    Well, you have insurance for American Home

13   Companion?

14          A    Yes.

15          Q    Who's that through?

16          A    Heffernan Insurance.

17          Q    Can you spell that?

18          A    No.

19          Q    Are they in the local book?

20          A    No.

21          Q    Where are they?

22          A    They're in the Bay Area somewhere.

23          Q    How did you find them?

24          A    I don't remember.

25          Q    Are there many companies that will write
```

56

1    insurance for a business like American Home Companion, do

2    you know?

3         A    Heffernan is a broker.

4         Q    I understand that.

5         A    How many -- I don't know.

6         Q    You go to Heffernan and then he goes out

7    and tries to place your business --

8         A    That's correct

9         Q    -- with insurers?

10         A    That's correct.

11         Q    And he gets paid a commission by the --

12    well, how does he get paid, do you know?

13         A    I assume he gets a commission.

14         Q    Who pays him that?

15         A    I do.

16         Q    You pay him, or you pay the insurance

17    company and they pay him?

18         A    I pay the broker and the broker pays the

19    insurance company.

20         Q    And is it your understanding that he puts

21    his commission on top of what the insurance company

22    quotes?

23         A    I would assume that to be the case.

24         Q    But you don't know?

25         A    No.

1       Q       When you had your charter business,

2   Professional Air Charter, I think --

3       A       Correct.

4       Q       -- did you have insurance?

5       A       Yes.

6       Q       Who was that insurance through?

7       A       It might have been Southwest Aviation, but

8   I can't be sure.

9       Q       Was it a difficult process to get the

10  insurance?

11      A       All insurance is difficult.

12      Q       You just call them up and say, I need to

13  get insurance for this and they went out and placed it?

14      A       Yes.

15      Q       And did you ever call -- you said

16  Southwest?

17      A       I think it's Southwest.

18      Q       They're out there and they are a broker

19  form aviation insurance?

20      A       Correct.

21      Q       When you were the president of the AMF, did

22  you call them up and ask them for a quote?

23      A       No.

24      Q       Why not?

25      A       I don't know why not.

58

1        Q      Do you think that Milsner has overcharged

2   on the insurance that AMF has paid for?

3        A      I don't know the answer to that.

4        Q      Did you ever tell anybody that the ESOP

5   paid Milsner too much money for his stock?

6        A      Did I ever tell anybody?

7        Q      Yes.

8        A      I don't believe so.

9        Q      And is it your testimony that you were

10  denied -- that as of the date of your request, Exhibit 7,

11  you had not been provided copies of tax returns from 1993

12  forward?

13              If you need to look at Exhibit 7, feel

14  free.  That's your demand.

15       A      Okay.  Which one are you referring to here?

16       Q      Well, the first line that you request, copy

17  of income tax return 1993 to present, and signed by

18  original officer signing the return.

19              Is it your testimony that you had not been

20  provided income tax returns for American MedFlight from

21  1993 up until 2002?

22       A      No.  But I didn't have any that were

23  signed.

24       Q      Have you ever gotten signed copies, even in

25  discovery?

1     A     No, not to my knowledge.

2     Q     When you sign the tax returns for American

3  Home Companion, do you sign the copy that goes into your

4  file?

5     A     Yes.

6     Q     And the same thing for your 1040s, you sign

7  the copy that you keep in the file?

8     A     Yes.

9     Q     Do you know, did AMF even have copies that

10  were signed?

11     A     I don't know.

12     Q     Had you been provided income tax returns up

13  until 2002?

14     A     I believe so.

15     Q     All of them, just unsigned?

16     A     Yes, I believe so.

17     Q     Copy of financial statements, 1993 to

18  present, and signed by president and CFO.

19           Had you been denied financial statements

20  from 1993 up until October of 2002?

21     A     I don't believe so.

22     Q     So you think you have them?

23     A     I think I do.

24     Q     Now, in 1995 there was a meeting of, I

25  think it was a board of directors, that resulted in a

1   provision being executed about doing business with

2   Olympian or Milsner's agency.   Do you recall that?

3          A     Yes.

4          Q     I'm referring to what we were calling

5   yesterday the unauthorized transaction.   Do you

6   understand?

7          A     Yes.

8          Q     You signed checks at AMF that went to Reno

9   Flying Service, didn't you?

10         A     Yes.

11         Q     And did you sign the checks that paid

12  Milsner's agency?

13         A     Probably.

14         Q     Did that indicate your approval of those

15  transactions?

16         A     No.

17         Q     You disapproved of those transactions?

18         A     Which transactions are you referring to?

19         Q     The ones you signed the checks for.

20         A     I mean, I don't know which checks I signed

21  and which ones I didn't.

22         Q     Was the protocol described in the board of

23  directors minutes that we just discussed -- do you need

24  to see it?

25         A     No, I know what it says.

61

1      Q      Was that ever complied with?

2             MR.  KING:  I'd like to know what you're

3   talking about.  What are you talking about?

4             MR. HILL:  The second minutes to the board

5   of directors meeting; isn't that when it occurred?

6             THE WITNESS:  I don't know.

7             MR. HILL:  Let's see if we can find it.

8   BY MR. HILL:

9      Q      It's 33.  Are you with me?

10     A      Uh-huh.

11     Q      Let's go to page 47.  These are minutes,

12  the third minutes, minutes of the third meeting of the

13  board of directors of American MedFlight, Inc.; is that

14  right?

15     A      Uh-huh.

16     Q      You prepared these?

17     A      I believe I did.

18     Q      And did the meeting occur on February 9,

19  1995?

20     A      Yes.

21     Q      Let's go to the next page.  Up at the top

22  of the page, do you see where it says, now, therefore, be

23  it resolved --

24     A      Huh-uh.

25     Q      -- that any business, contractual or

62

1    financial dealings with Olympian General Contractors,

2    Inc., Professional Air Charter, Reno Flying Service,

3    Inc., and Richard L. Milsner, Inc., including future

4    interests of the directors shall be approved by the board

5    of directors, and any contracts, agreements or financial

6    payments in any amount shall be signed by the president

7    and a disinterested party to the contractual agreement or

8    financial payment.

9              You prepared that; is that right?

10         A    Yes.

11         Q    Was that protocol followed?

12              MR.  KING:  You're talking what time?

13              MR. HILL:  From 1995 forward.

14              THE WITNESS:  No.

15   BY MR. HILL:

16         Q    Elko AMF owned two planes, right?

17         A    Correct.

18         Q    How old are they now?

19         A    Close to 30 years.

20         Q    Are planes like cars, that the older they

21   get, the more maintenance they have to have?

22         A    Probably.

23         Q    Are you prepared today to guarantee the

24   purchase of any planes by AMF?

25         A    Today?

63

1          Q      Yes.

2          A      I don't know how to answer that right now.

3          Q      Fair enough.

4                 Did Dawson ever tell you that he tried to

5    get quotes from other insurance agencies?

6          A      I don't believe so.

7          Q      Has there been any problem with any of the

8    coverage provided by Milsner's office?  I mean that's not

9    a good question, let me ask it this way.

10                Has AMF ever had to make a claim on any

11   insurance policy, that you're aware of?

12         A      I'm not aware of any.

13         Q      Is insurance required by the FAA for AMF,

14   do you know?

15         A      I don't believe so.

16         Q      Does the airport require that AMF maintain

17   insurance?

18         A      I don't believe so.

19         Q      Do any of AMF's customers require

20   insurance?

21         A      Washoe Med may have.  I don't know.

22         Q      Now, if I understand correctly you in 1998

23   took the position that AMF should retire Mr. Dawson's

24   stock rather than the stock be sold to Milsner?

25         A      Correct.

64

```
 1            MR.   KING:   Objection to "retired."   Do you

 2   mean redeemed?

 3   BY MR. HILL:

 4        Q     Do you understand the terms to be the same,

 5   retire, redeem?

 6        A     Yes.

 7        Q     Did AMF have the cash to make the down

 8   payment?

 9        A     Yes.

10        Q     Where?

11        A     In the bank.

12        Q     And the subject came up for discussion at a

13   meeting; is that right?

14        A     Say again?

15        Q     The prospect -- well, let me ask it this

16   way.

17              Was there a meeting of the three of you

18   where the issue was discussed whether to retire/redeem

19   the stock or Dawson sell it to Milsner?

20        A     Yes.

21        Q     And you were there?

22        A     I was there.

23        Q     Milsner was there?

24        A     Yes.

25        Q     Dawson was there?
```

1        A     Yes.

2        Q     And the issue was discussed?

3        A     Yes.

4        Q     What did Dawson say?

5        A     I don't think he said anything.

6        Q     What did Milsner say?

7        A     Milsner told me that the company couldn't

8   afford $5,000 a month.

9        Q     And what did you say?

10       A     I said it could easily afford $5,000 a

11  month.

12       Q     Was AMF paying all of its bills current at

13  that time?

14       A     I believe so.

15       Q     Were you prepared to invest anymore money

16  in AMF at that time?

17       A     What do you mean invest anymore money?

18       Q     What part of "were you prepared to invest

19  anymore in AMF at that time" do you not understand, sir?

20            MR.  KING:  Objection.  Argumentative.  I

21  don't understand it.

22            THE WITNESS:  Why would I want to put more

23  money into AMF, for what reason?

24  BY MR. HILL:

25       Q     So the answer is you were not willing to

66

1   invest anymore money --

2          A     No, that's not true.

3                MR.  KING:  Objection. Mischaracterizes his

4   testimony.

5   BY MR. HILL:

6          Q     Were you willing to invest anymore money in

7   AMF at that --

8          A     For what?

9          Q     For any reason.

10         A     I would be willing to put more money in

11  there, but I don't see any reason to.

12         Q     At that time?

13         A     At that time.

14         Q     Because everything was fine, it was paying

15  all of its bills, and it had cash in the bank?

16         A     I would say so.  I'd have to go back and

17  look at the financial statements to be sure.

18         Q     Do we need to go back into Exhibit 10?

19               MR. KING:  Yeah, let's do that, but let's

20  take a break.

21               MR. HILL:  I'm just about done here.  I'd

22  like to try to finish up by noon.  Is that good for you,

23  Mr. Carstarphen?

24               THE WITNESS:  That's fine.

25

```
 1   BY MR. HILL:

 2        Q     Let's go to page 390, it's way at the back

 3   in Exhibit 10.  Are you with me?

