# EXHIBIT 9

EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA-RENO
-oOo-

JOHN CARSTARPHEN,
Plaintiff,
vs.
RICHARD MILSNER, an individual, DOES 1 through 10,
Defendants.
______________________/

Case No.: 3:07-cv-00542-ECR-RAM

DEPOSITION OF JAMES S. PROCTOR

taken on behalf of the defendant at the offices of Richard G. Hill, 652 Forest Street, Reno Nevada, Thursday, June 3, 2010, at 9:15 a.m., before Jerry J. Silven, Court Reporter and Notary Public, pursuant to notice.

Reported by: JERRY J. SILVEN, CCR # 56





APPEARANCES:

For the Plaintiff: KING & RUSSO, LTD.
Attorneys at Law
by SCOTT RUSSO, ESQ.
by PATRICK KING, ESQ.
1021 Country Lane
Gardnerville, Nevada 89460

For the Defendant: RICHARD G. HILL, ESQ.
Attorney at Law
652 Forest Street
Reno, Nevada 89509

Also Present: JOHN CARSTARPHEN
JACK DAWSON
RICHARD MILSNER





INDEX

PAGE:
9:15 a.m., Deposition Commenced.................. 1
EXAMINATION
By Mr. Hill.............................. 1
10:10 a.m., Recess Taken......................... 41
10:25 a.m., Deposition Resumed................... 42
EXAMINATION
Resumed by Mr. Hill...................... 42
11:35 a.m., Recess Taken......................... 82
11:45 a.m., Deposition Resumed................... 83
EXAMINATION
Resumed by Mr. Hill...................... 83
12:06 p.m., Deposition Adjourned................. 94

******EXHIBITS NOT COPIED. ON ORIGINAL ONLY*****
EXHIBITS MARKED FOR IDENTIFICATION:
75 A copy of a multi-page document, dated April 8, 2010, to Richard G. Hill.......................... 51
76 A copy of a one-page document, entitled Exhibit 8-12..................... 75
77 A copy of a multi-page document, a series of e-mails...................... 80





EXHIBITS MARKED FOR IDENTIFICATION: (Cont'd) PAGE:
78 A copy of a multi-page document, on the letterhead of King & Russo, dated April 2, 2010, to James S. Proctor, CPA, CFE, CVA................... 83
79 A copy of a multi-page document, Invoice, John Carstarphen, dated Oct. 31, 208............................ 83
80 A copy of a two-page document, entitled Carstarphen v. Milsner Documents to be Produced pursuant to Subpoena in a Civil Case.............. 85
81 A copy of a one-page e-mail, From: James Proctor, dated November 04, 2009, to Scott Russo......... 91
82 A copy of a multi-page document, Carstarphen v. Milsner Purchase of Aircraft-Federal Action............... 93

RENO, NEVADA, THURSDAY, JUNE 3, 2010, 9:15 A.M.

-o0o-

JAMES S. PROCTOR

being first duly sworn,

testified as follows:

MR. HILL: This is the date, time and place set for the resumption of the deposition of Mr. Proctor.

EXAMINATION

BY MR. HILL:

Q Good morning, Mr. Proctor

A Good morning.

Q You've been sworn again?

A Yes.

MR. HILL: Okay. The record should reflect that we're at my office at 652 Forest Street.

Mr. Carstarphen is present accompanied by both of his counsel, Mr. Russo and Mr. King.

The record should reflect that Jack Dawson is present, and that Mr. Milsner is present, although he may be in and out of the room.

BY MR. HILL:

Q Mr. Proctor, you were asked to bring with you this morning some billing records from prior litigation. Do you have those with you?





A No.

Q When can we expect to receive those?

A You can expect to receive them next week. I'm in the middle of a trial, I didn't have an opportunity to go to storage and retrieve them. I thought they had been produced at my deposition in April of 2008.

Q My review of the deposition does not indicate that, sir, so I'll look forward to receiving those.

Have you done any work on this case since we last got together on April 28th?

A I reviewed my deposition. And I had a quick e-mail or two with Mr. Russo or Mr. Russo's office.

Q Okay. And are those e-mails in your binder?

A Probably not.

Q Why not?

A I think I deleted them.

Q Why?

A They weren't really relevant for any reason.

Q So you and Mr. Russo you were exchanging social e-mails?

A No.





Q They pertain to this case?

A Yes.

Q And you made the decision to destroy them?

A Yes.

Q How many were there?

A I can think of two. I can check my records and see if they're actually still there.

Q All right. It would be appreciated, sir.

Mr. Russo, would you care to offer copies of those e-mails?

MR. RUSSO: I don't know that I still have them. I think they were scheduling e-mails, to tell you the truth.

MR. HILL: Well, I don't know. We won't know until we see them.

BY MR. HILL:

Q Are all of e-mails between you and Mr. Russo preserved in your binders?

A Yes.

Q The last time you were here you made some notes. Did you do anything following up on the notes that you made to yourself?

A I reviewed those notes a little bit yesterday.

Q Did you do anything as a result of that





review?

A No.

Q Now, you've reviewed your deposition?

A Yes.

Q Has it been signed?

A Yes.

Q Are there any changes or corrections?

A Yes.

Q Where are those?

A Those are in the deposition binder, or the package that I left at Bonanza -- is it Bonanza Reporting?

MR. RUSSO: It was Silver State?

THE WITNESS: Silver State. They did not let me take anything out of the office, and so everything was left at their office.

I did not receive a copy of my deposition. I had to go to their offices and review it.

BY MR. HILL:

Q Okay. Is that the extent of activities that you engaged in in relation to this case since the last deposition?

A Yes.

Q The notes that you took, are they in your binder?

A No.
Q Where are they?
A They're sitting on my desk.
Q Is there anything else that pertains to this case that is not in your binders that you brought with you today?
A No.
Q Did you do anything to prepare for today?
A Yes.
Q What?
A I reviewed my notes -- since I wasn't allowed access to my deposition I reviewed my notes that I took as a part of my deposition.
I reviewed our reports. I reviewed the experts' reports on the other side and went through my binders.
Q Which expert report did you review?
A I reviewed Mr. Zachow's report. I briefly looked at Mr. - I think it's Menchetti's report.
Q Manginetti.
A Manginetti. Thank you.
Mr. Turner/Thomas's report.
I went through my binders, that would include the various workpapers and various items that we've talked about here in the prior deposition.





Q I believe the last time we got together you told me that you never exchanged a rough draft of your report or reports in this case with counsel.
Do I correctly recall, or is your testimony to the contrary?
A No, I that's true more for Mr. Russo and Mr. King. I think for Mr. Gunderson I had produced several different drafts which have been produced.
Q All right. Did Mr. Carstarphen tell you that he had a source of financing that would allow him to buy an airplane -- let me try it again.
You recall that one of the assertions in this case pertains to American Medflight having purchased an airplane as opposed to leasing from Reno Flying Service. Do you recall that?
A Yes.
Q Had Mr. Carstarphen ever provided you with any information to the effect that American Medflight had the financial ability to make a purchase?
A Not that I recall. But, you know, we've had six years of conversations, so it could have been early on in the case he might have asserted such. I haven't seen anything recently.
Q Have you ever seen any documents to that effect?





A Not that I recall.
Q Okay. Thank you.
Do you recall that the February 2010 report, you stated in there the consulting fee. Do you recall the $5,000 a month consulting fee?
A Yes.
Q In your February 2010 report you made the representation, or came to the conclusion - I don't care how you want to phrase it - that that fee had been paid into 2008. Do you recall that in your report?
A Yes.
Q What was your source of information that the consulting fee was paid in 2008?
A The CPA workpapers that you provided, I believe in February 2010, had referenced that it had been paid. It was also a question. I don't think they were able to tie that down definitively one way or another.
Q So, if I understand correctly, the source of information that you relied on were the CPA workpapers from the Daoro office?
A Yes.
Q And would those be in your binder?
A Those would be -- there might be extractions of some of those. Otherwise, Mr. Hill, those are in the sixty thousand documents that were





electronically produced.
Q Have you undertaken any independent investigation to verify the fairness of the lease rates applied between -- leasing airplanes between American Medflight and Reno Flying Service?
A No, I don't think that was part of the issue or part of my assignment.
Q Okay. So if someone's going to testify that those lease rates are fair or unfair, it would be someone other than you?
A Unless Mr. Russo or Mr. King requests me to do further work in that area.
Q Have you issued any subsequent reports or letters to them from your April report?
A No, sir.
Q Have they asked you to do any work subsequent to your last deposition?
A No, sir.
Q You understand -- or let me put it this way.
In your report you utilized the concept of American Medflight hiring two mechanics to perform service on its planes. Is that a fair summary?
A Yes, sir.
Q On what do you base the determination that

two mechanics is the correct number of employees?
A Representations from Mr. Carstarphen. Subsequent discussions or depositions or testimony with Mr. Dawson. Some of those expert reports.
Again, there is some times the assumption that that was going to be a stand-alone. I think Mr. Carstarphen's basically taken the position they would share positions like the chief of maintenance.
Q So you understood Mr. Carstarphen's game plan on the mechanics, if you will, to be that American Medflight would continue to share facilities, tools and some employees of Reno Flying Service?
A Maybe not the tools, but maybe some tools. I don't know what the demarcation point of that is.
But, yes, I mean there are -- as far as someone like they could get in house like, I believe, Mr. Brown.
Q And they would share location?
A Yes.
Q And the work that these mechanics would be doing, was that everything pertaining to these airplanes, or were there things that were to be excluded from the work that these in-house people would do?
A Well, I understand that there are -- I understood, excuse me, that there are certain items that





would still have to be contracted out, that even Reno Flying Service would have to contract out, you know, some type of major repair.
Q And can you identify for me those things that you -- other than -- well, that you believe are outside the scope of what Mr. Carstarphen contemplated in his two mechanics working in house?
A You really have to ask Mr. Carstarphen.
Q So you have no knowledge about that at all?
A I can think of one or two instances outside of -- you know, off the top of my head, but....
Q Well, I want to know what went into your report.
A The fact they would use two mechanics.
Q And that major repairs would be outside the scoop of work that those employees would do?
A Possibly.
Q Possibly?
A Well, I mean right now there's that arrangement with Reno Flying Service and American Medflight with AeroSolutions to fund some of those major repairs. I would imagine that that would still stay the same.
Q You understand AeroSolutions to not be the same as Reno Flying Service?





A Yes.
Q Anything else that you understood to be outside the scope of that game plan?
A No.
Q The original deadline for the production of expert reports in this case was December 8, 2009. Were you aware of that?
A No.
Q What did you understand to be the deadline that you had for the production of your report in this case when Mr. Russo and/or Mr. King discussed that issue with you for the first time?
A Well, I understand there have been many deadlines in this case, Mr. Hill, as the case has continued on. There was some type of deadline in the beginning of 2009.
I know that there were some discussions and hearings regarding documents.
I'm not aware of anything that was due in 2009 when Mr. Russo or Mr. King, I don't remember which, approached me in some time early February 2010 that something was due by the end of February 2010.
Q So, the first time you became aware that there was a deadline for the production of -- let me see if I can put it this way.





There were early deadlines that you heard about in this case that came and went; is that right?
A Yes.
Q And you were unaware of any deadline in December of 2009?
A That's correct.
Q And the first time you became aware of a real firm deadline was some time in late January, early February 2010?
A I believe February 2010.
Q Have you been provided with the documentation that was made available to Mr. Carstarphen in relation to the ESOP prior to the December 5, 2005 meeting?
A I'm sure some of that's in that sixty thousand documents that were provided to me in February of 2010.
Going back to the prior state case, I believe I have some documents with respect to that.
Q Do you have an opinion, sir, as to whether or not the documentation provided to Mr. Carstarphen in advance of that meeting was adequate or inadequate?
A I think the last time I testified, Mr. Hill, there was this discussion back and forth as to what Mr. Carstarphen might have needed to be advised about by

some of the professionals proposing to put this into place.

Q And are you prepared, sir, to express an opinion that the documentation provided to Mr. Carstarphen prior to the December 5, 2005 meeting was adequate or inadequate, or no opinion at all?

A No opinion. I can only state what Mr. Carstarphen has stated and what my prior testimony was on April 26th.

Q I'm unclear from your testimony, and I just want to be clear. You are not going to be testifying or expressing an opinion that the documentation provided to Mr. Carstarphen prior to the December 5, 2005 was not adequate in your professional opinion or is it inadequate?

A I might testify to that. I haven't been asked to. I might testify to that.

Q So, as you sit here today that topic is not within the scope of work that you have done; is that correct?

A Other than again, as I testified on April 26th, the fact of the matter is that he did not have a clear understanding from the professionals as to what the economic consequence to him and his interest in the company was.





Q Mr. Proctor, I'm not interested right now in what Mr. Carstarphen told you. I am interested in the scope of your assignment to date, and I want a clear answer from you, sir.

Have you, as you sit here today, formulated an opinion on the adequacy of documentation provided to Mr. Carstarphen prior to the December 5, 2005 meeting?

A Based on the documentation I've seen, it did not appear that he had an adequate understanding or could extrapolate from that information what the effect, the economic effect on him and his interest in the company was from those documents.

MR. HILL: Will you please read back my question and his answer.

(The following question and answer read by the reporter.)

"QUESTION: Mr. Proctor, I'm not interested right now in what Mr. Carstarphen told you. I am interested in the scope of your assignment to date, and I want a clear answer from you, sir.

Have you, as you sit here today, formulated an opinion on the adequacy of documentation provided to Mr.





"Carstarphen prior to the December 5, 2005 meeting?

"ANSWER: Based on the documentation I've seen, it did not appear that he had an adequate understanding or could extrapolate from that information what the effect, the economic effect on him and his interest in the company was from those documents."

BY MR. HILL:

Q Mr. Proctor, I don't think that answers my question.

You want to tell me what you think Mr. Carstarphen understood. I want to know your opinion as a professional. Are you prepared to testify to a reasonable degree of professional certainty that the documentation provided to Mr. Carstarphen prior to that meeting was inadequate?

A Yes.

Q How many ESOP transactions have you been involved in, sir?

A As I mentioned in my last two testimonies, I had at least two clients that I can think of that had ESOPs in place. We were not involved in implementation or the reporting of those ESOP plans.





Q What specific documentation should have been included in the materials provided to Mr. Carstarphen, sir?

A As I testified to on April 26th, some type of documentation that would have indicated this is the effect on the shares of your stock, the value on your stock, what you're able to do with that, what are the implications again as to the value of that stock and the value of the company.

Q Anything else?

A Not that I can think of.

Q Is that conclusion in your report?

A No.

Q You testified -- we went over last time about your draft report to Mr. Gunderson where you had normalized earnings. Do you recall that?

A Yes.

Q I believe that was Exhibit 46. And you told me that you received new information.

Correct me if I'm wrong, sir, but isn't normalization a method to value or is part of a valuation process?

A It can be. Normalization can mean all kinds of different things, Mr. Hill.

Q The normalization that you were engaging in

in your report to Mr. Gunderson - and if you need to see it, please say so - you would take out nonrecurring expenses; is that fair?

A Yes.

Q You would take out and put back into your calculation of the value of the company things that a shareholder had taken out for his benefit, majority shareholder?

A Yes.

Q Do you continue to believe that that is a valid process in arriving at the valuation of a business?

A It's one of the processes used in valuing a business.

Q Did you utilize that process in the most recent reports?

A No.

Q Why not?

A Because the methodology in which to arrive at the reports was somewhat changed. We had the benefit of more business valuations in the more recent report.

Back when we did the draft of Mr. Gunderson's report, I believe we only had one or two valuations.

Q So then tell me how it is -- well, what methodology did you apply in the report?





A Well, we analyzed and reviewed Mr. Weinress's report. That's W-e-i-n-r-e-s-s, I believe.

We did independent research looking at databases and professional libraries and industry sources, textbooks. We looked at Mr. Zachow's report.

I don't recall that Mr. Thomas's and Mr. Tuner's dealt a lot with that area.

We didn't again go back through and do as much normalization and indicate that as an issue as much as raise the issues and the changes in the report from December 15th to December 31st.

Q Do I understand you correctly that you -- in arriving at what you opined to be Mr. Carstarphen's damages as a result of the sales of stock by Mr. Milsner to the ESOP, that in calculating those damages you have relied on the business valuations that were made pursuant to the needs of the ESOP?

A Yes. That's a generalization, but yes.

Q Did you perform any analyses on your own to arrive at the same numbers or different numbers than were provided in any of those ESOP valuation reports?

A Again as I testified on April 26th, we were not provided Mr. Weinress's workpapers or how he came up with some of his conclusions, his research, some of methodologies.





We did double-check his calculations in those reports. We did trace through some of those numbers. We were not provided with management's projections that he used in those reports, again because we were not provided his workpapers.

As I testified to on April 26th, some of what we tried to do when we first started this engagement back in, I believe the end of 2004, is we thought we could come up with a business valuation to determine the damages on Mr. Carstarphen -- or for Mr. Carstarphen. That was not possible.

So then we take the next best information available to try to calculate that same amount. That's when we relied upon Mr. Weinress's two reports.

Again, had he provided the workpapers we might be able to determine that he did not perform normalization entries that we might have recommended.

Again his conclusions haven't been documented well enough in his report. We don't know if some of those conclusions and the research and his calculations and methodologies are in his workpapers to come up with that.

So what we did in our February 2010 report was critique the differences in his assumptions and methodologies in the December 15th report and the





December 31st report.

There are items, again, providing full disclosure; we might be able to determine that there should be some additional normalization or other adjusting journal entries or adjustments to information that he used in those reports.

MR. HILL: Will you read back my question and his answer, please.

(The following question and answer was read by the reporter.)

"QUESTION: Did you perform any analyses on your own to arrive at the same numbers or different numbers than were provided in any of those ESOP valuation reports?

"ANSWER: Again as I testified on April 26th, we were not provided Mr. Weinress's workpapers or how he came up with some of his conclusions, his research, some of methodologies.

We did double-check his calculations in those reports. We did trace through some of those numbers. We were not provided with management's projections

"that he used in those reports, again because we were not provided his workpapers.
"As I testified to on April 26th, some of what we tried to do when we first started this engagement back in, I believe the end of 2004, is we thought we could come up with a business valuation to determine the damages on Mr. Carstarphen -- or for Mr. Carstarphen. That was not possible.
"So then we take the next best information available to try to calculate that same amount. That's when we relied upon Mr. Weinress's two reports.
"Again, had he provided the workpapers we might be able to determine that he did not perform normalization entries that we might have recommended.
"Again his conclusions haven't been documented well enough in his report. We don't know if some of those conclusions and the research and his calculations and methodologies are in his workpapers to come up with that.





"So what we did in our February 2010 report was critique the differences in his assumptions and methodologies in the December 15th report and the December 31st report.
"There are items, again, providing full disclosure; we might be able to determine that there should be some additional normalization or other adjusting journal entries or adjustments to information that he used in those reports."
BY MR. HILL:
Q Your testimony is that you have not had access to or reviewed the projections relied upon by than Mr. Weinress; is that correct?
A Yes.
Q If I understand your critique, part of it is you do not understand what Mr. Weinress did, and I don't mean that in the sense that you're not smart enough to understand. What he did was so opaque, if you will, that you couldn't get inside and see what he did. Is that a fair statement?
A Yes and no. Can I explain?
Q Sure.
A We certainly understand what Mr. Weinress





did. Again, without the benefit and the disclosure sometimes necessary in a report to determine what his assumptions were, and again what his research was and what his conclusions were to come up with some of the amounts that he included in his report.
Q So you do not know what assumptions he made?
A We know what some of those assumptions were.
Q But you don't know what all of them were?
A That's correct.
Q And conceivably those would affect your work, wouldn't they?
A It could. Maybe it could and maybe it could not.
Q We don't know?
A That's why when people do formal business valuations, they lay everything out, report everything, so that someone else independently can come up, pick it up, say: Yes, we don't agree to that.
As I indicated the last time, when we get accountants in the room and kind of hash this out, you know, kind of go back and forth and discuss this and see whether or not you agree, disagree, somebody wants to change their mind, whatever, as to what some of those





amounts, research, computations are.
Q And you don't know what research Mr. Weinress did, isn't that correct, is that what you said?
A I believe that's -- yes, yes.
Q Do you understand Mr. Weinress's report to have been prepared for the specific purpose of complying with ESOP regulations?
A Yes.
Q Was that your purpose in your assignment?
A No.
Q You stated that you were unable to prepare a business evaluation -- my notes say: Business evaluation for damages was not possible for Mr. Carstarphen in this case. Do you recall -- is that a --
A Yes. Except it's valuation, not evaluation.
Q Why?
A As I testified on April 26th, we did not have full disclosure back in -- anywhere from 2004 to about 2009 or '10. The financial information necessary to determine whether there would be normalization entries or other adjustments did not necessarily have open and willing cooperation with management --
Q Let me interrupt, Mr. Proctor.
A Okay.

Q You now have all of that data, don't you?
A Yes.
Q And you have not gone back and done a business valuation for Mr. Carstarphen's damages, have you?
A Well, Mr. Hill, let's back up for just a minute here.
The information I have for the most part is 2005, maybe a little bit of 2004 information forward. We don't have that information back to 1997, 1999, five years before the time that Mr. Carstarphen was terminated.
Q Why is that relevant to ascertaining his damages from 1/1/2005 forward, sir?
A Well, we were talking about what I was doing back in the early part of case.
Q Now you testified earlier that you were unable in this case to prepare a business valuation for Mr. Carstarphen's damages. You told me -- you're telling me that you couldn't do it earlier because you didn't have the data.
You testified last time you have everything except Weinress's workpapers. I am mistaken?
A You're mistaken, Mr. Hill.
Q What else are you missing?





A When we did the original report for Mr. Gunderson, that was in the state court action, which involved prior to 2005. Our information with respect to everything that's been disclosed and reported on has to do with 2005 forward in the federal action.
Q Let me ask this question, sir. Why have you not performed a business valuation for the purposes of establishing Mr. Carstarphen's damages in this case?
A Haven't been asked to at this point.
Q Okay. Can you opine for me, sir, based on your review of the documentation in this case, what do you think the charges for that service would be?
A Knowing what we know now?
Q Yeah.
A And the fact that there have been previously hidden and undisclosed transactions --
Q Undisclosed transactions?
A Previously. I said previously.
Q Go ahead. I'm sorry.
A And the fact that there have been transactions that have come to light through subsequent discovery; the fact that we still have some unwilling management to some extent in this; some of the items that we have subsequently found that we reported on in our report; that would be typically expensive because it





would involve a little bit more forensic-type work or ferreting out information, maybe substantiating information more than you would than if you had an independent business valuation come in and: I want to value this company, here's everything, full disclosure, full cooperation. So I would say it would cost at least $30,000.
Q Are you prepared to opine that Mr. Weinress's report does not meet the standard for which it was issued?
A No.
Q You calculate Mr. Carstarphen's damages by relying on the two ESOP reports; right?
A Part of those damages, yes.
Q For the ESOPs?
A Yes.
Q And that is the basis on which you get to those damages, isn't it? What else did you include besides --
Let me rephrase the question.
Aren't your damages the difference -- one-third of the difference between the two Weinress appraisal numbers?
A With the marketability discount added back, yes.





Q The marketability of Mr. Carstarphen's stock has not changed as a result of the AMF ESOP transaction, has it? Or has it, or do you know?
A It could be debated whether it has or not.
Q Do you have an opinion, sir?
A On the face of it I don't think it has. But I'm not sure who would want to buy a company where the other majority shareholder is -- that's a good point. There could be people out there, a buyer for that stock that doesn't want to be saddled with employees having a saying in management or ownership in the company.
Q But you're not going to express a professional opinion on that topic, are you, sir?
A Not unless I'm asked.
Q And have you been asked?
A No.
Q You made a statement a moment ago about previously undisclosed transactions. The transactions that you're referring to are in fact present on the books and records of the company, are they not?
A Yes.
Q Tell me the previously undisclosed transactions to which you refer, sir.
A Well, there were -- that I can think of off the top of my head there was the credit line, the

personal guaranty payment to Mr. Milsner.
Q The $90,000 note?
A Yes. There were legal fees.
Q What else?
A There may be other transactions entered into between AMF and RFS that did not meet the protocols as put forth in the bylaws or the organizing minutes where there had to be authorization of a disinterested person, shareholder.
Q All of those transactions are in fact correctly set forth on the books and records of the company, are they not?
A I wouldn't say necessary correctly, but they're recorded, yes.
Q But they're present there?
A Yes.
Q Are any of those transactions set forth in the books and records in a manner that you believe is calculated to hide them or deceive anyone?
A Well, I can't speak to the fact that if they're put in a particular account where they're not supposed to be, that that was not an error or it wasn't something else.
Q The $90,000 payment to Milsner, do you know if that was approved by the board of directors?





A No, I don't recall specifically off the top of my head. I don't believe it was, because I don't think Mr. Carstarphen was aware of it.
Q All right. And the legal fees, do you know whether or not there was approval of those by the board of directors?
A Considering there's another lawsuit out there now on that, I don't know how they could have been approved by the board.
Q And do you have any reason to believe that the board of directors of American Medflight was at any time unaware of the dealings that it was having with Reno Flying Service?
A No.
Q Now, you've mentioned then transactions that have come to light. Are those the same transactions that we just discussed, the 90,000, legal fees, the AMF/RFS not dealing in accordance with what Mr. Carstarphen understood to be the second and third minutes of the board of directors meeting, are there any other transactions that fall into that that have come to light?
A Not that I can think of off the top of my head.
Q Have you given me all of the previously undisclosed transactions to which you were referring?





A I believe so. There could be some others.
Q Now you stated unwilling -- words to the effect that management was unwilling or uncooperative. Is that your opinion, sir?
A At what point in time, Mr. Hill?
Q As you sit here today.
A Mr. Dawson's been very cooperative as of late.
Q And everything that you've asked for has been provided to you, except Mr. Weinress's workpaper; is that right?
A I believe so.
Q And Mr. Dawson answered every question you asked him, didn't he?
A When are you -- are you going to say a particular time?
Q You and Mr. Dawson sat down with a court reporter.
A Thank you. Yes.
Q And every question that you had was answered to your satisfaction?
A Yes.
Q Did you have other questions that you were prevented from asking?
A No.





Q Were there questions that you didn't ask for any reason?
A No, not that I can think of.
Q Okay. So when you say that management -- did you mean to say that management was -- you perceived to be previously unwilling or presently unwilling?
A Previously.
Q And that situation no longer exists today?
A I don't believe so.
Q Okay. The projections that Weinress reviewed -- or that Weinress relied on, you've never seen them, have you?
A Other than what was enumerated or reported on his report.
Q Do you have any basis whatsoever to believe that those projections were deliberately erroneous on the part of management or anyone associated with American Medflight?
A I think by the nature of what I've reported in my report, we've called into question how reliable those projections were, because they were off substantially from what the actual results were.
Q Do you have any basis to assert that there is anything about the deviation - my word not yours - that was intentional?

A I'm not going to speak to the intent. I'm going to speak to the fact that they were substantially different than what was the actual result.
Q Do you have any reason to believe that they were done in other than good faith by management?
A I'm going to answer like I did the last time. I'm not going to speak to the intent.
Q Do you have any reason to believe that the projections were not based on data then available?
A One would think they could be a little more accurate if they had all the information.
Q Do you know whether those projections were made by Weinress or management?
A They're supposed to be made by management.
Q Do you know the answer to my question?
A I believe if you go through his report, you might indicate that those were management's projections.
Q Do you know whether they were or not?
A I don't recall off the top of my head. I would think that I would recall if they weren't or it was stated they were his.
Q If Weinress made them as opposed to management, that could conceivably have a very serious impact on his report, couldn't it?
A It could.





