# EXHIBIT 19

# EXHIBIT 19

Checkpoint Contents
  Accounting, Audit & Corporate Finance Library
    Standards and Regulations
      AICPA
        Technical Practice Aids
          Archive — Statements of Position — Accounting
            ACC Section 10,000—ARCHIVE — STATEMENTS OF POSITION — ACCOUNTING
              ACC Section 10,580—Statement of Position 93-6 Employers' Accounting for Employee Stock Ownership Plans

## ACC Section 10,580

## *Statement of Position 93-6 Employers' Accounting for Employee Stock Ownership Plans*

**November 22, 1993**

### NOTE

Statements of Position of the Accounting Standards Division present the conclusions of at least two-thirds of the Accounting Standards Executive Committee, which is the senior technical body of the Institute authorized to speak for the Institute in the areas of financial accounting and reporting. Statement on Auditing Standards No. 69, *The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles*, identifies AICPA Statements of Position as sources of established accounting principles that an AICPA member should consider if the accounting treatment of a transaction or event is not specified by a pronouncement covered by Rule 203 of the AICPA Code of Professional Conduct. In such circumstances, the accounting treatment specified by this Statement of Position should be used, or the member should be prepared to justify a conclusion that another treatment better presents the substance of the transaction in the circumstances.

## Scope

**.01**   This statement of position (SOP) provides guidance on employers' accounting for employee stock ownership plans (ESOPs). It applies to all employers with ESOPs, both leveraged and nonleveraged. It does not address financial reporting by ESOPs.[1]

---

[1] Financial reporting by ESOPs is discussed in the AICPA Audit and Accounting Guide *Audits of Employee Benefit Plans*.

**.02**   An ESOP is an employee benefit plan that is described by the Employee Retirement Income Security Act of 1974 (ERISA) and the Internal Revenue Code (IRC) of 1986 as a stock bonus plan, or combination stock bonus and money purchase pension plan, designed to invest primarily in employer stock.

**.03**   This SOP supersedes American Institute of Certified Public Accountants (AICPA) SOP 76-3, *Accounting Practices for Certain Employee Stock Ownership Plans* [ section 10,130], and affects certain Emerging Issues Task Force (EITF) consensuses. A list of the documents affected is provided in appendix D [ paragraph .102] of this SOP.

## Background

**.04**   SOP 76-3 [ section 10,130] was issued in December 1976, primarily to deal with accounting and reporting issues relevant to employers with leveraged ESOPs, and it has been the primary source of guidance on the subject.

**.05**   Since the issuance of SOP 76-3 [ section 10,130], Congress has revised laws concerning ESOPs several times and the Internal Revenue Service (IRS) and the U.S. Department of Labor have issued many regulations covering the operation of plans, which actions have resulted in changes in the way ESOPs may operate and the reasons they are established by companies. Those changes, the most significant of which are described in appendix C [ paragraph .101], were factors in the growth in the number of plans from fewer than 2,500 plans in 1976 to nearly 10,000 at the end of 1990.[2]

---

[2] Statistics from an unpublished study completed in 1991 by the National Center for Employee Ownership, Oakland, Calif.

**.06**   The increase in the number of ESOPs since the issuance of SOP 76-3 [ section 10,130] was matched by an increase

# EXHIBIT 20

# EXHIBIT 20

MINUTES OF SIXTH MEETING
OF
THE SHAREHOLDERS OF

AMERICAN MEDFLIGHT, INC.

The annual meeting of the Shareholders of AMERICAN MEDFLIGHT, INC. was held on January 7, 1999.

The following shareholders, being all of the shareholders of the corporation, were present:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

who, by their presence at, consent to, participation in, and signatures to these minutes, waived notice of the calling of the meeting and consented to the proceedings had and business transacted at the meeting.

Upon motion duly made, seconded and unanimously carried, John R. Carstarphen was thereupon elected to and assumed the position of Chairman and John A. Dawson was thereupon elected to and assumed the position of Secretary of the meeting.

The President of the corporation presented an oral report of all significant business operations and corporate matters for the year ended December 31, 1998. No shareholder objections were raised.

The Treasurer of the corporation presented an oral report of the financial condition for the year ended December 31, 1998. No shareholder objections were raised.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

> RESOLVED, that the shareholders of the corporation, being fully advised of the business activities and financial condition of the corporation for the year ending December 31, 1998, and having considered the same, hereby ratifies, approves,

1

AMF 00103
AMI-0104

confirms, accepts and adopts each and every act of the directors of the corporation during said year.

A motion was then declared by the Chairman to be in order for the nomination of directors of the corporation to hold office for the ensuing year and until their successors are elected and qualified, and the following persons were nominated:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

No further nominations having been made, the above-named persons were duly elected directors of the corporation.

Upon motion duly made, seconded and unanimously carried, the Secretary of the corporation was directed to prepare minutes of the shareholders' meeting and insert them in the corporate minute book.

There being no further business requiring shareholder action or consideration, and upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

Dated this 7th day of January, 1999.

_____
Jack A. Dawson, Secretary

_____
John R. Carstarphen, Shareholder

_____
Jack A. Dawson, Shareholder

_____
Richard L. Milsner, Shareholder

2

AMF 00104
AMI-0105

MINUTES OF SEVENTH MEETING
OF
THE SHAREHOLDERS OF

AMERICAN MEDFLIGHT, INC.

The annual meeting of the Shareholders of AMERICAN MEDFLIGHT, INC. was held on February 9, 2000.

The following shareholders, being all of the shareholders of the corporation, were present:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

who, by their presence at, consent to, participation in, and signatures to these minutes, waived notice of the calling of the meeting and consented to the proceedings had and business transacted at the meeting.

Upon motion duly made, seconded and unanimously carried, John R. Carstarphen was thereupon elected to and assumed the position of Chairman and John A. Dawson was thereupon elected to and assumed the position of Secretary of the meeting.

The President of the corporation presented an oral report of all significant business operations and corporate matters for the year ended December 31, 1999.  No shareholder objections were raised.

The Treasurer of the corporation presented an oral report of the financial condition for the year ended December 31, 1999.  No shareholder objections were raised.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

> RESOLVED, that the shareholders of the corporation, being fully advised of the business activities and financial condition of the corporation for the year ending December 31, 1999, and having considered the same, hereby ratifies, approves,

1

confirms, accepts and adopts each and every act of the directors of the corporation during said year.

A motion was then declared by the Chairman to be in order for the nomination of directors of the corporation to hold office for the ensuing year and until their successors are elected and qualified, and the following persons were nominated:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

No further nominations having been made, the above-named persons were duly elected directors of the corporation.

Upon motion duly made, seconded and unanimously carried, the Secretary of the corporation was directed to prepare minutes of the shareholders' meeting and insert them in the corporate minute book.

There being no further business requiring shareholder action or consideration, and upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

Dated this 9th day of February, 2000.

_____
Jack A. Dawson, Secretary

_____
John R. Carstarphen, Shareholder

_____
Jack A. Dawson, Shareholder

_____
Richard L. Milsner, Shareholder

2

AMF 00106
AMI-0107

# MINUTES OF EIGHTH MEETING
## OF
## THE SHAREHOLDERS OF

## AMERICAN MEDFLIGHT, INC.

The annual meeting of the Shareholders of AMERICAN MEDFLIGHT, INC. was held on January 5, 2001.

The following shareholders, being all of the shareholders of the corporation, were present:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

who, by their presence at, consent to, participation in, and signatures to these minutes, waived notice of the calling of the meeting and consented to the proceedings had and business transacted at the meeting.

Upon motion duly made, seconded and unanimously carried, John R. Carstarphen was thereupon elected to and assumed the position of Chairman and John A. Dawson was thereupon elected to and assumed the position of Secretary of the meeting.

The President of the corporation presented an oral report of all significant business operations and corporate matters for the year ended December 31, 2000.  No shareholder objections were raised.

The Treasurer of the corporation presented an oral report of the financial condition for the year ended December 31, 2000.  No shareholder objections were raised.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

RESOLVED, that the shareholders of the corporation, being fully advised of the business activities and financial condition of the corporation for the year ending December 31, 2000, and having considered the same, hereby ratifies, approves,

1

confirms, accepts and adopts each and every act of the directors of the corporation during said year.

A motion was then declared by the Chairman to be in order for the nomination of directors of the corporation to hold office for the ensuing year and until their successors are elected and qualified, and the following persons were nominated:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

No further nominations having been made, the above-named persons were duly elected directors of the corporation.

Upon motion duly made, seconded and unanimously carried, the Secretary of the corporation was directed to prepare minutes of the shareholders' meeting and insert them in the corporate minute book.

There being no further business requiring shareholder action or consideration, and upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

Dated this 5th day of January, 2001.

_____
Jack A. Dawson, Secretary

_____
John R. Carstarphen, Shareholder

_____
Jack A. Dawson, Shareholder

_____
Richard L. Milsner, Shareholder

2

AMF 00108
AMI-0109

MINUTES OF NINTH MEETING
OF
THE SHAREHOLDERS OF

AMERICAN MEDFLIGHT, INC.

The annual meeting of the Shareholders of AMERICAN MEDFLIGHT, INC. was held on March 24, 2002.

The following shareholders, being all of the shareholders of the corporation, were present:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

who, by their presence at, consent to, participation in, and signatures to these minutes, waived notice of the calling of the meeting and consented to the proceedings had and business transacted at the meeting.

Upon motion duly made, seconded and unanimously carried, John R. Carstarphen was thereupon elected to and assumed the position of Chairman and John A. Dawson was thereupon elected to and assumed the position of Secretary of the meeting.

The President of the corporation presented an oral report of all significant business operations and corporate matters for the year ended December 31, 2001. No shareholder objections were raised.

The Treasurer of the corporation presented an oral report of the financial condition for the year ended December 31, 2001. No shareholder objections were raised.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted:

> RESOLVED, that the shareholders of the corporation, being fully advised of the business activities and financial condition of the corporation for the year ending December 31, 2001, and having considered the same, hereby ratifies, approves,

1

AMF 00291

AMC-0108

confirms, accepts and adopts each and every act of the directors of the corporation during said year.

A motion was then declared by the Chairman to be in order for the nomination of directors of the corporation to hold office for the ensuing year and until their successors are elected and qualified, and the following persons were nominated:

JOHN R. CARSTARPHEN
JOHN A. DAWSON
RICHARD L. MILSNER

No further nominations having been made, the above-named persons were duly elected directors of the corporation.

Upon motion duly made, seconded and unanimously carried, the Secretary of the corporation was directed to prepare minutes of the shareholders' meeting and insert them in the corporate minute book.

There being no further business requiring shareholder action or consideration, and upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

Dated this 24th day of March, 2002.

Jack A. Dawson, Secretary

John R. Carstarphen, Shareholder

Jack A. Dawson, Shareholder

Richard L. Milsner, Shareholder

2

AMF 00292
AMC-0109

# EXHIBIT 21

# EXHIBIT 21

# AMERICAN MEDFLIGHT, INC.

## EMPLOYEE STOCK OWNERSHIP PLAN

Prepared: December 18, 2003
©1999, Menke & Associates, Inc.
All rights reserved.

AMF 02534

# CONTENTS

Section                                                                            Page

1.    NATURE OF PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.    ELIGIBILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.    PARTICIPATION IN ALLOCATION OF BENEFITS. . . . . . . . . . . . . . . . . . . . . . . 18
      (a)    Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      (b)    Leave of Absence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      (c)    Omission of Eligible Employee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      (d)    Inclusion of Ineligible Employee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      (e)    Suspended Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      (f)    Inactive Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      (g)    Uniformed Services Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5.    EMPLOYER CONTRIBUTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      (a)    Amount of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      (b)    Time for Making Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      (c)    Form of Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6.    INVESTMENT OF TRUST ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      (a)    Authorized Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      (b)    Duties of Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      (c)    Plan Loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      (d)    Nonrecognition of Gain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7.    ALLOCATIONS TO ACCOUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      (a)    Individual Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      (b)    Company Stock Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      (c)    Other Investments Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8.    EXPENSES OF THE PLAN AND TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

9.    VOTING COMPANY STOCK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

10.   DISCLOSURE TO PARTICIPANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      (a)    Summary Plan Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      (b)    Summary Annual Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      (c)    Annual Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      (d)    Notice of Rollover Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      (e)    Additional Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

AMF 02535

11.   ALLOCATION OF EMPLOYER CONTRIBUTIONS AND FORFEITURES. . . . . . . . 31
      (a)   Allocation of Employer Contributions and Forfeitures.  . . . . . . . . . . . . . . . . . . . . 31
      (b)   Allocation Limitations.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

12.   DETERMINATION OF PLAN BENEFIT VESTING AT DEATH, DISABILITY
      OR RETIREMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      (a)   Normal Retirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      (b)   Disability Retirement.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      (c)   Deferred Retirement.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

13.   OTHER TERMINATION OF SERVICE AND VESTING. . . . . . . . . . . . . . . . . . . . . . . 38
      (a)   Vesting Schedule.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (b)   Vesting Upon Reemployment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      (c)   Forfeitures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      (d)   Cash-Out Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

14.   DISTRIBUTION OF PLAN BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      (a)   Death, Disability or Retirement.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      (b)   Other Termination of Participation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      (c)   Death Prior to Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      (d)   Valuation Date.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      (e)   Consent and Notice Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      (f)   Required Commencement of Benefit Distribution. . . . . . . . . . . . . . . . . . . . . . . 45
      (g)   Undistributed Accounts.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      (h)   Optional Direct Transfer of Eligible Rollover Distributions.  . . . . . . . . . . . . . . 46
      (i)   Lien on Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      (j)   Automatic Rollovers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

15.   HOW PLAN BENEFIT WILL BE DISTRIBUTED.  . . . . . . . . . . . . . . . . . . . . . . . . . 47
      (a)   Form of Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
      (b)   Beneficiaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      (c)   Location of Participant or Beneficiary Unknown  . . . . . . . . . . . . . . . . . . . . . . . . 49

16.   RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK. . . 50
      (a)   "Put" Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
      (b)   Right of First Refusal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
      (c)   Other Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

17.   SPECIAL PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      (a)   Diversification of Investments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      (b)   S Corporation Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      (c)   C Corporation Cash Dividends  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

AMF 02536

18.   ADMINISTRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (a)   Named Fiduciaries for Administration of Plan and for Investment and
            Control of Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      (b)   Investment of Plan Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      (c)   Funding Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (d)   Claims Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (e)   Qualified Domestic Relations Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      (f)   General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      (g)   Independent Fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

19.   AMENDMENT AND TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (a)   Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (b)   Changes in the Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (c)   Termination, Partial Termination or Complete Discontinuance of
            Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      (d)   Determination by Internal Revenue Service. . . . . . . . . . . . . . . . . . . . . . . . . 65
      (e)   Return of Employer's Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

20.   MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      (a)   Participation by Affiliated Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      (b)   Limitation of Rights; Employment Relationship. . . . . . . . . . . . . . . . . . . . . . 67
      (c)   Merger; Transfer of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      (d)   Prohibition Against Assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      (e)   Applicable Law; Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

21.   TOP-HEAVY RULES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      (a)   Purpose and Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      (b)   Top-Heavy Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      (c)   Key Employee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
      (d)   Aggregated Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
      (e)   Minimum Vesting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
      (f)   Minimum Employer Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
      (g)   Coordination of Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

22.   EXECUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

iii

AMF 02537

**Section 16.**   <u>RIGHTS AND OPTIONS ON DISTRIBUTED SHARES OF COMPANY STOCK.</u>

(a)   <u>"Put" Option.</u>

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, and if such Company Stock is not immediately repurchased by the Company (or the Trust), then the "Qualified Holder" (as defined below) of such stock shall be granted, at the time that such shares are distributed to the Qualified Holder, an option to put the shares to the Company; provided, however, that all such shares are so put. The Company may grant the Trust the option to assume the rights and obligations of the Company at the time the put option is exercised. The term "Qualified Holder" shall mean the Participant or Beneficiary receiving the distribution of such shares, and any other party to whom the shares are transferred by gift or by reason of death. A put option shall provide that, for a period of sixty (60) days after such shares are distributed to a Qualified Holder (as defined above) (and, if the put is not exercised within such sixty (60) day period, for an additional period of sixty (60) days in the following Plan Year), the Qualified Holder would have the right to have the Company purchase such shares at their fair market value, as defined in Subsection 15(a). Such put option shall be exercised by notifying the Company in writing.