 4        A     Uh-huh.

 5        Q     This purports to be the balance sheet as of

 6   December 31, 1998, and there's some writing over on the

 7   side.  Do you see that?

 8        A     No.  Am I on the right one?

 9        Q     Are you on 390?  It's cut off up here.  Do

10   you see that?

11        A     Okay.

12        Q     What does that say.  Does that say "final"?

13        A     Maybe.

14        Q     Is that your writing?

15        A     No.

16        Q     What do you understand to be the balance in

17   the bank account on that date?

18        A     A negative 19,000.

19        Q     Was that the general circumstance of AMF on

20   the date that you were terminated, do you know?

21        A     I don't know.

22        Q     If that were the case then, if this is

23   correct at least as of December 31, 1998, AMF didn't have

24   the money in the bank to make the down payment to Dawson,

25   did it?
```

68

1              A       Yes, it did.

2                      MR.  KING:  Object --

3                      THE WITNESS:  This was due to being

4      prepaying expenses for year-end tax purposes.

5      BY MR. HILL:

6              Q       Is that something AMF did every year?

7              A       Yes.

8              Q       What do you think your shares in the

9      company are worth today?

10                     MR. KING:  Objection.

11     BY MR. HILL:

12             Q       Mr. Carstarphen, do you have on opinion as

13     to what your stock in AMF is worth today?

14             A       I have a general idea.

15             Q       And that would be?

16             A       Maybe about 400,000.

17             Q       The issues that you raise in your

18     complaint, have they affected the value of your stock, in

19     your opinion?

20             A       Yes.

21             Q       Adversely?

22             A       Adversely.

23             Q       Do you contend that any of the invoices

24     submitted by Reno Flying Service to AMF were called

25     phantom work, phantom flights, anything of that kind?

69

1    A    I don't have any knowledge to that.

2    Q    There was testimony yesterday that Milsner

3  was paid $94,000 for having guaranteed some bank loans.

4  Were you here for that testimony?

5    A    Uh-huh.

6    Q    Yes?

7    A    Yes.

8    Q    Thank you.

9         Do you have any knowledge about the

10  circumstances or the reasons why that $94,000 was paid?

11   A    No, I do not.  As a follow up to that, I

12  mean, I signed on all -- probably a million and a half

13  dollars worth of notes, and I never got $94,000.

14   Q    And how long did you guarantee?

15   A    Rephrase that question.

16   Q    How long was your guarantee in place?

17   A    From 1995 until '98.  And longer, actually.

18   Q    Through when?

19   A    I don't know, because it continued on the

20  airplanes after '98.

21   Q    Did Milsner continue on as a guarantor

22  after you ceased to be guarantor on these accounts?

23   A    Rephrase that.

24   Q    Your guarantees ceased to be in effect;

25  isn't that correct?

70

```
1            A      No.

2            Q      They're still in today?

3            A      No, they're not in today, because they

4     refinanced the airplanes.

5            Q      Is that the refinance in 2002?

6            A      I don't know when the refinance occurred.

7     That's approximately the time.

8            Q      So, as of the date that those planes were

9     refinanced, you were relieved of your personal

10    guarantees?

11           A      That's correct.

12           Q      You've never paid anybody anywhere any

13    money on any guarantee that you made of American

14    MedFlight, did you?

15           A      Say again.

16           Q      Have you ever paid anybody anywhere any

17    money as a result of any guarantee that you made of

18    American MedFlight?

19           A      No.

20           Q      Milsner continued to guarantee obligations

21    of American MedFlight after those planes were refinanced,

22    didn't he?

23                  MR.  KING:  Objection.  Lack of foundation.

24    BY MR. HILL:

25           Q      Do you know?
```

71

1          A      Yes.

2          Q      And the answer is?

3          A      Yes, he did.

4          Q      So you had your guarantees up for a

5     particular amount of money for a particular period of

6     time?

7          A      Yes.

8          Q      And Milsner has had his guarantees up for

9     particular amounts for periods of time?

10         A      Yes.

11               MR. HILL:  I have one set of documents

12    that I need to go over.

13               My preference would be, if you want to take

14    a break right now for five minutes, come back, and I've

15    got about a half hour left to go.

16               MR. KING:  Let's go to lunch.

17         (The lunch recess was taken at 11:55 a.m.)

18                              -o0o-

19

20

21

22

23

24

25

72

1      RENO, NEVADA, WEDNESDAY, APRIL 23, 2008, 1:13 P.M.

2                              -o0o-

3

4                            EXAMINATION

5                             (Resumed)

6      BY MR. HILL:

7          Q     Mr. Carstarphen, were there any answers

8      that you gave me this morning that you'd like to change

9      at this time?

10         A     Yes, in reference to this Exhibit 7 --

11         Q     Okay.

12         A     -- the first two items here, I think I'd

13     want to change what I said.

14               Back in October 7 of '02 when I wrote this,

15     I did not have enough financial information to know what

16     was going on with the company; especially when I found

17     out about the $140,000 that was stolen from the company.

18     I wanted to get more information, if there was other

19     moneys that was taken from the company.

20               So you asked me different bits and pieces

21     of this here, but I did not have enough overall knowledge

22     of what was going on in the company since I was gone for

23     approximately three years to know what was going on

24     there.

25         Q     The $140,000 that was stolen from the

1    company, what was that?

2         A    That was on the line of credit that Reno

3    Flying Service took.

4         Q    You know that that was paid back?

5         A    No, I do not.

6         Q    You don't?

7         A    No.  I have never received any documents.

8    I've never seen any checks.  I've never seen any records

9    of any kind that tell me that that money was paid back

10   with or without interest.

11        Q    Your testimony is that you've never seen

12   any documents indicating that the interest was paid back?

13        A    No.

14        Q    You went to lunch with Mr. King today?

15        A    Yes.

16        Q    Did you talk about changing your answer

17   during the lunch break?

18        A    Yes.

19        Q    Did Mr. King tell you what to say?

20        A    No.

21             MR. HILL:   Let's talk about Exhibit 52 for

22   a few minutes.

23                            (Exhibit 52 was marked for

24                             identification.)

25

74

1    BY MR. HILL:

2          Q    Do you have Exhibit 52, Mr. Carstarphen?

3          A    Uh-huh.

4          Q    The first page.  Is this a memo that you

5    sent to Mr. Gunderson in January of 2004?

6          A    It appears to be so.

7          Q    First paragraph, you say, there's some

8    places we need to look for money taken from the company

9    as follows.  Bonuses --

10         A    Can I get this out of here?  Are we done

11   with this?

12         Q    For now.  Sure.

13              Bonuses paid to Jack Dawson or Rich Milsner

14   from 1998 to present.

15              Did you ever find that there were any

16   bonuses paid to Mr. Dawson?

17         A    No.

18         Q    Did you ever find that there were any

19   bonuses paid to Mr. Milsner?

20         A    No

21         Q    Then you say, as a note 1998 is when I no

22   longer had access to financial information.

23              That's not true, is it?

24         A    I didn't have complete financial

25   information.

1        Q      Okay.

2        A      I didn't have enough information to make

3   good decisions on what was there.

4               And even the financial information that I

5   had was basically -- a lot of it said "preliminary" on

6   it.

7        Q      Then the next item you have.  Expense

8   accounts paid to J.D. and R.M. from 1998 to present.

9               Did you find that Mr. Milsner had an

10  expense account at AMF?

11       A      No.

12       Q      Did Mr. Dawson have an expense account?

13       A      Yes.

14       Q      Did you review it?

15       A      I never got the records.

16       Q      So you don't know whether there was

17  anything improper on there or not, do you?

18       A      No, I do not.

19       Q      Credit card use for personal expenses --

20  continuing with your memo here.

21               Credit card use for personal expenses by

22  J.D. and R.M. from 1998 to present.

23               Have you ever ascertained that Mr. Milsner

24  has a credit card for AMF?

25       A      No.

76

```
 1          Q      What about Mr. Dawson?

 2          A      Yes.

 3          Q      And do you believe that Mr. Dawson misused

 4   his credit card?

 5          A      I have no proof one way or the other.

 6          Q      I have conformation of personal use --

 7          A      Where are you at?

 8          Q      I'm just continuing where I was, sir.

 9          A      Okay.

10          Q      I have conformation of personal use of

11   credit cards by J.D. for meals and other personal

12   expenses.

13                 Did you have such documentation, sir?

14          A      I believe so.  I think I've seen it.  I

15   don't have it here.

16          Q      Did you produce it to Gunderson?

17                 MR.  KING:  And just so we're clear,

18   counselor, it says I have "conformation," and the next

19   time you changed it from "conformation" to

20   "documentation."