Q And if his report is in error for that reason, are your damage calculations equally infirm, or infirm to any degree?
A Not definitively. It could be, it could be not.
Q Are you -- as to the consulting fee, you have no knowledge one way or the other as to the validity of the underlying assertions between Carstarphen --
Well, are you prepared to opine that AMF did not get what it paid for in terms of any labor or materials that it purchased from Reno Flying Service at any time?
A Mr. Hill, I'm not trying to be difficult here, but you started with the consulting fee --
Q I know.
A The consulting fee's off the table for right now, right, because it's not part of the question you asked me?
Q Correct. Yes.
A And your question is again?
Q Are you going to at trial opine that any transaction for labor or material between AMF and RFS, that AMF did not get full value for what it paid for?
A No.
Q Have you been asked to opine about any





duties that existed -- start again.
Have you been asked to opine about the existence of duties owed by a majority shareholder to a corporation?
A No.
Q Or to a minority shareholder?
A No, other than in a general nature. I'm not going to give legal advice -- I'm not going to give a legal conclusion.
Q You're not going to testify -- you don't anticipate testifying -- let back up and try it this way.
Are you qualified to opine at trial about the existence of duties, fiduciary duties owed by a majority shareholder to either a corporation or a minority shareholder?
A Only my understanding as a businessman and a CPA, not as an attorney. I'm not an attorney, I will not give legal conclusions.
Q What about the duties owed by directors to either to corporation or any shareholder?
A My answer would be the same.
Q What do you understand those duties to be?
A To the --
Q Any of them.
A Well, number one, to adhere to whatever the





parameters have been set forth, whether in the organizing documents or at board meetings or bylaws, articles of incorporation, whatever.
Q Okay. Anything else?
A You know, I'm aware that there are some Nevada statutes that dictate what certain shareholder rights are and certain rights to members of LLCs and partners and items along those lines.
Q You would not feel comfortable testifying to those subjects, is that a --
A I can't testify to them this morning.
Q Fair enough.
Are you aware of any usurpation of any corporate opportunities by Mr. Milsner?
A I know that's been alleged.
Q I'd like to know if you have any knowledge about that, sir? Any facts to support that assertion?
A Okay. Well, speaking here today without the benefit of the statutes or anything else with respect to that, my understanding is that Mr. Carstarphen has not been allowed some of the same opportunities to receive moneys out of AMF as Mr. Milsner.
Q Anything else?
A I think that's basically it as I sit here this morning.

Q Okay. And what facts do you have -- I don't care what Mr. Carstarphen alleges, I want to know what facts you have that support that statement, that Mr. Carstarphen was not allowed the same opportunities to take money out of American Medflight as Mr. Milsner?
A Well, that credit personal guarantee payment, that ninety-some-odd dollars we talked about. Early on either Reno Flying Service or AMF used Mr. Carstarphen's --
Q Let me interrupt you.
You're only here to -- your report in this case only focuses on 1/1/05 forward, right?
A Yes.
Q So let's confine ourselves to that.
MR. RUSSO: You need to clarify that because you asked a --
MR. HILL: I stand corrected. You're correct. Mr. Russo.
BY MR. HILL:
Q Do you understand my question now, sir?
A Could you please restate it?
Q Since January 1, 2005, sir, what evidence do you have that Mr. Carstarphen has not had the same opportunities as anyone else to receive moneys out of American Medflight.





Now, you've identified personal guarantee money, the $90,000 paid to Milsner.
Anything else, sir?
A The payment of the legal fees.
Q Anything else?
A Not that I can think of off the top of my head, no.
Q Do you expect to testify at trial whether or not Mr. Milsner engaged in any knowing violation of the laws of the State of Nevada?
A No, as I stated before, I'm not attorney, I'm not the trier of fact to come to that conclusion.
Q You're not going to offer any opinions on that; correct?
A No.
Q My statement's correct?
A Yes.
Q Thank you. Are you going to opine at trial -- do you have an opinion that Mr. Milsner intentionally breached any duty that he owed to either the corporation or Mr. Carstarphen?
A Well, I believe, as I testified to on the 26th of April as well, Mr. Hill, there were certain protocols or safeguards put into effect between the intercompany transactions that we were not adhered to.





That's what I can think of.
Q Other than that, or is that the galaxy?
A Sitting here this morning that's all I can think of.
Q And those are all set forth in your reports?
A Yes.
Q Do you know at this point in time whether or not Milsner has any guarantees with anyone for any reason for the benefit of American Medflight?
A I know it's been alleged that he had personal guarantees out there.
Q That wasn't my question, sir.
Do you know one way or the other?
A I only know of the allegation.
Q So you have no -- you've not seen any documents one way or the other?
A Well, there's that $90,000 payment. I mean, if he's getting paid for a personal guarantee I would assume that there's a personal guarantee out there.
Q And do you recall off the top of your head when that occurred?
A I think it was a year or two ago.
Q What about today, do you know whether or not there are any guarantees out there?





A No.
Q In your report you used the term "fair value," and you differentiate fair value from fair market value. Is that a fair characterization of your report, sir?
A Yes.
Q I'd like for you to define for me, please, sir, the term "fair value."
A Fair value often is defined as the fair market value without a minority discount. That's an oversimplification, but that can be.
Q I would like to know what you used as your definition in your report.
A That's basically what we used.
Q And fair market value, how do you differentiate between the two, just the absence of the minority discount?
A Yes, a willing buyer, willing seller.
Q How does that -- so fair value does not include any allowance to a willing buyer, willing seller?
A Sometimes it could, sometimes it couldn't.
Q Did you make any allocation for that?
A No.
MR. HILL: Let's go ahead and take a break.
(A recess was taken at 10:10 a.m.)

RENO, NEVADA, THURSDAY, JUNE 3, 2010, 10:25 A.M.

-oOo-

MR. HILL: Let's go back on the record.

EXAMINATION

(Resumed)

BY MR. HILL:

Q Mr. Proctor, what were you and Mr. Russo talking about outside?

A He reminded me of some of the other things that I had either in my reports or exhibits with respect to some of corporate opportunities.

Q Why don't you tell us about that.

Anything that you talked about?

A No, I think that basically was it. Oh that, and the aircraft leases.

Q What about the aircraft leases?

A The fact of the matter is, is until recently -- and I haven't been provided the aircraft leases between AMF and Reno Flying Service, and the fact that the rates may actually not be comparable depending on what Reno Flying Service did with the equity on the planes, whether they refinanced them, pulled equity out.

Q Do you have any information along those lines?

A Not presently.





Q Do you anticipate getting that information?

A I might.

Q And what source -- what source would you have for that information?

A Mr. Russo might provide them to me.

Q Has Mr. Russo indicated that he might provide that to you?

A He didn't definitively say one way or the another.

Q What did he say?

A He just alerted me to the fact that that is another issue.

Q Now, you mentioned that Mr. Russo also alerted you to other usurpations of corporate -- possible usurpations of corporate opportunities by Mr. Milsner; is that correct?

A Yes.

Q What else did Mr. Russo remind you of?

A He reminded me of the fact that Mr. Carstarphen's participation in the ESOP was predicated on dismissal of the state court action.

The fact that we had discovered that there is a hundred-thousand dollars removed by Mr. Milsner out of the checking account unbeknownst to the management of AMF.





Q Anything that he reminded you of?

A No.

Q Anything else that you recall on your own or from Mr. Carstarphen or any other source other that you'd care amply, change or modify your previous answers?

A Just with respect to that whole payment on the credit line again, and that's it.

Q You're going back to 1999?

A Not the credit line, I'm sorry. The personal guarantee.

Q The 90,000?

A Yes.

Q Go ahead, I'm sorry.

A Just the fact that again Mr. Carstarphen was not afforded the fact that if he was going to personally guarantee any debt, that he would also be paid.

Q Okay. Do you have any facts to support the assertion that the guarantees by Milsner were made in anticipation of being paid?

A He was paid in anticipation of being paid?

Q That was my question.

Do you have any -- let me try it again. Apparently -- from the look on your face I don't think I got it right. Let me try it again.





If I understand correctly, what you just said was that Mr. Carstarphen -- nobody told Mr. Carstarphen that if he guaranteed anything he might receive some form of compensation. I did understand that correctly?

A Yes, sir.

Q Do you have any data on which to base an assertion, or do you make the assertion that Mr. Milsner made any guarantee in anticipation that he would be compensated for doing so?

A It's reasonable to assume that.

Q That wasn't my question.

A I understand.

Q And the answer to my question?

A Would be no.

Q Thank you.

What facts do you have at your disposal or that you are aware of that Mr. Carstarphen's participation -- let me back up.

Has Mr. Carstarphen told you that his participation in the ESOP in any way, shape or form was conditioned on dismissal of the state court lawsuit?

A Mr. Carstarphen stated such. Mr. Gunderson stated such. Mr. Russo and Mr. King have stated such.

Q Did King, Russo or Gunderson indicate to

you that they had personal knowledge, or they were just simply passing along what Mr. Carstarphen had told them?
A I don't know what the source of their knowledge was.
Q Did Mr. Carstarphen tell you that there were any witnesses to that conversation?
A No, I don't recall that he did or didn't say there were witnesses.
Q And you certainly weren't a witness?
A No, sir.
Q And do you know of any -- you don't know of any witnesses?
A I can only assume who might be witnesses.
Q Well, why don't you tell me who you might assume might be witnesses.
A Who could possibly be witnesses would be Mr. Dawson. It might be Mr. Brown. It might be Mr. Geyer. It might be Linda Reed. It might be Mr. Daoro. It might be --
Q Mr. Proctor --
A -- a host of attorneys. I don't know.
Q I once had a doctor tell me that anything is possible including group sex among porcupines. I mean, let's confine it to what you know.
I mean, do you have any knowledge of any





witnesses or not?
A I said no.
Q Thank you.
Let's take a look at Exhibit 69 for just a minute. That should be in this binder.
This is your report of April 16, 2010; is that right?
A Yes, sir.
Q Could you turn to page 6 of 27. And if you need to refer to your binders to respond to my questions about this feel free to do so, we just need to know what you're looking at.
I'd like you to tell me in terms of your analysis of the aircraft repairs and maintenance, how many hours per month were you assuming were being put on the aircraft to be maintained?
A I would have to look at my notes. My recollection was something like 60 hours, that may be 30 to 60 hours, I'd have to look at my binder.
Q They're on the floor over there?
A Yes.
Q Please pull them.
Mr. Proctor, do you know if you even had that information?
A Yes, I remember --





Q Okay.
A -- specifically.
Q In that case keep looking.
It's just that if you know you didn't have that, then we wouldn't waste any more time on it.
Can you tell us where you looked in your binder, sir.
A I looked in the RFS labor costs and parts. Aircraft purchase versus lease.
I'm looking in my note section.
Mr. Hill, it appears that that number is probably in the section of one of the black binders in the state court action, because those calculations began in the state court action.
And as to the question as to whether that was a reasonable assumption, it must have been because that we didn't change that amount, so the number of hours stayed the same as it was presented in the state court action. I'd have to refer to the state court action.
I know I've seen that amount, and again my recollection is anywhere from 30 to 60 hours approximately, but I don't remember it specifically.
Q Was the source of that Mr. Carstarphen?
A Yes.
Q Do you know what Mr. Carstarphen's source





of information on that point was?
A His knowledge of the operations and what it takes to take a plane off and they get to the hundred hours where they have to take them out of service and substitute another plane.
Q And your assignment -- your research then on that topic and your interactions with Mr. Carstarphen occurred some time between 2006 and -- early 2006 to 2008?
A Yes.
Q Did you inquire of Mr. Carstarphen what his source of information was, or did you just take it accurate?
A No. As I discussed in my April 26th testimony, we take Mr. Carstarphen's assertions and we verify them to the extent that we can, and do tests and everything along those lines.
And again, what I relied upon was that was his representations and it seemed reasonable in the fact that if these planes are flying X number of hours, how often they have to be taken out of service and another plane substituted, whatever.
Q Did you do anything to verify the 30-to-60-hour amount that Mr. Carstarphen gave you?
A I'd have to refer back because, again, most

of those calculations were done in the state court action so I'd have to go to that particular section in the binder in the state court action.

Q Did you ask Mr. Dawson?

A At that point in time we were not allowed access to Mr. Dawson.

Q In this case you were allowed access to Mr. Dawson?

A Yes.

Q Did you take the opportunity to update any information that Mr. Carstarphen had given you?

A No.

Q Did you take the opportunity to verify any information that Mr. Carstarphen had given you?

A No.

Q Why not?

A Didn't determine that it was really necessary at that point.

Q My recollection is that your binder has a separate section on the communications that you had with Mr. Russo, Mr. King and Mr. Carstarphen. Can you pull your binder and check the section on that topic, please?

Can you pull it out?

A Which particular section did you want, Mr. Hill?





Q I want you to give at this point in time from your binder all of the communications that you've had with Mr. Carstarphen, Mr. King or Mr. Russo that --

Can you do that?

A On this whole case?

Q Yes. Are they all in the binder?

A Yes.

Q Then what I'd like you to do is pull them out, give them to me, we're going to mark them as an exhibit.

A Do you have the Post-its? Last time it worked really well, Mr. Hill.

Q My recollection was that your binder was put together in such a fashion that they were all together. Is that not the case?

A No, sometimes they're interspersed between other documents.

Q Okay. Put this face down so....

I don't care if you put them face down, face up, just so they stay in an order that you can put back together.

I'm just making suggestions here so he can put Humpty-Dumpty together again.

Have you been able the remove the correspondence?





A Yes.

Q Okay. And have you as part of your assignment in this case -- you told me this morning that there were a couple of schedules -- well, Mr. Russo sent you scheduling e-mails that you've deleted and were not preserved.

Have you preserved all the other e-mails and communications that you've had with Mr. Russo, Mr. King and Mr. Carstarphen relative to your assignment in this case?

A Basically I do. I mean, I print them out and they're saved on the hard drive.

MR. HILL: Mr. Russo, what I'd like to do is have my staff make copies, we'll mark them and go through them later.

MR. RUSSO: That's fine.

BY MR. HILL:

Q Go ahead and set that aside if you want to. I'm going to want to look at those.

Let me show you what we're going to mark as Exhibit 75.

(Exhibit 75 was marked for identification.)

BY MR. HILL:

Q This is the report by Mr. Zachow. You've





seen this, haven't you?

A Yes.

Q Can you tell me, sir, do you hold any certifications as an appraiser?

A I have my CVA.

Q CVA. What is that?

A Certified Valuation Analyst.

Q And is that an appraiser of some sort?

A That's an accreditation by NACVA for business valuations.

Q And can you tell us what NACVA stands for?

A National Association of Certified Valuation Analysts.

Q And did they have protocols proscribed to the use to arrive at valuing business?

A Yes, sir.

Q And where can we find that?

A You might be able to find them on the NACVA Web site would be the easiest thing for now to do that.

Q And did you comply with NACVA standards in compiling your report, which is Exhibit 69?

A We're not doing a business valuation, as we've discuss.

Q Okay. So the answer to the question is no?

A I've used some of those standards. I'm not

preparing a business valuation, not all of them would apply. But I would also comply with all the professional standards that are out there, like the SSVS 1 relating to -- from the AICPA relating on valuation standards, some of the professional standards dictated by the AICPA in preparing work and....
Q Preparing what?
A Preparing work.
Q Oh, okay. I'm sorry, I didn't hear you.
So, you were not doing a business valuation in this case, so you did not comply with all of the standards that NACVA would call for?
A Correct.
Q Is that the only appraisal certification that you hold?
A Yes.
Q Tell me about SSVS 1. What is that?
A That's the statement promulgated by the AICPA listing out certain valuation standards.
Q Did you comply with those in arriving at your report in this case?
A Again, where they're relevant to comply with, yes.
Q So, you did not comply with all of them, you made a determination as to which ones were and were





not relevant?
A Right. A number of those are not relevant.
Q Which ones were not relevant?
A I couldn't think off the top of my head, Mr. Hill. I mean, as far as the standards go, planning, obtaining relevant data, supervision, report writing, those standards would be adhered to. But specifically talking about business valuations, those wouldn't apply.
Q Because you weren't doing a business valuation?
A That's correct.
Q Do you believe that Mr. Weinress -- let's talk about Mr. Zachow's report, Exhibit 75 for a minute.
Do you believe that Mr. Zachow has made any errors in his report?
A No. He raised a lot of issues that he was just, in our opinion, trying to raise a smoke screen or get the eye off the ball, if you will.
Q Do you agree that there is a distinction between what he calls an enterprise value and equity value?
A There can be. Enterprise value, there's a lot of literature out there that basically says to stay away from that kind of terminology because all of the governing bodies haven't been able to come up with a good





definitive explanation that they all agree on what an enterprise value is.
Q But you do agree that there's a distinction between the equity in a company and the value of the company?
A Yes.
Q And you understood Weinress was valuing the equity in the company?
A Yes.
Q On page 3, second paragraph of Exhibit 75 Mr. Zachow makes the statement:
"After an ESOP purchases shares in a private company, ERISA rules require the ESOP to have annual year-end valuations in addition to an initial valuation at time of first purchase."
Do you agree with that statement or disagree with that statement?
A I agree with that statement.
Q Now, in your report you talk about something occurred at American Medflight in a 2-week period that affected, in your opinion, the value of the company; is that right?
A That's a generalization, yes.
Q But it affected the value of the company?





A Yes.
Q Other than the transaction between Milsner and the American Medflight ESOP, what occurred that you're aware of?
A Nothing.
Q In your report you make the statement that an objective contemplation of that transaction would have revealed that there was going to be an effect on the company from that transaction; is that right?
A Yes.
Q When you say objective, do you mean fairly obvious?
A I mean neutral, what the word objective means. I mean, obvious, it may be obvious to professionals, maybe not so obvious to the layperson.
Q On page 4 of Mr. Zachow's report, first paragraph at the top of the page, second sentence, he said:
"However, based on the projections that Weinress used at the time of the transaction, the company was projected to have more than enough cash flow to cover expected debt payments."
Do you agree with Mr. Zachow that based on

the projections, the company -- it looked like the company would have more than enough cash flow to cover said payments?
A Based on the projections.
Q You don't have those projections, so you've not been able to perform any calculations on them.
A No, we talked about that earlier this morning, Mr. Hill.
Q I'm just making sure I'm on the same page of the book as you, sir.
Continuing down he makes the assertion -- well, he makes the assertion that he spoke with someone from the National Center for Employee Ownership. Have you ever heard of that entity before?
A I've heard of the entity, yes.
Q And he attributes to them a statement that 70% of all ESOP transactions are seller financed.
Do you have any information to the contrary?
A No.
Q And continuing down he attributes in the next paragraph, last sentence a statement to you, it's in quotes, in the last sentence, he says you say:
"It appears that the strain on AMF's cash flow is unsustainable."





You did make that statement in your report?
A Yes.
Q When did you form that opinion?
A Late February or March of this year.
Q And the basis, the documents you relied on for that are what?
A Well, number one, the fact that the ESOP was in default and owes Mr. Milsner money. And then the other financial statement, the tax returns.
Q And the default, did you discuss the ESOP default with Mr. Dawson when you met with him?
A I don't recall that we did. There might have been a conversation on that. I didn't bring the transcript from that hearing.
Q Nothing you learned at that session with Mr. Dawson changed that part of your report, did it?
A No, sir.
Q He continues on and he says in the next paragraph:
"We disagree with several aspects of his being" - your analysis - "and this statement." First, even using his" - meaning Mr. Proctor's own analysis - "it appears that the 3-year average EBITDA was in excess of the





"3 year average debt service."
Is his statement correct?
A I think it is.
Q Down at the bottom he has Exhibit 6. What do you understand him to be doing in that exhibit, if anything?
A I believe he extrapolated that information from Mr. Weinress's report and is reporting what Mr. Weinress said in his Exhibit 6, or what projected EBITDA would be.
Q Do you agree with his numbers?
A I would have to go back to Mr. Weinress's report, but I don't have any reason to disagree with those at that point or call those into question.
Q Have you looked at the numbers -- any of the numbers that Mr. Zachow used and compared them with either the Weinress report or other source documents to which he was referring?
A Yes.
Q And did you find any errors in Mr. Zachow's numbers?
A No, not that I recall.
Q The top of the next page, page 5, he says:
"Using these projections, we calculated two common rule of thumb





"lending metrics: Total debt service coverage and total debt as a multiple of EBITDA."
Do you recognize both of those as rule of thumb lending guidelines?
A Yes.
Q You're familiar with both of them?
A Yes.
Q And do you agree with the conclusions he arrives at applying them?
A In the example that he's using, yes.
Q And have you applied them to American Medflight?
A We verified his calculations, yes.
Q And you concurred with them?
A Yes.
Q How many -- I mean, you testified several times you've been involved in two instances where clients had ESOPs; is that right?
A Yes.
Q Were those leveraged or unleveraged?
A I believe they were both leveraged.
Q And when did those occur?
A Back in the '90s.
Q So it's been at least between 10 and 20

years ago?
A Yes.
Q That's not part of your practice?
A No.
Q My statement's correct?
A That's correct.
Q Thank you.
Have you participated in leveraged buyouts?
A Yes.
Q How many?
A I don't recall.
Q More than 10?
A Over the 25 years as a CPA I'd say more than 10, yes.
Q How many in the last five years?
A I could think of less than a half a dozen, but more than just a couple in the last five years.
Q How about management buyouts?
A There's been a few throughout the career.
Q How many in the last five years?
A I can't think of any in the last five years.
Q Did you apply total debt service coverage or total debt as a multiple of EBITDA in your analysis of Weinress's work?





A No.
Q Do you disagree with Zachow's statement that the AMF ESOP transaction with Milsner "appeared to be modestly sized"?
A I'd say that's -- yeah, it's modestly sized, yes.
Q Continuing on the next page. This would be page 6 of Zachow's report.
In the middle of page, do you see where it says "Page 9"?
A Yes.
Q Do you agree that the circumstance of Mr. Carstarphen's, what you contend is his damage relative to the ESOP is temporary?
A In the perfect world as this was projected in Weinress's report, yes. What's happened, no.
Q Well, what has happened that leads you to believe that the harm that fell on Mr. Carstarphen as a result of the transaction is not going to be temporary?
A Because the company is not able to pay its debts to Mr. Milsner, for one. His operating results are lower than what those projections were.
Q And you believe that -- well, are there any other factors that you believe support that position?
A No. Again, just looking at the results of





operations of the company and the fact that they're in default.
Q The default is the deciding factor for you?
A No, it's one of the contributing factors.
Q Do you know if the terms have been renegotiated?
A I understand from talking to Mr. Dawson that there was a discussion that those terms were being renegotiated.
Q Do you know if they have been?
A Sitting here today, I do not know.
Q So your assumption is that they have not been?
A I don't know that I have one way of that or another, Mr. Hill.
Q If they've been restructured in such a fashion that AMF can afford the transaction, will that make Mr. Carstarphen's damages temporary?
A It could. It could be one of many factors.
Q The attorneys' fees that have been paid by the company, if those were recaptured by the company -- they've never been paid by the company, could the company have made its payments to Milsner?
A If the company recouped over $700,000 in legal fees that have been --





Q Let me put it to you hypothetically.
If the company had not paid any attorneys' fees to defend Mr. Milsner in the state court case, would the company have been able to make the payments due to Milsner?
A I don't know that.
Q You don't know one way or the other?
A No. There's a lot of factors that could have entered into all of that.
Q Continuing down on the bottom on page 6, there's a paragraph that Mr. Zachow has that begins:
"Again, we would remind the reader of the example of the house with debt and without debt. If an outside buyer were to offer to purchase the house, he would have to pay the 'enterprise value' regardless of whether there was any debt on the property. Thus, all else being equal, the value of the house has not been diminished by the debt."
Do you disagree with the applicability of that example?
A Yes.
Q Why?
A We're talking about Mr. Carstarphen's

equity value, not the enterprise value of the company.
Q Any other reason?
A No. That's primarily it.
Q And do you have any reason to believe that the transaction between Mr. Milsner and the ESOP was done intentionally to depress the value of Mr. Carstarphen's stocks?
A As I testified on April 26th, Mr. Hill, we raised the issue that that's a possibility. We raised the question.
Q Do you expect -- will you express that as an opinion?
A I will raise that possibility.
Q Have you told me about all the things that you believe support that as being a possibility in your mind?
A Yeah, I think it's outlined in that report.
Q Do you believe it's a probability or just a possibility?
A What's a probability or possibility? My testimony or --
Q Fair question, sir. You're doing your job.
Do you believe that Milsner having set this -- having intentionally structured the transaction to intentionally depress the value of Mr. Carstarphen's





stock is a probability?
A That's really for the trier of fact to determine.
Q I'm asking for your opinion, sir, you're the expert.
A Given not only that transaction, but all the other transactions that we've talked about ad nauseam over the last two depositions, it would tend to be suspicious.
Q And does that amount in your mind, sir, to a probability?
A It's a very strong possibility.
Q The answer to my question is?
A It's a strong possibility. That's the answer.
Q You are unable to answer my question?
A I'm not saying I'm unable to answer your question, I'm saying that it's a strong possibility.
Q But you're not prepared to testify that it is a probability; is that correct?
A I would raise the issue and let the trier of fact take all the cumulative amount of evidence before it to determine that.
Q I think my question called for a yes or a no answer, sir?





A What was your question?
MR. HILL: Mr. Reporter, will you please read it back.
(The following question was read by the reporter.)
"QUESTION: But you're not prepared to testify that it is a probability; is that correct?"
THE WITNESS: And my answer's still going to be, Mr. Hill, it's a possibility, it's a strong possibility.
BY MR. HILL:
Q Do you regard a probability as being more certainly than a strong possibility?
A It could be.
Q The material in your report, Exhibit 69, are they stated to a reasonable degree of professional probability?
A Yes.
Q Does the opinion that you have about this transaction having been intentionally structured to lower the value of Mr. Carstarphen's equity, does it rise to the same level as the opinions in your report?
A No, and again, Mr. Hill, I'm just raising the issue.
Q Continuing down, Mr. Zachow states that he





understands you -- that's item 1, page 11, let me read it for you.
He says:
"Here Proctor points out that 'for no apparent reason....' the weightings used by Weinress in the two reports are different."
Is that your contention in your report -- I'm on page 7.
A Oh, I thought you said page 11.
Q No. He's referring to page 11 of your report.
A Sorry. Page 7?
Q Page 7.
A Item 1, page 11.
Q "Here Proctor points out that 'For no apparent reason....' the weightings used by Weinress in the two reports are different."
Do you make that assertion in your report at that point?
A Yes.
Q Do you concede that Mr. Weinress was hired to valuate the company at two different points in time?
A Yes. You asked that earlier and I answered yes.

Q Would you expect the weightings to change because of the change in circumstances of the company?
A It could. It could also not.
Q Okay. And that would be something that would be somewhat subjective on the part of the appraiser, wouldn't it?
A Yes. And as we talked about earlier, again we didn't have access to Mr. Weinress's workpapers that would indicate how he came to those conclusions or why or how he could substantiate or not substantiate his subjectivity.
Q You testified before, if I understand correctly, that in arriving at your report you've now had the benefit of not only of Mr. Weinress's reports for 2004, you've had the December 15, 2005, the December 31, 2005, you also had the benefit of 2006, 2007 and 2008 business reports prepared for ESOP; is that right?
A Yes.
Q Weinress didn't have all that information, did he?
A No. Mr. Weinress in 2005 did not have the information available in 2008.
Q Do you believe that Weinress's values are too high, too low, or can you tell?
A No, again, we raised issues with the





reports over how some of those assumptions, methodologies, procedures were done, how they might have been substantiated, researched.
We did not, again because we did not do the business valuations, indicate whether or not that value is reasonable, too low, too high. We raised these questions should that be answered.
Q What you've done in your report is simply take the differential between the two Weinress properties?
A And overgeneralization you like to do, Mr. Hill, but yes.
Q Well, you applied -- in arriving at the damage figure for Mr. Carstarphen, you took a third of that number, didn't you?
A After we added back the marketability discount. Excuse me, the minority discount.
Q Why did you add that back in?
A To come back up to fair value.
Q And what is your source of the definition of fair value?
A Authoritative literature, business knowledge, business publications.
Q Can you cite me to anything in particular?
A There's all kinds of literature out there.