Notwithstanding the foregoing, distribution shall not be made in the form of Company Stock during an S Corporation Year if it would cause the Company to fail to constitute a 'small business corporation' within the meaning of Section 1361(b)(1) of the Code.

In the case of a lump sum distribution of Company Stock, the terms of payment for the purchase of such shares of stock shall be as set forth in the put and may be paid either in a single payment or in up to five (5) equal annual installments (with interest on the unpaid principal balance at a reasonable rate of interest), as determined by the Committee. Payment for the purchase of such shares must commence within thirty (30) days after the put is exercised. The period during which the put option is exercisable does not include any time during which the distributee is unable to exercise it because the party bound by the put option is prohibited from

50

AMF 02587

honoring it by applicable federal or state law.  If payment is made in installments, adequate security and a reasonable rate of interest must be provided.  In the case of an installment distribution, payment must be made within thirty (30) days after the put option is exercised with respect to any installment distribution of Company Stock.

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

The requirements of this Subsection 16(a) shall not apply to the distribution of any portion of a Participant's Plan Benefit which has been diversified, distributed or transferred to another plan pursuant to the provisions of Subsection 17(a) hereof.

(b)     Right of First Refusal.

If the distribution of the Plan Benefit is made in the form of shares of Company Stock, and if such Company Stock is not immediately repurchased by the Company (or the Trust), then such shares of Company Stock are subject to a right of first refusal, until such time as such shares are publicly traded.  Such a right shall provide that prior to any subsequent transfer, the shares must first be offered by written offer to the Company, and then, if refused by the Company, to the Trust.  In the event that the proposed transfer constitutes a gift or other such transfer at less than fair market value, the price per share shall be determined by an Independent Appraiser (appointed by the Board of Directors) as of the Anniversary Date coinciding with or immediately preceding the date of exercise, except in the case of a transfer to a Disqualified Person.

In the event of a proposed purchase by a prospective bona fide purchaser, the offer to the Company (or Trust) shall be at the greater of fair market value, as determined by an Independent Appraiser as of the Anniversary Date coinciding with or immediately preceding the date of exercise (except in the case of a purchase by a Disqualified Person), or at the price offered by the prospective bona fide purchaser.  In addition, such offer must equal or exceed the other terms of the offer made by the prospective bona fide purchaser.  In the case of a purchase by or transfer to a Disqualified Person, fair market value shall be determined as of the actual date of the transaction.  Valuations must be made in good faith and based on all relevant factors for

51

AMF 02588

determining the fair market value of securities. The Company may accept the offer at any time during a period not exceeding fourteen (14) days after receipt of such offer. In the event the Company does not accept such offer, the Trust may accept such offer at any time during said fourteen (14) day period.

In the case of a purchase from a Disqualified Person, all purchases of Company Stock shall be made at prices which, in the judgment of an Independent Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

(c)     Other Options.

Except as otherwise provided in this Section 16, no security acquired with the proceeds of a Securities Acquisition Loan may be subject to a put, call, buy-sell or similar arrangement while held by or when distributed from the Plan.

52

AMF 02589

# EXHIBIT 22

# EXHIBIT 22

RE: Carstarphen v. Milsner, et al.

**Carstarphen (AMF) Maintenance Facility**

Mr. Carstarphens (AMF) thinking that he could save money by doing a maintenance start up operation for his aircraft does not appear to be financially sound or well thought out for his CFR 14 FAR 135 air ambulance operation.

To equip a start up maintenance facility with minimum maintenance equipment it would cost approximately $200,000.00.

Three phase 240V electrical power is required to building
Hobart GPU 28V
Air compressor
Aircraft Jacks
Tail stands
Rolling work benches
Wheel & tire tools
Air conditioning service equipment
Standby Generator system 120/240 30amp 10,000 watts
Grinders
Drill press
Hydraulic Press
Bead Blaster
Parts washer
Engine hoists
Assorted electrical test equipment
Pratt-Whitney Seal Tool Kit
Pratt –Whitney Wrench Kit
Nozzle Flow Bench
Barfield Test Unit
Dead weight tester
Turbine propeller pulling tool
Bore scope
Cylinder wrench kit
Wing bolt wrenches
Various tools not normally possessed by aviation maintenance technicians
Nitrogen Service Cart – 1 high pressure & 1 low pressure
Oxygen Service Cart 6 bottle

1

AMF-60979

Hydraulic Mule
Tron Air Hydraulic service cart
Initial Technical Service and Maintenance Manual Library
Lektro Aircraft Tug
Beta D50 Battery Capacitance Unit
Alpha 20/25 Battery Charging Unit
Parts racks and storage bins
Electrical extension cords & work lights 15A
Ladders & work platforms
Furniture for maintenance, administration offices & waiting area
Locking file cabinets
Shelving for maintenance libraries
Telephone system
Computer systems 2 minimum (maintenance & company/finance
Dry erase scheduling boards
First Aid Kits
Eye wash stations
Develop Active SMS Program
Hazmat storage lockers
Fire extinguishers
Safety goggles
Respirators
Fire-proof records storage for aircraft log books
Simplex Lock systems (Security Requirement)

The company operating bank account should maintain a monthly balance of approximately
$100,000.00 to manage any unforeseeable contingencies expeditiously.

The recommended minimum Cheyenne aircraft spare parts required would cost approximately
$35000.00. This is necessary for expeditious return to service of the aircraft.  Just the shipping
and locating of parts could be 2 days if the discrepancy is discovered too late in the day.  Having
spares is mandatory for any business aircraft operations. Some of the recommendations are:
Wheels, tires, tubes, ships batteries, assorted lamps, current limiters, brake assemblies,
bearings, hydraulic pumps, starter generators, fuel nozzles, flap motor, landing gear motor,
pitot tubes, windshield wiper, door seals, igniters, transponder, navigation and com radios,
deice boot patch kits, etc.

AMF-60980

The minimum consumables required to stock a parts room for Cheyenne aircraft could be as high as $5000.00. Gaskets, O' Rings, Sealants, Brake pads, hoses, Oil, nuts, bolts, screws, washers Filters, Ice X, various fluids, refrigerant,

The manpower required to complete the manufacturer's inspections on the aircraft *expeditiously* having a minimum of down time for a required inspection would have need of the following: one qualified *working* maintenance technician with *inspection & Director of Maintenance authority* and two additional qualified maintenance technicians. Down time is non-revenue time for an aircraft and not acceptable for an air ambulance operation or revenue generating business aircraft. If a required inspection is 55 hours, it would take 1 man over a week to complete if everything goes perfectly. Many operations would require at least two people because some maintenance operations and procedures require it and because of the physical limitations of one individual.  Three people could do it in 1.5 days.  Inspection authority is a special qualification of an aviation maintenance technician.

LABOR SCHEDULE    PIPER CHEYENNE II AIRCRAFT

MAN-HOURS

| | |
|---|---|
| Event One inspection | 50 |
| Event Two inspection | 55 |
| 100 hour inspections included with event one and two inspections | |
| 200 hour filter replacement | .6 |
| 300 hour generator brush inspection | 2.0 |
| 300 Hour AC spline lube | 2.5 |
| 300 hour inspection of oxygen system | 1.0 |
| 500 hour heater inspection | 2.0 |
| 500 hour landing gear inspection | 1.5 |
| 500 hour wing inspection | 1.5 |
| 500 hour over voltage relay check | 1.5 |
| 500 hour calibrate fuel quantity system | time & material |
| 500 hour nose gear link inspection | 1.0 |
| 500 hour replace instrument air filter | .4 |
| 500 hour flap control system inspection | 1.7 |
| 1000 hour starter/generator bench check R&R | 1.7 |
| 1000 hour flap/aileron hinge inspection | 4.5 |
| 1000 hour NLG bearing inspection | 4.0 |
| 1000 hour MLG bearing inspection | 4.0 |
| 300 hour fuel nozzle service | 4.5 |
| 300 hour engine bore scope inspection | 1.5 |

3

AMF-60981

Additional staffing would be required for log book and inspection entries, parts ordering, bookkeeping, telephone staffing, record keeping, timely issuing of customers invoices, regulatory and compliance issues i.e., H & R, Safety Program, FAA and TSA issues.

This would be one well qualified person familiar with aviation terminology and procedures staffing a new startup business at $75.000 per year.   A CPA would be required for tax consultations and filings for state and federal payments on a 'call when needed basis'.

New businesses would require cash deposits with state and federal agencies and public utility services.   Personal Guarantee's could be required in addition to deposits for payroll taxes, etc. Large companies such as Aviall are only issuing $2000.00 lines of credit to start up's with no previous history and increasing credit lines as the company is proven and base lines are established

Start up operations would have to establish lines of credit with numerous vendors and suppliers.  In many cases they are requiring deposits or COD status for a specific period of time to establish a baseline of purchases. This includes major aviation suppliers such as API, Aviall, Piper, Raytheon, Pratt & Whitney, Airgas and Duncan Aviation. Various technical publications providers require payment at the time of issue. Flight Safety International and other aviation training organizations require payment in full at the time of training or a 'full service agreement paid in advance for the training year.

Leases written by airports to tenant vendors addressing flowage fees for fuel sales and airport concession fees on all items sold to customers with the exception of navigation charts can affect the profitability of investing in startup operations at major airports.   The current concession fee at the Reno and Stead airports is 6% on the total sale. This fee is added to the end users invoice as a separate line item.

The minimum salaries and health benefits for a qualified maintenance staff at the facility would be approximately $240000.00 per year. Qualified personnel would require $90K for a Working Inspector, $55K for ea maintenance technician 2 ea plus benefits.  The working inspector would have to meet the FAA qualifications under FAR 119.69 and accept the responsibility as the Director of Maintenance by signing the Operations Specifications.

Cheyenne training schools would cost approximately $15000.00 each for initial training for the two technicians and the one working technician/inspector.  The Pratt & Whitney initial field

4

service maintenance school is $1500 for the 5 day course and $2100.00 for the 7 day course per student. This does not include travel, per diem or salary expense. The training on the engines would be mandatory in order for the technician to perform the required engine inspections and bore scope inspections.

Technical libraries for the engines and airframe would be from $9000.00 to $12000.00 for the initial service and in a year the fee for revision services depending on the level of support requested or required from ATP (Aircraft Technical Publications).

The hangar and office facilities required for this type of operation are not and have not been available for purchase or rental, at Reno and Stead airports for many years and at Truckee for the last 25 years. This is based on phone research to local airports.

If facilities were not available locally it would require the aircraft to be ferried to a **qualified** maintenance facility at a different airport adding 'non–revenue' generating flight time and additional takeoff and landing cycles times on the aircraft.

If a facility were available for lease or rental in the AMF service area it would cost approximately $9000.00 per month for hangar and office space. Truckee for example has had no hangar space or office space for FBO operations for 25 years.

Product liability, completed operations and workman's compensation insurance is approximately $55000.00 per year. Workman's Compensation Insurance as an example for Office Staff, $1.10 per hundred dollars of payroll, pilots $5.50 per hundred dollars and maintenance technicians $10.20 per hundred dollars based on no previous claims. Insurance companies writing aviation policies have declined in past years.

If the proposed facility were to be located off a major airport and within the AMF operational service area a fuel farm located at their maintenance facility would be highly recommended for significant savings in fuel cost based on the 1800 hours of flight operations per year. The 1800 hours is based on the supplied flight logs for the Cheyenne aircraft.

This savings would significantly offset the cost of operations. Depending on the contract negotiated with the fuel supplier the savings could be up to $3.00 per gallon over retail pricing. The acquisition and development costs for the fuel facility would be a positive long term investment. The fuel farm development would cost approximately $250,000 and a new truck would lease for approximately $2440.00 per month. Sales of fuel to the public would be recommended to accelerate the recovery of the investment and to make if profitable. Sales of Jet A only with a BP or Chevron branding would be recommended. Branding is highly

5

recommended incase of fuel shortages.   Branded facilities are guaranteed fuel during shortages. No Avgas sales due to the fact that it can be labor intensive due to the small volumes pumped into piston aircraft.

This would require the addition of at least one trained employee to do the required testing, filter changing and sampling of the fuel in the farm and the truck daily.  If the insured had an excellent safety record, proper training and a good relationship with his insurance company the add-on insurance premium rate would be approximately $5 to $7 thousand dollars per year.

In order to plan for any level of financial success or recovery of investment, the size of the facility, employee qualifications and location would have to be considered.  Offering services to the general public would be mandatory in order to generate the revenues necessary to support the operation when AMF aircraft did not require services.  If services were to be offered to the public, the size of the facility and technical libraries would have to be increased.  The hangar space required for this would be 13000 sq. ft. or better, increasing the monthly facility costs significantly.

Customers and aviation service providers in the local area have been somewhat balanced for the last few years.  A new maintenance facility would mean spreading the existing customers between the current maintenance service providers in the area chosen for the facility.

This plan would have great difficulty in succeeding if the location was not placed at a high traffic airport.  A low traffic airport could mean a very small customer base. Considering the current state of the aviation economy, it could be a very high risk situation.  Carson City or Minden would be the closest recommend airports where new business operations could be started economically.

### Alternative Maintenance Facility in lieu of RFS

The closest *qualified,* an FAA term meaning , trained personnel, current technical manuals, properly certified equipment and a DOT drug testing program.  This would be a maintenance facility, who's personnel are trained and qualified on the Cheyenne and have approved Pratt-Whitney initial and recurrent maintenance trained technicians with a drug testing program and the appropriately certified equipment. A geographically close one fitting the requirements is Yuba-Sutter Aviation located at the Marysville Airport.  They are trained in all levels of 'field services' on Pratt-Whitney turbine engines and turbine aircraft.  They have assisted many small flight departments in their maintenance programs including CFR 14 FAR 135 operators from Reno.

6

Their current labor rate on turbine aircraft is $87.00 per hour.  When you have to reposition the aircraft and flight crew for maintenance events on a 30 minute flight each way, **(considering no ATC (Air traffic control) weather delays),** plus the engine cycles, putting the crew in a hotel or renting a car each way significantly increases the operational costs.  Considering the estimated hourly costs by Conklin De Decker at $1022.00 per hour and convenience and location of RFS, it would be more economical to have the maintenance completed locally at the airport where the aircraft are based if possible.

The location of your maintenance facility, your primary parts suppliers and your relationship with them, is extremely important for business aircraft operations. If it's Christmas Eve and you break down in your business aircraft and you have a good relationship with your maintenance facility and your primary parts suppliers, they immediately respond to your needs and you're back in the air expeditiously.   This is much different than a relationship with your local car dealer!

An aircraft could also require a *'Ferry Permit'*, an FAA document authorizing the un-airworthy aircraft to fly from the location where the discrepancy occurred to maintenance. This is taking into consideration that the aircraft even qualifies for the ferry permit due to the type of discrepancy as depicted and addressed specifically in the aircraft MMEL, (minimum equipment list).  This ferry permit document, in addition to being issued by the local FAA office, must be signed off by a qualified maintenance technician to complete the permit requirement allowing aircraft movement specifically for maintenance.

### Purchase of new aircraft in lieu of lease from RFS
A new aircraft suitable for aero-medical transportation would be the King Air 90 series.   The King Air 90 series is in current production for approximately 3.5 mil.  The door modification is $120,000.00 and the installation of the medical interior would take approximately 8 weeks for completion.

There are also several pre-owned 90 series King Airs that are coming available as the current operators are upgrading to the King Air 200 series aircraft.

G.E. Capitol is one of several lenders available for purchase or leasing operations. They are recommended by many major aircraft manufacturers and aircraft resale operations. The credit standards for aircraft purchases by established companies are very tight.  For flight department startup operations without a proven track record it is even tighter or not available without a guarantor.

7

Considering the current state of the aviation industry worldwide and the fact that AMF has declined to participate in the guarantees of the obligation, 20% may not be considered unreasonable. Was the price fair? Is the primary business of RFS leasing aircraft? The risk to the individual lien holder or lender would determine the market place. The higher the perception of risk, the higher the interest. I see nothing in the lease to determine any requirement for the condition of the aircraft being returned to RFS at the end of the lease.