21                 MR. HILL:  Did I?  I'm sorry.

22                 MR. KING:  No problem.

23   BY MR. HILL:

24          Q      It says "conformation."  Is that right,

25   sir?
```

77

1          A      Uh-huh.

2          Q      Did you produce those to Mr. Gunderson?

3          A      I don't know if I did.

4          Q      Are the personal use of AMF credit cards by

5    Mr. Dawson something that you think you're entitled to

6    compensation for in this case?

7          A      Not really.

8          Q      Jack Dawson's truck payment is either being

9    paid by RFS and/or AMF, I don't know, but I know either

10   or both are making these payments.

11                Did you ever pursue that issue, sir?

12         A      No.

13         Q      Now you say, continuing down, skip the line

14   about the horse trailer, you say, Jack Dawson is getting

15   a salary from RFS and/or AMF.  Jack Dawson is in the

16   office only 15% of the time and half of that time is

17   spent with RFS.

18                What's your source of information on that

19   point, sir, the 15%?

20         A      Just personal observance.

21         Q      Now, was Mr. Dawson working -- was he

22   performing any duties for AMF in December of -- prior to

23   December of 1998?

24         A      Yes.

25         Q      What was he doing?

78

1          A       All things of the general management, just

2   like I was.

3          Q       So he was also a -- you just referred to

4   yourself as a general manager, is that what you felt your

5   position was?

6          A       Well, I was president the official title,

7   but --

8          Q       Duties you were general manager?

9          A       Yes.

10         Q       Was he an equal general manager?

11         A       Yes.

12         Q       And put in as much time as you did at AMF?

13         A       Probably not equal.

14         Q       More or less?

15         A       Probably less, because he was dealing with

16  Reno Flying Service, too.

17         Q       Can you quantity for me the time that

18  Dawson was putting in prior to December of 1998?

19         A       No.

20         Q       Now, when you departed in December of 1998

21  up until April of 1999, who took over the things that you

22  had been doing?

23         A       I presume Jack did.

24         Q       And then when you came back in April of

25  1999, from that time up until December of 1999, was

79

1   Dawson still there?

2          A    Yes.

3          Q    Was he still working full time at AMF?

4          A    I don't know if it was full time.  He was

5   still doing with Reno Flying Service, too.

6          Q    Was he still doing all the things with AMF

7   that he had been doing before?

8          A    Probably.

9          Q    Do you know?

10         A    I said "probably."

11         Q    And then after you departed, did Mr. Dawson

12  assume your roles --

13         A    Which times?

14         Q    -- at AMF?

15         A    Yes.

16              MR. KING:  Just for the record --

17              MR. HILL:  Certainly.

18              MR. KING:  -- I'm assuming this was -- at

19  one point in time to my understanding that Jack Dawson

20  was a defendant, and he's not a defendant anymore.  So

21  just so we're clear, these were probably generated for

22  Mark Gunderson in contemplation of him being a defendant.

23              MR. HILL:  Well, the speaking objections

24  are not appropriate.

25              MR.  KING:  And I'm just making the record

80

1   clear that his status has exchanged.

2                MR. HILL:  That's fine.

3   BY MR. HILL:

4        Q    Let's go to the next page, please, Mr.

5   Carstarphen, Exhibit 52.

6                This purports to be a memo from you to --

7   well who's it to, do you recall?

8        A    Well, let me read it.

9                I believe this was a memo to Mark.

10       Q    Were you here yesterday for the discussion

11  about your tax returns?

12       A    My tax return?

13       Q    Yes.

14       A    Yes.

15       Q    Do you understand that you improperly

16  completed your tax returns for 1995 and 1996?

17       A    I don't know that.

18       Q    Have you ever heard of the at-risk rule

19  before yesterday?

20       A    I believe I have, but I don't think I knew

21  about it back then.

22       Q    What do you understand the at-risk rule to

23  be, sir?

24       A    I'm not very clear on it.

25       Q    Do you understand, as you sit here today,

1  that if you paid taxes in 2003 on profit at American

2  MedFlight is because you improperly deducted losses prior

3  to this time?

4          A    No, I do not.

5          Q    Let's go to the next page, please.

6               Is this a memo to Gunderson in November of

7  2003?

8          A    It appears to be so.

9          Q    In June 6, 2003 we estimated $83,000 of

10 income from American MedFlight for 2002 from the

11 financial statement I had and I filed my tax return

12 paying $21,404 for American MedFlight.

13              Had you done that?  Is that true?

14         A    Yes.  One year it was -- I had to come

15 out-of-pocket for $32,000, I believe.

16         Q    When was that?

17         A    I don't know what year it was.

18              It was when American MedFlight ran out of

19 depreciation on the airplanes and then it showed a big

20 profit.  And there was no distribution to me to make the

21 taxes.  I had to go to the bank and borrow the money to

22 pay the taxes.

23         Q    Had there been any distributions to Mr.

24 Milsner at that time?

25         A    At what time?

1      Q      At the time that you just referred to, sir.

2      A      I don't know.

3      Q      You don't contend that Milsner got

4   distributions and you didn't, do you?

5      A      I have no knowledge one way or the other.

6             MR.   KING:   And at what point in time are

7   we referring?

8             MR. HILL:   The point in time that he was

9   referring to in his answer.   We don't know when that was.

10   BY MR. HILL:

11     Q      Can you turn to the next page, sir?

12            The top of the page purports to be an

13   e-mail from Mr. Gunderson to you on November 7, 2004.

14            Do you see that?

15     A      Uh-huh.

16     Q      And then the bottom part of that appears to

17   be an e-mail from you to Proctor and Gunderson.   Do you

18   see that?

19     A      Uh-huh.

20     Q      Let's go to the next page, please.

21            Do you see the reference to page 40 right

22   above where your name's typed?

23     A      Yes.

24     Q      Will you read that sentence out loud for

25   me, please?

1           A      There is a considerable difference between
2     controlling interest basis and minority interest basis.
3           Q      You've got an exclamation point after that;
4     is that right?
5           A      Uh-huh.
6           Q      Did you type this?
7           A      I probably did.
8           Q      What is the difference -- well, what's the
9     context of his --
10          A      I don't know.  I don't know what page 40
11    is.
12          Q      Let me see if I can help you.
13                 Take a look up here, and it says now to the
14    ESOP valuation report.  Does that help?
15          A      Well, I know it's one of the evaluation
16    reports, but I don't know what page 40 is referencing to.
17          Q      Well, is there a considerable difference
18    between controlling interest basis and minority interest
19    basis, Mr. Carstarphen, do you know?
20          A      No.
21          Q      So what did you mean when you put that
22    sentence there?
23          A      I have no idea.  I don't know what's on
24    page 40.
25          Q      We don't have it today.  So, maybe we'll

84

1    see if we can have it for trial.

2                    You had received a 2004 ESOP appraisal of

3    the company, hadn't you, as of November 6, 2004?

4            A    I would assume that I had.  I don't know.

5    But I would assume that I would have it.  I'm referencing

6    it.  I must have seen it.

7            Q    Let's go to the next page, please.

8                    This purports to be an e-mail from

9    Carstarphen to Gunderson and Proctor.  Do you recall

10   sending this on March 4, 2006?

11           A    No.

12           Q    I'm sorry?

13           A    No.

14           Q    Did you send him an e-mail that says,

15   attached is my revision to the income tax analysis?

16           A    Repeat that question.  I was reading.

17   Sorry.

18           Q    The first sentence you say, attached is my

19   revision to the income tax analysis.

20           A    Okay.

21           Q    Did you provide them with an income tax

22   analysis?

23           A    Boy, I don't know.  I don't know what this

24   is.

25           Q    Then you go on and you say -- or this

1    e-mail goes on and says, this shows an approximate net

2    worth of AMF of $12 million, or my one-third share of

3    $4 million, which is very close to Jim's numbers.

4                Did you, on March 4, 2006, believe that

5    your one-third of American MedFlight was worth

6    $4 million, sir?

7         A    I don't know.  I don't remember this.

8         Q    As you sit here today, does that strike you

9    as a reasonable value for your one-third interest in

10   American MedFlight as of March 2006?

11        A    I can't answer that.  I don't know where

12   the 12 million came from.

13        Q    So you don't recognize this as your work?

14        A    Well, obviously it came from me.

15        Q    Your e-mail is cessna185@sbcglobal.net?

16        A    That's correct.  It was.

17        Q    No longer?

18        A    No longer.

19        Q    When did that change?

20        A    I don't know.  I stopped using SBC probably

21   a couple years ago and went with Charter.

22        Q    Well, at least that was your e-mail address

23   in March of 2006; is that right?

24        A    I would assume so.

25        Q    Let's go to the next page.

86

1          Do you recognize your signature?

2     A    Yes.

3     Q    Is this a letter you sent to Mr. Gunderson

4  on April 15, 2003?

5     A    It must be.

6     Q    And it references that, again, you're

7  having to pay 27,400 to the IRS for the year 2002.  Did

8  you, in fact, make that payment, sir?

9     A    Yes, I did.

10    Q    Let's go to the next page, please.

11         Do you recognize your handwriting?

12    A    Uh-huh.

13    Q    That's a yes?

14    A    Yes.

15    Q    Is this something that you authored on or

16  about February 27, 2003?

17    A    Yes.

18    Q    You say, I got this by certified mail

19  2/26/03.

20         Do you know what you're referring to there?

21    A    No.

22    Q    Let's go to the next page for just a

23  moment, please.

24         Does this look familiar?  We talked about

25  this this morning, didn't we, this page we see here --

87

```
 1           A     Yes.

 2           Q     -- the balance sheet dated December 31,

 3   2002 with the receipt stamp?

 4           A     Uh-huh.

 5           Q     That was on Exhibit 10, wasn't it?  The

 6   first page of Exhibit 10.  Do you need to see it?

 7           A     Yeah.

 8           Q     Isn't that the same document?

 9           A     Yes.

10           Q     So are we in agreement, then, that you

11   received the December 31, 2002 balance sheet and other

12   financial data on February 26, 2003?