There's a lot of information with respect to the NACVA. Shannon Pratt books. There's the Gary Trugman books. There's the PPC books that talk about that.
Different governing bodies for appraisers and business valuations also define that. There's a glossary that defines that.
Q You are critical of Weinress as being not independent; is that true?
A I'm not critical. I just raised that as a possibility.
Q You do not have the opinion to a reasonable degree of professional certainty that he was not independent. Is that statement correct?
A I just raised the possibility.
Q Let's go to page 10. He references page 12, second to last paragraph of your report. Do you see that?
A Yes.
Q And he attributes a statement to you at the last sentence in that first paragraph:
"Weinress' assumptions and the changes in his assumptions make the pre-transaction value higher and the post-transaction value lower."
Is that your opinion?





A Yes.
Q Is that business value, equity value?
A Equity value.
Q And you say higher, should that be "(than it should be)"?
A No.
Q So you're not -- you don't mean to be saying that his value is wrong. You're just commenting that the assumptions he uses would tend to drive the value up?
A Yes.
Q And the assumptions that he used later would drive it down, you don't know whether it's appropriate or not?
A I was fine with the first part of the question, not fine with the second part of the question, Mr. Hill.
Q Why?
A His assumptions and his changes in that and his methodology does tend to make the pre-transaction value higher and the post-transaction value lower.
Q Go to page 11 of Mr. Zachow's report, next to the last paragraph.
He says in his circumstance, in his experience, he has seen minority discounts as high as

80%. Do you read that?
A Yes.
Q Have you ever seen that high of a minority discount applied?
A Yes.
Q What were the circumstances that caused the minority discount to be so high?
A I'm just speaking off of a vague memory, Mr. Hill. But the items that could determine that, that I believe was the amount of the minority interest and the fact that that minority interest had virtually had no power whatsoever. And a lot of that depends on the dynamics and synergies of the makeup of the company.
Q And whether or not that -- in this instance does it really matter whether Mr. Carstarphen owns one-third of the company or one percent of the company?
A Yes, it does.
Q Why?
A Because there are other protocols that are not typically -- or not all the time put into other companies. The sole issue about how these protocols and safeguards were put into effect because of insider transactions or related party transactions.
Q You're referring to the second and third board of directors minutes?





A Yes, if I recall that correctly.
Q If I understand what you just told me, you believe that those would not be contemplated in a one percent ownership; is that fair?
A Yeah. I mean, obviously any company can do whatever. But I have not seen where a one percent shareholder -- I think there's probably areas out there like that or companies that are like that, but I have not seen that.
Q Do you think that the adversarial relationship between the minority and majority shareholders would be something that should be taken into account in terms of arriving at a proper minority discount?
A It could be.
Q The minority shareholder having to expend money trying to enforce his rights?
A Could be.
Q That minority shareholder's of the opinion that the rules aren't being complied with, would that be something that would affect the minority discount?
A It could be.
Q Did you factor those into you arriving at 15%?
A Yes.





Q What else did you factor in?
A We had looked at Mergerstat.
Q What is that?
A That's a database of where public companies and minority discount rates have been going.
Q Public companies, meaning publicly traded?
A Publicly traded.
Q So that would be stock and such?
A Yes.
Q Did you factor any private companies?
A Yeah, I believe we did. I'd have to think of what we used for that, but yes.
Q Is that in the binders?
A It might be. It should be.
Q It should be. Well, why don't we take a look.
I'd like you to tell me which of your binders were used to get to minority discount?
Is it one page or more than one page?
A One page.
Q Let's remove it and mark it and we'll get you a copy before you leave.
This will be 76.
(Exhibit 76 was marked for identification.)





BY MR. HILL:
Q I'll hand you back Exhibit 76, and I'd like you to tell me where on here it tells us that any of those are not publicly traded companies?
A Right here.
Q You're referring to note A?
A Yes.
Q Note A and note B or just note A?
A Note A.
Q We'll get a copy of this for you next time we take a break.
Let's continue with Mr. Zachow's report, please, I'd like to go to page 12 where it says summary on page 12.
A Yes.
Q The paragraph right above that Mr. Zachow says:
"We would call attention to Proctor's statement in the last paragraph on page 12 and in note 6 in the chart on page 13 where he states that had he followed applicable appraisal standards both the estimated value and the minority s interest discount could be materially different."

Is that a true statement about your report?
A Yes.
Q Do you have any reason to believe that anyone associated with AMF should have known about the criticism that you have of Mr. Weinress's work?
Do you understand my question?
A Yes. Can I have the court reporter read that back?
(The following question was read by the reporter.)
"QUESTION: Do you have any reason to believe that anyone associated with AMF should have known about the criticism that you have of Mr. Weinress's work?
Do you understand my question?"
THE WITNESS: First of all, I understand your question.
BY MR. HILL:
Q Thank you.
A The answer would be yes.
Q On what basis do you make that statement, sir?
A They have an administrator involved. They have legal counsel involved. Management could have looked at the projections versus the actual.
So, yes, I would think somehow between all





the different professionals involved, how management or the people that are making decisions that they would have to raise the question of some of this and obtain more professional advice.
Q Anything else?
A No.
Q The administrator, what should they have done? What should they have done, and how would they have known what you know?
A Well, they handle a lot of ESOPs, according to their literature and their information.
And they certainly must see a lot of different appraisals and business valuations. And they could have questions.
Q Have you ever served as an ESOP administrator?
A No.
Q Have you ever had a client who served as an administrator for an ESOP?
A Not that I'm aware of.
Q On what basis, sir, do you make the statement that the ESOP administrator should have been aware of the errors that you contend are the errors in Mr. Weinress's report?
A What I just testified to, they see a lot of





different appraisals. And they're putting together reports, administering a plan and looking at these items to see whether or not they're making -- they're doing their reports and everything, they should be looking at this stuff.
Q As an accountant you believe that they as an ESOP administrator should have seen that?
A Yes, or at least have questions.
Q Do you know whether they did have questions?
A No.
Q On what basis do you make the assertion that legal counsel should have seen the errors that you attribute to Mr. Weinress?
A Well, if legal counsel is advising the company of what to do and what not to do on an ESOP, I would imagine they would look at the ESOP valuation. They might have questions as well.
Q As an accountant, that is your opinion of what the lawyers should have done?
A Yes.
Q And the same with management, it's your opinion as an accountant that that's what management should have done?
A Yes.





Q Do you know whether or not management did do that?
A I can't conclusively say one way or another.
Q Did you ask Mr. Dawson?
A No.
(Exhibit 77 was marked for identification.)
BY MR. HILL:
Q I'm going to hand you Exhibit 77. This is what my staff has brought back to me after copying what you gave us as your correspondence.
I'd like you to take a moment, look at Exhibit 77 that I've handed to you and confirm for me that everything that's in the bundle that we bought back is in 77.
A Okay.
Q First of all, you pulled out and gave us all the correspondence and e-mails that you've had with Mr. Carstarphen, Mr. King, Mr. Russo related to your assignment; is that right?
A Yes, in that section, Mr. Hill.
Q In just one section or --
A I'm sorry. I'm thinking that I have a whole other binder that might have had correspondence in

it with all these documents that you guys were discussing before.

Q So there's a fourth binder that --

A No. There's a third binder. Let's just go through that.

Q Mr. Proctor, what I want to do is I want to get a definitive list here of all of your communications with Mr. King, Mr. Russo and Mr. Carstarphen relative to your assignment in this case.

A Okay. There are some letters in this document dispute binder.

Q I would like you to remove them so we can copy them and add them to our....

A Which of course you've already got copies of these, but you're running copies again.

Q Some maybe, some not.

Is that one of your reports?

A This is an additional document request.

Q We'll need that.

A Do you want -- Mr. Hill, do you want information or letters in which I was cc'd on between you and Mr. Russo?

Q No.

A Mr. Hill, do you want copies of items that are interspersed that are the same copies?





Q No.

A Okay. Mr. Hill, do you want copies of the attachments to the e-mails?

Q What are they?

A Recaps of Bate stamp numbers.

Q What I want is communication of e-mails between you, Mr. Carstarphen, Mr. King and Mr. Russo because I believe that there have been substantial numbers that have been withheld from us.

MR. HILL: Let's take a break. When you're done with that, give those to my staff, please, and they'll make copies.

(A recess was taken at 11:35 a.m.)

-oOo-





RENO, NEVADA, THURSDAY, JUNE 3, 2010, 11:45 A.M.

-oOo-

MR. HILL: Back on the record.

(Exhibit 78 was marked for identification.)

EXAMINATION

(Resumed)

BY MR. HILL:

Q Mr. Proctor, while we were off the record my staff made some copies.

Does Exhibit 78 include all of the most recent e-mails and other correspondence that you pulled from your file?

A Along with 77.

Q My question is directed to whether 78 included the bundle you most recently pulled?

A Yes, sir.

Q Therefore, between 77 and 78 we have the galaxy of communication between you, Mr. King, Mr. Russo, and you and Mr. Carstarphen; is that correct?

A Yes.

(Exhibit 79 was marked for identification.)





BY MR. HILL:

Q Mr. Proctor, I'll hand you Exhibit 79. I believe you produced these in this case and you told us these are bills for services in this case; is that correct?

A Yes, sir.

Q And these are in fact true, correct and complete copies of the bills that were submitted to Mr. Carstarphen for services -- for all services in this case?

A Yes, sir.

Q And have you billed for any services since the date of your prior deposition?

A Yes, sir.

Q Anything that you did that you've not already described for me here today?

A No, sir.

Q So all the e-mails that are referenced on your billing should be in 77 or 78, right?

A Yes, sir.

Q Can you turn to the invoice dated January 31st, 2009.

A January 31st, 2009. Yes, sir.

Q I see a billing entry for January 7, 2009. Can you tell me if that's in 77 or 78. And if you want

to expedite things, I'll share with you, my staff -- I withdraw the question. They put one together that's chronological.

Continuing onto the next page, though, please. The next to the last entry, the one dated 1/6/09 at the bottom under your name?

A Yes.

Q Finalized preliminary report sent to attorney.

A Okay.

Q Where is that preliminary report?

A It will either have to do with all of the documents -- this is when you were having discussions back and forth in the federal case on the documents.

Q Mr. Proctor, if you could pull out for us the preliminary report to which you're referring.

You handed me a document -- let me go ahead and mark it Exhibit 80, a 2-page document entitled Carstarphen versus Milsner, documents to be produced pursuant to subpoena in a civil case.

(Exhibit 80 was marked for identification.)

BY MR. HILL:

Q These two pages, Exhibit 80, sir, is that what you're telling me is your preliminary report?





A Yes.

Q And we should then also in 77 and 78 have the correspondence to client?

A Unless it was done telephonically, Mr. Hill.

Q Well, correspondence --

A My recollection is that there were a lot of -- or several rewrites on the documents back and forth that they were requesting.

Q The documents that look like Exhibit 80?

A Yes.

Q But your testimony is that what we have as Exhibit 69, I believe it is, your report, the April report and the February prior report, those are it? There were no rough drafts submitted to counsel in advance?

A That's correct, Mr. Hill.

Q Okay. Do you disagree with Mr. Thomas's statement in his report that American Medflight had not paid its fair share of overhead in the early years, between '95 and '99?

A Yes.

Q On what basis do you disagree, sir?

A First of all, that was never alleged until recently. And then early on in the state case that was





never raised as a defense.

Q Anything else?

A And so I don't know on its face value that that allegation, that that's what that consulting fee was about, it had nothing do with that.

Q That doesn't answer my question. My question was, do you disagree that American Medflight was not paying its fair share of overhead expenses between '95 and '99? You went to the next -- you put a spin on that.

I want to know if you have any basis to disagree with the analysis what Mr. Thomas did on that subject?

A I want to see more proof.

Q So at this point in time is, no, you do not, but you'd like to see additional documentation?

A Yes, sir.

Q Thank you.

Have we discussed all of the opinions that you have formed pertaining the Mr. Milsner and his interactions with American Medflight?

A At this time, yes.

Q Has anything been added to your binders since the last time you were here?

A I don't believe so.





Q Anything removed from your binders since the last time you were here other than the documents we've pulled today?

A I don't believe so.

Q Do you have any basis to assert that Milsner withheld any information in his possession pertaining to the transaction with the ESOP from Mr. Carstarphen?

A Not recently.

Q Can you explain, please?

A Well, I just went through binder number 3 which had all the document discussions, pleadings, correspondence back and forth about not turning over documents and alleging to turn over documents and all that.

So there was some dispute about what was turned over and what was not turned over the past several years.

Q Let me put a finer point on my question, sir.

I'd like you to focus on the meeting that occurred December 5th, 2005.

A Okay.

Q Do you have any evidence in your possession that prior to that meeting there was any information that

Milsner had from any source pertaining to the ESOP or the transaction that he was going to enter into that he withheld from Mr. Carstarphen?

A Well, Mr. Hill, if it hasn't been produced, I wouldn't know what might have been withheld, but I don't know of anything that was withheld.

Q Thank you.

Have you told me about all of the harm that you believe has occurred to Mr. Carstarphen in relation to the matters arising out of his ownership of the stock in American Medflight?

A I think both in my prior report, Mr. Hill, my testimony on April 26th, and other testimony, we indicated that there were other areas of damages that we were not asked to explore or quantify that could further be determined or explored.

Q Understood. Other than those items that you've already identified, are there any others?

A No, sir.

Q Has Mr. King or Mr. Russo expressed, or Mr. Carstarphen for that matter, expressed to you any things that they anticipate asking you to do in relation to this matter between now and trial?

A I can't specifically recall that, but we're always kind of fluid.





MR. RUSSO: I asked him to look into the leasing issue.

THE WITNESS: There was the issue, yes, we just discussed about the leasing of the aircraft.

BY MR. HILL:

Q Tell me what you understand to be the assignment, sir.

A To determine whether or not the transactions between AMF and RFS are at a fair rate. Has Mr. Carstarphen been damaged because of the terms or the amounts of those arrangements, and how that might play in with any of the assets that AMF should have purchased or leased.

Q How do you plan to go about this assignment, sir?

A Well, since it was just brought up, I haven't had a chance to really think about it too much. But I think we'll start doing some research in the next day or so.

Q And in terms of assignment, do you distinguish between leasing and renting?

A Yes, as we discussed on April 26th the difference between leasing and renting.

Q So this assignment pertains solely then to the leasing?





A No, it might actually involve into the renting of it as well.

Q I'm asking for your understanding of the this new assignment, sir.

A I'd like to do the renting as well as lease.

(Exhibit 81 was marked for identification.)

BY MR. HILL:

Q I show you Exhibit 81, Mr. Proctor.

This purports to be an e-mail from you to Mr. Carstarphen. Is that in fact what it is?

A It appears to be, yes, sir.

Q Did you send this e-mail to him on or about that date?

A It would appear to be so, yes.

Q Did Mr. Carstarphen get back to you with the staffing level and positions that he contended AMF needed from 2005 on?

A Yes.

Q Anything that we haven't talked about here?

A No. And you already have copies of those sections of the --

Q Thank you.

And same question for number 2 on that





e-mail, the salary levels and benefits and arrangements for them?

A Yes.

Q And do we already have that?

A Yes, sir.

Q And did you inquire of Mr. Carstarphen how he arrived at the salary levels and benefits?

A Yes, I did.

Q What did he tell you?

A My recollection is that's just what he thought and what his recollection was.

And was as I testified on April 26th at my deposition on that date, we actually found that -- we found better sources of information that we used.

Q Have you found Mr. Carstarphen's information to be unreliable?

A I wouldn't say unreliable, no.

Q So you found Mr. Carstarphen's information to be reliable?

A Generally reliable, yes.

Q And you've relied on it in your report?

A To some extent, yes.

Q What did he tell you about number 4, any special requirements, licensing, et cetera that staff would need?

A I believe he said they had to be certified I think within -- is it 121 possibility?
Q 135?
A 135 maybe.
Q One of those numbers?
A Yes, one of those numbers. I don't know the FAA regulations as much as I know the Tax Code.
Q Did he provide you with any documentation or just a narrative?
A It was just narrative or conversation, I do recall that there was some correspondence back and forth, which I think you have copies of with respect to that. And I might have actually gone and looked at the FAA regulation on that as well.
(Exhibit 82 was marked for identification.)
MR. HILL: Exhibit 82. And, counsel, I'll get you a copy of that in a minute.
BY MR. HILL:
Q This looks like some sort of amortization schedule, at least the top of it is. Is that what you understand this to be?
A Yes, at least, as you say, the top four pages.
Q Top four pages.





Did you prepare that top four pages or have it prepared as part of your analysis?
A Yes, sir.
MR. HILL: Let's take a break for a minute. I think we're done.
(Off the record.)
BY MR. HILL:
Q Mr. Proctor, have there been any questions that I've asked you that you want to change your answers to?
A I don't believe so, Mr. Hill.
MR. HILL: In that case, I'll pass the witness.
MR. RUSSO: No questions.
MR. HILL: All right. We're done.
(The deposition was adjourned at 12:06 p.m.)
-o0o-





I, JAMES S. PROCTOR, deponent herein, do hereby certify and declare under penalty of perjury, the within and foregoing transcription to be my deposition in said action, subject to any corrections I have heretofore submitted, and that I have read, corrected, and do hereby affix my signature to said deposition.

James S. Proctor

STATE OF NEVADA )
) ss:
COUNTY OF WASHOE )

Subscribed and sworn to before me this ______day of ______________, 2010 .

Notary Public





CERTIFICATE OF REPORTER

STATE OF NEVADA )
) ss:
COUNTY OF WASHOE )

I, JERRY J. SILVEN, a duly commissioned Notary Public, Washoe County, State of Nevada, do hereby certify:

That I reported the deposition of the witness, JAMES S. PROCTOR, commencing on Thursday, June 3, 2010, at the hour of 9:15 a.m.;

That prior to being examined, the witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate record of testimony provided by the witness at said time.

I further certify (1) that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action, and (2) that pursuant to NRCP 30 (e), transcript review by the witness was requested.

IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Washoe, State of Nevada, this 8th day of June , 2010.

Jerry J. Silven, CCR #55

# EXHIBIT 10

# EXHIBIT 10

# MINUTES OF SEVENTEENTH MEETING
# OF
# THE BOARD OF DIRECTORS OF

# AMERICAN MEDFLIGHT, INC.

The seventeenth meeting of the Board of Directors of AMERICAN MEDFLIGHT, INC., was held by phone, Reno, Nevada 89502, on December 9, 2003, at 10:20 A.M.

Present were John R. Carstarphen, Jack A. Dawson, Richard L. Milsner, by phone. This being all of the Board of Directors of American Medflight, Inc.

On a motion duly made and unanimously carried, John R. Carstarphen was elected Chairman of the meeting and Jack A. Dawson was elected Secretary thereof.

The minutes of the sixteenth meeting of the Board of Directors were read.

> "NOW, THEREFORE, BE IT RESOLVED: That the minutes of the sixteenth meeting of the Board of Directors shall be adopted and placed in the corporate minute book."

It was discussed to sell the corporation to the employees thru an ESOP Plan to be administered by Menke and Associates to be concluded on or before December 31, 2003 at a cost of administration not to exceed $9,000 and Document costs not to exceed $4,000. It was also discussed to change the corporation tax status to "C" corp. as required by the ESOP.

> "NOW, THEREFORE, BE IT RESOLVE: That the Board of Directors approve and ratified this expense and the adoption of the ESOP Plan."

There being no further business, the meeting was adjourned.

Jack A. Dawson, Secretary

Jack A. Dawson, Director, President and Secretary

John R. Carstarphen, Director and Vice President

Richard L. Milsner, Director and Treasurer

# EXHIBIT 11

EXHIBIT 11

KING & RUSSO, LTD
PATRICK O. KING, ESQ., BAR NO. 5034
J. SCOTT RUSSO, ESQ., BAR NO. 6477
1677 Lucerne Street, Suite B
Minden, NV 89423

Telephone No. (775) 783-7500
Facsimile No. (775) 783-7600

Attorneys for Plaintiff John Carstarphen

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA - RENO**

| | |
|---|---|
| John Carstarphen, an individual<br><br>Plaintiff,<br><br>vs.<br><br>Richard Milsner, an individual and DOES 1 through 10, inclusive.<br><br>Defendants. | Case No.: 3:07-cv-00542-ECR-RAM<br><br>**PLAINTIFF JOHN CARSTARPHEN'S RESPONSE TO SECOND SET OF INTERROGATORIES** |

PROPOUNDING PARTY: RICHARD MILSNER

RESPONDING PARTY: JOHN CARSTARPHEN

Plaintiff John Carstarphen ("Responding Party" and/or "Carstarphen") hereby responds to the Second Set of Interrogatories, propounded by Defendant Richard Milsner ("Propounding Party" and/or "Milsner") as follows:

**GENERAL OBJECTIONS AND QUALIFICATIONS**

Responding Party interposes the following General Objections and Qualifications to each of the Interrogatories. These objections are made to each and every individual Interrogatory and are incorporated by reference into each of the specific responses which are set forth below.

The responses by Responding Party to the Interrogatories should not be construed as an

admission that such information and/or documentation is relevant to the subject matter of this litigation or is admissible evidence.

Responding Party's lack of objection to the Interrogatories, or any individual Interrogatory contained therein, is not to be deemed an admission that the Interrogatory is not otherwise seeking privileged information and/or documentation or objectionable on some other grounds.

All of the responses contained herein are based only upon the information and documents which are presently available to and specifically known to Responding Party, and discloses only those contentions which are presently asserted by Responding Party upon the facts known.

It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the contentions herein set forth.

The following responses are given without prejudice to Responding Party's right to produce evidence of any subsequently discovered facts which Responding Party may later recall. Responding Party accordingly reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known, which should in no way be to the prejudice of Responding Party in relation to further discovery, research or analysis.

Responding Party has a made a diligent search and reasonable inquiry in an effort to respond to each of the Interrogatories as Responding Party understands and interprets each Interrogatory. If Propounding Party subsequently asserts an interpretation of the Interrogatories which differs from that of Responding Party, Responding Party reserves the right to supplement his objections or responses, or both.

RESPONSE TO INTERROGATORIES

INTERROGATORY NO.6

As to each transaction by American Medflight, Inc. in which you refer to in your First Amended Complaint and as to which you claim any right to compensation:

(a) identify each transaction to which you refer by date, amount and substance of each transaction (i.e., what labor or materials are furnished);

(b) identify all documents that memorialize all components, portions or aspects of each transaction identified;

(c) specifically identify each labor or material component furnished in any identified transaction that you contend was not reasonably necessary or appropriate under the circumstances, was not actually furnished, or was defective or deficient;

(d) specifically identify any labor or materials in any identified transaction for which AMF was overcharged (i.e., charged more than was appropriate in light of charges for similar labor and materials in the local industry).

RESPONSE TO INTERROGATORY NO.6

Carstarphen is reviewing the voluminous document production from AMF and RFS necessary to respond to this interrogatory. Pursuant to the agreement of counsel, Carstarphen will respond further to this interrogatory on or before August 14, 2009.

INTERROGATORY NO.2

State each and every error or omission, provision, term or other factor about the structure, organization, operation or any other aspect of the AMF ESOP that you contend has not been appropriate in any way or to any extent.

RESPONSE TO INTERROGATORY NO.2

Carstarphen does not contend that was or is an inappropriate error, omission, provision or term in the structure, organization or operation of the AMF ESOP.

Carstarphen's contention in this case is as follows:

Prior to the December 5, 2005, Board of Directors and Stockholders' Meeting, Carstarphen was provided with an appraisal of AMF prepared by Menke Associates, stating that the fair market value of AMF was approximately $5.5 Million at that time. Responding Party very much was considering selling his stock to the ESOP upon the terms discussed at the meeting. However, prior to entering the meeting, Milsner told Carstarphen that he could not participate in the sale to the ESOP unless he dismissed his state court lawsuit. In the lawsuit, Carstarphen contended, among other things, that Milsner had wrongfully diverted millions of dollars from AMF for the benefit of RFS. The condition to participation in the sale, dismissal of the lawsuit, was the only reason at that time that Carstarphen did not agree to sell his stock at the ESOP at that time.

As of the December 5, 2005 meeting, Carstarphen was aware that the AMF ESOP did not have cash to pay Milsner for his stock and that a note from the AMF ESOP would be required. However, Carstarphen had no knowledge that the AMF ESOP executing a note to would cause a liability by AMF. Carstarphen did not know that Milsner's sale to the AMF ESOP would have any adverse effect on the fair market value of AMF. It was only when Carstarphen first provided with the year end appraisal of AMF, December 31, 2005, that he first learned that the AMF ESOP liability to Milsner would devalue AMF and therefore Carstarphen's stock. Carstarphen contends that, had he been aware on December 5, 2005, that the AMF ESOP's obligation would correspondingly devalue AMF, he would have had to balance the reasonable value of his lawsuit versus the loss in value of his stock, and may very well have decided to sell his stock to the ESOP at that time.

DATED: July 17, 2009

KING & RUSSO, LTD.

By:________________________
J. Scott Russo
Attorneys for Plaintiff

# VERIFICATION

**STATE OF NEVADA, COUNTY OF WASHOE**

I have read the foregoing **PLAINTIFF JOHN CARSTARPHEN'S RESPONSE TO SECOND SET OF INTERROGATORIES** and know its contents.

**[ ] CHECK APPLICABLE PARAGRAPHS**

[X] I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[ ] I am [ ] an officer [ ] a partner ________ [ ] a ________ of ____________
________________________________________________, a party to this action, am authorized to make this verification for and on its behalf, and I make this verification for that reason. [ ] I am informed and believe and on that ground allege that the matters stated in foregoing document are true.

[ ] I am one of the attorneys for ______________________________, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on X July 17, 2009, at Reno, Nevada

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

John Carstarphen
Type or Print Name

John Carstarphen
Signature

# EXHIBIT 12

EXHIBIT 12

MENKE & ASSOCIATES, INC.
ESOP ADVISORS AND BANKERS

San Francisco, California
Morristown, New Jersey
Atlanta, Georgia
Chicago, Illinois
Portland, Oregon

AFFILIATE:
BSI - Los Angeles, California

December 5, 2003

PERSONAL AND CONFIDENTIAL

Mr. Rich Milsner
American Medflight, Inc.
1233 Alpine Road, Suite 200
Walnut Creek, CA 94596

Dear Rich:

The purpose of this letter is to set forth our recommendations and the terms of our proposal for the design and qualification of an Employee Stock Ownership Plan ("ESOP") for American Medflight, Inc.(the "Company").

The main objectives of the use of an Employee Stock Ownership Plan for American Medflight, Inc., as we understand them, are as follows:

1. To provide a tax-deductible and flexible, in-house market for the acquisition of your shares.

2. To provide you with the opportunity to sell some or eventually all of your shares tax-free, subject to the rollover provisions of the Internal Revenue Code, based upon your timetable.

3. To enable the Company to borrow money (if it so desires) for the stock purchase and to repay the entire loan with before-tax dollars.

4. To provide a means for your employees to earn a benefit that is tied to the long-term success of the business.

5. To attract, retain, motivate and reward productive employees.

6. To decrease the Company's income tax liability.

7. To provide the Company with a shareholder "liquidity and diversification" technique that may be preferable to the alternatives of stock redemption, which requires after-tax dollars, or liquidation of the corporation, or sale of the corporation to an outside party.