If AMF were to allow the state of maintenance on the current aircraft airframes or engines to decline to an unreasonable state and default on the lease, RFS could be left in a position that would make it extremely difficult to allow them to recover the losses. Similar to a car, if you return the car at the end of your lease in poor cosmetic condition, poor mechanical condition and/or excess mileage, the residual on the lease could be significantly more than you planned due to those conditions. These conditions can be extremely significant in pre-owned aircraft sales. In the case of an aircraft returned in a negligent condition to RFS, the costs could be extremely expensive. 20% would be nothing compared to a major airframe or engine issues that may be required to be repaired before sale.

Aircraft that have been damaged and have been repaired to perfection after an in-motion or a not in-motion operation have a definite loss of value. This is always addressed and depicted in the log books and would be reviewed by a prospective purchaser who would offer a lower price due to that depicted maintenance operation.

All of these losses might have to be absorbed by RFS. This could be a high risk financially for RFS when the aircraft is placed for sale.

### Aircraft lease agreement for Cheyenne Aircraft

Under section 7 (f) required maintenance is incorrect. It states the maintenance shall be done in accordance with the Raytheon/Beechcraft 90 Series Maintenance Publications. This aircraft addressed in the lease agreement is a Piper Cheyenne Aircraft, not a King Air 90.

There is no language to address the condition of the aircraft and/or penalties in case of default or end of lease termination.

I have discussed the RFS 20% profit issue on the AMF aircraft with several aviation sales and leasing professionals in general terms not mentioning companies or individuals. In their opinion, the 20% does not seem unreasonable based on their interpretation of the possible risks.

8

AMF-60986

The fact that the aircraft is used for medical transportation rather than personal transportation or executive charter increasing aircraft wear and tear was a consideration for them at the time of lease return.

The additional factor that the operator, AMF either could not qualify or simply declined to accept or qualify for financial responsibility increased the risk in their mind. A consideration was possibly AMF was unsure of the continued success of the venture or other unknown factors. Their question was, 'Why did AMF sign' and then chose to litigate?

If AMF would accept some financial responsibility for the aircraft lease, the industry standard for individuals or companies with excellent credit is 1% triple net programs and more for higher risk individuals, companies or types of operations up to 1.4% triple net.

*(A lease in which the lessee pays rent to the lessor, as well as all taxes, insurance, and maintenance expenses that arise from the use of the property.)*

*1 to 1.4% is based upon the agreed value of the aircraft when the lease is signed.  If the aircraft is worth seven hundred thousand dollars, the lease payment would be seven thousand dollars per month plus applicable taxes.*

The lessee would be responsible to pay for all operational costs for the aircraft not limited to, crew costs, maintenance, operation, insurance and hangar.

A 20% profit factor was apparently established by RFS because they foresaw a risk factor or a greatly diminished value of the aircraft at the end of the term of the lease due to the type of operations and AMF not choosing to participate in the financial responsibility.

For the last 15 months the value on all resale aircraft has greatly diminished which could prove that the decision and foresight by RFS of 20% was a prudent one.

On a lease or purchase of an aircraft with respect to the value of the Cheyenne at the time the lease was signed, the three most aggressive aviation lenders, G.E. Capitol, Bank of America and First Source would have required a minimum of 15% percent down. This would be based on the lowest risk factor individual or company to them, and the type of usage the aircraft would be engaged in.

Currently G.E. Capitol, Bank of America and First Source are still lending aggressively for aircraft and they are examining credit applications and applicants with greater scrutiny.

Conklin De Decker figures for hourly operations of the Cheyenne II are as follows:

9

AMF-60987

Fuel                          $619. 00 per hour
Maintenance                   $420.00 per hour
Engine reserve account        $166.00 per hour
Miscellaneous                 $61.00
**Total**                     **$1022.00 per flight hour**

10

AMF-60988

## *Curriculum Vitae*

Gerald Arthur Canavan          530-582-1102          Office
10356 Truckee Airport Road     530-582-0103          Facsimile
Terminal One                   916-813-2869          Cell
Truckee, CA 96161              regentair@regentair.com
Born June 27, 1941 New York City, NY     US Citizen          Single

### Work History
President and Founder of Regent Air, Inc. June 2005 to present.

Jet Aircraft Management, Fixed Base Operations and Aviation Maintenance Department. Experienced in crew served operations in King Air 90 & 200 series, DC9-10, Citations 500/550 operating under FAR 121 & 135 in Citation 560 & Falcon 900EX, Dassault 7X operating under FAR 91. Serving in Line Pilot & Management Positions. Responsible for day to day company operations, budget, regulatory compliance and jet aircraft acquisitions and completions.

Former President and Founder of Pilot Services Corporation Oct 1984 to June 2007

FAR 135, Aircraft Management Company and Fixed Base Operation and Maintenance Department.   Served in Line Pilot & Management Positions.  Responsible for day to day company operations, budget, regulatory compliance and jet aircraft acquisitions and completions Sold company in 2007.

### Experience
Direct supervision and responsibility for FAR 135 and Corporate Flight Department Start-up operations.  Direct responsibility and supervision for numerous jet and turbine, & piston aircraft acquisitions, overhauls, hot section inspections and flight crew and maintenance technician training. .  Served as the direct representative for owner/clients to the aircraft manufacturers and their respective vendors. Aircraft included Beechcraft Bonanza, Barons, Dukes, King Airs, Citations 500 series, Falcon 900EX, Falcon 7X and various small general aviation aircraft. This process included engines, paint and interior and avionics selections.

Jet & Turbine Aircraft management –King Air's, Citations & Dassault Falcon aircraft.
Owned and Managed Fixed Base Operations in Reno, Truckee and Concord.
Developed an Active (SMS) Safety Management Systems for Domestic and International Flight Operations at Regent Air, Inc. for Dassault Falcon 900EX, Dassault Falcon 7X and Citation 560 Encore.

Certifications: ATP, CFIIME, Jet Type Ratings, FAA Accident Prevention Counselor
Full Service Client at Flight Safety International since 1989 and professionally trained in all aircraft flown.

2007 Hours

| Aircraft N# | Aircraft Type | Rent/Charter | Owner | Training | Maintenance | TOTAL |
|---|---|---|---|---|---|---|
| 172RF | Cessna 172 | 694.1 | 2.6 | 1.1 | 2.8 | 700.6 |
| 12531 | Cessna 172 | 346.3 | 1.3 | 0.9 | 1.2 | 349.7 |
| 419R | Piper Cheyenne II | 243.3 | 2.0 | 26.5 | 1.0 | 272.8 |
| 155CA | Piper Cheyenne II | 417.5 | 2.1 | 11.7 | 1.0 | 432.3 |
| 789CH | Piper Cheyenne II | 653.6 | 1.2 | 2.7 | 4.0 | 661.5 |
| 111KV | Piper Cheyenne II | 444.9 | 0.0 | 8.7 | 11.1 | 464.7 |

AMF-60990

2008 Hours

| Aircraft N# | Aircraft Type | Rent/Charter | Owner | Training | Maintenance | TOTAL |
|---|---|---|---|---|---|---|
| 172RF | Cessna 172 | 486.3 | 1.3 | 2.3 | 3.8 | 493.7 |
| 12531 | Cessna 172 | 354.8 | 0.8 | 0.0 | 3.5 | 359.1 |
| 419R | Piper Cheyenne II | 263.2 | 2.4 | 27.4 | 6.1 | 299.1 |
| 155CA | Piper Cheyenne II | 519.2 | 19.6 | 16.5 | 8.6 | 563.9 |
| 789CH | Piper Cheyenne II | 461.4 | 16.9 | 14.0 | 6.4 | 497.7 |
| 111KV | Piper Cheyenne II | 295.5 | 1.9 | 5.9 | 12.6 | 315.9 |
| 22WF | Piper Cheyenne II | 76.2 | 0.0 | 10.4 | 0.4 | 87.0 |

AMF-60991

AMERICAN MEDFLIGHT PAYS RENO FLYING SERVICE

| DATE | 155CA 771MF | 419R 772MF | |
|------|-------------|------------|---|
| Jan-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Feb-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Mar-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Apr-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| May-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jun-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jul-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Aug-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Sep-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Oct-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Nov-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Dec-05 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jan-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Feb-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Mar-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Apr-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| May-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jun-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jul-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Aug-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Sep-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Oct-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Nov-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Dec-06 | $1,094.40/HOBBS HOUR | $1,094.40/HOBBS HOUR | |
| Jan-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| Feb-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| Mar-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| Apr-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| May-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| Jun-07 | $1,272.32/HOBBS HOUR | $1,272.32/HOBBS HOUR | |
| Jul-07 | 1 $10,457.64/MONTH | $1,272.32/HOBBS HOUR | 1 Reno Flying Service leases to |
| Aug-07 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Sep-07 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Oct-07 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Nov-07 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Dec-07 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Jan-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Feb-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Mar-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Apr-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| May-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Jun-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Jul-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Aug-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Sep-08 | $10,457.64/MONTH | $1,272.32/HOBBS HOUR | |
| Oct-08 | 2 $353.03/MONTH | 4 $390.23/MONTH | 2 155CA is refinanced for refu |
| Nov-08 | $1,091.32/MONTH | $1,261.50/MONTH | 4 Reno Flying Service leases t |
| Dec-08 | $1,036.57/MONTH | $1,179.73/MONTH | refinanced for refurbishment |

AMF-60992

| | | | | | |
|---|---|---|---|---|---|
| Jan-09 | | $1,105.04/MONTH | | $1,1221.94/MONTH | |
| Feb-09 | | $1,068.55/MONTH | | $1,281.72/MONTH | |
| Mar-09 | | $965.14/MONTH | | $1,163.56/MONTH | |
| Apr-09 | | $1,259.10/MONTH | | $1,288.22/MONTH | |
| May-09 | | $1,227.60/MONTH | | $1,246.67/MONTH | |
| Jun-09 | | $1,315.44/MONTH | | $1,326.78/MONTH | |
| Jul-09 | 3 | $3,715.61/MONTH | 5 | $3,736.58/MONTH | 3 155CA refurbishment loan te |
| Aug-09 | | $3,715.61/MONTH | | $3,736.58/MONTH | 5 419R refurbishment loan ten |
| Sep-09 | | $3,715.61/MONTH | | $3,736.58/MONTH | |
| Oct-09 | | $3,715.61/MONTH | | $3,736.58/MONTH | |
| Nov-09 | | $3,715.61/MONTH | | $3,736.58/MONTH | |

AMF-60993

o American Medflight

rbishment
to American Medflight and

AMF-60994

med out

AMF-60995

**Subject:** AMERICAN MEDFLIGHT/RENO FLYING SERVICE

As of 11-19-09.

Reno Flying Service owned Cheyenne.

N155CA/N771MF  monthly payment to Nevada State Bank  $3,096.34

N419R/N772MF    monthly payment to Nevada State Bank  $3,113.82

American Medflight owned Cheyenne.

N111KV/N774MF  monthly payment to Nevada State Bank  $1,328.75

N789CH/N775MF  monthly payment to Nevada State Bank  $1,872.41

AMF-60996

# RENO FLYING SERVICE INC.

Nov. 2009

### LABOR SCHEDULE    PIPER CHEYENNE II AIRCRAFT

MAN-HOURS

| | |
|---|---|
| Event One inspection | 50 |
| Event Two inspection | 55 |
| 100 hour inspections included with event one and two inspections | |
| 200 hour filter replacement | .6 |
| 300 hour  generator brush inspection | 2.0 |
| 300 Hour AC spline lube | 2.5 |
| 300 hour inspection of oxygen system | 1.0 |
| 500 hour heater inspection | 2.0 |
| 500 hour landing gear inspection | 1.5 |
| 500 hour wing inspection | 1.5 |
| 500 hour over voltage relay check | 1.5 |
| 500 hour  calibrate fuel quantity system | time & material |
| 500 hour nose gear link inspection | 1.0 |
| 500 hour replace instrument air filter | .4 |
| .500 hour flap control system inspection | 1.7 |
| 1000 hour starter/generator bench check R&R | 1.7 |
| 1000 hour flap/aileron hinge inspection | 4.5 |
| 1000 hour NLG bearing inspection | 4.0 |
| 1000 hour MLG bearing inspection | 4.0 |
| 300 hour fuel nozzle service | 4.5 |
| 300 hour engine borescope inspection | 1.5 |

AMF-60997

# EXHIBIT 22A

# EXHIBIT 22A

tcm

RICHARD G. HILL, ESQ.
State Bar No. 596
CASEY D. BAKER, ESQ.
State Bar No. 9504
RICHARD G. HILL, CHARTERED
652 Forest Street
Reno, Nevada 89509
(775) 348-0888
Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA - RENO

John Carstarphen.                              )
                                               )    Case No.: 3:07-cv-00542-ECR-RAM
                        Plaintiffs,            )
                                               )
v.                                             )
                                               )
Richard Milsner, an individual,                )
DOES 1 through 10,                             )
                                               )
                        Defendants.            )
_____)

## DECLARATION OF GERALD A. CANAVAN

GERALD A. CANAVAN, having been duly sworn, avers under penalty of perjury, as follows:

1.      I am a resident of the State of California and over 18 years of age. This declaration is based on my personal knowledge, except for those matters stated on information and belief, and as to those items, I believe them to be true. This declaration is made in support of the Motion for Summary Judgment by defendant Richard Milsner, and represents my testimony if called upon to present same in Court.

2.      I have been retained as an expert by Richard Hill, counsel for defendant Richard Milsner in this case.

LAW OFFICE
RICHARD G. HILL
Post Office Box 2561
Reno, Nevada 89505
(775) 348-0686
Fax(775) 348-0658

1         3.     Attached as Exhibit 1 is a true and correct copy of my December 8,

2   2009 report, which embodies my opinions in this case.

3            I declare under penalty of perjury that the foregoing is true and correct

4   to the best of my knowledge.

5              DATED: _06 - 30 - 10_

6

7               **GERALD A. CANAVAN**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

# EXHIBIT 23

# EXHIBIT 23

#3

February 12, 2007

John Carstarphen
1310 Hilltop Road
Reno, NV 89509

Re: Meetings of 02-08&09-2007

Dear John:

This letter will confirm our meetings on the above referenced dates. In attendance on 02-08-2007 Linda Reed, Will Geyer, Dave Gurney, Jim Brown, Jack Dawson and yourself. In the meeting of 02-09-2007 there were only you and I.

Both meetings were held to discuss the pressing need of American Medflight, Inc. to replace it's aging fleet of aircraft due to extreme maintenance issues in the immediate future. The first meeting required the attendance of the above reference AMF personnel for them to provide their input on the necessity of this change of aircraft and for their ideas on how to proceed. Our meeting the next day provided you with the opportunity to discuss the issues in a more private meeting with me.

It was the unanimous opinion of all in attendance that the aircraft should be replaced immediately with Beechcraft King Air C90B model aircraft. It was also agreed that the company needed to purchase two of these aircraft as soon as possible. It was also the opinion of the group that the current fleet of Cheyenne aircraft would be kept as backup aircraft and also to be used for business expansion exploration.

We also discussed the fact that AMF has been turned down for financing and or equipment leasing by, Fleet financing, US bank, Nevada State bank and Key Equipment financing due to the current law suit and because you and Rich Milsner will not guarantee the loans because of the law suit. We discussed having Reno Flying Service, Inc., with Rich Milsner guaranteeing



EXHIBIT   5

EXHIBIT
61

AMF-58272

the loan, lease the necessary aircraft to AMF. I pointed out that this would
obviously cost AMF more than purchasing the aircraft as RFS, as well as
any leasing company, would be making a profit. We all agreed including
you and I that this was the only course AMF had available to it and that we
should proceed with the plan for RFS to purchase the aircraft to lease to
AMF.

If you do not agree with the contents of this letter please let me know within
10 days, otherwise I will have the necessary board meetings to go forward.

Sincerely,

Jack Dawson
President

cc: Rich Milsner, Richard Hill, Pat Cashill, John Fowler

AMF-58273

# EXHIBIT 24

# EXHIBIT 24

# Report of Findings and Conclusions

Carstarphen v Milsner et al.

I have been asked to evaluate the maintenance undertaken by Reno Flying Service (RFS) on several Piper Cheyenne II aircraft operated as air ambulance for American Med Flight (AMF). This includes the work accomplished and billings associated with the work. The following factual information, activities, referenced data and research within this report are used to support my opinions and conclusions. I understand additional documents and information may yet be produced from the plaintiff. If this occurs the opinions and conclusions in this report may be supplemented.