13                 MR.  KING:  Objection.  Compound question.

14                 THE WITNESS:  I don't know that these are

15   tied together.  I can't remember.

16   BY MR. HILL:

17           Q     You don't remember what you're referring to

18   here in the first sentence of this memo dated December

19   27, 2003?

20           A     No.

21           Q     Then you go and you say in this last

22   paragraph of this memo to Mr. Gunderson, that is Mark G.,

23   isn't it Mark Gunderson?

24           A     Yes.

25           Q     AMF has annual revenues of $3.1 million.  I
```

1    believe RFS annual revenues are approximately 1.5

2    million, of which $768,581.32 came from AMF.

3              What is your source of information here

4    that RFS has annual revenues of approximately $1.5

5    million?

6         A    Well, I used to work there.

7         Q    You worked at Reno Flying Service?

8         A    It's all the same place, it's all the same

9    office.

10        Q    So when did you --

11        A    Even though I was not an officer or

12   stockholder of Reno Flying Service, I knew what Reno

13   Flying Service was doing.

14        Q    And that was in what year, sir?

15        A    Well, I would have got that knowledge

16   before I was fired in '99.

17        Q    So your subsequent source of knowledge in

18   2003 would have been what?

19        A    That basically the company hadn't grown or

20   it hadn't shrunk, and so I estimated it being around the

21   same as it was in '98 and '99

22        Q    Did you have information that you based

23   this estimate on, or were you just guessing?

24        A    No, I'm sure I saw financial statements of

25   Reno Flying at times.

89

1          Q      Really?

2          A      Yeah.  Why not?

3          Q      How would they have come to you, sir?

4          A      Well, they were just in the office.

5          Q      Did you keep copies?

6          A      No.

7          Q      Who showed them to you?

8          A      I don't know if anybody -- I mean, they

9    were just there.

10         Q      Well, let's go to the next-to-the-last page

11   of Exhibit 52, please.

12                Is this a memo you sent to Mr. Gunderson on

13   March 18, 2004?

14         A      It appears to be so.

15         Q      Let's go down to item number 6, please.

16                Let me read it for you.

17                The loans were made for RFS using AMF

18   $300,000 line of credit of which this $300,000 line of

19   credit was part of the total $1.7 million personal

20   guarantee of mine.

21                Did I read that correctly?

22         A      You said 1.7, it's 1.75.

23         Q      Thank you.

24                Then you go on and you say, there are also

25   records showing RFS paid to AMF the interest to NSB owed

 1   by RFS on money borrowed by AMF so AMF could pay the

 2   interest to NSB.  Hence, interest charges came from RFS

 3   to AMF and then to NSB.

 4             Did I read that correctly?

 5        A    Yes.

 6        Q    Aren't you saying here that RFS paid

 7   interest to NSB on the $300,000 line of credit?

 8        A    That's what I was told.

 9        Q    But you say there are also records there.

10   Isn't that what you said?

11        A    Yes.

12        Q    Let's go to the last page.

13             Is this a memo you sent to Mark Gunderson

14   on March 1, 2004?

15        A    Uh-huh.

16        Q    Last paragraph.  You say, I think we should

17   subpoena R.L. Milsner Insurance, Inc. records and request

18   the same documents that I furnished, plus I would like to

19   have copies of all current insurance certificates for

20   AMF.

21             Do you know, was a subpoena ever issued to

22   R.L. Milsner Insurance, Inc. in this case?

23        A    I don't believe so.

24        Q    What are you referring to when you say,

25   request the same documents that I furnished?

91

1          A      I'm not sure.

2          Q      What documents had you furnished?

3          A      I furnished all kind of documents in this

4    case.

5          Q      Then you go and you say, with these

6    insurance certificates we could get an insurance quote

7    and compare it to the current income tax return and see

8    if Rich is overcharging for the insurance.  All these

9    years I've not known if AMF is getting a fair price in

10   insurance.

11                Did Mr. Gunderson ever follow up on that

12   avenue of request, sir, to the best of your knowledge?

13                MR.  KING:  Objection.  Lack of foundation.

14   BY MR. HILL:

15         Q      Now, you told me this morning that you

16   believe your stock is worth $400,000?

17         A      Yes.

18         Q      Has anyone ever offered you more than that

19   for the stock?

20         A      No.

21         Q      If someone were to offer you more than

22   $400,000 -- well, let me back up.

23                Do you think the stock should be worth more

24   than $400,000?

25         A      Yes.

1      Q    How much do you think it should be worth?

2      A    Well, before the ESOP sale it was worth 1.7

3   or 1.8 million.

4      Q    And to what do you attribute the

5   difference?

6      A    It was the dilution of my stock by the sale

7   wherein AMF took on the debt of Rich Milsner.

8      Q    Anything else?

9           MR.  KING:  Could you clarify that?

10          THE WITNESS:  Anything else what?

11  BY MR. HILL:

12     Q    Any other factors that caused the drop in

13  the value that you've just referred to?

14     A    No, it dropped in one day.

15     Q    Have there been any questions that I asked

16  you this afternoon that you'd like to change your answer

17  to?

18     A    No.

19          MR. HILL:  That's all that I have then.

20          MR.  KING:  Thank you.

21          MR. HILL:  Thank you very much.  Appreciate

22  your time.

23          (The deposition was adjourned at 1:40 p.m.)

24                        -o0o-

25

93

1        I, JOHN CARSTARPHEN, deponent herein, do hereby

2   certify and declare under penalty of perjury, the within

3   and foregoing transcription to be my deposition in said

4   action, subject to any corrections I have heretofore

5   submitted, and that I have read, corrected, and do hereby

6   affix my signature to said deposition.

7

8                                    _____

9                                    John Carstarphen

10

11

12

13

14

15

16   STATE OF NEVADA        )
                            )     ss:
17   COUNTY OF WASHOE       )

18

19   Subscribed and sworn to before me this_____day of

20   _____, 2008 .

21

22

23                                    _____
                                      Notary Public

24

25

94

1                       CERTIFICATE OF REPORTER

2

    STATE OF NEVADA        )
3                          )        ss:
    COUNTY OF WASHOE       )

4

5           I, JERRY J. SILVEN, a duly commissioned Notary
    Public, Washoe County, State of Nevada, do hereby
6   certify:

7           That I reported the deposition of the witness,
    JOHN CARSTARPHEN, commencing on Wednesday, April 23,
8   2008, at the hour of 10:13 a.m.;

9           That prior to being examined, the witness was by
    me first duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth; that I thereafter
    transcribed my said shorthand notes into typewriting and
11  that the typewritten transcript of said deposition is a
    complete, true and accurate record of testimony provided
12  by the witness at said time.

13          I further certify (1) that I am not a relative or
    employee of an attorney or counsel of any of the parties,
14  nor a relative or employee of any attorney or counsel
    involved in said action, nor a person financially
15  interested in the action, and (2) that pursuant to NRCP
    30 (e), transcript review by the witness was not
16  requested.

17          IN WITNESS WHEREOF, I have hereunto set my hand
    in my office in the County of Washoe, State of Nevada,
18  this  7th   day of    may          ,  2008.

19

20

21                              _____
                                Jerry J. Silven, CCR #55
22

23

24

25

# EXHIBIT 7

# EXHIBIT 7

March 18, 2004

MEMO TO:   Mark Gunderson

This is in response to your letter of March 10, 2004 refer to Plaintiff's Supplemental Requests for Production of Documents as follows:

After a year and two requests, we still have not gotten any important information from them?

Item 1 – NSB refused their line of credit because their in-house financial statements did not balance to the income tax returns.

Item 2 – This is probably true.

Item 3 – There are bank records of the money transfers to RFS either by check or verbal order to make these transfers back and forth to RFS.

Item 4 – There would be records from NSB refusing to continue the line of credit.

Item 5 – The four invoices you reference Oct thru Nov 1998. These same invoices exist for each and every month to the present, because I have seen most of them. They are lying about the documents and why would I have these documents?

Item 6 – The loans were made to RFS using AMF $300,000 Line of Credit of which this $300,000 Line of Credit was part of the total $1.75 million personal guarantee of mine. There are also records showing RFS paid to AMF the interest to NSB owed by RFS on money borrowed from AMF so AMF could pay the interest to NSB. Hence interest charges came from RFS to AMF and then to NSB.

John Carstarphen

# EXHIBIT 8

# EXHIBIT 8

MEETING OF THE BOARD OF DIRECTORS

AMERICAN MEDFLIGHT, INC.

-oOo-



Monday, December 5, 2005

Reno Flying Service

485 South Rock Boulevard, Hanger B

Reno, Nevada  89502

Reported by:                    CINDY LEE BROWN, CCR #486

| Page 2 |
|---|

1    A P P E A R A N C E S
2
3    JACK DAWSON, President
4    RICHARD L. MILSNER
5    JOHN CARSTARPHEN
6    WOODBURN AND WEDGE
     Attorneys at Law
7    BY JOHN P. FOWLER
     6100 Neil Road, Suite 500
8    Reno, NV 89505
9    CASEY D. BAKER
     Attorney at Law
10   652 Forest Street
     Reno, NV 89509
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 3 |
|---|

1    RENO, NEVADA; MONDAY, DECEMBER 5, 2005; 10:06 A.M.
2              -oOo-
3         MR. DAWSON: Okay. I'm going to call to order