RFS 00706

6. The Company would make annual contributions to the ESOP in cash in an amount necessary to pay the interest and principal payments on the loan. Pursuant to the Internal Revenue Code, these contributions are tax-deductible for federal income tax purposes in any amount up to 25% of covered compensation to the extent necessary to pay the principal on the loan. Over and above the 25% limitation, the Company may contribute dividends (to the ESOP only) which are also tax-deductible if such dividends are used to repay debt and are paid during the fiscal year.

   In addition, the Company may contribute and deduct however much is necessary to pay the interest on the loan even if this amount exceeds 25% of payroll. Contributions to pay interest are counted in the 25% limit if more than one-third of the contributions are allocated to highly compensated employees.

   **Note**: The Company's assets typically serve as a collateral for the loan. Additional collateral is sometimes required and may take the form of personal guarantees of a seller or a pledge of the securities purchased from the proceeds of the loan. The pledge may be limited in both amount and duration.

7. Please note that it will no longer be necessary to switch to a regular C corporation in order to purchase Company stock. Effective January 1, 1998, the purchase of Company stock by a qualified plan will no longer result in termination of the S election. However, in the case of an ESOP that is maintained by an S corporation, the seller may not take advantage of the tax-free rollover provisions of Section 1042 of the Internal Revenue Code. Accordingly, in most cases it will be advisable to switch to a C corporation in order to avoid these limitations.

8. Finally, the sale price for the common stock would be at fair market value as required by the Internal Revenue Code and related regulations.

Rich, I have only outlined the general structure of our proposal. A great many variations are possible, depending on policy decisions and individual circumstances. Some of the advantages we feel you should consider under an ESOP are these:

1. An in-house market for your stock is created by the ESOP.

2. The ESOP enables the repurchase of outstanding shares tax-free, subject to the rollover provisions. You must buy stocks and bonds of American corporations to qualify for tax-free rollover.

3. The ESOP enables the repurchase of outstanding shares with tax-deductible dollars to the Company, as contrasted to after tax funds used in a stock redemption.

4. The ESOP permits borrowing wherein not only the interest but also the <u>principal</u> payments are tax deductible.

MENKE & ASSOCIATES, INC.



5. The Company acquires a strong employee motivational tool and employees acquire a beneficial interest in the Company for which they work. The employee/owners have a unique opportunity to build wealth through stock appreciation without personal liability.

6. ESOPs provide continuity of ownership and control. The ESOP committee is appointed by the Board of Directors. Thus, voting control continues as under existing arrangements or can be arranged in the manner you specify.

7. The ESOP could be prefunded with cash for several years in order to purchase your stock at a future time.

8. The ESOP can be used to enable the Company to continue to finance its expansion out of pretax earnings of the Company through the issuance of newly issued common stock. Borrowing through an ESOP also improves a Company's cash flow versus traditional borrowing, which benefits a business further by improving its credit worthiness.

9. The ESOP enables the Company to significantly decrease, and possibly eliminate, its income tax liability.

Should you desire to go forward with an Employee Stock Ownership Plan for the Company, the services of Menke & Associates in connection with the design and qualification of the Plan are as follows:

FINANCIAL CONSULTING

Menke & Associates, in conjunction with corporate management, will design a plan for the acquisition of stock by the ESOP. Such plan shall include advice and assistance in structuring the transaction so as to comply with all applicable IRS contribution and allocation limitations. Menke & Associates will also be available to assist in the explanation of any aspects of the ESOP or the transactions thereunder to others who may be involved, such as the shareholders, Directors, Company counsel, Company auditors and Company lenders.

DRAFTING OF PLAN DOCUMENTS

Menke & Associates will work with you and, at your election, your counsel to design an Employee Stock Ownership Plan and the related Employee Stock Ownership Trust Agreement. When these documents and all policy and procedural questions are resolved, the final documents will be submitted for adoption and signature. The form and content of The Plan and Trust shall be designed by Menke & Associates to reflect and facilitate the Company's desires and preferences with respect to the various items covered therein. In addition, Menke & Associates will work with you and your counsel to prepare the necessary corporate minutes, committee minutes and stock purchase agreement.

(Menke & Associates, Inc. is not licensed to practice law under the various state law jurisdictions. Accordingly, all state law matters, including stock splits, amendments to Articles of Incorporation, permits for the issuance and/or transfer of stock, and the like, must be handled by local counsel.)

OBTAIN INTERNAL REVENUE SERVICE APPROVAL

When the ESOP and the related documents are in a form satisfactory to you, Menke & Associates will prepare the application to the Employee Plans/Exempt Organizations (EP/EO) Division of the Internal Revenue Service for a Determination Letter. Menke & Associates will submit the application (Forms 5300, 5309 and 2848), together with the Plan and Trust Agreement, to the Internal Revenue Service and will explain and work with the EP/EO representatives of the Internal Revenue Service in connection with obtaining IRS approval.

The Revenue Act of 1987 requires a determination letter application fee that ranges from $700 to $1,250 per plan. This fee is payable directly to the Internal Revenue Service upon submission of the Plan documents.

EMPLOYEE COMMUNICATIONS

Menke & Associates shall prepare a general explanation booklet, which explains the background and philosophy of the ESOP, and a Summary Plan Description booklet, which explains the technical aspects of the Plan. In addition, Menke & Associates shall design a color slide presentation about the Plan and shall have Sherman Coultas or John Givens, my partners in charge of employee communications, speak to the covered employees at meetings held during the course of one day at one location for the purpose of communicating the Plan in greater detail and answering questions.

To minimize travel costs, we strive to limit employee briefings to the first week of each calendar month. By following this schedule we are able to prorate travel costs among several clients within certain geographic regions. Briefings which require extra day(s) consistent with client needs will be subject to an incremental fee of $1,000 per day.

ADMINISTRATIVE FORMS

Menke & Associates shall design and prepare various administrative forms that are necessary in operating the Plan and in periodically advising the Plan participants of their accumulated Plan benefits and of their options and alternatives under the Plan, with respect to the distribution of Plan benefits.

The foregoing services do not include Annual Administration Services. See subsequent paragraph entitled "Annual Administration Services."

MENKE & ASSOCIATES, INC.



PAYMENT SCHEDULE

Payment of **$15,000** for the aforementioned services (excluding the initial Stock Appraisal that is referred to in the separate proposal) shall be made in accordance with the following schedule.

1. **35%** upon delivery of this proposal to Menke & Associates, Inc. as a retainer.
2. **40%** upon delivery to the Company of the Plan and Trust Agreement.
3. **15%** upon submission of the Plan and Trust Agreement to the Internal Revenue Service, together with other required documents.
4. **10%** upon delivery of the Summary Plan Description (SPD) and the Administrative System.

Menke & Associates will absorb all out-of-pocket expenses, with the exception of expenses incurred in connection with travel on behalf of the Company and the fee charged by the IRS for plan submissions. Menke & Associates guarantees the Plan will receive a favorable Determination Letter from the Internal Revenue Service. Otherwise, all fees paid, less out-of-pocket costs, will be refunded.

The services and associated fees, as stated in this proposal, will be honored by Menke & Associates, Inc. for a period of one year from the date of this proposal.

ANNUAL ADMINISTRATION SERVICES

Menke & Associates shall provide the annual administration services necessary to administer and operate the Plan. The administration services include the following: (a) allocation of contributions, forfeitures and investment gains and losses as of each anniversary date; (b) preparation of individual statements of accounts for distribution to employees; and (c) preparation and filing of Internal Revenue Service annual tax returns. The fee for the Annual Administration Services is based upon the number of participants, as set forth in the attached Schedule.

OPTIONAL SERVICES:

ASSISTANCE IN ARRANGING FINANCING

If requested by the Company, Menke & Associates, Inc. shall assist the Company in obtaining financing for the proposed transaction by introducing the Company to lenders who are active in making ESOP loans. Menke & Associates, Inc. shall (a) prepare a preliminary loan request which shall describe the operations of the Company and the structure of the proposed transaction; (b) solicit indications of interest from such potential lenders; (c) assist in screening such potential lenders; and (d) assist in explaining any aspects of the transaction to such potential lenders.

MENKE & ASSOCIATES, INC.



SUPPLEMENTARY DOCUMENTS

If requested by the Company, Menke & Associates, Inc. shall draft other documents incidental to the installation of an ESOP including the following: (a) supplementary executive retirement plans (SERP); (b) management stock bonus plans; (c) revised buy/sell agreements; (d) loan agreements; (e) pledge agreements; and (f) opinion letters. The fees for drafting the above documents are set forth in the attached schedule.

OTHER

If requested by the Company, Menke & Associates, Inc. shall assist the Trustees in obtaining the following services through service providers recommended by Menke & Associates, Inc.

1. Independent Review of Valuation Report
2. Fairness Opinion
3. Due Diligence Review
4. Independent Fiduciary Services
5. Independent ESOP Legal Representation

We hope the foregoing fully describes our program, and the services and fee arrangements. At your convenience, I would like to schedule a meeting to answer any questions you may have on the ESOP idea, as well as to discuss in detail all pertinent plan provisions you will require, should you decide to proceed with the acceptance of this proposal.

Very truly yours,

MENKE & ASSOCIATES, INC.

Kyle Coltman
Chief Executive Officer

KC:rbe
Enclosures

**ACKNOWLEDGMENT**: The foregoing proposal is hereby accepted on behalf of American Medflight, Inc.

Date: ______________________ By: ________________________________
Authorized Officer

# EXHIBIT 13

# EXHIBIT 13

gr

RICHARD G. HILL, ESQ.
State Bar No. 596
CASEY D. BAKER, ESQ.
State Bar No. 9504
RICHARD G. HILL, CHARTERED
652 Forest Street
Reno, Nevada 89509
(775) 348-0888
Attorney for Richard Milsner

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA - RENO

| | |
|---|---|
| JOHN CARSTARPHEN,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD MILSNER, an individual, DOES 1 through 10,<br><br>Defendants.<br><br>AND RELATED CLAIMS | Case No.: 3:07-CV-00542- ECR-RAM |

**DECLARATION OF RICHARD L. MILSNER**

RICHARD L. MILSNER, being first duly sworn, deposes and under penalty of perjury avers as follows:

1. I am a resident of the State of California and over 18 years of age. This declaration is based on my personal knowledge, except for those matters stated on information and belief, and as to those items I believe them to be true. This declaration is made in support of my Motion for Summary Judgment, and represents my testimony if called upon to present same in court.

2. In 1993, Jack Dawson (1/3), John Carstarphen (1/3), and myself (1/3) agreed to form Aero Medicate, Inc., which was a Nevada corporation. That entity later changed its name to American Medflight, Inc. ("AMF"). AMF was formed to provide fixed

LAW OFFICE
RICHARD G. HILL,
CHARTERED
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

wing air ambulance services to rural Nevada.

3. When AMF was formed, Jack Dawson (50%) and I (50%) owned and operated Reno Flying Service, Inc. ("RFS"). RFS was an established business, located at the Reno Airport, offering flight school, charters ("PT-135") and a fixed base operation, servicing and repairing airplanes.

4. The initial capitalization of AMF was $25,000.00 from each shareholder, with one-half as debt and one-half as equity. John Carstarphen's loan was repaid by AMF. As of that time, neither the loan by Dawson nor mine were repaid.

5. At its formation, because AMF was thinly capitalized, all three shareholders guaranteed virtually all debt of AMF. That was a material consideration for each of us in entering into that business.

6. From its inception, RFS subsidized AMF. As mentioned, before AMF was formed, RFS held a Part 135 charter license from the FAA. This meant that it had (and paid for) its own staff, as required by federal regulations, including chief pilot, director of operations and director of maintenance. In an effort to assist AMF, RFS agreed that it would share those employees with AMF. AMF was supposed to pay one-half of those employees, as well as other expenses of its operation, but it did not. I have reviewed the study by David Thomas, and believe it accurately stated the extent of out-of-pocket subsidy of AMF by RFS for 1995-1999.

7. In 1998, Jack Dawson asked me to buy his stock in both RFS and AMF. He needed the money for personal reasons. In accordance with the Bylaws, the proposal that I purchase 740 of his 800 shares was submitted to both AMF, and John Carstarphen, personally. Mr. Carstarphen would not purchase the stock, and both Dawson and I were

LAW OFFICE
RICHARD G. HILL,
CHARTERED
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

of the opinion that AMF could not afford to do so. I later acquired Dawson's remaining 60 shares in AMF in exchange for a horse.

8. I am aware that John Carstarphen contends that the $5,000.00 per month payment, which is called a "consulting fee," is really me bleeding AMF to buy Dawson's stock. that is not true. In the first instance, as mentioned above, AMF owed RFS money. Second, at that time, AMF was simply not strong enough. Third, my payments to Dawson were $15,000.00, not $5,000.00 per month.

9. In December 2007, I sold all of my shares in RFS to an ESOP created for that company by Menke & Associates.

10. I did not meet with John Carstarphen before the December 5, 2005 shareholder meeting. I never told John Carstarphen that he could not sell his AMF stock to the AMF ESOP unless he dismissed his state court case. What I told him, as set forth in the transcript of that meeting, was that I would not personally guarantee a $1,000,000 loan to provide cash to him if that lawsuit was pending.

11. I ensured that John Carsarphen received all documents and data from Menke & Associates regarding the AMF ESOP and AMF. I withheld no data I had on the AMF ESOP from John Carstarphen.

LAW OFFICE
RICHARD G. HILL,
CHARTERED
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

I declare under penalties of perjury of the laws of the State of Nevada and the United States of America that the foregoing is true and correct.

DATED this 30 day of June, 2010.

RICHARD L. MILSNER

LAW OFFICE
RICHARD G. HILL,
CHARTERED
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

# EXHIBIT 14

EXHIBIT 14

gr

RICHARD G. HILL, ESQ.
State Bar No. 596
CASEY D. BAKER, ESQ.
State Bar No. 9504
RICHARD G. HILL, CHARTERED
652 Forest Street
Reno, Nevada 89509
(775) 348-0888
Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA - RENO

| | |
|---|---|
| John Carstarphen.<br>Plaintiffs,<br>v.<br>Richard Milsner, an individual, DOES 1 through 10,<br>Defendants. | Case No.: 3:07-cv-00542-ECR-RAM |
| AND RELATED CLAIMS. | |

**DECLARATION OF JACK DAWSON**

JACK DAWSON, being first duly sworn, deposes and under penalty of perjury avers:

1. I am a resident of the County of Washoe, State of Nevada, and over 18 years of age. This declaration is based on my personal knowledge, except for those matters stated on information and belief, and as to those items I believe them to be true. This declaration is made in support of the Motion for Summary Judgment by Richard L. Milsner, and represents my testimony if called upon to present same in court.

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

2. I am the general manager of both AMERICAN MEDFLIGHT, INC., ("AMF") and RENO FLYING SERVICE, INC. ("RFS"), and while having enjoyed a variety of titles, I have essentially been in charge of operating both companies since 1999, when John Carstarphen was terminated from AMF.

3. In 1995, Richard L. Milsner, John Carstarphen and I joined together to form AMF, for the purpose of providing fixed-wing air ambulance services to rural Nevada. AMF holds a "part 135" certificate from the FAA, which licenses AMF to operate an air-charter service. Each of us owned one-third of AMF, each of us contributed $25,000.00 (one-half debt, one-half equity), and each of us guaranteed the balance of AMF's financial debt. Further, we had an agreement that if AMF lost $75,000.00, we would close it down. To monitor that eventuality, we created what are called "Monday reports," weekly financial data circulated to the three owners to enable us to closely oversee the financial affairs of AMF.

4. Prior to establishing AMF, Milsner and I (50/50) owned and operated Reno Flying Service, Inc. RFS already held a "part 135" certificate. RFS was engaged in business as a "fixed base operator" (FBO), and was also providing maintenance and repair service for airplanes, a flight school, and air charter services.

5. An FBO provides maintenance and repair services for airplanes. At its inception, it was understood and agreed by all concerned that AMF would not be competing with RFS in terms of services being offered relative to maintaining or repairing airplanes. Because AMF was so thinly capitalized, AMF could not have undertaken to establish a maintenance or repair facility of any kind when it was established.

It was specifically understood that AMF had its airplanes serviced at and by RFS, because it was cheaper, proximate, and RFS was providing goods and services below

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

market rate. That aspect of the business between AMF and RFS continued until after the first case was filed. As general manager of both AMF and RFS, I have always been careful to ensure that each and every transaction between the two companies was fair to each company, and that all interested parties had full information at all times.

6. AMF is licensed by the FAA and is highly regulated. For example, RFS and AMF, as part 135 licensee, are both required to have numerous specific positions staffed by qualified personnel. These include, by way of example and not limitation: chief pilot, chief mechanic, director of operations and director of maintenance.

7. From its inception, AMF could not afford to staff these positions or to open its own service department. Accordingly, an agreement quickly evolved by which AMF and RFS shared the employees in those federally required positions, and RFS worked on AMF's airplanes. Thus, AMF was able to obtain the required staff, and the costs of necessary employees was substantially reduced split. RFS frequently carried a significant account receivable owed by AMF. All of this was known to John Carstarphen throughout the formation and ongoing operation of AMF.

8. Beginning in approximately the summer of 1999, it was agreed by Milsner, Carstarphen and myself that AMF was finally stable enough that it should start to repay the subsidy it had been receiving from RFS. This repayment was labeled a "consulting fee," and the sum of $5,000.00 per month was agreed on. Attached to the Motion for Summary Judgment as Exhibit 29 are true and correct copies of checks signed by John Carstarphen paying that consulting fees, while he was president of AMF. He <u>knew</u> all of the facts related to those payments when he signed those checks. That repayment was justified and fair. It terminated in December 2007.

9. Attached to the Motion for Summary Judgment as Exhibit 2 is a review by

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

David Thomas, of Turner &Loy, Milsner's accounting expert witness in this case. I have reviewed the supporting data on which his opinion is based, and it is accurate. His conclusions regarding the costs borne by RFS (Milsner and myself[1]) to support AMF are accurate. His conclusions are correct and supported by the books and records of both companies.

10. I have heard Mr. Carstarphen's assertion that he was terminated twice at AMF, and that the reason was because he made inquiries about the consulting fee. That is untrue. He was terminated once, and only once, in 1999. That was because other employees at AMF refused to fly with him. He would disappear from work for hours, and return smelling of alcohol. Also, he began to request that AMF hire additional staff to do his job.

11. We now know that in 1999, John Carstarphen met an individual named Martin Fruchtman from Los Angeles. Fruchtman had come to Reno to investigate the prospect of buying AMF. We now know that Fruchtman shared his business model with John Carstarphen, and that John Carstarphen took the opportunity discussed by Fruchtman for himself, and began preparations to leave AMF and open American Home Companion.

12. I understand that John Carstarphen contends that Milsner/RFS usurped a corporate opportunity in relation to leasing airplanes rather than having AMF purchase airplanes itself. That assertion is false.

12.1. That issue goes back into the first lawsuit filed by John Carstarphen. As part of that case, Carstarphen falsely contended that RFS secretly made

---

[1] I sold my stock in RFS to Milsner in 1998.

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

use of an AMF line of credit that he had guaranteed. In truth, RFS' line of credit was withdrawn by Pioneer Citizen's Bank (now Nevada State Bank), because of errors by RFS' accountant. John Carstarphen knew about the use of AMF's line of credit when it happened. He also knew that RFS paid the entire amount charged for its benefit through AMF. See Exhibit 30 to Motion for Summary Judgment.

12.2. Nonetheless, Carstarphen swore in his first complaint, in state court, that he did not know about RFS' use of that line of credit for a long time, and that he suffered in excess of $10,000.00 in damages as a result. However, when his deposition was taken, he conceded that he had not suffered any damages. Also, his guarantee had been released by Pioneer Citizen's Bank at, or before, the time the first case was filed. Later, in discovery in that case, Carstarphen's expert produced an email in which Carstarphen conceded that he had known about the use of the line of credit and that RFS had paid its entire debt.

12.3. In the context of the pendency of that first lawsuit, Carstarphen refused to guarantee any obligation whatsoever for AMF. This left Milsner as the sole guarantor of all obligations of AMF, from approximately 2002, when Carstarphen's guarantee was revoked, up until the present.

13. Over the years, AMF's business has grown. Because of FAA regulations and good practice, as well as expanding business, AMF began to need the use of additional aircraft.

13.1. Because of its specialized needs, AMF cannot just lease any airplane. Any type of plane to be used must be identified on AMF's 135 certificate, and, must be set up for use as a medical evacuation plane. That essentially requires gutting the airplane. These special needs exacerbated the non-availability of such planes, and there are

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

none to be had locally.

13.2. RFS has flown Piper Cheyenne II airplanes as part of its Part 135 certificate since its inception. Thus, RFS was a logical source for AMF to get legally compliant planes, appropriately equipped, and from a nearby source. All rentals by RFS to AMF were at cost, and vice versa. This arrangement was known by John Carstarphen, as well as everyone involved with both RFS and AMF.

13.3. As time passed, AMF's business has grown, and the need for additional aircraft increased. Ultimately, by early 2007, the dialogue among the officers, directors, and John Carstarphen as shareholder, came to a consensus that AMF needed to have additional aircraft. To that end, I began making inquiries at various banks and similar sources to ascertain what financing was available to AMF.

I learned that without personal guarantees, loans for the purchase of airplanes were not available for AMF.

13.4. Until very recently, John Carstarphen has steadfastly refused to guarantee any obligation of AMF. While Milsner was already obligated on guarantees for AMF, he was unwilling to guarantee financing for new airplanes unless John Carstarphen would also guarantee. John Carstarphen refused.

13.5. My inquiries lead to the conclusion that without either a very substantial down payment, or personal guarantees, AMF could not qualify for financing to purchase any new airplanes. I communicated that finding to the board of directors, and to John Carstarphen.

13.6. The foregoing is confirmed in my letter of February 2007 to

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

John Carstarphen. The factual assertions in that letter are true.

14. I understand that John Carstarhpen makes the contention that before the meeting on December 5, 2005, Richard Milsner met privately with John Carstarphen, and supposedly told John Carstarphen that unless he dropped his state court case, Milsner would not allow John Carstarphen to sell any stock in AMF to the ESOP.

14.1. I was with Richard Milsner at the AMF/RFS offices before the meeting, without interruption from the time he arrived until the start of the meeting. Milsner did not meet privately with John Carstarphen before the meeting, nor did I see the two speak–and I would have seen them do so if they had spoken.

14.2. I attended the December 5, 2005 meeting.

14.3 At not time did Richard Milsner say that Carstarphen could not sell stock to the AMF ESOP. What Milsner said was that he (Milsner) had arranged possible bank loans to provide <u>cash</u> to Carstarphen, but that he (Milsner) would not do that because his personal guarantee was required, unless Carstarphen dropped his lawsuit. Carstarphen always had the option to sell his AMF stock on the same terms and conditions as Milsner.

15. Attached as Exhibit 23 to the Motion for Summary Judgment is a true and correct copy of my letter of February 12, 2007, to John Carstarphen. The contents of that letter are true and correct recitals of dialogues with John Carstarphen. As the Court will see, John Carstarphen agreed that RFS was an acceptable source of getting an airplane for AMF.

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

16. I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

**AFFIRMATION Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

DATED this 1ST day of July, 2010.

Jack Dawson

JACK DAWSON

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

# EXHIBIT 15

EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA-RENO
-oOo-

JOHN CARSTARPHEN,
Plaintiff,
vs.
RICHARD MILSNER, an individual, DOES 1 through 10,
Defendants.
_______________________/

Case No.: 3:07-cv-00542-ECR-RAM

DEPOSITION OF JOHN CARSTARPHEN

taken on behalf of the defendant at the offices of Richard G. Hill, 652 Forest Street, Reno Nevada, Thursday, June 3, 2010, at 1:33 p.m., before Jerry J. Silven, Certified Court Reporter and Notary Public, pursuant to notice.

Reported by: JERRY J. SILVEN, CCR #55



ii

APPEARANCES:

For the Plaintiff: KING & RUSSO, LTD.
Attorneys at Law
by SCOTT RUSSO, ESQ.
1021 Country Lane
Gardnerville, Nevada 89460

For the Defendant: RICHARD G. HILL, ESQ.
Attorney at Law
652 Forest Street
Reno, Nevada 89509

Also Present: JACK DAWSON
RICHARD MILSNER



iii

INDEX


| | PAGE: |
|---|---|
| 1:33 p.m., Deposition Commenced | 1 |
| EXAMINATION By Mr. Hill | 1 |
| 2:41 p.m., Recess Taken | 57 |
| 2:52 p.m., Deposition Resumed | 58 |
| EXAMINATION Resumed by Mr. Hill | 58 |
| 3:55 p.m., Recess Taken | 104 |
| 4:08 p.m., Deposition Resumed | 105 |
| EXAMINATION Resumed by Mr. Hill | 105 |
| 5:15 p.m., Recess Taken | 153 |
| 5:25 p.m., Deposition Resumed | 154 |
| EXAMINATION Resumed by Mr. Hill | 154 |
| 5:28 p.m., Deposition Adjourned | 155 |

****EXHIBITS NOT COPIED. ON ORIGINAL ONLY****
EXHIBITS MARKED FOR IDENTIFICATION:

| | | |
|---|---|---|
| 83 | A copy of a multi-page document, first page entitled Minutes of Seventeenth Meeting of The Board of Directors of American MedFlight, Inc. | 46 |




iv


EXHIBITS MARKED FOR IDENTIFICATION: (Cont'd)

| | | page: |
|---|---|---|
| 84 | A copy of a multi-page document on the letterhead of Sansome Street Appraisers, Inc. dated September 13, 2004. | 108 |
| 85 | A copy of a multi-page document, Declaration of John Carstarphen In Support Of Plaintiff's Opposition To Motion to Dismiss | 120 |
| 86 | A copy of a multi-page document, entitled EXHIBIT 1 | 135 |

RENO, NEVADA, THURSDAY, JUNE 3, 2010, 1:33 P.M.

-oOo-

JOHN CARSTARPHEN
being first duly sworn,
testified as follows:

MR. HILL: The record should reflect that this is the date, time and place set for the resumption of the deposition of the plaintiff, John Carstarphen.

Mr. Carstarphen is present with his counsel, Mr. Russo.

Also joining us today at my office are Mr. Dawson and my client, Mr. Milsner.

EXAMINATION

BY MR. HILL:

Q Mr. Carstarphen, did you do anything to prepare for your deposition today?
A No.
Q Did you review the deposition of your last testimony?
A Yes, I did.
Q When did you do that?
A A couple days ago.
Q Were there any changes or corrections?
A Yeah, I have a few things that I think





could be clarified.
Q Can you tell us what they are, please?

MR. HILL: Counsel, do you plan to provide us with a written document or what are we going to do?

MR. RUSSO: I have to have him do a final review and execution then we'll give it to you. He has not reviewed it closely enough for that.

MR. HILL: Okay. So, what are you going to do? Do you want to postpone completing his deposition today or what?

MR. RUSSO: No.

MR. HILL: So he's going to change his testimony again?

MR. RUSSO: He's going to tell you what the changes are and I'm going to have him do it on an errata sheet and sign it and get it to you. But he can discuss them certainly now.

BY MR. HILL:

Q Do you have a sheet that these are on, Mr. Carstarphen?
A No.
Q Have you made any notes?
A I have notes here on the deposition.
Q Mr. Carstarphen, in all the years that you and I have known one another you've never ever ever





reviewed a deposition transcript. Why did you change?
A What do you mean I've never reviewed a deposition transcript?
Q Your testimony up until today has been that you did not review a deposition transcript. This is the first time that you've said that. How come?
A I don't know that to be the fact.
Q Have you reviewed the other deposition transcripts in either the state court case or this case?
A Yeah.
Q And when did you review them?
A After I got them.
Q So your testimony is that you -- well, is it your testimony, sir, that after your depositions have been taken prior to today you in a timely fashion reviewed those depositions?
A I don't know if it was in a timely fashion, but I have gone through them, maybe not in total, but parts and sections of it.
Q And are there changes or corrections to any of those transcripts prior to the deposition taken April 23, 2010?
A I don't believe so.
Q So up until that deposition everything's fine?