**BACKGROUND**

AMF operated up to 4 Piper Cheyenne II aircraft in its air ambulance operation. N774MF (Formerly N111KV), N775MF (Formerly N789CH), N772MF (formerly N419R) and N771MF (formerly N155CA). The aircraft are based in Reno, Nevada. Maintenance of the aircraft is performed by RFS, labor is billed out on the aircraft on a per man hour basis and parts are billed either at cost or with a nominal mark up. It has been contended by Mr. Carstarphen that AMF should have hired its own employees to perform maintenance on the aircraft and that this would have been less costly than having Reno flying Service work on the aircraft. It is also contended by Mr. Carstarphen that AMF should have had a different third party maintenance facility provide maintenance on the AMF aircraft, this would also have been less costly than having Reno Flying Service work on the aircraft. Mr. Carstarphen also claims that Reno Flying service charged too much for labor and parts on the aircraft.

**COST OF LABOR FROM RFS**

The labor rate charged by RFS for technician time working on the aircraft is $80.00 per hour. The national average labor rate for maintenance on this type of aircraft is $84.00 per hour (Conklin deDecker). In a telephone survey in which I conducted I contacted; Aviation Classics, Stead, Corporate Air Technology, San Jose, Corporate Aircraft, Fresno, Mather Aviation, Sacramento and Mather Aviation Hayward and found the following; the typical labor rate of qualified maintenance shops within 200 miles of Reno ranges from $85.00/Hr to $105.00/Hr.

**COST OF LABOR FROM RENO FLYING SERVICE TO AMF 2005 AND 2006**

I have reviewed Reno Flying Service invoices to AMF for 2 of the Piper Cheyenne II's flown in 2005 and 2006, N774MF (Formerly N111KV) and N775MF (Formerly N789CH). In taking all the labor costs billed by RFS to AMF during that time and dividing them by the actual hours flown by the two aircraft, I come up with a maintenance labor cost per flight hour of **$108.95.** Since 2005 and 2006 only represented 2 aircraft over a 2 year period I will use the years 2007 and 2008 as a model for further analysis in this

AMF-60998

report because it is a larger sampling and closer in date to the latest Conklin deDecker aircraft cost report.

## COST OF LABOR FROM RENO FLYING SERVICE 2007 and 2008

I have reviewed Reno Flying Service invoices to AMF for 3 of the Piper Cheyenne II's flown in 2007 and 2008, N774MF (Formerly N111KV), N775MF (Formerly N789CH) and N771MF (Formerly N155CA). N772MF (Formerly N419R) is not included in the average since it was leased to AMF late in 2008. In taking all the labor costs billed by RFS to AMF during that time and dividing them by the actual hours flown by the three aircraft I come up with a maintenance labor cost per flight hour of **$185.40.** Comparing this to a third party aircraft cost report (Conklin deDecker) I find a published maintenance labor cost per flight hour of: **$217.89.**

## COST OF AMF STAND ALONE

If AMF hired their own technicians as Mr. Carstarphen has contended, the staff of technicians to support three Piper Cheyenne II aircraft and associated facilities and consumables the monthly cost would be: $52,209.98. Using the actual average flight hours in 2007 and 2008 of 40.7 hours per month the maintenance labor costs per flight hour would be **$1,282.80.** This would be over five times the amount actually billed by RFS and referenced by Conklin deDecker. (See Actual Cost Analysis American Medflight v Reno Flying service).

If somehow AMF only paid the technician wages and had RFS absorb all other associated costs of running a shop (which is unlikely), the monthly cost of fully burdened salaries would be $23,284.89. Dividing this by 40.7 flight hours a month would make maintenance costs $572.11 per flight hour. More than double what they had paid RFS. (See Actual Cost Analysis American Medflight v Reno Flying service).

Neither of the above samples include start up costs of spare parts, tooling and equipment, aircraft tug and a service vehicle. These would be a cost of at least $130,000.00. This would also not include a staff of accountants, clerical, flight nurses, pilots, Chief Pilot and Director of Operations that would all be required to operate a 14CFR FAR Part 135 operation. This would cost at least $85,000.00 per month. Adding these calculations to the hourly operating the cost would more than double the hourly cost of $1,258.23 that AMF would incur. (See Actual Cost Analysis American Medflight v Reno Flying service).

## VIABILITY OF OUTSIDE MAINTENANCE SHOP

Since RFS has one of the lowest labor rates in the region, it would be unrealistic to expect utilizing another shop would cost any less to maintain the aircraft for AMF. Especially, factoring in a minimum direct operating cost of $1,100.00 per hour for relocation of the aircraft.

- 2 -

AMF-60999

**COST OF PARTS FROM RFS**

I reviewed the maintenance invoices from RFS to AMF in the years 2005, 2006, 2007 and 2008 and found that the parts that were replaced on the aircraft to be typical of normal Piper Cheyenne II operation. The pricing on the parts is what would be traditional and customary charges for those parts.

**COST OF SPECIALIZED SERVICES**

Specialized services including but not limited to; avionics troubleshooting, avionics component repair, autopilot repair, upholstery, painting, engine or engine component overhaul and aircraft cleaning would still need to be accomplished by the corresponding outside vendors. It would not be cost effective for AMF to set up to perform these services in house. These costs would remain the same whether or not RFS billed AMF hourly for services or if AMF hired it's own technicians. RFS currently does not perform these services and contracts them out to the various vendors.

**CONCLUSIONS:**

In addition to the foregoing I have the following conclusions:

The costs billed to AMF by RFS were traditional and customary rates for labor for the work RFS performed. They were less than national average labor costs cited by Conklin deDecker.

The costs billed to AMF for aircraft parts is typical and customary with the rest of the industry and typical of Piper Cheyenne II operations.

Contrary to Mr. Carstarphens assertions the maintenance labor billing arrangement between RFS and AMF was the most financially beneficial arrangement for AMF. If AMF hired its own technicians their labor costs would have increased at least five fold from actual and industry average costs. AMF would not reduce maintenance labor costs if they had their aircraft maintained by a different shop at another location. AMF could not have saved any significant cost had they provided their own parts. Many of the outside services billed to AMF by RFS would remain the same if they were billed directly to AMF.

**CONTEMPLATION OF ADDITIONAL WORK**

At this time I am contemplating the additional work, including but not limited to the following: preparation of demonstrative exhibits for use in the court room, written responses to plaintiff expert reports or additional information or documents produced by the plaintiff. Before deposition on this case I will inspect the AMF aircraft in Reno, Nevada, and inspection the Reno Flying Service maintenance facility.

Steve Magginetti                                    December 7, 2009

- 3 -

AMF-61000

**Items reviewed and tasks performed in preparing this report:**

Review of Reno Flying Service invoices to AMF 2007 and 2008 (Bates # AMF59011 thru AMF59773)

Review of Reno Flying Service Invoices to AMF 2005 and 2006 (Bates # AMF59783 thru AMF60229)

Telephone discussion with Jim Brown and Jack Dawson of Reno Flying Service.

Review of complaint and answers to complaint of Mr. Carstarphen.

Piper PA-31T Type Certificate Data Sheet.

Technical documents related to Piper PA-31T.

14 CFR Title 14

Conklin deDecker Aircraft Cost Report

AMF-61001

# Actual Cost Analysis American Medflight Inc. v Reno Flying Service

## AMF hiring technicians for maintenance 135 operation 40.7 hours per aircraft a month with needed costs associated:

1 Director of maintenance: 80k annually + 30% benefits= 104k  $8,666.66 / Monthly

2.5 full time technicians:  $26.00 / hr X 2076= $53,976 + 30% benefit = $70,168 X 2.5 = $175,420.00 / $14,618.33 / Monthly

Liability insurance = 10k Monthly

Hangar rent = 15k / Month (Per Jack Dawson)

Consumable supplies:  $1,500 / Month

Uniforms / Rags:  $800 / Month

Maintenance tracking system:  $416.66 / Monthly

Technical manuals: $208.33 / Monthly

Total Monthly cost: **$52,209.98** divided by 40.7 hours per month=

**Labor cost per hour: $1282.80 per flight hour v Conklin deDecker  $217.89 per flight hour**

## AMF hiring technicians for maintenance 135 operation 40.7 hours per aircraft a month showing technician salary alone:

1ea Director of maintenance: 80k annually + 30% benefits= 104k  $8,666.66 / Monthly

2.5 full time technicians:  $26.00 / hr X 2076= $53,976 + 30% benefit = $70,168 X 2.5 = $175,420.00 / $14,618.33 / Monthly

Total Monthly cost: **$23,284.99**

**Labor cost per hour: $572.11 per flight hour v Conklin deDecker  $217.89 per flight hour**

- 5 -

AMF-61002

**Analysis of Reno Flying Service Provided Labor Cost on Hourly Rate, Based on Actual flight time of 40.7 hours per aircraft a Month:**

3 Piper Cheyenne II's

Each aircraft flies **40.7 hours a month**

Average actual labor cost billed AMF by Reno Flying Service per Month: $7,546.01 2007 and 2008 (Based on actual invoices).

Reno Flying Service maintenance labor cost per hour: **$ 185.40 per flight hour** v Conklin Dedecker **$217.89 per flight hour.**

**CONKLIN DEDECKER:**      **$217.87 per Hour**

**RENO FLYING SERVICE:**   **$185.40 per Hour**

**AMERICAN MED FLIGHT:**   **$1,282.80 per Hour** with associated costs

**AMERICAN MED FLIGHT:**   **$572.11 per Hour** labor alone

# ADDITIONAL COSTS NOT FACTORED IN:

**START UP COSTS:**
Spare parts on hand: 50k
Tooling and shop equipment: 40K
Service truck: 30k
Aircraft tug: 12k
Total Maintenance start up costs: **$132,000.00**

**ADDITIONAL AMF STAFF REQUIRED AS STAND ALONE 135 OPERATION.**
1 Director of operations: 110k + 30% = 143k
1 chief Pilot: 90k + 30% = 117k annually
5 pilots: 65K annually + 30% benefits= 84.5k X 5 = $422,500
1 Clerical administration: 35k annually + 30% benefits = 45.5k

- 6 -

AMF-61003

1 Book Keeper: 45k annually + 30% benefits = 58.5k

4 flight nurses: 55k annually + 30% benefits = 71.5k annually X 4 = 286k

Total Additional Minimum Staff Annually = **$1,072,500.00**

**MAN POWER REQUIREMENT CALCULATION:**

3 Aircraft Flight Time 2007 and 2008 = 2936 hours of flight time.

2936 X 2.96 (Conklin deDecker maintenance hors per each flight hour) = 8590.56 man hours needed over a 2 year period.

8590 / 2 = 4295 man hours needed per year

4295 / 4075 (work hours per year) = 2.06 full time technicians working at 100% productivity, no vacations.

Realistic productivity rate factor 2.06 X 1.2 = 2.48 full time technicians needed.

100% of the Director of maintenance time in administration and ordering parts.

**MINIMUM NUMBER OF TECHNICIANS NEEDED FOR 3 CHEYENNE II's FOR AMF = 3.5**

**APPENDIX: Rate Schedule**

Steve Magginetti

All Expert Witness Services and Direct Travel time:      $200.00 per hour

Direct and Travel Expenses:       Actual Cost (Travel Billed Portal to Portal)

Pre-Purchase Inspections:       As negotiated.

FAR Part 135 consulting:           As negotiated.

FAR Part 145 consulting       As negotiated.

Maintenance record Audits:       As negotiated.

**TERMS ARE NET 30 DAYS UNLESS OTHERWISE ARRANGED.**

AMF-61004

# Expert Witness Experience Last 4 Years

### Steve Magginetti

**Cessna 340**, Financial Recovery for Improper Import Procedures
    Centurion v. McCandless        2006
    Dutton, Braun, Staack and Hellman
    Tom Staack, Plaintiff Attorney
    Iowa District Court, Waterloo
    Investigation, Report and Trial

**Seneca V**, Damage Due to Improper Maintenance    2007
    Primevera Aviation LLC vs Victor Sloan Enterprises
    Downey Brand
    Richard Sueyoshi, Plaintiff Attorney
    California Superior Court, Santa Clara County
    Investigation, Report and Deposition

**A-36 Bonanza**, Damage Due to Improper Maintenance    2008
    Abramson vs. Gavilan Aviation
    Kern and Wooley
    David McGovern, Defense Attorney
    California Superior Court, San Benito County
    Investigation, Report and Deposition

**Beech 35 Bonanza**, Damage Due to Improper Maintenance    2007
    Michelburg v Aviation Classics
    Kern and Wooley
    Doug Pahl, Defense Attorney
    California State Court
    Investigation, Report, Deposition and Trial

**Cirrus SR 22**, Breach of Contract    2009
    Pahlavan v Cirrus Design Corporation
    Schuman Rallo and Rosenburg
    Peter Cook, Defense Attorney
    Federal Court Los Angeles
    Investigation, Report and Trial

AMF-61005

## CURRICULUM VITAE OF STEVE MAGGINETTI
REVISED 11-2009

Steven J. Magginetti
4672 Carson Ct.
Pleasanton, CA
(925) 963-8766

Birth:  4-14-56 Burlingame, California
Marital status: Married
Physical information: Height: 5'10", Weight: 160#, Hair: Black, Eyes: Brown

EDUCATION

Graduate of University of Southern California Viterbi School of Engineering, Aviation Safety and Security Program, August 2007

University of Southern California Viterbi School of Engineering, Legal Aspects of Aviation Safety, Course August 2007

University of Southern California Viterbi School of Engineering, Safety Management for Aviation Maintenance, Course May 2007

University of Southern California Viterbi School of Engineering, Human Factors In Aviation Safety, Course February, 2007

University of Southern California Veterbi School of Engineering, Role of the Technical Witness in Aviation Litigation, Course August, 2005

University of Southern California Viterbi School of Engineering, Aircraft Accident Investigation, Course June, 2004

Pratt & Whitney PT6A refresher course.  Los Alamitos, California. 1999

Pratt & Whitney JT15D ground maintenance school.  San Jose, California. 1995

Pratt & Whitney PT6A ground maintenance school.  San Jose, California.  1993

Pratt & Whitney JT15D ground maintenance training course.  Oakland, California.  1987

General Electric CJ610 & CF700 maintenance training seminar.  Oakland, California. 1986

Airesearch, 400LS IEC diagnostic and maintenance school.  Lakeland, Florida.  1985

Piper Aircraft (Flight Safety) Cheyenne 400LS maintenance training school.  Lakeland, Florida.  1985

Garrett TPE-731-14 ground service and maintenance troubleshooting school.  Phoenix, Arizona.  1983

Collins Avionics EFIS-85, EHSI-74, FMS-90 familiarization and maintenance school.  Oakland, California. 1983

Marathon Battery, Nicad service and repair course.  Oakland, California. 1982

AMF-61006

Pratt & Whitney ground maintenance and hot section school. Millville, New Jersey. 1981

Piper Aircraft (Flight Safety) PA31T, PA31T1 and PA31T2 ground maintenance school. Lakeland, Florida. 1980

Pratt & Whitney PT6A Operations and maintenance seminar (Cooper Airmotive). Oakland, California. 1979

Airesearch TPE-331 Ground service and maintenance troubleshooting school. Phoenix, Arizona. 1979

Rolls Royce, Spey MK801 ground service and maintenance training seminar. NASA, Ames Research Center, Sunnyvale, California 1976

NASA, Ames Research Center. Aircraft maintenance apprentice program. Sunnyvale, California. 1975-1976

College of San Mateo. Aircraft maintenance program leading to A&P license. San Mateo, California. Graduated 1977 G.P.A. 3.9

Hillsdale High School, San Mateo, California. Graduated 1974 G.P.A. 3.6

LICENSES

FAA Airframe and Powerplant License #3286089

FCC Restricted Radio and Telephone Operator Permit

EMPLOYMENT HISTORY

2006 to Present, ACM Aviation LLC, San Jose, CA
Title: Director of Maintenance (FAR Part 135 operator)

Duties:
Evaluate and re-organize maintenance and quality assurance system to assure most efficient and thorough system possible, Interface with San Jose FSDO to keep current compliance with new regulations, Manage maintenance personnel, evaluate and conform new aircraft for conformity to FAR part 135, fiscally balance maintenance department, develop in house training program, audit vendors and charter associates. Manage maintenance department through transition to new ownership. Provide remedial training under direction of FAA FAST Team Oakland FSDO.