4    American Medflight special meeting of the stockholders.
5    Wrong notes there? Stockholders. In attendance, Richard
6    Milsner, John Carstarphen. I've got to take notes myself so
7    -- John Fowler.
8         MR. FOWLER: For the record, I'll announce that
9    I represent Mr. Milsner.
10        MR. DAWSON: Casey Baker.
11        MR. BAKER: Also for the record, I'm here on
12   Richard Hill's behalf. We represent Reno Flying Service.
13        MR. DAWSON: And myself, Jack Dawson.
14        There are no previous minutes to be read or
15   approved. There will be no treasurer's report, and there is
16   no old business to be conducted. In the notice of the
17   meeting, the content of this meeting was, for new business
18   was delivered, and we'll start with the first item here.
19        MR. MILSNER: Excuse me, Jack. Let me hand out
20   this stuff now so we can look at it for a minute. I'm
21   handing out information concerning ESOP, E-S-O-P, and loans
22   in relationship to the ESOP material to John Carstarphen, to
23   John Fowler. I didn't know you were coming.
24        MR. BAKER: That's okay.
25        MR. MILSNER: And Jack.

| Page 4 |
|---|

1         MR. FOWLER: We can share. We've got it.
2         MR. DAWSON: Okay.
3         MR. MILSNER: Okay, Jack. Sorry to interrupt,
4    but I wanted to get everybody to start looking at that.
5         MR. DAWSON: Okay. The first item on the
6    agenda, I'm going to read from the notice, In light of the
7    cost of maintaining the existing aircraft or airplanes, it
8    says, the potential disposition of airplanes and the
9    acquisition of new ones with or without personal guarantees.
10   So it's open for discussion.
11        MR. MILSNER: I keep hearing from Jim Brown and
12   Jack Dawson that we're on very thin ice as to the continued
13   operation of the Cheyennes. And we've been talking about
14   changes for two, three years, maybe, and the difficulties
15   keep mounting. And the big problem is we can't get
16   replacement parts, so it looks like we have to start
17   considering King Air 90 -- what's the -- E90?
18        MR. DAWSON: I think --
19        MR. MILSNER: C90?
20        MR. DAWSON: Yeah.
21        MR. MILSNER: Which, you know, run maybe around
22   a million two to a million three. Maybe the existing
23   Cheyennes are worth 600. We don't know how long we can keep
24   this going, John, so we need to put this on notice so that we
25   can come up with a workable plan one way or the other before

| Page 5 |
|---|

1    it gets anymore serious than it is today. So I guess what
2    we're trying to figure out is if you -- what you feel your
3    role is, if you want to continue to try to see that this
4    company continues to grow or thrive.
5         MR. CARSTARPHEN: Well, from what I talked with
6    Jim too is that the C90s have the same kind of parts problems
7    as the Cheyennes. Maybe not as severe but -- don't you
8    think?
9         MR. DAWSON: Jim Brown hasn't indicated that to
10   me. I specifically asked him that question, if we were going
11   to end up in the same problem with lack of parts situation.
12   He didn't think it was going to be the same problem that
13   exists with Piper. We keep running into longer and longer
14   delay periods in getting parts, whereas they're still
15   building King Airs and supporting them, so he didn't think it
16   was going to be as bad.
17        MR. CARSTARPHEN: Well, he had a King Air in
18   here for maintenance that was here for about six weeks with a
19   part problem, wasn't it?
20        MR. DAWSON: Are you talking about the King Air
21   200?
22        MR. CARSTARPHEN: I don't know which one.
23        MR. DAWSON: The only one that I know that he
24   worked on was a King Air 200 that was hangared here, and it
25   was here all of the time. But I'm not familiar with any

## Page 6

1 problems that he had at that point. But regardless of
2 whether it's a King Air or not -- and we keep sticking -- we
3 keep looking at King Airs because we can't find another
4 solution.
5        MR. CARSTARPHEN: I don't think there is any
6 good solutions out there.
7        MR. DAWSON: I don't think there is another
8 choice.
9        MR. CARSTARPHEN: Well, the other one is the
10 Pilatus.
11        MR. DAWSON: The Pilatus, as you know, is about
12 $2.7 million per copy.
13        MR. CARSTARPHEN: Yeah.
14        MR. DAWSON: And it's a single-engine airplane.
15 You can't do single-engine airplanes in the State of Nevada,
16 so that's not even a choice. We might be able to push it and
17 try to get it passed, but then you're still faced with $2.7
18 million. I don't think that's a viable solution. I don't
19 think we can support that financially.
20        MR. CARSTARPHEN: I don't think so, but it's a
21 choice.
22        MR. DAWSON: Yeah.
23        MR. CARSTARPHEN: There is not much out there
24 to do, you know.
25        MR. DAWSON: No. The King Air is the only --

## Page 7

1        MR. CARSTARPHEN: Conquest.
2        MR. DAWSON: You know, I haven't looked at
3 Conquest because I've heard that we're going to end up with
4 the same problem as the Piper in the sense that they no
5 longer build them, and so, therefore, they have no reason to
6 support them. On the other hand, like I said in the
7 beginning, Beechcraft is still building King Airs, so I would
8 imagine they would continue to support them as long as
9 they're building them, maybe not as well as they should, but
10 somewhat.
11        MR. MILSNER: We're really just trying to make
12 you aware, John, we know you're already aware of it, but it's
13 getting more serious. So we're probably going to, probably
14 in the next 60 to 90 days, have to make a decision one way or
15 the other what we're going to do before we start losing
16 flights and having problems we can't resolve.
17        MR. DAWSON: Do you have any ideas, John?
18        MR. CARSTARPHEN: I've talked to Jim at fairly
19 great length, you know, over the past years, and I'm not
20 disagreeing with what you're saying. I mean, what he's
21 telling me now, that as one airplane comes in for
22 maintenance, he's tearing the parts off to put on the other
23 airplane that's coming out of maintenance.
24        MR. DAWSON: Yes, that happens.
25        MR. CARSTARPHEN: And that's not a very good

## Page 8

1 situation.
2        MR. DAWSON: Do you have any suggestions?
3        MR. CARSTARPHEN: The only that one I've come
4 up with is to find a wrecked Cheyenne and just buy the
5 airplane.
6        MR. DAWSON: We've considered that too. I'm
7 not sure that's a solution, though, on the basis that you're
8 only buying one of each part. And so, for instance, one of
9 the problems we have -- we wanted to paint the aircraft. One
10 of the problems we have is we need to rebuild some flaps.
11 Well, I'm sorry, we need to replace some flaps. We can't
12 even rebuild them.
13        And we can't get any flaps. They were more
14 than a year out, an estimate to get them delivered. So if we
15 bought an airplane for parts, we'd have one set of flaps, and
16 we need two sets of flaps, just as an example. So I'm not
17 sure that's -- we've considered it. I'm not sure that's a
18 solution, though.
19        MR. MILSNER: I want to make sure everybody
20 knew about the problem. We're going to talk some more,
21 welcome any input you have, call us any time, and then we're
22 going to have to deal with this. So we just cannot keep
23 going this way. We've been limping along five years now.
24        MR. DAWSON: Oh, yeah.
25        MR. MILSNER: It's the same problem.

## Page 9

1        MR. DAWSON: And it's just getting worse.
2        MR. MILSNER: Okay.
3        MR. DAWSON: However, part of this, as this
4 question here, has not only to do with the fact that we need
5 to do something, but we need to know whether you're willing
6 to sign on the loans if we do buy some new airplanes because,
7 as you know, in the past you withdrew your personal guarantee
8 on the loans.
9        MR. CARSTARPHEN: Uh-huh.
10        MR. MILSNER: I'd like to -- I'm glad you asked
11 the question. I want to give John a chance to think about
12 the answer because the rest of this material might help him
13 to decide one way or the other as to what he would do about
14 your question.
15        MR. DAWSON: I understand. Let me open up --
16 I'll continue to leave that question on the table then for
17 further discussion, and I'll go to number two on the agenda.
18 And, you're right, it might have some bearing on question
19 number one.
20        Number two on the agenda is the sale of stock
21 of the corporation by Richard Milsner and/or John Carstarphen
22 to an Employee Stock Ownership Plan. Discussion?
23        MR. MILSNER: I'll open that up because I'm the
24 one that's done most of the research on this. John, in your
25 package, I'm going to give you the page that -- you have a

Page 10

1  copy of this full appraisal.
2          MR. CARSTARPHEN: Yes.
3          MR. MILSNER: You were given that. The
4  principal page, in my opinion, is page 40, which tells you
5  what, in this appraiser's opinion, is what the company is
6  worth. The ESOP rules are very strict. You have to go to an
7  ESOP-approved appraiser, and he is the one that decides all
8  the information about the company. And he did extensive
9  research, and he came up with these numbers.
10         MR. CARSTARPHEN: Okay. This comes right from
11 that appraisal?
12         MR. MILSNER: I took it right out of the
13 appraisal, page 40, so you already have this. Rather than
14 make you page through it, I thought I'd just pull it out.
15 This is the one you'd end up looking at.
16         MR. CARSTARPHEN: I've already seen this.
17         MR. DAWSON: You've already seen that one,
18 right?
19         MR. CARSTARPHEN: Yes.
20         MR. MILSNER: Now I'm going to step back one
21 more step. Jack has run a profitable company, as you know,
22 and we have a good problem now. We have a tax problem. We
23 either pay -- we are now a C corp. In order to do an ESOP,
24 the best way to do an ESOP, really the only way, is to be a C
25 corp. We were always an S corp. So we opted for a C corp.

Page 11

1  So we no longer have individual --
2          MR. CARSTARPHEN: When did the C corp come into
3  effect?
4          MR. MILSNER: I don't know the exact date. But