A Yes.
Q Why don't you tell me what changes or corrections you have, sir?
A Okay.
Q Do you have the original document there?
A Yes.
Q Tell me the page and line, please.
A 37.
Q Okay. What line?
A I'm looking for it. I didn't highlight it. I believe it's line 5.
Q Line 5, the question was put to you:
"Do you believe that Milsner controls or manipulates Daoro?"
And your answer on line 7 is "no."
A Okay. I don't know whether he does or he doesn't. But what I do know is that the decisions that he has made as a board of director benefits Milsner and does not benefit the stockholders of American MedFlight.
Q So you're changing your testimony?
A Yes.
Q What's the next one, sir?
A The same question was asked of Jack Dawson.
Q Line 21 on page 37; is that correct?
A Yes, I believe so.

Q Thank you.
And just so we're clear, I asked you at line 21:
"Now, do you believe that Milsner manipulates or controls Mr. Dawson?"
And your answer was:
"I already answered that question."
And then I asked you, I said:
"I'm sorry, I don't recall the answer."
And you said, "I don't know" at line 25.
A Yes.
Q That was your answer. Do you want to change it?
A I still don't know. But I think some of the decisions that Jack has made could be that Milsner does control. I don't know.
Q What decisions, sir?
A Different board of directors' decisions.
Q Could you be more specific?
A No.
Q But you're changing your testimony?
MR. RUSSO: He's amending his testimony or clarifying.
THE WITNESS: No. I'm amending it or clarifying it.





BY MR. HILL:
Q Didn't you say on that date, "I don't know"? That was your answer at that time?
A Yes. I still don't know.
Q Okay. And then you've added some clarification that we've got on the record?
A Okay.
Q All right. Anything else on that page, sir?
A That's it.
Q Your next change or clarification what's the term you used?
MR. RUSSO: Clarification.
MR. HILL: Thank you.
THE WITNESS: This is page 63, line 1.
BY MR. HILL:
Q Page 63, line 1. Just a second, sir.
Page 63, line 1, I asked you:
"Do you have any reason why the corporation should not continue to indemnify Mr. Milsner in this case?"
And your answer was: "Yes."
And I asked you: "Why?"
And your answer was:





"I believe that the corporation is indemnifying Mr. Milsner but not me."
And I said:
"Any other reason you can think of, sir?"
And your answer was: "Not offhand."
Was that the testimony you gave at that time, sir?
A Yes, it is.
Q Okay.
A When you asked me is there any other reason, I believe that the corporation cannot afford to indemnify Milsner. I think it's putting it into an insolvent position.
And I also believe that if Mr. Milsner loses this case, I don't believe he'll pay the money back.
Q Okay. Anything else?
A No.
Q Now, did your counsel tell you to say that or --
A No.
Q -- did you -- you thought these up on your own?
A This is my handwriting and my notes.





Q Okay. What's the next one, sir.
A Here.
Q What page are you on, sir?
A Page 115.
Q What line?
A I don't know, I'm reading. Just in generality --
Q What line, sir?
A Number 5.
Q On line 5. Let's start on line 1, I asked you:
"Do you feel comfortable as you sit here today that the board of directors has known that throughout this period of time?"
And your answer was: "Oh, yes."
Are you changing or amplifying that answer, sir?
A Just amplifying it.
Q Okay. What do you want --
A I believe that doing business with Reno Flying Service is not a problem, and I think it's fine, it's okay. But if we could do it in-house cheaper, I think we should do it in-house.
If we took it to another company and we

could do it cheaper, we should do that.

Q Any other changes you want to make, sir?

A No.

Q Do you have any evidence that the work -- any work could be done more cheaply in-house?

A I know it could be done cheaper in-house.

Q Do you have any evidence, sir?

A No.

Q You believe that to be the case?

MR. RUSSO: Other than the expert analysis?

BY MR. HILL:

Q Mr. Carstarphen --

MR. RUSSO: You need to clarify what you mean by evidence.

MR. HILL: Thank you.

BY MR. HILL:

Q Mr. Carstarphen, do you understand my question?

A Maybe ask it again.

Q Okay. Do you have any facts that lead you to believe that AMF could perform any work on its own planes in-house more cheaply than the rate charged by Reno Flying Service for comparable parts or labor?

A Well, Reno Flying Service is a for-profit corporation.





Q Okay.

A And they're expected to get a profit out of the thing. So if it was done in-house, it could be done cheaper because you don't have to pay that profit.

Q Do you have any facts as to the profit margin that Reno Flying Service made on its dealings with American MedFlight?

A I have no facts, but a reasonable amount would be somewhere around 15, 20 percent.

Q So if Reno Flying Service did not make 15 or 20 percent on its dealings with American MedFlight, would American MedFlight be obligated to pay that differential?

A I don't understand that question.

Q You assume that American MedFlight is providing a profit margin on its dealings with Reno Flying Service of 15 to 20%, right?

A Yes.

Q What if the profit margin is only 5%?

A That's still 5% that American MedFlight could have.

Q Have you found anybody anywhere that will do any of the work, labor or materials for American MedFlight more cheaply than Reno Flying Service does it?

A We do -- American MedFlight does have other





outside companies do work for it.

Q Does that answer my question?

A I don't think it does.

Q Okay. Can you answer my question or do you need to have the court reporter read it back to you?

A Why don't you just ask me the question again.

MR. HILL: Read the question back, please, Mr. Reporter.

(The following question was read by the reporter.)

"QUESTION: Have you found anybody anywhere that will do any of the work, labor or materials for American MedFlight more cheaply than Reno Flying Service does it?"

THE WITNESS: I don't know how to answer that question.

BY MR. HILL:

Q You previously told me, sir, that you have not performed any - I'll call it a cost comparison survey - comparing what Reno Flying Service charges with other comparable entities. Do you recall giving me that testimony, Mr. Carstarphen?

A Yes.

Q Is that still the case --





A Yes, I believe so.

Q -- that you've not done any kind of cost comparison survey?

MR. RUSSO: Personally?

THE WITNESS: Personally, no.

BY MR. HILL:

Q Has anybody done that?

A I don't know.

Q But it hasn't been you?

A I haven't done it.

Q And nobody's provided you with any of that information?

A No.

Q All right.

A Not to my knowledge.

Q Did we cover all of the correction changes or clarifications you wanted to make on page 115?

A Yes.

Q What's next?

A Page 138.

Q What line?

A I'm trying to find it. Line 2.

Q 138, line 2. Let's go back to 137. Page 137, line 19, I asked you:

"Have we discussed every device, every

"scheme, everything that you know about about how moneys were diverted to Reno Flying Service from American MedFlight?"

Your answer was: "No."

Do you want to change that?

A Yes.

Q Because I asked you what else is there and you said:

"I don't know. I haven't had access to records and books to find out."

Line 2 I asked:

"But today you and I have talked about all the ones that you know about, haven't we?"

And then you said: "I have talked" -- and then apparently I cut you off and said: "There could be others?"

And you said: "There could be others."

Was there something there you want to --

A Yes.

Q What did you want to say?

A We missed the plane leasing.

Q Okay. Anything else?

A That's it.

Q Well, we'll come back and talk about the





plane leasing in a little while. Let's finish up with your deposition clarifications or --

Now, the transcript is accurate?

A Yes.

Q So you're adding to your testimony?

A Yes, it's mainly clarifications that I thought of after.

Q Okay. Sobeit. What's the next one?

A That's it.

Q The rest of the transcript is fine?

A I believe so.

Q The plane leasing. Can you tell me -- you knew about the transaction before it occurred, transaction or transactions, before they occurred, didn't you?

A The plane leasing?

Q Yes.

A No.

Q Didn't Dawson send you a letter? Don't you remember the letter that you and I spent quite a bit of time talking about in February of 2007?

A That's correct.

Q And you at first didn't recall that letter and then you did recall that letter?

A I do recall that letter.





Q Does that refresh your recollection about whether or not you knew about any plane leasing before it occurred?

A I knew about plane leasing. I didn't know the terms of the plane leasing.

Q Don't you recall that letter setting forth what the terms were?

A It didn't say anything about the terms, that I recall.

Q Mr. Carstarphen, let me you show you Exhibit 61. Isn't that the letter that you and I talked about, the February 2007 letter from Mr. Dawson to you?

A Okay.

Q Isn't that the letter you and I talked about?

A That's correct.

Q That's the letter from Mr. Dawson to you on February 12, 2007, right?

A Yes.

Q And you told me that you believe you received it on or about that date, somewheres in that time frame, right?

A I don't remember what I said.

Q Well, do you recall -- you did get this letter?





A Yes.

Q And you got it in a timely fashion?

A I would say so.

Q Did you send a letter back to Dawson saying that he was wrong about any of the information in here?

A No.

Q Okay. On page 23 he says, we all agree, including you and I, that this, that being --

A Where are you at?

Q Are you with me?

A Okay. I got it.

Q We all agree, including you and I, that this, this being leasing from Reno Flying Service, was the only course AMF had available to it and that we should proceed with the plan for RFS to purchase the aircraft to lease to AMF. Remember we talked about that?

A Yes.

Q Did you write back to Dawson and say: I didn't agree to this?

A No.

Q Did you call him and say: I didn't agree to this?

A No.

Q What did you understand to be the terms that were being discussed?

A There was no terms discussed.
Q You're sure of that?
A Pretty darn sure.
Q Did you write back and say: What terms are you talking about?
A No.
Q Did you follow up and say to him: What terms are you talking about?
A No. I assumed that I would be told what they were before the lease went into effect.
Q And your testimony, as you sit here today, is that you never received any further information about what the terms and conditions were going to be on the leasing of the airplane?
MR. RUSSO: Will you clarify what airplane?
BY MR. HILL:
Q You're the director of the company, aren't you, sir?
A Yes.
Q Does AMF at this time lease an airplane from Reno Flying Service?
A Yes.
Q Okay. You pilots use tail numbers; is that right?
A Yes.





Q What's the tail number on that airplane, sir?
A I don't know.
Q Can we call it Bob or give it a name or description? What is it?
A The tail numbers have been changed when they were repainted, and I don't know what -- I don't know the previous tail number and I don't know the current tail number.
Q If you wanted Mr. Dawson to bring that airplane to you, how would you describe for him what airplane to bring to you?
A You would give it a tail number.
Q Okay. You don't know the tail number, so you'd say to Mr. Dawson: Bring me the airplane I don't know the tail number of?
A Well first of all, I wouldn't ask him to bring me an airplane.
Q Tell me about the airplane that you, as a director of the company, understand that American MedFlight leases from Reno Flying Service. Tell me what you know about it. About the plane itself. What color is it?
A I don't know.
Q Have you ever seen it?





A I'm sure I have.
Q Do you know anything about the plane at all?
A It's a Piper Cheyenne 2.
Q Now there's three of them; is that right?
A There's four.
Q There's four of them. Can we distinguish that plane from the others in any way, shape or form by any description?
A By tail number.
Q But you don't know the tail number of that plane. Do you know the tail number of the other plane?
A No.
Q Okay.
A I know tail numbers of previous, but not all of them. 1-1 Kilo Victor, and 419 Romeo.
Q And what are those?
A Piper Cheyenne 2s.
Q And those are owned by American MedFlight?
A 1-1 Kilo Victor is owned by American MedFlight and 419 Romeo is owned by Reno Flying Service.
Q Is that the plane you're talking about?
A No.
Q So there's two planes on lease?
A One plane.





Q You just told me a plane, I think you used the word Romeo?
A Yeah, 419 Romeo.
Q That's owned by Reno Flying Service?
A Yes.
Q And the Kilo plane is owned by American MedFlight?
A Yes.
Q What do you understand to be the terms and conditions that American MedFlight has or uses the Romeo plane that belongs to Reno Flying Service, Mr. Carstarphen?
A American MedFlight does not use 419 Romeo.
Q Are you okay?
A Yeah.
Q Your counsel indicated you had some medical issues. What are they precisely, sir?
A There's none.
Q Mr. Carstarphen, you're not making sense here this afternoon.
A Neither are you.
Q Okay. Can you tell me -- can you give me any description any way we can try to make a record here today, sir, so that when we go to the judge at some point in time about this airplane lease that you can help me so

we can identify that airplane? Is there anything we can do?
A Not right now. I can go and I can talk with Jack Dawson and find this information out if you want.
Q In the binder over there is Exhibit 62. Would you take a moment and look at that.
Have you ever seen Exhibit 62 before, Mr. Carstarphen?
A Just recently.
Q Is that the airplane we're talking about?
A I believe so.
Q Okay. So serial number 0024. And the registration number, would that be the tail number?
A It's 7820024.
Q Yes, sir. The registration number, do you see that down there N 155 CA, would that be the tail number?
A That's the tail number.
Q So would be what, Nancy --
A That's the way it is, is November 155 Charlie Alpha.
Q So can we call that the November plane?
A No, because they all start with N.
Q So what should we call this one?





A 155 Charlie Alpha.
Q Call this one Charlie Alpha?
A You can do that.
Q So Charlie Alpha is owned by Reno Flying Service; is that correct?
A I believe so.
Q And when was the first time that you found out that Charlie Alpha was being made available to American MedFlight by Reno Flying Service?
A Probably right from the beginning.
Q And when was that? Can you give me a time frame? A year?
A No.
Q You shook your head, that's a no, you cannot give me a year?
A No. I'm not really sure.
Q You were a director of the company when it first formed?
A Uh-huh.
Q Yes?
A Yes.
Q Thank you. And you ceased to be a director at some point in time?
A Yes.
Q When?





A When I was terminated.
Q In 1999?
A Correct.
Q Or was it 1998?
A I believe it was '99.
Q You continued to attend shareholder meetings; is that right?
A Yes.
Q Did you vote for yourself for director?
A Did I vote myself as director?
Q Do you understand my question, Mr. Carstarphen?
A I would say no.
Q Why didn't you vote for -- did you want to be a director of the company?
A Yes.
Q Did you vote for yourself to be a director of the company?
A I don't believe so.
Q Why not, if you wanted to be a director?
A Because no one wanted me to be a director.
Q Didn't you just tell me that you wanted to be a director?
A Yes.
Q And you just agreed you didn't --





A I mean, when you're fired and you're thrown out of the company, I mean, no one's going to vote -- if I put it up for nomination I'm not going to get nominated.
Q You owned a third of the company, didn't you?
A Yes.
Q Couldn't you cast your vote for yourself?
A You have to have a second on any kind of motion. There was no second available.
Q Did you at any point in time nominate yourself to be a director of the company and that failed for lack of a second?
A No.
Q So, you just decided you'd go off from being a director because nobody wanted you; is that fair?
A Probably.
Q Okay. Well, I wasn't there, so if you want to say it wasn't fair or it's not a fair characterization of what happened say so.
A I was terminated from the company that I started, and that's it.
Q And did somebody -- did Dawson tell you you weren't a director at that point?
A Say that one again.

Q Did either Dawson or Milsner tell you that at that point in time you were no longer a director?
A I don't know how I was notified about that.
Q In your mind when you ceased to be the president, did you also automatically cease to be a director?
A No.
Q So they're independent, you could be the president without being a director and a director without being an officer?
A Correct.
Q And you could be a director without being a shareholder?
A Correct.
Q And you could be shareholder without being a director?
A Yes.
Q So, you believe that it was what, at the meeting in 1999 when you ceased -- the directors' annual meeting in 1999 when you ceased to be a director?
A No, I believe it was in 2000. I'm not sure of that.
Q What started us off down this tangent was I'm trying to give you some timeline for when you may have found out about this 155 Charlie Alpha? Is that





what we call it?
A Yes.
Q When that came into possession of American MedFlight. Does that help you any?
A 155 Charlie Alpha is not in the possession of American MedFlight.
Q It's not?
A No.
Q Didn't you just tell me 3 minutes ago that the plane that is described in Exhibit 62 is a plane that Reno Flying Service is leasing -- American MedFlight is leasing from Reno Flying Service?
A It's leasing it, but Reno Flying Service owns it.
Q Have you ever leased a car?
A No.
Q Have you ever leased anything?
A Yes.
Q You lease a building space where you are, don't you?
A No, I own it.
Q Okay. Have you ever leased anything?
A I leased a copy machine.
Q Who had possession of it? You did, didn't you?





A Yes.
Q Even though Mr. Copier Company owned it?
A Yes.
Q So, as part of the lease between American MedFlight and Reno Flying Service, who has possession of 155 Charlie Alpha, do you know?
A Yes.
Q Who?
A American MedFlight has possession, but it doesn't own it.
Q We've covered that, sir.
Is any of this helping you to come to a time when that plane came into the possession by lease or otherwise of American MedFlight?
A Well, this lease is dated October 1, 2008, so it must have been right around there.
Q Is that when you found out about it?
A No.
Q When did you find out about it?
A That Reno Flying Service was leasing an airplane to American MedFlight?
Q The airplane described on Exhibit 62 --
A Yes.
Q -- that plane.
When did you find out about that?





A Probably right when it happened, or shortly thereafter.
Q Were you a director when that happened? When did you become a director again, do you know?
A I don't know.
Q It was in 2009, wasn't it?
A Probably.
Q So you weren't a director at that time, were you?
A In 2008, I believe I was.
Q When did you go back on the board, sir?
A I think 2009.
Q Okay. As you sit here today, do you understand -- well, do the terms and conditions that are set forth in Exhibit 62 accurately set forth the terms and conditions of the agreement?
A Ask that question again, please.
Q Are there terms and conditions for that lease other than are set forth in Exhibit 62?
A I know of no others.
Q So that is the agreement?
A I believe it is the agreement.
Q Do you know if the board of directors considered it before it was executed?
A I would say no.

Q And what do you base --
A Because if this was executed back in 2008, I was on the board of directors, and I never saw this agreement.
Q And if you weren't on the board of directors in 2008, you wouldn't have seen it if it came before the directors, would you?
A But I was.
Q Okay. But you can't tell me when you -- I thought you told me you went back on the board in 2009.
A Okay. 2009.
Q This is dated 2008.
A Yes.
Q 2008 is in that period of time when you were not a director, isn't it?
What are you looking at, sir?
MR. RUSSO: He's looking at Exhibit Number 58.
MR. HILL: Thank you. I just want to make sure we're all on the same sheet.
THE WITNESS: I was terminated in December of '98. And this document, if correct, is dated October 2008. And at that time I was on the board of directors and this document was never shown to me. And the board of directors never considered this document.





BY MR. HILL:
Q You're sure of that?
A I've been to every one of the board of directors' meetings while I was a director. I've never missed one.
MR. RUSSO: This is 10 years later.
THE WITNESS: Oh, okay. Pardon me. I've got the dates mixed up here.
Yeah, '98.
MR. RUSSO: More than two years ago.
THE WITNESS: So, I got my dates wrong.
BY MR. HILL:
Q Okay. So let's -- your counsel's had the opportunity to help you here and that's fine.
MR. RUSSO: Well, there was a fundamental misunderstanding. He was looking at this in 2008, he was referencing the timeline when he was on the board in 1998.
MR. HILL: I understand that.
What I want to do is I want to give him an opportunity now to give me an answer as to --
What you looked at the timeline for, I thought, was to see if you could figure out when you went back upon the board. It's not on there, is it?
THE WITNESS: No.





BY MR. HILL:
Q Did anybody ever tell you that American MedFlight was paying RFS's costs plus 20% on the airplane lease?
A No.
Q Nobody's ever told you that?
A No.
Q Do you know whether cost plus 20% is within the realm of reasonableness for leasing companies?
A I have no idea.
Q Do you think it's an -- do you believe it's unfair?
A I don't know.
Q Okay. How much do you think you should be entitled to because of the airplane leasing between -- because of its lease on Exhibit 63? Do you have a number?
Do you want to see Proctor's report? I'll be happy to help you out. Whatever you need.
A I don't have a number.
Q Okay. Was there a need for American MedFlight to have that plane?
A Yes.
Q And was Jim Brown the secretary of Reno Flying Service in September 2008?





A I have no idea.
Q Well, can you see here he signed that he was?
Excuse me, Reno Flying Service.
Milsner signed as president of American MedFlight, Inc. Do you see that?
A Yes.
Q Was he the president of the company?
A Yes.
Q Have you gone to the board of directors and said that you thought this was unfair?
A I haven't seen this lease until just recently.
Q Okay. Have you gone to the board and said you don't think it's fair?
A I have only seen this one the last month.
Q I understand that, sir.
A Yeah.
Q So the answer to the question is, no, you have not?
A There has been no board of directors' meeting since then.
Q Your testimony is you didn't see this until last month when it was at your deposition?
A Yes, that's the first time I think I saw

it.
Q There was a need for this plane by AMF?
A Yes.
Q And AMF has had use of the plane?
A Yes.
Q Has Reno Flying Service done everything it's required to do under this lease as you, a layman, understand it?
A I have no knowledge of that.
Q Do you have any reason to believe that Reno Flying Service did not do what it was required to do under Exhibit 63, sir?
A I have no knowledge of that.
Q Okay. So what's wrong with the lease? Why did it do you wrong, sir?
A Under some of the subsequent things that were going on, paying Milsner for guarantees, that if I was going to get fees for guaranteeing loans, I probably would have signed on the loan myself and we wouldn't have the need for a lease.
Q We talked last time that Dawson did ask you to guarantee the airplane leases and you refused. Do you recall that conversation?
A Yes. But at that time the terms and conditions were not explained to me.





Q That's your testimony. You've said that.
A Yes.
Q And is it that -- I mean, your testimony is that Jack Dawson never told you what the terms and conditions would be of the lease; is that your testimony?
A I only saw this a month ago.
Q Different question, sir. Your answer may be a good one, but it doesn't answer my question.
Is it your testimony that Jack Dawson never explained to you what the terms and conditions were going to be of the lease between Reno Flying Service and American MedFlight?
A That's correct.
Q Do you think Dawson did that to keep you in the dark?
A I was in the dark all along.
Q Do you think Dawson did that to make sure you stayed in the dark?
A I have no idea.
Q Well, he was the president of American MedFlight up until recently, wasn't he?
A Who?
Q Dawson.
A Dawson is the president of the American MedFlight.





Q Okay. Didn't you expect him to be telling you about those things?
A As one-third owner I think I should know those things.
Q I do, too, sir.
And it's your testimony that Dawson didn't do that; is that right?
A That's what I said.
Q And I'm asking you, do you think Dawson did that deliberately?
A I have no idea.
Q Have you confronted Mr. Dawson about that: Mr. Dawson, why didn't you tell me that?
A Ever since I got terminated in '98, I've been requesting information, financial information of the company, and ever since '98 I've been denied that information.
Q You do believe that, don't you?
A I do believe what?
Q That you were denied financial information from 1998 forward; you do believe that, don't you?
A Yes, I do.
Q Do you remember when I took your deposition and went through the Monday reports? Do you remember the fax headers at the top of the Monday report? Do you





remember that?
A Uh-huh.
Q Yes?
A Yes.
Q Do you know where those Monday reports came from that we used for an exhibit? Do you remember where those came from?
A No.
Q They came from Mr. Gunderson's office, and they've been provided to you all through that period of time, Mr. Carstarphen.
A No, they have not.
Q Mr. Carstarphen, let me show you Exhibit 10. This purports to be a balance sheet dated December 31, 2002. Do you see down in the lower right-hand corner? You know what a Bate stamp is; after seven years you know what that is, don't you?
A I think so.
Q Okay. Do you know whose Bate stamps CAR 0284 is?
A Uh-huh.
Q Whose?
A It's mine.
Q So, this is a document that your lawyer produced in the discovery, right?

A Yes.
Q So where did you get this December 31, 2002 balance sheet to give it to Mr. Gunderson?
A I have no idea.
Q Turn to Bate sheet number 299 in that exhibit, Mr. Carstarphen. Are you with me, sir?
A Uh-huh.
Q Oh, yours doesn't have the fax header on the top. I went over this with Mr. King. Let me show you mine. See the fax header across the top of that?
A Yes.
Q Do you know whose fax number is 856-5801?
A That's Reno -- American MedFlight.
Q And do you know who's number 5 on their speed dial?
A I have no idea.
Q What's it say next to 005 up in the upper right-hand corner?
A It says 004.
Q What's it say next to that?
A Carstarphen.
Q Does that help refresh your recollection where you got this, these documents, sir? They were faxed to you every Monday, weren't they?
A That's not a Monday report.





Q You're right.
Let's go to Exhibit 11.
A This is also in 2002.
Q Right. Turn to Exhibit 11 --
A Your question is 1998 forward.
Q Turn to Exhibit 11, turn to page 484, Mr. Carstarphen. Do you see that?
A Yes.
Q Do you know where your lawyer got that one from?
A Probably from me.
Q Let me show you mine with the header across the top. Same thing we saw on the other one, isn't it?
A Yes.
Q Does this refresh your recollection as to how this came to you?
A It doesn't refresh me, but it obviously came by fax.
Q So it obviously came to you on July 9, 2001, didn't it?
A Yes.
Q So you've told me earlier today that you were flat denied any financial information about the company from 1998 forward. And here in just a matter of a moment we've shown you 2001. Do you want to go back





into 2000?
A Let's start at '99.
Q Mr. Carstarphen, all I can deal with is what you produced.
A Okay.
Q You produced 2000.
A I have no information from 1998 forward. And this little bit of a Monday report is not financial information of the company.
Q Okay.
A I mean, I'm not a CPA, but I can tell you that's not financial information of the company.
Q Mr. Carstarphen, let's go back into Exhibit 10, please. Can you go to page 401, CAR 0401, Mr. Carstarphen. Do you see that? It's an income statement for the 12 months ending December 31, 1998.
A Uh-huh.
Q When did you get that, sir? You got it all along, didn't you. You've just been mistaken; isn't that right?
A Nope, I have not been mistaken.
Q So, the fax machine lied?
A Nope.
Q So explain to me, sir, how is it that the fax headers are on these documents that were produced by





your lawyer, but you didn't get them?
A Is this what you're saying, these three or four documents here is complete financial information?
Q Mr. Carstarphen, some day --
MR. RUSSO: Mr. Hill, we have a lawsuit that's up on appeal having to do with the providing of information. There's been no allegations in the complaint in this case about the providing of information, and you're doing your discovery for --
MR. HILL: For the next trial.
MR. RUSSO: -- the other lawsuit. So you might want to test his memory a little bit, but you're spending a lot of time now on this case.
MR. HILL: Well, we are also here now reviewing Mr. Carstarphen's credibility and his ability to recall.
BY MR. HILL:
Q So your testimony then is, is that you were denied any financial information?
A I didn't say any. I said adequate financial information.
Q Oh, adequate.
Now you didn't say adequate before in this testimony today, did you, sir, you said any, didn't you?
A I may have, but it's....

Q All right. Well, let's see if we can get back on beam here.
I asked you -- what started on this was I asked you whether you thought Dawson withheld information on the lease from you deliberately.
A I have no idea.
Q So he may have?
A May have.
Q What would be his motivation in doing that?
A The decision-making of the company's business during that time period I was completely out of the loop.
So to say that it was deliberate, it was a hundred percent I was out of the loop.
I wasn't asked. I wasn't -- no one mentioned it. I didn't sign checks. I didn't sign any documents. I didn't sign any leases.
Q Mr. Carstarphen, let's take a moment and look at Exhibit 33. These are some of the minutes of the board of directors for American MedFlight. The first page is AMI 0036; is that right?
A Yes.
Q And references Aero Medcare. That's American MedFlight, is it not?
A Yes.