2003 to Present, Aviation Analysis, Inc.
Title: President (Consulting)

AMF-61007

Duties:
Consult to FAA part 145 repair stations, writing of repair station manuals.  Perform duties as interim
director of maintenance for several FAR Part 135 operations. Writing of RVSM Maintenance Manuals.
Pre-Buy inspections.  Engine overhaul management. Public Speaking.  Aviation Safety Counselor for
Oakland FSDO.  Expert Witness.


2000- 2003, Mather Aviation LLC, Hayward, California.
Title:  General Manager (FAR 145 Repair Station)

Duties:
Re-establish FAA part 145 repair station and upgrade rating to class 4.  Re-establish business as a
Raytheon associated service center.  Management of staff including, inspection dept, parts dept, warranty
administration, avionics repair and clerical.  Managed fractional jet remote service, Avionics, Service dept
and developed overall business goals.  Facility performed light and heavy maintenance on Cessna 425
aircraft.

1989-2000, Corporate Air Technology, San Jose, California.
Titles: Aircraft mechanic, Foreman, Technical Services Specialist (FAR 145 Repair Station)

Duties:
Aircraft mechanic various aircraft.
Established and implemented "Crew Chief" accountability system on hangar floor.
Supervised work schedule and mechanics worked performed on aircraft.
Performed work as repair station inspector, revised repair station manual, operations specification and
certificate to stay current with changing FAA regulations.
Explored and evaluated new areas of business.
Established trend-monitoring system for Pratt & Whitney engines.
Organized system of airworthiness directive search and tracking on computer network.
Wrote technical articles for trade journals and aircraft owners groups.
Established written bid process for repair to insurance companies and potential customers.
Ordered parts and outside vendor services to support ongoing business.
Performed public speaking to FAA safety and operator groups, to promote safety and education.
Worked as legal expert witness to several law firms in the area of accident reconstruction, accident
investigation, legality and causation of FAA record keeping.  Deposition and Federal courtroom
experience.
Beta testing and product evaluation for business associates in the aircraft maintenance records industry.
Performed duties as director of maintenance for Silicon Valley Express.
Performed flight department maintenance audits for fortune 500 companies.
Performed several major repairs on Cessna 425 aircraft.
Performed light and heavy maintenance on Cessna 425 aircraft.


1986-1989 Aero Services Oakland, California

Titles: Shop foreman, Chief inspector, Cheyenne service administrator, Interim propeller shop manager,
Interim service manager, Interim facility operations manager (FAR 145 Repair Station)

AMF-61008

Duties:
Implement plan on hangar floor to increase productivity
Re-write repair station manual.
Establish quality control system.
Acted as director of maintenance for several FAR 135 operators.
Supervise propeller overhaul and level III NDT shop.
Train technicians in new aircraft types.
Project and budget cash flow analysis for remote corporate headquarters.
Negotiated supply contracts with the port of Oakland and other supporting vendors.
Negotiated and wrote maintenance contracts with large customers.
Provided 24hr aircraft recovery service to the Port of Oakland (North Field).
Provided technical support for Piper Cheyenne series aircraft under contract with Piper Aircraft.
Established paperwork flow system for customer billing.
Evaluated the maintenance operations of other Aero Services locations and facilities.
Performed light and heavy maintenance on Cessna 425 aircraft.


1981-1986 Piper Aircraft Corporation, DBA Pacific Cheyenne.  San Jose, California.
Title:  Regional Product support manager (Aircraft Manufacturer)


Duties:
Provided 24hr technical support to the West Coast region for Piper
Cheyenne series aircraft.
Administered new aircraft warranty.
Established required spares inventory, tooling and training requirements for Cheyenne service centers.
Evaluated and approved factory service centers to support customer base.
Performed field evaluations of factory kits and modifications.
Wrote and submitted field engineering defect reports to the Piper engineering staff.
Trained service center mechanics in aircraft maintenance, modification and hot section repair.
Developed central parts department to support service centers in region.
Developed detail plan to establish a service shop for Piper Aircraft at the San Jose Jet Center including:
tooling requirements, parts inventory and control, personnel requirements, training requirements and cash
flow analysis.
Worked with new aircraft sales team in technical representations to prospective buyers.
Performed technical analysis of competitive aircraft.


1978 - 1981 Western Airmotive Corporation, Oakland, California.

Titles:  Aircraft mechanic, lead mechanic, foreman, inspector, chief inspector, CORPAC service
administrator (FAR 145 Repair Station)

Duties:
Maintained numerous types of piston and turbine aircraft for sales department, charter department and
flight school.
Performed duties as mechanic, inspector, chief inspector and shop foreman.
Participated in Piper Aircraft and Pratt and Whitney field evaluation programs.
Performed duties as CORPAC service administrator (administering product support and warranty policies
for Piper Cheyenne series aircraft).

- 12 -

AMF-61009

Performed light and heavy maintenance on Cessna 425 aircraft.

1977 - 1978 Pacific Aero, San Jose, California.

Titles:  Aircraft mechanic, chief inspector, flight mechanic and load master. (FAR 135/121 Operator)

Duties:
Maintained aircraft for freight operator (fleet of approximately 10 aircraft).
Assisted in writing and obtaining FAA approval for Part 121 maintenance program for Convair 440.
Performed duties as flight mechanic and load master for cargo flights to the East Coast carrying radio pharmaceuticals.
Performed duties as chief inspector for part 121 program and acted as supervising mechanic during "C" and "D" checks.

1975 - 1977 NASA Ames Research Center, Sunnyvale, California.
Title:  Supervising engineering technician. (Research and Development)

Duties:
Participated in aircraft mechanic training program through college of San Mateo in partnership with NASA, Northrop and Lockheed for one year.  Remainder of time spent working for NASA and it's inter-agency partners as supervising engineer technician on research experimental aircraft.

Performed ground support, routine inspections, airframe system modification.
Worked with design team to implement modifications.

AIRCRAFT AND ENGINE EXPERIENCE

|  | Airframe | Engines |
|---|---|---|
| Corporate Air | Cheyenne series | P&W PT6A series |
| Technology | Cessna Citation | P&W JT15D series |
|  | Cessna 400 series | Various |
|  | Beech piston series | Various |
|  | Fairchild Merlin | TPE-331 series |
|  | Piper piston series | Various |
|  | Gulfstream I-IV | Rolls Royce series |
|  | Astra series | TFE-731 |
|  | Lear 35 | TFE-731 |
|  | Raytheon Hawker | TFE-731 |
|  |  |  |
| Aero Services | Cheyenne series | P&W PT6A series |
|  | Fairchild Merlin | TPE-331 series |
|  | Canadair Challenger | GE 101 series |
|  | Lear 25 | GE CJ 610-6 |
|  | Cessna 200 series | Continental series |
|  | Cessna 400 series | Continental series |
|  | Piper piston series | Various |

AMF-61010

|  | Mitsubishi MU-2 | TPE-331 |
|---|---|---|
|  | Mitsubishi MU-300 | P&W JT15D |
|  | Hawker DH-125 | TFE-731 |
| Piper Aircraft | PA-31T | P&W PT6A-28 |
|  | PA-31T1 | P&W PT6A-11 |
|  | PA-31T2 | P&W PT6A-135 |
|  | PA-42 | P&W PT6A-41 |
|  | PA-42-720 | P&W PT6A-60 |
|  | PA-42-1000 | Garrett TPE 331-14 |
| Western Airmotive | Piper Cheyenne | P&W PT6A series |
|  | Fairchild Merlin | TPE-331 series |
|  | Hawker DH-125 | TFE-731 |
|  | Rockwell Sabreliner | P&W JT 12A |
|  | Hansa Jet | GE CJ 610-6 |
|  | Mitsubishi MU-2 | TPE-331 series |
|  | King Air series | P&W PT6A series |
|  | Aero Commander | TPE-331 series |
|  | Cessna 400 series | Various |
| Pacific Aero | Convair 440 | P&W R 2800 |
|  | Falcon 20 | GE CF700-2D |
|  | Cessna 400 series | Continental series |
|  | Rockwell Commander | TPE-331-43BL |
| NASA | X-14B | GE J85-GE-5 |
|  | DHC-6 Twin Otter | P&W PT6A-27 |
|  | C-8A Buffalo | RR Spey MK 801 |
|  | Lockheed YO-3A | Continental IO-540 |
|  | Ryan XV-5B | GE J85-GE-5 |
|  | Northrop T-38 | GE J85-GE-5 |
|  | Lockheed C-141 | P&W TF33-P-7 |
|  | Convair CV-990 | GE CJ-805-23B |
|  | Convair CV-340 | P&W R 2800 CB16 |
|  | Lockheed U-2A | P&W J57-P-13 |
|  | Lockheed F104C | GE J79 GE-11A |
|  | N American OV-10A | Lycoming T-53-C-13 |
|  | Lear 23 & 24 | GE CJ-610-6 |

ROTOR WING AIRCRAFT

|  | Bell UH-1H | Lycoming LTS-101 |
|---|---|---|
|  | Hiller Hornet | Ram Jet |
|  | Hiller H-12E | VO-435 |
|  | Hughes 500B | Allison 250 |
|  | Bell 206 | Allison 250 |
|  | Enstrom 28 series | Lycoming |

- 14 -

AMF-61011

PROFESSIONAL AFFILIATIONS

Professional Aircraft Maintenance Association  1995

Papa Alpha 31T Owners Group  1992

College of San Mateo Industry Advisory Board  1987

Aircraft Owners and Pilot Association  1979

Aviation Maintenance Foundation Incorporated  1977

Oakland FSDO Aviation safety Counselor (assigned as remedial instructor for remedial training program)

NTSB Bar Association (Associate Member)

ARTICLES PUBLISHED: (The Jemar Company 2005 through present)

Articles:

PT6 Compressor Washes

FAA Service Difficulty Reports

Cheyenne aircraft aging issues

Non-routine Inspections

ADDITIONAL ACCOMPLISHMENTS

Special guest speaker at College of San Mateo Aviation maintenance department.

Special guest speaker at San Jose State University, Aviation maintenance department.

Special guest speaker Stanford University, Business department.

Keynote speaker Papa Alpha 31T operators group 1996.

Primary speaker, joint aircraft operators group 1997.

Technical consultant to Western Aerospace Museum, Oakland, California.

- 15 -

AMF-61012

Technical consultant to The Hiller Aviation Museum, San Carlos, California.

Special guest speaker FAA IA renewal seminar.  Topic:  Mechanic in the courtroom 2001, Pre-buy inspections 2002.

Designated as a remedial trainer / counselor for FAST Team Oakland FSDO.


ADDITIONAL SKILLS

Proficient in the use of Apple Macintosh and IBM PC computer systems.  Microsoft Word, XL and Windows.

Proficient in the use and analysis of Pratt and Whitney Trend Monitoring systems.

Proficient in the use of interrogation systems on Garrett TPE-331-14 integrated engine computers.

Proficient in the use and administration of CAMPS, CAMS, CESCOM and ATP navigator computer tracking systems.

AMF-61013

# EXHIBIT 24A

# EXHIBIT 24A

tcm

1   RICHARD G. HILL, ESQ.
2   State Bar No. 596
    CASEY D. BAKER, ESQ.
3   State Bar No. 9504
    RICHARD G. HILL, CHARTERED
4   652 Forest Street
    Reno, Nevada 89509
5   (775) 348-0888
    Attorneys for Defendant
6

7

8

9               UNITED STATES DISTRICT COURT

10             FOR THE DISTRICT OF NEVADA - RENO

11

12  John Carstarphen.                      )
                                           )   Case No.: 3:07-cv-00542-ECR-RAM
13              Plaintiffs,                 )
                                           )
14  v.                                     )
                                           )
15  Richard Milsner, an individual,        )
    DOES 1 through 10,                     )
16                                         )
                Defendants.                )
17  _____    )

18          **DECLARATION OF STEVE MAGGINETTI**

19

20          STEVE MAGGINNETTI, having been duly sworn, avers under penalty of

21  perjury, as follows:

22          1.      I am a resident of the State of California and over 18 years of age. This

23  declaration is based on my personal knowledge, except for those matters stated on

24  information and belief, and as to those items, I believe them to be true. This declaration is

25  made in support of the Motion for Summary Judgment by defendant Richard Milsner, and

26  represents my testimony if called upon to present same in Court.

27          2.      I have been retained as an expert by Richard Hill, counsel for defendant

28  Richard Milsner in this case.

LAW OFFICE
RICHARD  G.  HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

1      3.     Attached as Exhibit 1 is a true and correct copy of my December 7,

2   2009 report, which embodies my opinions in this case.

3            I declare under penalty of perjury that the foregoing is true and correct

4   to the best of my knowledge.

5            DATED: _7- 1- 2010_

6

7            _____

8            STEVEN MAGGINETTI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE
RICHARD G. HILL
Post Office Box 2551
Reno, Nevada 89505
(775) 348-0888
Fax(775) 348-0858

# EXHIBIT 25

# EXHIBIT 25

RENO, NV 89510
(702) 856-2003

1894
CHECK NO.

Nov 2, 1998
DATE

******$7,000.00
AMOUNT

Seven Thousand and 0/100 Dollars

RENO FLYING SERVICE, INC.

#2

TWO SIGNATURES REQUIRED IF OVER $2500.00

⑈001894⑈ ⑆121201063⑈:001019591⑈7⑈          ⑈0000700000⑈

---

AMERICAN MEDFLIGHT, INC.
P.O. BOX 7813
RENO, NV 89510
(702) 856-2003

PIONEER CITIZENS BANK OF NEVADA
MAIN BRANCH
RENO, NV 89501

91-106-1
1212

01858

1858
CHECK NO.

#1

Oct 21, 1998
DATE

******$7,000.00
AMOUNT

Seven Thousand and 0/100 Dollars

RENO FLYING SERVICE, INC.

TWO SIGNATURES REQUIRED IF OVER $2500.00

⑈001858⑈ ⑆121201063⑈:001019591⑈7⑈          ⑈0000700000⑈

---

AMERICAN MEDFLIGHT, INC.
P.O. BOX 7813
RENO, NV 89510
(775) 856-2003

PIONEER CITIZENS BANK OF NEVADA
MAIN BRANCH
RENO, NV 89501

91-106-1
1212

02021

#3

2021
CHECK NO.

Dec 4, 1998
DATE

******$8,222.90
AMOUNT

Eight Thousand Two Hundred Twenty-Two and 90/100 Dollars

RENO FLYING SERVICE, INC.

TWO SIGNATURES REQUIRED IF OVER $2500.00

#2

⑆1063⑈:001019591⑈7⑈          ⑈00008 22290⑈

Attachment

Reno Flying 0002.



## RENO FLYING SERVICE, INC.

November 30, 1998

AMERICAN MEDFLIGHT, INC.
P.O. Box 7813
Reno, NV 89510

Invoice Number: 113098

CONSULTING and SUPPORT for November 1998          $5,000.00

RFS 30620
AMF 7118.3

PAID
U 2021
12-4-98



# RENO FLYING SERVICE, INC.

November 30, 1998

AMERICAN MEDFLIGHT, INC.
P.O. Box 7813
Reno, NV 89510

---

Invoice Number: 113098

MANAGEMENT SERVICES for November 1998      $2,000.00

RFS 3290.0
AMF 4290.3

PAID
U2021
12-4-98

Reno Flying 0004.



**RENO FLYING SERVICE, INC.**

September 30, 1998

AMERICAN MEDFLIGHT, INC.
P.O. Box 7813
Reno, NV 89510

---

Invoice Number: 093098

CONSULTING and SUPPORT for September 1998          $5,000.00

RFS 3062.0
AMF 7118.3

Reno Flying  0005.



## RENO FLYING SERVICE, INC.

September 30, 1998

AMERICAN MEDFLIGHT, INC.
P.O. Box 7813
Reno, NV 89510

---

Invoice Number: 093098

MANAGEMENT SERVICES  for September 1998          $2,000.00

RFS  3290.0
AmF  4290.3

# EXHIBIT 26

# EXHIBIT 26

April 16, 2010

Mr. J. Scott Russo
King & Russo, Ltd.
1677 Lucerne Street, Suite B
Minden, Nevada 89423

        **Re:**    **John Carstarphen v. Richard Milsner**
                **Case No. 3:07-cv-00542-ECR-RAM**

Dear Mr. Russo,

## INTRODUCTION

This report is in response to our engagement by King & Russo, Ltd. on November 26, 2008 concerning the matter of John Carstarphen v. Richard Milsner, United States District Court For the District of Nevada-Reno, Case Number 3:07-cv-00542-ECR-RAM. Meridian Business Advisors (MBA) was engaged to provide forensic accounting services on behalf of Mr. John Carstarphen (Carstarphen or Client) regarding damages to him in the above-referenced matter. This report supplements our February 26, 2010 as a result of additional document production and the examination of Jack Dawson, President of American MedFlight, Inc.