5  you call Bob Daoro, and he'll give you the exact date. Let
6  me give you his phone number.
7          MR. CARSTARPHEN: I already have his phone
8  number.
9          MR. MILSNER: Call Daoro and he can tell you.
10         MR. CARSTARPHEN: When is it effective?
11         MR. DAWSON: This year, 2005 taxes.
12         MR. MILSNER: Daoro advises us that we have a
13 tax problem for this year. Now, one rule that is available
14 to us, I think you know about this rule, I think he, Daoro,
15 explained it to you, is a one time -- there is a term that is
16 used. I believe it's a dividend, stockholder dividend, and
17 it's approximately seven percent of the stock's value. In
18 this year, '05, that would equate to $420,000 tax reduction
19 of our taxable income.
20         MR. DAWSON: Approximately.
21         MR. MILSNER: We're talking approximately here.
22 Therefore, I've made the decision to go ahead and sell to the
23 ESOP a minimum of 30 percent of my stock, and it will
24 probably be more because, if you look at this page, the
25 amount of stock you sell determines the price you receive as

Page 12

1  to whether or not you get the majority or the minority price.
2          All these things tie together with the
3  airplanes. That's why I asked you to hold off on your
4  answer. So enough of me. Let me tell you what would happen
5  if you decided to sell some stock to the ESOP plan, which is
6  in place now for AMF.
7          I took the appraiser's numbers times the
8  valuation for your interest, and it came to -- and these are
9  approximate figures. Don't hold me to them because you'd
10 have to have your own accountant do this, or you can call
11 Manke direct. They're the experts. And I'm going to defer
12 all of these numbers and information to Kyle Coltman,
13 C-O-L-T-M-A-N, I think it is, at Manke, M-A-N-K-E, in San
14 Francisco.
15         So I took from these figures your number, and I
16 took a hundred percent sale. It would come to 1,782,216. We
17 don't have that much money available in the ESOP. We do have
18 some cash that's been contributed.
19         Now I've got to defer to Jack. We haven't made
20 our contribution for '05, right?
21         MR. DAWSON: No, we have not.
22         MR. MILSNER: Right. Now, that will be a good
23 contribution. I'm going to estimate that will be another
24 somewhere --
25         MR. CARSTARPHEN: You made an '04 contribution.

Page 13

1          MR. MILSNER: We made an '04, so the '05
2  contribution will be somewhere around, somewhere between 150
3  and $250,000.
4          MR. DAWSON: If I may interrupt?
5          MR. MILSNER: Yeah.
6          MR. DAWSON: Do you know what it was last year?
7          MR. MILSNER: I have the total. All I have is
8  the -- yeah, I think I have that.
9          MR. DAWSON: Well, let me point out that it
10 will be approximately the same amount because it's based on
11 payroll.
12         MR. MILSNER: Okay.
13         MR. CARSTARPHEN: Well, the first year was 177.
14         MR. DAWSON: It's going to be approximately --
15 last year, I believe, was 185, as a guess.
16         MR. MILSNER: See what I have here, is I have
17 the total --
18         MR. DAWSON: Divide that by two, 182,000 a year
19 per year, is what it averaged.
20         MR. MILSNER: So it would be another 182,000,
21 which would bring it up to about 400 -- no. $584,000.
22         MR. DAWSON: 540 --
23         MR. MILSNER: Let's round it off to 545. You
24 would be entitled to, among other monies, one-third of that.
25 Okay? And if you comply with the ESOP rules and regs, which

Page 14

1 you and I have talked about, it's a tax exempt transaction.
2 And if you hold onto the US stocks and bonds, it is not a
3 taxable event.
4          MR. CARSTARPHEN: I understand.
5          MR. MILSNER: Okay. So my plan would be --
6 now, I have to remind you I'm going to do this because I
7 don't want to pay these taxes this year. And I'm 63. I
8 think now is a good time to start this and let the new guys
9 take over and run with the company.
10          So I did some math, but it's wrong because I
11 forgot about the $180,000 contribution in '05. So your
12 numbers would be about $181,000 in immediate cash, one-third
13 of an ESOP loan, which I also gave you here two loan offers
14 made by two separate lenders, ESOP-approved lenders.
15          So it would be a combination of those two for
16 cash, and then it would be a note that you may or may not
17 choose to take back. I'm going to take a note back so that I
18 can avail of the higher estimated price.
19          One other reminder, in order to do this and get
20 the tax advantage that we would receive in '05, it must be
21 done before 12/30/05. So I'm going to make sure this week it
22 gets well into process, which is why I rushed this meeting.
23          Now, the -- one reminder, if you read the terms
24 of the Merrill Lynch and the Diablo Bank loan offers, I have
25 to guarantee individually. It says at the bottom, Guarantor,

Page 15

1 Richard Milsner. Both of them have this requirement. I'm
2 stating here today at the meeting I'm unwilling to do that if
3 there is litigation pending after 12/30/05.
4          MR. CARSTARPHEN: You're unwilling.
5          MR. MILSNER: I'm unwilling to do that, right.
6          Okay. So that ESOP has been in place now for a
7 couple of years. This is probably the third year. I'm
8 choosing this year to go ahead with it. We will need to know
9 your decision in the next 10 days or we'll have to take that
10 as a no because the paperwork has to be put into place. This
11 is a very complex set of rules, the ESOP rules, and you have
12 to do them right or you don't get any of the tax advantages
13 that are offered.
14          MR. CARSTARPHEN: How much are they offering?
15 What are the terms of this?
16          MR. MILSNER: This is a one -- I'm willing to
17 guarantee $1 million. They're up to two million. They're $1
18 million. Merrill Lynch is one; Diablo Bank is two million.
19 But I'm only going to go for a guarantee of one million.
20 It's a little expensive, and they tie you up pretty good.
21          So I'd rather go ahead and do that for some
22 additional monies. But you can't spend them until the
23 borrower, which is the ESOP, which ultimately is American
24 Medflight, repays the loan. As they repay the loan, the
25 monies are then released or the stocks would be released to

Page 16

1 the seller. They're going to hold that as collateral.
2          All ESOP lenders, I've checked with a number of
3 them, not all of them will do this. Union Bank declined. I
4 think there was one other bank I went to that declined, but I
5 figured two offers was sufficient to get it done.
6          So can I ask you to go ahead -- what we've
7 asked in the past, and we don't always get a response, so i
8 want to put on the record today that I'm going to take a
9 failure to respond as a no after 10 days. So that would make
10 it --
11          MR. FOWLER: The 15th.
12          MR. MILSNER: The 15th of December. Okay?
13 Everybody understand that?
14          MR. DAWSON: Further discussion? Questions?
15          MR. CARSTARPHEN: Well, I want to read these,
16 but I know you were looking in to getting these -- some bank
17 financing for the ESOP. And I understand ESOP because I have
18 an ESOP on my corporation, so I understand the ESOP pretty
19 well.
20          MR. MILSNER: You probably understand it better
21 than I do. But then you understand an ESOP loan, it's very
22 simple. The ESOP borrows the money. The collateral, you
23 must purchase US stocks or bonds. It's very restricted.
24          MR. CARSTARPHEN: Yeah, I understand that.
25          MR. MILSNER: The lender's going to keep that

Page 17

1 as collateral, and they want to guarantee a personal
2 guarantee. We do not have to do this. This is optional.
3 However, I'm going to go ahead and do it. I will, more than
4 likely, do the loan as well as the internal financing. Okay.
5          MR. CARSTARPHEN: So we have basically got two
6 things on the table. We've got the loan, and we have the
7 other $540,000 in cash?
8          MR. MILSNER: Yeah. It's the exact amount of
9 money in the ESOP account as of today, before the '05
10 contribution, is 364,924.51. If you opt to sell your stock,
11 one-third of that will inure to you.
12          MR. DAWSON: If he sells all of the stock.
13          MR. MILSNER: Well, he has to sell at least
14 one-third of his stock, as I understand it, to make a -- to
15 qualify for an ESOP transaction. That's always been my
16 understanding. I think that's spelled out in the appraisal.
17          MR. CARSTARPHEN: That's correct.
18          MR. MILSNER: Yeah. One other point that's
19 important. I don't think it's going to make a change. But
20 in order to qualify, and that's the reason we have to move on
21 this, is in order to do this, there has to be a current
22 appraisal. So they'll have to come out -- I don't know if
23 they'll have to come and see you again, but this Tony, the
24 appraiser --
25          MR. DAWSON: Weinress.

Page 18

1    MR. MILSNER: M.O. Weinress, W-E-I-N-R-E-S-S,
2  will have to do a new current appraisal to move forward in
3  '05, or any year. I think we have said everything about the
4  ESOP there is to say.
5    MR. DAWSON: So there are -- I'm just going to
6  recap here then, the corporation has the money put into the
7  ESOT, which is the trust --
8    MR. MILSNER: Right.
9    MR. DAWSON: -- available for the purchase of
10  stock. We have two offers of a loan: one for one million,
11  one for two million, of which you are willing to guarantee
12  the $1 million loan. And the third portion -- I'm sorry.
13    MR. CARSTARPHEN: Let me clarify something.
14  So, in other words, you want to use the Merrill Lynch one and
15  not this one.
16    MR. MILSNER: No. I'll take the one that's the
17  best. Theirs looked the best because the fee was lower, 2500
18  versus the fee that they disclosed here, which was an initial
19  fee of $10,000, plus out-of-pocket expenses, which, to me, is
20  an open item. And that 10,000 is for two, so I'm going to
21  assume it's 5,000 if we borrow one million.
22    MR. FOWLER: Can I just ask, which proposal is
23  that?
24    MR. MILSNER: That's the Diablo Bank --
25    MR. FOWLER: Okay.

Page 19

1    MR. MILSNER: -- proposal. From what I can