Q So in Exhibit 33 let's go to the last two pages. Are you with me, sir? This would be Bates number AMI 0159. Are you with me?
A Yes.
Q And it's dated December 9, 2003. Are you with me?
A Uh-huh.
Q Turn to the next page, please, which would be page 2. Do you see your signature on that page, sir?
A Yes.
Q And do you see where your name is typed?
A Yes.
Q And what are the words after your name?
A Director and vice president.
Q Were you a director and vice president at that time, sir?
A I believe so.
Q So, had you come back on the board in 2003 after you were off the board in December of 1998 I think you said?
A I believe so.
Q So you came back on the board?
A I believe so.
Q When? Do you recall?
A No.





Q Let's go to page 85, AMI 85.
MR. RUSSO: Which exhibit?
MR. HILL: It's 2 pages ahead, Scott.
BY MR. HILL:
Q These would be the sixteenth minutes of the sixteenth meeting, Mr. Carstarphen? Page 84.
A Yes.
Q Let's go back to page 83. You signed as a director, did you not?
A Yes.
Q That would have been 2002?
A Yes.
Q Did you sign this document at or about that time?
A Yes.
Q So you were on the board in 2002, weren't you?
A Yes.
Q What about 2001?
A I don't know.
Q Go to the fifteenth meeting, that's also in 2002, but you've signed that.
Let's go to the fourteenth meeting, Mr. Carstarphen, that would be page AMI 0080.
Mr. Carstarphen, what are you looking at?





A My notes.
Q Well, have those been marked?
A Yes.
Q Can you tell me, please, what they were marked as?
A 58.
Q So you're looking at page 2?
A Page 2.
Q Is there anything on there that helps you?
A I was just looking at the timeline, the dates.
Q The fourteenth meeting is January 5, 2001. Do you see that on page 8-0?
A Yes.
Q And the next page, is that your signature?
A Yes.
Q Were you a director and an officer at that time, sir?
A Yes.
Q Let's go to the thirteenth meeting, which would be page 78, Mr. Carstarphen.
A 78?
Q Page 78. February 9, 2000.
A Yes.
Q The next page we've got your signature,

don't we?
A Yes.
Q Did you ever go off the board up until 2003, Mr. Carstarphen?
A I don't know.
Q Well, let's look at page 74.
Do you see on page 74 it says October 28, 1998? Are you with me?
A Yes.
Q And go to the next page. Does it have your signature?
A Yes.
Q You're a director and president, aren't you?
A Yes.
Q So, you were on the board in '98, right?
A Yes.
Q And you were on the board in 2000?
A Yes.
Q Do you know if you were on the board in 1999?
A I don't know.
Q Now, did you continue -- we know that you were on the board in 2003, don't we?
A Yes.





Q What about 2004, do you know?
A I don't know.
Q What would we look at?
A You can look at the minutes.
Q Do you want to do that?
A I don't care.
MR. HILL: Oh, I just wanted to put on the record, Mr. Russo, you served -- you personally served a subpoena on Jack Dawson for the June 15th hearing.
MR. RUSSO: Yes.
MR. HILL: And you gave him a witness fee in cash of?
MR. RUSSO: $30. And I advised him if there are copy costs or production costs, we will take care of that.
MR. HILL: I just wanted to be sure that was on the record.
(Exhibit 83 was marked for identification.)
BY MR. HILL:
Q Mr. Carstarphen, let me hand you Exhibit 83. I'm not going to warrant to you that it's complete, but I will tell you that I think we've got a number of board of directors' minutes here which might help us answer some of these questions.





Let's go to the minutes of the seventeenth meeting right on the top, sir.
A It's upside down.
Q Excuse me?
A It's upside down. Some of them are upside down.
Q I apologize, sir. Let's see if we can work -- I put the sticker on upside down. The copies weren't upside down, the sticker was.
A Well, some of them are upside down, some aren't. They're not all the same.
Q Well, you're right.
Mr. Carstarphen, let's go to the seventeenth minutes. Are you with me? That's 62063 fifth page, sir. Are you with me?
A Yeah.
Q December 9, 2003, do you see that?
A Yes.
Q This is the ESOP meeting, isn't it?
A The ESOP meeting?
Q See down here, it was discussed to sell the corporation to the employees through an ESOP plan to be administered by Menke and Associates, to be concluded on or before December 31, 2003 at a cost of administration not to exceed $9,000 and document costs not to exceed





$4,000. It was also discussed to change the corporation tax status to C Corp as required by the ESOP.
I read that correctly, didn't I?
A Yes.
Q Did you attend the meeting on December 9, 2003, when that was discussed?
A Yes.
Q And on the next page, 62064, do we have your signature?
A Yes.
Q And you're still a director and a vice president, aren't you?
A Yes.
Q We already talked about this, this is the last one in that exhibit we talked about before.
Let's go to the next one, which is 62065. Are you with me?
A Yes.
Q Now, this is a resolution for you and Milsner to be directors. Do you recognize it as that?
A I don't recognize this document.
Q So you don't recall having signed a document that looks like 62065. There's no signature there for you, there's a space but no signature; right?
A Yes. I don't recognize this document.

Q What about the next one, 62066. Same thing?
A I don't remember seeing this document.
Q Didn't sign anything that looked like that?
A I don't believe so.
Q Go to the next blue page. Let's go to 62079. Are you with me?
A Yeah.
Q Let me read it for you. Unanimous written consent of the board of directors of American MedFlight, Inc., a Nevada corporation.
The undersigned, being the directors of American MedFlight, Inc., a Nevada corporation, (the Corporation) hereby consent pursuant to NRS 78.315 to the following as the due and proper actions by the board of directors of the corporation.
Award a bonus to president of the corporation.
The corporation is aware of the diligent and skillful efforts of Jack A. Dawson, president of the corporation, and are aware that the corporation has had a profitable 2005.
In appreciation of Mr. Dawson's efforts for the year, the board of directors hereby direct the officers and employees of the corporation to a pay





year-end bonus to Mr. Dawson in the sum of $30,000.
Jack Dawson, by signing the signature line below, declines to participate in this board of directors decision.
Then it's dated December 20, 2005, Richard Milsner, William Geyer, and then beneath that there's a line for Dawson.
This says the directors and your name isn't listed; right?
A Yes.
Q Can we presume then that you were off the board by December of 2005?
A I can't presume anything from this document.
Q Well, do you think these guys cooked this up to get around you?
A No. It's probably correct, but I can't verify it one way or the other.
Q Let's go to 62080. Let me read the body, but I'll skip the top part.
It says declaration of dividends.
The corporation wishes to declare dividends as of the end of the year December 31, 2005 after a profitable year.
In addition, it is the intent of the board





to disburse available funds for dividends to the stockholders in order to allow the corporation to fund the American MedFlight employee stock ownership plan, effective January 1, 2003.
Are you with me?
A I'm a little bit lost.
Q Let me know when you've caught up.
A Okay.
Q Ready?
A Let me read it.
Q Do you see at the top where it says the undersigned being all of the directors?
A Yes.
Q And then the last paragraph says the amount of this dividend shall be $390,000?
A Uh-huh.
Q Of which 260,000 shall be disbursed to the employee stock ownership plan, and 130,000 should be disbursed to John Carstarphen.
Did I read that right?
A Yes.
Q You did get a check for $130,000, didn't you?
A Yes.
Q And you weren't on the board at that time,





were you?
A No, I don't believe so.
Q I mean, don't you remember all the confusion we had over why you got a check for $130,000?
A Yes.
Q Is that why there was confusion because you weren't on the board and didn't know what they had done?
A I didn't know what they had done.
Q Because you weren't on the board?
A Because I wasn't on the board.
Q All right. Now, the last time we got together we talked about the provisions in the second and third minutes of the board of directors. You recall those. The second board of directors meeting deals with the $2,500 check issue?
A Yes.
Q Do you remember that? Yes?
A Yes.
Q Thank you.
And then the third deals with the -- what you said was the unanimous consent by the board of directors for any dealings between American MedFlight and Reno Flying Service. Do you recall the minutes?
A Yes.
Q At our last session you told me that that

had been repealed by the board of directors. Is that a true statement that you made?
A I believe so, but I have not seen the board of directors' minutes where it was repealed.
Q What is your source of information that that occurred?
A Probably Jack Dawson, but I'm not sure.
Q Do you believe it or do you doubt it?
A I believe it.
Q Has Dawson ever lied to you?
A I don't think so.
Q Has he ever told you something that turned out to be false?
A I don't believe so.
Q Let's go to page 62086. Are you with me?
A Yes.
Q This is the minutes of a special meeting of the board of directors, April 12, 2006. Do you see that at the top?
A Uh-huh.
Q The second paragraph says:
The following persons, constituting the full board of directors, were present at the offices of the company: Jack A. Dawson and William Geyer.





Richard L. Milsner was present by speaker telephone.
Do you contend, sir, that as of April 12, 2006, you were on the board of directors?
A I don't believe so.
Q Were you an officer at that time?
A I don't believe so.
Q And the board is vested with the responsibility for managing the company, isn't it? Do you understand that?
A Uh-huh.
Q Yes?
A Yes.
Q Thank you.
Let's go to 62096. Are you with me?
A Uh-huh.
Q These are minutes of the special meeting of the board of directors, December 29, 2006. Do you see that?
A Yes.
Q And present were Jack Dawson, director by telephone, William Geyer, director by telephone, Richard L. Milsner, director.
Do you contend you were an officer or director at that time, sir?





A I don't believe so.
Q Do you believe that Milsner manipulated or controlled Dawson when he, being Dawson, signed 62096 that we see here?
A I have no idea.
Q Let's go to 62099. This is minutes of a meeting dated January 19, 2007. Do you see that, sir?
A Yes.
Q And do you believe you were a director in 2007?
A No.
Q You knew about the expansion into Elko, didn't you?
A Yes.
Q And how did you find out about it?
A I don't know.
Q Okay. Fair enough.
Let's go to 62103, please. Are you with me?
A Uh-huh.
Q This is a meeting of December 27, 2007. You don't contend you were a director or an officer at that time, do you?
A No.
Q This talks about Mr. Geyer resigning. Do





you see that in the first paragraph -- actually the second paragraph? And they're talking about putting Mr. Brown on the board.
A If you say so.
Q Did you know that Mr. Brown went on the board of directors of American MedFlight December 27, 2007?
A I don't know that.
Q Is today the first time you've heard that?
A Yes.
Q Did you know that Jim Brown was ever on the board of directors before I just told you here today?
A Yes.
Q When did you find out?
A I don't know.
Q But you knew before today?
A Before today, yes.
Q How did you find out?
A I don't know. Either with Jim Brown or Jack Dawson.
Q Are you just guessing or do you recall?
A I'm just guessing.
Q Okay. Fair enough.
Then they go on down below and don't they talk about -- never mind.

MR. HILL: We'll take a break

(A recess was taken at 2:41 p.m.)

-o0o-





RENO, NEVADA, THURSDAY, JUNE 3, 2010, 2:52 P.M.

-o0o-

MR. HILL: Let's go back on the record.

EXAMINATION

(Resumed)

BY MR. HILL:

Q Mr. Carstarphen, while we were off the record I asked Mr. Russo to consult with you because I'm of the opinion right now that you're impaired as we're proceeding. I don't mean to insult you, sir, I say that out of fairness.

I'm entitled to take your deposition, but I think you're entitled to be feeling up to being deposed. And I'm getting very distinct impression here this afternoon that you're not hitting on all cylinders.

That happened to me when I deposed Mr. Proctor previously in the state court case, everybody was gracious enough to say, well, if you don't feel good, we'll stop.

I want you to know that invitation's open to you. And if you don't feel good and you're not able to focus fair's fair.

Do you wish to proceed, sir, or do you want to --

A I feel fine and wish to proceed.





MR. HILL: Here we go.

BY MR. HILL:

Q We were on 62106, I believe. Have you seen this document before, Mr. Carstarphen?

A When was this dated?

Q 62107 is dated 2/4/08 and it identifies the directors as Brown, Dawson and Milsner. Do you see that?

A Where is that? What paragraph is that?

Q Page 62107, Mr. Carstarphen. Do you see that?

A Uh-huh.

Q Have you seen this document before?

A I don't believe so.

Q Then we won't talk about it.

But you were not on the board in 2008; is that right?

A I believe that's correct.

Q Let's go to 62117.

A 62117.

Q Have you ever seen this document before, sir?

A I don't believe so.

Q You're aware that the board elected to indemnify Mr. Milsner for attorneys' fees in this case, aren't you?





A That's the way it's been since day one.

MR. HILL: Do you want me to have the court reporter read back my question or do you have it --

Why don't you read the question back to him, Jerry.

(The following question was read by the reporter.)

"QUESTION: You're aware that the board elected to indemnify Mr. Milsner for attorneys' fees in this case, aren't you?"

THE WITNESS: American MedFlight has been paying the attorneys' fees since '93.

BY MR. HILL:

Q Since 1993?

A I believe so. Let me look.

Q Just for the record what are you looking at, sir?

A 58.

Q Thank you.

A It's not on here, but it was like in 1999.

Q What happened then, sir?

A That's when American MedFlight has been paying Milsner's attorneys' fees.

Q Since 1999?

A I believe that's the date.

Q Is that when you filed your first lawsuit?
A That's what I was looking on here and I don't see the date of the lawsuit, so I don't know what the date is.
Q Mr. Carstarphen, I will again offer to adjourn the deposition today.
Have you seen this document before, 62117, 62118, 62119?
A I don't believe so.
Q Didn't you verify the complaint in the state court case that you just filed?
A Say that again.
Q Do you know what it means when you verify a complaint?
A Not really.
Q Did you ever sign a document that you -- you know you filed -- your lawyers lawsuit for you here very recently in state court?
A Yes.
Q Had it been filed before we took your deposition the last time on April 23rd? Were you aware that it had been filed when your deposition was taken last time?
A I don't know.
Q When was the first time you heard that that





suit had been filed?
A We had talked about it. I don't know that I know a date that it was filed.
Q I'm asking you when you heard about it for the first time that it had been filed, past tense.
A Within the last couple of months.
Q Can you get any more specific than that?
A No.
Q Did you read the complaint -- have you ever read it?
A I believe I have.
Q When?
A I think it was e-mailed to me and I read it.
Q Do you recall the date?
A No.
Q Was it before or after it was filed?
A Well, I assume it was after.
Q And is every -- is everything in that complaint true?
A I believe so.
Q Do you know if this document that we're talking about right now is attached as an exhibit to that complaint?
A I don't know.





Q Let's go to 62127.
A 62127?
Q Yes, sir. This is the letter from you to American MedFlight, August 13, 2008; is that right?
A That's correct.
Q And you signed it, John Carstarphen, stockholder and former director of American MedFlight, Inc. Why did you send it to Mr. Brown?
A Because he's one of the directors.
Q So by that date you knew Brown was a director?
A Yes.
Q You weren't a director at that time; is that right?
A I believe that's correct.
Q And you said:
I am requesting a special meeting of the board of directors as soon as possible to discuss my claim for attorneys' fees from American MedFlight, Inc., in accordance with Section 7.01(a) of American MedFlight's bylaws."
Do you believe that American MedFlight should be paying your attorneys' fees in this federal





case?
A Yes.
Q Is that why you filed this lawsuit in state court?
A No. This one? This most recent one?
Q Yes.
A No.
Q Were you an officer or a director during the period of time that you filed this case, the federal case?
A Was I an officer or a director? I don't know.
Q Let's go to the next page, 62128.
Down at the bottom it says:
John, although not mentioned in the minutes, you were selected to research the airport lease developments and present solutions for a new location for RFS and AMF. I was wondering if you have any news for us?
Regards
Jim Brown.
Did you get this?
A Uh-huh.
Q Yes?

A Yes.
Q Thank you.
Were you in charge of research for the airport lease developments and finding a new location for both RFS and AMF?
A I think we all were.
Q So the answer is, everybody was in charge of that?
A Everyone was looking.
Q What did you do?
A What did I do? I was looking for airport locations.
Q What did you do to look for airport locations, Mr. Carstarphen?
A I went to different places and talked to people to see if we could get locations.
Q What places did you go? Who did you talk to? When did you go there? What did they say?
A I talked to a number of people and found a location in Silver Springs that we could lease land and build a building.
Q Is that the only thing you did?
A I talked to Jim Brown a number of times and Jack Dawson about painting a hangar in Carson City.
Q And you understood that American MedFlight





and Reno Flying Service would be sharing this space together?
A That's correct.
Q Was that acceptable to you?
A Yes. We also looked at the Stead airport area, too.
Q Let's go to 62193, please. Are you with me?
A Yes.
Q This purports to be a letter by you to American MedFlight, Inc., attention Jim Brown. Is that what this is?
A Yes.
Q When did you deliver this? Can you give me a clue? Look at 62195, it's got a memo, I think this is from Scott Russo, I don't know.
Let me direct your attention to 62183. I'm just trying to find out the date that you delivered this letter, Mr. Carstarphen.
A I can't. There's no date there.
Q No, there's not.
A Okay.
Q 62183 is a memo to you from Scott Russo dated June 10. Was that enclosed, do you know?
A I don't know.





Q Well, let's talk about the content of this document.
A Which one?
Q 62193, sir, your letter.
You say:
At our last board of directors' meeting the directors called for a special board of directors' meeting. If not conducted soon, I would like to call for a special board of directors' meeting within the next 30 days.
Was there one held within 30 days from the date of your undated letter, sir, do you know?
A I don't know what the date of this letter is, so I don't know.
Q Okay. Was there ever -- well, you go on then and you list five items.
Was there ever -- let's talk about the first one.
That AMF abide by the corporate bylaws in regard to RFS that it has not done in approximately the last 10 years.
You're referring there to your veto over those dealings, aren't you?
A I don't have a veto. I mean the bylaws





request that I sign all the checks going to Reno Flying Service. That's not a veto.
Q Don't you recall telling me that you thought you had a veto?
A I don't recall anything like that.
Q All right. Did you get a vote from the directors on point number one on this undated letter, number 62193, Mr. Carstarphen?
A I think before a vote was done, the bylaws had been changed to eliminate this part of the bylaws or amend them.
Q As you sit here today, do you believe that that part of the bylaws has been changed by the directors?
A I believe it has.
Q Then item number 2:
The termination of John Fowler, attorney for services to AMF since AMF is not a party to any litigation.
Has Mr. Fowler been terminated, do you know, sir?
A I believe I have the wrong name in this, to begin with.
Q Who do you think you mean?
A I don't know. I'd have to ask --

Q Harrison, the guy that was here before?
A Could be.
Q Did you get a vote on that issue at a directors' meeting, sir?
A I do not believe so.
Q Was there a meeting held in response to your request?
A I do not believe so.
Q So, none of the things in here got voted on by the board?
A I believe subsequent board meetings some of these issues were taken care of -- were discussed or done. But I do not believe we had a special board of directors' meeting.
Q Okay. You want the board of directors to pay your attorneys' fees? Yes?
A I believe that if they're paying Milsner's they should pay mine.
Q You want AMF to pay your attorneys' fees, though, right?
MR. RUSSO: He answered that question.
THE WITNESS: I answered that.
MR. HILL: I'm sorry?
MR. RUSSO: He said it was conditional, if they are paying one, then they should pay for his.





BY MR. HILL:
Q Have you presented bills to the company that you want paid?
A Yes.
Q When did do you that?
A A year or so ago.
Q Who did you give them to?
A I believe I gave them to Jack Dawson.
Q Whose bills were they?
A They were mostly Gunderson's bills.
Q So you wanted them to pay the state court case bills?
A Yes.
Q And have you presented any of Mr. Russo's or Mr. King's bills to the company to pay?
A I don't believe so. I think it was only Gunderson's.
Q So your testimony is that you presented Gunderson's bills to Jack Dawson for the company to pay, but you've not presented any of the King or Russo bills; correct?
A I did not produce the bills. I produced a summary.
Q Do you know whether Milsner presents actual bills?





A Does Milsner present actual bills?
Q Do you understand the question?
A I don't understand what bills does Milsner present?
Q I believe we were talking about the attorneys' fees bills, did you understand that?
A Yes.
Q Do you know if Mr. Milsner presents attorneys' fees bills for American MedFlight in order to get them paid?
A I have no knowledge of that.
Q Now, you were outside earlier today when Mr. Russo and Mr. Proctor were discussing the new assignment to Mr. Proctor?
A Yes.
Q What do you understand that assignment to be, sir?
A I don't think I can fully describe that.
Q Well, describe what you understand.
A It was in regards to aircraft leasing.
Q And what was Mr. Proctor's task?
A I can't answer that.
Q Why not?
A Because I didn't really understand what they were doing.





Q Did Mr. Russo give Mr. Proctor a timeline to complete the task?
A I don't know.
Q Were you there?
A I was there, but I'm not sure that I understood if there was a timeline, I don't know. I mean, are you saying, is there an exact date or something? I don't know of any exact date.
Q Did he say the next week, the next month the next year?
A He didn't say any of those things.
Q You want the judge in this case to award you your attorneys' fees that Mr. King and Mr. Russo charged you?
A I don't know how to answer that. I don't know what the legality is.
Q Do you want the judge to award you attorneys' fees?
A I don't know what is the legality of that.
Q If it's legal, do you want him to award them to you?
A If it's legal, yes.
Q How much do you want him to give you?
A Attorneys' fees.
Q How much?

A I don't know what they are.
Q You don't know how much you've spent on attorneys' fees in this case as you sit here?
A No. I don't have a total.
Q Do you have any idea how much you've spent?
A Yes.
Q How much?
A Probably 750,000.
Q And does that include Gunderson?
A Yes.
Q How much did you pay Mark?
A I don't know.
Q Have you ever had any -- well, let me back up.
Do you believe that American MedFlight has unfairly charged Reno -- start over. Apologize.
Do you believe that Reno Flying Service has unfairly charged American MedFlight for any parts?
A For any parts?
Q Yes, sir.
A I don't know.
Q What about the labor?
A I don't know.
Q Do you believe that the lease is unfair?
A I don't know.





Q Do you have any facts that lead you to believe that it is?
A No.
Q The rental fees, do you believe any of those are unfair?
A This is the rental before the lease?
Q Yes.
A I don't know.
Q Okay. Have you ever taken issue of whether or not -- well, is American MedFlight supposed to pay half of the rent for the hangar?
A Which hangar?
Q Any hangar anywhere -- let me back up.
You were supposed to go look for new space for Reno Flying Service and American MedFlight.
A We all were supposed to go look for space for Reno Flying Service and American MedFlight.
Q Which company was going to pay how much of the new lease?
A That was never discussed.
Q What was your understanding of what that would be?
A My understanding on the one particular one down in Carson City was 50/50.
Q Is it your understanding that the current





arrangement in Reno at the airport is 50/50 between American MedFlight and Reno Flying Service, do you know?
A It's not quite as easy as that because there's like three or four hangars, and some of them are in Elko, two or three of them are in Reno.
Q I believe my question asked about the Reno Airport, sir. How many hangars does American MedFlight have the use of at the Reno airport, do you know?
A Probably three or more.
Q At the Reno airport?
A Yes.
Q And are any of those exclusive to American MedFlight?
A Yes.
Q How many of them?
A I believe two.
Q The one which they would share would share with Reno Flying Service; right?
A Say again.
Q There are three hangars that American MedFlight has the use of at the Reno airport. That's your testimony?
A No, there's two I believe.
Q Okay. There are two hangars at the Reno airport that American MedFlight has the use of; is that





your testimony?
A I believe that's correct.
Q Does it have the exclusive use of either one of those?
A Yes.
Q The one that it does not have exclusive use of, who does it share with?
A The hangars that American MedFlight has have exclusive use of those two hangars.
Q They have exclusive use of them?
A Yes.
Q Does it share facilities anywhere on the planet with Reno Flying Service, Mr. Carstarphen?
A Not to my knowledge.
Q Your testimony as a director of this company is that to the best of your knowledge American MedFlight does not share any physical location with Reno Flying Service. Is that your testimony?
A I believe that's true.
Q Where is the American MedFlight office, do you know the address?
A 295 South Rock Boulevard.
Q Is there any other company that has an office at that address?
A Reno Flying Service.

Q Are they in the same building?
A They are in the same building.
Q Do you understand them to share space inside four walls and a roof?
A Yes.
Q How does that differ from the material that I just asked you about, whether or not American MedFlight shared any physical location with any other entity anywhere on the planet?
A You asked me if they shared a hangar. They do not share a hangar. They share an office.
Q All right. What percentage of the rent for that building does American MedFlight pay, do you know?
A No, I do not.
Q As a director, do you think you should know?
A I don't think so.
Q You contend that Mr. Milsner should be punished in this case. Is that fair?
A No.
Q You don't?
A No.
Q You don't seek punitive damages against Mr. Milsner?
A You asked punished, so I don't believe so.





Q Do you believe that the judge should assess moneys against Mr. Milsner to teach him a lesson so he doesn't do this again to somebody else?
A No.
Q So if you get compensatory damages, that's good enough for you?
A I don't know what that means.
MR. HILL: Counsel, do you want to make a statement here?
MR. RUSSO: I've got to look at the complaint, which I happen to have.
The prayer in the complaint does seek punitive damages as part of the prayer.
BY MR. HILL:
Q Mr. Carstarphen, do you know what punitive damages are?
A I have a vague idea.
Q What do you understand them to be, sir?
A I don't think I can answer that. I don't really know enough about it.
Q You're not a lawyer and I'm not going to hold you to a legal definition. All I want to know is what you think punitive damages are.
A I don't think I can answer that.
Q Do you understand that we've pled against





you for punitive damages in this case?
A No, I don't know that.
Q You don't understand that.
Do you understand that Mr. Milsner's counter-claimed against and contended that you've brought seven years of frivolous litigation just simply to disrupt his business? Has anybody ever explained that to you?
A Frivolous litigation, you've got to be kidding.
Q Can you answer my question, sir? Do you understand that's the allegations against you?
A Whatever.
Q Mr. Carstarphen, do you understand that the AMF ESOP has not been able to pay Mr. Milsner as agreed?
A Yes.
Q Do you know why?
A Because the payments were in excess of what the cash flow of the company was.
Q And where did 750,000 of that cash flow go, Mr. Carstarphen?
A To you.
Q It went to legal bills because of the frivolous lawsuits that you've brought.
MR. RUSSO: Objection. Argumentative.





BY MR. HILL:
Q Now, Mr. Carstarphen, I intend to ask the jury for punitive damages against you. And by that, sir, I mean that I think the jury should punish you financially for what you've done.
Do you understand that as you sit here now, sir?
A Is that a question?
Q Do you understand that, sir? I have just told it to you in case nobody else has ever told you that. You're entitled to know that, sir.
Do you understand that now?
A I would say yes.
Q Now, you own American Home Companion?
A Say again.
Q What business are you engaged in, Mr. Carstarphen?
A I have American Home Companion.
Q Any other business?
A Any other business?
Q Yes, sir.
A American Care Givers.
Q And what percentage of those companies do you own?
MR. RUSSO: Objection, not reasonably

calculated to lead to discovery in this lawsuit and I instruct the witness not to answer.

MR. HILL: And do you wish to assert privilege, counsel?

MR. RUSSO: I assert privilege.

MR. HILL: Do you believe your objection is well founded, Mr. Russo?

MR. RUSSO: I sure do. You're seeking discovery with respect to his assets, which are totally irrelevant to the allegations in this complaint.

MR. HILL: We call it a counter-claim. In California everything's a cross-complaint, I understand that.

Even on the issue of punitive damages, Mr. Russo?

MR. RUSSO: Absolutely.

MR. HILL: Okay. I'll defer my questioning on that for today then.