Comments and observations are based on our professional experience as CPAs and forensic accountants and business valuators. They are not intended to represent legal conclusions or legal opinions.

### Description of Assignment and Scope of Work

In mid 2004, Mr. James Proctor, CPA, CFE, CVA, and his predecessor firm were engaged to assist in the Nevada State District Court companion case to the above-referenced matter. When Mr. Proctor joined MBA it was engaged to assist in the Federal and State cases.

A biographical outline of the preparers is are forth below and in the attached **Appendix A.** Fees for our services are billed at MBA's standard hourly rates in effect at the time services are rendered. Standard hourly fees for professional staff range from $185-$295 per hour, and administrative assistants at $50-$70 per hour. Testimony rates are $285-$395 per hour. MBA reserves the right to amend this analysis should additional information become available. Comments and observations are based on the undersigned's professional experience in litigation support and business valuations.

Carstarphen alleges that since his termination in 1999 from American MedFlight (AMF or Company) he has been damaged by Richard Milsner (Milsner) through his conduct of the financial affairs of AMF and the transactions between AMF and Reno Flying Service (RFS). Carstarphen is a stockholder of AMF but not RFS. Milsner is a stockholder of AMF and RFS. Specifically, Carstarphen alleges he has been damaged because:

Mr. J. Scott Russo
April 16, 2010
Page 2 of 27

1. AMF was required to pay RFS a consulting fee of $5,000 per month.
2. AMF was required to lease an aircraft from RFS instead of purchasing its own. AMF owns two aircraft, but occasionally must have a third aircraft for use. In those instances, AMF was required to lease that aircraft from RFS.
3. For its two aircraft that it owns, AMF was required to use RFS for repairs and maintenance instead of AMF employing its own maintenance personnel.
4. AMF and RFS entered into financial transactions that were not properly authorized by the Board of Directors or have otherwise benefited Milsner or his companies to the detriment of AMF and, hence Carstarphen.
5. Carstarphen's stock has decreased in value because AMF entered into an Employee Stock Ownership Plan (ESOP). That ESOP redeemed Milsner's stock with a cash down payment and a Promissory note.

Our calculations for the above damages in this Federal action were for the time period subsequent to 2004. For this report we were asked to rely upon the documents produced to date, and as recapped through your office.

**Limiting Conditions and Disclosures**

Meridian Business Advisors and its officers, directors or employees preparing this report have no present or contemplated financial interest in or with John Carstarphen, Richard Milsner, American Medflight, or Reno Flying Service. The fees for the work in this case are based upon MBA's normal hourly billing rates, and in no way are contingent upon the results of the findings.

Portions of this report and analysis are based on historical and/or prospective financial information provided to us by third parties as noted herein. This information has not been subjected to any audit or review procedures by us as defined by the American Institute of Certified Public Accountants (AICPA) during this engagement. The terms "audit," "examination," and "review" are described and defined in pronouncements promulgated by the AICPA. Accordingly, this report should not be construed, or referred to, as an audit, examination or review of the Company's financial information by Meridian Business Advisors. Accordingly, we take no responsibility for the underlying data presented or relied upon in this report, which is the representation of others. MBA and the persons working on this report are not attorneys and as such, do not purport to express any legal representation or opinions herein.

MBA and the experts signing this report reserve the right to amend this report in the event additional documents, pertinent information, and/or other material are discovered subsequent to the submission of this report.

This report has been prepared for the specific purpose of addressing damages to John Carstarphen. This engagement should not be referred to, used or relied upon outside of this specific purpose. Accordingly, this report is not to be distributed to or used by third parties other than those you deem necessary for this matter and the analysis for which this is intended.

Mr. J. Scott Russo
April 16, 2010
Page 3 of 27

## Qualifications

The professionals working on this matter are:

### James S. Proctor, CPA, CFE, CVA.

Mr. Proctor has over 25 years of business consulting and litigation related experience. He is the former managing partner of a long-time Reno, Nevada Certified Public Accounting firm where, in addition to business consulting, tax and financial statement related services, he performed many litigation support services. These services included forensic accounting investigations, divorce analysis, damage calculations, expert witness testimony, court appointed examiner, court appointed receiver, and business valuation assignments.

Mr. Proctor also served as a United States Bankruptcy Trustee where he administered bankruptcy cases under Chapter 11 and Chapter 7. He has operated businesses in financial distress as a trustee, searched for hidden assets, investigated fraudulent transfers, preferential transfers, and testified accordingly when called upon. He also has directed and conducted debtor examinations. In addition to his CPA certification, he is a Certified Fraud Examiner (CFE) and a Certified Valuation Analyst (CVA). A copy of Mr. Proctor's CV is enclosed (**Appendix A**).

### Heather M. Tryon, CPA/ABV, CVA, CFF

Ms. Tryon has 18 years of experience in the accounting profession including that as a CPA and director in a large, local public accounting firm, specializing in financial reporting and consulting, auditing, auditing retirement plans and ESOPs, internal control evaluation, business valuation, forensic accounting, and litigation support.

Her practice concentration is business valuations, SFAS No's. 141, 142, and 123R analyses, forensic accounting, litigation support, fraud and embezzlement investigations, divorce, shareholder disputes, buying or selling business interests, intellectual property transactions, identification of intangible asset impairment, stock option valuations, bankruptcy proceedings, and mergers and acquisitions. She has performed business valuation, litigation support, and forensic accounting work in many fields, including gaming, entertainment, food and beverage, retail, wholesale, distribution, manufacturing, medical practices, legal practices, engineering firms, construction, technology, aerospace, and early stage development companies. Ms. Tryon is a CPA, a Certified Valuation Analyst (CVA), a Accredited in Business Valuation (ABV) and is also certified by the American Institute of CPAs as Certified in Financial Forensics (CFF), which is related to forensic (investigative) accounting.

## Documents Considered

Documents considered, including those relied upon in the analysis and preparation of this report, are listed in **Appendix B**.

## Background

AMF operates a fixed wing air ambulance service primarily in the western pacific states. The Company provides for the medical transport for injured and critically ill patients, primarily from rural communities to larger more urban hospitals. The fleet of aircraft and staff are available 24 hours a day, 365 days a year. AMF owns two aircraft– Piper Cheyenne's. AMF shares its facilities with RFS.

Mr. J. Scott Russo
April 16, 2010
Page 4 of 27

RFS is located at the Reno Tahoe International Airport. RFS provides aircraft charter service, flight lessons, and maintenance including inspections, annual inspections, parts, and repairs. RFS provides its services to the general public.

Reno Flying Service, Inc. (RFS) was organized in 1991 and American MedFlight, Inc. (AMF) was organized in 1993, at which time they began conducting business between each respective company. During the initial years, according to Carstarphen he performed a number of tasks in managing AMF, including the billing. The performance of these tasks continued until 1999 when he was terminated.

Since 1993, Carstarphen has been the owner of a one third (33 1/3%) interest in AMF's issued stock, which is eight hundred (800) shares. Richard Milsner (Milsner) and John Dawson (Dawson), who formed AMF with Carstarphen in 1993, each also, owned one third (33 1/3%) interests in AMF's issued stock. Both Milsner and Dawson are believed to have been shareholders in RFS. Milsner was believed to be the controlling and majority shareholder of RFS, it has been alleged that Milsner sold his RFS stock to its ESOP in 2007. Dawson is the President of AMF and RFS.

In 1998, RFS/Milsner purchased Dawson's AMF stock, placing Milsner in control of 2/3 percent (66 2/3%) of AMF's issued and outstanding stock. In December 2005, Milsner sold the 1600 of AMF's stock he controlled to the AMF Employee Stock Option Plan (ESOP.) The ESOP paid RFS/Milsner a cash down payment and provided a Promissory note for the balance of the purchase price.

## ANALYSIS

### Reno Flying Service Consulting Fees

Beginning in 1998, consulting fees of $5,000 per month were paid by AMF to RFS. No evidence has been produced that this agreement was in writing or authorized by the Board of Directors while Carstarphen was a member. The total amount paid for the period 2005 through 2009 is **$175,000** as reflected in **EXHIBIT 1**.

| | | CARSTARPHEN v. MILSNER EXHIBIT 1 Summary of Consulting Fees 2005 through 2009 | | | | | |
|---|---|---|---|---|---|---|---|
| | G/L Acct. # | AMF019884, AMF019891 2005 | AMF030024, AMF030030 2006 | AMF029271 2007 | AMF029423 2008 | 2009 | Totals |
| Consulting & Support | 7118.3 | $ 55,000 | $ 60,000 | $ 60,000 | $ - | $- | $175,000 |
| | | $ 55,000 | $ 60,000 | $ 60,000 | $ - | $- | $175,000 |

Carstarphen asserts that in 1999 when he started questioning those monthly fees he was terminated. He did not concur with the payments, and as a stockholder or director he did not approve those payments.

Mr. J. Scott Russo
April 16, 2010
Page 5 of 27

## Aircraft Lease vs. Purchase

AMF owns two Piper Cheyenne aircraft. Because of FAA regulations, its aircraft must undergo inspections for every 100 hours of flight time, at which time the aircraft is not available for transport. Thus, it is necessary to have access to another aircraft. At least two aircraft is needed by AMF at all times. AMF has leased that additional aircraft from RFS instead of purchasing a third aircraft.

Had AMF purchased one additional aircraft instead of renting such from RFS it would have had an additional projected cash flow of approximately **$1,037,742 (Exhibit 2)** for the period 2005 through 2012. This is a calculation of additional cash flow available to the company and does not consider tax deductions, such as depreciation, that would reduce its taxable income and could increase the Company's cash flow. The calculation is for the period that such an aircraft would be financed. If the aircraft was not financed or upon pay off of the financed debt, the annual addition to AMF cash flow would be approximately $208,000.

| | | | | | | | | Cash Flow Improvement with |
|---|---|---|---|---|---|---|---|---|
| | Loan Payment | Engine Reserve | Insurance | Hanger Rent | Property Tax | Net Cash Flow | Lease Actual | Purchase |
| 2005 | 104,944 | 55,800 | 27,000 | 6,600 | 15,000 | (209,344) | (539,664) | 330,320 |
| 2006 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (529,361) | 310,476 |
| 2007 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (419,076) | 200,191 |
| 2008 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (150,410) | (68,475) |
| 2009 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (97,433) | (121,452) |
| 2010 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (312,797) | 93,912 |
| 2011 | 114,485 | 55,800 | 27,000 | 6,600 | 15,000 | (218,885) | (312,797) | 93,912 |
| 2012 | 9,540 | 55,800 | 27,000 | 6,600 | 15,000 | (113,940) | (312,797) | 198,857 |
| **Cash Flow Improvement 2005-2012** | | | | | | | | **$ 1,037,742** |
| 2013 | - | 55,800 | 27,000 | 6,600 | 15,000 | (104,400) | (312,797) | 208,397 |

Table title (above table):
CARSTARPHEN v. MILSNER
EXHIBIT 2
Analysis of Aircraft Lease vs. Purchase (Before Tax)

**ASSUMPTIONS:**
1. Aircraft Purchase Price-$675,000, no down payment.
2. Assumed aircraft purchase in 2005.
3. Engine reserve contribution would be $93/hr/aircraft. Aircraft usage at 50 hrs per month.
4. Seven year amortization/payoff estimated by US Bank.
5. Interest rates - 5% (average of rates provided by US Bank.)
6. Insurance at $27,000 annually per Jack Dawson.
7. Hanger rent estimated by Carstarphen at $550 per month.
8. Average of historical Property Tax.

Mr. J. Scott Russo
April 16, 2010
Page 6 of 27

## Aircraft Repairs and Maintenance

Carstarphen alleges that he has been damaged because AMF was required to pay RFS for repairs and maintenance instead of employing its own FAA certified maintenance personnel. Had AMF been allowed to hire two mechanics instead of paying RFS for repairs and maintenance it would have saved approximately $1.2 million for 2005 through 2009. This is calculated for the two years by reducing the repairs and maintenance paid to RFS by the 25% parts markup alleged by Carstarphen, and the salaries and benefits of two FAA licensed mechanics. The amount of savings assumes that AMF would pay market wages and provided for typical fringe benefits.

|  | | 2005 | | 2006 | | 2007 | | 2008 | | 2009 | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CARSTARPHEN v. MILSNER** | | | | | | | | | | | | |
| **EXHIBIT 3** | | | | | | | | | | | | |
| **Summary of Repairs and Maintenance (Parts & Labor)** | | | | | | | | | | | | |
| **2005 through 2009** | | | | | | | | | | | | |
| Repairs & Maintenance-Parts | $ | 157,388 | $ | 123,135 | $ | 163,799 | $ | 638,713 | $ | 344,310 | $ | 1,427,345 |
| Repairs & Maintenance-Labor | | 165,410 | | 157,677 | | 255,466 | | 552,464 | | 452,141 | | 1,583,158 |
| | $ | 322,798 | $ | 280,812 | $ | 419,265 | $ | 1,191,177 | $ | 796,451 | $ | 3,010,503 |

Source: General Ledger summaries provided by attorney. Includes only items from the cash disbursements and cash receipts journals.

Detailed invoices not available for most of 2009. Detail for unavailable 2009 invoices were taken from Bates #000601-000623.

## Unauthorized, Unsupported and Questionable Transactions

The AMF Corporate Bylaws provide that there shall be unanimous consent and approval when transactions take place between AMF and any companies owned by any of the shareholders. Carstarphen alleges that this requirement was not adhered to for the payment of the monthly consulting fees, the leasing of aircraft from RFS, the maintenance and repairs performed by RFS, and other transactions between the companies.

Based upon our analysis of the information provided to date, we have determined that the amount of other unauthorized, unsupported and questionable transactions paid by AMF to RFS for the years 2005-2009 is approximately **$199,429 (Exhibit 4)**. These amounts do not include the separately outlined amounts above for the RFS monthly consulting fee, aircraft leasing, and aircraft maintenance and repairs.

|  | | 2005 | | 2006 | | 2007 | | 2008 | | 2009 | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CARSTARPHEN v. MILSNER** | | | | | | | | | | | | |
| **EXHIBIT 4** | | | | | | | | | | | | |
| **Summary of Unauthorized, Unsupported & Questionable Transactions** | | | | | | | | | | | | |
| **2005 through 2008** | | | | | | | | | | | | |
| Milsner - Loan Guarantee Payment | $ | 94,063 | $ | 23,444 | $ | 1,702 | $ | - | $ | 10,000 | $ | 129,209 |
| Milsner - Unknown | | 15,000 | | - | | - | | 2,099 | | - | | 17,099 |
| Reno Flying Service | | 18,947 | | 21,677 | | 11,867 | | - | | - | | 52,491 |
| Unknown | | - | | - | | 580 | | 49 | | - | | 630 |
| | $ | 128,010 | $ | 45,121 | $ | 14,149 | $ | 2,148 | $ | 10,000 | $ | 199,429 |

Source: General Ledger summaries provided by attorney. Includes only items from the cash disbursements and cash receipts journals.