2  see, they want another crack at this, so they're going to
3  meet with me again this week to see if they can approve this.
4  But right now Merrill Lynch is the better of the two because
5  their fee was 2500.
6    MR. CARSTARPHEN: Okay.
7    MR. MILSNER: I need to clarify for the record
8  that I'm unwilling to guarantee these --
9    MR. DAWSON: I'm going to bring that up right
10  now.
11    MR. MILSNER: Well, you've been awful slow.
12    MR. DAWSON: Well, you guys interrupted me,
13  but that's quite all right. So back to the second point,
14  was there are two loans available: one for $1 million, the
15  other for $2 million. You are willing to guarantee $1
16  million of either loan as long as the existing lawsuit is
17  dropped.
18    MR. MILSNER: Certainly.
19    MR. DAWSON: And the third method is, refresh
20  my memory, a note, personal note.
21    MR. MILSNER: Correct. In order then, most
22  ESOPs don't have the money initially to get the sellers
23  funded, so it's common practice to take a note back. The way
24  this would work is this, as I'm explained by Manke, and that
25  is, if you promise to take a note back of your controlling

Page 20

1  interest within two years, you can then get the hire price.
2  Otherwise, you take the minority price. The ESOP gets
3  control one way and doesn't get it the other way.
4    MR. CARSTARPHEN: What was the majority and the
5  minority? This was the minority one, wasn't it?
6    MR. MILSNER: It's pretty well spelled out,
7  page 40.
8    MR. CARSTARPHEN: These are the two prices, the
9  62 and the 53.
10    MR. MILSNER: Right. I think it's important
11  for the record that this corporation has gone to, I believe
12  it's four brokers, to try and sell outside of the ESOP its
13  stock. One is a local Reno broker, who I think you knew
14  better than I do.
15    MR. CARSTARPHEN: Corporate Investments.
16    MR. MILSNER: Corporate Investments. Then
17  there was a Dick Seifert out of Los Angeles with a large
18  firm, division or referral of Merrill Lynch. Then Merrill
19  Lynch had another big hitter firm in Chicago, who we went to.
20  You may or may not know about them, but they visited us, got
21  all of the information and were unable to come up with
22  somebody.
23    And then the largest broker in the country
24  represented by Kelly Klute was also unsuccessful in selling
25  this company. So this marketability issue of this company is

Page 21

1  a huge issue.
2    Now, there is another option, I'm glad you
3  brought that up, and that would be in your, some of your
4  correspondence, John, legal correspondence, you asked for,
5  through your attorney, to terminate the corporation and cash
6  out its assets. I don't know if you remember that. It was a
7  number nine or a number 10. So I would put that on the table
8  as well.
9    We could -- Jack could go ahead and come up
10  with an estimate of the value of the company based on its
11  assets. That would be equity in the airplanes, cash, other
12  equipment, whatever, and we could definitely cash you out for
13  that. And you could, of course, take it to your CPA or
14  whoever, appraiser or all of the above, and determine the
15  correctness of that appraisal.
16    But there is nobody else I can go to sell it
17  to. If you have somebody, I would suggest highly that you
18  bring it up today. Otherwise, we're dealt the ESOP or the
19  cash-out, terminate the corporation. I personally don't
20  particularly want to do that, but I'll honor that if that's
21  what you want to do. We'll just divide it by one-third, and
22  you can take it. So that's also on the table.
23    If you wanted some idea of that number, Jack,
24  could you put something informally together on that figuring
25  the equity in the planes, the cash and any other assets of

Page 22

1  the company and tell John so he can make a decision? I think
2  he's entitled to that.
3          MR. DAWSON: I agree. I can't do it here,
4  though.
5          MR. MILSNER: Well, no. We're waiting.
6     So if you want that from Jack, then I would
7  suggest you ask Jack for it, and that would be another
8  alternative for you to sell out the company. Otherwise, I go
9  with the sale. We go ahead and litigate, and we move on. We
10 can't just stay in limbo, though.
11    Okay. Anything else on the, on that item on
12 the agenda?
13         MR. DAWSON: No, that takes care of number two.
14 We're up to -- any further discussion?
15         MR. CARSTARPHEN: No, I think that's pretty
16 clear.
17         MR. DAWSON: Okay. This has to do -- number
18 three on the agenda is the renewal of the bank line of credit
19 with Nevada State Bank. We currently have a line of credit
20 of $350,000, an operating line of credit, which we just
21 renewed, I believe -- no, it's pending, I believe.
22         MR. MILSNER: It was in the last 30 days. That
23 lady got a lot of information from me, and I think it's in
24 the process of being renewed. I haven't seen the renewal
25 documents, but I would say they're coming shortly.

Page 23

1          MR. DAWSON: Okay. So that was for discussion,
2  open for discussion.
3          MR. MILSNER: I'll jump into that. Again, this
4  company can't just stand still, in my opinion. It's either
5  got to continue to grow and expand or I don't think it will
6  succeed. Now, it needs credit in addition to its cash.
7     I don't think I, John, want to keep going with
8  this standalone guarantees much longer. I went ahead with
9  them now so we could have a meeting and I could think it
10 through and Jack could decide on the airplanes, et cetera.
11 But I'm pretty well putting us on notice that I'm not going
12 to have an outside stockholder obtaining benefits with no
13 risk. I'm not sure it's equitable. It's what we agreed on
14 initially, and now all of the sudden we've changed direction.
15    So you can think about that. But I don't
16 really plan to keep the line in place much longer under the
17 present conditions. Now --
18         MR. CARSTARPHEN: Is there an existing line of
19 credit right now?
20         MR. MILSNER: Yeah.
21         MR. CARSTARPHEN: That you're guaranteeing?
22         MR. MILSNER: Sure. It's the same one. And I
23 just renewed it, so it will be good for -- I don't know how
24 long those renewals are good for.
25         MR. DAWSON: One year.

Page 24

1          MR. MILSNER: Yeah. I gave her all of the
2  information with the understanding I'd talk it over with Jack
3  and counsel here and decide when I would stop doing that.
4  You see, based on your decisions, then I'll know if I should
5  be -- what I should be doing, so that's why I can certainly
6  wait. And then based on your decisions, I can go ahead and
7  act on the line of credit.
8     That also ties in with going back to the
9  existing airplanes. I may have to do the same thing with the
10 existing airplanes and withdraw my guarantee there. That
11 will probably result in the bank calling the loan and us
12 having to deal with new airplanes one way or the other, but,
13 again, I'm not going to go on this basis much longer.
14    I think I should give a date today, probably,
15 well, at the end of the year because it will tie into this.
16 That way I can decide if we're going to go ahead and sell the
17 existing planes, and I can pay off those loans.
18         MR. CARSTARPHEN: You're going to have a huge
19 recaptured cost on the taxes if we sell those.
20         MR. MILSNER: I'm aware of that. Our
21 accountant's explained that. You bet. Actually, you used
22 the pronoun you. I think you're going to find it's you and
23 I.
24         MR. CARSTARPHEN: Us.
25         MR. DAWSON: Maybe we.

Page 25

1          MR. MILSNER: Maybe a we there and not a you.
2  I forgot to mention that, but that was an important point.
3          MR. DAWSON: Any further discussion on that
4  subject?
5     We'll move on then to item number four on the
6  agenda, is the amendment to the bylaws of the company to
7  exempt sales to the ESOP from the requirements of section
8  1.14 and 8.1 to offer the shares to the corporation and other
9  stockholders first.
10    As I understand it, we -- there is a 60-day
11 waiting period. You have to offer it to the corporation
12 first, then you have to offer it to the individual
13 stockholders second. And that no one jumping up and taking
14 that, then we could sell it to the ESOP. Of course, we don't
15 have time to wait for that with the tax situation. So --
16         MR. FOWLER: If I might insert?
17         MR. DAWSON: Please.
18         MR. FOWLER: I drafted a simple one-sentence
19 change to both of those bylaws, and I left it in my
20 briefcase. Let me just go out and get it in the office, and
21 I'll be right back.
22         MR. DAWSON: All right.
23         MR. MILSNER: You got it.
24         MR. DAWSON: We'll take a five-minute
25 adjournment then.

## Page 26

1      (Whereupon a brief recess was taken.)

2           MR. DAWSON: Okay. Call the meeting to order

3   again, and we'll continue where we left off.

4           Mr. Fowler, you went out to get the proposed

5   change to the bylaws.

6           MR. FOWLER: Right. Mr. Milsner asked me to

7   draft the changes to the bylaws to permit the ESOP to go

8   forward, and they're just one sentence. For some reason,

9   your bylaws contained two identical provisions, two identical

10  articles, providing for the right of first refusal that you

11  often see in corporations if one person wants to sell out.

12          In order to make sure it can go forward with

13  the ESOP, we need the exception, one simple sentence for each

14  of the two provisions. After reading the bylaws, I

15  would strongly urge the corporation to consider these changes

16  so you can go forward with the ESOP.

17          MR. DAWSON: How about I read them for the

18  record, and then we'll have discussion.

19          Resolution amending section 1.14 and article 8

20  of the bylaws of American Medflight, Inc., a Nevada

21  corporation. Resolved, that section 1.14 of the bylaws of

22  this corporation shall be amended to add to it a new

23  subsection F to read as follows:

24          F, the provision of this section 1.14 shall not

25  apply to any sale of any shares in the corporation to any

## Page 27

1   Employee Stock Option Plan. Further resolve, that article 8,

2   section 8.1 of the bylaws of this corporation shall be