MR. RUSSO: I'm asserting the objection for failure to bring a motion --

MR. HILL: And I --

MR. RUSSO: And I will delve into it if you're holding this to be true that I get to go into tomorrow every asset that Mr. Milsner has. We can both bring our motions to the court.





MR. HILL: I appreciate your invitation to file a motion, Mr. Russo. I think you know I know how to do that.

BY MR. HILL:

Q Now, the last time we got together we talked about the transcript of the December 5, 2005 shareholder meeting. Do you recall that? That's the meeting that you went to where Milsner was going to sell his stock to the company?

A To the ESOP.

Q Thank you. You're right.

Do you recall that conversation we had last time?

A Yes.

Q And you understood that the company had some money. And if you abided by what you say are the conditions Milsner imposed, that you had to dismiss your state court case, you were going to get one-third of that money.

Did you understand that?

A Yes.

Q Who was going to get the other two-thirds? Where was it going to go?

A To Milsner.

Q And you were going to sell -- if you abided





by that condition you were going to get to sell all your stock, weren't you?

A I believe so.

Q Now, last time you told me that there was a guy in Milsner's office name Sanjay. Do you remember telling me that?

A SamJay?

Q Or was it Monjay, Robert Monjay, do you remember that name?

A In Milsner's office? No, that was in Gunderson's office.

Q You're right. Did I say Milsner?

A Yeah.

Q I misspoke. Thank you.

You recall Robert Monjay?

A Yes.

Q And you told me that Monjay told you that if you sold your stock, your case -- your state court case, case number one, would go away.

A I believe that's correct.

Q And that was not an acceptable option to you; right? Do you recall telling me that?

A This was before the ESOP sale, though.

Q Right. Right. Did you go back to Monjay and talk with him about that issue after that meeting on





December 5th, 2005?

A I believe after December 5th, 2005 Monjay was no longer with Gunderson.

Q Did you confirm with Gunderson after that meeting that Monjay's advice to you had been correct?

MR. RUSSO: Objection. Attorney-client privilege. I would instruct him not to answer. You're talking about before the meeting what he knew or did not know, not after.

MR. HILL: That's going to draw a motion because -- do you want to talk about it or just deal with the motion? Because if you'll recall on the transcript, Mr. Russo, Mr. Carstarphen was given 10 days after the meeting to go consult with counsel or whatever he wanted to do, so the offer remained open.

MR. RUSSO: My recollection is that within the scope of discovery that we talked about, we talked about it through the end of 2005, if you remember that.

With respect to communications, I guess we need to limit it to whether or not that would need a stipulation on the discovery of such communications during that period.

The first question is, was there -- did this conversation occur within that time period.

BY MR. HILL:
Q Did you go back to Mr. Gunderson's office after the -- well, let me back up.
Somebody, you think it was Monjay, in that office told you before the meeting that if you sold your stock your right to pursue the lawsuit would go away; correct?
A It's not before the meeting. It was probably a year before the meeting.
Q Okay. Well, before the meeting then?
A Yes.
Q And you went to that meeting with that understanding; right?
A Yes.
Q And the meeting occurs and they ask you to get back to them within 10 days; right?
A Yes.
Q And during that period of time did you talk to Mr. Gunderson -- did you communicate with Gunderson?
A About the meeting?
Q Yeah.
A Yes, I did.
Q Okay Did you ask him whether or not Monjay's advice was correct?
A No.





Q You just assumed it was?
A I don't know what you're -- what you're trying to find out.
Q What I'm trying to find out is what you did in that 10-day window after the meeting, Mr. Carstarphen, to decide whether or not that was a deal that you wanted to pursue.
A The deal was contingent upon me dropping the lawsuits to sell my stock, and I did not want to drop the lawsuits.
Q Okay. But you didn't want to sell your stock because you knew that you'd lose the lawsuit -- the right to pursue the lawsuit, didn't you?
A It was conditioned upon it from the get-go --
Q But you knew --
A If I wanted to sell my stock, I was told by Milsner that I had to drop the lawsuit. It had nothing to do with the fact that if I sold my stock to somebody else, and that was what the discussion was with Monjay, that if I sold it to XYZ, I would lose my condition on the lawsuits. Whether that's true or not true I don't know.
Q But that was your understanding of the state of the law when you walked into the meeting on





December 5th, 2005?
A Yes. But it had nothing to do with the decision I did then or 10 days later.
Q Okay. We started your deposition last time and I asked you to tell me everything that was -- that Milsner told you that was false. We can open the deposition up because I don't want you to -- I told you we'd go back and talk about them and we never had the opportunity and I want to do that. So if you want to open it, you can follow along here. If you want to open to page 24.
On page 23 at line 22 I asked you:
Has Mr. Milsner ever told you anything that was false, and your answer was yes.
What has Mr. Milsner told you that was false, sir? Give me the list and we'll go through all of them.
And your answer is, well, the list is too numerous, I think, to even try and come up with.
And I said to you, well, why don't you give me the top five, let's start with the top five, can we do that?
And your answer was, okay.
Now, the first one was before a board of directors' meeting. He told me that if I dropped the





lawsuit I could participate in ESOP.
Do you see that answer that you gave?
A Uh-huh.
Q Yes?
A Yes.
Q Thank you.
What board of directors' meeting are you referring to?
A The December 5th, 2005 meeting.
Q And Milsner -- it was false? What Milsner told you was false?
He told me that if I dropped the lawsuit I could participate in the ESOP. That's what he told you?
A Yes.
Q Okay. Was that statement false?
A No, I believe that's what he told me.
Q So you want to change that testimony there to reflect what you just said?
A Yes.
Q The next one: He told me that he would buy my stock back in 1999.
Now, we talked about that one last time; do you recall that?
A Vaguely.
Q Do you want to -- anything you want to tell

me about that that was false?
A Well, he never bought it.
Q And you believe that he didn't intend to buy it?
A I have no idea as to his intent.
Q Well, when I say to you something that was false, that would mean that he said something he never intended to live up to. Did you understand that question to mean that?
A No.
Q What did you understand that question to mean, sir? Has Mr. Milsner ever told you anything that was false?
A He told me he would buy my stock, and he did not buy my stock.
Q And I want to know why you think that statement was false. Just because he didn't buy the stock?
A We had terms and conditions, and he didn't buy it. So what he told me was false.
Q All right. Can you distinguish in your world, Mr. Carstarphen, between something being false where Mr. Milsner lies to you, and where the transaction just doesn't happen for some reason? Can you distinguish between the two?





A Yes.
Q I want to know why you believe that was false as opposed to it just didn't happen. Do you have any facts?
A I have documents showing the terms and conditions that were never done, and then I was terminated.
Q Okay. Is that why you were terminated, because he didn't want to buy your stock?
A I have no idea.
Q Why was Mr. Milsner's statement to you that he would buy your stock in 1999, why was that statement false, Mr. Carstarphen? What facts do you have? Any?
A I have documents showing terms and conditions and it was not done.
Q Okay Those are the galaxy of facts that support that statement; is that your testimony?
A I believe so.
Q Fair enough.
Is there anything else you want to tell me about that as to why you believe it was false as opposed to it just didn't happen?
A It was false, not just didn't happen.
Q Okay. But you've told me all the facts that you have to believe that; is that right?





A I believe so.
Q On page 25 I have down that the third thing that you gave me was --
A Where are you here?
Q Page 25, line 2.
He told me, when I questioned him about the consulting fee, that he deserved it because of the risk he was taking. Is that a statement that Mr. Milsner made to you, Mr. Carstarphen?
A Yes.
Q When did he make that statement to you?
A Shortly after the 5,000 a month payments were made, when I questioned it.
Q And the explanation you were given was $5,000 a month was to go to Milsner?
A Was to go to Reno Flying Service.
Q And the reason for that was because of risks Milsner was taking?
A Yes.
Q What risks did Milsner tell you he was taking?
A He didn't.
Q Did you ask?
A No.
Q Why not?





A Why? There was no risk.
Q Did anybody ever explain -- well, we covered if --
Did I get an answer from him on how much AMF is paying for the building at Reno Flying Service on South Rock? They're paying 50% of lease, aren't they?
A AMF?
Q Yeah.
A On the office space?
Q Yeah.
A I don't know, but it's probably -- 50% is about right.
Q Is that fair to American MedFlight?
A Yes.
Q Has American MedFlight paid that from the day it opened its business forward?
A I believe so.
Q Did it pay all the rest of its expenses, its share of expenses from the day it opened forward?
A Yes.
Q Have you gone back and looked to see if that's true, or are you just assuming it's true?
A No, I was there then, and I believe we paid our fair share.
Q Have you seen Mr. Thomas's report on that?

A No.
Q All right. Page 25, the next one that I think you gave me is that, he admitted the fact -- page 25, line 10 you say, he admitted the fact that my stock was going to go down 1.3 million dollars by the sale of the ESOP to Mr. Milsner by Mr. Milsner.
Do you mean to say the sale of stock by Milsner to the ESOP?
A I'm not quite sure what you're asking me.
Q Well, I asked you to give my the list of things that Milsner told you that was false; right?
A I said that right there, that this is not false.
MR. RUSSO: I think the word "admitted" should be "omitted."
BY MR. HILL:
Q Well, tell me. I mean --
A That word is wrong, that is correct.
Q What is correct, sir?
A The word is wrong.
Q Are you changing your testimony?
MR. RUSSO: No, he's going to correct the transcript.
MR. HILL: You're going to coach him and tell him that's what he should say, aren't you?





MR. RUSSO: It's so apparent and I was there.
MR. HILL: Is it?
MR. RUSSO: It is.
BY MR. HILL:
Q So, what makes you believe --
MR. RUSSO: Nothing personal. Occasionally it happens.
BY MR. HILL:
Q Mr. Carstarphen, do you believe that Mr. Milsner knew that?
A That he knew that?
Q Yes.
A He knows it now. I don't know when he knew it.
Q Do you have any reason to believe that prior to the meeting -- at or prior to the meeting on December 5, 2005, that Milsner knew?
Do you have any basis to believe that?
A Well, he was in constant contact with Menke and Daoro, I would assume that he would know it, but I don't know for sure.
Q So you assume because he talked to Menke and because he talked to Daoro that he knew; is that your testimony?





A Yeah.
Q Any other fact that you can recall on to support that, sir?
A No.
Q Okay. You've told me all the facts that you have to support that assertion; right?
A I believe so.
Q The next one that I have that you gave me on page 25 is line 21.
He used my personal guarantee on a line of credit for his personal use in an amount of about $140,000 without my knowledge.
Do you want to change that testimony?
A No.
Q Milsner used it for his personal use. This is the guarantee that started the first lawsuit?
A He used it for Reno Flying Service, which he owned.
Q And he owned it solely at that time?
A I believe so.
Q Didn't Dawson own it at that time? Didn't Dawson own half?
A I don't believe so, but I'm not sure.
Q Mr. Carstarphen, let me show you Exhibit 6. It's your verified complaint from the first lawsuit. Let





me show you paragraph 12. Why don't you read that to yourself and tell me when you've read it.
Have you been able to read 12 by now, sir?
A Yes.
Q Okay. Can I have it back? Thank you.
That says, on or before September 2000 Dawson utilized the 1997 guarantee to obtain a loan for Reno Flying Service in various amounts from September 2000 to February 2003, the maximum of was which $281,800. Is that what you contend happened?
A I don't have a recollection of these amounts. This 287,000 doesn't jibe with 140,000 on the line of credit. So I don't know quite what this is.
Q So you know that you swore this was true --
A Yes.
Q -- Exhibit 6 this is true?
A Yes.
Q And are you telling me now that it's not true?
A No, I'm telling you that I don't know what that's in reference to. You're telling me it's in reference to the line of credit, and I don't see that that has anything to do with the line of credit.
Q You don't understand paragraph 12 of the amended complaint to be referring to the line of credit,

Mr. Carstarphen; is that what you're telling me?
A Yeah. The amounts are not the same.
Q How many guarantees did you have?
A How many?
Q Yeah. You had one guarantee at Pioneer Citizens --
A Maybe --probably a half a dozen.
Q Where?
A With Nevada State Bank.
Q That's it?
A I believe so.
Q Didn't Pioneer Citizens become Nevada State Bank, Mr. Carstarphen?
A Yes, it did.
Q Isn't that what this is talking about here?
A It could be.
Q Could be or is?
A Could be. I don't know what this is about here in that paragraph 12. It does not jibe with the numbers of just the line of credit.
Q Could it be possible, Mr. Carstarphen, that you're confused?
A No.
Q So the correct number is a hundred and forty?





A The line of credit was more than a hundred and forty. I think it was at that time two hundred.
Q So either you're confused or this is wrong, or we've got two incidents. Help me out here.
A I think we got two different things.
Q Okay, here we go.
So, go back to page 25 of your last deposition, you said he, Milsner, used my personal guarantee on a line of credit for his personal use.
Now we only talked about from the prior lawsuit. That was for Reno Flying Service, wasn't it?
A Yes.
Q So, this is a different one because it's for his personal use?
A It was really for Reno Flying Service.
Q So are we talking --
A When I use the word, "personal use," it means for Reno Flying Service that he owns a hundred percent of.
Q So we're talking a hundred and forty plus the two eighty?
A Those, I believe, are guarantees on airplanes, not line of credit.
Q That you were referring to in the first case?





A I believe so. I'm not sure.
Q So tell me, when did this occur? We're talking about here on page 25, line 21 through 23 of your deposition, sir.
A When did it occur?
Q Yes.
A I don't know the dates.
Q Do you have any documents to corroborate what you're saying here, sir?
A Yes.
Q Where are they?
A They're in my files.
Q What files are those?
A I presented these files to you. You have them as a part of the information that Gunderson has presented. And it was on the Monday report.
Q Before we move off, I just want to be clear, that the incident that you're talking about on page 25 is not the incident that's being referred to in your first complaint; is that right?
A I don't believe it's the same thing.
Q Fair enough.
And you believe Gunderson's provided the information on the $140,000 incident?
A In the first case.





Q Then at the bottom of page 25, you might want to follow along, line 24 I said, what else?
And you said, he wrote himself a personal check for $100,000 without Jack or my knowledge.
Now it wasn't a personal check, it was an American MedFlight check, wasn't it?
A Yes.
Q And I think we talked about that. Is there anything else you want to tell me about that incident?
A I don't believe so.
Q The next one I show is line 3. He took about another, and I'm not sure of the amount, but it's around a hundred thousand dollars as a fee for guaranteeing the notes on the aircraft.
Now, that was on the books and records, wasn't it?
A I would assume it was.
Q Now, did Milsner take that money without the directors' approval, do you know?
A If I was a director then, I did not approve it. But I'm not sure when it was done.
Q Do you know whether or not it was approved by those who were directors at the time?
A I have no knowledge of that.
Q One way or the other?

A No.
Q The next one that I have that you gave me, number 8, is page 26, line 19. We specifically had in the bylaws protection when we formed the corporation that there would be no self-dealing. And I had a construction company at that time and we all agreed that if American MedFlight was going to use my construction company for anything, that one of the other partners would sign the checks and watch the disbursements; and likewise, if any money was going to Reno Flying Service that I was supposed to sign the checks and approve them, which was never done.
Did I read the correctly?
A Yes.
Q Okay. You did sign some of the checks when you were an officer, didn't you?
A Yes.
Q And there came a point in time when you were no longer an officer?
A Yes.
Q Were you supposed to still sign all those checks?
A That's what the bylaws says.
Q And you've brought this to the attention of the board?





A Yes.
Q We went over that earlier?
A Yes.
Q We had the letter which you sent, it was undated, do you remember that?
A Yes.
Q And they've since rejected that, haven't they? It's your understanding that they rejected --
A They've amended the bylaws. That's my understanding, but I have not seen the amendment.
Q It's your understanding that the board of directors has rejected your assertion; isn't that true?
A Well, I don't assert it. I say they amended the bylaws.
Q And do you take that as a rejection of your position?
A I don't know what you're trying to say there.
Q Well, you've come in and said, hey, you're not abiding by the rules; isn't that what your said?
A Yes.
Q And what's their response? They changed the rules?
A They changed the rules.
Q Did you not take that as a rejection of





your position?
A Well, if you want to use it as that, you can say that if you want. They amended the bylaws.
Q Why?
A I have no idea.
Q Was it because Milsner manipulated them?
A I have no idea.
Q And then you go on and say on page 27, line 4, and subsequently in 2008 that provision of the bylaws was repealed against my vote.
So you were there for that vote apparently; is that true?
A I don't believe so.
Q So your testimony is in error? Do you want to change that testimony, too?
A I don't believe that I was in a board of director's meeting where there was a vote on that, but I'm not sure.
Q So, do you want to change your testimony on page 27, Mr. Carstarphen? It's an easy question. Yes or no?
A I don't want to change my testimony because you're taking it out of context. My vote is just my -- my -- an expression of what I've wanted.
Q So you want to change your testimony from





the word "vote" to "what I wanted"?
A You could change it to that.
Q Okay. Mr. Carstarphen, I don't care whether you change your testimony. But if you want to change it, just say so. Don't beat around the bush.
A I'm not beating around the bush.
Q Do you want to change your testimony or not? Yes or no?
A I don't know whether I voted at a board of directors' meeting on this or not. I'd have to go back and research the records and the minutes.
MR. RUSSO: Let's take 5. It's 4 o'clock.
MR. HILL: Well, I just want --
MR. RUSSO: You're going to be going for a while longer anyway. Let's take 5.
MR. HILL: All right.
(A recess was taken at 3:55 p.m.)
-oOo-

RENO, NEVADA, THURSDAY, JUNE 3, 2010, 4:08 P.M.

-o0o-

MR. HILL: Let's go back on the record.

EXAMINATION

(Resumed)

BY MR. HILL:

Q Mr. Carstarphen, were there any answers you've given me so far that you want change, correct or clarify?

A No.

Q Okay. Now, before we broke the question I wanted to ask you was, have you told me now all of the things that Mr. Milsner has told you that were false?

A I believe so.

Q Have you told me all of the things that you believe Mr. Milsner has done to loot American MedFlight?

A I believe so.

Q Thank you, sir.

Do you understand that the obligation -- you do understand, don't you, that the obligation of American MedFlight has on the ESOP obligation to Milsner is contingent?

A On what?

Q On the ESOP not paying Milsner, or paying the plan participants; do you understand that?





A No.

Q Okay. You were involved in litigation with Milsner as of the December 5, 2005 meeting; right?

A Yes.

Q And in that litigation you contend that Milsner withheld information from you, didn't you?

A I don't know.

Q Don't you recall, Mr. Carstarphen, in that litigation you complained that Milsner had refused to give you financial information?

A Yes.

Q And did you believe that?

A Yes.

Q Did you believe it on December 4th, 2005?

A Yes.

Q When you went into the meeting on December 5th, 2005, did you believe that you had been given all of the information that you needed to make an intelligent decision about the ESOP?

A The only information I was given was two letters from two banks offering to do a leveraged buyout.

MR. HILL: Mr. Reporter, will you read that last question back for Mr. Carstarphen?

(The following question was read by the reporter.)

"QUESTION: When you went into the





"meeting on December 5th, 2005, did you believe that you had been given all of the information that you needed to make an intelligent decision about the ESOP"?

MR. HILL: With regard to the ESOP. Do you understand that question, Mr. Carstarphen?

THE WITNESS: Yes.

BY MR. HILL:

Q Can you answer it, please?

A No.

Q Did you ask during that meeting for additional information?

A I don't believe so. But I believe additional information was to be forthcoming.

Q What information did you believe at that time was forthcoming?

A Terms and conditions of the sale, the amount of the sale,

Q The amount of the sale, you did not understand that?

A No.

Q That was not in the information that had been provided to you?

A No.





Q You had been provided with a copy of some data from Mr. Weinress, hadn't you, prior to that meeting?

A No.

Q You had not?

A No.

Q You don't recall any discussion at that meeting about page 40 of the Weinress appraisal?

A The appraisal of what date?

Q Do you recall any discussion about any appraisal that Weinress had done that had previously been provided to you?

A On December the 5th there was no appraisal.

Q You're sure?

A It was done subsequently.

MR. HILL: Many, many trees have been put to death needlessly.

(Exhibit 84 was marked for identification.)

BY MR. HILL:

Q Mr. Carstarphen, I'm going to hand you Exhibit 84. Counsel, a copy for you.

Do you see this, Mr. Carstarphen, Exhibit 84 --

A Yes.

Q -- this purports to be a September 13, 2004 letter to Mr. Milsner on Sansome Street Appraisers, and if you turn to the next page it's signed by Mr. Weinress, that's page AMF-58355. Do you see that?
A Yes.
Q Turn to AMF-58356. This is a valuation report of the common stock of American MedFlight, Inc., as of June 30, 2004, prepared by M.O. Weinress, September 13, 2004. Do you see that?
A Yes.
Q Did you have this before the 12/5/05 meeting, Mr. Carstarphen?
A I do not believe so.
Q Mr. Carstarphen, please turn to page 40 of the report. It is AMF-58397. Are you there, Mr. Carstarphen?
A 58397?
Q 58397, page 40 of the Sansome Street Appraisers, Inc. report.
A Yes.
Q You're there.
You had this before that meeting, didn't you?
A I don't believe so, but I'm not sure.
Q If you did, did you read it?





A I'm sure I would have.
Q Do you feel confident that you could understand the data in this report?
A No.
Q Did you take any steps to have anybody explain anything about ESOPs to you before you went to that meeting?
A I don't know that I had this report.
Q Mr. Carstarphen, I'm going to hand you Exhibit 28. This is the transcript of the meeting on December 5th, 2005. You recall being there?
A Yes.
Q You recall there was a court reporter there?
A Yes.
Q And have you read this transcript before?
A I've read parts of it.
Q You and I went through it the last time you were here, do you recall that?
A Yeah, I have a vague recollection that we went through some of the things there.
Q Let me show you page 20. On line 4 you say, what was the majority and the minority? This was the minority one, wasn't it?
And Mr. Milsner said, it's pretty well





spelled out, page 40.
Then you say, these are the two prices, the 62 and the 53.
Does that refresh your recollection as to whether or not you had that document, Mr. Carstarphen?
A 62 and 53.....
Q Look at page 40.
A At that December the 5th meeting, I believe I was given page 40, but I do not believe I had any of the rest of the document.
Q Let's go to page 9 of Exhibit 28, Mr. Carstarphen. Down at the bottom of page 9 Mr. Milsner says, I'll open that up because I'm the one that's done most of research on this. John, in your package I'm going to give you the page that you have a copy of this full appraisal.
And what's your answer? On page 10 do you see the answer on line --
A Yes.
Q What's your answer?
A Yes.
Q Then Mr. Milsner says, you were given that. The principal page, in my opinion, is page 40, which tells you what in this appraiser's opinion is what the company is worth. The ESOP rules are very strict. You





have to go to an ESOP-approved appraiser and he is the one that decides all the information about the company, and he did extensive research and came up with these numbers.
And you say, okay. This comes right from that appraisal?
And Milsner says, I took it right out of the appraisal, page 40. So you already have this. Rather than make you page through it, I thought I'd just pull it out. This is the one that you'd end up looking at.
And you say to him, I've already seen this.
Do you see that?
A Yeah.
Q Was that true or were you bullshittin' him?
A I believe that's correct.
Q Okay.
A But this appraisal is a year and a half before that date. It's basically not relevant to anything.
Q You had Exhibit 84 in front of you, didn't you, before that meeting?
A Apparently I did.
Q Well, if you didn't, say so. If you did, say so?

A I don't remember having it, but I do remember having Rich giving me that one page 40 at that meeting.
Q You say in here you've already seen the whole appraisal, don't you?
A That's what I said there.
Q Now, did you get anybody to explain it to you because you didn't understand it, or were you relying on Milsner?
A I was relying on Milsner.
Q Why?
A Why not?
Q You're suing him because he withheld information from you and he had lied to you, weren't you?
A Yes.
Q What changed that made you feel you could suddenly trust Mr. Milsner, Mr. Carstarphen?
Can you answer the question?
A Say it again.
Q What changed that you felt you could trust Mr. Milsner?
A I felt that Mr. Milsner would give me adequate information as to the sale of the ESOP.
Q You told me here today that you thought that he was a liar and dishonest since 1998. Do you want





to change that testimony?
A No.
Q You've told me here today that you were suing him for not giving you information before the ESOP subject even came up; right?
A Yes.
Q So why did you suddenly think you could trust Milsner?
A It wasn't a matter of trust. If I saw the documents, I could read the documents myself.
Q So you did read Exhibit 84 for yourself?
A Exhibit 84, yes.
Q And is it your testimony that you read it and understood it?
A No.
Q Did you tell Milsner you didn't understand it?
A No.
Q Did you tell anybody at the meeting that you didn't understand it?
A What's the point of that?
Q Did you tell anybody at the meeting that you did not understand any part of Weinress's work product that you have?
A The meeting on the 5th was to discuss





Milsner's sale, not to discuss whether or not the report was accurate or wasn't accurate.
Q So the answer to the question is, no, Mr. Hill, I did not say that to anyone at that meeting?
A I did not say anything to anybody at that meeting.
Q Thank you, sir. Why not?
A Why would I?
Q Because there is about to be a transaction that could affect you. Did you understand that?
A I did not know it was going to affect me.
Q But you think that -- you trusted Milsner to tell you that it would?
A No. I wanted to see the documents. This was just a preliminary meeting as to whether or not the sale's going to go forward or wasn't going to go forward.
There was no terms, no conditions, no notes, no nothing presented.
Q Who told you it was preliminary?
A Preliminary? I didn't even have an agenda of what the meeting basically was before the meeting.
Q Your testimony under oath is that you didn't have an agenda for that meeting, sir?
A I don't believe I did.
Q I'm not going to pull it out. You're





wrong.
A Okay.
Q So I come back and I have to ask the questions because I haven't gotten an answer.
The day before you walked into that meeting you don't trust Milsner, he's dishonest and you're suing him because he withheld information from you; right?
A Yes.
Q So why in the world do you think you can trust him when you walk in the door?
A It was not a matter of trust. I'm just coming to a meeting to find out what we're doing. That's it.
You know, if I thought that this meeting was some big conclusion coming, I probably would have brought an attorney with me.
Q But you elected not to get back to them within the 10 days, didn't you?
A Yes.
Q You did not get back to them within 10 days; correct?
A I did not.
Q That was your decision, wasn't it?
A Yes.
Q Did you tell Milsner during that 10-day

period that you didn't have enough information?
A No.
Q Did you tell Dawson?
A No.
Q Did you tell Henderson?
A No, because there's no way you could produce the information that I needed in 10 days.
Q What information did you need?
A The conditions of the sale. The contract. The note. And none of that was done until almost the end of December.
Q Did you tell anybody that?
A Why, when I know that you can't prepare legal documents in 10 days.
Q Did you ever tell anybody you weren't going to do the deal?
A I think I said that in that meeting.
Q You do?
A I believe so.
Q You'll stand by whatever's in the transcript?
A Yes.
Q I asked you last time whether or not the ESOP was damage, you were damaged, right, by Milsner's sale?