Mr. J. Scott Russo
April 16, 2010
Page 7 of 27

The corporation has paid legal fees on behalf of the Milsner and the ESOP. The amounts of legal fees paid from 2005 through 2009 are:

| | 2005 | 2006 | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|---|---|
| | | | CARSTARPHEN v. MILSNER | | | |
| | | | EXHIBIT 5 | | | |
| | | | Summary of Legal Fees | | | |
| | | | 2005 through 2009 | | | |
| Aero Solutions, Inc. - Le | $ - | $ - | $ - | $ - | $ 3,576 | $ 3,576 |
| Hale Lane | - | - | 23,496 | 5,130 | - | 28,626 |
| Holland and Hart | - | - | - | 604 | 86 | 690 |
| Michael Lehners | - | - | - | - | 613 | 613 |
| Parsons Behle | - | 12,300 | 7,009 | 1,968 | - | 21,277 |
| Pat Cashill | 67,312 | 86,719 | 74,517 | 52,010 | - | 280,558 |
| Richard Hill | - | - | 6,864 | - | 91,827 | 98,691 |
| Tod Ratfield | - | 100,000 | 180 | - | 4,278 | 104,458 |
| Reno Flying Service | - | - | - | - | 20,510 | 20,510 |
| Richard Milsner | - | 1,433 | 19,471 | 53,992 | 90,272 | 165,168 |
| Woodburn and Wedge | 3,534 | - | 138 | 3,447 | 5,138 | 12,257 |
| | $ 70,846 | $ 200,452 | $ 131,675 | $ 117,151 | $ 216,300 | $ 736,424 |

Source: General Ledger summaries provided by attorney for 2005-2008. Includes only items from the cash disbursements and cash receipts journals and Parson Behle items from purchase journal. 2009 General Ledger for "Legal" Bates #AMF61578-61579 for 2009.

## Employee Stock Ownership Plan (ESOP)

In December 2005 AMF instituted an Employee Stock Ownership Plan (ESOP). Concurrently, Milsner sold all 1600 shares of his stock to the ESOP for $3,696,000. He received a $362,644 cash down payment for those shares and holds a promissory note for the remaining $3,333,356.

The AMF ESOP is a highly leveraged ESOP. When Milsner's 1600 shares of AMF were purchased in December 2005, the total value of the shares of $3,696,000 was funded with a note in the amount of $3,333,356, making the ESOP 91% leveraged. In addition, the debt of the ESOP is required to be reported on the balance sheet of AMF. At December 31, 2005, after the formation of the ESOP and its stock purchase transaction, AMF's capital structure was essentially 100% debt and no equity, whereas one year earlier, it was approximately 15% debt and 85% equity. The debt on AMF's balance sheet is owed to the ESOP trust. Understandably, a leveraged ESOP may put a strain on a company's cash flows and this has been true for AMF. The ESOP obligation requires an annual payment by AMF of $371,686.

According to Robert F. Reilly, CPA/ABV, CMA, CFA, CBA, ASA, noted expert and author in the field of business valuation, in *Guide to ESOP Valuation:*

> Most ESOP lenders have guidelines for the minimum ratio of earnings before interest, taxes, depreciation, and amortization (EBITDA) relative to the annual amount of employer corporation debt service. Typically, the employer corporation should have a "cushion" in its operating cash flow amount after meeting all of its debt service obligations. A cash flow cushion of 20 percent to 50 percent over total annual debt service requirements is typical.[1]

---

[1] Robert F. Reilly and Robert P. Schweihs, *Guide to ESOP Valuation and Financial Advisory Services, Second Edition,* Willamette Management Associates, New York, 2007, p. 47.

Mr. J. Scott Russo
April 16, 2010
Page 8 of 27

An objective analysis of how AMF's financial condition would be affected immediately after the ESOP transaction should have alerted all parties that AMF could not meet this guideline. With actual financial information now available, one can analyze the effect the ESOP debt and cash flow strain has had on AMF and that a realistic, forward looking budget would have shown that AMF could not meet this cushion. An analysis of AMF's annual debt service obligation, including the ESOP obligation, and its EBITDA for 2005 through 2007 (required interest payments on its line of credit are excluded) is as follows:

| CARSTARPHEN v. MILSNER EXHIBIT 6 ESOP Leverage "Cushion" Analysis | | | | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | Total |
| Note payable principal and interest | $ 36,864 | $ 39,000 | $ 39,000 | $ 114,864 |
| Note payable principal and interest | 36,156 | 39,768 | 39,768 | 115,692 |
| ESOP obligation | 371,686 | 371,686 | 371,686 | 1,115,058 |
| Total annual debt service | 444,706 | 450,454 | 450,454 | 1,345,614 |
| EBITDA | $329,080 | $882,434 | $178,116 | $1,389,630 |
| EBITDA surplus | | | | $    44,016 |
| **EBITDA "cushion" percentage** | | | | **3%** |

Source: AMF Reviewd Financial Statements for the Years Ended December 31, 2005 - 20007.

It appears that the strain on AMF's cash flow is unsustainable.

According to Shannon P. Pratt, CFA, FASA, MCBA, MCBC, CM & AA, noted expert and author in the field of business valuation in *Valuing a Business*, in discussing post-transaction value in leveraged ESOPs:

> After the ESOP purchases employer securities, the company has a significant demand on cash flow for debt repayments. Unless the company receives substantial future cost or tax savings, the fair market value of the ESOP shares immediately after the transaction is reduced. The reduction in value is directly attributable to the reduction in cash flow available to the common equity as a result of the company's obligation to amortize the ESOP debt.[2]

The same cash flow strain has the effect of also reducing the value of Carstarphen's minority equity interest or common shares in AMF. Once the ESOP debt is repaid, the company's stock value returns to pre-leveraged levels, all other factors being relatively equal.

In the AMF Stockholder Meeting Minutes of February 10, 2009, it was noted that a letter of default was received from Milsner (dated October 31, 2008). "That happened because the ESOP could not make the payment on the promissory note."[3] Dawson explained that "the terms of the

---

[2] Shannon P. Pratt, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fifth Edition,* McGraw Hill, New York, 2008, p. 820.

[3] Mr. Dawson, Shareholder Meeting Minutes, 2/10/09.

Mr. J. Scott Russo
April 16, 2010
Page 9 of 27

pledge agreement and guarantee and security of American Medflight secures the promissory note ... and one of the remedies is that Mr. Milsner would [get] back 1/20 of the stock, which equals the [annual] amount of the promissory note that was not paid. The promissory note is for 20 years." The minutes reflect Milsner received 320 shares of the 1600 he originally sold to the ESOP, though this does not compute, thus we are unsure how many shares have been returned to Milsner. The minutes indicated that AMF would also not be able to make the 2008 payment.

If one follows the course of these events from 2005 to its logical conclusion, it likely will go something like this: Milsner, once having taken control of AMF, orchestrates the leveraged ESOP transaction and pays no capital gains tax on the sale of his stock; this depresses the value of the stock, including that of Carstarphen, and puts an unsustainable cash flow strain on AMF; AMF defaults on its annual payments; Milsner regains a controlling interest in AMF. The stock regains the value it lost when the original ESOP sale transaction occurred.

As previously discussed, immediately after the sale of stock to a leveraged ESOP, the value of the stock is reduced as a direct result of the reduction in the company's cash flow. Therefore, when comparing the ESOP valuations as of December 15, 2005 (*pre-transaction*) and December 31, 2005 (*post-transaction*) prepared by Mr. Weinress (Weinress or appraiser), one would expect to see a drop in value. However, we noted several changes in assumptions about the company and in the calculations not directly related to the new existence of the leveraged ESOP that would not be expected given the mere two week difference in the effective dates of the valuations. Notably, all of the said noted assumption changes have the effect of making the final *pre-transaction* value **higher** and the *post-transaction* value **lower**. The following table illustrates the comparison of those assumptions in the two valuation reports.

(Remainder of Page Intentionally Left Blank)

CARSTARPHEN v. MILSNER
EXHIBIT 7
Comparison of ESOP Appraisal Assumption
As of December 15, 2005 (Before ESOP) and December 31, 2005 (After ESOP)

### Weinress Valuation as of 12/15/2005

| | | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Fair market value of 100% controlling interest | | $5,544,000 | | | | |
| **1 Weighted average EBITDA** | | | | | | |
| Normalized EBITDA (000s) | | 271 | 319 | 1,210 | 754 | 1,117 |
| Weighting | | 0 | 0 | 1 | 2 | 2 |
| Weighted average EBITDA (000s) | | | | | | 990 |
| **2 Earnings discount rate - industry mid-range** | | 16.2% | | | | |

| **3 Capital Structure** | Debt | Equity |
|---|---|---|
| Ibbotson industry capital structure | 55% | 45% |
| Company capital structure | 16% | 84% |
| After-tax cost of debt estimated | | |

| **4 Projected cash flow** | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Revenue growth | 5.0% | 6.9% | 6.9% | 6.9% | 6.9% |
| Working capital requirement as % of sales | 25.8% | 25.8% | 25.8% | 25.8% | 25.8% |
| Earnings margin | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% |
| Capital spending (000s) | 16 | 18 | 19 | 20 | 22 |

### Weinress Valuation as of 12/31/2005

| | | 2001 | 2002 | 2003 | 2004 | 2005 | Page No. |
|---|---|---|---|---|---|---|---|
| Fair market value of 100% controlling interest | | $1,315,000 | | | | | 2 |
| **1 Weighted average EBITDA** | | | | | | | |
| Normalized EBITDA (000s) | | 271 | 319 | 1,210 | 754 | 902 | 16 |
| Weighting | | 1 | 2 | 3 | 4 | 5 | 18 |
| Weighted average EBITDA (000s) | | | | | | 804 | 18 |
| **2 Earnings discount rate - industry mid-range** | | 19.7% | | | | | 41 |

| **3 Capital Structure** | Debt | Equity | Page No. |
|---|---|---|---|
| Ibbotson industry capital structure | 55% | 45% | |
| Company capital structure | 100% | 0% | |
| After-tax cost of debt estimated | 6% | | 20 |

| **4 Projected cash flow** | 2006 | 2007 | 2008 | 2009 | 2010 | Page No. |
|---|---|---|---|---|---|---|
| Revenue growth | 5.0% | 5.3% | 5.3% | 5.3% | 5.3% | 24 |
| Working capital requirement as % of sales | 39.2% | 39.2% | 39.2% | 39.2% | 39.2% | 24 |
| Earnings margin | 20.8% | 20.8% | 20.8% | 20.8% | 20.8% | 24 |
| Capital spending (000s) | 200 | 200 | 200 | 200 | 200 | 24 |

Source: Weinress ESOP Valuation Reports as of December 15, 2005 and as of December 31, 2005.

Mr. J. Scott Russo
February 25, 2010
Page 11 of 27

The *pre-transaction* fair market value of the company is $5,544,000 and the *post-transaction* value is $1,315,000. Both values represent a non-marketable, controlling interest of 100% of the company's equity, i.e. no minority interest discount and inclusive of a marketability discount (of 10%).

Each of the four items in the table represents areas where the appraiser uses his judgment and empirical data to make assumptions that will affect the final value conclusion. Putting aside the issue of the ESOP transaction and that it has the effect of immediately causing a reduction in value, and which is elsewhere accounted for in Weinress' final values, each of the four assumptions change in the two week period and the valuation reports do not adequately explain the reason for the changes. Each of the four assumptions tends to make the *pre-transaction* value higher and the *post-transac*tion value lower.

1. Item number one relates to how the appraiser places weight on the historical EBITDA earnings stream. The earnings stream used is higher in later years. Therefore, putting more weight on later years, or zero weight on earlier years, will make the final value higher, which is what Weinress has done in the *pre-transaction* calculation. For no apparent reason, in the *post-transaction* calculation, Weinress places weight on the earlier, lower earnings years. If Weinress had used the same weighting assumption as was used in the *pre-transaction* calculation, the *post-transaction* value would be higher. The change in weighting makes the *post-transaction* value lower.

2. Item number two is Weinress' selection of a discount rate to apply to the earnings stream. The selected discount rate is a reflection of risk. If the discount rate is lower, this reflects lower risk and the value will be higher. If the discount rate is higher, this reflects higher risk and the value will be lower. Weinress explains in his reports that his selection of a discount rate is based on industry discount rates in the mid-range. The *pre-transaction* discount rate is 16.2% (higher value). The *post-transaction* discount rate is 19.7% (lower value). Are we to understand that in two weeks the industry changed dramatically enough to cause a 3.5% increase in risk?

3. Item number three addresses the capital structure of the industry and the company. The capital structure is the relative size of a company's or an industry's debt versus equity. The cost of equity is higher than the cost of debt. For example, the cost of equity may be between 20% to 25% and the cost of debt may be between 7% and 10% (this example is not meant to reflect any particular company or industry). The relative size of an industry's debt versus equity affects the discount rate used to apply to an earnings stream. For example, an industry with 80% equity and 20% debt will reflect a discount rate that results from weighting the cost of equity by 80% and the cost of debt by 20%. Compare this to an industry where the capital structure is 50% equity and 50% debt. The resulting discount rate to apply to an earnings stream will be lower, resulting in a higher value. Weinress does not discuss or address the industry's capital structure or how it may have affected his selection of a discount rate. If the industry's capital structure closely resembles the subject company's capital structure, an industry derived discount rate makes sense. According to Ibbotson's Cost of Capital statistics, the subject industry's capital structure is approximately 45% equity and 55% debt. AMF's post-transaction capital structure was essentially 100% debt and zero equity. Does it make sense to not adjust the discount rate for such a mismatch? Not taking this into account tends to make the post-transaction value of AMF lower.

Mr. J. Scott Russo
February 25, 2010
Page 12 of 27

4. Item number four addresses assumptions made by Weinress in determining projected earnings and cash flow, which is discounted to result in a value of the Company. Four assumptions are addressed: revenue growth, working capital requirements, earnings margin, and capital spending (expenditures on equipment). In a two week period between the *pre-transaction* valuation date and the *post-transaction* date, Weinress changed his opinion on AMF's expected growth rate from 6.9% to 5.3%. This tends to make the *pre-transaction* value higher and the *post-transaction* value lower. Similarly, the assumption for future working capital requirements is changed from 25.8% to 39.2%, resulting in higher value and lower value, respectively. Similarly, the earnings margin expectation is reduced from 22.1% to 20.8% - same result. Finally, the assumption on expected future equipment purchases changes from a range of $16,000 to $22,000 from 2001 through 2005, to $200,000 per year. Again, why is the assumption changed in a two week period with no explanation, which makes the *pre-transaction* value higher and the *post-transaction* value lower?

All of these assumption changes appear are not explained and call into question the independence and objectivity of Weinress. Weinress' assumptions and the changes in his assumptions make the *pre-transaction* value higher and the *post-transaction* value lower.

The following illustrates *estimated values* and the significant change in Carstarphen's 33.33% equity ownership interest before and after the existence of the leveraged ESOP. MBA did not perform its own appraisal. The estimates shown below are based on the values determined by Weinress with adjustments made to reflect the estimates of fair value, or value to the holder. Had MBA performed a complete appraisal, the estimated values could be different and those differences could be material.

(Remainder of Page Intentionally Left Blank)

Mr. J. Scott Russo
February 25, 2010
Page 13 of 27

---

**CARSTARPHEN v. MILSNER**
**EXHIBIT 8**
Estimated Fair Values of Mr. Carstarphen's 33 1/3% Minority Equity Interest
As of December 15, 2005 (Before ESOP) and December 31, 2005 (After ESOP)

|  |  | 12/15/2005 | 12/31/2005 |
|---|---|---|---|
| Fair market value of 100% controlling interest[1] |  | $ 5,544,000 | $ 1,315,000 |
| Add back marketability discount[2] |  | 616,000 | 146,000 |
| Fair value of 100% controlling interest[3] |  | 6,160,000 | 1,461,000 |
| Multiply by ownership interest[4] | 33.33% | 2,053,128 | 486,951 |
| Apply minority interest discount[5] | 15% | (307,969) | (73,043) |
| **Estimated fair value of 33.33% minority equity interest[6]** |  | **$1,745,159** | **$ 413,908** |
| **Difference** |  | **$1,331,251** |  |

Notes:

1  Fair market value of 100% controlling interest from Weinress reports, page 2.

2  10% marketability discount determined by Mr. Weinress, 12/15/05 page 43, 12/31/05 page 44.

3  Fair value eliminates the assumption that there is a hypothetical buyer and hypothetically seller, thereby reflecting the value to the holder of the ownership equity interest. Fair value is the appropriate standard of value in shareholder disputes in Nevada.

4  Mr. Carstarphen's ownership interest is 33.33%.

5  It has been MBA's experience and is also reflected in empirical data that minority interests generally range from 5% to 20%. 15% is selected as a discount frequently determined when valuing a 1/3 interest. However, performance of a complete appraisal under applicable appraisal standards may result in a minority interest discount at a different level, and that difference could be material.

6  The estimated fair value of the 33.33% minority equity interest reflects the value of the interest to the holder, Mr. Carstarphen. This is a broadstroke estimate with its foundation on the appraisal conclusions of Mr. Weinress. Had MBA performed a complete appraisal under applicable appraisal standards, the estimate of value may be different, and that difference may be material.