3   amended to add a new subsection F to read as follows:

4           F, the provision of this section 8.1 shall not

5   apply to any sale of any shares of the corporation to any

6   Employee Stock Option Plan.

7           Discussion?

8           MR. CARSTARPHEN: You've got to get this done

9   before the end of the year?

10          MR. MILSNER: Get what --

11          MR. CARSTARPHEN: This.

12          MR. MILSNER: Well, it's Mr. Fowler's advice

13  that we do this before we do any -- before we make any ESOP

14  decisions, and the ESOP, my shares, I'm only speaking for me,

15  I believe need to be done by the end of the year to avoid a

16  huge tax hit. So I plan to do this, as I stated earlier,

17  before 12/30/05.

18          MR. CARSTARPHEN: Uh-huh.

19          MR. MILSNER: I don't know any other way to

20  answer your question.

21          MR. CARSTARPHEN: Okay. So your deadline

22  basically for you is the end of this month.

23          MR. MILSNER: Correct. But I can't let them

24  get started that late, so I'm going to let them -- I'm going

25  to give Manke the go ahead in the next few days so they can

## Page 28

1   prepare the documents. Tony Weinress can do the appraisal,

2   all of the detail work that's got to be done. And this is

3   part of it because, as I understand it, our bylaws say

4   something to the -- that's different.

5           Right?

6           MR. FOWLER: Yeah. The bylaws say that within

7   -- you must first offer any stock that's going to be sold to

8   the corporation and basically wait 60 days, so we don't have

9   60 days to wait.

10          MR. MILSNER: If we didn't have the tax issue,

11  John, then I wouldn't care 60 days one way or the other. It

12  wouldn't matter that much. Although, I'd like to get moving

13  on things. I mean, I've waited quite a while.

14          This ESOP will be ending its third year. I

15  think that's long enough to tell the employees that they're

16  going to get stock and for us to go ahead and start getting

17  paid. We've never been paid anything. I've never been paid

18  anything out of this company. I think it's time.

19          MR. CARSTARPHEN: Don't feel like the lone

20  stranger.

21          MR. MILSNER: Right. I guess that's why we're

22  here.

23          MR. DAWSON: This is a golden opportunity for

24  everybody to take some money.

25          MR. FOWLER: Well, I guess I'd request that

## Page 29

1   there be a vote taken on this so we can go forward.

2           MR. DAWSON: Yeah, any further discussion on

3   the bylaws?

4           John?

5           MR. CARSTARPHEN: No.

6           MR. DAWSON: Rich?

7           MR. MILSNER: No.

8           MR. DAWSON: Does anyone want to make a motion

9   regarding the bylaws?

10          MR. MILSNER: I'll make the motion.

11          MR. DAWSON: You'll make the motion. What is

12  your motion?

13          MR. MILSNER: That we approve the amendment to

14  the bylaws.

15          MR. DAWSON: Okay. Do I have a second?

16          MR. CARSTARPHEN: I'm going to abstain from it.

17  I think I'd do it, but I want to abstain right now.

18          MR. DAWSON: Okay. Since there is only two

19  stockholders, and I believe the proper way --

20          MR. FOWLER: I think you'd call for a vote.

21          MR. DAWSON: I'd just call for a vote, I guess,

22  at this point.

23          MR. MILSNER: And I'd vote in favor of this,

24  and John abstains.

25          MR. DAWSON: Well, you can't answer for him.

Page 30

1      MR. CARSTARPHEN: I just said it.
2      MR. MILSNER: He just said he abstains. I
3  mean, if he abstains, he abstains. That's good
4  enough. Okay. So --
5      MR. DAWSON: All right.
6      MR. MILSNER: Mr. Fowler, if you'll put that
7  into place, I'd appreciate it.
8      MR. FOWLER: Okay.
9      MR. MILSNER: Okay.
10     MR. DAWSON: That take us down to number five
11 on the agenda, such other further business that may be placed
12 before the stockholders. Is there any further business that
13 either of the stockholders would like to discuss?
14     MR. MILSNER: Going back to four, I think it's
15 important that you understand that if I don't move on my
16 stock, I can't speak for yours, then the corporation takes a
17 severe tax hit. I'd much rather take the cash than pay the
18 tax. That's my sole purpose for wanting to do this before
19 12/30. Otherwise, the beginning of next year would make no
20 difference to me.
21     But I was told this not too long ago by Manke.
22 I said, I think we're going to go. Well, if you're going to
23 do it, you better do it before the end of the year or you
24 can't have this seven percent additional tax -- I keep
25 calling it a credit. I don't know the proper term.

Page 31

1      But they take seven percent of the payroll, and
2  it's an additional bonus to the ESOP for tax avoidance for
3  that tax year. It's a big number. And we're very fortunate
4  we've got a great year, so it would be crazy if I didn't push
5  it into '05 and take the cash. You, however, are free to do
6  what you want.
7      Such other business.
8      MR. DAWSON: John, do you have any other
9  business you would like to discuss?
10     MR. CARSTARPHEN: No, really, other than
11 maybe we should talk to Jim Brown about the airplanes maybe a
12 little bit.
13     MR. DAWSON: I agree. Further discussion is --
14     MR. CARSTARPHEN: But we don't need to do that
15 here.
16     MR. DAWSON: No. Further discussion on it is
17 definitely necessary, though. We've been discussing it for
18 years.
19     MR. CARSTARPHEN: I know we have.
20     MR. MILSNER: I'm going to make a personal
21 request, number five, any discussions with Jim Brown are
22 between the hours of 9:00 to 5:00, as an employee of Reno
23 Flying Service, Inc., and not outside of that duty. Okay?
24 Jim's been pretty well advised of that, right? We just need
25 to get that clarified, that he's an employee of Reno Flying,

Page 32

1  and he's an employee of American Medflight.
2      Anything else?
3      MR. DAWSON: If there is no further business,
4  then I'll call for a motion to adjourn.
5      MR. MILSNER: One moment before that. John, is
6  there anything else that I need to bring up to get everything
7  out of the way today that we needed to --
8      MR. FOWLER: I'm confused about something you
9  said. Maybe you can clarify it. When you were talking about
10 the value of the, the value and the assets and sort of the
11 value of the company --
12     MR. MILSNER: Okay. That's a twofold issue
13 there.
14     MR. FOWLER: Okay.
15     MR. MILSNER: As another alternative for John
16 to receive money from the sale of his stock in AMF, I
17 referred him to his pleading, one of his pleadings, that they
18 requested that the company be dissolved and that the assets
19 be divided equally as in relation to the relationship of
20 their stock ownership. So I simply said that if John wants
21 cash as opposed to ESOP or as opposed to nothing, after 10
22 days, then he can go ahead and asked Jack to workup that
23 number and review that number. And then so long as it's
24 reasonable, I see no reason that the corporation wouldn't
25 have another meeting and approve the disbursement of those

Page 33

1  funds for John Carstarphen's stock.
2      I also mentioned that the Cheyennes were
3  causing us some real problems, and that I, for one, am tired
4  of the problem. And I'm leaning towards, I want to wait a
5  year or a couple -- at least a month, but that we go ahead
6  and sell the two existing Cheyennes that I'm the sole
7  guarantor of. I don't like that position, and I don't plan
8  to stay in that position much longer. So -- but I will wait
9  for '06 on that particular action.
10     MR. CARSTARPHEN: It's -- I've got a question.
11 You don't have to answer. What are you going to do with the
12 Cheyennes of Reno Fly?
13     MR. MILSNER: I don't know any reason why the
14 Cheyennes that are in Reno Fly would do anything different
15 than they're doing today. I haven't thought about that.
16     Are we using the Cheyennes in Reno Fly for
17 day-to-day activities?
18     MR. DAWSON: Yeah. But I don't understand the
19 question.
20     MR. MILSNER: I don't either.
21     MR. CARSTARPHEN: It's none of my business, but
22 I'm just curious. If you're going to sell the two Cheyennes
23 here and replace them with King Airs, are you going to
24 replace the two that you have in Reno Fly with King Airs?
25     MR. DAWSON: Oh, I see what you're asking.

Page 34

1  You're asking what Reno Fly plans to do with their Cheyennes.
2          MR. CARSTARPHEN: Yeah.
3          MR. DAWSON: Yes. We were planning on doing
4  pretty much the same thing.
5          MR. MILSNER: Same exact problem with Reno Fly.
6          MR. CARSTARPHEN: It's going to be the same.
7          MR. MILSNER: It is the same problem. Part
8  availability, that's the problem. Our pilots are all
9  Cheyenne trained. We've got cross-training. It's a real
10  nightmare because it's not just buying airplanes. It's
11  maintenance and pilots. They're all going to have to go to
12  flight safety for King Air. We're talking about a big
13  commitment here.
14          MR. DAWSON: A lot of money.
15          Any further discussion on any of these open
16  items? If not, how about a motion for adjournment then?
17          MR. MILSNER: So moved.
18          MR. DAWSON: Second?
19          MR. CARSTARPHEN: Second.
20          MR. DAWSON: Adjourned.
21          (Hearing concluded at 11:03 a.m.)
22                    -oOo-
23
24
25

Page 35

1  STATE OF NEVADA, )
2                  ) ss.
3  COUNTY OF WASHOE. )
4
           I, CINDY LEE BROWN, Certified Court Reporter of
5
   Second Judicial District Court, in and for the County of
6
   Washoe, State of Nevada, do hereby certify;
7
           That I was present in the above-entitled hearing
8
   on December 5, 2005, and took verbatim stenotype notes of
9
   the proceedings and thereafter transcribed the same into
10
   typewriting, as herein appears;
11
           That the foregoing transcript is a full, true and
12
   correct transcription of my stenotype notes of said hearing.
13
           Dated at Reno, Nevada, this 20th day of December,
14
   2005.
15
16
                    _____
17                  CINDY LEE BROWN, CCR #486
18
19
20
21
22
23
24
25