A Yes.
Q And you own a third of the company?
A Yes.
Q Did the ESOP suffer twice as much damage as you as a result of that transaction, do you know?
A I don't know.
Q Did the ESOP overpay?
A I don't know.
Q Has Milsner ever struck you?
A What?
Q Did Milsner ever hit you?
A No.
Q Did he ever threaten to hit you?
A No.
Q Did he ever threaten you with bodily harm?
A No.
Q Had he ever gone around town telling people he'd survive without you?
A I have no idea.
Q So, the galaxy of bad things that Milsner did is pertaining to the ESOP sale, what you've called the self-dealing, the consulting fee, the lease rental and not doing the work in-house; is that right?
A That's about it.
Q And would you agree with me, sir, those are





business-related issues?
A Yes.
Q Have you made any assertions to Mark Gunderson that he committed legal malpractice in that prior case?
MR. RUSSO: The state court case?
MR. HILL: Yes.
THE WITNESS: Ask that question again.
BY MR. HILL:
Q Have you or anyone on your behalf made an assertion that Mr. Gunderson committed malpractice in the state court case?
A Yes.
Q And I know you're not a lawyer. Okay? What do you understand that Milsner did or did not do?
A Milsner?
MR. RUSSO: Gunderson.
MR. HILL: Thank you. It's late for both of us, sir.
BY MR. HILL:
Q What do you think Gunderson did --
MR. RUSSO: The case is on appeal for that reason.
MR. HILL: Well, I want to talk with Mr.





Carstarphen about what he understands.
BY MR. HILL:
Q Can you answer my question?
A Yes. The fact that he let it go past the five-year rule. And he got the case dismissed.
Q And do you believe that Mr. King and Mr. Russo had any hand in that?
A Do I think that they -- Mr. King and Mr. Russo were not involved during that time period.
Q Did they have any culpability in that?
A No.
MR. HILL: Just a second, sir. I'm sorry.
(Exhibit 85 was marked for identification.)
BY MR. HILL:
Q Exhibit 85, Mr. Carstarphen, is what purports to be your declaration. Have you seen this document before?
A Most likely.
Q Well, turn to -- turn to the last page -- or page 5 rather. Is that your signature?
A Yes.
Q Did you understand when you signed this document that you were swearing that everything in it was true?

A Yes.
Q Is everything that is in Exhibit 85 true?
A I believe so.
Q Was it true when you signed it?
A I believe so.
Q Do you think it's still true today?
A I haven't read it right now so I don't know, but I believe so.
Q Page 1, line 27, 28. When American MedFlight, Inc. was formed, I was not and never intended to be a minority shareholder.
You were always a one-third shareholder, weren't you?
A We were all equal shareholders.
Q Right. And you were a one-third shareholder?
A Yes.
Q So you were always -- you've always been a one-third shareholder and that's never changed?
A Yes.
Q Page 2, line 23. Mandatory meetings of the shareholders were not held.
What period of time are you referring to, Mr. Carstarphen?
A I believe this is after 2005.





Q Okay. Then you say, the bylaws of American MedFlight were not followed. That's the second meeting of the board of -- well, you say the bylaws of American MedFlight were not followed.
What bylaws were not followed?
A The transactions between American MedFlight and Reno Flying Service.
MR. HILL: I'm sorry, sir. Can you read his answer back, Jerry.
(The following answer was read by the reporter.)
"ANSWER: The transactions between American MedFlight and Reno Flying Service."
BY MR. HILL:
Q That's not the bylaws, though, is it?
A Yes, it is.
Q It is?
A Yes.
Q Okay. Do you distinguish between directors' resolutions and the bylaws, or are they the same thing as far as you're concerned?
A Directors' resolutions? I don't understand your question.
Q You believe that this business about the $2500 check --





A $2500 check.
Q If any check over $2500 is written. Do you recall that?
A Yes.
Q That's part of the bylaws?
A I believe that's part of board of directors' minutes, but not of the bylaws.
Q But your declaration says bylaws, doesn't it?
A Yes.
Q Is that correct?
A Yes.
Q That's the same thing, the directors' resolutions and the bylaws are the same thing?
A No.
Q Okay. Is your declaration correct?
A Yes, it is. This declaration doesn't say anything about a $2500 signature.
Q Let me ask the question this way then.
You say on line 23, the bylaws of American MedFlight were not followed. That's what you swore under oath? Right?
A Yes.
Q What are you referring to, sir?
A The transactions between American MedFlight





and Reno Flying Service.
Q Okay. And what about the transactions?
A They were not followed by the bylaws.
Q The bylaws were not complied with?
A Correct.
Q What part of the bylaws?
A They required that any check to Reno Flying Service were to be signed by me.
Q And you stand by that testimony?
A Yes.
MR. RUSSO: We'll stipulate that his answers are to the bylaws and board resolutions.
MR. HILL: Well, maybe he doesn't know the difference, but somebody in your office ought to know the difference, Mr. Russo, because your declaration isn't correct, is it, sir? Do you still believe it's correct?
THE WITNESS: I believe it's correct.
BY MR. HILL:
Q Down on line 24 you say, and dividends were not paid to me.
Do you have any reason to believe that Dawson ever got a dividend when he was a shareholder that you didn't get?
A No.
Q Do you have any reason to believe that

Milsner got a dividend that you didn't get?
A I don't know.
Q So the fact -- okay.
AMF now controlled by Milsner disregarded the 1995 board resolutions that a disinterested officer must approve all transactions with RFS and that I must cosign any check to RFS.
Now that's true?
A I believe so.
Q Except that was never abided by, was it?
A No.
Q So it didn't just start in 19 -- it just didn't start when Milsner took over and got control, it was going on before that, wasn't it?
A Yes.
Q Now in here, in that sentence I just read you talk about the board resolutions. Are you with me?
A Yes.
Q Is that the same thing as on line 23 where you refer to the bylaws, or is that different?
A I believe that's a board resolution, not a bylaw.
Q So your declaration is not correct?
A It is correct.
Q Do we need to get the bylaws out, Mr.





Carstarphen, and maybe look at them?
A I don't think we need to get the bylaws out. This refers to board resolutions, not bylaws.
Q And line 23 talks about the bylaws, doesn't it?
A Yes.
Q I want to know what part of the bylaws you're talking about?
A I think it's 7.01.
Q Okay. Here you go, Mr. Carstarphen, here is 7.01 of Exhibit 15, it deals with indemnification and insurance, doesn't it?
A That's not the right one.
Q Okay. Do you want to look through this or do you want to finally agree with me that your declaration isn't correct?
A No.
Q Okay. I want you to tell me what part of those bylaws you're referring to in that declaration, sir.
Now this document we're talking about, this declaration, this was prepared by your lawyers, wasn't it? You didn't prepare it, did you?
A No.
MR. RUSSO: Let the record reflect that I'm





showing him AMI-0041 to 0045, and AMI-0047 to 48, which are the minutes of the second meeting of the board of directors and the minutes of the third meeting of the board of directors.
BY MR. HILL:
Q And that's what you're referring to, isn't it, Mr. Carstarphen?
A I believe that's it.
Q So it's not in the bylaws, is it?
A Apparently not.
Q So you were mistaken?
A Yeah.
Q Right?
A Yes.
Q Okay. See how easy that was?
Don't put it away.
You go on on line 26 to 27 and say, AMF pays RFS approximately $1 million each year for plane rentals and maintenance.
And we've talked here today that none of those plane rentals were joyrides. Those were all planes that AMF actually got from Reno Flying Service; right?
A Yes.
Q And you can't tell me that the fare charged by Reno Flying Service to AMF was unfair, can you?





A No.
Q And the maintenance was already talked about. We don't need to worry about that for right now.
On the next page, page 3, line 7 in your declaration you say, however, the maximum --
A Wait. I'm lost.
Q Page 3, line number 7.
A Okay.
Q Are you with me?
A Yes.
Q Let me read it for you. It says, however, the maximum legal contribution that AMF could make annually to the AMF ESOP was less than the amount the AMF ESOP would be obligated to pay annually to service the debt if my 800 shares of stock were purchased with the 1600 shares controlled by Milsner.
Is that a true statement?
A I believe so.
Q When did you figure that out? When did you have this epiphany?
A What was the question?
Q When did you figure that out?
A I don't know.
Q How did you figure it out?
A I figured it out when American MedFlight

was unable to make the payments to -- the ESOP payments to Milsner and it went in default.
Q So it was when the default notice was issued by Milsner?
A I believe so. Jack may have told me some time sooner that they were having trouble making the payments.
Q But you figured this out when the default occurred?
A I don't know when I figured it out.
Q Well, can you remember the event, I mean, how this epiphany came to you?
A No.
Q What does this mean? So what?
A What do you mean "so what"?
Q What does this sentence mean, Mr. Carstarphen?
A It says that I don't think that American MedFlight could make the payments to me.
Q But you didn't know that at the time of the meeting, did you?
A The December 5th meeting?
Q Yeah.
A No.
Q Okay. Now, on line 14 you say, the sale of





his stock to the ESOP netted Milsner $1 million. Do you see that?
A I didn't say one million.
Q Excuse me, you're right.
The sale of his stock to the ESOP netted Milsner millions of dollars. I stand corrected, sir.
On what basis do you believe that the sale of the stock to Milsner netted him millions of dollars?
A The contract says that under the condition of sale he was to get 3.6 million, I believe.
Q Were you done?
A Yes.
Q Do you understand in the English language the difference between present tense, past tense and future tense?
A Yes.
Q The sale of his stock to the ESOP netted. Is that past tense, present tense or future tense?
A I don't think it has any of those.
Q Netted is past tense, isn't it? Today I net; tomorrow I will net; and I have netted many times in the past. Does that sound right to you?
A Yes.
Q So you're telling the court here that Milsner has gotten millions of dollars for his stock;





right?
A Yes.
Q Is that true?
A Yes. On his balance sheet I'm sure it shows $3.6 million.
Q And how much of that has he gotten, Mr. Carstarphen?
A I have no idea.
Q So how could you say it has netted him millions of dollars if you have no idea?
A Because I saw the contract that said it was $3.6 million.
Q And it's a contract that hasn't been honored; right?
A It's been partially honored.
Q But you can't tell us to what extent?
A No.
Q Let's go to page 4, line 1.
At the AMF annual stockholders' meeting on February 10, 2009, Dawson acknowledged that he was present on behalf of and represented the AMF ESOP shareholders.
Who are the trustees of the AMF ESOP, Mr. Carstarphen, do you know?
A At what time?





Q As of February 10, 2009.
A I'm not real sure. I think Jack Dawson, and I'm not sure who else. I think Rich Milsner might have been.
Q As of November 2007 when this lawsuit was filed do you know who the trustees of the AMF ESOP were?
A I'm not sure.
Q Do you have any data at your disposal that you can point me to that says that Milsner on the date you filed this lawsuit was a trustee of the AMF ESOP?
A No.
Q But you told the court that you believe that he's controlling the AMF ESOP, haven't you?
A I don't know.
Q You don't know if you made that assertion to the court?
A No.
Q Do you believe it to be true, that Milsner controlled the AMF ESOP?
A I believe Milsner controls the whole company.
Q So that includes the AMF ESOP?
A Yes.
Q And so you believe that if Dawson's signing and saying he's the only one, that Dawson's being

untruthful when he says that?
A That he is the only one of what?
Q The only trustee for the ESOP?
A I believe now he is the only trustee of the ESOP.
Q Do you believe that Milsner still controls the AMF ESOP?
A I don't know.
Q You've told the court that you believe that, haven't you?
A I don't know that I have.
Q Let's go down to paragraph 10 on line 12, let me read it for you.
At a special meeting of the board of directors that AMF held March 31, 2009, I complained that the checks and balances established in 1995 have not been followed.
Did you complain at that meeting, Mr. Carstarphen?
A I believe so.
Q Milsner then brought a motion to ratify all of AMF's prior business dealings with outside contractors or suppliers, including RFS. Is that a true statement?
A I believe that is.
Q Was that motion seconded?





A I have no idea.
Q This included all of the tortuous conduct alleged in the state court action as well as a portion of the conduct alleged in the current lawsuit.
Is that true?
A I believe so.
Q Milsner and James Brown, who worked for RFS and is controlled by Milsner voted for ratification and I voted against it.
Is that true?
A I believe so.
Q Then on to the next page.
At the same 2009 board meeting it was proposed by Milsner that the requirement -- let me back up.
As of that meeting on March 31, 2009, was Milsner trying to benefit Reno Flying Service?
A I was in the wrong place. Go ahead read your --
Q This is the meeting that we just talked about, the board meeting.
A Yeah.
Q Milsner was trying to benefit Reno Flying Service and therefore himself; right?
A Yes.





Q Because if he could get the money to Reno Flying Service, it goes to him; right?
A Yes.
Q And that was of that date of March 31, 2009?
A Yes.
Q Then the next page. At the same 2009 board meeting it was proposed by Milsner that the requirement that the president and a disinterested party approve agreements with third-party entities, again including RFS be removed. This would allow Milsner, who's currently the president of AMF to sign any contract he wanted with RFS, and you objected to that because Milsner, as of that time, he is part of RFS; right?
A Yes.
Q Doing okay, Mr. Carstarphen?
A Yes.
(Exhibit 86 was marked for identification.)
BY MR. HILL:
Q I'm going to hand you Exhibit 86. I'm going to ask you to turn to page -- up at the top it says page 29 of 31.
Mr. Carstarphen, let's start on page 28 of 31, please.





Interrogatory number 2. State each and every error or omission, provision, term, or other factor about the structure, organization, operation or any other aspect of the AMF ESOP that you contend has not been appropriate in any way or to any extent. Okay? And let's go to page 29 of 31.
This is the answer that your lawyers have prepared and given to us. Okay?
Carstarphen does not contend that was or is an inappropriate error, omission, provision or term --
Can you help me out, Scott?
Carstarphen does not contend that there are or there was? It's missing a verb. There was?
MR. RUSSO: That there was.
BY MR. HILL:
Q Carstarphen contention in this case is as follows. Prior to the December 5, 2005 board of directors' and stockholders' meeting, Carstarphen was provided with an appraisal of AMF prepared by Menke and Associates. Is that true?
A I think that's true.
Q You swore this was true, didn't you?
A Yes.
Q Now, this document on here, this verification -- have you signed a bunch of these or just

one?
A A bunch of them.
Q Were the dates blank?
A I don't know.
Q I mean, you signed a stack of them for your lawyer?
MR. RUSSO: I can tell you that's never happened.
MR. HILL: Well, that may be your testimony.
THE WITNESS: A stack of them?
BY MR. HILL:
Q Yeah.
A No.
Q So, every time that you need to sign a verification, what do you do?
A They usually fax them to me for signature and I fax them back. And then I mail them the original.
Q All right. So, you're swearing that the statements on that page 29 of 31 are true, aren't you?
A Yes.
Q So you did get an appraisal by AMF prepared by Menke and Associates?
A Yes, it was a year and a half earlier.
Q Did you complain about that at the meeting,





Mr. Carstarphen?
A Why would I complaint about it?
Q Well, it seems to be a big point to you now. You're a sharp guy, you picked up on that, didn't you? You knew that.
A It's not a big point to me now.
Q So it didn't matter?
A I mean, it's an outdated report.
Q Did you say that to anybody?
A Why? Everybody knew what the date of the thing was.
Q Well, here this afternoon you didn't even know you got it.
A Okay.
Q So you got the appraisal stating that the fair market value of AMF was approximately $5.5 million at that time. Do you understand that that's what that report said?
A Yes.
Q The responding party, that's you, very much was considering selling his stock to the ESOP upon the terms discussed at the meeting.
Is that true?
A Yes, I was interested in selling my stock.
Q So you were prepared to tank your lawsuits





to do the transaction?
A I didn't know about that until just before the meeting.
Q No, Mr. Monjay told you a year before that you'd lose your lawsuit if you sold the stock, didn't he?
A Yes, he did.
Q So, even though Mr. Monjay had told you that, you were very much considering selling your stock to the ESOP?
A Yes, I was.
Q What were the terms?
A We never got to the terms.
Q Well, you're telling the judge here -- or you're telling us in this answer on the terms discussed at the meeting. I want to know what those terms were that you were very much considering, Mr. Carstarphen?
A The terms were my one-third interest.
Q What was the price?
A The price was one-third of the 5.5.
Q And were you going to get cash?
A No.
Q What were the terms?
A I didn't know what were the terms.
Q So how did you know you were going to -- how come you were considering -- very much considering





selling them?
A I was considering it. I didn't say I was.
Q Okay. Prior to entering the meeting, Milsner told Carstarphen that he could not participate in the sale to the ESOP unless he dismissed his state court lawsuit. Now we talked about that?
A Yes.
Q And there were no witnesses to that?
A No.
Q In the lawsuit Carstarphen contended, among other things, that Milsner had wrongfully diverted millions of dollars from AMF for the benefit of Reno Flying Service.
Now we've talked about the consulting fee. We've talked about the repair and the maintenance. We've talked about the rental and we've talked about the lease.
Does that cover the waterfront? Is that everything?
A The line of credit.
Q And the line of credit. He stole money from you?
A Yeah.
Q So he was not only dishonest and had withheld information from you, he had stolen from you?
A Yes.

Q And you still trusted him when you went into this meeting?
A There was no trust. We were having a meeting.
Q Did you trust Milsner at that meeting, yes or no?
A There was nothing to trust. We were having a meeting to discuss what we were going to do with the ESOP. It had nothing to do with trust.
Q So it didn't pertain one way or the other whether you could believe what he said?
A When I see a final document I could believe that.
Q Did you get back to them and tell them, please prepare a final document for me to look at?
A No. He said he would do that. He would prepare all the documents.
Q Milsner told you that he would prepare all the documents?
A Yes. I believe he was with Daoro preparing the final documents.
Q Didn't he ask you to get back to him within 10 days to let him know whether or not you were going to participate?
A Yes.





Q And you've told us already that you did not get back to them?
A I did not get back to them.
Q You didn't tell them, yes, I'm going to participate, no I'm not, you just wouldn't sign them; right?
A No. The condition was that if I wanted to participate, I had to drop the state lawsuit, and I didn't think that needed a response.
Q So you just went silent?
A I said I didn't think -- yes, it didn't need a response.
Q So you give them no response at all?
A No response.
Q And you were silent?
A I gave them no response.
Q Did you tell Jack Dawson that Milsner had made this condition?
A I don't know if I did or I didn't.
Q Did you think it was unfair?
A I don't think -- you use the word "unfair," that was the condition he put on there.
Q Well, you were very much considering selling your stock to the ESOP, weren't you?
A I was considering it.





Q Well, is "very much" too strong a word here? That's what it says, doesn't it? It says, very much considering. Line 8. Do you want to read it?
A I've read it.
Q So is that true, very much considering?
A Very much considering; I don't know the difference.
Q These are your answers, Mr. Carstarphen.
A What's the difference?
Q Well, you tell me. They're your words, Mr. Carstarphen, what is the difference?
A I don't see any difference.
Q Good enough.
Now, did you think that it was unfair for Milsner to put that condition on?
A I don't know.
Q Okay. You don't know.
Then you go on on line 13. The condition to participation in the sale, dismissal of the lawsuit was the only reason at that time that Carstarphen did not agree to sell his stock to the ESOP at that time.
Have there been subsequent reasons that you found that you shouldn't do the deal?
A No.
Q Continuing on on line 15, sir, please





follow along. As of the December 5, 2005 meeting, Carstarphen was aware that the AMF ESOP does not have cash to pay Milsner for his stock and that a note from AMF would be required.
So you understood that there were going to be long-term payments coming out to Milsner, didn't you?
A Yes.
Q And does that to you in your mind signify that there's debt owed to Milsner?
A I didn't understand that part of the transaction at all --
Q Did you make --
A -- at that time.
Q Well, when did you come to understand that part of this transaction, sir?
A When I got the December 31, 2005 appraisal. And at that time I still didn't understand it.
Q Well, my question to you was, do you understand it today?
A Yes, I do.
Q When did you come to understand it and how?
A Jack and I discussed it a number of times, and we could not figure out why there was -- why this was occurring.
It wasn't until some time later, I don't

know, six months, a year, that Jack figured it out, but he couldn't explain it to me. And then all of a sudden at one point the light came on and then I figured it out.
Q What did you understand when the light came on, sir?
A That my stock was devalued due to this sale by 1.3 million.
Q But you knew that when you got the December 31 appraisal.
A I knew that, but I didn't know why. You're asking me the difference between knowing and why.
Q Why was your stock devalued?
A Because American MedFlight took on the debt. And the appraisers feel that because of the additional debt the company isn't worth as much money.
And I'm still not sure why that is, but I understand that that's what they're doing.
Q Okay. You have questions about that?
A I have questions about that, yes.
Q What are the questions you have, sir?
A I mean, if I own a house that's worth $200,000, and then I take a note on it for a hundred thousand, I don't think the house is worth a hundred thousand. I think it's still worth two hundred thousand.
Q Makes sense, doesn't it?





A Makes sense. But the sense that they have in this appraisal in their logic doesn't make sense to me. I understand what they're doing, but it doesn't make any sense to me.
Q It's goes against your common sense?
A Yes.
MR. RUSSO: The seller doesn't pay off the debt at the time of the transaction it makes sense.
MR. HILL: But if it's a contingent debt, if I guarantee your obligation to buy a car and you sell the car, you don't get to keep the money; you pay off the debt to the bank on the car before you get the net. That's where your falling down.
BY MR. HILL:
Q Mr. Carstarphen, did you ever have a discussion with Dawson where you told him that you recognize -- well, do you understand that the ESOP appraisal is a specialized appraisal?
A Yes.
Q And have you ever had a discussion with Dawson where you told him that you understood that the -- that it was a specialized appraisal and that the value of the company as a whole really had not been damaged?
A I don't know.
Q Carstarphen had no knowledge -- I'm on line





17, sir.
Carstarphen had no knowledge that the AMF ESOP executing a note would cause a liability by AMF.
You voted to establish the ESOP in 2003, didn't you?
A Yes.
Q Did you take any steps between 2003, December 2003 and December 2005 to educate yourself about ESOPs?
A Yes.
Q What did you do?
A Extensively. I mean --
Q Okay. What did you do?
A The education that I learned with a government-run program is horrendous. And I'm not sure I would have done the ESOP if I had known how horrendous the reporting and everything is.
Q What steps did you take to educate yourself about ESOPs between December of 2003 and December of 2005?
A That's an ongoing, day-to-day education. Learn by hard knocks.
Q Can you tell me one thing that you did to educate yourself about ESOPs during that time frame, sir?
A I read as much as I could. I talked with





Menke, I talked with their attorneys, I talked with the people doing the administration on how the whole thing was structured.
And we did a lot of research in how we were going to structure the ESOP when we started it.
Q You had at one point established an ESOP for both of your companies, didn't you?
A No.
Q Did you establish an ESOP for one of your companies?
A Yes.
Q Which company, sir?
A American Home Companion.
Q And was that during that period of time, was that part of the educational process?
A Yes.
Q Now the American Home Companion ESOP has never gone to fruition, has it, you never sold any stock to the ESOP, have you?
A No.
Q Why not?
A Why?
Q You paid money to get it established.
A That's fine. That doesn't require that I sell the stock.

Q Okay. So have you made a decision that you're not going to sell it to the ESOP?
A No.
Q So it's out there, maybe yes, maybe no?
A There is an existing ESOP.
Q And as of this time there's been no stock sold to the ESOP?
A That's correct.
Q Has the ESOP been provided any moneys in anticipation of such an event?
A Yes.
Q Do you plan to sell the stock to the ESOP?
A I think so, but I'm not sure.
Q Okay. Let me continue here. It was only when -- oh, let me back up. Line 18.
Carstarphen did not know that Milsner's sale to the AMF ESOP would have any adverse effect on the fair market value of AMF.
You believe today that the -- you understand the difference between -- you heard me talking with Mr. Proctor about the difference between enterprise value and equity value?
A Yes.
Q Do you understand -- do you have a grasp on those concepts, do you think?





A Slightly.
Q Well, you've given me here the example of the house?
A Yes.
Q In the example you've given, two hundred thousand dollars, that would be the enterprise value of that house, that's the value on the hoof?
A Uh-huh.
Q And your equity in that house in you example would be one hundred thousand dollars?
A Yes.
Q Applying those same analytical terms to American MedFlight, it is your opinion that the enterprise value of American MedFlight has been damaged; is that right?
A I don't know.
Q Line 20. It was only when Carstarphen was first provided with the year-end appraisal of AMF, December 31, 2005, that he first learned that the AMF ESOP liability to Milsner would devalue AMF and therefore Carstarphen's stock.
You knew that there was a guarantee proposed by Menke that AMF was going to guarantee the obligation to the ESOP, didn't you?
A No.





Q Didn't have any knowledge?
A No. I never saw any guarantees.
Q Did you read all the materials you got from Menke?
A Menke didn't give me any materials.
Q I believe the correct flow of the material was they came from Menke to Milsner, they went to Cashill, and from Cashill they went to Gunderson, from Gunderson they went to you.
Now, did Gunderson give you brochures and data from Menke?
A Brochures. Like what?
Q Any information about the ESOP.
A I had brochures from Menke back in '93.
Q '93?
A Yes.
Q Did you get any updates?
A Well, I'm sure he sent me notices of seminars and different things.
Q The materials that were provided by Menke -- we covered that. I'm not going to ask about it.
Carstarphen contends that, had he been aware on December 5, 2005, that the AMF ESOP's obligation would correspondingly devalue AMF, he would have had to balance the reasonable value of his lawsuit versus the





loss in value of his stock, and may very well have decided to sell his stock to the ESOP at that time.
Now, last time we talked about the value of your lawsuit, you recall what that was, don't you?
A No.
Q Two million dollars, don't you remember?
A I don't remember.
Q Did Milsner give you documents from Menke?
A What kind of documents?
Q Any document.
A I don't know what kind of documents you're referring to.
Q Did Mr. Milsner at a meeting at Harrah's in Reno ever give you any documents pertaining to the AMF ESOP from Menke?
A Probably.
Q Okay. Do you recall what those were?
A No.
Q Do you still have them?
A More than likely, but I don't know what they are, so I can't tell you.
Q Did you read them?
A I'm sure I did.
Q What was in them?
A I don't know. I don't remember.

MR. HILL: Let's take a break.

(A recess was taken at 5:15 p.m.)

-o0o-





RENO, NEVADA, THURSDAY, JUNE 3, 2010, 5:25 P.M.

-o0o-

MR. HILL: Let's go back on the record.

EXAMINATION

(Resumed)

BY MR. HILL:

Q Mr. Carstarphen, the maintenance and repair work that you contend should have been brought in-house, was that everything?

A I don't understand the question.

Q Was that everything to be done on the planes?

A No.

Q What was excluded?

A Like avionics work.

Q What else? Anything else? How about painting?

A Painting.

Q Upholstery?

A Probably upholstery.

Q Engine work?

A Some engine work we did. Some we had outside sources do it.

Q You're using past tense here. AMF had never done the work in-house, has it? That's your whole





complaint, isn't it?

A Yes.

Q So, when you say, we did some, explain, please.

A Reno Flying Service did some and some we subbed out.

Q Any other answers you want to change that you've given me today?

A Not right now.

MR. HILL: Okay. That's all I have for this witness.

(The deposition was adjourned at 5:28 p.m.)

-o0o-





I, JOHN CARSTARPHEN, deponent herein, do hereby certify and declare under penalty of perjury, the within and foregoing transcription to be my deposition in said action, subject to any corrections I have heretofore submitted, and that I have read, corrected, and do hereby affix my signature to said deposition.

John Carstarphen

STATE OF NEVADA )
 } ss:
COUNTY OF WASHOE )

Subscribed and sworn to before me this _____ day of __________, 2010 .

Notary Public

CERTIFICATE OF REPORTER

STATE OF NEVADA )
) ss:
COUNTY OF WASHOE )

I, JERRY J. SILVEN, a duly commissioned Notary Public, Washoe County, State of Nevada, do hereby certify:

That I reported the deposition of the witness, JOHN CARSTARPHEN, commencing on Thursday, June 3, 2010, at the hour of 1:33 p.m.;

That prior to being examined, the witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate record of testimony provided by the witness at said time.

I further certify (1) that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action, and (2) that pursuant to NRCP 30 (e), transcript review by the witness was requested.

IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Washoe, State of Nevada, this 15th day of June, 2010.

Jerry J. Silven, CCR #55