---

Had AMF or Milsner purchased or redeemed Carstarphen's stock in December 2005 using the proper valuation standards as outlined above the amount due Carstarphen would have been $1,745,159.

There also has been an unexplained payment to Milsner on December 30, 2005 for $234,629. The CPA prepared financial statements record this as a dividend, but the check copy describes this as an additional principal payment.

## Omega Valuations April 8, 2010 Letter

On April 13, 2010 the "Defendant's Third Supplemental Disclosure of Expert Witness and First Disclosure of Rebuttal Expert Witnesses Pursuant to FRCP 26(a)(2) Et Seq." was delivered; included in that Disclosure was a letter dated April 8, 2010 from Mr. Keith Zachow of Omega Valuations, Inc., addressed to attorney Richard Hill.

Mr. J. Scott Russo
February 25, 2010
Page 14 of 27

Mr. Zachow's letter demonstrates that two knowledgeable, experienced, qualified, credentialed ESOP valuation experts may have differences of opinion. His letter should be read with caution, as it misstates the assertions made by us in our February 25, 2010 letter related to the ESOP valuations dated December 15, 2005 and December 31, 2005, prepared by Mr. Weinress. He also includes frequent assertions that we have a lack of understanding of leveraged ESOP valuation methodology in general and, in particular, that used by Mr. Weinress, which is incorrect. There is nothing in Mr. Zachow's letter that has caused us to reconsider our comments on the ESOP valuations.

## Conclusion

Given the above assumptions MBA estimates the damages to the Company to be

### $5,197,469

The estimated damages to Carstarphen based upon his one-third ownership is

### $1,732,490

**CARSTARPHEN v. MILSNER**
**EXHIBIT 9**
**Summary of Damages Including Accrued Interest**

|  | Pre-Mitigation Loss | Less: Mitigation | Loss | Add: Accrued Interest | Total Loss Including Interest |
|---|---|---|---|---|---|
| Reno Flying Service Consulting Fees (EXHIBIT 1) | $ 175,000 | $ - | $ 175,000 | $ 21,118 | $ 196,118 |
| Aircraft Lease vs. Purchase (EXHIBIT 2) | 1,037,742 | - | 1,037,742 | 108,996 | 1,146,738 |
| Aircraft Repairs and Maintenance-Labor (1) (EXHIBIT 3) | 1,583,158 | 628,575 | 954,583 | 32,544 | 987,127 |
| Aircraft Repairs and Maintenance-Parts (2) (EXHIBIT 3) | 1,427,345 | 1,141,876 | 285,469 | 14,314 | 299,783 |
| Unauthorized and Questionable Transactions (EXHIBIT 4) | 199,429 | - | 199,429 | 28,291 | 227,720 |
| Legal Fees (EXHIBIT 5) | 736,424 | - | 736,424 | 49,095 | 785,519 |
| Employee Stock Ownership Plan (ESOP) (EXHIBIT 8) | 1,331,251 | - | 1,331,251 | 223,213 | 1,554,464 |
|  | $ 6,490,349 | $1,770,451 | $4,719,898 | $ 477,571 | $5,197,469 |

(1) Mitigation is based on the salary and benefit for two aircraft mechanics per year of $125,715.
(2) Mitigation is based on 25% markup charged by RFS. If AMF purchased parts itself, they would only pay 75% of what RFS is charging them, or ($290,728 x 75% = $218,046).

Our analysis of the records did not include a review of the AMF time and billing records, patient records, patient charts, or trip sheets. Additionally, as Mr. Carstarphen's remuneration was limited, the amount of damages does not include any damages for lost wages.

Our analysis did not consider whether the transactions between AMF and Aero Solutions are reasonable, nor did we analyze the ownership of Aero Solutions.

Our fees to date approximate $68,000.

We reserve the right to amend and supplement this report if additional and more complete information becomes available, which would more fully report the financial transactions and position, and could change the conclusions and information in this report. We therefore reserve the right to change our report and testimony.

Mr. J. Scott Russo
February 25, 2010
Page 15 of 27

Respectively Submitted,

**MERIDIAN BUSINESS ADVISORS**

James S. Proctor, CPA, CFE, CVA
Senior Director

Heather M. Tryon, CPA/ABV, CVA, CFF
Director

Appendix A

Mr. J. Scott Russo
February 25, 2010
Page 17 of 27

## JAMES S. PROCTOR, CPA, CFE, CVA
### DIRECTOR-FORENSIC ACCOUNTING
### MERIDIAN BUSINESS ADVISORS

## EDUCATION & CERTIFICATIONS

BS, University of Nevada, Reno
**CPA**, Certified Public Accountant in Nevada
**CFE**, Certified Fraud Examiner
**CVA**, Certified Valuation Analyst

## EXPERIENCE

Mr. Proctor has over 25 years of business consulting and litigation related experience. He is the former managing partner of a long-time Reno, Nevada Certified Public Accounting firm where, in addition to business consulting, tax and financial statement related services, he performed many litigation support services. These services included forensic accounting investigations, divorce analysis, expert witness testimony, court appointed examiner, court appointed receiver, and business valuation assignments. Mr. Proctor also served as a United States Bankruptcy Trustee where he administered bankruptcy cases under Chapter 11 and Chapter 7. He has operated businesses in financial distress as a trustee, searched for hidden assets, investigated fraudulent transfers, preferential transfers, and testified accordingly when called upon. He also has directed and conducted debtor examinations. Jim has worked in the gaming industry and has in depth knowledge of gaming operations. Early in his career he worked with the international accounting firm of Grant Thornton. Jim has also been active in the Nevada Society of CPAs, has served as the Chairman of the Professional Ethics Committee, and has received the Outstanding Community Service Award.

In addition to his **CPA** certification, he is a Certified Fraud Examiner **(CFE)**, and a Certified Valuation Analyst **(CVA)**.

## PROFESSIONAL ASSOCIATIONS

American Institute of Certified Public Accountants
Nevada Society of Certified Public Accountants
Association of Certified Fraud Examiners, lifetime member
National Association of Certified Valuation Analysts
Association of Insolvency Accountants

## OTHER ASSOCIATIONS

Vets with a Mission
Chamber of Commerce, Leadership Reno
Washoe Legal Services

Mr. J. Scott Russo
February 25, 2010
Page 18 of 27

## HEATHER M. TRYON, CPA/ABV, CVA, CFF
## DIRECTOR
## MERIDIAN BUSINESS ADVISORS

### EDUCATION & CERTIFICATIONS

**BS**, University of Nevada, Reno
**CPA**, Certified Public Accountant, Nevada
**ABV**, Accredited in Business Valuation, AICPA
**CVA**, Certified Valuation Analyst, National Association of Certified Valuation Analysts
**CFF**, Certified in Financial Forensics, AICPA

### EXPERIENCE

Ms. Tryon's 18 years of experience in the accounting profession includes that as a CPA and director in a large, local public accounting firm, specializing in financial reporting and consulting, auditing, and internal control evaluation. While in public accounting, she added business valuation, forensic accounting, and litigation support to her existing specialties. She specializes and works exclusively in business valuations, SFAS Nos. 141, 142, and 123R analyses, forensic accounting, litigation support and court testimony for purposes including business and financial consulting, fraud and embezzlement investigations, divorce, shareholder disputes, estate and gift tax and compliance, succession and family limited partnership planning, intellectual property transactions, identification of intangible asset impairment, stock option valuations, bankruptcy proceedings, and mergers and acquisitions. In addition to her **CPA** designation, she earned the Certified Valuation Analyst (**CVA**) designation in 1998, and the Accredited in Business Valuation (**ABV**) credential in 2007. Ms. Tryon is also certified by the American Institute of CPAs as Certified in Financial Forensics (**CFF**), which is related to forensic (investigative) accounting.

### PROFESSIONAL ASSOCIATIONS

Member, American Institute of Certified Public Accountants (AICPA)
Member, Nevada Society of Certified Public Accountants (NSCPA)
Member, National Association of Certified Valuation Analysts (NACVA)
Member, Institute of Business Appraisers (IBA)
Member, Past President, Institute of Management Accountants (IMA), Reno Chapter
Member, Washoe County Bar Association
Member, Western Industrial Nevada (WIN)

### PUBLICATIONS

"Improve Buy-Sell Agreements – Help Your Clients and the Valuation Professional," *The Writ, Official Publication of the Washoe County Bar Association,* June 2009, and *The Silver State CPA, the Magazine of the Nevada Society of Certified Public Accountants,* May 2009.

**Appendix B**

Mr. J. Scott Russo
February 25, 2010.
Page 20 of 27

## DOCUMENTS CONSIDERED

1. First Amended Complaint for Breach of Fiduciary Duties and Self Dealing, dated January 28, 2008 filed in the United States District Court for The District of Nevada – Reno. Case Number: 3:07-cv-00542-ECR-RAM.

2. The Court's Order dated January 23, 2009.

3. The defendant's Answer, Affirmative Defenses, Counterclaim and Third Party Complaint (Jury Demand), dated February 6, 2009.

4. Plaintiff John Carstarphen's Supplemental Response to Interrogatories, dated August 14, 2009.

5. The defendant's Report of Compliance and Motion for Relief From Order, dated January 20, 2010.

6. The Defendant's Third Supplemental Disclosure of Expert Witness and First Disclosure of Rebuttal Expert Witnesses Pursuant to FRCP 26(a)(2) et seq. dated April 9, 2010.

7. American MedFlight website.

8. Reno Flying Service website.

9. US Department of Labor website.

10. US Bureau of Labor Statistics website.

11. Salary.com website.

12. State of Nevada DETR website, Nevada Occupational Employment and Wages.

13. American MedFlight ESOP plan documents.

14. American MedFlight federal corporate income tax returns, Forms 1120 and 1120S, 1995-2008.

15. Reno Flying Service federal corporate income tax returns, Forms 1120S, 1995-1997, 2004-2008.

16. American MedFlight financial statements 1995-2008.

17. Reno Flying Service financial statements 1995-1997.

18. American MedFlight accounts payable records, 2005-2008.

19. American MedFlight payroll records, including payroll tax reports, 2005-2008.

Mr. J. Scott Russo
February 25, 2010
Page 21 of 27

20. American MedFlight general ledgers, 2005-2009, including working trial balances and adjusting journal entries.

21. American MedFlight CPA prepared financial statements, 2005-2008, including working trial balances, adjusting journal entries, and accountant workpapers.

22. July 14, 1999 Corporate Investment International of Nevada letter to Rich Milsner from Greg Roberti, faxed July 14, 1999.

23. E-mail correspondence dated August 16, 2002 from Tim Williamson to Kelly Klute.

24. Deposition of John Carstarphen dated July 10, 2007.

25. Deposition of John Carstarphen dated April 13, 2004.

26. Deposition of John Dawson dated March 28, 2006.

27. Deposition of Richard Milsner dated March 16, 2005.

28. Examination of Jack Dawson dated April 7, 2010.

29. AMF copies of billings from RFS, 2005-2008.

30. AMF ESOP Valuation Reports 2005 – 2008.

31. "Determining Economic Damages." Gerald D. Martin, Ph.D., James Publishing Inc., revised 2009.

32. Ibbotson Associates, Cost of Capital Yearbook, Statistics for SIC Code 4522, Air Transportation, Nonscheduled.

33. Molezzo Reporters, American MedFlight, Inc. Annual Stockholders Meeting minutes, dated Tuesday, February 10, 2009.

34. Letter Correspondence from Richard L. Milsner to American Medflight, Inc. dated October 31, 2008; of "Formal Notice of Default" on the December 31, 2007 ESOP note payment.

35. US Courts website, post judgment interest rates.

**Appendix C**

Mr. J. Scott Russo
February 25, 2010
Page 23 of 27

### JAMES S. PROCTOR, CPA, CFE, CVA
### SUMMARY OF TRIAL TESTIMONY AND DEPOSTIONS
### 1991-2010

1991
Indio Properties & Fred Parr Cox
Re: Forensic and Fraud
US Bankruptcy Court – District of Nevada
Trial Testimony

1991
Pike v. Pike
Re: Divorce
Second Judicial District Court
Trial Testimony and Deposition

1992
Trimmer Ltd v. Dooley
Re: Litigation
Second Judicial District Court
Trial Testimony and Deposition

1992
Skender v. Skender
Re: Divorce
Second Judicial District Court
Deposition

1992
Loftin Associates
US Bankruptcy Court – District of Nevada
Testimony regarding Forensic Analysis

1992
Sierra Woods Group
US Bankruptcy Court – District of Nevada
Testimony regarding Forensic Analysis

1993
Dan Minedew
Re: Forensic and Fraud
US Bankruptcy Court – District of Nevada
Trial Testimony and Deposition

Mr. J. Scott Russo
February 25, 2010
Page 24 of 27

1993
ET Herman
US Bankruptcy Court – District of Nevada
Testimony regarding Forensic Analysis

1993-94
Ruby Dome
Re: Forensic and Fraud
US Bankruptcy Court – District of Nevada
Trial Testimony

1994
Trelease v. Hardesty
Re: Litigation/Economic Damages
Second Judicial District Court
Trial Testimony and Deposition

1994-95
Gerland v. Tahoe Douglas Fire
Re: Economic Damages
US District Court - Nevada
Trial Testimony

1995
Quinton, Ekins & Motherlode v. Bass & Hart Law
Re: Litigation
California Superior Court – Sacramento
Deposition

1995
Avatar Int'l Merchant Bancorp
US Bankruptcy Court – District of Nevada
Testimony regarding Forensic Analysis

1996
Paschall v. Fidelity National Title
Re: Litigation – Economic Damages
Second Judicial District Court
Trial Testimony

1997
Selective Industrial v. Levy
Re: Receivership
Second Judicial District Court
Trial Testimony and Deposition

Mr. J. Scott Russo
February 25, 2010
Page 25 of 27


1997
Henson, Joel & Sandy
Re:  Forensic & Fraud
US Bankruptcy Court – District of Nevada
Trial Testimony


1998
Taormina v. Bussey
Re:  Litigation – Economic Damages
Second Judicial District Court
Trial Testimony


1999
Fletcher v. Woodburn Wedge & Oskam
Re:  Litigation
US District Court - Nevada
Deposition


1999
Sierra Rehab Services v. Majerus
Re:  Litigation
US Bankruptcy Court – California Eastern District
Trial Testimony


1999
Richards v. Herz
Re:  Economic Damages
Ninth Judicial District Court
Trial Testimony and Deposition


1999
Hart v. Dory
Re:  Litigation
Second Judicial District Court
Deposition


2000
Lewis v. Proflame, Inc.
Re:  Economic Damages
Second Judicial District Court
Trial Testimony and Deposition

Mr. J. Scott Russo
February 25, 2010
Page 26 of 27

2001
Byrnes v. LAS-Cal
Re: Litigation
Second Judicial District Court
Trial Testimony and Deposition

2003
Altman Constr. v. USA Media
Re: Litigation
Second Judicial District Court
Trial Testimony and Deposition

2003
Allred v. Bullis
Re: Litigation
Ninth Judicial District Court
Trial Testimony and Deposition

2004
Public Restroom v. McKnight, Kaufman
Re: Litigation
Second Judicial District Court
Trial Testimony

2005
Carstarphen v. Am Medflight, RFS
Re: Litigation
Second Judicial District Court
Deposition

2008
Helping Angels v. First Health/St. NV
Re: Forensics & Fraud
State of Nevada Administrative Hearing
Trial Testimony

2008
Cantlon v. Santor
Re: Economic Damages
Second Judicial District Court
Deposition

Mr. J. Scott Russo
February 25, 2010
Page 27 of 27

2008
Carstarphen v. Milsner
Re: Litigation
US District Court - Nevada

2008
American Home Companion
Re: Forensics & Fraud
State of Nevada Administrative Hearing
Trial Testimony

2009
Wilson v. Wilson
Re: Divorce
Fourth Judicial District Court
Trial Testimony

2009
Hall v Grant Robinson Construction, K-2 Engineering, et al
Re: Economic Damages
Second Judicial District Court
Deposition

2009
Buck v. Buck
Re: Litigation
Second Judicial District Court
Deposition

## PUBLICATIONS

"Save on Expert Witnesses" The Writ, Washoe County Bar Association, January 2010